# Exhibit 3

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

NICOLAS GOUREAU and STEPHANIE
MENKIN, individually and derivatively on
behalf of ML FASHION, LLC, a Delaware
limited liability company,

                    C.A. No. 2020-0486

        Plaintiffs,

    v.

MARCUS LEMONIS, an individual, ML
RETAIL, LLC, a Delaware limited
liability company, MARCUS LEMONIS,
LLC, a Delaware limited liability
company, ROBERTA RAFFEL aka
Bobbi Lemonis, an individual, and MLG
RETAIL, LLC, a Delaware limited
liability company,

        Defendants,

   and

ML FASHION, LLC, a Delaware limited
liability company,

        Nominal Defendant.

**VERIFIED FIRST AMENDED COMPLAINT**

Nicolas Goureau ("Goureau") and Stephanie Menkin ("Menkin"),

(collectively "Plaintiffs"), by and through their undersigned counsel, individually

and derivatively on behalf of ML Fashion, LLC ("ML Fashion" or the "Company"),

bring this Verified First Amended Complaint against Marcus Lemonis ("Lemonis"),

ML Retail, LLC ("ML Retail"), Marcus Lemonis, LLC ("ML, LLC"), Roberta Raffel aka Bobbi Lemonis ("Raffel"), and MLG Retail, LLC ("MLG Retail") (collectively "Defendants"), and allege as follows:

## INTRODUCTION

1.     This limited liability derivative action arises from the bad faith actions by, and breaches of the fiduciary duties of, Marcus Lemonis, the Manager, Chairman/CEO, and, via his entity ML Retail, LLC, the most powerful owner of Delaware limited liability company, ML Fashion, LLC.  Defendants Lemonis, ML Retail, and ML, LLC have knowingly and purposefully mismanaged the Company and used it solely for their own personal gain.  Defendants are siphoning money from the Company, actively preventing it from meeting its obligations, and looting its assets.

2.     Defendant Marcus Lemonis is a wolf in sheep's clothing.  Through his television show, "The Profit," he presents himself as a savior to struggling small business owners, all the while preying on the business he purports to be saving. Lemonis strategically and deliberately drowns these businesses in debt to him and his entities in order to foreclose on them and take their assets and intellectual property to expand his own empire.

3.     Plaintiffs Goureau and Menkin's family-owned high-end women's clothing store, Courage.B, was featured on a 2014 episode of "The Profit."

Courage.B began in 2008 as a business owned and operated by Neomi Goureau and her children, Plaintiffs Goureau and Menkin, through their entity Gooberry Corporation ("Gooberry") which owned the Courage.B brand and stores.

4.     Over the next six years, Plaintiffs' family business, Courage.B, became very successful.  In 2014, Courage.B had seven different retail stores around the country, including locations in Greenwich, CT, Palm Beach, FL, Bethesda, MD, Aspen, CO, New York, NY, Southampton, NY, and Fairfax, VA, and was valued at over $2.6M based on Lemonis' own investment.

5.     In their episode of "The Profit," Lemonis agreed to invest in Courage.B by acquiring a 30% interest in Gooberry for $800,000.  That $800,000 investment was supposed to be broken down as follows: $300,000 new inventory, $40,000 to eliminate high interest debt, $150,000 in working capital, $200,000 to renovate the stores, $50,000 to create a new e-commerce site and an extra $60,000 the use of which was to be determined.

6.     However, while the show was filming, and before the deal was finalized, Lemonis spent millions of dollars to renovate the Company's stores. Lemonis represented to Plaintiffs that he was taking care of the renovations, that Plaintiffs did not have to worry about the costs involved, and that they should "trust the process."  Plaintiffs had no idea that Lemonis was vastly exceeding the $200,000 renovations budget.

7.     When Plaintiffs received the exorbitant bills for the renovations and questioned the costs being incurred on Gooberry's behalf, Lemonis said if they no longer wanted to do the deal, they would have to pay him back the millions he spent on Gooberry—a demand that was impossible for Plaintiffs to meet.

8.     Thus, the parties moved forward.  On November 18, 2014, the deal reached on the show was memorialized, and Lemonis purchased his stake in Gooberry through Defendant ML Retail, LLC.

9.     Eventually, Lemonis needed more control over the women's fashion business he entered into with Plaintiffs.  By March 2016, Lemonis had destroyed Gooberry's profit margins and saddled it with debt owed to himself and his entities that neither Gooberry nor the Plaintiffs could ever repay.  Lemonis represented to Plaintiffs that the only way they could make money from their business venture now was to join him in investing in other businesses.

10.     Thus, Lemonis convinced Goureau and Menkin to start a new entity with him, ML Fashion.  Lemonis represented to Plaintiffs that ML Fashion would be the umbrella entity through which the parties invest in various retail clothing and fashion businesses, brands, and stores.

11.     As detailed below, Lemonis was sure to give himself unbridled control over ML Fashion as its Manager, Chairman/CEO, and owner of ML Retail, LLC, the most powerful member of the Company.  Lemonis discouraged Plaintiffs from

having independent attorneys review the documentation by having attorneys that were supposedly representing the Company draft the documents. These attorneys however, represented Lemonis in a variety of other business and personal matters.

12.     Lemonis used his unchecked control over ML Fashion for his personal gain to the detriment of the Company and Plaintiffs. Time and time again, Lemonis forced ML Fashion to take on unnecessary debts in order to force the Company to obtain loans from another entity controlled by Lemonis, often ML, LLC, to meet its obligations, such as payroll and rent. Whenever Plaintiffs questioned his decisions, Lemonis would respond with threats to either foreclose on the Company, fire their mother Neomi, or fire Plaintiffs themselves. The Company was now Plaintiffs' livelihood, and they had no choice but to fall in line.

13.     In 2016, Lemonis met Defendant Raffel at a trade show in New York City. Raffel wanted Lemonis to invest in her business, Runway Boutique ("Runway"), which operated a store in Deerfield, Illinois. Lemonis was smitten with Raffel and forced Gooberry to purchase her business, renovate her store, and buy new product for the store. With their romance in full swing, Lemonis and Raffel then decided to use ML Fashion, and its infrastructure built by Plaintiffs, to grow their personal fashion brand and retail concept, MARCUS, instead of Plaintiffs' brand, Courage.B.

14. Recently however, Lemonis has taken his misconduct, mismanagement, and misuse of power of ML Fashion to the next level. Lemonis is actively removing money from the Company's bank accounts so that its debts—which debit automatically from its bank accounts—cannot be paid.

15. Even worse, Lemonis is actively using the global pandemic to continue to loot ML Fashion. Lemonis has been unilaterally closing its retail stores and moving the Company's inventory, furniture, fixtures, and equipment to other entities and/or businesses owned or controlled by Lemonis.

16. Without the Court's intervention, the Company will be irreparably harmed. Through this Complaint, Plaintiffs seek redress for Defendants' fraud and mismanagement of the Company, the appointment of a receiver to prevent Defendants from further harming the Company, the judicial dissolution of the Company, and to hold Defendants accountable for breaching their fiduciary duties, the Company's LLC Agreement (defined and described below), wasting the Company's corporate assets, and operating the Company as a self-enrichment vehicle for themselves to harm the Company and Plaintiffs.

## **PARTIES**

17. Plaintiff Goureau is an individual residing in Florida and is one of the co-founders of ML Fashion. Goureau is an entrepreneur and clothing and retail executive. Goureau is a signatory to the Limited Liability Company Agreement

(defined and described below) and owns a 33.33% membership interest in the Company.

18. Plaintiff Menkin is an individual residing in New York and is one of the co-founders and the President of ML Fashion. Menkin is an entrepreneur and clothing and retail executive. Menkin is a signatory to the Limited Liability Company Agreement (defined and described below) and owns a 33.33% membership interest in the Company.

19. Nominal Defendant ML Fashion is a privately held Delaware limited liability company. ML Fashion has its principal place of business in New York, New York and owns and operates a number of fashion brands and retail stores across the country.

20. Defendant Marcus Lemonis is an individual residing in Illinois and the Manager and Chairman/CEO of ML Fashion. Lemonis is an investor and television personality of CNBC's reality show, "The Profit." Lemonis owns a 33.34% membership interest in the Company through his entity ML Retail, LLC. Lemonis signed the Limited Liability Company Agreement on behalf of ML Retail, LLC. He is also chairman and CEO of Camping World, Good Sam Enterprises, Gander Outdoors, and The House Boardshop.

21. Defendant ML Retail, LLC is a Delaware limited liability company with its principal place of business in Illinois. Defendant Lemonis is the sole

member of ML Retail and has complete control over ML Retail. ML Retail is the alter ego or agent of Lemonis, and ML, LLC and operates as Lemonis' personal holding company.

22.     Defendant Marcus Lemonis, LLC is a Delaware limited liability company with its principal place of business in Illinois. The sole member of ML, LLC is Marcus Lemonis Enterprises, LLC, whose sole member is the Marcus Lemonis Revocable Trust, whose trustee is Marcus Lemonis. ML, LLC is the alter ego or agent of Lemonis, and ML Retail and operates as Lemonis' personal holding company.

23.     Defendant Roberta Raffel aka Bobbi Lemonis is an individual residing in Illinois.

24.     Defendant MLG Retail, LLC is a Delaware limited liability company. MLG Retail has its principal place of business in New York, New York. MLG Retail's sole member is ML Fashion.

25.     At all times relevant to this action, Defendant Marcus Lemonis had exclusive and complete dominion and control over ML Retail, LLC and Marcus Lemonis LLC, such that these entities were his alter egos and the acts of ML Retail and ML, LLC as set forth in this Complaint are also the acts of Defendant Marcus Lemonis.

26.     There is such a unity of interest and ownership between Defendant Marcus Lemonis on one hand and ML Retail and ML, LLC on the other hand, that the individuality of ML Retail and ML, LLC or their separateness from Defendant Marcus Lemonis have ceased because, upon information and belief:

    a.     ML Retail and ML, LLC are completely influenced and governed by Defendant Marcus Lemonis, the sole natural person involved in each entity;

    b.     Defendant Marcus Lemonis completely controls ML Retail and ML, LLC;

    c.     Defendants Lemonis, ML Retail, and ML, LLC share the same address as their principal place of business;

    d.     ML Retail and ML, LLC were at all times material to this matter, instrumentalities used for the benefit of Defendant Marcus Lemonis;

    e.     ML Retail and ML, LLC are, and at all times herein mentioned were, kept under-capitalized by Defendant Marcus Lemonis, in relation to the reasonable needs of its business;

    f.     The corporate forms of ML Retail and ML, LLC are a mere façade for the operation of Defendant Lemonis;

    g.     The corporate form, entity, and structure of ML Retail and ML, LLC were at all times disregarded by Defendant Marcus Lemonis;

h.    The assets of ML Retail and ML, LLC were or are intermingled with the assets of Defendant Marcus Lemonis, or transferred without consideration, to Defendant Marcus Lemonis in disregard of the purported separate corporate form, entity and structure of ML Retail and ML, LLC, so as to make it impossible to separate from individual liabilities;

i.    The business and corporate affairs of ML Retail and ML, LLC are intermingled with those of Defendant Marcus Lemonis;

j.    ML Retail and ML, LLC have failed to abide by corporate formalities; and

k.    Defendant Lemonis uses his control over ML Retail, ML, LLC and their assets to further his own personal interest.

27.    Upon information and belief, Defendants ML Retail and ML, LLC were never intended to have, and have never had, any true existence as a corporation. Indeed ML Retail and ML, LLC are and were organized and designed to act as a device by which Defendant Marcus Lemonis could evade his obligation, responsibility and liability to third parties, including Plaintiffs, by engaging in unlawful activity without personal liability.

28.    Continued adherence to the fiction of the separate existence of ML Retail and ML, LLC would sanction fraud and promote injustice, in that Defendant

Marcus Lemonis is attempting to escape liability for his unlawful activity, as set forth below, by hiding behind ML Retail and ML, LLC and manipulating assets and liabilities to avoid responsibility for the unlawful acts that he directed and caused for his own benefit.

<u>**JURISDICTION AND VENUE**</u>

29.     The Court of Chancery has subject matter jurisdiction over this matter pursuant to 8 Del. C. § 111, 10 Del. C. § 341, 10 Del. C. § 343, and 6 Del. C. § 18-1001.

30.     The Court of Chancery has personal jurisdiction over nominal Defendant ML Fashion in this action under 6 Del. C. § 18-105.  ML Fashion is organized under Delaware law and is subject to service of process by service on its registered agent in Delaware.

31.     The Court of Chancery has personal jurisdiction over Defendant Lemonis in this action as the non-resident manager, and the Chairman/CEO, of a limited liability company (ML Fashion) organized under the laws of the State of Delaware pursuant to 6 Del. C. § 18-109.  Further, Lemonis came into the State of Delaware to benefit from the powers and protections of the laws of the State of Delaware in order to create ML Retail, a Delaware limited liability company, and ML LLC, a Delaware limited liability company, both which Lemonis controlled and directed as their alter ego or as their agent, to organize, control, and operate ML

11

Fashion for Lemonis' benefit causing injuries to ML Fashion that occurred in ML Fashion's state of organization, Delaware.

32.     The Court of Chancery has personal jurisdiction over Defendant ML Retail in this action under 6 Del. C. § 18-105.  ML Retail is organized under Delaware law and is subject to service of process by service on its registered agent in Delaware.

33.     The Court of Chancery has personal jurisdiction over Defendant ML, LLC in this action under 6 Del. C. § 18-105.  ML, LLC is organized under Delaware law and is subject to service of process by service on its registered agent in Delaware.

34.     The Court of Chancery has personal jurisdiction over Defendant MLG Retail in this action under 6 Del. C. § 18-105.  MLG Retail is organized under Delaware law and is subject to service of process by service on its registered agent in Delaware.

35.     The Court of Chancery has personal jurisdiction over Defendant Raffel under 10 Del. C. § 3104 in that the claims asserted against Raffel arise from Raffel either in person or through one or more agents: (1) causing tortious injury in Delaware to Delaware limited liability companies by an act or omission in Delaware or (2) causing tortious injury in Delaware or outside of Delaware by an act or omission outside of Delaware and regularly engaging in a persistent course of conduct in Delaware or deriving substantial revenue from services, or things used or

consumed in the State of Delaware. Delaware has a substantial interest in defining, regulating and enforcing the fiduciary obligations of managers and other persons, who manage, direct or otherwise control the limited liability companies formed by them.

## SUBSTANTIVE ALLEGATIONS

### A.    Courage.B is a Successful Business

36.    Along with their mother, Neomi Goureau ("Neomi"), Plaintiffs Goureau and Menkin began the luxury women's fashion line and retail stores Courage.B in 2008. The brand focused on high-end garments and accessories, inspired by the family's French roots.

37.    Plaintiffs' retail stores and Courage.B brand were owned by the trio's corporation called Gooberry Corporation. Goureau owned 100% of the stock of Gooberry and was its CEO, Menkin was Gooberry's President, and Neomi was the Chief Designer for the brand.

38.    The story of Courage.B began over twenty years ago, in 1987, when Neomi and her husband Patrick began the family interest in owning and operating retail stores when they opened up Fopp's in New York City. However, Patrick sadly passed away just a year later from after losing the fight to cancer, leaving Neomi to continue the business while raising Goureau and Menkin, who were both young children at the time.

39.     Over time, Goureau and Menkin became more involved in Fopp's so that Noemi could focus on her passion—designing the upscale clothing their retail stores would sell.  As an adult, Goureau took the reins of managing the business, and eventually began Courage.B.

40.     Courage.B's first store opened in Greenwich, Connecticut on November 4, 2008.  The store was featured in several local news publications when it opened.

41.     The business was a success and began to do $6.5 Million in sales within the first twenty months of opening.  Through their hard work over the next six years, the three were able to grow their company and expand to seven different retail boutiques across the country.

42.     The Courage.B stores carried their exclusive Courage.B label clothing and items which were designed by Noemi.  This created a loyal customer base that was interested in the Courage.B label.  Often, Courage.B customers would shop in various Courage.B locations in order to shop the exclusive Courage.B line.  For example, Plaintiffs had customers that lived in Greenwich, visited family in New York City, wintered in Palm Beach, and summered in Aspen shopping at each Courage.B store along the way.

43.     Courage.B's success continued and the company was doing roughly $5.5 Million in sales each year.  As a result of their success, Plaintiffs and Noemi

were ready to take their business to the next level. Plaintiffs developed a growth plan and began meeting with potential investors. They were looking for an investor that understood family businesses and that had experience in retail stores. Unfortunately, Marcus Lemonis represented himself as the perfect investor for Plaintiffs' business.

### B.     "The Profit" Comes to Help Courage.B

44.     Marcus Lemonis is an entrepreneur and reality television personality who is featured in the documentary reality series, "The Profit." "The Profit" has aired for roughly seven years and has featured around one hundred businesses.

45.     On each episode of the show, Lemonis visits an ailing business and purportedly offers his business acumen and a financial investment in exchange for an ownership interest in the entity.

46.     On the intro of "The Profit," Lemonis speaks to the viewers, stating "my name is Marcus Lemonis and I fix failing businesses. I make the tough decisions and I back them up spending my own money. It's not always pretty, but this is business. I do it to save jobs, and I do it to make money. This is The Profit."

47.     During commercial breaks in the episodes, Lemonis invites struggling businesses to apply for his help, stating "if your business is in trouble and you need my help, log on to the profitcasting.com." That page represents that Lemonis "has been called America's number one business turnaround artist. He will do whatever

it takes to fix YOUR failing business. When Marcus Lemonis isn't running his multi-billion dollar company, Camping World, he is on the hunt for struggling businesses that are desperate for cash and ripe for a deal. In the past 10 years, he's successfully turned around over 100 companies." Interested business owners are then invited to "Apply now for a chance to save your business!"

48. CNBC's website for "The Profit" promotes Lemonis' tactics, stating that Lemonis "goes on the hunt for struggling businesses that are desperate for cash and ripe for a deal. In each one-hour episode of The Profit, Lemonis makes an offer that's impossible to refuse; his cash for a piece of the business and a percentage of the profits."

49. As Plaintiffs would soon learn, Lemonis uses the show to prey upon desperate and often less sophisticated business owners to build his own individual wealth at the expense of the very businesses he was supposed to be helping.

50. Indeed, "The Profit" often features small, family-owned businesses where the family members are often over-worked and fulfilling multiple roles in the company. These business owners often don't have formal business training. Even more, these companies often don't have a general counsel or independent attorneys who can review the company's involvement with Lemonis, his various entities, and the show.

51.    Goureau first learned about "The Profit" when he saw an episode on television.  The episode featured a company called Sweet Pete's, a small family-run candy shop in Florida.  On the episode, Lemonis is portrayed as an expert investor who can help the business achieve the success its owners dreamed of.

52.    Plaintiffs' family business had experienced success and growth, and the trio were ready to take the next step in their business.  Goureau, Menkin, and Neomi believed that "The Profit" and Lemonis would be able to help their growing business make it to the next level.  Goureau e-mailed the television show and applied for Courage.B to appear on the show.

53.    Around spring 2014, the production company for "The Profit," Machete Corporation dba Machete Productions ("Machete") reached out to Goureau about Courage.B's application for the show.

54.    In or around spring 2014, Plaintiffs had a Skype interview with Kim Donnan ("Donnan"), a producer working for Machete, about their involvement in the show.   During the Skype interview, Donnan represented that the stories, investments, and successes portrayed on the show are real.   Donnan further represented that if Lemonis was interested in investing, they would make a deal while the show was being filmed and that the deal would be real.

55.    Eventually, Plaintiffs were selected to appear on "The Profit."  During the course of filming the television show, Plaintiffs and Lemonis reached an

agreement for Lemonis to invest in Courage.B and Gooberry. Lemonis was to purchase a 30% stake in Gooberry for $800,000.

56.     In June 2014, Plaintiffs' episode of the show was filmed. During the filming, the producers created a story for Plaintiffs to follow and present on the show. Producers consistently told Plaintiffs that their mother Noemi was a problem, that she didn't know what she was doing, and that Goureau had to fix what she was doing. This, of course, was not the reality for Plaintiffs' business.

57.     During the filming of the episode, Lemonis spoke to Plaintiffs and explained, "[a]nd you know what's even more amazing to me? You're doing $5 million with this product. Can you imagine what you would do if your product was right?" He further explained his belief in the company, and that it was close to where it needed to be already, stating to Plaintiffs, "[t]his has the makings of being something great, but the business needs money, and all I have to get my head around is, we're talking about changing the product and changing the process, and it's extreme, and putting money in at the same time."

58.     In fact, Lemonis doubled-down on his belief that Courage.B was not far off from obtaining even greater success when, during a cut scene where Lemonis is speaking to the viewers, Lemonis explained that, "[t]he real problem is, the company doesn't have the right product on the ground and if I can fix the product

18

going forward and then merchandise it in a creative way, I know I can make money immediately."

59.     Despite these beliefs, when the time came to make his offer to Plaintiffs, Lemonis first offered $800,000 for full control of Courage.B and 50% of the stock, after which he chimed in "and before you answer, just know that if you don't do a deal with me, you may not make it."

60.     In what has since turned out to be a prophetic statement, after having his first offer rejected by Goureau, Lemonis responded to Goureau's counterproposal of $800,000 for 10% of the company's stock stating: "I'll give you a half-a-million-dollar loan and take the stock of the company as collateral. I mean, if you default, I'll take the business. So you don't want that option. The option you want is you want me to be just as excited as you are."  What Lemonis failed to mention is that he would run the business in a way which overloaded it with debt, allowing him to foreclose on a whim.

61.     While the episode was being filmed, Lemonis made renovations to a Gooberry store in Greenwich, Connecticut.  Plaintiffs were told by Lemonis and production that they could not visit the store while it was undergoing the renovations. On "The Profit," renovations are done during the filming of the episode so that the episode can show the supposedly great improvements that Lemonis makes to the

businesses. The owners are purposefully kept in the dark about how much the renovations are costing and who ultimately will be paying for them.

62. The same was true here. Lemonis did not tell Plaintiffs how much he was spending on the renovations, and when Plaintiffs asked, he told them, "I got it," that they "didn't have to deal with it," and to "trust the process."

63. During the course of the show, when the parties discussed the terms of Lemonis' potential investment, Lemonis told Plaintiffs that $200,000 of his initial investment would be used towards renovations. Lemonis led Plaintiffs to believe that the work he had done to the Greenwich location during the show would be covered by that $200,000 investment.

64. After the show finished filming, but before the deal was formalized, Lemonis began taking control over Gooberry and Courage.B. Lemonis started renovating Gooberry's additional stores. Once again, Lemonis told Plaintiffs not to worry about the renovations and that he was taking care of it. Because of Lemonis' representations, Plaintiffs believed that Lemonis was staying within the $200,000 renovations budget. Lemonis, however, forced Gooberry to incur upwards of $2M in debt renovating Gooberry's stores in only six months. Lemonis and his representative, Johnny Sirpilla, completely controlled the renovations and did not allow Plaintiffs to give any input or inform them of how much the renovations were costing Gooberry. Lemonis consistently told Plaintiffs to just "trust the process."

65.     During the filming of the show, Lemonis represented himself as an expert in retail and promised to introduce Plaintiffs to his team of expert retail and business executives who would help Plaintiffs grow the brand.  Lemonis explained that "Neomi is the face of the brand, and it's still her eye that I trust.  But in order to make sure that she's successful, I'm gonna hire legitimate designers with legitimate track records."   Lemonis additionally stated to viewers that he was hiring "professional visual merchandisers to come in and assist in the renovations of the show."

66.     Plaintiffs believed Lemonis' representations that he was there to help their business grow and that he believed in their family business.  Lemonis told Plaintiffs that he cared about their family, that he would always take care of their mother Noemi, and that he wouldn't let anything bad happen to her.

67.     However, all of these purported executives were employees of Camping World—a now public company that Lemonis serves as its CEO.  Lemonis did not tell Plaintiffs how much Gooberry was paying these so-called expert executives.  Again, whenever Plaintiffs inquired about the costs, Lemonis would tell them that he had it covered and not to worry about it.  Eventually, however, Plaintiffs learned that these executives were charging Gooberry exorbitant fees.

68.     When Plaintiffs learned about the skyrocketing renovation and executive costs, Lemonis berated them, called them ungrateful, and told them that if

they want to back out of the deal, all they had to do was pay him back for the renovations. At that point, of course, Plaintiffs were not able to repay Lemonis the over $2M that Lemonis had unilaterally decided to spend on the store—despite telling Plaintiffs that renovations would only cost $200,000 and keeping them in the dark about how much was being spent on the renovations. Feeling entrapped and like they had no other choice, Plaintiffs moved forward with Lemonis.

69.     On or around November 18, 2014, the parties executed the paperwork memorializing Lemonis' investment. Lemonis' entity, Defendant ML Retail, purchased 32% of the shares of Gooberry for $800,000.

70.     At the same time, the shareholders of Gooberry, Goureau, Menkin, Neomi, and ML Retail, entered into a Shareholder Agreement ("Gooberry Shareholder Agreement"). The Gooberry Shareholder Agreement gave ML Retail broad power over Gooberry. Gooberry needed ML Retail's affirmative shareholder vote in order to, among other things: (1) enter into any contract outside of the normal course of business, (2) make any distributions to shareholders, (3) make any expenditure over $50,000, and (4) hire or replace any member of Gooberry's executive team.

71.     The Gooberry Shareholder Agreement also gave ML Retail the sole power to, among other things: (1) manage and control Gooberry's bank accounts,

(2) open certain retail locations, and (3) control Gooberry's revolving line of credit with Lemonis' entities.

72.     Lemonis made clear that if Plaintiffs objected to the Gooberry documents that he would force them to repay the money that he had put into the renovations—which would wipe them out—and take their business from them.

73.     Not long after the deal was finalized, Lemonis sent IT personnel from Camping World to the Gooberry offices to upgrade their e-mail and computing systems.  During the process, the IT technicians, allegedly on accident, deleted all of the e-mails from Gooberry's system.   This meant that years and years of Gooberry's e-mail records were now gone.

74.     Plaintiffs were then given new @courageb e-mail addresses. Eventually, Plaintiffs' e-mails were transitioned to @marcuslemonis e-mail addresses.  Plaintiffs used these e-mails to conduct the business of Gooberry and eventually ML Fashion.  However, as discussed below, one by one, Plaintiffs, and their mother Neomi, were removed from the business venture and lost access to their @marcuslemonis e-mail accounts.

75.     ML Retail used the power bestowed upon it in the formation documents to take over Gooberry and Courage.B.  ML Retail, through Lemonis, had all of Gooberry's retail stores renovated and changed the products that the stores were selling.  However, despite making these changes himself, Lemonis later determined

that he did not like the changes he had implemented or the new products that he had added. Lemonis then forced the company to do further renovations and buy even more new product.

76. In 2015, a retail concept called Blues Jean Bar was featured on an episode of "The Profit." Lemonis unilaterally determined that Gooberry would purchase the Blues Jean Bar business and its three stores. Lemonis rebranded the Blues Jean Bar stores and two Courage.B locations as Denim & Soul. Lemonis then renovated all of the stores, including Gooberry stores that he had just renovated, for hundreds of thousands of dollars, all on Gooberry's dime, only growing its debts to him and his entities.

77. The new inventory did not appeal to Gooberry's loyal customer base. Several customers came to Courage.B to shop their exclusive fashion line. The product that Lemonis forced on the stores was often purchased at trade shows and widely available at department stores and boutiques. This type of product brought in price comparison shoppers who were looking to get the best deal on this type of clothing. Gooberry was often unable to compete against department stores carrying the same clothes and offering various friends and family, VIP and rewards programs.

78. In addition, the inventory Lemonis purchased was often from a previous season, which was not appealing to Gooberry's fashion savvy customer base.

79.     As the inventory did not work for the stores, Lemonis forced Gooberry to sell the new inventory that he had previously forced the company to acquire at a steep discount.  Lemonis now wanted the stores to carry younger and hipper brands. While on the show Lemonis represented that all Gooberry needed to do to take its business to the next level was get the proper inventory, Lemonis' new inventory tanked the business' margins.  Indeed, this change in inventory reduced Gooberry's typical profit margins from 73% to 52%.

80.     Destroying Gooberry's profit margins was part of Lemonis' practice. On one occasion, Lemonis purchased over $150,000 in inventory from a factory in Milan in styles and colors that the stores had not carried before.  Shortly thereafter, Lemonis determined that he did not like the order and forced the stores to sell the items for pennies on the dollar.

81.     All of the renovations, inventory purchases, and other large expenses were funded through Gooberry's line of credit with Lemonis' entities.  By making these large purchases, reducing Gooberry's profit margins, and forcing the company to sell inventory at a loss, Lemonis ensured that Gooberry would need to rely on its revolving line of credit with Lemonis' entities to meet its normal financial obligations, such as payroll.  This practice insured that Gooberry was always heavily indebted to Lemonis, giving Lemonis the power to convert on its assets at any time.

25

Lemonis used the threat of foreclosing on his loans to Gooberry to keep Plaintiffs in line.

### C. Lemonis Wants More and Insists on the Formation of ML Fashion, LLC

82.    Eventually, Plaintiffs and Lemonis decided to expand beyond the Courage.B brand and begin investing in additional business entities together. The idea was that Plaintiffs would be investors, and equal partners, with Lemonis on various fashion and retail-related business investments. Those ventures often included businesses that Lemonis encountered through his television show. Lemonis told Plaintiffs that investing in these other businesses was the only way to make profits—this was, of course, after Lemonis slashed Gooberry's profit margins.

83.    Despite wielding an incredible amount of control over Gooberry, Lemonis wanted more. In the beginning of 2016, Lemonis began selling Plaintiffs on starting a new business venture with Lemonis.

84.    Lemonis represented that Plaintiffs would be able to make more money in this new business venture than they were making with Gooberry.

85.    During this time, Lemonis told Plaintiffs that he wanted to be equals in the business with them. Lemonis praised Menkin telling her that she would take on a larger management role in the new business venture and that her equity share should be equal to his and Goureau's. Lemonis sold Menkin on ML Fashion by

representing that she would be its President and would be heavily involved in running the business.

86.     However, in order to make Plaintiffs own a roughly equal membership interest with Lemonis, Lemonis removed Neomi's equity and placed it with Menkin. Lemonis told Plaintiffs that their mother's equity laid with, them, her children.  This was the start of Lemonis attempting to build a wedge between Plaintiffs and their mother in order to boost his control of the business.

87.     Lemonis also represented that he and Plaintiffs would work to grow a fashion empire that they would eventually be able to sell for millions in profit. Lemonis represented that Plaintiffs and Lemonis would split any such profits equally—after Lemonis' debts were repaid.  Over time, however, Lemonis drowned ML Fashion in so much debt that Plaintiffs' equity in the Company eventually became meaningless.  This meant that Plaintiffs had to keep working for Lemonis in order to derive any value from the business they started and to be able to support their families.

88.     Lemonis represented to Plaintiffs that ML Fashion would be an umbrella entity to hold the parties' various business ventures.  He told Plaintiffs that he wanted to help them grow their business and that they could build something special together.  Lemonis represented that a limited liability company, as opposed to a corporation, would be more beneficial for everyone.

89.    ML Fashion was formed on March 29, 2016 as a Delaware limited liability company.  On March 29, 2016, the Limited Liability Company Agreement of ML Fashion, LLC ("LLC Agreement") was entered into among the members, Goureau, Menkin, and ML Retail.  *See* ML Fashion LLC Agreement, Declaration of Sean Bellew ("Bellew Decl."), Ex. A.

90.    The formation documents for the Company were prepared by the attorneys that Lemonis used in a lot of his business and personal matters.  Lemonis told Plaintiffs that the attorneys represented all three of them to deter Plaintiffs from seeking independent counsel.  Based on these representations, Plaintiffs did not seek independent counsel and relied on Lemonis' attorneys.  When the attorneys presented the formation documents to Plaintiffs for execution, Plaintiffs believed that the attorneys, and Lemonis, had their best interest in mind and signed the documents.

91.    Exhibit A to the LLC Agreement lists the Company's members and membership interest as follows:

| Member | Membership Interest |
|---|---|
| ML Retail, LLC | 33.34% |
| Nicolas Goureau | 33.33% |
| Stephanie Menkin | 33.33% |

| Total | 100.00% |
|-------|---------|

92.     The LLC Agreement names Marcus Lemonis as the Company's manager. *Id.* at § 6.1(b). The LLC Agreement gives ML Retail the sole power to remove a manager and appoint any successor. *Id.*

93.     The LLC Agreement gives the Manager broad powers:

**6.1** **Manager (a).** The management of the Company shall be vested entirely and exclusively in the Manager. Except as expressly provided for in this Agreement or prohibited by the Act, the Manager shall have the full, exclusive and unilateral power and authority to make all decisions affecting the business and affairs of the Company. No Member acting as such shall have any voting, approval, or management rights whatsoever or any authority to bind the Company, except as expressly provided for in this Agreement or the Act.

LLC Agreement § 6.1(a), Bellew Decl., Ex. A.

94.     Additionally, the LLC Agreement gives the Manager the power to appoint and remove officers of the Company and to determine when to make distributions to members. *Id.* at §§ 5 and 6.1(c).

95.     The LLC Agreement then limits the powers of the individual members:

**7.1** **Rights or Powers.** The Members shall not have any right or power to take part in the management or control of the Company or its business and affairs or to act for or bind the Company in any way. Notwithstanding the foregoing, the Members have all the rights and powers.

LLC Agreement at § 7.1, Bellew Decl., Ex. A.

96.     The LLC Agreement further limits the members' voting rights:

**7.2** **Voting Rights.** No Member has any voting rights except as otherwise provided in this Agreement and with respect to the following, which shall require the Approval of the Members:

(a) any conversion of the Company to any other entity; or

(b) any merger of the Company with or into any other entity that is not subject to a Drag Transaction; and

in each case, such Approval of the Members shall only be required in the event such conversion or merger would divest or diminish the rights of, or otherwise disproportionately disadvantage or unfairly discriminate against, any Member, with respect to that Member's Membership Interests in relation to other Membership Interests having similar rights, or increase the liabilities or obligations of any Member.

LLC Agreement at §7.2, Bellew Decl., Ex. A.

97. The LLC Agreement discusses the duties and obligations of the Manager stating:

**6.2** **Duties and Obligations of the Manager; Discretion.**

(a) In lieu of any duty (including fiduciary duties) imposed on the Manager or any Members in acting as a Manager by the Act or otherwise at law or equity, the sole duty of the Manager or any such Member shall be to comply with the terms of this Agreement, and the Manager (including any Former Manager) or any such Member shall not have or incur any liability to the Company or to any Member relating thereto, except where the claim at issue is based on the Misconduct of such Person.

(b) Subject to the foregoing but notwithstanding any other provision of this Agreement to the contrary or other applicable provision of law or equity, whenever in this Agreement a Manager or an Officer is permitted or required to make a decision or take an action (i) in his "sole discretion" or "discretion" or under a similar grant of authority or latitude, in making such decisions or taking such actions, he shall be entitled to take into account his own interests as well as the interests of the Members as a whole or (ii) in "good faith" or under another

expressed standard, he shall act under such express standard and shall not be subject to any other or different standard.

LLC Agreement at 6.2, Bellew Decl., Ex. A.

98.    The LLC Agreement defines Misconduct as "fraud, breach of fiduciary duty, bad faith, a knowing violation of law or willful misconduct." *Id*. at p. 5.

99.    When it comes to limiting the duties of the officers of the Company, the agreement is silent and has no such limiting language.

100.    The LLC Agreement lists the officers of the Company as follows:

| Office | Name |
|---|---|
| Chairman/CEO | Marcus Lemonis |
| President | Stephanie Menkin |
| Chief Financial Officer | Manish Karna |

LLC Agreement at Schedule A, Bellew Decl., Ex. A.

101.    The LLC Agreement selected ML Retail as the "tax matters partner," and gave it the sole power to "make any and all elections for federal, state, local, and foreign tax purposes…." (*Id*. at § 8.)  Indeed, Section 8 of the LLC Agreement gives ML Retail sole and broad power over ML Fashion's tax matters.  (*Id*.)

102.    Lemonis as the Manager and Chairman/CEO of the Company and ML Retail, owner of the most powerful membership share of the Company, formed a

control group due to their significant voting power coupled with their formidable managerial power ("ML Control Group").

103.  By virtue of being a control group, the ML Control Group owes fiduciary duties to the Company, Goureau, and Menkin.

104.  Eventually, Lemonis sought to transfer the assets of Gooberry to an entity called MLG Retail, LLC ("MLG Retail").  MLG Retail is owned by ML Fashion and ML Fashion is MLG Retail's manager.  Transferring the assets and operations of Gooberry to MLG Retail would have finally given Lemonis the complete, unfettered control over Gooberry that he wanted.  While Lemonis was successful in transferring some of Gooberry's assets to MLG Retail, he did not transfer all of its assets, such as the Runway brand, to MLG Retail.

105.  Nevertheless, Lemonis, ML Retail, and ML, LLC began operating MLG Retail under ML Fashion to run several of ML Fashion's retail stores. Lemonis also set up a similar credit structure between MLG Retail and ML Fashion. On October 1, 2016, MLG Retail and ML Fashion entered into a Credit Agreement whereby MLG Retail could borrow up to $10,000,000 from ML Fashion at an interest rate of 7.5% per annum.

106.  Of course, ML Fashion's ability to loan funds to MLG Retail came from its own credit agreement with ML, LLC.  Thus, as explained below, when MLG

Retail drew on its line of credit from ML Fashion, it was really drawing from Lemonis and ML, LLC.

### D. Lemonis Mismanages ML Fashion And Uses It For Personal Gain

107. As detailed above, the LLC Agreement gave Lemonis enormous power over ML Fashion. Lemonis used this power to mismanage ML Fashion in order to benefit himself, ML Retail, and ML, LLC.

108. Lemonis' misconduct often related to credit agreements and loans he made to the Company through entities he controlled. Indeed, the very day that ML Fashion was formed, it entered into a Credit Agreement with ML Retail. *See* Bellew Decl. Ex. B. Under this Credit Agreement, ML Fashion could receive up to $30,000,000 in loans from ML Retail at a rate of 6% interest per annum. Lemonis represented that this Credit Agreement would provide ML Fashion with a reliable source of capital that would be used to fund the Company.

109. While the agreement is signed by Menkin, the decision for ML Fashion to enter into the Credit Agreement was solely Lemonis' decision. Lemonis often used Menkin to sign documents on ML Fashion's behalf to attempt to add legitimacy to his actions. However, he would often have his attorney send packages with hundreds of pages and several documents to her with the instruction to sign them. Menkin trusted Lemonis and his attorney and simply signed all of the documents they presented.

110. Concurrent with the execution of the Credit Agreement, ML Fashion and ML Retail entered into a Security Agreement. *See* Bellew Decl. Ex. C. The Security Agreement gave ML Retail a continuing security interest in essentially all of ML Fashion's assets. *Id*.

111. Also on March 29, 2016, ML Retail entered into a Credit Agreement and a Security Agreement with Defendant ML, LLC (collectively, the "ML, LLC Credit Agreements"). *See* Bellew Decl. Exs. E and F. These agreements mirrored the Credit Agreement and Security Agreement that ML Fashion entered into with ML Retail only now ML Retail was the borrower and ML, LLC was the lender. *Id*. Thus, whenever ML Fashion drew on its line of credit with ML Retail, it was in reality drawing from ML, LLC, a Lemonis controlled non-member.

112. This arrangement gave Lemonis the power to funnel his predatory lending practices through ML, LLC who was not a member of ML Fashion or a signatory on the LLC Agreement. Lemonis attempted to shield his lending from the fiduciary duties that an ML Fashion member and LLC Agreement signatory would have otherwise had. Lemonis could now foreclose on ML Fashion, through ML Retail, without regard to any membership obligations ML Retail may have had.

113. There can be no doubt that this funding arrangement was set up to thwart fiduciary duties, obligations under the LLC Agreement, and potential

creditors. This is just one example of Defendants using the fraudulent corporate structure to perpetrate fraud against Plaintiffs.

114. Together, these agreements combined gave Defendants the unfettered ability to misuse the assets of ML Fashion. Again, the LLC Agreement gave Lemonis the sole power to run the operations of ML Fashion. Thus, Lemonis forced ML Fashion to buy assets, leaving it unable to meet its current obligations, and then forced ML Fashion to take a loan from ML Retail which would then take a loan from ML, LLC. Eventually, he could render ML Fashion insolvent such that ML, LLC could foreclose on all of the assets owned by ML Fashion.

115. Indeed, as of February 2020, ML Fashion's line of credit with ML Retail had an outstanding balance of nearly Twelve Million Dollars, far exceeding ML Fashion's assets of roughly Five Million Dollars. Further, as of 2018, ML Retail had made nearly $500,000 in interest from its loans to ML Fashion.

116. Lemonis, acting on his behalf and for ML Retail and ML, LLC, used his power to grow ML Fashion's debts to himself and his entities a number of times. Lemonis was only interested in growing his personal brand and his television show. Lemonis would often use the businesses featured on "The Profit" to boost his image and add debt to ML Fashion.

117. Often "The Profit" would show Lemonis helping needy business owners by renovating their stores or finding buyers for their products. However,

improving those businesses was not Lemonis' intentions, rather he was using ML Fashion to pay for those renovations and large purchases as a means to strap it with more debt.

118. Lemonis represented to Plaintiffs that the businesses they were investing in through ML Fashion were making money and would be good investments for ML Fashion. Lemonis represented to Plaintiffs that the strategy he was employing for ML Fashion was how he built Camping World, and that his methods would help make ML Fashion become as successful as Camping World. However, as discussed herein, the businesses Lemonis forced ML Fashion to invest in were often failing and Lemons used ML Fashion to provide an influx of capital to those businesses by forcing ML Fashion to purchase their inventory and hire their personnel.

119. For example, a November 2016 episode of the show featured the brand Susan Monaco, and on the show, the parties reached a deal where Lemonis would invest $600,000 for 50% of the business. However, Susan Monaco ended up being a huge loss on the ML Fashion books. In order to put money in the Susan Monaco business, ML Fashion had to buy all of Susan Monaco's old inventory. That inventory was a loss for ML Fashion because they had to sell what they could at a Street Sell for negligible profits and donate the rest. Often when ML Fashion had to

donate excess product Lemonis had forced on it, Lemonis made sure that he got the tax write-off for the donation personally.

120.   A June 2017 episode featured a brand called Swim by Chuck Handy. Once again, the show touts a deal where Lemonis would invest $600,000 for 55% of the business.  However, it was ML Fashion that produced hundreds of thousands of dollars of product before the deal was finalized.  The deal with the owners of Swim by Chuck Handy fell through, and it was ML Fashion that was left holding the bag.  ML Fashion was forced to donate all of the product it produced again, taking a complete loss.

121.   Similarly, a June 2018 episode featured the brand Ellison Eyewear that produced sunglasses in Greece.  According to the show, Lemonis would invest $350,000 for 50% of the business.  Once again, ML Fashion spent hundreds of thousands of dollars producing inventory in Greece.  Then, the deal fell through, and ML Fashion was forced to try to sell the inventory in its retail stores.  The inventory is still on ML Fashion's books as a loss.

122.   Several times, ML Fashion was forced to hire the business owners and employees featured on "The Profit" solely because their own business could not afford to pay them.  These persons primarily worked on their own business while Menkin was forced to find special projects at ML Fashion for them to work on.  This happened with the production manager of the Susan Monaco brand featured in

season four, the owner of Ben's Garden featured in season six, the owners of Flex Watches featured in season four, and with the winner of another Lemonis television program called "The Partner."

123.  Lemonis used the constant brand acquisitions, store openings, store rebrandings, store closings, personnel changes, and inventory changes to distract Plaintiffs from the mismanagement and misconduct he was orchestrating as the Manager of ML Fashion.  Lemonis purposefully kept Plaintiffs overworked and overextended so that all they could focus on was the ground level ML Fashion work that Lemonis was having them do.  Plaintiffs knew that if they were not able to keep up with the workload, Lemonis would threaten to give the work opportunity to someone else, fire them, or foreclose on the Company.

124.  Time and time again, Lemonis used "The Profit" to bolster his own image as a small business savior when in reality the deals being made on the show were being used to force debt upon ML Fashion.  This debt not only forced ML Fashion to continually take loans from Lemonis and his entities, it also allowed Lemonis to write-off income he made as the Chief Executive Officer of Camping World and income from his other personal endeavors.

125.  At the end of the year, Lemonis and his accountants would use the debts incurred by ML Fashion as tax write-offs to help offset his personal income.  Indeed, on or around April 16, 2018, Lemonis expressly instructed Menkin on the write-off

telling her to "[d]rive the number as high as you can," and confirmed that he wanted the tax benefit personally. *See* Bellew Decl. Ex. G.

126. By keeping ML Fashion saddled in debt, Lemonis was consistently able to lower his personal tax liability. Moreover, because these write-offs decreased ML Fashion's indebtedness to ML Retail and ML, LLC, Lemonis often represented to Plaintiffs that he was taking the write-offs as a favor to them.

127. Additionally, Lemonis represented that ML Fashion would purchase retail stores, renovate them, and flip them for a profit. Lemonis represented that Plaintiffs and Lemonis would split these profits evenly, after Lemonis' debts were repaid. While ML Fashion purchased or opened around thirty stores, none of those stores were ever converted to profits and all were eventually closed. Often Lemonis would spend exorbitant amounts of money to renovate the stores—often several times per store—and swap out the stores inventories. These upfront costs meant that the stores could never be sold for a profit due to how far in debt each venture was to Lemonis.

128. Once the stores failed, ML Fashion would be forced to liquidate the stores at a huge loss. This meant hiring a close down crew, paying for staff termination and severance packages, and often paying early buy out charges on the stores' leases.

129. Forcing debt onto ML Fashion was not the only way in which Defendants engaged in misconduct. Lemonis and ML Retail used promissory notes that his entities had from other businesses to make sham contributions to the Company on behalf of ML Retail.

130. One such sham contribution related to the assets of a shoe company Inkkas. Inkkas was featured on an episode of "The Profit" and as part of the deal from the show, Gooberry purchased the company's assets. Then, through a string of transactions, the Inkkas assets became owned by an entity called Inkkas, LLC. On or around June 6, 2017, ML Retail purchased the assets of Inkkas, LLC for $429,937.34. In agreements dated the same day, ML Retail transferred the assets of Inkkas, LLC to ML Fashion as a membership contribution *then* transferred those very assets from ML Fashion to a company called ML Footwear LLC. Essentially, Lemonis and ML Retail used assets that were already owned by the joint business venture as a contribution by ML Retail to ML Fashion, then transferred the assets out of ML Fashion.

131. Contributions like this ensured that ML Retail was first in line if the Company ever issued distributions. Under the LLC Agreement, distributions are made "first, 100% to and among the Members in proportion to and to the extent of their respective Unreturned Capital Contributions." *See* LLC Agreement at § 5.1(b), Bellew Decl. Ex A. This allowed ML Retail to receive distributions for purporting

to contribute assets that already belonged to the joint business venture. Between the sham contributions and Lemonis' debt position, Lemonis made sure that any monies coming out of ML Fashion were owed to him first.

132. Lemonis also treated the bank accounts of ML Fashion, and its wholly-owned subsidiary MLG Retail, as his own personal piggy bank. Lemonis used his personal American Express card to make purchases for the Company; however, Lemonis also used this card to make personal and non-business-related purchases.

133. Lemonis would then take money directly from the MLG Retail bank account to pay off his American Express card. The funds taken from MLG Retail to pay the card were not correlated to the amount of actual business expenses that Lemonis put on the card. Instead, Lemonis would see how much money was in the MLG Retail account, then take whatever he could and put it towards his personal card. Lemonis made payments to his personal American Express card from MLG Retail's bank accounts several times a month. Lemonis took up to $100,000 at a time to pay off his card.

134. Between March 2019 and February 2020, Lemonis took $3,023,004.47 from MLG Retail's bank account to make payments to his personal credit card. In addition, Lemonis benefited by keeping the American Express rewards points from these payments and using them for his personal gain.

135.   There were times where, as a result of Lemonis taking money from the Company's bank accounts to pay, at least in part, his personal obligations, MLG Retail and ML Fashion could not pay its vendors.  Then, as always, ML Fashion would have to borrow money from Lemonis' entities to pay those vendors.

136.   Another example of Lemonis using ML Fashion for personal gain related to the retail boutique Runway.  In early 2016, Lemonis met Defendant Raffel, owner of Runway, at a trade show in New York City.  Raffel approached Lemonis and Menkin because she wanted Lemonis to purchase her Runway store in Deerfield, Illinois.

137.   Shortly thereafter, Lemonis visited Runway and decided that ML Fashion would purchase the store.  On March 23, 2016, Gooberry purchased Runway.  In May 2016, Gooberry and ML Fashion paid to completely renovate Runway and stock it with new inventory.  Once again, these expenditures forced the companies to take on additional debt from Lemonis to meet their basic expenses.

138.   On information and belief, Lemonis wanted Gooberry to acquire Runway because Lemonis was romantically interested in its owner Raffel, not because he believed the acquisition would help Gooberry or ML Fashion, which was formed shortly after the acquisition.

139.  Not long after Gooberry acquired Runway, Raffel was buying inventory for ML Fashion's other retail stores despite not having a position with ML

Fashion. Indeed, on or around March 24, 2016, the day after the acquisition closed on March 23, 2016, Raffel purchased inventory for non-Runway stores.

140. Soon, Lemonis and Raffel began buying inventory together and spending far more than ML Fashion's allocated budget on inventory. Again, overspending on inventory forced ML Fashion further into debt to Lemonis' entities.

141. There can be no doubt that Lemonis and Raffel knew they were exceeding ML Fashion's budget for purchasing inventory because ML Fashion's controller prepared detailed monthly budgets and a quarterly purchasing budget for future inventory orders called an open-to-buys. Lemonis and Raffel were sent these budgets.

142. Further, every day, the controller informed Lemonis of the status of ML Fashion's debt with ML Retail and ML, LLC and the Company's daily sales, cash, and payables positions. This report also included Lemonis and Raffel's inventory orders so they could see how much they were buying compared to the Company's ability to purchase inventory.

143. Despite having all of this information showing that ML Fashion could not afford the inventory the two were purchasing, Lemonis and Raffel continued to overspend without regard for the Company's financial abilities. The more Lemonis and Raffel overspent, the more indebted the Company would need to become to Lemonis and his entities.

144.   At one point in 2018, Lemonis and Raffel were over-buying inventory at a rate of approximately $1M per quarter.  Indeed, some of the stores did not even have the physical space to receive the inventory that Lemonis and Raffel were purchasing.  Stores complained to both Lemonis and Raffel that they did not have the space for any more inventory, yet Lemonis and Raffel continued their purchasing unabated.

145.   Lemonis forced ML Fashion to open liquidation stores called Sample Sale in order to sell the excess inventory that he and Raffel were buying for the Company.  Once again, ML Fashion incurred debt to open these Sample Sale stores, but the stores had no chance of making enough revenue to stay afloat as they were selling inventory at liquidation prices.  These Sample Sale stores only added to ML Fashion's indebtedness with Lemonis.

146.  Whenever Plaintiffs complained about Lemonis' and Raffel's overspending, Lemonis would threaten to foreclose on ML Fashion because of the huge debt it owed to ML Retail and ML, LLC.  Plaintiffs knew that if they did not play ball, Lemonis would foreclose on the debt and take the company they worked so hard to build from them.

147.   Indeed, Plaintiffs witnessed Lemonis do this with several entities he encountered through "The Profit".  For example, a January 19, 2016 episode of the

"The Profit" featured the brand Inkkas Shoes. On the show, the parties agreed to a deal where Lemonis would invest $750,000 for 51% of the business.

148. After the episode aired, but before the acquisition was completed under the ML Fashion umbrella, Lemonis forced Inkkas Shoes to hold a sale called "Free Shoe Friday." Lemonis tweeted a code which allowed shoppers to buy shoes from the Inkkas website for zero dollars. This led to $200,000 of inventory being given away in six hours.

149. Lemonis used this and other tactics to force debt on Inkkas and a few months later, foreclosed on the business, took its assets, and removed the original owners.

150. Similarly, a September 2016 episode of "The Profit" featured the brand Flex Watches based in Los Angeles, California. During the episode, Lemonis agreed to invest $400,000 in exchange for 40% of the business. This gave Flex Watches, Inc., the company running the brand, a valuation of $1,000,000.

151. Lemonis had ML Fashion open a Los Angeles office for Flex Watches, forcing the Company to incur debt. Lemonis also forced debt on Flex Watches, Inc. By September 2016, Lemonis had saddled Flex Watches, Inc. with over $300,000 in debt. When it came time to formalize his investment in Flex Watches, Lemonis used that debt to offset the $400,000 purchase price and was able to move the assets for

Flex Watches, Inc. to a company called Flex Watches, LLC which was wholly owned by ML Fashion.

152.  As is to be expected, the Flex Watches brand floundered under Lemonis' control and its debts to Lemonis grew insurmountable.  In August 2019, almost three years after their episode aired, Lemonis sold Flex Watches back to one of the original owners for $10 plus $52,175 in inventory, $13,437.63 in the company's cash accounts, and $128,231.95 in accounts payable—a tiny fraction of Flex Watches' $1,000,000 valuation prior to Lemonis' involvement.

153.  This happened again with a business called Ben's Garden that was featured on "The "Profit" in January 2019.  Ben's Garden produced home and gift items like greeting cards, paperweights, and picture frames.  On the show, Lemonis agreed to invest $400,000 for 40% of the business.  Ben's Garden needed an influx of cash to pay unpaid bills so Lemonis funded the company by forcing MLG Retail—one of ML Fashion's biggest assets—to purchase its old inventory and put it into its retail stores.  ML Fashion and MLG Retail had not been in the home good market before, so the sudden addition of home goods to their stores did not go well. The product did not sell and ended up being a loss on the Company's books.

154.  As seems to always happen, by June 2019, Lemonis and the owner of Ben's Garden had a falling out.  After that, Lemonis, just as he had tried to do with Plaintiffs before the Gooberry deal was signed, told the Ben's Garden owner that he

had to repay Lemonis for all of the money he put into his business on the show or else Lemonis would take the business from him.

155. Lemonis used the new businesses, new retail stores, and constant acquisitions to keep Plaintiffs distracted from what he was doing with the ML Fashion assets. Lemonis was constantly having Plaintiffs open new retail locations, change retail locations to different brands, close new locations, and clean up after Raffel's messes to create a fog where Plaintiffs were too overworked to closely examine the wellbeing of the Company. Whenever Plaintiffs did question what Lemonis was doing with the Company, Lemonis would respond with threats to either fire their mother Neomi, foreclose on his debt and take the Company from them, or fire them from the Company. Lemonis made it clear that they had no power to prevent him from doing as he pleased with the Company. Again, after watching Lemonis do this with other business owners they knew he would make good on his threats.

### E.    Lemonis Uses ML Fashion To Grow His Personal Brand

156. Furthermore, Lemonis was not actually interested in growing the Courage.B brand or any of the other brands ML Fashion acquired such as Denim & Soul. Instead, Lemonis, together with Raffel, his new wife, sought to use ML Fashion's assets and Plaintiffs' know-how to grow his new retail concept MARCUS.

157.   On information and belief, Lemonis and Raffel wanted to grow MARCUS to have a venture together, further promoting Lemonis' personal brand and the couple's image.  Lemonis and Raffel married in February of 2017 in Los Angeles.

158.   In 2017, Lemonis wanted to open a store in downtown Chicago.  At the time, Menkin and Goureau advised that opening a retail store in that location would be extremely expensive.  Despite their concern, Lemonis opened a retail store branded MARCUS.

159.   Once the new MARCUS store was opened, around fall 2017, Lemonis renovated and rebranded ML Fashion's other retail locations from Courage.B, Denim & Soul, and Runway as MARCUS stores.  For the most part, these were stores that ML Fashion had recently spent hundreds of thousands of dollars renovating that the Company now had to spend even more money to renovate and change branding and inventory to become MARCUS stores.

160.   In addition, the stores had to purchase new signage, websites, and branded materials such as shopping bags, tissue paper, displays, etc.  All of the old signage and branded materials had to be thrown out.  Again, the renovations and rebranding forced ML Fashion to take on more loans from Lemonis to cover its expenses.

161. Then, on information and belief, on or around July 31, 2018, Lemonis applied to trademark the word MARCUS for the products sold under the brand, such as handbags, clothing, and footwear. However, instead of applying for the mark under ML Fashion, the company that was running the MARCUS retail stores, Lemonis tried to obtain the trademark for MARCUS under ML Creative, LLC, an entity which Plaintiffs have no ownership interest in and, under information and belief, is owned and controlled solely by Lemonis.

162. Additionally, Lemonis sought to build strife between Plaintiffs and their mother, Neomi. After the creation of ML Fashion, Neomi continued to earn a salary from ML Fashion, like she did from Gooberry, as a management fee. However, after about a year, Lemonis told Neomi that he hated all of her designs and that Neomi should let Lemonis and Plaintiffs do all of the work for the Company.

163. Lemonis attempted to pit Plaintiffs against their mother by consistently telling Plaintiffs that they would make more money if the Company was not paying their mother.

164. Lemonis also used Neomi as a pawn to ensure that Plaintiffs did not question how much influence over the Company he had given Raffel. Raffel did not have experience buying inventory for a multi-store chain, did not understand the different markets and needs of the stores, and was unfamiliar with the software

systems ML Fashion used to manage its inventory. This forced other ML Fashion staff to fix errors and mistakes that she made, costing the Company time and money.

165. When Plaintiffs questioned why Raffel was making purchases for the Company, Lemonis would tell them that they had to deal with Raffel being involved because Lemonis was keeping their mother Neomi on the payroll. Lemonis often threatened to fire Neomi whenever Plaintiffs did not simply fall in line.

### F. Lemonis Removes Plaintiffs From Their Business

166. In September 2019, Lemonis made good on his threats to remove Neomi and abruptly terminated her employment with the Company. Giovanni Senafe, one of Lemonis' agents, called Neomi to tell her that she was terminated, effective immediately, that she would receive no further compensation moving forward, and that her health insurance was being cut off.

167. Indeed, one by one, Lemonis has sought to cut Plaintiffs out of the business they created with their family. In March 2016, Lemonis moved Goureau from ML Fashion to ML, LLC in an attempt to drive a rift between Goureau and Menkin. Lemonis had Goureau work on other businesses that Lemonis invested in through "The Profit" that did not fall under the ML Fashion umbrella. As part of the transition, Lemonis prohibited Goureau from entering the stores owned by ML Fashion or having any opinion or influence in a company he created. Goureau knew

that if he pushed back Lemonis would fire his sister Menkin and his mother Neomi who relied on ML Fashion and Gooberry to make a living.

168.   Then, in May 2017, Lemonis moved Goureau from ML, LLC to Camping World.  Lemonis represented that working at Camping World would be beneficial for Goureau because it was a publicly traded company that could offer stock vesting and other employment benefits.  However, Lemonis fired Goureau from Camping World in December 2018.

169.   On or around December 2019, Lemonis and Menkin discussed how she could separate from the Company and Lemonis' businesses.  The two discussed terms of a departure, however, once the COVID-19 pandemic started, around April 2020, Lemonis abruptly cut off Menkin and removed her access to her company e-mail and all of her company files.

170.   Further, ML Fashion has not paid Menkin since the end of March 2020. As the President of ML Fashion, Menkin received compensation of $11,558 on the first and fifteenth of each month.  Menkin's compensation came from an account in the name of MLG Retail but was for her work as the President of ML Fashion.

171.   Thus, in six years, Lemonis effectively separated all three founders of Courage.B from their business and from the Company that he was supposed to be helping and growing.

### G.   Lemonis Seeks to Benefit From the Pandemic

172. While the entire world is dealing with the devastating COVID-19 pandemic, Lemonis has been using the shutdown to further loot ML Fashion.

173. Starting in April 2020, Lemonis began shutting down some of the Company's retail stores and sending employees across the country to take the assets and inventory from the stores. On or around April 30, 2020, Lemonis sent employees to close a MARCUS branded store located in Glencoe, Illinois where MLG Retail is the lessee of the store and ML Fashion is the guarantor. Lemonis had the employees remove roughly $110,034 worth of inventory and $60,772 worth of fixtures, furniture, and equipment ("FFE") from the Glencoe location. Plaintiffs do not know what Lemonis has done with the inventory and FFE that was removed.

174. Lemonis has continued closing stores—and taking their assets—all over the country during the pandemic. Also, on or around April 30, 2020, Lemonis sent employees to close a MARCUS branded store located in Dallas, Texas owned and operated by ML Fashion. Closing this store was directly against ML Fashion's interest because this location was one of ML Fashion's strongest performing stores. Lemonis removed roughly $149,215 worth of inventory and $75,451 worth of FFE from the Dallas location.

175. Lemonis is also looting the assets of one of ML Fashion's biggest assets, MLG Retail. On May 1, 2020, Lemonis sent employees to close a MARCUS location in Palm Beach, Florida and remove its inventory and FFE. Those

employees removed roughly $118,128.00 in inventory and $61,032 in FFE. The lease for that Palm Beach location is personally guaranteed by Goureau, yet Lemonis did not tell Goureau he was shutting down the stores and taking its inventory and FFE. Again, Plaintiffs do not know what Lemonis is doing with the assets he took.

176. On or around August 13, 2020, Lemonis closed on of ML Fashion's MARCUS branded stores in Newtown, Massachusetts. Once again, Lemonis has taken hundreds of thousands of dollars in inventory and FFE from that location and Plaintiffs are in the dark as to the current location of those assets.

177. Moreover, starting on April 27, 2020, Lemonis, or someone acting at his direction, began systematically moving funds out of the MLG Retail account that was used to automatically pay several of MLG Retail's debts. Importantly, the account was used to pay a payment plan for the Company's corporate American Express credit card that is tied to Goureau personally.

178. This American Express corporate card was ML Fashion and MLG Retail's regular business credit card which employees in the Company used to purchase inventory, office supplies, and other business goods. American Express requirements meant that an individual had to be tied to the card, and in this case the individual tied to the card was Goureau.

179. Starting around 2018, Lemonis began using this credit card for larger Company purchases. Previously, the card had a standing balance of around

$200,000. Through 2018 and 2019, Lemonis increased the balance to over $600,000. On information and belief, this was done because the card was tied to Goureau personally which allowed Lemonis to use the threat of defaulting on the card, and triggering hundreds of thousands of personal liability for Goureau, to keep Menkin from questioning his decisions.

180. On or around April 4, 2019, MLG Retail entered into a payment plan with American Express and agreed to pay the balance due, roughly $688,762, in monthly installments of $18,696. *See* March 17, 2020 Letter from S. Menkin to N. Goureau, Bellew Decl. Ex. D. Lemonis expressly approved this payment plan. *Id*. at p. 2. Under the agreement, the installment payments were drawn directly out of one of MLG Retail's bank accounts.

181. While Lemonis has no problem making regular payments of several thousands of dollars to his personal American Express card, he made sure that the corporate American Express card tied to Goureau had a payment plan where any missed payments triggered the entire amount due. Lemonis often used the threat of stopping the automatic payments—which would automatically make Goureau personally liable for hundreds of thousands of dollars—to keep Menkin in line.

182. On or around March 17, 2020, ML Fashion and MLG Retail confirmed that the companies would continue to pay the amount due on the American Express account, now around $463,112. *See* March 17, 2020 Letter from S. Menkin to N.

Goureau, Bellew Decl. Ex. D. However, Lemonis has been purposefully depleting the account used for the automatic payments so that there are no funds in the account when American Express attempts to debit the automatic payments.

183. Again, under the payment plan, the entire amount outstanding becomes due upon a default. Thus, Lemonis is forcing MLG Retail to default on the payments, triggering not only the entire debt for the Company, but also for Goureau as the credit card is in his name. After the initial filing of this Complaint, Defendants had left funds in the account for the Amex payments to draw on. This allowed the Amex payments to become current. However, on or around August 4, 2020, Defendants have reversed roughly $94,049 in payments on the American Express card.

184. Goureau has been informed by American Express that if payments are not made soon, it will begin collections proceedings against Goureau personally. This would have an extremely negative impact on Goureau's credit and personal finances.

185. Lemonis has further benefited from the pandemic through the government's Paycheck Protection Program ("PPP"). Without Plaintiffs' consent or knowledge, Lemonis applied for a PPP loan and on May 1, 2020, the Company received $818,394 in PPP funds.

186.   Upon information and belief, on or around May 22, 2020, Lemonis, or someone acting at his direction, transferred all funds (roughly $601,324.02) in the ML Fashion and MLG Retail bank accounts into a new bank account under the name of MLG Retail.  The new bank account was not tied to any of ML Fashion or MLG Retail's other accounts, and Menkin, a signatory on all of the bank accounts for both companies, does not have access to the account and cannot see any transactions being done in that account.

187.   Since the original filing of this Complaint on June 18, 2020, Defendants have continued to deplete the assets of ML Fashion.  Defendants have held several fire sales liquidating the inventory of ML Fashion by selling it at up to 90% off.

188.   Further, despite the fact that several retail stores are closed due to the pandemic and stay at home orders are in effect, Defendants have hosted private liquidation events at the Company's store in Deerfield, Illinois, where Defendants invited Camping World employees and gave them massive discounts.  Even more, holding these large private events during a pandemic, in violation of state and local rules about large gatherings and retail stores, creates potential liability for ML Fashion.

189.   Based on all of Lemonis' recent actions, it is clear that he is planning on rendering ML Fashion and its asset, MLG Retail, insolvent so that he can

foreclose on the companies, remove Plaintiffs from the business, and use the assets to continue his MARCUS brand.

190.    While setting up ML Fashion and MLG Retail, the parties worked to register the Company to do business in several states.  As part of the process, Menkin and/or Goureau were listed as the individuals associated with ML Fashion and MLG Retail in several states including Illinois, Connecticut, Minnesota, and Florida. Now, Defendants have failed to make ML Fashion's required annual payments to those states, leaving Menkin and/or Goureau personally responsible for the payments.  For example, on August 5, 2020, the Minnesota Department of Revenue sent a letter to Goureau explaining that MLG Retail had missed the deadline to file and pay its taxes and stating that if the return was not filed, and taxes not paid, before September 4, 2020, that there would be additional penalties.  *See* Bellew Decl. Ex. H.    These outstanding debts have hindered Plaintiffs' ability to start separate businesses in Illinois, Connecticut, Minnesota, and Florida.

## **DERIVATIVE ALLEGATIONS**

191.    Plaintiffs bring this action directly and derivatively in the right of and for the benefit of ML Fashion to redress injuries suffered, and to be suffered, by ML Fashion as a direct result of Defendants' gross mismanagement, breaches of fiduciary duty, breach of the LLC Agreement, and use of ML Fashion solely as a vehicle for personal gain at the detriment of the Company.

192.   ML Fashion is named as a Nominal Defendant in this case solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.  Plaintiffs were members of ML Fashion at the time of the transgressions of which they complain and continue to be members of the Company.

193.   Plaintiffs will adequately and fairly represent the interests of ML Fashion and its members in prosecuting and enforcing their rights.  Prosecution of this action, independent of the current Manager, is in the best interests of the Company.

194.   The wrongful acts complained of herein subject, and will continue to subject, ML Fashion to continuing harm because the adverse actions are continuing and the consequences of those actions are still in effect and ongoing.

## DERIVATIVE DEMAND FUTILITY

195.   Plaintiffs have not made any demand to Lemonis as ML Fashion's Manager to bring suit and assert the claims set forth herein because such a pre-suit demand would clearly be futile and is, therefore, excused as a matter of law.

196.   As ML Fashion's sole Manager and sole owner of ML Retail, the only member that can remove a manager, Lemonis obviously suffers from a patent conflict of interest which would prevent him from exercising independent business judgment in evaluating the merits of the claims asserted against him herein.  Stated

differently, a demand for Lemonis to bring this suit and assert the claims set forth herein is excused by the simple fact that such a demand would essentially require Lemonis to sue himself and, in that regard, potentially subject himself to personal liability.

197.   As the manager of ML Fashion, Lemonis used the Company's assets to enrich himself and the Lemonis entities by, among other things, taking actions that financially favored the member ML Retail, LLC, while decreasing the value and viability of the Company to the detriment of the other shareholders.

198.   Further, Lemonis used his control of the Company force the Company to assume increasing debt by taking on loans and promissory notes from his other entities that would allow him to foreclose on the Company at any time.  Lemonis also benefited from his use of the Company to acquire the fledgling brands, businesses, and products featured on the "Profit" to boost his own image at the expense of the Company.  Moreover, Lemonis has since removed assets of the Company and transferred them to other entities and/or businesses owned or controlled by Lemonis.

199.   In addition to Lemonis' self-interest, demand is further excused here because Lemonis forced the Company to undertake actions and engage in transactions that were so egregious on their face that they could not have been the products of sound business judgment.  As the manager of ML Fashion, Lemonis

consistently mismanaged the Company's assets and pursued a business strategy that was so reckless and vastly against the Company's interests that his decisions could not have been the products of sound business judgment. Lemonis' actions include: (1) saddling the Company with expensive inventory then forcing the Company to sell that inventory at a loss, (2) purposefully decreasing the Company's profit margins making it reliant on loans from Lemonis and his entities, (3) purposefully removing capital from the Company so that its debts could not be paid, (4) purposefully increasing the debt of the Company and forcing it to take loans from Lemonis, and/or other companies owned and/or controlled by him, in order to meet its financial obligations, (5) taking actions that financially favored member ML Retail, LLC, decreasing the value and viability of the Company to the direct detriment of the other members of the Company, (6) using the assets of the Company to grow Lemonis' personal brand MARCUS, (7) taking a personal tax write-off on ML Fashion's charitable donations, (8) using ML Fashion as a vehicle to defraud and foreclose upon small business owners Lemonis was purporting to save, (9) closing the Company's retail stores and removing at least $377,377 worth of inventory and $197,255 worth of fixtures, furniture, and equipment from the stores, (10) improperly removing at least $601,324.02 from the Company's bank accounts, and (11) improperly taking at least $3,023,004.47 from ML Fashion and MLG Retail to pay personal, non-Company related, expenses that Defendants put on Defendant

Lemonis' personal credit card and keeping and/or using the rewards points from those payments for Defendants' benefit.

200.   Even if Lemonis acceded to a demand from Plaintiffs and pursued litigation against himself on behalf of the company, there is no reason to believe that he would appoint the proper persons to conduct the litigation or fully pursue any and all available remedies.

201.   In short, it is readily apparent that Lemonis would either be incapable or unwilling to take the actions required to seek the relief requested in this Complaint.

**COUNT I**
**(Fraudulent Inducement – Direct Claim Against Lemonis, ML Retail, and ML, LLC)**

Plaintiffs repeat and reallege each allegation contained above as though fully set forth herein.

202.   Defendants, and each of them through their agent and/or alter ego Lemonis, knowingly made numerous material misrepresentations to Plaintiffs and/or failed to disclose material information to Plaintiffs in order to induce them into the LLC Agreement.

203.   As the only natural person involved in the management of Defendants ML Retail and ML, LLC, when Lemonis made representations to Plaintiffs, he did so in his individual capacity and on behalf of ML Retail and ML, LLC.

204.    Defendants' material misrepresentations and/or failures to disclose material information described above include but are not limited to: (1) representing that Defendants wanted to help Plaintiffs expand their business through ML Fashion, (2) representing that Plaintiffs and Lemonis would be treated as equals in running ML Fashion, (3) representing that Defendants would run ML Fashion in a way that would benefit Plaintiffs and the Company, (4) representing that ML Fashion would invest in other business to and help grow and develop the businesses in their profile, and (5) representing that ML Fashion's Credit Agreement with ML Retail, and the corresponding agreement with ML Retail and ML, LLC, would be used to provide the Company with cost-effective capital not to make the Company insurmountably indebted to ML Retail and ML, LLC.

205.    At all times, Defendants knew these misrepresentations were false and that Defendants intended to use ML Fashion as a vehicle for self-enrichment to the detriment of Plaintiffs and the Company itself.  Defendants further knew that they would use credit agreements to force debt upon ML Fashion, allowing them to foreclose on the Company on a whim, and that they would use ML Fashion to defraud other small business owners Lemonis purported to save.

206.    Defendants intended that Plaintiffs rely upon these misrepresentations and fraudulent omissions of material facts.

207.  Plaintiffs were ignorant of the falsity of the representations and justifiably relied on the misrepresentations and fraudulent omissions of material facts and entered into the LLC Agreement with Defendants.  Plaintiffs would not have entered into the LLC Agreement with Defendants if they knew that Defendants' representations we false.

208.  Defendants' actions were willful, wanton, malicious and oppressive.

209.  As a direct and proximate result of Defendants' fraud, Plaintiffs have been harmed.  As a result of Defendants' fraud, Plaintiffs entered into the LLC Agreement, and put their time and energy into ML Fashion and away from their brand Courage.B and original company Gooberry.

## COUNT II
### (Fraud – Direct Claim Against Lemonis, ML Retail, and ML, LLC)

Plaintiffs repeat and reallege each allegation contained above as though fully set forth herein.

210.  Defendants, and each of them through their agent and/or alter ego Lemonis, knowingly made numerous material misrepresentations to Plaintiffs and/or failed to disclose material information to Plaintiffs.

211.  As the only natural person involved in the management of Defendants ML Retail and ML, LLC, when Lemonis made representations to Plaintiffs, he did so in his individual capacity and on behalf of ML Retail and ML, LLC.

212.   Defendants' material misrepresentations and/or failures to disclose material information described above include but are not limited to: (1) representing that ML Fashion was investing in stores, brands, and retail businesses in order to further grow those businesses and ML Fashion, (2) representing that purchases made for ML Fashion were done to benefit the brand and not increase ML Retail and ML, LLC's debt position in ML Fashion, (3) representing that ML Fashion and MLG Retail would make payments towards the American Express balance on the account in Goureau's name, (4) representing to Plaintiffs that ML Fashion would make required company state tax payments in the states where Plaintiffs were made personally liable and (5) representing that funds ML Fashion obtained through its Credit Agreement with ML Retail, and the corresponding agreement with ML Retail and ML, LLC, would be used to provide the Company with cost-effective capital not to make the Company insurmountably indebted to ML Retail and ML, LLC.

213.   At all times, Defendants knew these misrepresentations were false and that Defendants intended to use ML Fashion as a vehicle for self-enrichment to the detriment of Plaintiffs and the Company itself.  Defendants further knew that they would use credit agreements to force debt upon ML Fashion, allowing Lemonis, through his alter ego entities ML Retail and ML, LLC, to foreclose on the Company on a whim and that Defendants would use ML Fashion to defraud other small business owners Lemonis purported to save.  Defendants further had no intention of

fully paying the American Express balance in Goureau's name and intended to use the balance as a sword over Plaintiffs to keep them in line.

214.   Defendants intended that Plaintiffs rely upon these misrepresentations and fraudulent omissions of material facts.

215.   Plaintiffs were ignorant of the falsity of the representations and justifiably relied on the misrepresentations and fraudulent omissions of material facts.  Plaintiffs relied on Defendants' representations by such things, including but not limited to, continuing the business venture with Defendants, and using the American Express card, tied to Goureau personally, to make Company purchases.

216.   Defendants' actions were willful, wanton, malicious and oppressive.

217.   As a direct and proximate result of Defendants' fraud, Plaintiffs have been harmed.  As a result of Defendants' fraud Plaintiffs have been prevented from starting new business ventures to the state tax liabilities, and Goureau's ability to obtain financing has been hindered due to the American Express debt.

## <u>COUNT III</u>
**(Breach of Fiduciary Duty – Derivative Claim Against Lemonis)**

Plaintiffs repeat and reallege each allegation contained above as though fully set forth herein.

218.   Lemonis currently serves as the Manager of ML Fashion.  Under the LLC Agreement, a Manager can be liable to the Company when he engages in what the LLC Agreement describes as Misconduct.  *See* LLC Agreement at p. 5, § 6.2,

Bellew Decl. Ex. A. Such Misconduct includes breach of fiduciary duty. By including a breach of fiduciary duty as Misconduct, the LLC Agreement contemplates and authorizes claims for breach of fiduciary duty as separate claims from breaches of the LLC Agreement.

219. Lemonis currently serves as the Chairman/CEO of ML Fashion, and, as an officer of ML Fashion, Lemonis owes the Company the fiduciary duties of care, loyalty, and good faith. The fiduciary duties that Lemonis owes to the Company as an officer, are separate and apart from, and in addition to, the fiduciary duties he owes to the Company as its Manager.

220. Lemonis engaged in Misconduct and breached his fiduciary duty to ML Fashion, as described above, by doing the following, among other things: (1) saddling the Company with expensive inventory then forcing the Company to sell that inventory at a loss, (2) purposefully decreasing the Company's profit margins making it reliant on loans from Lemonis and his entities, (3) purposefully removing capital from the Company so that its debts could not be paid, (4) purposefully increasing the debt of the Company and forcing it to take loans from Lemonis, and/or other companies owned and/or controlled by him, in order to meet its financial obligations, (5) taking actions that financially favored member ML Retail, LLC, decreasing the value and viability of the Company to the direct detriment of the other members of the Company, (6) using the assets of the Company to grow Lemonis'

personal brand MARCUS, (7) taking a personal tax write-off on ML Fashion's charitable donations, (8) using ML Fashion as a vehicle to defraud and foreclose upon small business owners Lemonis was purporting to save, (9) closing the Company's retail stores and removing at least $377,377 worth of inventory and $197,255 worth of fixtures, furniture, and equipment from the stores, (10) improperly removing at least $601,324.02 from the Company's bank accounts, (11) improperly taking at least $3,023,004.47 from ML Fashion and MLG Retail to pay personal, non-Company related, expenses that Defendants put on Defendant Lemonis' personal credit card and keeping and/or using the rewards points from those payments for Defendants' benefit, and (12) preventing ML Fashion from paying the business American Express card tied to Goureau personally.

221.   As a direct and proximate result of Lemonis' breaches of his fiduciary duty, Plaintiffs and the Company have been harmed in an amount to be proven at trial, but at least $4,198,960.49.

## COUNT IV
### (Breach of Fiduciary Duty – Direct and Derivative Claim Against Defendants Lemonis, ML Retail, and ML, LLC)

Plaintiffs repeat and reallege each allegation contained above as though fully set forth herein.

222.   As a control group wielding unbridled power to control the Company, the ML Control Group owes a fiduciary duty to the Company and Plaintiffs.  The

ML Control Group is connected by common ownership, as Lemonis is the only natural person with an interest in ML Retail and ML, LLC, and worked together towards their shared goal of running ML Fashion to benefit themselves to the detriment of the Company and Plaintiff. The fiduciary duties owed to the Company and to Plaintiffs by the Control Group do not arise from the LLC Agreement.

223. The fiduciary duties that Lemonis owes to the Company and to Plaintiffs as a result of being in the ML Control Group are separate and apart from, and in addition to, the fiduciary duties he owes to the Company as its Manager and an officer.

224. The ML Control Group breached its fiduciary duty to the Company, Goureau, and Menkin, as described above, by doing the following, among other things: (1) saddling the Company with expensive inventory then forcing the Company to sell that inventory at a loss, (2) purposefully decreasing the Company's profit margins making it reliant on loans from Lemonis and his entities, (3) purposefully removing capital from the Company so that its debts could not be paid, (4) purposefully increasing the debt of the Company and forcing it to take loans from Lemonis, and/or ML Retail and/or ML, LLC, in order to meet its financial obligations, (5) taking actions that financially favored member ML Retail, LLC, decreasing the value and viability of the Company to the direct detriment of the other members of the Company, (6) using the assets of the Company to grow Lemonis'

personal brand MARCUS, (7) having Lemonis take personal tax write-offs on ML Fashion's charitable donations, (8) using ML Fashion as a vehicle to defraud and foreclose upon small business owners Lemonis was purporting to save, (9) closing the Company's retail stores and removing at least $377,377 worth of inventory and $197,255 worth of fixtures, furniture, and equipment from the stores, (10) improperly removing at least $601,324.02 from the Company's bank accounts, and (11) improperly taking at least $3,023,004.47 from ML Fashion and MLG Retail to pay personal, non-Company related, expenses that Defendants put on Defendant Lemonis' personal credit card and keeping and/or using the rewards points from those payments for Defendants' benefit.

225. As a direct and proximate result of the ML Control Group's breaches of their fiduciary duty, Plaintiffs and the Company have been harmed in an amount to be proven at trial, but at least $4,198,960.49.

## COUNT V
### (Aiding and Abetting – Direct Claim Against Raffel)

Plaintiffs repeat and reallege each allegation contained above as though fully set forth herein.

226. As stated above, Defendants Lemonis, ML Retail, and ML, LLC as the alter ego of Lemonis and ML Retail, owed fiduciary duties to the Company and Plaintiffs.

227.   Defendant Raffel knew that Defendants Lemonis, ML Retail, and ML, LLC owed fiduciary duties to ML Fashion.

228.   Defendant Raffel knowingly aided and abetted Defendants' breaches of their fiduciary duties by: (1) working with Lemonis to buy product for ML Fashion's retail stores far above ML Fashion's budget for product thus forcing ML Fashion to incur more debt from Lemonis so it was not able to cover its normal business expenses, such as payroll and rent, (2) making business decisions that were outside of her understanding such as managerial, staffing, discounting, and merchandising decisions, knowing that ML Fashion would have to expend time and resources to correct and redo her work, and (3) working with Defendants to make ML Fashion insolvent and indebted to ML Retail and ML, LLC so that they could use the assets of ML Fashion to grow Lemonis and Raffel's MARCUS brand.

229.   As a direct and proximate result of Defendant Raffel's conduct, Plaintiffs and the Company have been harmed in an amount to be proven at trial.

## COUNT VI
**(Breach of the Implied Covenant of Good Faith and Fair Dealing – Direct and Derivative Claim Against Defendants Lemonis, ML Retail, and ML, LLC)**

Plaintiffs repeat and reallege each allegation contained above as though fully set forth herein.

230.   The LLC Agreement contains an implied covenant of good faith and fair dealing.  The implied covenant of good faith and fair dealing attaches whenever

an LLC Agreement gives a party the ability to take an action in their "sole discretion."  As discussed above, the LLC Agreement gave Lemonis the sole discretion to manage the day to day affairs of ML Fashion, gave ML Retail the sole discretion to change the Company's manager, and gave ML Retail the sole discretion to handle ML Fashion's tax matters.

231.   The implied covenant of good faith and fair dealing applies in an LLC agreement that, like the LLC Agreement here, attempts to limit the liability of its managers and members.

232.   Defendants breached this covenant by abusing, unreasonably and in bad faith and for their own interests and to the detriment of the Company, the managerial power over the Company provided to them in the LLC Agreement.  Actions which breached the covenant, described above, include, but are not limited to: (1) saddling the Company with expensive inventory then forcing the Company to sell that inventory at a loss, (2) purposefully decreasing the Company's profit margins making it reliant on loans from Lemonis and his entities, (3) purposefully removing capital from the Company so that its debts could not be paid, (4) purposefully increasing the debt of the Company and forcing it to take loans from Lemonis, and/or other companies owned and/or controlled by him, in order to meet its financial obligations, (5) taking actions that financially favored member ML Retail, LLC, decreasing the value and viability of the Company to the direct detriment of the other

members of the Company, (6) using the assets of the Company to grow Lemonis' personal brand MARCUS, (7) having Lemonis take personal tax write-offs on ML Fashion's charitable donations, (8) using ML Fashion as a vehicle to defraud and foreclose upon small business owners Lemonis was purporting to save, (9) closing the Company's retail stores and removing at least $377,377 worth of inventory and $197,255 worth of fixtures, furniture, and equipment from the stores, (10) improperly removing at least $601,324.02 from the Company's bank accounts, and (11) improperly taking at least $3,023,004.47 from ML Fashion and MLG Retail to pay personal, non-Company related, expenses that Defendants put on Defendant Lemonis' personal credit card and keeping and/or using the rewards points from those payments for Defendants' benefit.

233.  As a direct and proximate result of Defendants' breaches of the implied duty of good faith and fair dealing, Plaintiffs and the Company have been harmed in an amount to be proven at trial, but at least $4,198,960.49.

**COUNT VII**
**(Breach of ML Fashion's LLC Agreement – Direct and Derivative Claim Against Defendants Lemonis, ML Retail, and ML, LLC)**

Plaintiffs repeat and reallege each allegation contained above as though fully set forth herein.

234.  This is a direct and derivative action for money damages arising out of Defendants' breach of the duties and obligations owed to ML Fashion and the

Company's members under the LLC Agreement, and the resulting damages that were incurred.

235.   At all times material to this action, Defendant Lemonis was the Manager and Chairman/CEO of ML Fashion, Defendant ML Retail owned the largest and most powerful membership interest in the Company, and ML, LLC was an agent and alter ego of both Lemonis and ML Retail.  As such, Defendants agreed to fulfill and discharge certain managerial duties and obligations that were expressly set forth in the LLC Agreement.

236.   Specifically, under Section 2.8 of the LLC Agreement, Defendants agreed that "[t]he Company's credit and assets shall be used solely for the benefit of the Company."  *See* LLC Agreement at § 2.8, Bellew Decl. Ex A.

237.   Defendants materially breached Section 2.8 of the LLC Agreement, by removing the assets of the Company, including money in its bank accounts and inventory in its stores, and using the assets of the Company to promote Lemonis' personal brand MARCUS, thus clearly not using them solely for the benefit of the Company.  Indeed, the removal of these assets have prevented the Company from being able to satisfy its financial obligations.

238.   Lemonis further breached this provision of the LLC Agreement by improperly taking at least $3,023,004.47 from ML Fashion and MLG Retail to pay personal, non-Company related, expenses that Defendants put on Defendant

Lemonis' personal credit card and keeping and/or using the rewards points from those payments for Defendants' benefit.

239.   Further, Section 6.2(b) required Lemonis to act in good faith and to take actions for the benefit of all of the members as a whole:

**6.2   Duties and Obligations of the Manager; Discretion**:

(b)     Subject to the foregoing but notwithstanding any other provision of this Agreement to the contrary or other applicable provision of law or equity, whenever in this Agreement a Manager or an Officer is permitted or required to make a decision or take an action (i) in his "sole discretion" or "discretion" or under a similar grant of authority or latitude, in making such decisions or taking such actions, he shall be entitled to take into account his own interests as well as the interests of the Members as a whole or (ii) in "good faith" or under another expressed standard, he shall act under such express standard and shall not be subject to any other or different standard.

*See* LLC Agreement at § 6.2(b), Bellew Decl. Ex A.

240.   Lemonis materially breached Section 6.2 by taking actions that failed to take into account "the interests of the Members as a whole" and failing to act in good faith.  Specifically, Lemonis made ML Fashion take on debt and forced ML Fashion to take loans from ML Retail in transactions that solely benefited ML Retail and harmed ML Fashion and its other members.

241.   Moreover, Lemonis' actions of draining ML Fashion's bank accounts and transferring funds to MLG Retail so that ML Fashion could not pay its debt clearly were not done in good faith.

242. The LLC Agreement prohibits the Manager from engaging in Misconduct. The LLC Agreement defines Misconduct as "fraud, breach of fiduciary duty, bad faith, a knowing violation of law or willful misconduct." *See* LLC Agreement at p. 5, Bellew Decl. Ex A.

243. Lemonis' Misconduct as the manager of ML Fashion includes, but is not limited to: (1) forcing the Company to take on debt making it reliant on credit from Lemonis and his entities to meet its regular obligations, such as payroll, and allowing Lemonis to further encumber ML Fashion, (2) using ML Fashion as a vehicle to defraud and foreclose upon the businesses Lemonis was purporting to save, (3) removing funds from the Company's bank accounts in order to ensure that its automated payments could not be made out of the account forcing ML Fashion to become delinquent on its debts, (4) closing ML Fashion's retail stores during a global pandemic and converting at least $377,377 worth of inventory and $197,255 worth of fixtures, furniture, and equipment from the stores, (5) moving all of the funds out of ML Fashion's bank accounts (roughly $601,324.02) and transferring them to a different company and making the new account invisible to the other owners and signatories on ML Fashion's bank accounts, and (6) improperly taking at least $3,023,004.47 from ML Fashion and MLG Retail to pay personal, non-Company related, expenses that Defendants put on Defendant Lemonis' personal

credit card and keeping and/or using the rewards points from those payments for Defendants' benefit.

244.    Further, the LLC Agreement limits the Manager's and Members' ability to take assets and distributions from the Company.  Section 2.7 confirms that "no Member shall have ownership interest" in the Company's property as all of it belongs to the Company itself.  *See* LLC Agreement at § 2.7, Bellew Decl. Ex A. Section 3.4 prevents Members from seeking capital of the Company in return for contributions "prior to termination of the Company."  *Id*. at § 3.4.

245.    Similarly, no cash distributions are allowed where, as here, the Company's trade accounts are past due.  *Id.* at § 5.1(a).  Even if the trade accounts were not past due, however, the distributions can be made only within the Manager's "reasonable business judgment" and only to ***all*** the Members pursuant to the specific mechanism set forth in the LLC Agreement.  *Id.* at § 5.1(b).

246.    An additional limitation on cash distributions is that they cannot be made at all if the effect of the distributions is for all the Company's liabilities to exceed the fair value of its assets.  *Id.* at ¶ 5.4.

247.    Defendants have breached these provisions of the LLC Agreement by removing cash from the Company's bank accounts and removing inventory from the Company's retail stores to the benefit of Defendants and detriment of the Company and Plaintiffs.

248.   As a direct and proximate result of Defendants' material breaches of the LLC Agreement, Plaintiffs and the Company have been harmed in an amount to be proven at trial, but at least $4,198,960.49.

## COUNT VIII
### (Unjust Enrichment – Direct and Derivative Claim Against Defendants Lemonis, ML Retail, and ML, LLC)

Plaintiffs repeat and reallege each allegation contained in Paragraph 1 – Paragraph 233 above as though fully set forth herein.

249.   Plaintiffs bring this claim for Unjust Enrichment in the alternative to their claim for Breach of the LLC Agreement (Count VII) above.  Such alternative pleading is proper where, as here, Plaintiffs are seeking rescission of the LLC Agreement through their claim for Fraudulent Inducement (Count I).

250.   Plaintiffs allege that the Company has no adequate remedy at law and bring this unjust enrichment claim against Defendants.

251.   By their wrongful acts and omissions, as alleged herein, the Defendants were unjustly enriched at the expense of, and to the detriment of, the Company.  The Defendants used the Company as a self-enrichment vehicle while forcing the Company to take actions counter to the Company's interests and to assume increasing debt.

252.   As the manager of ML Fashion, Lemonis used the Company's assets to enrich himself and his entities by, among other things: (1) purposefully decreasing the Company's profit margins making it reliant on loans from Lemonis and his

entities, (2) purposefully increasing the debt of the Company and forcing it to take loans from Lemonis, and/or other companies owned and/or controlled by him, in order to meet its financial obligations, (3) taking actions that financially favored member ML Retail, LLC, decreasing the value and viability of the Company to the direct detriment of the other members of the Company, (4) using the assets of the Company to grow Lemonis' personal brand MARCUS, (5) having Lemonis take personal tax write-offs on ML Fashion's charitable donations, (6) closing the Company's retail stores and removing at least $377,377 worth of inventory and $197,255 worth of fixtures, furniture, and equipment from the stores, (7) improperly removing at least $601,324.02 from the Company's bank accounts, (8) improperly taking at least $3,023,004.47 from ML Fashion and MLG Retail to pay personal, non-Company related, expenses that Defendants put on Defendant Lemonis' personal credit card and keeping and/or using the rewards points from those payments for Defendants' benefit, (9) receiving at least approximately $500,000 in interest from ML Fashion on ML Retail and ML, LLC's line of credit with ML Fashion, and (10) using the assets, relationships, good will, and trade secrets of ML Fashion to grow Defendants' own retail concept MARCUS.

253. Plaintiffs, as members and representatives of the Company, seek restitution from the Defendants, and seek an order from this Court requiring the

Defendants to disgorge all profits, benefits, and other compensation obtained by the Defendants from their wrongful conduct and fiduciary breaches.

254.    Further, it is against equity and good conscience to permit Defendants to retain what is sought to be recovered because Defendants used the Company's assets to enrich themselves at the expense of the Company and its other members. There is no justification for Defendants' actions.

## COUNT IX
### (Gross Mismanagement – Direct and Derivative Claim Against Defendants Lemonis, ML Retail, and ML, LLC)

Plaintiffs repeat and reallege each allegation contained above as though fully set forth herein.

255.    As the manager of ML Fashion, Lemonis has grossly mismanaged the Company and its assets.   Lemonis' gross mismanagement, described above, includes, but is not limited to: (1) saddling the Company with expensive inventory then forcing the Company to sell that inventory at a loss, (2) purposefully decreasing the Company's profit margins making it reliant on loans from Lemonis and his entities, (3) purposefully removing capital from the Company so that its debts, including the American Express payment plan, could not be paid, (4) purposefully increasing the debt of the Company and forcing it to take loans from Lemonis, and/or other companies owned and/or controlled by him, in order to meet its financial obligations, (5) taking actions that financially favored member ML Retail, LLC,

decreasing the value and viability of the Company to the direct detriment of the other members of the Company, (6) using the assets of the Company to grow Lemonis' personal brand MARCUS, (7) having Lemonis take personal tax write-offs on ML Fashion's charitable donations, (8) using ML Fashion as a vehicle to defraud and foreclose upon small business owners Lemonis was purporting to save, (9) closing the Company's retail stores and removing at least $377,377 worth of inventory and $197,255 worth of fixtures, furniture, and equipment from the stores, (10) improperly removing at least $601,324.02 from the Company's bank accounts, (11) improperly taking at least $3,023,004.47 from ML Fashion and MLG Retail to pay personal, non-Company related, expenses that Defendants put on Defendant Lemonis' personal credit card and keeping and/or using the rewards points from those payments for Defendants' benefit, (12) receiving at least approximately $500,000 in interest from ML Fashion on ML Retail and ML, LLC's line of credit with ML Fashion, (13) using the assets, relationships, good will, and trade secrets of ML Fashion to grow Defendants' own retail concept MARCUS, and (14) creating personal liability for Plaintiffs due to the failure to pay the American Express and failure to pay required tax and business fees in Illinois, Connecticut, Minnesota, Florida.

256.   As a direct and proximate result of Defendants' gross mismanagement, Plaintiffs and the Company have been harmed in an amount to be proven at trial, but

at least $4,198,960.49. Plaintiff Goureau has been harmed by Defendants' gross mismanagement as Defendants' failure to pay the American Express debt triggers' Goureau's personal obligation to pay the outstanding amount. Plaintiff Menkin has been harmed by Defendants' gross mismanagement by being personally liable for state tax and business fees in Illinois, Connecticut, Minnesota, and Florida, thus hindering her ability to start separate businesses in those states.

## COUNT X
**(Waste and Misappropriation of Corporate Assets – Derivative Claim Against Defendants Lemonis, ML Retail, and ML, LLC)**

Plaintiffs repeat and reallege each allegation contained above as though fully set forth herein.

257. This is an action for relief arising out of the waste of corporate assets caused solely by Defendants' malfeasance, acts or omissions, to the detriment of the Company.

258. Defendants have taken at least $3,023,004.47 in funds from ML Fashion and MLG Retail's bank accounts to pay personal, non-Company related, expenses that Defendants put on Defendant Lemonis' personal credit card.

259. Since April 2020, Defendants have been closing retail stores all over the country owned and/or operated by either ML Fashion or MLG Retail, and have removed the Company's assets from those stores. In total, Defendants have removed at least $377,377 worth of inventory and $197,255 worth of fixtures, furniture, and

equipment from the Company's stores in Palm Beach, Florida, Glencoe, Illinois, and Dallas, Texas. Defendants have also taken hundreds of thousands of dollars from the Company's Newtown, Massachusetts store.

260. On or around May 22, 2020, Defendants moved roughly $601,324.02 out of ML Fashion's bank accounts and transferred the funds to an account in the name of MLG Retail that was not tied to either company's other accounts preventing the accounts' other signatory, Plaintiff Menkin, from being able to access or view the account.

261. Since the filing of Plaintiffs' initial Complaint on June 18, 2020, Defendants have held fire sales selling large portions of ML Fashions inventory for up to 90% off forcing the Company to take huge losses on that inventory.

262. These actions by Defendants amount to a waste and misappropriation of corporate assets.

263. As a direct and proximate result of Defendants' malfeasance, acts or omissions, Plaintiffs and the Company have been harmed in an amount to be proven at trial, but at least $4,198,960.49.

## COUNT XI
### (Conversion – Derivative Claim Against Defendants)

Plaintiffs repeat and reallege each allegation contained above as though fully set forth herein.

264.   ML Fashion had a property interest in the funds in its bank accounts and inventory and furniture, fixtures, and equipment in its retail stores and a right to possess those funds and inventory and have them utilized for legitimate business purposes.

265.   Defendants converted these funds by removing such funds from ML Fashion's bank accounts for no legitimate business purpose, including removing roughly $601,324.02 from the Company's bank accounts.

266.   Defendants additionally converted ML Fashion's property by taking at least $3,023,004.47 from ML Fashion and MLG Retail's bank accounts to pay personal, non-Company related, expenses that Defendants put on Defendant Lemonis' personal credit card.

267.   To the extent that any of the $3,023,004.47 was used towards legitimate business expenses, Defendants converted the American Express rewards points associated with those credit card payments.

268.   Defendants converted ML Fashion's inventory by removing at least $377,377 worth of inventory and $197,255 worth of fixtures, furniture, and equipment from the Company's stores in Palm Beach, Florida, Glencoe, Illinois, and Dallas, Texas for no legitimate business purpose.  Defendants have also taken hundreds of thousands of dollars from the Company's Newtown, Massachusetts store.

269.   On information and belief, Defendants are converting ML Fashion's inventory and FFE, at least in part, to support Lemonis and Raffel's MARCUS brand and move the brand from ML Fashion to ML, LLC.

270.   Defendants' actions were willful, wanton, malicious and oppressive.

271.   As a direct and proximate result of Defendants' actions, Plaintiffs and the Company have been harmed in an amount to be proven at trial, but at least $4,198,960.49.

## COUNT XII
### (Receiver)

Plaintiffs repeat and reallege each allegation contained above as though fully set forth herein.

272.   Defendants are actively removing assets from ML Fashion, purposefully rendering it unable to meet its current obligations.  Defendants have prevented the Company from making the agreed upon automatic monthly payments to the American Express credit card in Goureau's name.  American Express has informed Goureau that if payments are not made before June 26, 2020 it will take action against Goureau personally and seek the entire outstanding balance of roughly $463,112.

273.   As of the filing of this Complaint, Defendants have closed three of the Company's stores and removed at least $377,377 worth of inventory and $197,255 worth of fixtures, furniture, and equipment from the stores.

274. Further, on or around May 22, 2020, Defendants moved roughly $601,324.02 from the Company's bank accounts.

275. As a result of Defendants' current misappropriation of the Company's funds and assets, the appointment of a custodian or receiver to direct and supervise ML Fashion's business and affairs pending a decision on the merits of Plaintiff's claims is necessary and appropriate to avoid irreparable harm to the Company and its members.

## COUNT XIII
### (Temporary, Preliminary and Permanent Injunction)

Plaintiffs repeat and reallege each allegation contained above as though fully set forth herein.

276. By purposefully rendering ML Fashion unable to pay its debts, removing funds from ML Fashion's bank accounts, closing its stores and removing its assets, and seeking to misappropriate ML Fashion's funds for their personal benefit, Defendants' actions threaten to cause irreparable harm to Plaintiffs and the Company. To preserve the status quo and prevent damage to ML Fashion, Plaintiffs seek an order immediately restraining and enjoining all Defendants, or those acting in privity with them, from (or as appropriate, requiring them to take the following action):

i.   Spending, transferring or dissipating any funds of ML Fashion except as absolutely necessary in the ordinary course of business for ML Fashion, and including specifically that no funds will be expended for:

a.   Any payments whatsoever to Defendants or their affiliates, for any purpose, including bonuses; or

b.   Any payments whatsoever to Defendants' personal attorney from the Company's funds.

ii.   Entering into any banking, borrowing and/or investment arrangements on behalf of the Company.

iii.   Closing any retail stores of ML Fashion and/or moving, or removing any of the inventory, furniture, fixtures, and equipment and any other assets located in such stores.

277.   The issuance of a temporary restraining order will prevent further harm to the Company until a preliminary injunction hearing is held and will not unduly prejudice Defendants.

## COUNT XIV
### (Dissolution under 6 Del. C. § 18-802)

Plaintiffs repeat and reallege each allegation contained above as though fully set forth herein.

278.   6 Del. C. § 18-802 authorizes a member or manager of a limited liability company to petition the Court for dissolution of the company whenever it is not

reasonably practicable to carry on the business in conformity with a limited liability company agreement.

279.    Pursuant to 6 Del. C. § 18-802, Plaintiffs, as members of ML Fashion, allege that it is "not reasonably practicable to carry on the business in conformity with a limited liability company agreement" and therefore ask this Court to order a dissolution of the Company.

280.    Lemonis, ML Retail, and the ML Control Group have beached their duties owed to the Company and its members.  They have forced the Company to take on debt forcing it to take loans from Defendants, purposely transferred funds from the Company's bank accounts so that the Company could not pay its debts, closed the Company's stores and removed its assets, and actively used the Company as a self-enrichment vehicle constantly acting to benefit themselves to the detriment of the Company and Plaintiffs.

281.    Plaintiffs accordingly request that the Court dissolve ML Fashion pursuant to Section 18-802.  Plaintiffs further request that a liquidating trustee be appointed to oversee the dissolution and winding up of ML Fashion pursuant to Section 18-803, instead of the Defendants.  A liquidating trustee would ensure that Plaintiffs are protected from further harm caused by the Defendants—who have demonstrated a history of mismanagement and misappropriating of the Company's funds.

## COUNT XV
**(Breach of Contract – Direct Claim by Plaintiff Menkin Against Defendants ML Fashion and MLG Retail)**

Plaintiffs repeat and reallege each allegation contained above as though fully set forth herein.

282.  Since its inception, Plaintiff Menkin served Defendants ML Fashion and MLG Retail as their President.  In exchange for her services, Menkin and ML Fashion and MLG Retail agreed that she would receive bimonthly payments of $11,558.  Those bimonthly payments were made on the 1st and 15th of every month.

283.  Thus, a valid and enforceable contract existed between Menkin, ML Fashion, and MLG Retail where Menkin received compensation of bimonthly payments of $11,558 in exchange for serving as the President of the companies.

284.  Beginning on April 1, 2020, ML Fashion and MLG Retail ceased paying Menkin the compensation due under the agreement.  By failing to pay Menkin, ML Fashion and MLG Retail have breached the agreement between it and Menkin.

285.  As a direct and proximate result of Defendants' actions, Plaintiff Menkin has been harmed in an amount to be proved at trial, but not less than $69,348.

286.  Plaintiffs repeat and reallege each allegation contained above as though fully set forth herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants as follows:

A.  Compensatory damages in an amount to be determined at trial, but not less than $4,268,308.49;

B.  Punitive damages;

C.  Rescission of the LLC Agreement as it was obtained by fraud;

D.  Compelling the Defendants to account for all assets they misappropriated from the Company, as well as any benefits they have realized from those assets;

E.  Disgorging from the Defendants all assets they misappropriated from the Company, as well as any benefits they have realized from those assets;

F.  The appointment of a receiver as set forth in Count XII.

G.  A temporary, preliminary, and permanent injunction set forth in Count XIII.

H.  A judgment that ML Fashion is dissolved;

I.  The appointment of an independent liquidating trustee to wind up the affairs of ML Fashion;

J.  An award of the costs and disbursements of this action, including reasonable attorneys' fees, costs and expenses; and

K.   All such other and further relief as the Court deems just and proper under the circumstances.

*    *    *

Dated: August 24, 2020

*/s/ Sean J. Bellew*
Sean J. Bellew (#4072)
**Bellew LLC**
Red Clay Center at Little Falls
2961 Centerville Road, Suite 302
Wilmington, Delaware 19808
Telephone: (302) 353-4951
sjbellew@bellewllc.com

**Gerard Fox Law P.C.**
Gerard P. Fox (*pro hac vice forthcoming*)
Lauren M. Greene (*pro hac vice forthcoming*)
1880 Century Park East, Suite 1410
Los Angeles, CA 90067
Telephone: (310) 441-0500
Facsimile: (310) 441-4447
gfox@gerardfoxlaw.com
lgreene@gerardfoxlaw.com

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

NICOLAS GOUREAU and STEPHANIE
MENKIN, individually and derivatively on
behalf of ML FASHION, LLC, a Delaware
limited liability company,

    C.A. No. 2020-0486

    Plaintiffs,

  v.

MARCUS LEMONIS, an individual, ML
RETAIL, LLC, a Delaware limited
liability company, MARCUS LEMONIS,
LLC, a Delaware limited liability
company, ROBERTA RAFFEL aka
Bobbi Lemonis, an individual, and MLG
RETAIL, LLC, a Delaware limited
liability company,

    Defendants,

  and

ML FASHION, LLC, a Delaware limited
liability company,

    Nominal Defendant.

**<u>VERIFICATION PURSUANT TO 10 *Del.* C. § 3927</u>**

Pursuant to 10 *Del.* C. § 3927, Nicolas Goureau hereby state:

1.  I, Nicolas Goureau am the Plaintiff in the above captioned proceeding

and am a member of nominal Defendant ML Fashion, LLC ("ML Fashion" or

"Company").

2.    I have read the foregoing Verified First Amended Complaint and affirm: (i) that the factual allegations contained therein are true and correct to the best of my knowledge, except, that in the case of allegations based upon information and belief, I believe such allegations to be true, and (ii) insofar as they relate to the acts of any other person, are believed by me to be true.

I declare under penalty of perjury under the laws of Delaware that the foregoing is true and correct.

Executed on the 24th day of August 2020

_____

NICOLAS GOUREAU

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

NICOLAS GOUREAU and STEPHANIE
MENKIN, individually and derivatively on
behalf of ML FASHION, LLC, a Delaware
limited liability company,

                Plaintiffs,

     v.

MARCUS LEMONIS, an individual, ML
RETAIL, LLC, a Delaware limited
liability company, MARCUS LEMONIS,
LLC, a Delaware limited liability
company, ROBERTA RAFFEL aka
Bobbi Lemonis, an individual, and MLG
RETAIL, LLC, a Delaware limited
liability company,

                Defendants,

    and

ML FASHION, LLC, a Delaware limited
liability company,

                Nominal Defendant.

C.A. No. 2020-0486

## <u>VERIFICATION PURSUANT TO 10 *Del.* C. § 3927</u>

Pursuant to 10 *Del.* C. § 3927, Stephanie Menkin hereby state:

1.     I, Stephanie Menkin am the Plaintiff in the above captioned proceeding

and am a member of nominal Defendant ML Fashion, LLC ("ML Fashion" or

"Company").

2.      I have read the foregoing Verified First Amended Complaint and affirm: (i) that the factual allegations contained therein are true and correct to the best of my knowledge, except, that in the case of allegations based upon information and belief, I believe such allegations to be true, and (ii) insofar as they relate to the acts of any other person, are believed by me to be true.

I declare under penalty of perjury under the laws of Delaware that the foregoing is true and correct.

Executed on the 24th day of August 20

_____
STE