# Exhibit 4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| NICOLAS GOUREAU and STEPHANIE MENKIN, individually and derivatively on behalf of GOOBERRY CORP., a New York corporation, | : : : : | |
| Plaintiffs, | : : | Civil Action No. 20-cv-4691 |
| v. | : : | |
| MARCUS LEMONIS, an individual, ML RETAIL, LLC, a Delaware limited liability company, and MARCUS LEMONIS, LLC, a Delaware limited liability company, and MACHETE CORPORATION d/b/a/ MACHETE PRODUCTIONS, a California corporation, | : : : : : : : | **FIRST AMENDED COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL ON ALL CLAIMS SO TRIABLE** |
| Defendants, | : : | |
| and | : : | |
| GOOBERRY CORP., a New York corporation, | : : | |
| Nominal Defendant. | : : : | |

Nicolas Goureau ("Goureau"), Stephanie Menkin ("Menkin") (collectively, "Plaintiffs"), by and through their undersigned counsel, individually and on behalf of Gooberry Corp. ("Gooberry" or the "Company"), bring this action against Defendants Marcus Lemonis ("Lemonis"), ML Retail, LLC ("ML Retail"), Marcus Lemonis, LLC ("ML, LLC") (collectively "Lemonis Entities"), and Machete Corporation dba Machete Productions ("Machete") (Lemonis, Lemonis Entities, and Machete are collectively referred to as "Defendants") and allege as follows:

1

## INTRODUCTION

1.     This action arises from the fraudulent scheme, bad faith actions, and breaches of the fiduciary duties of Defendant Marcus Lemonis via the entities he controls, including ML Retail, LLC, a shareholder of Gooberry Corp., and Marcus Lemonis, LLC.  These Defendants have knowingly and purposefully mismanaged the Company and used it solely for their own personal gain.  Defendants are siphoning money from the Company, actively preventing it from meeting its obligations, and lootings its assets.

2.     Defendant Marcus Lemonis is a false prophet who uses his fame and fortune to steal small businesses from everyday Americans.  Through his television show, "The Profit," Lemonis preys on small businesses and slowly drowns them in debt in order to expand his own empire.  On the show, Lemonis portrays himself as the savior to small businesses, when in reality, he is a cancer that destroys the businesses he purports to save from the inside out.  Like the Wizard of Oz, Lemonis conducts his operations through a constellation of entities, the Lemonis Entities, but in reality, he stands behind all of them.

3.     On every episode of "The Profit," Lemonis says the same line, "there is one condition, I am 100 percent in charge."  This strongman persona gives Lemonis the opportunity to saddle the businesses with exorbitant debt to him and his entities making them ever beholden to him.  Eventually, Lemonis calls his debt, forecloses on the business, and takes all of its assets for himself leaving the original owners to pick up the pieces.

4.     Courage.B began in 2008 as an upscale women's clothing store and brand owned and operated by Neomi Goureau and her children Plaintiffs Goureau and Menkin through their entity Gooberry Corp.  Gooberry Corp. owns the Courage.B brand.  The brand focused on high-end garments and accessories, inspired by the family's French roots.

2

5.     Over the next six years, Courage.B became very successful.  In 2014, Courage.B had seven different retail stores around the country, including locations in Greenwich, CT, Palm Beach, FL, Bethesda, MD, Aspen, CO, New York, NY, Southampton, NY, and Fairfax, VA, and was valued at over $2.6M based on Lemonis' own investment.

6.     Plaintiffs Goureau and Menkin's family-owned clothing line was featured on a 2014 episode of "The Profit."  In their episode, which aired on October 14, 2014, Lemonis agreed to invest in Courage.B by acquiring a 30% interest in Gooberry for $800,000.  That $800,000 investment was supposed to be broken down as follows: $300,000 new inventory, $40,000 to eliminate high interest debt, $150,000 in working capital, $200,000 to renovate the stores, $50,000 to create a new e-commerce site and an extra $60,000 whose use was to be determined.

7.     However, while the show was filming and before the deal finalized, Lemonis spent millions renovating its stores.  While he was making the renovations, Lemonis represented to Plaintiffs that he was taking care of renovations, that they did not have to worry about it, and that they should "trust the process."  Plaintiffs had no idea that Lemonis was vastly exceeding the stated $200,000 renovations budget.

8.     When Plaintiffs received the exorbitant bills for the renovations and questioned the costs being incurred on Gooberry's behalf, Lemonis said if they no longer wanted to do the deal, they would have to pay him back the millions he spent on Gooberry—a demand that was impossible for Plaintiffs to meet.

9.     On November 18, 2014, the deal reached on the show was memorialized and Lemonis purchased his stake in Gooberry through Defendant ML Retail, LLC.

10.     As detailed below, Lemonis was sure to give himself unbridled control over Gooberry by allowing himself, as owner and Chief Executive Officer of ML Retail, to make any and all business decisions for the Company without the consent of Goureau or Menkin.

11.     Once Lemonis had control of Gooberry, he began to use it for his personal gain. Time and time again, as set forth below, Lemonis forced Gooberry to become further indebted to him by unnecessarily renovating and rebranding stores, buying inventory above what Gooberry could afford, and buying inventory that was not profitable.

12.     These debts often forced the Company to obtain loans from one of Lemonis' controlled entities to meet its payment obligations such as payroll and rent.

13.     As discussed below, Defendants used the television show, "The Profit," to bait small business owners into Defendants' web.  Defendants made fraudulent representations that Defendants would be helping the small businesses, when in reality, they were setting them up to fail so that Defendants could take the business for themselves.  Defendants' fraudulent and deceptive scheme violates the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq*.

14.     Recently, Lemonis has taken his misconduct, mismanagement, and misuse of power of Gooberry to the next level.  Lemonis is actively using the global pandemic to further loot Gooberry.  Lemonis has unilaterally closed its retail stores and moved the Company's inventory, furniture, fixtures, and equipment to other entities and/or businesses owned or controlled by Lemonis.

15.     Without the Court's intervention, the Company will be irreparably harmed. Through this Complaint, Plaintiffs seek redress for Lemonis' mismanagement of the Company, the appointment of a receiver to prevent Lemonis from further harming the Company, and to hold

Lemonis and Lemonis Entities accountable for their RICO violations, for breaching their fiduciary duties, wasting the Company's corporate assets, and operating the Company as a self-enrichment vehicle for Lemonis and Lemonis Entities.

### PARTIES

16.     Plaintiff Goureau is an individual, a resident of Florida, and co-founder and a majority shareholder of Gooberry Corp.  Goureau is an entrepreneur and clothing and retail executive.  He is a signatory to the Stock Purchase Agreement and Shareholder Agreement (defined and described below) and owns 34% of the shares of the Company.  Together with his sister, Plaintiffs Goureau and Menkin own 56% of the shares of Gooberry, a majority interest in the Company.

17.     Plaintiff Menkin is an individual, a resident of New York County, and co-founder and a minority shareholder of Gooberry Corp.  Menkin is an entrepreneur and clothing and retail executive.  Menkin is a signatory to the Shareholder Agreement (defined and described below) and owns 22% of the shares of the Company.  Together with her brother, Plaintiffs Menkin and Goureau own 56% of the shares of Gooberry, a majority interest in the Company.

18.     Nominal Defendant Gooberry Corp. is a privately-held New York corporation. Gooberry has its principal place of business in New York, New York and owns and operates a number of fashion brands and retail stores that have included Runway, Denim & Soul and Courage.B.  As of the filing of this Complaint, Gooberry owns and operates the Runway brand and has stores in Greenwich, Connecticut and Lake Forest, Illinois.

19.     Defendant Marcus Lemonis is an individual domiciled in Illinois and is the owner of ML, LLC and ML Retail, LLC.  Lemonis is an investor and television personality of CNBC's reality show, "The Profit."  Lemonis signed the Stock Purchase Agreement (defined and described

below) on behalf of ML Retail, LLC. Upon information and belief, Lemonis also signed the Shareholder Agreement (defined and described below) on behalf of ML Retail, LLC. He is also chairman and CEO of Camping World, Good Sam Enterprises, Gander Outdoors, and The House Boardshop.

20.    Defendant ML Retail, LLC is a limited liability company organized and existing under the laws of Delaware with its principle place of business in the State of Illinois. ML Retail, LLC is a party to the Stock Purchase Agreement and Shareholder Agreement (defined and described below) and owns 32% of the shares of the Company. Lemonis is the sole member of ML Retail.

21.    Defendant Marcus Lemonis, LLC is a limited liability company organized and existing under the laws of Delaware with its principle place of business in the State of Illinois. Marcus Lemonis Enterprises, LLC is the sole member of ML, LLC. The sole member of Marcus Lemonis, LLC is the Marcus Lemonis Revocable trust, whose trustee is Marcus Lemonis. ML, LLC is the alter ego or agent of Lemonis, and ML Retail operates as Lemonis' personal holding company.

22.    Defendant Machete Corporation dba Machete Productions is a corporation organized and existing under the laws of California with a principle place of business in the State of California. Machete Corporation is the agent for Defendants Lemonis, ML Retail, and ML, LLC.

23.    At all times relevant to this action, Defendant Marcus Lemonis has had, either directly or indirectly, exclusive and complete dominion and control over ML Retail and ML, LLC, such that these entities were his alter egos and the acts of ML Retail and ML, LLC as set forth in this Complaint are also the acts of Defendant Marcus Lemonis.

24.     There is such a unity of interest and ownership between Defendant Marcus Lemonis on one hand and ML Retail and ML, LLC on the other hand, that the individuality of ML Retail and ML, LLC or their separateness from Defendant Marcus Lemonis have ceased because, upon information and belief:

a.  ML Retail and ML, LLC are completely influenced and governed by Defendant Marcus Lemonis;

b.  Defendant Marcus Lemonis completely controls ML Retail and ML, LLC;

c.  Defendants Lemonis, ML Retail, and ML, LLC share the same address as their principal place of business;

d.  ML Retail and ML, LLC were at all times material to this matter, instrumentalities used for the benefit of Defendant Marcus Lemonis;

e.  ML Retail and ML, LLC are, and at all times herein mentioned were, kept under-capitalized by Defendant Marcus Lemonis, in relation to the reasonable needs of their businesses;

f.  The corporate forms of ML Retail and ML, LLC are a mere façade for the operation of Defendant Lemonis;

g.  The corporate form, entity, and structure of ML Retail and ML, LLC were at all times disregarded by Defendant Marcus Lemonis;

h.  The assets of ML Retail and ML, LLC were or are intermingled with the assets of Defendant Marcus Lemonis, or transferred without consideration, to Defendant Marcus Lemonis in disregard of the purported separate corporate form, entity and structure of ML Retail and ML, LLC, so as to make it impossible to separate from individual liabilities;

7

    i.    The business and corporate affairs of ML Retail and ML, LLC are intermingled with those of Defendant Marcus Lemonis;

    j.    ML Retail and ML, LLC have failed to abide by corporate formalities; and

    k.    Defendant Lemonis uses his control over ML Retail, ML, LLC and their assets to further his own personal interest.

25.    Upon information and belief, Defendants ML Retail and ML, LLC were never intended to have, and never have had, any true existence as a corporation. Indeed, ML Retail and ML, LLC are and were organized and designed to act as devices by which Defendant Marcus Lemonis could evade his obligation, responsibility, and liability to third parties, including Plaintiffs, by engaging in unlawful activity without personal liability.

26.    Continued adherence to the fiction of the separate existence of ML Retail and ML, LLC would sanction fraud and promote injustice, in that Defendant Marcus Lemonis is attempting to escape liability for his unlawful activity, as set forth below, by hiding behind ML Retail and ML, LLC and manipulating assets and liabilities to avoid responsibility for the unlawful acts that he directed and caused for his own benefit.

## JURISDICTION AND VENUE

27.    This action arises under the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq*., and under the common law of the State of New York. This Court has subject matter jurisdiction over the RICO claims pursuant to 18 U.S.C. § 1964 and 28 U.S.C. § 1331. The Court has subject matter jurisdiction over the related New York state law claims pursuant to 28 U.S.C. § 1367.

28.    Additionally, as stated above, Plaintiff Goureau is domiciled in the State of Florida and Plaintiff Menkin is domiciled in the State of New York. No non-nominal defendant is a citizen

of the States of New York or Florida or domiciled in the States of New York or Florida. Defendant Lemonis is domiciled in Illinois, Defendant ML Retail is a citizen of Illinois, Defendant ML, LLC is a citizen of Illinois, and Defendant Machete is a citizen of California.

29.    This Court has diversity jurisdiction over the parties pursuant to 28 U.S.C. § 1332 because all Plaintiffs are residents of different states than the non-nominal Defendants and the amount in controversy exceeds $75,000. As set forth below, Plaintiffs claim millions of dollars in damages.

30.    Venue in this district is proper pursuant to 28 U.S.C. §§ 1391(b)(2) and (c)(2) because a substantial part of the events giving rise to this claim occurred in this judicial district and because Defendants have extensive contacts with, and conduct business within this judicial district and have caused injuries to Plaintiffs, as described herein, in this judicial district.

## FACTS

### A.    Courage.B is a Successful Business

31.    Along with their mother Neomi Goureau ("Neomi"), Plaintiffs Nicolas Goureau and Stephanie Menkin began the luxury women's fashion line and retail stores, Courage.B, in 2008.

32.    Plaintiffs and their mother ran the clothing enterprise through the corporation, Gooberry Corp. Gooberry owns the Courage.B brand. Goureau owned 100% of the stock of Gooberry and was its CEO, Menkin was Gooberry's President, and Neomi was the Chief Designer for the brand.

33.    The story of Courage.B began over twenty years ago, in 1987, when Neomi and her husband Patrick began the family interest in owning and operating retail stores when they opened up Fopp's in New York City. However, Patrick sadly passed away just a year later after losing the

9

fight to cancer, leaving Neomi to continue the business while raising Goureau and Menkin who were young children at the time.

34.     Over time, Goureau and Menkin became more involved in Fopp's so that Noemi could focus on her passion—designing the upscale clothing their retail stores would sell.  As an adult, Goureau took the reins of managing the business, and eventually opened up Courage.B in 2008.

35.     Courage.B's first store opened in Greenwich, Connecticut on November 4, 2008.  The store was featured on several local news publications when it opened.  Through their hard work over the next six years, the three were able to grow their company and expand to seven different retail boutiques across the country, including store locations in Greenwich, CT, Palm Beach, FL, Bethesda, MD, Aspen, CO, New York, NY, Southampton, NY, and Fairfax, VA.

36.     The Courage.B stores carried their exclusive Courage.B label clothing and items which were designed by Noemi.  This created a loyal customer base that was interested in the Courage.B label.  Often, Courage.B customers would shop in various Courage.B locations in order to shop the exclusive Courage.B line.  For example, Plaintiffs had customers that lived in Greenwich, visited family in New York City, wintered in Palm Beach, and summered in Aspen shopping at each Courage.B store along the way.

37.     Courage.B's success continued and the company was doing roughly $5.5 Million in sales each year.  As a result of their success, Plaintiffs and Noemi were ready to take their business to the next level.  Plaintiffs developed a growth plan and began meeting with potential investors.  In or around 2014, Plaintiffs began looking for an investor that understood family businesses and that had experience in retail stores.  Unfortunately, Marcus Lemonis represented himself as the perfect investor for Plaintiffs' business.

**B.** **"The Profit" Comes to Help Courage.B**

38.     Marcus Lemonis is an entrepreneur and reality television personality who is featured in the documentary reality series, "The Profit." "The Profit" has aired for roughly seven years and has featured around one hundred businesses.

39.     On each episode of the show, Lemonis visits a purportedly ailing business and offers his business acumen and a financial investment in exchange for an ownership interest in the entity. Lemonis promises to save the struggling businesses and use his expertise and resources to make them profitable. Moreover, in every episode, Lemonis says the same line, that he will help, but there is one condition: that he is "100 percent in charge."

40.     For the intro of "The Profit," Lemonis states "my name is Marcus Lemonis and I fix failing businesses. I make the tough decisions and I back them up spending my own money. It's not always pretty, but this is business. I do it to save jobs, and I do it to make money. This is The Profit."

41.     During commercial breaks in the episodes, Lemonis invites struggling businesses to apply for his help, stating "if your business is in trouble and you need my help, log on to the profitcasting.com." That page contains a statement claiming that Lemonis "has been called America's number one business turnaround artist. He will do whatever it takes to fix YOUR failing business. When Marcus Lemonis isn't running his multi-billion dollar company, Camping World, he is on the hunt for struggling businesses that are desperate for cash and ripe for a deal. In the past 10 years, he's successfully turned around over 100 companies." The page invites interested business owners to "Apply now for a chance to save your business!"

42.     CNBC's website for The Profit promotes Lemonis' tactics, stating that Lemonis "goes on the hunt for struggling businesses that are desperate for cash and ripe for a deal. In each

one-hour episode of The Profit, Lemonis makes an offer that's impossible to refuse; his cash for a piece of the business and a percentage of the profits."

43.     As Plaintiffs would soon learn, Lemonis used the show to prey upon desperate and often less sophisticated business owners to build his own individual wealth at the expense of the businesses he was supposed to be helping.

44.     Indeed, "The Profit" often features small, family-owned businesses where the family members are often overworked and fulfilling multiple roles in the company.  These business owners often don't have formal business training.  Even more, these companies often don't have a general counsel or independent attorneys who can review the company's involvement with Lemonis, his various entities, and the show.

45.     Goureau first learned about "The Profit" when he saw an episode on television.  The episode featured a company called Sweet Pete's, a small family run candy shop in Florida.  On the episode, Lemonis is portrayed as an expert investor who can help the business achieve the success its owners dreamed of.

46.     The Plaintiffs' family business had experienced success and growth, and the three were ready to take the next step in their business.  Unfortunately, Goureau, Menkin, and their mother Neomi believed that "The Profit" and Lemonis would be able to help their growing business make it to the next level.  Goureau e-mailed the television show and applied for Courage.B to appear on the show.

47.     Around spring 2014, the production company for "The Profit," Defendant Machete reached out to Goureau about Courage.B's application for the show.

48.     Machete is the agent of Lemonis, ML Retail, and ML, LLC.  Machete acted on the Lemonis Entities behalf, and with their authority, when screening potential applicants for "The

Profit" and when making representations to potential applicants, including Plaintiffs, about Lemonis' ability to help small businesses, the deals Lemonis makes on the show, and how Lemonis has helped business that appeared on previous episodes of "The Profit."

49.     The Lemonis Entities authorized Machete to make representations to potential applicants for "The Profit," including Plaintiffs, in order to induce them to appear on the show and allow the Lemonis Entities to invest in their small businesses.

50.     The Lemonis Entities also authorized Machete to make the advertisements and websites promoting the show to the general public, described above, which included representations about Lemonis' ability to help small businesses, the deals Lemonis makes on the show, and how Lemonis has helped businesses that appeared on previous episodes of "The Profit." The Lemonis Entities had the right to control the representations made by Machete to the general public and to potential applicants for "The Profit," including Plaintiffs.

51.     On or around spring 2014, Plaintiffs had a Skype interview with Kim Donnan ("Donnan") a producer working for Machete about their involvement in the show.  During the Skype interview, Donnan represented that the stories, investments, and successes portrayed on the show are real.  Donnan further represented that if Lemonis was interested in investing they would make a deal while the show was being filmed and that deal would be real.

52.     Eventually Plaintiffs were selected to appear on "The Profit."  On or around June 2014, Plaintiffs' episode was filmed.  During the filming, the producers for Machete created a story for Plaintiffs to follow and present on the show.  Despite the fact that Plaintiffs' business was successful and was averaging $5 million in sales per year, Producers for Machete wanted to portray Plaintiffs' business as one that was struggling and in need for Lemonis' help.  Producers for Machete consistently told Plaintiffs that their mother Neomi was a problem, that she didn't know

what she was doing, and that Goureau had to fix what she was doing. This, of course, was not the reality for Plaintiffs' business.

53.     During the filming of the episode, Lemonis spoke to Plaintiffs and explained, "[a]nd you know what's even more amazing to me? You're doing $5 million with this product. Can you imagine what you would do if your product was right?" He further explained his belief in the company, and that it was close to where it needed to be already, stating to Plaintiffs, "[t]his has the makings of being something great, but the business needs money, and all I have to get my head around is, we're talking about changing the product and changing the process, and it's extreme, and putting money in at the same time."

54.     In fact, on the episode, Lemonis doubled-down on his belief that Courage.B was not far off from obtaining even greater success when he stated during a cut-scene that, "[t]he real problem is, the company doesn't have the right product on the ground and if I can fix the product going forward and then merchandise it in a creative way, I know I can make money immediately."

55.     Despite these beliefs, when the time came to make his offer to Plaintiffs, Lemonis first offered $800,000 for full control of Courage.B and 50% of the stock, after which he chimed in "and before you answer, just know that if you don't do a deal with me, you may not make it."

56.     In what has since turned out to be a prophetic statement, after having his first offer rejected by Goureau, Lemonis responded to a counterproposal made by Goureau stating that for $800,000 for 10% of the company's stock stating, "I'll give you a half-a-million-dollar loan and take the stock of the company as collateral. I mean, if you default, I'll take the business. So you don't want that option. The option you want is you want me to be just as excited as you are." What Lemonis failed to mention is that he would run the business in a way which overloaded it with debt allowing him to foreclose on a whim.

14

57.     While the episode was being filmed, Lemonis made renovations to a Gooberry store in Greenwich, Connecticut.   On "The Profit," renovations are done during the filming of the episode so that the episode can show the supposedly great improvements that Lemonis makes to the businesses.  The owners are purposefully kept in the dark about how much the renovations are costing and who ultimately will be paying for them.

58.     The same was true here.  Plaintiffs were told by Lemonis and Machete that they could not visit the store while it was undergoing the renovations.  Prior to the show, Lemonis did not tell Plaintiffs how much he was spending on the renovations, and when Plaintiffs asked, he told them, "I got it," that they should "trust the process," and that they "didn't have to deal with it."

59.     During the course of filming the show, when the parties discussed the terms of Lemonis' potential investment, Lemonis told Plaintiffs that $200,000 of his initial investment would be used towards renovations.  Lemonis led Plaintiffs to believe that the work he had done to the Greenwich location during the filming would be covered by that $200,000 investment.

60.     While filming the television show, Plaintiffs and Lemonis reached a handshake agreement for Lemonis to invest in Courage.B and Gooberry.  As discussed on the show, Lemonis was to purchase a 30% stake in Gooberry for $800,000.  That $800,000 investment was supposed to be broken down as follows: $300,000 new inventory, $40,000 to eliminate high interest debt, $150,000 in working capital, $200,000 to renovate the stores, $50,000 to create a new e-commerce site and an extra $60,000 whose use was to be determined.

**C.     Lemonis Takes Over and Drowns the Company in Debt**

61.     After the show finished filming, based on their handshake deal, and Defendants' representations that the deal reached on the show would be real, Lemonis began taking control

over Gooberry and Courage.B.  Lemonis started renovating Gooberry's additional stores.  Once again, Lemonis told Plaintiffs not to worry about the renovations and that he was taking care of it.  Because of Lemonis' representations, Plaintiffs believed that Lemonis was staying in the $200,000 renovations budget.  Lemonis, however, forced Gooberry to incur upwards of $2M in debt for renovating Gooberry's stores in only six months.  Lemonis and his representative, Johnny Sirpilla, completely controlled the renovations and did not allow Plaintiffs to give any input or keep them informed of the costs of the renovations.

62.     During the filming of the show, Lemonis represented himself as an expert in retail and promised to introduce Plaintiffs to his team of expert retail and business executives who would help Plaintiffs grow the brand.  Lemonis explained that "Neomi is the face of the brand, and it's still her eye that I trust.  But in order to make sure that she's successful, I'm gonna hire legitimate designers with legitimate track records."  Lemonis additionally stated to viewers that he was hiring "professional visual merchandisers to come in and assist in the renovations of the show."

63.     Plaintiffs believed Lemonis' representations that he was there to help their business grow and that he believed in their family business.  Lemonis told Plaintiffs that he cared about their family, that he would always take care of their mother Noemi, and that he wouldn't let anything bad happen to her.

64.     However, that is not what happened once the cameras stopped rolling.  It turned out that all of Lemonis' purported executives were employees of Camping World—a now public company that Lemonis serves as its CEO.  Lemonis did not tell Plaintiffs how much Gooberry was paying these so-called expert executives.  Again, whenever Plaintiffs inquired about the costs, Lemonis would tell them that he had it covered and not to worry about it.  Eventually, however, Plaintiffs learned that these executives were charging Gooberry exorbitant fees.

65.     When Plaintiffs questioned Lemonis about the skyrocketing renovation and executive costs, Lemonis berated them, called them ungrateful, and told them that if they want to back out of the deal, all they had to do was pay him back for the renovations.  At that point, of course, Plaintiffs were not able to repay Lemonis the over $2M that Lemonis had unilaterally decided to spend on the store—despite telling Plaintiffs that renovations would only cost $200,000 and keeping them in the dark about how much Lemonis was truly spending.  Feeling entrapped and like they had no other choice, Plaintiffs moved forward with Lemonis.

66.     Plaintiffs later learned that this was part of Defendants' fraudulent pattern and practice in his dealings with businesses that appeared on "The Profit."  Lemonis would spend money on the businesses making it seem like the money he spent would either be part of his investment or otherwise covered by him, only to present them with a bill that would automatically give him a debt position over the company that he would then use to try to strong-arm the deal or take the business.

67.     Lemonis made several representations to Plaintiffs during the filming of the show that later turned out to be false.  For example, Lemonis told Plaintiffs that they would have access to his executive team that consisted of retail experts to assist with human resources, finance, business operations, marketing, etc., when in reality, those executives were employees of Camping World.  Unbeknownst to Plaintiffs, Lemonis' employees made purchases on behalf of Gooberry, leaving Goureau and Menkin to foot the bill.  Plaintiffs were also charged for Lemonis' Camping World employees' time and fees even though this was represented as a part of the Lemonis expertise package.

68.     Additionally, during the filming of the show, Lemonis misrepresented the costs of renovating the retail stores, that he was taking care of the stores, and that Plaintiffs did not need to

worry about the renovations. In reality, Lemonis was spending millions of dollars so that Plaintiffs would have no choice but to close the deal with him.

69.     On or around November 18, 2014, the parties executed the paperwork memorializing Lemonis' investment. Gooberry, Goureau, and ML Retail entered into a Stock Purchase Agreement ("Gooberry Stock Purchase Agreement"). *See* Ex. A. Lemonis' entity, Defendant ML Retail, purchased 32 shares of Gooberry (a 32% ownership interest) for $800,000. *Id.* at § 2. 2.

70.     At the same time, the shareholders of Gooberry, Plaintiff Goureau, Plaintiff Menkin, their mother Neomi, and Defendant ML Retail entered into a Shareholder Agreement ("Gooberry Shareholder Agreement"). *See* Ex. B. According to the Gooberry Shareholder Agreement, up to four Directors are allowed on the Board, and each shareholder was given the right to appoint one Director. *Id.* at § 3. Lemonis, Goureau, Menkin, and Neomi appointed themselves. Accordingly, the Gooberry Board of Directors consisted of the four shareholders: Lemonis, Goureau, Menkin and Neomi.

71.     Concerningly, Section 2 of the Gooberry Shareholder Agreement gives ML Retail broad power over Gooberry. *Id.* at § 2. For example, Gooberry needs ML Retail's "affirmative shareholder vote" in order to make any fundamental business decisions:

**2. 1. 1** the following actions shall not be taken without the affirmative vote of the ML Shareholder:

(a)     enter into any transaction outside of the ordinary course of business of the Company;
(b)     A merger, consolidation, stock exchange, or similar transaction involving the Company;
(c)     Any contract or transaction, or amendment to any existing contract or transaction, with any of the Shareholders, Directors, or affiliates of any of them;
(d)     The admission of new Shareholders;
(e)     The dissolution or liquidation of the Company;

(f)  Amendment of the Articles or this Agreement;

(g)  Incurrence of any Indebtedness of issuance of any guarantee or indemnity of any obligation of any other Person or entity if the aggregate amount of the principal amount…shall exceed $25,000;

(h)  Make any capital expenditures in excess of $50,000 in one transaction or series of similar transactions;

(i)  Make any Distributions to Shareholders, other than a Tax Distribution;

(j)  Increase of modify compensation plans to senior executives of the Company of pay bonuses or other amounts outside of approved compensation plans;

(k)  Hire, remove or otherwise replace any of the senior executive team of the Company;…

*Id.* at § 2.1.1

72.  Essentially, Gooberry needs ML Retail's affirmative shareholder vote in order to, among other things: (1) enter into any contract outside of the normal course of business, (2) make any distributions to shareholders, (3) make any expenditure over $50,000, (4) hire or replace any member of Gooberry's executive team, and (5) dissolve or liquidate the Company.

73.  Moreover, Section 2 of the Gooberry Shareholder Agreement also gives ML Retail "the sole and absolute discretion over" the financials and operation of the Company:

**2. 2**  Notwithstanding anything to the contrary contained herein, the ML Shareholder shall have sole and absolute discretion over:

**2. 2. 1**  All financial and accounting functions, controls, decisions and procedures for the Company, including, but not limited to, accounting and financial reporting methods and controls, banking relationships, opening and closing of bank accounts, capital expenditures for store expansions, remodels and new locations; and

**2. 2. 2**  Tax matters, including, without limitation, causing the Company to make an election to be treated as a Subchapter S corporation under the Internal Revenue Code.

*Id.* at § 2.2

74.  Not only did the Agreement give ML Retail the sole power to manage and control Gooberry's bank accounts, but also the power to open certain retail locations and control Gooberry's revolving line of credit with the Lemonis Entities.  *Id.*  at §§ 2. 1. 2, 2. 3, and 2. 4.

Under Section 2.3, Gooberry's line of credit with the Lemonis Entities accrued interest at 5% per annum. *Id.* at § 2.3.

75.     Lemonis represented that the line of credit would be used to provide the capital for his $800,000 investment. Lemonis did not tell Plaintiffs that he would use the line of credit to make Gooberry insurmountably indebted to him and the Lemonis Entities.

76.     Not long after the deal was finalized, Lemonis sent IT personnel from Camping World to the Gooberry offices to upgrade their e-mail and computing systems. During the process, the IT technicians, allegedly on accident, deleted all of the e-mails from Gooberry's system. This meant that years and years of e-mail records were now gone.

77.     Plaintiffs were then given new @courageb e-mail addresses. Eventually, Plaintiffs' e-mails were transitioned to @marcuslemonis e-mail addresses. Plaintiffs used these e-mails to conduct the business of Gooberry and eventually ML Fashion. However, as discussed below, one by one Plaintiffs, and their mother Neomi, were removed from the business venture and lost access to their @marcuslemonis e-mail accounts.

78.     Lemonis used the power given to him in the formation documents to make good on his promise that he was "100 percent in charge" and took over Gooberry and Courage.B. ML Retail, through Lemonis, had all of Gooberry's retail stores renovated and changed the product that the locations were selling. However, despite making these changes himself, Lemonis later determined that he did not like the changes or the product.

79.     Lemonis then forced Gooberry to sell old inventory at a steep discount and forced the Company to purchase new inventory. Lemonis now wanted the stores to carry younger and hipper brands.

80.     The new inventory did not appeal to Gooberry's loyal customer base.  Several customers came to Courage.B to shop their exclusive fashion line.  The product that Lemonis forced on the shows was often purchased at trade shows and widely available at department stores and boutiques.  This type of product brought in price comparison shoppers who were looking to get the best deal on this type of clothing.  Gooberry was often unable to compete against department stores carrying the same clothes and offering various friends and family, VIP and rewards programs.

81.     In addition, the inventory Lemonis purchased was often from a previous season, which was not appealing to Gooberry's fashion savvy customer base.

82.     As the inventory did not work for the stores, Lemonis forced Gooberry to sell the new inventory that he had previously forced the company to acquire at a steep discount.  Lemonis now wanted the stores to carry younger and hipper brands.  While on the show Lemonis represented that all Gooberry needed to do to take its business to the next level was get the proper inventory, Lemonis' new inventory tanked the business' margins.  Indeed, this change in inventory reduced Gooberry's typical profit margins from 73% to 52%.

83.     Destroying Gooberry's profit margins was part of Lemonis' pattern and practice.  For example, Courage.B had a lucrative and very successful handbag line.  On one occasion, Lemonis purchased over $150,000 in inventory from a factory in Milan in styles and colors that the stores had not carried before.  Shortly thereafter, Lemonis determined that he did not like the order and forced the stores to sell the handbags for pennies on the dollar.  This ultimately destroyed Gooberry's legacy handbag line.

84.     All of the renovations, inventory purchases, and other large expenses were funded through Gooberry's line of credit with the Lemonis Entities.  By making these large purchases,

reducing Gooberry's profit margins, and forcing the company to sell inventory at a loss, Lemonis ensured that Gooberry would need to rely on its revolving line of credit with the Lemonis Entities to meet its normal financial obligations, such as payroll and rent. This practice insured that Gooberry was always heavily indebted to Lemonis giving Lemonis the power to foreclose on the Company's assets at any time.

85.    When it came to running the business, Lemonis was mostly concerned with building his television persona on his show, "The Profit." To that end, Lemonis would use the businesses featured on the show to boost his image and add debt to Gooberry by forcing Gooberry to take on fledgling brands, businesses, and products featured on the show, as described below. On the show, Lemonis tells business owners that he is there to help save their business when he is really there to steal it.

86.    In 2015, a retail concept called Blues Jean Bar was featured on an episode of "The Profit." Lemonis unilaterally determined that Gooberry would purchase the Blues Jean Bar business and its three stores. Lemonis rebranded the Blues Jean Bar stores and two Courage.B locations as Denim & Soul. Lemonis then renovated all of the stores, including the Gooberry stores he had just renovated for hundreds of thousands of dollars, on Gooberry's tab.

87.    In 2015, a candle business called Wick'ed was featured on an episode of "The Profit." On the show, Lemonis and the business owner entered into a deal where Lemonis would invest $200,000 for 33% of the business. However, what actually happened was that Lemonis forced Gooberry to buy thousands of candles from Wick'ed in order to get cash into the Wick'ed owners' hands. Gooberry stores did not sell candles, so the purchase did not make sense for Gooberry's brands. Eventually, as is often the case, Lemonis' relationship with the Wick'ed

owners soured, and the deal fell through. Gooberry was left holding the bag and had to liquidate the candles at a huge loss.

88.     In 2016, a t-shirt business called DiLascia was featured on an episode of the show. On the show, the parties agreed that Lemonis would invest $200,000 for 50% of the business. Lemonis produced tons of tee-shirts with the original owners and then, of course, had a falling out with them. Lemonis then forced Gooberry to purchase the shirts and sell them in its stores despite being completely off brand for the Gooberry stores. Eventually, Gooberry was forced to liquidate its inventory of the shirts at a loss.

### D.     Lemonis Wants More and Insists on the Formation of Another Entity

89.     Eventually, Plaintiffs and Lemonis decided to expand beyond the Courage.B brand and began investing in additional business entities together. The idea was that Plaintiffs would be investors with Lemonis on various fashion and retail-related businesses. Those ventures often included businesses that Lemonis encountered through his television show.

90.     Despite wielding an incredible amount of control over Gooberry, Lemonis wanted more. Lemonis told Plaintiffs that he wanted to be equals in the business with them. He also told them that their mother Neomi should receive equity of the business because Lemonis was making the decisions on the inventory and branding.

91.     Lemonis represented to Plaintiffs that ML Fashion, LLC ("ML Fashion") would be an umbrella entity for the parties' various business ventures. He told Plaintiffs that he wanted to help them grow their business and that they could build something special together. Lemonis represented that a limited liability company, as opposed to a corporation, would be more beneficial for everyone. ML Fashion was formed on March 29, 2016 as a Delaware limited liability company.

92.     Although Goureau and Menkin were given 33.33% membership interest in ML Fashion, Lemonis was sure to give himself the controlling 33.34% interest as well as make himself Chairman and CEO of ML Fashion.  This meant he was able to bind ML Fashion to any and all agreements.  Eventually, Lemonis began running Plaintiffs' business through the ML Fashion entity instead of Gooberry.

### E.     Lemonis Further Mismanages Gooberry

93.     Lemonis' misconduct often related to credit agreements and loans he made to Gooberry through entities he controlled.  For example, on or around October 2016, Lemonis executed a credit agreement between Gooberry and ML Fashion ("Credit Agreement").  *See* Ex. C.  Under this Credit Agreement, Gooberry could receive up to $10,000,000 in loans from ML Fashion at a rate of 7.5% per annum.

94.     While the agreement is signed by Menkin, the decision for Gooberry to enter into the Credit Agreement was solely Lemonis' decision.  Lemonis often used Menkin to sign documents on Gooberry's behalf in an attempt to add legitimacy to his actions.  However, he would often have his attorney send packages with hundreds of pages and several documents to her with the instruction to sign them.  Menkin trusted Lemonis and his attorney and simply signed all of the documents they presented.

95.     Concurrent with the execution of the Credit Agreement, Gooberry and ML Fashion entered into a Security Agreement.  *See* Ex. D.  The Security Agreement gave ML Fashion a continuing security interest in essentially all of Gooberry's assets.  *Id.*

96.     These agreements combined gave Lemonis the unfettered ability to misuse the assets of Gooberry.  Again, the Gooberry Shareholder Agreement gave Lemonis, as owner and CEO of ML Retail, the sole power to bind Gooberry.  Thus, Lemonis forced Gooberry to buy

assets, leaving it unable to meet its current obligations, and then force Gooberry to take a loan from ML Fashion. Eventually, he could render Gooberry insolvent such that ML Fashion could foreclose on all of the assets owned by Gooberry.

97. While ML Fashion was owned by Lemonis and Plaintiffs, ML Fashion's funding came from a Credit Agreement that it had with ML, LLC. Thus, whenever ML Fashion lent money to Gooberry, those funds were actually coming from Lemonis through ML, LLC. As such, loans between ML Fashion and Gooberry gave Lemonis the ability to kill two birds with one stone and increase his debt position in both companies at one time.

98. That was not the only way in which Lemonis gained control over Gooberry's assets. Lemonis transferred promissory notes issued by Gooberry to Lemonis Entities. For example, Gooberry issued a $7.9M promissory note to ML, LLC. Then, on or around December 2016, the note was purchased by ML Retail LLC and on the same day sold to ML Fashion. Lemonis engaged in this practice of forcing Gooberry to take on more debt in order to gain control over the Company's assets in the process.

99. Another example of Lemonis using the Company for his personal gain related to the retail boutique Runway Boutique ("Runway"). In early 2016, Lemonis met Roberta Raffel ("Bobbi" or "Raffel"), owner of Runway, at a trade show in New York City. Raffel approached Lemonis and Menkin because she wanted Lemonis to purchase her Runway store in Deerfield, Illinois.

100. Shortly thereafter, Lemonis visited Runway and decided that Gooberry would purchase the store and on March 23, 2016, Gooberry purchased Runway.

101.    On information and belief, Lemonis wanted Gooberry to acquire Runway because Lemonis was romantically interested in its owner Raffel, not because he believed the acquisition would help Gooberry or ML Fashion, which was formed shortly after the acquisition.

102.    In May 2016, Gooberry and ML Fashion paid to completely renovate the Runway store in Deerfield, Illinois and stock it with new inventory.  Once again, these expenditures forced the companies to take on additional debt from Lemonis to meet its basic expenses.

103.    Not long after Gooberry acquired Runway, Lemonis began courting Raffel.  As part of their courtship, Lemonis allowed Raffel to make business decisions for Gooberry and ML Fashion.  Raffel was buying inventory for ML Fashion's other retail stores despite not having a position with ML Fashion.  Indeed, Lemonis and Raffel began buying inventory together and spending far more than Gooberry's or ML Fashion's allocated budget on inventory.  Again, overspending on inventory forced Gooberry and ML Fashion further into debt.

104.    Indeed, Plaintiffs witnessed Lemonis do this with several entities he encountered through "The Profit."  For example, a January 19, 2016 episode of the "The Profit" featured the brand Inkkas Shoes.  On the show, the parties agreed to a deal where Lemonis would invest $750,000 for 51% of the business.

105.    After the episode aired, but before the acquisition was completed under the ML Fashion umbrella, Lemonis forced Inkkas Shoes to hold a sale called "Free Shoe Friday."  Lemonis tweeted a code that allowed shoppers to buy shoes from the Inkkas website for zero dollars.  This led to $200,000 of inventory being given away.

106.    Lemonis used this and other tactics to force debt on Inkkas and, a few months later, foreclosed on the business, took its assets, and removed the original owners.

107.    Indeed, in March 2016, when Goureau started questioning decisions Lemonis was making for Gooberry and ML Fashion, Lemonis moved Goureau to ML, LLC and had him work on Lemonis' non-fashion related businesses.  Then in May 2017, Lemonis moved Goureau from ML, LLC to Camping World.  Lemonis represented that working Camping World would be beneficial for Goureau because it was a publicly traded company that could offer stock vesting and other employment benefits.  However, Lemonis fired Goureau from Camping World in December 2018.  Lemonis also removed Goureau's access to all of his Company files and e-mails.

108.    Lemonis also used Plaintiffs' mother, Neomi, as a pawn to keep Plaintiffs in line. Whenever Menkin or Goureau questioned Lemonis, he would threaten to fire Neomi and remove her from the business.

109.    In September 2019, Lemonis made good on his threats to remove Neomi and abruptly terminated her employment with the Company.  Giovanni Senafe, one of Lemonis' agents, called Neomi to tell her that she was terminated immediately, that she would receive no further compensation moving forward, and that her health insurance was being cut off.  As a result, Neomi lost access to her company files and e-mails.

110.    Furthermore, Lemonis was not actually interested in growing the Courage.B brand or any of the other brands he forced Gooberry or ML Fashion to acquire, such as Denim & Soul. Instead, Lemonis, together with Raffel, now his wife, sought to use ML Fashion's assets and Plaintiffs' know-how to grow his new brand MARCUS.

111.    In 2017, Lemonis wanted to open a store in downtown Chicago.  At the time, Menkin and Goureau advised that opening a retail store in that location would be extremely expensive.  Despite their concern, Lemonis opened a retail store branded MARCUS.

112.    Once the new MARCUS store was opened, Lemonis renovated and rebranded retail locations from Courage.B and Denim & Soul as MARCUS stores.  For the most part, these were stores that the Company and ML Fashion had recently spent hundreds of thousands of dollars renovating and now had to spend even more money to renovate and change branding and inventory to become MARCUS stores.

113.    Whenever Plaintiffs complained about Lemonis' and Raffel's overspending, Lemonis would threaten to foreclose on Gooberry and ML Fashion because of the huge debt it owed to Lemonis and his entities.  Plaintiffs knew that if they did not play ball, Lemonis would foreclose on the debt and take the company they worked so hard to build.

114.    Sometime in 2018, Lemonis sought to move the assets of Gooberry to another entity, MLG Retail, LLC ("MLG Retail").  MLG Retail is a Delaware limited liability company owned by ML Fashion, and ML Fashion is its manager.  Transferring the assets and operations of Gooberry to MLG Retail would have finally given Lemonis the complete, unfettered control over Gooberry that he wanted.  Lemonis represented to Plaintiffs that the move would help the business because MLG Retail was a limited liability company and it would officially put the Gooberry business under the ML Fashion umbrella.   In reality, Lemonis just wanted more control over Gooberry's operations and to separate Plaintiffs' mother Neomi from the business—which as discussed above, Lemonis eventually did.

115.    Lemonis was successful in moving several of Gooberry's assets and its debts to MLG Retail.  However, the paperwork to fully memorialize the transfer was never fully completed, and some of Gooberry's assets were not transferred to MLG Retail.  For example, Gooberry's asset, the Runway business, was never transferred to MLG Retail.  Thus, Gooberry still has assets that Lemonis is currently mismanaging and depleting.

### F. Lemonis Seeks to Benefit from the Pandemic

116.     Recently, however, Lemonis has taken his misconduct, mismanagement, and misuse of power of Gooberry to the next level.  In or around March 2020, Lemonis cut off Menkin without any warning and removed her access to her company e-mails and files.  By shutting out Menkin, Lemonis had now removed all three original owners from their business.

117.     Moreover, Lemonis is actively using the global pandemic to continue to loot Gooberry.  Lemonis has been unilaterally closing its retail stores and moving the Company's inventory to other entities and/or businesses owned or controlled by Lemonis.

118.     On or around May 8, 2020, Lemonis flew employees out to close on one of Gooberry's retail stores in Greenwich, Connecticut and ship out all product and inventory in the store.  The employees took roughly $148,313 worth of inventory and $89,056 in furniture, fixtures, and equipment ("FFE") from the store.  Like all past actions taken by Lemonis, Goureau and Menkin were not made aware of these plans nor do they have any knowledge of what Lemonis did with the store's inventory and FFE.

119.     From June 2014 to present, with Lemonis' "help", Gooberry has gone from a valuation of roughly $2.6 Million to being practically insolvent.  Without Lemonis' involvement, Gooberry would have continued to thrive and likely would be worth several million dollars.  Given Lemonis' recent activity, it is clear that he is planning on foreclosing on Gooberry and even further removing Plaintiffs from the fashion and retail business they worked so hard to build.

120.     Without the Court's intervention, the Company will be irreparably harmed.  Plaintiffs seek redress for Lemonis' mismanagement of the Company, the appointment of a receiver to prevent Lemonis from further harming the Company, and to hold Lemonis and Lemonis

Entities accountable for breaching their fiduciary duties, wasting the Company's corporate assets, and operating the Company as a self-enrichment vehicle for themselves.

## DERIVATIVE ACTION

121.    Plaintiffs bring this action derivatively in the right of and for the benefit of Gooberry to redress injuries suffered, and to be suffered, by Gooberry as a direct result of Defendants' gross mismanagement, breaches of fiduciary duty, and use of Gooberry as a vehicle for personal gain at the detriment of the Company.

122.    Gooberry is named as a Nominal Defendant in this case solely in a derivative capacity.  Plaintiffs are shareholders of Gooberry at the time of the transgressions of which they complain and continue to be shareholders of the Company.

123.    Plaintiffs will adequately and fairly represent the interests of Gooberry and its members in prosecuting and enforcing their rights.  Prosecution of this action is in the best interests of the Company.

124.    The wrongful acts complained of herein subject, and will continue to subject, Gooberry to continuing harm because the adverse actions are continuing and the consequences of those actions are still in effect and ongoing.

## DERIVATVE DEMAND FUTILITY

125.    Plaintiffs have not made any demand to the Company's Board of Directors to bring suit and assert the claims set forth herein because such a pre-suit demand would clearly be futile and is, therefore, excused as a matter of law.  A pre-suit demand for the allegations alleged herein would be futile because in entering into the Gooberry Shareholder Agreement, Lemonis, as owner and CEO of ML Retail, was given complete dominion and control over the assets and operation of the Company, thus a demand would require Lemonis to essentially sue himself.

126.    As the Chairman and CEO of ML Retail, Lemonis is the only controlling shareholder that has the "sole and absolute discretion over all financial and accounting functions, controls, decisions, and procedures for the Company, including, but not limited to, accounting and financial reporting methods and controls, banking relationships, opening and closing of bank accounts, capital expenditures for the store expansions, remodels and new locations." *See* Ex. B, § 2. 2.  Moreover, according to the Gooberry Shareholder Agreement, the affirmative vote of the ML Shareholder, Lemonis, is needed for the Company to: "…enter into any transaction outside of the ordinary course of business of the Company;…[make] any contract or transaction, or amendment to any existing contract or transaction, with any of the Shareholders, Directors of affiliates or any of them;…[admit] new Shareholders;…[t]he dissolution or liquidation of the Company;…[m]ake any capital expenditures in excess of $50,000 in one transaction or series of similar transactions;…[h]ire, remove or otherwise replace any of the senior executive team of the Company; …" *Id.*  at § 2. 1. 1.

127.    Lemonis suffers from a patent conflict of interest which would prevent him from exercising independent business judgment in evaluating the merits of the claims asserted against him herein. Stated differently, a demand for Lemonis to bring this suit and assert the claims set forth herein is excused by the simple fact that such a demand would essentially require Lemonis to sue himself; and, in that regard, potentially subject himself to personal liability.   The extraordinary personal gains and profits that Lemonis has been able to extract from the Company at the expense of the Company and its other shareholders renders him too self-interested to independently evaluate the merits of the claims asserted against him herein.

128.    As President and CEO of ML Retail, and Director of Gooberry, Lemonis used the Company's assets to enrich himself and the Lemonis entities by, among other things, taking actions

that financially favored the shareholder ML Retail, LLC, while decreasing the value and viability of the Company to the detriment of the other shareholders.

129.    Further, Lemonis used his control of the Company via ML Retail to force the Company to assume increasing debt by taking on loans and promissory notes from his other entities that would allow him to foreclose on the Company at any time.  Lemonis also benefited from his use of the Company to acquire the fledgling brands, business, and products featured on the "Profit" to boost his own image at the expense of the Company.  Moreover, Lemonis has since removed assets of the Company and transferred them to other entities and/or businesses owned or controlled by Lemonis.

130.    In addition to Lemonis' self-interest, demand is further excused here because Lemonis forced the Company to undertake actions and engage in transactions that were so egregious on their face that they could not have been the products of sound business judgment.  As President and CEO of ML Retail, and Director of Gooberry, Lemonis consistently mismanaged the Company's assets and pursued a business strategy that was so reckless and vastly against the Company's interests that his decisions could not have been the products of sound business judgment.  Lemonis' actions include: (1) saddling the Company with expensive inventory then forcing the Company to sell the inventory at a loss; (2) purposefully decreasing the Company's profit margins and making it reliant on loans from Lemonis and his entities; (3) purposefully increasing the debt of the Company and forcing it to take loans from Lemonis, and/or other companies owned and/or controlled by him, in order to meet its financial obligations; (4) destroying the Company's legacy handbag line; (5) taking actions that financially favored the shareholder ML Retail,  decreasing the value and viability of the Company to the direct detriment of the other shareholders of the Company; (6) using the assets of the Company to grow Lemonis'

personal brand MARCUS; (7) using Gooberry as a vehicle to defraud and foreclose upon small business owners Lemonis was purporting to save; (8) closing the Company's retail stores and removing its inventory, furniture, fixtures, and equipment; (9) eliminating all Courage.B retail stores and destroying the Courage.B brand; and (10) mismanaging the Company's corporate assets and funds.

131.    Even if Lemonis acceded to a demand from Plaintiffs and pursued litigation against himself on behalf of the company, there is no reason to believe that he would appoint the proper persons to conduct the litigation or fully pursue any and all available remedies.

132.    In short, it is readily apparent that Lemonis would either be incapable or unwilling to take the actions required to seek the relief requested in this Complaint.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION: FRAUDULENT INDUCEMENT
**[By Plaintiffs Against Defendants Lemonis, ML Retail, ML, LLC, and Machete]**

133.    Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

134.    Defendants, and each of them through their agent and/or alter ego Lemonis, knowingly made numerous material misrepresentations to Plaintiffs and/or failed to disclose material information to Plaintiffs in order to induce them into entering the Gooberry Shareholder Agreement and Stock Purchase Agreement, and in giving ML Retail and Lemonis control and ownership interest in the Company.

135.    As the only natural person involved in the management of Defendants ML Retail and ML, LLC, when Lemonis made representations to Plaintiffs he did so in his individual capacity and on behalf of ML Retail and ML, LLC as their manager and agent.

136.   As discussed above, Machete is the agent of the Lemonis Entities and was authorized to make representations to Plaintiffs during their initial Skype interview in spring 2014, over the course of preparing to film the show, and during the filming of Plaintiffs' episode in June 2014.

137.   Defendants' false material misrepresentations and/or failures to disclose to Plaintiffs described above include but are not limited to: (1) representing that the Lemonis Entities help the businesses featured on "The Profit," (2) representing that deals with the Lemonis Entities portrayed on "The Profit" were real, (3) representing that the results the small business featured on "The Profit" achieved with the Lemonis Entities' help were real, (4) representing to Plaintiffs that Defendants wanted to help Plaintiffs expand their business through Gooberry and not saddle it with debt in order to take its assets; (5) representing that Plaintiffs and Lemonis would be treated as partners and equals in running Gooberry; (6) representing that Defendants would run Gooberry in a way that would benefit Plaintiffs and the Company; (7) representing that Defendants cared for Plaintiffs' family and their business and that Lemonis would take care of Plaintiffs' mother Noemi, (8) that renovating Plaintiffs' stores would cost $200,000 and would be part of Defendants' overall $800,000 investment, and (9) representing that Gooberry would invest in other business and to help grow and develop the businesses in their profile.

138.   At all times, Defendants knew these misrepresentations were false and that Defendants intended to use Gooberry as a vehicle for self-enrichment at the detriment of Plaintiffs and the Company itself.  Defendants further knew that they would use credit agreements to force debt upon Gooberry allowing them to foreclose on the Company on a whim and that Defendants would use Gooberry to defraud other small business owners Lemonis purported to save.

139.     Defendants intended that Plaintiffs rely upon these misrepresentations and fraudulent omissions of material facts.

140.     Plaintiffs were ignorant of the falsity of the representations and justifiably relied on the misrepresentations and fraudulent omissions of material facts and allowed Defendants to invest in their business, entered into the Shareholder Agreement, gave ML Retail and Lemonis control and ownership interest in the Company, and refrained from moving forward with a different investor for their business.  Plaintiffs would not have entered into the Shareholder Agreement and Stock Purchase Agreement, given ML Retail and Lemonis control and ownership interest in the Company, and refrained from moving forward with a different investor for their business if they knew Defendants' representations were false.

141.     Defendants' actions were willful, wanton, malicious and oppressive.

142.     As a direct and proximate result of Defendants' fraud, Plaintiffs have been harmed in an amount to be proven at trial, but at least millions of dollars.  As a result of Defendants' fraud, Plaintiffs entered into the Stock Purchase Agreement and Shareholder Agreement, and stopped searching for alternative investors for their businesses.

## SECOND CAUSE OF ACTION: FRAUD
### [By Plaintiffs Against Defendants Lemonis, ML Retail, and ML, LLC]

143.     Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

144.     Defendants, and each of them through their agent and/or alter ego Lemonis, knowingly made numerous misrepresentations of material facts to Plaintiffs and/or failed to disclose material information to Plaintiffs.

145. As the only natural person involved in the management of Defendants ML Retail and ML, LLC, when Lemonis made representations to Plaintiffs he did so in his individual capacity and on behalf of ML Retail and ML, LLC.

146. Defendants' false material misrepresentations and/or failures to disclose described above include but are not limited to: (1) representing that Gooberry was investing in stores, brands, and retail businesses in order to further grow those businesses and Gooberry; (2) representing that purchases made for Gooberry were done to benefit the brand and not increase Lemonis' debt position in Gooberry; (3) representing that Plaintiffs would have access to Lemonis' team of experts in the retail industry, not Lemonis' employees at Camping World; (4) representing that this team of experts were part of the Lemonis expertise package, not that Plaintiffs would have to pay for their fees and services; and (5) representing that Lemonis would be investing in Plaintiffs' business in order to help grow their business not to saddle it with debt in order to remove its assets.

147. Defendants intended Plaintiffs to rely on these representations; however, none of these statements were true when made. Defendants knew these misrepresentations were false and that Defendants intended to use Gooberry as a vehicle for self-enrichment at the detriment of Plaintiffs and the Company itself. Defendants further knew that they would use credit agreements to force debt upon Gooberry, allowing them to foreclose on the Company on a whim and that Defendants would use Gooberry to defraud other small business owners Lemonis purported to save.

148. Defendants knew or should have known that Plaintiffs would rely upon representations that Lemonis would grow the Company business and brand because this is what Lemonis said he would do.

149.    Upon information and belief, Lemonis intended that Plaintiffs rely on his misrepresentations and fraudulent omissions of material facts.

150.    Upon information and belief, the sole purpose for Lemonis' misrepresentations to Plaintiffs was to take their money and their Company and make a profit, without regard to the consequences that Plaintiffs would have to be left with, such as debt and no assets.

151.    Plaintiffs believed and justifiably relied on those misrepresentations and were induced by them in continuing to do business with Defendants to their detriment.  Plaintiffs relied on Defendants' representations by such things, including but not limited to, continuing to run Gooberry with Defendants.

152.    As a result of Defendants' acts described above, Plaintiffs have been damaged in an amount to be proven at trial, but at least millions of dollars.

153.    In committing the above-described acts, Lemonis acted with fraud, oppression, and malice.  Given Defendants' conduct that was willfully and wantonly reckless or malicious and Defendants' high degree of moral culpability, punitive damages are appropriate and warranted.

### THIRD CAUSE OF ACTION: BREACH OF FIDUCIARY DUTIES
**[By Plaintiffs, derivatively on behalf of Gooberry, Against Defendant Lemonis]**

154.    Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

155.    Lemonis currently serves as a Director of Gooberry.  As a Director of Gooberry, Lemonis owes the Company fiduciary duties of care, loyalty and good faith.

156.    Lemonis engaged in misconduct and breached his fiduciary duty to Gooberry, as described above, by doing the following, among other things: (1) saddling the Company with expensive inventory then forcing the Company to sell that inventory at a loss; (2) purposefully decreasing the Company's profit margins and making it reliant on loans from Lemonis and his

entities; (3) purposefully increasing the debt of the Company and forcing it to take loans from Lemonis, and/or other companies owned and/or controlled by him, in order to meet its financial obligations; (4) destroying the Company's legacy handbag line; (5) taking actions that financially favored the shareholder ML Retail, decreasing the value and viability of the Company to the direct detriment of the other shareholders of the Company; (6) using the assets of the Company to grow Lemonis' personal brand MARCUS; (7) using Gooberry as a vehicle to defraud and foreclose upon small business owners Lemonis was purporting to save; (8) closing the Company's Greenwich, Connecticut store and removing roughly $148,313 worth of inventory and $89,056 in furniture, fixtures, and equipment from the store; (9) eliminating all Courage.B retail stores and destroying the Courage.B brand; and (10) mismanaging the Company's corporate assets and funds.

157. As a direct and proximate result of Lemonis' breaches of his fiduciary duty, Plaintiffs and the Company have been harmed in an amount to be proven at trial, but at least millions of dollars.

## FOURTH CAUSE OF ACTION: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### [By Plaintiffs Against Defendants Lemonis, ML Retail, and ML, LLC]

158. Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

159. Within every contract is an implied covenant of good faith and faith dealing; thus, the Gooberry Shareholder Agreement contains this implied covenant. Plaintiffs and Defendants— either individually or through their agents/alter egos—are parties to the Shareholder Agreement.

160. The Shareholder Agreement gave Lemonis, and ML Retail, broad powers to control the operation of Gooberry. As discussed above, Lemonis and ML Retail had the sole discretion to manage and control Gooberry's bank accounts, open certain retail locations and control

Gooberry's revolving line of credit with the Lemonis Entities. Ex. 2 at § 2. In such situations, the implied covenant of good faith and fair dealings requires Lemonis and ML Retail to act in good faith when exercising their broad power over Gooberry.

161. Defendants breached this covenant by abusing, unreasonably and in bad faith and for their own interests and to the detriment of the Company, the power over the Company provided to them in the Shareholder Agreement. Actions which breached the covenant, described above, include, but are not limited to: (1) saddling the Company with expensive inventory then forcing the Company to sell that inventory at a loss; (2) purposefully decreasing the Company's profit margins and making it reliant on loans from Lemonis and his entities; (3) purposefully increasing the debt of the Company and forcing it to take loans from Lemonis, and/or other companies owned and/or controlled by him, in order to meet its financial obligations; (4) destroying the Company's legacy handbag line; (5) taking actions that financially favored the shareholder ML Retail, LLC, decreasing the value and viability of the Company to the direct detriment of the other shareholders of the Company; (6) using the assets of the Company to grow Lemonis' personal brand Marcus; (7) using Gooberry as a vehicle to defraud and foreclose upon small business owners Lemonis was purporting to save; (8) closing the Company's Greenwich, Connecticut store and removing roughly $148,313 worth of inventory and $89,056 in furniture, fixtures, and equipment from the store; (9) eliminating all Courage.B retail stores and destroying the Courage.B brand; and (10) mismanaging the Company's corporate assets and funds.

162. As a direct and proximate result of Defendants' breaches of the implied duty of good faith and fair dealing, Plaintiffs and the Company have been harmed in an amount to be proven at trial, but at least millions of dollars.

## FIFTH CAUSE OF ACTION: UNJUST ENRICHMENT
### [By Plaintiffs, derivatively on behalf of Gooberry, Against Defendants Lemonis, ML Retail and ML, LLC]

163.     Plaintiffs repeat and reallege each and every allegation contained in Paragraph 1 – Paragraph 157 as if fully set forth herein.

164.     Plaintiffs bring this claim for Unjust Enrichment in the alternative to their contract based claims.  Such alternative pleading is proper where, as here, Plaintiffs are seeking rescission of the Shareholder Agreement and Stock Purchase Agreement through their claim for Fraudulent Inducement (First Cause of Action).

165.     Plaintiffs allege that the Company has no adequate remedy at law and bring this unjust enrichment claim against Defendants.

166.     By their wrongful acts and omissions, as alleged herein, the Defendants were unjustly enriched at the expense of, and to the detriment of, the Company.  The Defendants used the Company as a self-enrichment vehicle while forcing the Company to take actions counter to the Company's interests and to assume increasing debt.

167.     As President and CEO of ML Retail, and Director of Gooberry, Lemonis used the Company's assets to enrich himself and his entities by, among other things: (1) decreasing the Company's profit margins in order to make it dependent on loans from Lemonis and his entities; (2) purposefully increasing the debt of the Company and forcing it to take loans from Lemonis, and/or other Companies owned and/or controlled by him, in order to meet its financial obligations; (3) taking actions that financially favored the shareholder ML Retail, LLC, while decreasing the value and viability of the Company to the detriment of the other shareholders; (4) using the assets of the Company to grow Lemonis' personal brand MARCUS; (5) using Gooberry as a vehicle to

defraud and foreclose upon small business owners Lemonis was purporting to save on his television show; and (6) forcing Gooberry to acquire Runway and thereby incur more debt.

168.    Further, upon information and belief, Defendants have continued to enrich themselves at the Company's expense and have been closing the Company's store in Greenwich, Connecticut and removing $148,313 worth of inventory and $89,056 in furniture, fixtures, and equipment from the store.

169.    The Defendants had knowledge of the benefits conferred upon them by the Company.

170.    Plaintiffs, as shareholders of the Company, seek restitution from the Defendants to disgorge all profits, benefits, and other compensation obtained by the Defendants from their wrongful conduct and fiduciary breaches.

171.    Further, it is against equity and good conscience to permit Defendants to retain what is sought to be recovered because Defendants used the Company's assets to enrich themselves at the expense of the Company and its other shareholders. There is no justification for Defendants' actions.

172.    As a result of Defendants' actions, the Company has been harmed in an amount to be proven at trial, but at least millions of dollars.

**SIXTH CAUSE OF ACTION: MISAPPROPRIATION OF CORPORATE ASSETS**
**[By Plaintiffs, derivatively on behalf of Gooberry, Against Defendants Lemonis, ML Retail, and ML, LLC]**

173.    Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

174.    This is an action for relief arising out of the misappropriation of corporate assets caused solely by Defendants' malfeasance, acts or omissions, to the detriment of the Company.

175. As President and CEO of ML Retail, and Director of Gooberry, Lemonis misappropriated assets of the Company by, for example: (1) purposefully decreasing the Company's profit margins and making it reliant on loans from Lemonis and his entities; (2) purposefully increasing the debt of the Company and forcing it to take loans from Lemonis, and/or other companies owned and/or controlled by him, in order to meet its financial obligations; (3) taking actions that financially favored the shareholder ML Retail, decreasing the value and viability of the Company to the direct detriment of the other shareholders of the Company; (4) using the assets of the Company to grow Lemonis' personal brand MARCUS; (5) closing the Company's Greenwich, Connecticut store and removing $148,313 worth of inventory and $89,056 in furniture, fixtures, and equipment from the store, and (6) using Gooberry as a vehicle to defraud and foreclose upon small business owners Lemonis was purporting to save.

176. As a direct and proximate result of Defendants' malfeasance, acts or omissions, the Company and Plaintiffs have been harmed in an amount to be proven at trial, but at least millions of dollars.

## SEVENTH CAUSE OF ACTION: CORPORATE MISMANAGEMENT AND WASTE
### [By Plaintiffs, derivatively on behalf of Gooberry, Against Defendants Lemonis, ML Retail, and ML, LLC]

177. Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

178. This is an action for relief arising out of the mismanagement and waste of corporate assets caused solely by Defendants' malfeasance, acts or omissions, to the detriment of the Company.

179. As President and CEO of ML Retail, and Director of Gooberry, Lemonis has grossly mismanaged the Company by, for example: (1) forcing the Company to spend hundreds

of thousands of dollars renovating its stores only to then rebrand and spend additional hundreds of thousands of dollars on rebranding those stores; (2) decreasing the Company's margins from 73% to 52%; (3) saddling the Company with expensive inventory then forcing the Company to sell that inventory at a loss; (4) destroying the Company's legacy handbag line; (5) closing the Company's Greenwich, Connecticut store and removing $148,313 worth of inventory and $89,056 in furniture, fixtures, and equipment from the store; and (6) getting rid of all but one Courage.B retail store and destroying the Courage.B brand.

180.     Beginning in May 2020, Defendants have been closing retail stores owned and/or operated by Gooberry and have removed the Company's inventory and assets from those stores.

181.     These actions by Defendants amount to waste and mismanagement of corporate assets.

182.     As a result of their mismanagement and waste of corporate assets, Defendants are liable to the Company and Plaintiffs under common law and New York Bus. Corp. Law § 720.

183.     As a direct and proximate result of the foregoing, the Company and Plaintiffs have been injured in an amount to be determined at trial in an amount to be proven at trial, but at least millions of dollars.

### EIGHTH CAUSE OF ACTION: CONVERSION
**[By Plaintiffs, derivatively on behalf of Gooberry, Against Defendants Lemonis, ML Retail and ML, LLC]**

184.     Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

185.     Gooberry has a property interest in the assets and inventory in its retail stores and a right to possess those assets and inventory and have them used for legitimate business purposes.

186.     Defendants converted roughly $148,313 worth of inventory and $89,056 in furniture, fixtures, and equipment from the Company's Greenwich, Connecticut store for no legitimate business purpose.

187.     Without Plaintiffs' knowledge or consent, Defendants took possession of the assets and inventory of the Company, in derogation of the Company's rights.

188.     Defendants' acts were willful, wanton, malicious, and oppressive.

189.     As a result of Defendants' conversion, Plaintiffs have been damaged in an amount to be proven at trial, but at least $237,369.

## NINTH CAUSE OF ACTION: RICO § 1962
### [By Plaintiffs, derivatively on behalf of Gooberry, Against Defendants Lemonis, ML Retail, ML, LLC, and Machete]

190.     Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

191.     This cause of action asserts claims against Defendants for violations of 18 U.S.C. § 1962(c) for conducting the affairs of the "Lemonis Enterprise" described herein, through the "pattern of racketeering activity" described herein.

192.     At all relevant times, Plaintiffs, Lemonis, ML Retail, and ML, LLC are "persons" as defined in 18 U.S.C. §§ 1961(3) and 1962(c).

193.     Plaintiffs are each a "person injured in his or her business or property by reason of a violation of" RICO within the meaning of 18 U.S.C. § 1964(c).

194.     At all relevant times, each Defendant was, and is, a "person" who conducted the affairs of the "Lemonis Enterprise" described below, through the "pattern of racketeering activity" described below.  While each Defendant participates in the Lemonis Enterprise, it has an existence separate and distinct from the enterprise.  Further, the Lemonis Enterprise is separate and distinct from the "pattern of racketeering activity" in which each Defendant has engaged and is engaging.

44

195.    At all relevant times, each Defendant was associated with, operated or controlled, the Lemonis Enterprise, and each Defendant participated in the operation and management of the affairs of the Lemonis Enterprise, through a variety of actions described herein. Each Defendant's participation in the Lemonis Enterprise is necessary for the successful operation of the Defendants' scheme.

### The Lemonis Enterprise

196.    Section 1961(4) of RICO defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

197.    The following persons, and others presently unknown, have been members of and constitute an "enterprise" within the meaning of RICO, which are referred to herein collectively as the "Lemonis Enterprise:"

    a.   Defendant Marcus Lemonis;

    b.   Defendant ML Retail;

    c.   Defendant ML, LLC; and

    d.   Defendant Machete.

198.    The RICO "enterprise" was an association-in-fact Enterprise, as the term is defined in 18 U.S.C. §§ 1961(4) and 1962(c), consisting of Lemonis, ML Retail, ML, LLC, Machete, and their respective agents and employees, who associated together for the common purpose of employing the multiple deceptive, abusive and fraudulent acts described herein.  The Lemonis Enterprise is an ongoing organization with an ascertainable structure, and a framework for making and carrying out decisions, that functions as a continuing unit with established duties, and that is

separate and distinct from the pattern Lemonis Enterprise was used as a tool to effectuate the pattern of racketeering activity.

199.     Each Defendant was responsible for and carried out separate roles in pursuit of the common purpose of the Enterprise:

     a.   Marcus Lemonis' role in the Lemonis Enterprise was to use his personality, fame, purported business acumen, and fraudulent representations to bait Plaintiffs, and the other businesses he encountered through "The Profit," to allow him to invest and obtain equity in their businesses. Lemonis represented to Plaintiffs, and other participants on "The Profit" that he was there to help their business and that he had their best interest in mind. Lemonis' role in the enterprise also included keeping Plaintiffs, and other business owners, in line by threatening to foreclose on their businesses and take their assets from them.

     b.   ML Retail's role in the Lemonis Enterprise was to act as the corporate vehicle through which the Lemonis Enterprise invested in Plaintiffs' business and, on information and belief, the other businesses that the Lemonis Enterprise baited through "The Profit." Thus, ML Retail was used to represent the Lemonis Enterprises' equity in these businesses. In the agreements with Plaintiffs, ML Retail was given broad management power over Gooberry which it used to run the Company to Defendants' benefit, to the detriment of Plaintiffs and the Company.

     c.   ML, LLC's role in the Lemonis Enterprise was to act as the financing behind the enterprise. Part of the Lemonis Enterprise's fraudulent conduct was making Plaintiffs' business, Gooberry, and the other businesses the Lemonis Enterprise

encountered through "The Profit," insurmountably indebted to the Lemonis Enterprise. The funding to make the unnecessary inventory purchases, renovations, and other fraudulent capital expenditures came from ML, LLC.

d.  Machete's role in the Lemonis Enterprise was to provide initial inducements to prospective businesses and business owners in order for them to appear on "The Profit." Machete would use Skype and other electronic means to communicate to small businesses and their owners telling them that appearing on "The Profit" and making a deal with Lemonis would save their business and/or help successfully expand their business. In addition, Machete produced the show "The Profit" which the Lemonis Enterprise used to advertise and sell their fraudulent scheme. Further, Machete used the Internet and television to make representations about the success the businesses featured on the show had achieved when in reality most of the business that appeared on the show are no longer in business, were severely damaged by the show, or insurmountably saddled with debt to the Lemonis Entities.

200.  The Lemonis Enterprise is an ongoing enterprise which engages in, and whose activities affect, interstate commerce within the meaning of 18 U.S.C. § 1962(c), by, among other things, marketing and advertising "The Profit" television show and Defendants' purported ability to save family business and small fledgling businesses through television, media, and Internet outlets, and using the instrumentalities of interstate commerce to make fraudulent representations to Plaintiffs and others as part of a scheme to defraud. The Lemonis Enterprise began by at least July 2013 and presently continues to operate as a single unit.

201.    The overarching purpose of the Lemonis Enterprise is for each of its members to profit from defrauding small, often family owned, businesses across the Country, primarily through the guise of the television show "The Profit."  Defendants accomplished the purpose of the Lemonis enterprise by: (1) falsely representing Lemonis as a business savior who helps failing small businesses, (2) targeting small family run businesses without general counsel or independent attorneys, (3) using means of mail and wire (defined below), such as the Internet and television, to make representations that induce small businesses, including Plaintiffs, to appear on the television show "The Profit," (4) using means of mail and wire (defined below), such as the Internet and television, to represent to each business that Lemonis will help the business, make the businesses profitable, and provide marketing and publicity by virtue of being on the show and part of the Lemonis family of businesses, (5) using means of mail and wire (defined below), such as the Internet and television, to represent to each business that the deals Lemonis makes on the show and the help he provides the companies on the show are real, (6) using means of mail and wire (defined below), such as the Internet and television, to represent that Lemonis has helped and improved the small businesses featured on the show when, in reality, the majority of businesses featured on the show are either now closed, severely damaged by the show, or insurmountably indebted to the Lemonis Entities, (7) saddling the business with debt to the Lemonis Entities, both prior to finalizing the Lemonis Entities' investment and after, in order to give the Lemonis Enterprise leverage over the business and its owners, (8) obtaining an ownership interest in the business that gave the Lemonis Entities complete control over the business, its finances, and its line of credit with the Lemonis Entities, (9) mismanaging the business in a way that benefited the Lemonis Enterprises, to the detriment of the business and its owners, and in a way that make it insurmountably indebted to the Lemonis Entities, and (10) eventually foreclosing on the debt in

order to take the business from its original owners and fold it into the Lemonis Entities and its various companies.

<div align="center"><b>Predicate Acts (Mail and Wire Fraud)</b></div>

202.   Section 1961(1) of RICO provides that "racketeering activity" is, among other things, any act indictable under any of the provisions of 18 U.S.C. § 1341 (mail fraud) and §1343 (wire fraud).

203.   As set forth below, to carry out, or attempt to carry out its scheme to defraud, Defendants have engaged in, and continues to engage in, the affairs of the Lemonis Enterprise through the following pattern of racketeering activity, in violation of 18 U.S.C. § 1341 (mail fraud) and §1343 (wire fraud):

    a.  Without limitation, instructions to open U.S. banking accounts, make banking transactions, carry out activities in furtherance of the fraud, material misrepresentations made to Plaintiffs, and the negotiation, finalization, and notarization of documents in furtherance of the fraud were sent by the Lemonis Enterprise or their authorized agents via mail and wire to and from the United States, and specifically to and from New York.

    b.  The Lemonis Enterprise used the mail and wire, including television, media, Skype, and the Internet, as follows:

        i.  Using the Internet and Skype to make fraudulent representations to small businesses, that Lemonis would help their business through "The Profit" and running advertising and maintaining a website including false representations portraying Lemonis as a savior of small businesses and representing that Lemonis helps small businesses.   Using the

<div align="center">49</div>

Internet and television to make fraudulent representations that Lemonis has helped and improved the small businesses featured on the show when, in reality, the majority of businesses featured on the show are either now closed, severely damaged by the show, or insurmountably indebted to the Lemonis Entities. In Plaintiffs case, using Skype around spring 2014 to make representations that Lemonis could help their business move to the next level, that the deals Lemonis makes on the show are real, and that the businesses Lemonis helps on the show. These representations are made to induce small businesses to be on the show "The Profit" and provide Defendants the opportunity to invest in the targeted small business.

ii. Using the Internet to transmit documents used to give the Lemonis Entities equity positions in these businesses. In Plaintiffs' case, using the Internet in or around October and/or November 2014 to transmit the Shareholder Agreement and Stock Purchase Agreement that gave Defendants an equity interest in and control over Gooberry.

iii. Using the Internet and telephone to make fraudulent representations after the Lemonis Entities' invested that the Lemonis Enterprise was helping these businesses while they were actually mismanaging them to the detriment of the business, including Plaintiffs' business, to make loans to Plaintiffs and the other businesses that made them insurmountably indebted to the Lemonis Enterprise, and to foreclose on

these businesses whenever the Lemonis Entities wanted to get rid of the original owners.

c.  The fraud would not have been possible had the Lemonis Enterprise, their entities, and their authorized agents not used the mail and wire, as described above, to send and receive the communications throughout the Country.

d.  Defendants conducted exchanges, payments, and monetary transfers using the wires concerning the receipt and distribution of the proceeds of Defendants' improper racketeering enterprise.

204.    Defendants' misrepresentations and acts were knowing and intentional, and made with the intent to defraud, primarily through the show "The Profit," its marketing, website, and promotional materials.

205.    Plaintiffs reasonably relied on Defendants' false representations by, among other things, allowing Defendants to invest in their company Gooberry, allowing Defendants to obtain control of Gooberry, and allowing to Defendants to control Gooberry's line of credit with the Lemonis Entities.

206.    These multiple and frequent acts of mail and wire fraud establish a pattern of racketeering and, further, give context to the defendants' racketeering activity that persisted for years.

## Pattern of Racketeering Activity

207.    As set forth herein, Defendants have engaged in a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5), by committing or conspiring to commit at least two acts of racketeering activity, described above, within the past ten years.

208.    Defendants have engaged in a scheme to defraud small business owners, including Plaintiffs and Gooberry, through fraudulent misrepresentations, knowing concealments, suppressions and omissions of material fact in their television show "The Profit," which has run for seven seasons, and upon information and belief, will continue for an eighth season, and featured approximately 100 businesses, e-mail and other communications, marketing materials, on their website, and in other advertisements, with the use of United States mail or interstate telecommunication systems for the purpose of executing its scheme.

209.    Defendants' scheme to defraud was knowingly made and reasonably calculated with the intent to deceive and defraud persons of ordinary prudence and comprehension, including Plaintiffs.

210.    Defendants' scheme to defraud was made with intent to induce reliance by Plaintiffs upon such misrepresentations, concealments, suppressions, or omissions.

211.    Defendants' scheme to defraud was made with the purpose of gaining millions of dollars in equity, assets, trade secrets, inventory, good will, loan interest, monies, and profits from Plaintiffs, and other small businesses, that would not have been gained but for Defendants' acts and omissions alleged herein.

212.    But for Defendants' scheme to defraud, Plaintiffs would not have permitted Defendants to invest in Gooberry, preventing Defendants' ability to harm Gooberry from the harms alleged herein.  The harms that took place would not have occurred if Plaintiffs had proceeded to operate Gooberry in the absence of Defendants as they would have either obtained financing from another source or would have continued to operate as they previously were, where they were selling over $5 million in revenue in a year without the added debts brought about by Defendants' fraudulent scheme and conspiracy.

213.     As detailed below, Defendants' long running fraudulent scheme and conspiracy consisted of, among other things: (1) falsely representing Lemonis as a business savior who helps failing small businesses, (2) targeting small family run businesses without general counsel or independent attorneys, (3) using means of mail and wire (defined below), such as the Internet and television, to make representations that induce small businesses, including Plaintiffs, to appear on the television show "The Profit," (4) using means of mail and wire (defined below), such as the Internet and television, to represent to each business that Lemonis will help the business, make the businesses profitable, and provide marketing and publicity by virtue of being on the show and part of the Lemonis family of businesses, (5) using means of mail and wire (defined below), such as the Internet and television, to represent to each business that the deals Lemonis makes on the show and the help he provides the companies on the show are real, (6) using means of mail and wire (defined below), such as the Internet and television, to represent that Lemonis has helped and improved the small businesses featured on the show when, in reality, the majority of businesses featured on the show are either now closed, severely damaged by the show, or insurmountably indebted to the Lemonis Entities, (7) saddling the business with debt to the Lemonis Entities, both prior to finalizing the Lemonis Entities' investment and after, in order to give the Lemonis Enterprise leverage over the business and its owners, (8) obtaining an ownership interest in the business that gave the Lemonis Entities complete control over the business, its finances, and its line of credit with the Lemonis Entities, (9) mismanaging the business in a way that benefited the Lemonis Enterprises, to the detriment of the business and its owners, and in a way that make it insurmountably indebted to the Lemonis Entities, and (10) eventually foreclosing on the debt in order to take the business from its original owners and fold it into the Lemonis Entities and its various companies.

214.     The above-described racketeering activities amount to a common course of conduct intended to deceive and harm Plaintiffs and other small business owners.  Each such racketeering activity is related, has a similar purpose, involves the same or similar participants and methods of commission, and has similar results affecting similar victims, including Plaintiffs.  These acts pose a threat of continued racketeering activity and constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

### Injury to Plaintiffs

215.     As a direct and proximate result of violations of 18 U.S.C. § 1962(c) by the Defendants, Gooberry and, consequently, Plaintiffs derivatively, have been injured in their property within the meaning of 18 U.S.C. § 1964(c) in an amount to be proven at trial, but not less than twelve million dollars.

216.     Under the provisions of 18 U.S.C. § 1964(c), the Defendants are liable to Gooberry for three times the damages sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

### TENTH CAUSE OF ACTION: ACCOUNTING
**[By Plaintiffs, derivatively on behalf of Gooberry, Against Defendants Lemonis, ML Retail and ML, LLC]**

217.     Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

218.     As detailed above, by diverting and misusing corporate funds for Defendants' own benefit, and by engaging in the other misconduct described above, the Defendants are guilty of mismanagement and waste under New York Bus. Corp. Law § 720.

219.     According to the Shareholder Agreement, Lemonis, as President and CEO of ML Retail, was given the sole and absolute discretion over financial and accounting functions, controls,

decisions, and procedures for the Company. Further, as a Director of Gooberry, Lemonis owed a fiduciary duty to act in the best interests of the Company. Thus, the Company is entitled to an accounting from Defendants.

220. Plaintiffs, as shareholders, are entitled to commence an action to compel Defendants to account for their failure to perform their duties and their waste of corporate assets.

221. In view of the foregoing, the Company is entitled to an accounting of all transactions, receipts, and disbursements undertaken by the Company and by the Defendants, purportedly on its behalf.

222. The Company is entitled to an accounting from the Defendants as to all sums they have received from the Company, as compensation or any other form of disbursement, regardless of whether the funds went directly to Defendants or to third parties.

223. Such an accounting is necessary to determine the rights of the Company and Plaintiffs to funds that have been improperly in Defendants' possession and control because the Company and Plaintiffs have an interest in these funds.

224. Given that Defendants have failed, neglected, or refused to account to the Company and Plaintiffs, proper accounting is both appropriate and necessary.

225. Plaintiffs have no adequate remedy at law.

## ELEVENTH CAUSE OF ACTION: APPOINTMENT OF A TEMPORARY RECEIVER
### [By Plaintiffs Against Defendants]

226. Plaintiffs repeat and reallege each allegation contained above as though fully set forth herein.

227. Given Defendants' abuse of power by misappropriating and mismanaging the Company's assets and engaging in other criminal conduct, as detailed above, there is an imminent

danger that corporate assets will continue to be improperly diverted and misused by the Defendants for their personal benefit.

228.    Although Plaintiffs are co-founders and shareholders of Gooberry, the Shareholder Agreement gives Lemonis, as CEO and President of ML Retail, all financial power, accounting, and business control over Gooberry.

229.    Lemonis is actively removing assets from Gooberry, purposefully rendering it unable to meet its current obligations.  As of the filing of this Complaint, Lemonis has closed one of the remaining two stores and removed all of the store's assets.  As for the remaining store, it is only a matter of time before Lemonis takes action.

230.    Lemonis' conduct has and is causing significant financial harm to the Company and has exposed it to potential insolvency.  There is a significant risk that if Lemonis is allowed to remain in control of the Company and its finances, the corporate assets will continue to be diverted to his pockets and the Company will be run into the ground.

231.    To prevent the Company and Plaintiffs, as shareholders, from suffering serious and irreparable harm, it is both necessary and appropriate for a temporary receiver to be instated to control the Company's finances and preserve its assets.

232.    As a result of Lemonis' misappropriation of the Company's funds and assets, the appointment of a custodian or receiver to direct and supervise Gooberry's business and affairs pending a decision on the merits of Plaintiffs' claims is necessary and appropriate to avoid irreparable harm to the Company and its shareholders.

233.    Plaintiffs have no adequate remedy at law.

## TWELFTH CAUSE OF ACTION: PERMANENT INJUNCTION RESTRAINING THE DEFENDANTS FROM CONTINUING TO MAINTAIN CONTROL OVER THE COMPANY'S FINANCES AND ASSETS
### [By Plaintiffs Against Defendants]

234.    Plaintiffs repeat and reallege each allegation contained above as though fully set forth herein.

235.    As stated above, Lemonis continues to maintain exclusive control over the finances, accounting, and business decisions of the Company.  If Defendants are permitted to continue to exert such wrongful control over the Company, Gooberry and Plaintiffs will suffer serious and irreparable harm, because the Company will be rendered insolvent.

236.    By purposefully rendering Gooberry unable to pay its debts, closing its stores and removing its assets, and seeking to misappropriate Gooberry's funds for their personal benefit, Defendants' actions threaten to cause irreparable harm to Plaintiffs and the Company.  Such harm can only be prevented by an Order removing Defendants from positions of influence or authority over the Company's finances and assets.

237.    To preserve the status quo and prevent damage to Gooberry, Plaintiffs seek an order immediately restraining and enjoining Defendants, or those acting in privity with them, from (or as appropriate, requiring them to take the following action):

    i.    Spending, transferring or dissipating any funds of Gooberry except as absolutely necessary in the ordinary course of business for Gooberry, and including specifically that no funds will be expended for:

        a.    Any payments whatsoever to Defendants or their affiliates, for any purpose, including bonuses; or

        b.    Any payments whatsoever to Defendants' personal attorney from the Company's funds.

ii.    Entering into any banking, borrowing and/or investment arrangements on behalf of the Company.

iii.   Closing any retail stores of Gooberry and/or moving, or removing any of the assets located in such stores.

238.    The issuance of a temporary restraining order will prevent further harm to the Company until a preliminary injunction hearing is held and will not unduly prejudice Defendants.

239.    Plaintiffs have no adequate remedy at law.

## THIREENTH CAUSE OF ACTION: DISSOLUTION UNDER N.Y. BUS. CORP. LAW § 1104-a
### [By Plaintiffs Against Defendants]

240.    Plaintiffs repeat and reallege each allegation contained above as though fully set forth herein.

241.    Pursuant to N. Y. Bus. Corp. Law § 1104-a, and as of the filing of this Complaint, Plaintiff Goureau is holder of at least 34 shares of Gooberry.  Plaintiff Menkin is holder of at least 22 shares of Gooberry.

242.    Defendants are guilty of illegal, fraudulent, or oppressive actions toward Plaintiffs, the complaining shareholders.

243.    Illegal, fraudulent or oppressive conduct engaged in by Defendants, include, but are not limited to: (1) purposefully decreasing the Company's profit margins and making it reliant on loans from Lemonis and his entities; (2) purposefully increasing the debt of the Company and forcing it to take loans from Lemonis, and/or other companies owned and/or controlled by him, in order to meet its financial obligations; (3) taking actions that financially favored the shareholder ML Retail, LLC, decreasing the value and viability of the Company to the direct detriment of the other shareholders of the Company; (4) using the assets of the Company to grow Lemonis'

personal brand MARCUS; (5) using Gooberry as a vehicle to defraud and foreclose upon small business owners Lemonis was purporting to save; and (6) closing Gooberry owned retail stores and removing its inventory, furniture, fixtures, and equipment.

244.    Furthermore, the property or assets of Gooberry have been looted, wasted, or diverted for non-corporate purposes to the benefit of Defendants.

245.    Liquidation is the only feasible means whereby Plaintiffs may obtain a fair return of their investment and is reasonably necessary for the protection of the rights and interests of the shareholders.

246.    Upon dissolution, the Defendants' interests, if any, should be subject to a surcharge due to willful or reckless dissipation or transfer of assets or corporate property without just or adequate compensation.

247.    Plaintiffs accordingly request that the Court dissolve Gooberry and that a liquidating trustee be appointed to oversee the dissolution and winding up of Gooberry, instead of the Defendants.  A liquidating trustee would ensure that Plaintiffs are protected from further harm caused by the Defendants—who have demonstrated a history of mismanagement and misappropriating of Company's funds.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against the Defendants, as follows:

1. For monetary damages in an amount to be determined at trial;

2. For treble damages and reasonable attorneys' fees under 18 U.S.C. 1964(c);

3. For an accounting under Court supervision of the money owed/due for all assets Defendants misappropriated from the Company, as well as any benefits they have realized from those assets;

4. For disgorgement from the Defendants all assets they misappropriated from the Company, as well as any benefits they have realized from those assets;

5. For rescission of the Shareholder Agreement and Stock Purchase Agreement as they were obtained through fraud;

6. The appointment of a receiver as set forth in Count XI;

7. A temporary, preliminary, and permanent injunction set forth in Count XII;

8. A judgment that Gooberry be dissolved;

9. The appointment of an independent liquidating trustee to wind up the affairs of Gooberry;

10. An award of the costs and disbursements of this action, including reasonable attorneys' fees, costs and expenses;

11. For punitive damages;

12. For treble damages; and

13. For such further relief as the Court may deem just and proper under the circumstances.

## JURY TRIAL DEMANDED ON ALL CLAIMS SO TRIABLE

Dated: August 17, 2020          **Gerard Fox Law P.C.**

*/s/ Maja Lukic*
_____
Gerard P. Fox (*admitted pro hac vice*)
Maja Lukic (SBN 4888038)
1345 Sixth Avenue, 33rd Floor
New York, New York 10105
Telephone: (646) 690-4980
Facsimile: (646) 368-9328
gfox@gerardfoxlaw.com
mlukic@gerardfoxlaw.com

Lauren M. Greene (*admitted pro hac vice*)
1880 Century Park East, Suite 1410
Los Angeles, California 90067
Telephone: (310) 441-0500
Facsimile: (310) 441-4447
lgreene@gerardfoxlaw.com

EXHIBIT A

# STOCK PURCHASE AGREEMENT

THIS STOCK PURCHASE AGREEMENT (this "Agreement"), is made and entered effective as of November **11**, 2014 (the "Effective Date"), between GOOBERRY CORP., a New York corporation (the "Company"), NICOLAS GOUREAU ("Shareholder"), an individual and owner of all of the issued and outstanding shares of the stock of the Company, and ML RETAIL LLC (the "Purchaser").

Capitalized terms used in this Agreement and not otherwise defined are defined in Section 1 of this Agreement.

## PRELIMINARY STATEMENT

A. Shareholder is the owner of one hundred percent of the issued and outstanding Common Stock of the Company.

B. In connection with the Company's ongoing operation of its business, Shareholder and the Company have determined it is necessary, desirable and in each of their best interests to further capitalize the Company.

C. The Company is willing to issue and sell to the Purchaser, and the Shareholder is willing to cause the Company to issue and sell to the Purchaser, shares of Common Stock in consideration of capital contributions to the Company and the Purchaser is willing to purchase shares of the Common Stock and make a capital contribution to the Company pursuant to the term and conditions of this Agreement.

NOW, THEREFORE, in consideration of the mutual representations and agreements set forth in this Agreement and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Company, Shareholder and the Purchaser hereby agree as follows:

**Section 1.**   **DEFINITIONS.**

1.1   As used in this Agreement, the following terms shall have the following meanings:

(a)   "Action" means any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena or investigation of any nature (civil, criminal, administrative, regulatory or otherwise), whether at law or in equity.

(b)   "Board" means the Board of Directors of the Company.

(c)   "Charter" means the Articles of Incorporation of the Company attached to this Agreement as Exhibit A.

(d)   "Closing" is defined in Section 2.2 of this Agreement.

(e)   "Common Stock" means the common stock of the Company.

(f)   "Disclosure Schedules" shall collectively refer to all schedules attached hereto, including those in response to the representations, warranties and disclosures made in Section 5 of this Agreement.

(g)    "Governmental Authority" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any arbitrator, court or tribunal of competent jurisdiction.

(h)    "Indemnifying Party" is defined in Section 8.4 of this Agreement.

(i)    "Knowledge," "Knowledge of the Company," or similar terms with respect to the Company, means the actual knowledge of the Company and/or Shareholder.

(j)    "Law" means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, other requirement, or rule of law of any Governmental Authority.

(k)    "Loss" means any losses, damages, liabilities, deficiencies, actions, judgments, interest, awards, penalties, fines, costs, or expenses of whatever kind, including reasonable attorney's fees and the cost of enforcing any right to indemnification hereunder and the reasonable cost of pursuing any insurance providers.

(l)    "Management Agreement" shall mean the agreement to be entered into between the Management Company and the Company, pursuant to which the Management Company shall provide certain management services to the Company, the terms of which shall be mutually agreed upon between the Shareholder, the Purchaser and the Company.

(m)    "Management Company" shall mean ECONOLUX360 Inc.

(n)    "Notice of Claim" is defined in Section 8.4 of this Agreement.

(o)    "Outstanding Shareholder Loan" shall mean that certain loan by the Shareholder with a current outstanding principal balance (including all accrued and unpaid interest) of $140,000.00, prior to the $40,000 payment contemplated pursuant to Section 2.2 hereof.

(p)    "Permits" means all permits, licenses, franchises, approvals, authorizations, registrations, certificates, variances, and similar rights obtained, or required to be obtained, from Governmental Authorities.

(q)    "Permitted Encumbrances" is defined in Section 5.13 of this Agreement.

(r)    "Preemptive Rights" is defined in Section 5.3 of this Agreement.

(s)    "Person" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association, or other entity.

(t)    "Purchase Price" is defined in Section 2.1 of this Agreement.

(u)    "Purchaser Indemnitees" is defined in Section 8.2 of this Agreement.

(v)    "Reference Balance Sheets" is defined in Section 5.4 of this Agreement.

(w)    "Release" means any actual or threatened release, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, abandonment, disposing, or allowing

*Stock Purchase Agreement*

to escape or migrate into or through the environment (which includes, without limitation, ambient air (indoor or outdoor), surface water, groundwater, land surface, or subsurface strata or within any building, structure, facility or fixture). "Representative" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants, and other agents of such Person.

      (x)    "Shareholder Agreement" shall mean the form of Shareholder Agreement to be executed at Closing in a form mutually acceptable to the Company, the Purchaser, the Shareholder, Menkin and Goureau.

**Section 2.**    **PURCHASE AND SALE OF STOCK.**

    2.1    <u>Sale and Issuance of Common Stock</u>. Subject to the terms and conditions of this Agreement, and upon the basis of the representations and warranties contained in this Agreement, at the Closing (as hereinafter defined) the Company shall issue and sell to the Purchaser effective as of the Effective Date free and clear of any liens, claims, charges, and encumbrances whatsoever (except those imposed by this Agreement or securities laws generally), and the Purchaser agrees to purchase and accept from the Company effective as of the Effective Date, shares of Common Stock representing thirty-two percent (32%) of the issued and outstanding Common Stock (the "<u>ML Shares</u>").

    2.2    <u>Purchase Price</u>. The consideration for the ML Shares (the "Purchase Price") shall be $800,000.00 which shall be contributed by the Purchaser to the Company. $602,000.00 of the Purchase Price has been paid and contributed to the Company, or paid to third parties on behalf of the Company, by the Purchaser prior to the date hereof and the remaining $198,000.00 (the "Closing Contribution") of the Purchase Price shall be paid and contributed to the Company or paid to third party vendors on behalf of the Company simultaneously with the issuance and transfer of the ML Shares. The Closing Contribution shall be used for (a) the payment of a $40,000 principal payment to the Shareholder on the Outstanding Shareholder Loan, (b) general working capital purposes and (c) capital improvements and expenditures by the Company. Notwithstanding anything to the contrary contained on the Reference Balance Sheet, the Company and Shareholder represent and warrant that the outstanding principal amount under the Outstanding Shareholder Loan immediately prior to the Closing is $140,000.00 and following the $40,000.00 principal payment to the Shareholder the outstanding principal amount together with all accrued and unpaid interest shall be $100,000.00 [

    2.3    <u>Closing, Payment and Delivery</u>. Payment for and delivery of the certificates evidencing the Common Stock to be issued and sold to the Purchaser pursuant to this Agreement (the "Closing") shall take place simultaneously with the execution of this Agreement. At the Closing, the Company shall issue a stock certificate to the Purchaser evidencing the ML Shares.

    2.4    <u>Transfer to Menkin and Goureau</u>. At or prior to the Closing, the Shareholder shall transfer to each of Stephanie Menkin ("Menkin") and Noemi Goureau ("Goureau") shares of Common Stock of the Company whereby at Closing Menkin shall own twenty-two percent (22%) of the issued and outstanding Common Stock of the Company (the "Menkin Shares") and Goureau shall own twelve percent (12%) of the issued and outstanding Common Stock of the Company (the "Goureau Shares" and together with Menkin Shares and the ML Shares the "Shares").

**Section 3.**    <u>CONDITIONS OF SHAREHOLDER'S OBLIGATIONS AT CLOSING</u>. The obligation of the Company to consummate the issuance and conveyance of the ML Shares to the Purchaser at the Closing is subject to the satisfaction of the following conditions, any of which may be waived by the Company in writing:

3.1     Representations and Warranties True at Closing. The representations and warranties made by the Purchaser in Section 6 of this Agreement shall be true, correct, and complete as of the Closing.

3.2     Closing Contribution to the Company. The Purchaser shall pay and make a capital contribution to the Company in an amount equal to the Closing Contribution.

3.3     Management Agreement. The Management Agreement shall be executed and delivered.

3.4     Shareholder Agreement. The Purchaser, Shareholder, Menkin and Goureau shall have entered into the Shareholder Agreement.

**Section 4.     CONDITIONS OF PURCHASER'S OBLIGATIONS AT CLOSING.** The obligation of the Purchaser to purchase ML Shares under this Agreement at the Closing is subject to the satisfaction of the conditions described in this Section 4. Except as otherwise expressly set forth below, the satisfaction of such conditions will be determined, and any such condition may be waived in writing, by the Purchaser.

4.1     Corporate Proceedings. All corporate and other proceedings required to be taken by the Company and Shareholder in connection with the Closing and all documents incident thereto shall be reasonably satisfactory in form and substance to the Purchaser, and the Purchaser shall have received all such counterpart originals or certified or other copies of such documents as it shall reasonably request.

4.2     Closing Certificate. At the Closing, the Company shall have delivered a copy, certified as of the date of the Closing by the Secretary of the Company, of the resolutions of the Board authorizing the execution, delivery and performance of this Agreement and the transactions contemplated hereby and thereby, and the issuance and sale of the Shares pursuant to this Agreement at such Closing.

4.3     Corporate Standing. The Company shall be in good standing in the State of New York, and the Company shall have delivered to the Purchaser a copy of its current good standing certificate certified by the Secretary of State of the State of New York.

4.4     Consents. The Company and Shareholder shall have obtained all consents necessary for the issuance and conveyance of the Shares under this Agreement.

4.5     Management Agreement. The Management Agreement shall be executed and delivered.

4.6     Representations and Warranties True at Closing. The representations and warranties made by the Company and Shareholder in Section 5 of this Agreement shall be true, correct and complete in all material respects as of the Closing.

4.7     Shareholder Agreement. The Purchaser, Shareholder, Menkin and Goureau shall have entered into the Shareholder Agreement

**Section 5.     REPRESENTATIONS AND WARRANTIES OF SHAREHOLDER AND THE COMPANY.** The Company and Shareholder represent and warrant to the Purchaser that:

5.1     Organization and Qualification. The Company is a corporation duly organized and validly existing in good standing under the laws of the State of New York, with the requisite legal and corporate power to own its property and to carry on its business as currently conducted. The Company is in good standing and is

*Stock Purchase Agreement*

ML
Nb

duly qualified to transact business as a foreign corporation in each jurisdiction in which the failure to qualify would have a material adverse effect on its business, properties, prospects, or financial condition.

    5.2    <u>Power</u>. The Company has all requisite legal power to enter into this Agreement and to carry out and perform its obligations under the terms hereof and thereof. The Company has all requisite legal power to issue the Shares.

    5.3    <u>Capitalization</u>.

    (a)    The Shareholder is the owner of one hundred percent (100%) of the issued and outstanding Common Stock all of which (i) has been duly authorized, validly issued, and is fully paid and nonassessable, (ii) has not been issued in violation of preemptive rights, voting agreements, or rights of first offer or refusal applicable to the Common Stock (collectively, "<u>Preemptive Rights</u>"), and (iii) has been offered, issued, and sold by the Company in compliance with all applicable federal and state securities laws. Attached hereto as Schedule 5.3(a) is a complete and accurate list of the shareholders of the Company, with the number of shares and percentage interest of the Company's Common Stock.

    (b)    Other than pursuant to this Agreement (i) there are no subscriptions, warrants, options, convertible securities (including convertible debt), participation rights or other rights (contingent or otherwise) to purchase or acquire any Common Stock, (ii) the Company has no obligation (contingent or otherwise) to issue any subscription, warrant, option, convertible security (including convertible debt) or other such right, or to issue or distribute to shareholders any evidences of indebtedness or assets of the Company, (iii) the Company has no obligation (contingent or otherwise) to purchase, redeem, or otherwise acquire any Common Stock or to pay any dividend or to make any other distribution in respect thereof, (iv) there are no outstanding or authorized stock appreciation, phantom stock, or similar rights with respect to the Company, and (v) there are no agreements, written or oral, between the Company and any holders of its securities relating to Preemptive Rights or the sale or transfer (including agreements relating to rights of first refusal, co-sale rights or "drag-along" rights), registration under the Securities Act, or voting, of the Common Stock.

    5.4    <u>Financial Statements</u>.

    (a)    Shareholder and the Company have delivered to the Purchaser the financial statements identified on Schedule 5.4(a) hereto, copies of which are attached as Schedule 5.4(a) hereto (said financial statements and information are collectively referred to as the "Financial Statements. The Financial Statements are true, correct and complete, have been prepared in accordance with the generally accepted accounting principles consistently applied and fairly present the financial position of the Company on the dates indicated and the results of its operations for the periods then ended. The Company has recorded and the Financial Statements reflect true and accurate allocations of expenses and revenues.

    (b)    Schedule 5.4(b) sets forth the Company's unaudited balance sheet as of September 30, 2014 (the "Reference Balance Sheet") and its unaudited statements of operations for the year to date. Such financial statements (including in all cases the notes thereto, if any) are accurate and complete in all material respects. Such unaudited financial statements present fairly the financial position of the Company as of the date indicated.

    (c)    The Company has no Knowledge of an event or condition of any type that has materially and adversely affected or is likely to affect materially and adversely the business, condition, affairs, operations, properties, or assets of the Company.

    5.5    <u>Accounts Receivable</u>. The accounts receivable reflected on the Reference Balance Sheets and the accounts receivable arising after the date thereof (a) have arisen from bona fide transactions entered into by

*Stock Purchase Agreement*

the Company involving the sale of goods or the rendering of services in the ordinary course of business consistent with past practice, and (b) constitute only valid, undisputed claims of the Company not subject to claims of set-off or other defenses or counterclaims other than normal cash discounts accrued in the ordinary course of business consistent with past practice.

5.6     Liabilities. The Company has no liabilities, actual or contingent, except (a) liabilities fully reflected on the Reference Balance Sheets, (b) liabilities disclosed on the Disclosure Schedule, (c) liabilities incurred in the ordinary course of business since the date of the Reference Balance Sheet, and (d) liabilities incurred for services provided incident to the transactions contemplated by this Agreement.

5.7     Company Authorizations. All corporate action on the part of the Company and its directors and shareholders necessary for the authorization, execution and delivery of this Agreement and the consummation of the transactions contemplated hereby, and for the authorization, issuance (or reservation for issuance), and delivery of the Shares has been taken. This Agreement is the legal, valid, and binding obligation of the Company, enforceable in accordance with its terms, except (a) as limited by bankruptcy, insolvency, or other Laws affecting the enforcement of creditors rights generally, and (b) as limited by Laws relating to the availability of specific performance, injunctive relief, or other equitable remedies or equitable principles of general applicability (the "Standard Exceptions").

5.8     Validity of Shares. The Shares, when issued, sold, and delivered to the Purchaser by the Company in accordance with the terms of this Agreement, will be duly and validly issued, fully paid, non-assessable, and free and clear of all liens, charges, claims, and encumbrances (except those imposed by this Agreement or securities laws generally).

5.9     Collective Bargaining Agreements; Employment Agreements and Benefit Plans; ERISA Matters; Employee Compensation. Except as set forth on Schedule 5.9, the Company (i) has no collective bargaining agreement, employment agreement or any incentive compensation, deferred compensation, profit sharing, or other benefit (including hospitalization, disability insurance, vacation or death benefit) plan or arrangement with or for the benefit of any officer, employee or other person, and (ii) does not maintain or sponsor and is not required to make contributions to, any pension, profit sharing, thrift or other retirement plan, whether or not such plan is or is intended to be qualified under Section 401(a) of the Internal Revenue Code of 1954, as amended (the "Code") (the "Plans"), including, without limitation, any employee benefit plan within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). The Company does not participate in or contribute to any multi-employer pension plan. The Company is not a party to any collective bargaining agreement. Schedule 5.9 also sets forth the name, title, length of service and current compensation of each employee of the Company as of the date hereof. Except as otherwise set forth on Schedule 5.9, all employees of the Company are employed "at will." To the best of each Seller's knowledge after due inquiry, within the 12-month period preceding the date of this Agreement, there have been no actions relating to or attempts at organizing any unions for the Company, and the Company's relations with its employees have been good in all material respects.

5.10    Other Authorizations. No approval or consent of any Person is required by law, by the Charter, or by any indenture, instrument, or other agreement to which the Company is a party, or by any holder of indebtedness of the Company in connection with the issuance and sale of the Shares pursuant to this Agreement and the performance by the Company of its obligations hereunder.

5.11    Adequacy of Rights; Trade Names and Trademarks. The Company owns or possesses adequate franchises, permits, licenses or other rights to use all trade names, trademarks, patents, copyrights, warranty rights and intangible assets necessary to conduct its business in the manner heretofore conducted. Schedule 5.11 attached hereto sets forth all registered trademarks, trademark registrations, service marks, service mark registrations and

*Stock Purchase Agreement*

applications therefor and trade names (the "Trade Names and Trademarks") owned, used or held by the Company. The Company owns the entire right, title and interest in and to the Trade Names and the Trademarks and to the Company's knowledge the same do not infringe upon or conflict with any trade name, trademark or service mark of any other person.

    5.12   Compliance with Laws. The business of the Company is being conducted in compliance in all material respects with the applicable federal, state or local law, ordinance or regulation. All governmental approvals, permits and licenses required by the Company to conduct its business have been obtained and are in full force and effect and are being complied with in all material respects.

    5.13   Other Agreements. The execution and delivery of this Agreement, the consummation of the other transactions contemplated herein, the carrying on of the business as currently conducted by the Company, and compliance with the terms and provisions of this Agreement will not conflict with or result in a breach of the terms and conditions of, or constitute any default under, the Charter, or of any provision of (a) any indebtedness of the Company, (b) any contract, covenant, or instrument under which the Company is bound, or (c) any judgment, order, ruling, injunction, or decree of any court or administrative agency affecting the Company.

    5.14   Intentionally Omitted.

    5.15   Litigation. There is no action, suit, proceeding, or investigation pending or, to the Company's Knowledge, currently threatened against the Company that questions the validity of this Agreement or any agreement executed and delivered in connection with the consummation of the other transactions contemplated herein, or the right of the Company to enter into such agreements, or to consummate the transactions contemplated hereby or thereby, or that might result, either individually or in the aggregate, in any material adverse changes in the assets, condition, or affairs of the Company, financially or otherwise, or any change in the current equity ownership of the Company, nor is the Company aware that there is any basis for the foregoing.

    5.16   Intentionally Omitted.

    5.17   Transactions with Related Parties. Except for the Outstanding Shareholder Loan and the Management Agreement (to be executed at Closing), neither Shareholder, any affiliate of Shareholder nor any present or former officer, director or employee of the Company or any of their respective affiliates is a party to any transaction with the Company, including, without limitation, any guaranty by the Company of the obligations of such persons or any contract, agreement or other arrangement providing for the employment of, furnishing of services by, rental of real or personal property from or otherwise requiring payments to or any loan to or by Shareholder, any affiliate of Shareholder or any such officer, director, key employee, shareholder or other affiliate. For the purpose of this Section 5.17, the term "affiliate" means any member of a person's or his or her spouse's family and any entity which is controlled by such person or any such family member or members.

    5.18   Liability Insurance. The Company has procured insurance against loss or damage with respect to the Company's properties and assets.

    5.19   Tax Matters. (a) The Company has filed all tax returns that it is required to file under applicable Law, (b) all such returns are complete and correct, and to the extent returns were filed and there were amounts shown thereon to be due and payable by the Company, such amounts have been paid in full except as set forth on Section 5.19 of the Disclosure Schedule or, if payable with respect to any period ending on or before the date of a Reference Balance Sheet, adequate provisions therefor have been included on such Reference Balance Sheet, or if payable with respect to any period beginning after such date, adequate provision therefor has been reflected on the books of the Company, (c) the Company has withheld all taxes which it is or was obligated to withhold from amounts paid or owing to any employee, shareholder, member, creditor, or other third party, and have paid over

*Stock Purchase Agreement*

the withheld amounts to such party or to the applicable taxing authority if so required by law, (d) the Company is not liable, whether directly or indirectly, contingently or secondarily, for any sales, use, excise, or similar taxes arising from the operation of their respective businesses through the date hereof, and (e) the Company has not waived any statute of limitations or agreed to the extension of time with respect to a tax assessment or deficiency.

    5.20    Guaranties. The Company is not a guarantor or otherwise liable for any liability or obligation (including indebtedness) of any other Person or entity.

**Section 6.**    **REPRESENTATIONS AND WARRANTIES OF THE PURCHASER.** The Purchaser represents and warrants to the Company that the Purchaser has full power and authority and full legal capacity to enter into this Agreement and any other agreements entered into by the Purchaser as of the date hereof or otherwise in connection herewith with the Company or Shareholder.

**Section 7.**    **INTENITONALLY OMITTED.**

**Section 8.**    **INDEMNIFICATION.**

    8.1    Survival. Subject to the limitations and other provisions of this Agreement, the representations and warranties contained herein shall survive the Closing and shall remain in full force and effect until the date that is eighteen (18) months following the Closing; provided, that the representations and warranties in Section 5.1, Section 5.2, Section 5.3 shall survive indefinitely, and the representations and warranties in Section 5.20 shall survive for the full period of all applicable statutes of limitations (giving effect to any waiver, mitigation, or extension thereof). All covenants and agreements of the parties contained herein shall survive the Closing indefinitely or for the period explicitly specified therein. Notwithstanding the foregoing, any claims asserted in good faith with reasonable specificity (to the extent known at such time) and in writing by notice from the non-breaching party to the breaching party prior to the expiration date of the applicable survival period shall not thereafter be barred by the expiration of the relevant representation or warranty, and such claims shall survive until finally resolved.

    (a)    Indemnification by the Company and Shareholder. Subject to the other terms and conditions of this Section 8, the Company and Shareholder, jointly and severally, shall indemnify and defend each of the Purchaser and its Representatives (collectively, the "Purchaser Indemnitees") against, and shall hold each of them harmless from and against, and shall pay and reimburse each of them for, any and all Losses incurred or sustained by, or imposed upon, the Purchaser Indemnitees based upon, arising out of, with respect to, or by reason of any inaccuracy in or breach of any of the representations or warranties of the Company contained in this Agreement; or

    (b)    any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Company pursuant to this Agreement.

    (c)    Indemnification by Purchaser. Subject to the other terms and conditions of this Section 8, Purchaser shall indemnify and defend the Company and the Shareholder and each of their respective Representatives (collectively, the "Company and Shareholder Indemnitees") against, and shall hold it harmless from and against, and shall pay and reimburse it for, any and all Losses incurred or sustained by, or imposed upon, the Company and Shareholder Indemnitees based upon, arising out of, with respect to or by reason of any inaccuracy in or breach of any of the representations or warranties of Purchaser contained in this Agreement.

*Stock Purchase Agreement*

8.2     Notice of Claims. Any person seeking indemnification (the "Indemnified Party") hereunder shall give to the Person obligated to provide indemnification to such Indemnified Party (the "Indemnifying Party") prompt written notice of any written claim, demand, assessment, action, suit or proceeding to which the indemnity set forth in this Section 8 applies ("Notice of Claim"). If the document evidencing such claim or demand is a court pleading, the Indemnified Party shall give such notice to the Indemnifying Party within fifteen (15) days of receipt of such pleading; otherwise, the Indemnified Party shall give such Notice of Claim within thirty (30) days of the date it received written notice of such claim, provided that the failure to notify the Indemnifying Party will not relieve the Indemnifying Party of any liability that it may have to the Indemnified Party. The Indemnified Party will have the exclusive right at its own expense to assume the defense thereof using counsel acceptable to the Indemnified Party in its reasonable discretion and to settle such claims solely involving the payment of money. In connection with any claim, action, or proceeding, the parties hereto shall cooperate with each other and provide each other with access to relevant books and records in their possession.

## Section 9.     MISCELLANEOUS.

9.1     Amendment and Waiver.

(a)     Any term, covenant, agreement, or condition contained in this Agreement may be amended with, and only with, the consent of all of the parties to this Agreement. Compliance by the Company, on the one hand, or Purchaser, on the other, with any such term, covenant, agreement, or condition may be waived (either generally or in a particular instance and either retroactively or prospectively), by written instruments signed by the by the other party or parties, as the case may be, hereto pursuant to the terms hereof.

(b)     This Agreement shall not be altered, amended, or supplemented except by written agreement in accordance with Section 9.1(a) above. Any waiver of any term, covenant, agreement, or condition contained in this Agreement shall not be deemed a waiver of any other term, covenant, agreement, or condition, and any waiver of any default in any such term, covenant, agreement, or condition shall not be deemed a waiver of any later default thereof or of any default of any other term, covenant, agreement, or condition.

9.2     Electronic Signature. This Agreement shall be deemed duly executed by either Party hereto upon the delivery of their executed signature page by facsimile transmission or other commonly accepted electronic means, including a transmission of the signature page as a Portable Document Format ("PDF") to counsel for the other Party.

9.3     Severability. The invalidity or unenforceability of any provision hereof in any jurisdiction shall not affect the validity, legality, or enforceability of the remainder hereof in such jurisdiction, or the validity, legality, or enforceability hereof, including any such provision, in any other jurisdiction, it being intended that all rights and obligations of the parties hereunder shall be enforceable to the fullest extent permitted by law.

9.4     Successors and Assigns. All representations, warranties, covenants, and agreements of the parties contained in this Agreement or made in writing in connection herewith, shall, except as otherwise provided herein, be binding upon and inure to the benefit of their respective successors heirs and permitted assigns.

9.5     Notices. All communications in connection with this Agreement shall be in writing and shall be deemed properly given if hand delivered or sent by e-mail (provided that such communication is acknowledged electronically as received by the recipient), telecopier (provided that such communication is confirmed by same-day deposit in the United States mail first class postage prepaid) or pre-paid nationally recognized overnight

*Stock Purchase Agreement*

courier with adequate evidence of delivery, or sent by registered or certified mail, postage prepaid and return receipt requested and:

       if to the Company, to the Company's offices at:

38 East 29th Street, 6th Floor
New York, NY 10016
Attn: Nicolas Goureau

With a copy to:

James Rieger, Esq.
Tannebaum Helpern Syracuse & Hirschritt, LLP
900 Third Avenue
New York, NY 10022sch

       if to the Purchaser, to the Purchaser's offices at:

250 Parkway Drive, Suite 270
Lincolnshire, IL 60069
Attn: Marcus Lemonis

With a copy to:

250 Parkway Drive, Suite 270
Lincolnshire, IL 60069
Attn: Tom Newell

or such other addresses or persons as the recipient shall have designated to the sender by a written notice given in accordance with this Section 9.5. Any notice called for hereunder shall be deemed delivered when received.

    9.6    Governing Law. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Illinois without regard to its conflicts or choice of law provisions.

    9.7    Waiver of Jury Trial. EACH OF THE PARTIES HERETO WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE, BETWEEN ANY OF THE PARTIES HERETO ARISING OUT OF OR RELATED TO THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR ANY OTHER INSTRUMENT, DOCUMENT, OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH. ANY PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

    9.8    Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which shall together constitute one and the same Agreement.

*Stock Purchase Agreement*

9.9     Further Assurances. Each party agrees to execute and deliver such documents or other instruments and to take such other actions as may be necessary or appropriate to effect the intent and purposes of this Agreement.

9.10    Headings. The headings used herein are solely for the convenience of the parties and shall not serve to modify or interpret the text of the sections at the beginning of which they appear.

9.11    Construction and Representation. The parties understand and acknowledge that they have each been represented by (or have had the opportunity to be represented by) counsel in connection with the preparation, execution, and delivery of this Agreement. This Agreement shall not be construed against any party for having drafted it.

*[Signatures on following page]*

*Stock Purchase Agreement*

IN WITNESS WHEREOF, the parties hereto have caused this Stock Purchase Agreement to be executed on the day first above written.

COMPANY:                GOOBERRY CORP.

                        By:

                        Name: *Nicolas Goureau*

                        Its: *Cheif Executive officer*

PURCHASER:              ML RETAIL LLC

                        By:

                        Name: Marcus Lemonis

                        Its: Chief Executive Officer

SHAREHOLDER:

                        NICOLAS GOUREAU

*Stock Purchase Agreement*

## EXHIBIT A

Certified Articles of Incorporation

*Stock Purchase Agreement*

ML
NG

DISCLOSURE SCHEDULES TO

STOCK PURCHASE AGREEMENT

by and among

ML RETAIL LLC,

GOOBERRY CORP.

and

NICOLAS GOUREAU

Unless otherwise defined in these disclosure schedules (each a "Schedule" and, collectively, the "Schedules"), all capitalized terms herein shall have the meaning ascribed to them in the Stock Purchase Agreement, dated as of _____, 2014 (the "Agreement"), by and among ML Retail LLC (the "Purchaser"), Gooberry Corp. (the "Company") and Nicolas Goureau (the "Shareholder").

In no event shall the inclusion of any such additional matters in these Schedules be deemed or interpreted to broaden or otherwise amplify any of the Company's representations, warranties, covenants or agreements contained in the Agreement or to be an admission that any such matter is material. Disclosures in one section of the Disclosure Schedule are incorporated by reference into each other relevant section of the Disclosure Schedule for which applicability of such information and disclosure is reasonably apparent on its face.

The attachments hereto form an integral part of these Schedules and are incorporated by reference for all purposes as if set forth fully herein.

[1004785-1]

## Schedule 5.3(a)

### Class and Number of Shares

| Stockholder | Class of Shares | Number of Shares |
|---|---|---|
| Nicolas Goureau | Common Stock | 34 |
| Noemi Goureau | Common Stock | 12 |
| Stephanie Menkin | Common Stock | 22 |

Schedule 5.4(a)

Financial Statements

See attached.

Schedule 5.4(b)

Reference Balance Sheet

See attached.

[1004785-1]

5:17 PM
11/05/14
Accrual Basis

# Gooberry Corp.
## Balance Sheet
### As of September 30, 2014

|  | Sep 30, 14 | Correcting Entries | Investment Entries | Adjusted, Sept 30th, 2014 |
|---|---|---|---|---|
| **ASSETS** |  |  |  |  |
| **Current Assets** |  |  |  |  |
| **Checking/Savings** |  |  |  |  |
| Bank of America (SH) | 3,321.30 |  |  | 3,321.30 |
| Cash in Drawer | 1,000.00 |  |  | 1,000.00 |
| Fopps, Inc. #6388 | 13,641.92 |  |  | 13,641.92 |
| Gooberry Corp - #6826 | 143,509.12 | (130,000.00) |  | 13,509.12 |
| Gooberry Corp - #8168 | 791.55 |  |  | 791.55 |
| Wells Fargo - #0694 (AS) | 3,573.80 |  |  | 3,573.80 |
| **Total Checking/Savings** | 165,837.69 | (130,000.00) | - | 35,837.69 |
|  |  |  |  |  |
| **Accounts Receivable** |  |  |  |  |
| Accounts Receivable | 80.18 |  |  | 80.18 |
| **Total Accounts Receivable** | 80.18 | - | - | 80.18 |
|  |  |  |  |  |
| **Other Current Assets** |  |  |  |  |
| **Inventory Asset** |  |  |  |  |
| Inventory South Hampton | 20,899.00 |  |  | 20,899.00 |
| Inventory Aspen | 20,422.00 |  |  | 20,422.00 |
| Inventory Back Stock | 70,611.00 |  |  | 70,611.00 |
| Inventory Bethesda | 20,517.00 |  |  | 20,517.00 |
| Inventory Fopps | 95,379.00 |  |  | 95,379.00 |
| Inventory Greenwich | 31,762.00 |  |  | 31,762.00 |
| Inventory Mosaic | 41,401.00 |  |  | 41,401.00 |
| Inventory Palm Beach | 8,152.00 |  |  | 8,152.00 |
| Inventory Storage | 246,500.00 |  |  | 246,500.00 |
| Inventory XX-1 - Showroom | 274,153.00 | 158,013.98 |  | 432,166.98 |
| **Total Inventory Asset** | 829,796.00 | 158,013.98 | - | 987,809.98 |
|  |  |  |  |  |
| Prepaid Childsu | 750.00 |  |  | 750.00 |
|  |  |  |  |  |
| Planned Capital Expenditures |  |  | 158,424.00 | 158,424.00 |



5:17 PM
11/05/14
Accrual Basis

## Gooberry Corp.
## Balance Sheet
### As of September 30, 2014

| | Sep 30, 14 | Correcting Entries | Investment Entries | Adjusted, Sept 30th, 2014 |
|---|---|---|---|---|
| Undeposited Funds | 15,217.96 | | | 15,217.96 |
| Total Other Current Assets | 845,763.96 | 158,013.98 | 158,424.00 | 1,162,201.94 |
| | | | | |
| **Total Current Assets** | 1,011,681.83 | 28,013.98 | 158,424.00 | 1,198,119.81 |
| | | | | |
| **Fixed Assets** | | | | |
| Accumulated Depreciation | -59,350.00 | | | -59,350.00 |
| Furniture & Equipment | 420.00 | | | 420.00 |
| Furniture & Equipment 2013 | 7,514.72 | | | 7,514.72 |
| Furniture & Equipment BE 2013 | 8,572.86 | | | 8,572.86 |
| Leasehold Improvements | 89,897.47 | | | 89,897.47 |
| LHI - Bethesda 2013 | 13,974.91 | | | 13,974.91 |
| LHI - Greenwich 2013 | 1,814.85 | | | 1,814.85 |
| LHI - NYC 2013 | 8,845.60 | | | 8,845.60 |
| Signs | 1,800.00 | | | 1,800.00 |
| Leasehold Improvements & Furniture | | | 501,576.00 | 501,576.00 |
| **Total Fixed Assets** | 73,490.41 | - | 501,576.00 | 575,066.41 |
| | | | | |
| **Other Assets** | | | | |
| Security Deposits | | | | |
| Security Deposit - Mosaic | 13,268.13 | | | 13,268.13 |
| Security Deposit - Office | 35,433.17 | | | 35,433.17 |
| Security Deposits Asset - Fopps | 16,878.00 | | | 16,878.00 |
| Security Deposits Asset - Goobe | 82,666.00 | | | 82,666.00 |
| Security Deposits - Other | 375.00 | | | 375.00 |
| **Total Security Deposits** | 148,620.30 | - | - | 148,620.30 |
| | | | | |
| **Total Other Assets** | 148,620.30 | - | - | 148,620.30 |
| | | | | |
| **TOTAL ASSETS** | 1,233,792.54 | 28,013.98 | 660,000.00 | 1,921,806.52 |



5:17 PM
11/05/14
Accrual Basis

# Gooberry Corp.
## Balance Sheet
### As of September 30, 2014

| | Sep 30, 14 | Correcting Entries | Investment Entries | Adjusted, Sept 30th, 2014 |
|---|---|---|---|---|
| **LIABILITIES & EQUITY** | | | | |
| **Liabilities** | | | | |
| **Current Liabilities** | | | | |
| **Credit Cards** | | | | |
| **Credit Cards** | | | | |
| Amex #23002  Plum | 475.88 | | | 475.88 |
| Amex #61003 Corporate Card | 395.00 | | | 395.00 |
| Amex #71004 Jet Blue | 40.00 | | | 40.00 |
| Amex #83005/84003/85000 Platnum | 81,480.12 | | | 81,480.12 |
| Mileage United #8036 | 19,925.92 | | | 19,925.92 |
| Visa Signature #8117 | 7,588.76 | | | 7,588.76 |
| Credit Cards - Other | 70.00 | | | 70.00 |
| **Total Credit Cards** | 109,975.68 | - | - | 109,975.68 |
| | | | | |
| **Total Credit Cards** | 109,975.68 | - | - | 109,975.68 |
| | | | | |
| **Other Current Liabilities** | | | | |
| Customer Deposits | 264.22 | | | 264.22 |
| Lines of Credit | | | | 0.00 |
| Wells Fargo | 20,458.54 | | | 20,458.54 |
| **Total Lines of Credit** | 20,458.54 | - | - | 20,458.54 |
| | | | | |
| Loans to Gooberry | | | | |
| David Turgeman | 60,000.00 | (60,000.00) | | 0.00 |
| Helpern Tannabaum | 70,000.00 | (70,000.00) | | 0.00 |
| **Total Loans to Gooberry** | 130,000.00 | (130,000.00) | - | 0.00 |
| | | | | |
| Sales Tax Payable | | | | |
| Sales Tax Aspen | 10,373.00 | | | 10,373.00 |
| Sales Tax Fopps | 2,784.00 | | | 2,784.00 |

Page 3 of 5

5:17 PM
11/05/14
Accrual Basis

# Gooberry Corp.
## Balance Sheet
### As of September 30, 2014

| | Sep 30, 14 | Correcting Entries | Investment Entries | Adjusted, Sept 30th, 2014 |
|---|---|---|---|---|
| Sales Tax Gooberry | 5,066.00 | | | 5,066.00 |
| Sales Tax Greenwich | 2,623.00 | | | 2,623.00 |
| Sales Tax Maryland | 1,602.00 | | | 1,602.00 |
| Sales Tax Palm Beach | 2,196.00 | | | 2,196.00 |
| Sales Tax Virgina | 1,429.00 | | | 1,429.00 |
| **Total Sales Tax Payable** | 26,073.00 | - | - | 26,073.00 |
| | | | | |
| Shareholder Loans | | | | |
| Loan - Neomi | -10,050.65 | 10,050.65 | | 0.00 |
| | | | | |
| Shareholder Loans - Other | 392,716.28 | (10,050.65) | (282,665.63) | 100,000.00 |
| **Total Shareholder Loans** | 382,665.63 | - | (282,665.63) | 100,000.00 |
| | | | | |
| Unbilled Purchases (AP) | 158,013.98 | | | 158,013.98 |
| **Total Other Current Liabilities** | 717,475.37 | (130,000.00) | (282,665.63) | 304,809.74 |
| | | | | |
| **Total Current Liabilities** | 827,451.05 | (130,000.00) | (282,665.63) | 414,785.42 |
| | | | | |
| **Total Liabilities** | 827,451.05 | (130,000.00) | (282,665.63) | 414,785.42 |
| | | | | |
| Equity | | | | |
| Addition Paid in Capital | 45,000.00 | | | 45,000.00 |
| | | | | |
| Capital Stock | 9,000.00 | | 242,665.63 | 251,665.63 |
| Capital Stock - Lemonis | 100,000.00 | | 700,000.00 | 800,000.00 |
| Retained Earnings | 216,657.79 | | | 216,657.79 |
| | | | | |
| Net Income | 35,683.70 | 158,013.98 | | 193,697.68 |



CaseCase201c20051204501ument Doc4m File04019/0920 Page 86 of Page Page 134#:477

# Gooberry Corp.
## Balance Sheet
### As of September 30, 2014

| | Sep 30, 14 | Correcting Entries | Investment Entries | Adjusted, Sept 30th, 2014 |
|---|---|---|---|---|
| **Total Equity** | 406,341.49 | 158,013.98 | 942,665.63 | 1,507,021.10 |
| **TOTAL LIABILITIES & EQUITY** | 1,233,792.54 | 28,013.98 | 660,000.00 | 1,921,806.52 |
| Check figure, balance | 0.00 | - | - | 0.00 |



Schedule 5.9

Employees

See attached.

[1004785-1]

COURAGE b
Employee Roster
As of Sept 11th 2014

| LAST NAME | FIRST NAME | TITLE/RESPONSIBILITY | LOCATION | FT/PT | SALARY/HOURLY | $ Amount |
|-----------|------------|----------------------|----------|-------|---------------|----------|
| Goureau | Nicolas | CEO | NYC-Office | FT | SALARY | $108,000/yr |
| Goureau | Neomi | Chief Designer | NYC- Office | FT | SALARY | $160,000/yr |
| | | | | | | |
| Menkin | Stephanie | President | NYC- Office | FT | SALARY | $93,000/yr |
| Agberebissi | Akouavi | Seamstress/Stock | NYC-Office | PT | HOURLY | $15/hr |
| Sforza | Jessica | Web/Graphic Designer | NYC- Office | PT | HOURLY | $15/hr |
| Nunekpeku | Kwabla | Warehouse Manager | NYC- Office | FT | SALARY | $55,000/yr |
| | | | | | | |
| Bartella | Nichelle | Boutique Manager | Aspen, CO | FT | SALARY | $50,000/yr |
| Chi | Linda | Sales Associate | Aspen, CO | PT | HOURLY | $17.50/hr |
| New | Kori | Sales Associate | Aspen, CO | PT | HOURLY | $19/hr |
| Van Woerkom | Jackie | Sales Associate | Aspen, CO | FT | HOURLY | $19/hr |
| | | | | | | |
| Rizov | Jolanta | Assistant Manager | Palm Beach, FL | FT | HOURLY | $17.50/hr |

| | | | | | | |
|---|---|---|---|---|---|---|
| Jacob | Sheila | VP Retail | Palm Beach, FL / Southampton, NY / Bethesda, MD / Fairfax, VA | FT | SALARY | $73,000/yr |
| Flynn | Giulia | Boutique Manager | Greenwich, CT | FT | HOURLY | $20/hr |
| Epifano | Gina | Sales Associate | Greenwich, CT | FT | HOURLY | $15/hr |
| Monteiro | Carla | Sales Associate | Southampton, NY | FT | HOURLY | $17.50/hr |
| Murray | Alissa | Sales Associate | Southampton, NY | Seasonal FT | HOURLY | $12/hr |
| Edewor | Joyce | Acting Boutique Manager | Bethesda, MD | FT | SALARY | $45,000 |
| Setlur | Abhilasha | Sales Associate | Bethesda, MD | PT | HOURLY | $15/hr |
| Cordes | Margaret | Sales Associate | Bethesda, MD | PT | HOURLY | $15/hr |
| Ziama | Kolu | Sales Associate | Bethesda, MD / Fairfax, VA | FT | HOURLY | $13/hr |
| Vucetic | Iva | Sales Associate | Fairfax, VA | FT | HOURLY | $13/hr |
| Kyoungok | Kim | Sales Associate | Fairfax, VA | FT | HOURLY | $12/hr |
| Cheng | Ying | Sales Associate | Fairfax, VA | FT | HOURLY | 10/hr |
| Salonga | Raquel | Boutique Manager | New York, NY | FT | SALARY | $52,000/yr |
| Diop | Diarra | Sales Associate | New York, NY | FT | HOURLY | $19/hr |
| Nagrani | Sarit | Sales Associate | New York, NY | PT | HOURLY | $24/hr |

| COMMISSION | % Amount | Additional benefits |
|---|---|---|
| | | Aspen Ski Pass, Health |
| N | | Insurance |
| N | | Health Insurance |
| | | Health Insurance, $200/mo |
| | | toward car, $1400/mo partial |
| N | | child care |
| N | | |
| | | |
| N | | FIT Course $1475 |
| N | | |
| | | |
| | | |
| | | Medical Reimbursement |
| | | $718.65/mo, Skip Pass |
| | | $1,200/yr, Clothing allowance |
| Y | 1.5% of Aspen Sales | $3,000/yr, 4 wks paid Vacation |
| Y | 1% of partial Sales | |
| Y | .5% of partial Sales | Ski Pass $1,200/yr |
| Y | 1% of partial Sales | |
| | | |
| Y | 1.2% of partial Sales | 2 wks paid Vacation |

| | | |
|---|---|---|
| Y | 2.3% of PB, SH, BR, MO Sales | Medical Reimbursement $455/mo, Cell Phone reimbursement $120/mo, $3000/yr CB Clothing allowance, 4 wks Paid Vacation |
| Y | 2% of Greenwich Sales | 2 Wks Paid Vacation |
| Y | 1% of partial Sales | |
| Y | 1% of partial Sales | |
| N | | |
| Y | 1% of partial Sales | Parking Pass $120/mo, 2 wks Paid vacation |
| N | | |
| Y | 1% of partial Sales | |
| Y | 1% of partial Sales | |
| Y | 1% of partial Sales | |
| Y | 1% of partial Sales | |
| Y | 1% of partial Sales | |
| Y | 1.3% of NYC Sales | 2 Wks Paid vacation |
| Y | 1% of partial Sales | |
| Y | 1% of partial Sales | Paid Parking $19/day |



## NOTES

Wife of Ernest
CB currently paying a portion of FIT course in IN Design, Illustrator, Photoshop etc.
Known as "Ernest"

Problematic, clash with Sheila

Was given warning last week b/c of Alcohol on breath

To discuss, but nothing pressing

Being Promoted to Boutique Manager in September

Excellent potential for Manager.  Wants to relocate with company.

Problematic drama.  Clash with Sheila

Incredible at sales, merchandising and management.  Lives 1 hour
outside of city.  Would give her Manager role in NYC in a sec if
could make the commute worth it.



## Schedule 5.11

### Trade Names and Trademarks

o      Trademarks COURAGE B
o      Service Marks I BELIEVE NONE
o      Copyrights NONE
o      Domain Names www.courageb.com

[1004785-1]

## Schedule 5.13(b)

### No Conflicts

Consents may be required pursuant to the terms of the Company's leases of real property.

Schedule 5.19

**Taxes**

None.

EXHIBIT B

# SHAREHOLDER AGREEMENT
## OF
### GOOBERRY CORP.

THIS SHAREHOLDER AGREEMENT (this "Agreement") is made and entered into as of this ⫽ day of November, 2014 (the "Effective Date") by and between GOOBERRY CORP., a New York corporation (the "Company"), NICOLAS GOUREAU ("Nicolas"), STEPHANIE MENKIN ("Stephanie"), NOEMI GOUREAU ("Noemi" and together with Nicolas and Stephanie, the "Family Shareholders") and ML RETAIL LLC, a Delaware limited liability company ("ML Shareholder" and together with the Family Shareholders, the "Shareholders").

## RECITALS

WHEREAS, the parties hereto, other than the Company, together own, directly or indirectly, all of the issued and outstanding shares in the capital of the Company as of the date hereof; and

WHEREAS, the parties hereto wish to record their agreement as to the manner in which the Company's affairs are to be conducted.

NOW, THEREFORE, in consideration of the mutual covenants of the parties hereinafter set forth, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

## SECTION 1
### DEFINITIONS

As used in this Agreement, the following terms shall have the following meanings:

1.1 "Act" means the New York business corporations act, as amended from time to time.

1.2 "Agreement Year" shall mean each consecutive twelve month period during the term of this Agreement, with the first Agreement Year commencing on the Effective Date and each subsequent Agreement Year commencing on the annual anniversary of (a) the Effective Date or, (b) if the Effective Date is other than the first day of a calendar month, the annual anniversary of the first day of the next succeeding calendar month.

1.3 "Affiliate" of a Person shall mean any other Person which owns, is owned by or is under common ownership with such Person.

98192/1

1.4 "Agreement" means this Agreement, as amended, modified or supplemented from time to time.

1.5 "Articles" mean the Articles of Incorporation of the Company, as amended in accordance with the Act.

1.6 "Board of Directors" shall mean the Directors appointed by the Shareholders from time to time.

1.7 "Bona Fide Offer" means a writing setting forth the bona fide good faith intention of a qualified buyer delivering such writing to purchase Shares stating the consideration to be paid therefor, the method of payment and all other material terms and conditions of the offer to purchase such Shares.

1.8 "Book Value" means the total assets less the total liabilities of the Company as of the end of the month immediately preceding the Triggering Event. The independent accountants for the Company shall, at the Company's expense, determine Book Value based on the Company's financial statements and using generally accepted accounting principles consistently applied.

1.9 "Book Value Per Share" means the Book Value, divided by the total number of shares of the Shares that were outstanding as of the end of the month immediately preceding the Triggering Event.

1.10 "Common Stock" shall mean the issued and outstanding common stock of the Company.

1.11 "Director" means such Person or Persons as the Shareholders shall at any time or from time to time designate as a Director, and "Directors" means all Persons designated as Directors.

1.12 "Indebtedness" means, without duplication, the sum of: (a) all principal and accrued (but unpaid) interest owing by the Company for debt for borrowed money owed to any third party; plus (b) all obligations of the Company under leases that have been recorded as capital leases under GAAP; plus (c) Indebtedness of any person other than the Company that is guaranteed by the Company; provided, however, that Indebtedness shall not include trade payables or amounts due on credit cards.

1.13 "Liquidity Ratio" shall mean, at the end of any applicable calendar month, the ratio of current assets to current liabilities. As used in the foregoing sentence, current assets and current liabilities shall mean assets and liabilities of the Company, which would be characterized as a current asset or current liability, as applicable, on a balance sheet prepared in accordance with generally accepted accounting principals.

1.14 "Required Liquidity Ratio" shall mean a Liquidity Ratio of 1.20 to 1.0 or greater.

1.15 "Shareholders" means Nicolas, Stephanie, Noemi and ML Shareholder and any other Person who hereafter becomes an additional or substituted Shareholder of

98192/1                                       2

the Company for as long as each such Person continues to be a Shareholder of the Company, and "Shareholders" means the Persons who are at any one time Shareholders of the Company.

1.16 "Shares" shall mean all shares of the Common Stock owned by the Shareholders, either directly or beneficially, together with any securities of any class of the Company issued in respect of such shares of Common Stock (whether by reason of stock split, stock dividend, recapitalization or otherwise) or for which such shares of Common Stock may be exchanged. Exhibit "A" attached hereto sets for the number of Shares owned by each Shareholder as of the date hereof.

1.17 "Permitted Transfer" shall mean a transfer of shares to an Affiliate.

1.18 "Person" means an individual, a general partnership, a limited partnership, a limited liability company, a trust, an estate, an association, a corporation or any other legal or commercial entity.

1.19 "Triggering Event" means the occurrence of an event giving rise to the right and option of the Remaining Shareholders (as defined below) to purchase any Shares under Section 6 or Section 7 below.

In addition to the terms defined in this Section 1, other terms used in this Agreement identified by the capitalization of the initial letter thereof will have the definitions provided elsewhere in this Agreement.

## SECTION 2
## SHAREHOLDERS/SPECIAL APPROVAL PROVISIONS

2.1 The Shareholders, in their capacity as shareholders, shall not participate in the business affairs of the Company, transact any business on behalf of the Company, or have any power or authority to bind or obligate the Company. The Shareholders shall, however, be entitled to vote on those matters requiring Shareholder approval as set forth in this Agreement, the Articles or the Act. Except as set forth below, actions by the Shareholders may be taken with the affirmative vote of Shareholders representing a majority of the total Percentage Interests. Notwithstanding anything to the contrary contained herein:

2.1.1 the following actions shall not be taken without the affirmative vote of the ML Shareholder:

(a) enter into any transaction outside of the ordinary course of business of the Company;

(b) A merger, consolidation, stock exchange, or similar transaction involving the Company;

(c)     Any contract or transaction, or amendment to any existing contract or transaction, with any of the Shareholders, Directors or affiliates of any of them;

(d)     The admission of new Shareholders;

(e)     The dissolution or liquidation of the Company;

(f)     Amendment of the Articles or this Agreement;

(g)     Incurrence of any Indebtedness or issuance of any guarantee or indemnity of any obligation of any other Person or entity if the aggregate amount of the principal amount of all Indebtedness of the Company and its subsidiaries and the principal amount of all Indebtedness guaranteed or indemnified by the Company and its subsidiaries shall exceed $25,000;

(h)     Make any capital expenditures in excess of $50,000 in one transaction or series of similar transactions;

(i)     Make any Distributions to Shareholders, other than a Tax Distribution;

(j)     Increase or modify compensation plans to senior executives of the Company or pay bonuses or other amounts outside of approved compensation plans;

(k)     Hire, remove or otherwise replace any of the senior executive team of the Company; and

2.1.2   Business development and store expansion plans for the Company, including, without limitation, identifying new markets and/or store locations and causing the Company to take all necessary actions to open stores in such new markets and/or locations shall not be taken without the affirmative vote of the ML Shareholder and Nicolas; provided, however, the ML Shareholder shall have the sole right to cause the Company to open not less than two (2) new retail stores, on a cumulative basis, during each Agreement Year. For purposes of clarity, if the Company opens three (3) new retail stores during the first Agreement Year, the ML Shareholder shall only have the right to cause the Company to open one (1) new retail store during the second (2nd) Agreement Year.

2.2     Notwithstanding anything to the contrary contained herein, the ML Shareholder shall have sole and absolute discretion over:

2.2.1   All financial and accounting functions, controls, decisions and procedures for the Company, including, but not limited to, accounting and financial reporting methods and controls, banking relationships, opening and closing of bank accounts, capital expenditures for store expansions, remodels and new locations; and

2.2.2   Tax matters, including, without limitation, causing the Company to

98192/1                                        4

make an election to be treated as a Subchapter S corporation under the Internal Revenue Code.

2.3    If the Company, during any fiscal year, exceeds $4,700,000 in gross revenues (the "Revenue Target"), for every $1,000,000 of gross revenue in excess of such Revenue Target (each such additional $1,000,000 of gross revenue in excess of the Revenue Target referred to herein as a "Revolving Loan Tranche"), the ML Shareholder shall make available to the Company a revolving line of credit in the amount of $250,000 (each, a "Revolving Loan") for the Revolving Loan Tranche; provided, however once a Revolving Loan Tranche has been obtained in any fiscal year a new Revolving Loan shall not be provided for obtaining the same Revolving Loan Tranche in any subsequent fiscal year. Such line of credit, when drawn, shall accrue interest at 5% per annum and shall be paid from available cash flow from the Company and shall be evidenced by mutually acceptable loan documents.

2.4    In the event the Company fails to meet the Required Liquidity Ratio at the end of any calendar month the ML Shareholder shall have the right to loan funds to the Company in an amount sufficient to cause the Liquidity Ratio to be equal to the Required Liquidity Ratio (each such loan, individually, a "ML Shareholder Loan" and, collectively, the "ML Shareholder Loans"), whereby the cash loaned by the ML Shareholder would be considered a current asset and the ML Shareholder Loan would be considered a long term liability.  Additionally, in the event of new store openings caused by the ML Shareholder pursuant to Section 2.1.2 above whereby the pro forma balance sheet of the Company following such new store opening would result in a Liquidity Ratio below the Required Liquidity Ratio, as a condition to the ML Shareholder causing such new store opening, the ML Shareholder shall agree to make a ML Shareholder Loan to the Company following such store opening to cause the Liquidity Ratio to equal the Required Liquidity Ratio. The ML Shareholder Loans shall accrue interest at 5% per annum, shall be paid from available cash flow from the Company and shall be evidenced by mutually acceptable loan documents.  In the event of ML Shareholder Loans, the Company shall have the right to cause all, but not less than all, ML Shareholder Loans to be refinanced with Indebtedness incurred by the Company on terms more favorable than the ML Shareholder Loans.

### SECTION 3
### DIRECTORS

The Board of Directors shall consist of up to four (4) Directors and each Shareholder shall have the right to appoint one (1) Director. In the event one Shareholder elects not to appoint a Director, the Board of Directors shall consist of the Directors appointed by the other Shareholder(s). A Shareholder may elect to remove and/or replace a Director appointed by such Shareholder.

N.G
  ML
SM  NF

## SECTION 4
## DISTRIBUTIONS

4.1    Distributions.  Subject to payment of Tax Distributions, the Shareholders shall be entitled to receive Distributions, including Distributions in connection with a Liquidation Event, when and as determined by the Board of Directors, subject to approval of the Shareholders as set forth herein, out of assets of the Company legally available therefor payable in cash or in-kind on such payment dates to Shareholders on such record date as shall be determined by the Board of Directors.

4.2    Tax Distributions.

4.2.1    At such time as the Company shall elect to be taxed as a Sub-Chapter S corporation under the Internal Revenue Code the Board of Directors shall cause the Company to distribute to the Shareholders, on a quarterly basis on or prior to the 15th (or next succeeding business day) of each March, June, September and December of each Fiscal Year, an amount designed to assist the Shareholders (and their equity holders) in satisfying their respective tax liabilities arising from allocations of income, gain, loss, deduction and credit attributable to such Shareholders' interests in the Company in any taxable quarter (or other applicable period) for which such an allocation is required (each, a "Tax Distribution").

4.2.2    Unless the Board of Directors determines in good faith that a Tax Distribution referred to in this Section 4.2.2 would be prohibited under the Act, or under any other law, statute, rule or regulation applicable to or binding on the Company or any of its Subsidiaries, the Company shall make a Tax Distribution to the Shareholders entitled thereto not later than the date specified in Section 4.2.2.

4.3    Non-Cash Distributions.  Subject to the Shareholder consent rights provided for herein, the Board of Directors is authorized to make distributions to the Shareholders in the form of securities, notes or other property received or otherwise held by the Company; provided, however, that, in the event of any such non-cash distribution, such non-cash distribution shall be valued at the fair market value as determined by the Board of Directors.

4.4    Loan from Nicolas.  The loan from Nicolas to the Company of $100,000 as of the date hereof (the "Nicolas Loan") is acknowledged and begins to accrue interest at the rate of five percent (5%) per annum as of the date of the this Agreement.  Such loan shall be paid from the available cash flow of the Company.  Except for the Nicolas Loan, Nicolas represents and warrants that that the Company is not indebted to Nicolas and any prior loans have been paid in full or converted to equity prior to the date hereof.

## SECTION 5
## RESTRICTIONS ON TRANSFER

5.1    Prohibition on Transfer.  None of the Shares may be conveyed, pledged, assigned, transferred, hypothecated, encumbered or otherwise disposed of by a Shareholder, and no Shareholder may permit or suffer there to exist any lien or security interest on such Shareholder's Shares, except in accordance with the terms of this

Agreement or with the prior written consent of the Company and all of the Shareholders.

5.2    Encumbrance. If any Shares are subject to any lien or encumbrance of a Shareholder and the debt or obligation secured by such lien or encumbrance is in default, the Company and, alternatively, the other Shareholders, shall have the right (in addition to all other rights hereunder) to pay the holder of the obligation (the "Secured Party") the amount of the debt so as to release the Shares from the lien or encumbrance. The Company or the other Shareholders shall be subrogated to all of the legal rights and privileges of the Secured Party (including any other collateral, security interests or right of guarantee) and may enforce payment in the same manner as the Secured Party.

5.3    Additional Shares. Any additional Shares issued by the Company shall be subject to the provisions of this Agreement, and the Company shall require each recipient of such newly-issued additional Shares who is not already a party to this Agreement to execute a copy hereof or an acknowledgment hereof as an additional agreeing Shareholder prior to registering any such Shares in the name of such recipient.

## SECTION 6
## RIGHT OF FIRST REFUSAL

Except for a Permitted Transfer, any voluntary transfer of any Shares shall first be subject to the following:

6.1    Notice of Intended Transfer. Each Shareholder shall promptly advise the Company and the other Shareholders in writing of the existence of all serious negotiations with any Person for the transfer of any Shares held by such Shareholder.  In the event any Shareholder desires to transfer all or a portion of such Shareholder's Shares pursuant to a Bona Fide Offer, then such Shareholder becomes a "Transferring Shareholder" and the other Shareholders become the "Remaining Shareholders" for the purposes of this Agreement with respect to such proposed transfer.  The Transferring Shareholder shall promptly give written notice (the "Option Notice") to the Company and the Remaining Shareholders of such proposed transfer stating (i) the Transferring Shareholder's intention to make such transfer, (ii) the number of Shares intended to be transferred (the "Offered Shares"), (iii) the identity and relevant background of the person making the Bona Fide Offer and (iv) a copy of the Bona Fide Offer. Except for Permitted Transfers and transfers pursuant to this Section 6, no Shareholder may voluntarily transfer any of the Shares owned by such Shareholder.

6.2    For a period of forty-five (45) days after the last date that on which the Company and all of the Remaining Shareholders shall have received the Option Notice, the Remaining Shareholders shall have and are hereby granted the right, privilege and option to elect to purchase all or a portion of the Offered Shares owned by the Transferring Shareholder that are subject to the Option Notice.  The purchase price for the Offered Shares shall be the purchase price payable for the Offered Shares in accordance with the Bona Fide Offer as delivered to the Company and the Remaining Shareholders with the Notice of Bona Fide Offer.  In the event the purchase price is not in cash or a deferred payment of cash, then the Board of Directors of the Company shall determine the present, realizable cash value of such other consideration and such determination shall be final and

binding on all parties and shall determine the purchase price for the Offered Shares. The purchase price shall be paid in cash or in deferred payments of cash as stated in the Bona Fide Offer subject to the Company's Board of Directors determining the present, realizable cash value of any other consideration proposed in the Bona Fide Offer. Each Remaining Shareholder shall have the initial right to purchase that portion of the Offered Shares of the Transferring Shareholder equal to the ratio which the number of Shares owned by such Remaining Shareholder on the date of the Option Notice bears to the total number of Shares owned by all Remaining Shareholders on the date of the Option Notice. A Shareholder may exercise the right and option granted in this Section 6.2 by providing written notice to the Transferring Shareholder, the Company and the Remaining Shareholders within the period described in this Section 6.2 containing a statement of such Remaining Shareholder's election to exercise such option and the number of Offered Shares which such Remaining Shareholder elects to acquire. Failure to provide a timely written election shall constitute the election of a Remaining Shareholder not to exercise such right and option.

6.3    In the event that one or more of the Remaining Shareholders do not exercise fully their initial right and option under Section 6.2 above, the Transferring Shareholder shall notify in writing (the "Secondary Option Notice") all other Remaining Shareholders and the Company of that fact within five (5) days after the expiration of the initial option period specified in Section 6.2. Each Remaining Shareholder who has fully exercised his, her or its initial right and option to purchases Offered Shares under Section 6.2 shall thereafter have a secondary right and option to purchase all of the Offered Shares of the Transferring Shareholder which the Remaining Shareholders have not theretofore elected to purchase under this Agreement in the ratio which such Remaining Shareholder's existing number of Shares owned on the date of the Option Notice (exclusive of Shares acquired by reason of the exercise of Remaining Shareholder's exercise of the right and option under Section 6.2 and Section 6.3) bears to the total number of Shares owned on the date of the Option Notice by all other Remaining Shareholders who have fully exercised their initial right and option under Section 6.2 and the secondary right and option under this Section 6.3 (exclusive of Shares acquired by reason of the exercise of Remaining Shareholder's exercise of the right and option under Section 6.2 and Section 6.3). Such secondary right may be exercised by providing written notice to the Transferring Shareholder, the Company and the Remaining Shareholders who have fully exercised their initial rights under Section 6.2 within ten (10) days after receipt by such Remaining Shareholder of the Secondary Option Notice. The purchase price and terms of the secondary right shall be identical to those described in Section 6.2. The secondary right provided under this Section 6.3 shall be renewed in the same manner until all of the Transferring Shareholder's Offered Shares have been purchased or until no Remaining Shareholder desires to purchase any of the Offered Shares of the Transferring Shareholder which the Remaining Shareholders have not theretofore elected to purchase under this Agreement.

6.4    In the event all of the Offered Shares subject to the Option Notice and the Secondary Option Notice are not purchased by the Remaining Shareholders, the Transferring Shareholder may transfer such Offered Shares for which the Remaining Shareholders have not exercised their rights and options to purchase under Section 6.2 and Section 6.3 in the manner described in the Option Notice and Bona Fide Offer during the

period ending sixty (60) days following the expiration of the rights and options set forth in Section 6.3 hereof, but only to the person and upon the terms set forth in the Option Notice and Bona Fide Offer, and subject to the conditions set forth in the next sentence. Such transferee shall receive and hold the Shares subject to all of the provisions and restrictions herein contained and, as a condition to the effectiveness of any such transfer of the Shares, such transferee shall enter into a written agreement with the Company to that effect in a form reasonably acceptable to the Company prior to the transfer of such Shares to such transferee.

6.5     During any period in which the Shareholder has given the Option Notice and the Secondary Option Notice, the Transferring Shareholder shall refrain from participating as an officer, director or shareholder of the Company in connection with any determination by the Company's Board of Directors with respect to such proposed transfer unless requested to do so by the Company's Board of Directors in which event the Transferring Shareholder shall cooperate and vote as directed by the Company's Board of Directors to effectuate the purposes of this Agreement.

## SECTION 7
## INVOLUNTARY TRANSFERS

The Shares shall not be assignable or transferable involuntarily by a Shareholder or otherwise by operation of law, except as subject to the provisions of this Agreement. In the event of any purported or claimed involuntary assignment or transfer of any Shares by a Shareholder or otherwise by operation of law, each such event shall entitle the other Shareholders to exercise their rights and options in Section 6.2 and Section 6.3 above. For the purpose of applying the rights and options under Section 6.2 and Section 6.3 to this Section 7, the Shareholder whose shares are subject to any involuntary assignment or transfer or any assignment or transfer by operation of law shall be considered the "Transferring Shareholder," the other Shareholders shall be the "Remaining Shareholders," the "Offered Shares" shall be the Shares subject to such involuntary assignment or transfer or such assignment or transfer by operation of law and the purchase price for the Offered Shares shall be the Book Value Per Share as of the end of the month immediately preceding the Triggering Event. For the purposes of applying the rights and options under Section 6.2 and Section 6.3 to this Section 7, the Option Notice and Secondary Option Notice may be given by the Company, the Remaining Shareholders or the Transferring Shareholder. In the event of the holder of any Shares is adjudicated a bankrupt or insolvent or makes an assignment for the benefit of creditors or if a writ of attachment or execution or any other order be levied on the interest of any Shareholder in the Shares and is not released or satisfied within thirty (30) days thereafter, or if a receiver, trustee, conservator or any other person in a representative capacity be appointed in a proceeding or action against any Shareholder with authority to take possession or control of any of the Shares and such authority is not revoked within thirty (30) days after such appointment, each such event shall entitle the Remaining Shareholders to exercise their rights and options provided in Section 6.2 and Section 6.3 as provided in this Section 7. In the event all of the Offered Shares are not purchased by the Remaining Shareholders under the rights and options pursuant to this Section 7, the remaining Offered Shares may be assigned or transferred by reason of such involuntary assignment or transfer or such assignment or transfer by operation of law;

provided that any subsequent transfer of such Shares shall be subject to the terms and conditions of this Agreement.

## SECTION 8
## TERMS OF PURCHASE

8.1     The Remaining Shareholders who exercise any of their rights and options under Section 6 or Section 7 shall tender the purchase price for the Offered Shares that such Remaining Shareholder is purchasing pursuant to this Agreement within ten (10) business days after the expiration of the last option period under Section 6 or Section 7. Subject to Section 8.2 below, such Remaining Shareholder shall pay the purchase price for the Shares being purchased in immediately available funds to the record holder(s) of such Shares or, in the case of a deferred cash purchase price in the Bona Fide Offer, a promissory note for deferred cash purchase price against delivery and surrender to such Remaining Shareholder of the Offered Shares so purchased, properly endorsed so as to vest good and valid title thereto in such Remaining Shareholder, free and clear of all liens and encumbrances (other than this Agreement); provided that failure of the record holder(s) of such Offered Shares to deliver and surrender such Offered Shares shall not affect the rights of such Remaining Shareholder under this Agreement and the record holder(s) of such Offered Shares shall cease to have any equity interest whatsoever in the Company with respect to such Offered Shares but such Remaining Shareholder shall have all equitable and beneficial rights with respect to such Offered Shares. In the event the proviso to the immediately preceding sentence applies, such Remaining Shareholder shall pay the purchase price for such Offered Shares when the record holder delivers and surrenders such Offered Shares to the Remaining Shareholder in accordance with this Section 8.1.

8.2     There shall be deducted from the purchase price for the Offered Shares to be paid by any Remaining Shareholder pursuant to Section 8.1 above and paid by such Remaining Shareholder to the Company all sums due and owing to the Company by the Transferring Shareholder whose Offered Shares are being purchased by such Remaining Shareholder which amount shall be applied to reduce such indebtedness and the balance of the purchase price for the Offered Shares purchased by such Remaining Shareholder shall be paid in the manner provided in Section 8.1.

## SECTION 9
## NOTICES

All notices and other communications required or permitted under this Agreement shall be in writing and may be sent by certified U.S. mail, return receipt requested, postage prepaid, overnight air courier, facsimile, or personal delivery to the Shareholders at their addresses as shown from time to time on the records of the Company. Any Shareholder may specify a different address by notifying the Company in writing of such different address. Such notices shall be deemed given (i) three days after mailing, (ii) the day after deposit with an overnight air courier, or (iii) when delivered in person or transmitted by fax machine (confirmation of transmission received), as the case may be.

## SECTION 10
### FINANCIAL REPORTING

10.1    Daily Reporting.  On a daily basis, the Company shall provide the ML Shareholder with total sales for the immediately preceding day on a consolidated and store by store basis, with comparative figures for the corresponding period in the previous fiscal year.

10.2    Monthly Reporting.  For each monthly period, no later than the last fifteenth (15th) day of the month following the end of each monthly period the Company shall provide the ML Shareholder with the following:

10.2.1 Company prepared unaudited consolidated balance sheet of the Company as at the end of such month with comparative figures for the corresponding period in the previous fiscal year; and

10.2.2 Company prepared unaudited consolidated statements of income and changes in shareholders' equity of the Company for such month and (in the case of each month during the fiscal year except the first and last month) for the portion of the fiscal year ending with such month, with comparative figures for the corresponding periods in the previous fiscal year.

## SECTION 11
### MISCELLANEOUS

11.1    Inurement.  This Agreement shall be binding upon, and inure to the benefit of, all parties hereto, their personal representatives, heirs, successors and assigns, to the extent, but only to the extent, that assignment is made in accordance with, and permitted by, the provisions of this Agreement.

11.2    Entire Agreement.  This Agreement constitutes the entire agreement among the parties relating to the subject matter hereof.  It supersedes any prior agreement or understandings between or among any of them relating to the subject matter hereof.

11.3    Governing Law.  This Agreement and the rights of the parties hereunder shall be governed by and interpreted in accordance with the internal laws of the State of Illinois without regard to principles of conflict of law.

11.4    Captions.  Captions contained in this Agreement are inserted only as a matter of convenience and in no way define, limit or extend the scope or intent of this Agreement or any provision thereof.

98192/1                                    11

11.5 <u>Severability</u>. If any provision of this Agreement, or the application of such provision to any person or circumstances shall be held invalid, the remainder of this Agreement, or the application of such provision to persons or circumstances other than those to which it is held invalid, shall not be affected thereby.

11.6 <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

11.7 <u>Waiver</u>. No consent or waiver, express or implied, by any Shareholder to or of any breach or default by the other in the performance of obligations hereunder shall be deemed or construed to be a consent or waiver of any other obligations of such Shareholder hereunder. Failure on the part of any Shareholder to complain of any act or failure to act of any other Shareholder or to declare any other Shareholder in default, irrespective of how long such failure continues, shall not constitute a waiver by such Shareholder of his, her or its rights hereunder.

*[Signatures on following page]*

IN WITNESS WHEREOF, each of the parties hereto has executed and delivered this Agreement as of the day and year first above written.

GOOBERRY CORP.

By: _____

Its: _Chief Executive Officer_

SHAREHOLDERS:

ML RETAIL LLC

By: _____

Its: _Chief Executive Officer_

_____

Nicolas Goureau

_____

Stephanie Menkin

_____

Noemi Goureau

<u>EXHIBIT "A"</u>
<u>Existing Shares by Shareholders</u>

<u>Ownership as of Date of Agreement</u>

ML Retail LLC     32 shares
Nicolas Goureau   34 shares
Stephanie Menkin  22 shares
Noemi Goureau   12 shares

*N·G*
*SM ML*
*NG*

EXHIBIT C

CANCELLED

# CREDIT AGREEMENT

**THIS CREDIT AGREEMENT** is made and entered into as of October 1, 2016, by and between **GOOBERRY CORP.**, a New York corporation ("Borrower"), and **ML FASHION, LLC**, a Delaware limited liability company ("Lender").

## W I T N E S S E T H:

**WHEREAS**, subject to the terms and conditions set forth herein, Lender is willing to make revolving loans (the "Loans") to Borrower in amounts not to exceed $10,000,000 in the aggregate.

**NOW, THEREFORE,** in consideration of the foregoing, of the mutual covenants set forth herein and for other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged, the parties hereto, intending legally to be bound, hereby agree as follows:

## ARTICLE I
## DEFINITIONS; ETC.

1.1    Definitions.  As used in this Agreement, the following terms and phrases shall have the following meanings:

"Agreement" means this Credit Agreement, as the same may hereafter be amended, modified, supplemented or restated.

"Borrower" is defined in the first paragraph.

"Borrowing" means a future borrowing of a Loan by Borrower.

"Business Day" means each day other than a Saturday, a Sunday or any other day on which banks are permitted to be closed in the City of New York, New York.

"Closing Date" means the date on which both of the following shall have occurred: (a) Lender has received counterparts of, or signature pages to, the Loan Documents executed by Borrower, and (b) the conditions set forth in Article IV have been satisfied.

"Collateral" means all property and interests in property now owned or hereafter acquired by Borrower in or upon which a security interest, lien or mortgage is granted to Lender by Borrower, whether under this Agreement, or under any other documents executed by Borrower and delivered to Lender.

"Collateral Documents" means, collectively, (a) the Security Agreement, and all other security agreements, mortgages, deeds of trust, patent and trademark assignments, lease assignments, guarantees and other similar agreements made by Borrower for the benefit of Lender now or hereafter delivered to Lender pursuant to or in connection with the transactions contemplated hereby, and all financing statements (or comparable documents now or hereafter

filed in accordance with the Uniform Commercial Code or comparable law) against Borrower as debtor in favor of Lender as secured party, and (b) any amendments, supplements, modifications, renewals, replacements, consolidations, substitutions and extensions of any of the foregoing.

"Commitment" means the commitment of Lender to make Loans to Borrower in an aggregate amount at any time outstanding not in excess of $10,000,000.

"Commitment Termination Date" means the earlier of (a) Borrower's sale, transfer, pledge or other disposition of all or any substantial part of its assets, Borrower's consolidation or merger with any other entity or the sale, transfer, pledge or other disposition of all or substantially all of the membership interests of Borrower, other than to an affiliate, (b) the date on which the Commitment shall terminate pursuant to Article VI, and (c) the date that is three (3) years from the date hereof.

"Default" means any event, act or condition which with notice or lapse of time, or both, would constitute an Event of Default.

"Dollars" and "$" mean the lawful money of the United States of America.

"Event of Default" has the meaning ascribed to it in Article VI.

"Indebtedness" means (a) indebtedness for borrowed money or the deferred purchase price of property or services purchased (other than amounts constituting accrued expenses and trade payables arising in the ordinary course of Borrower's business), (b) obligations arising in respect of letters of credit or similar instruments, (c) obligations under capital leases, (d) indebtedness of the type described in clauses (a), (b) and (c) which have been directly or indirectly assumed or guaranteed.

"Interest Period" means the period commencing on the date of a Loan or the last day of the preceding Interest Period (with the first Interest Period to commence on the date of this Agreement) and ending on the last day of the calendar month which is one month thereafter; provided, however, that if any Interest Period would end on a day which shall not be a Business Day, such Interest Period shall be extended to the next succeeding Business day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day.

"Interest Rate" means, for each loan, seven and one-half percent (7.5%) per annum with annual compounding.

"Lender" is defined in the first paragraph.

"Loan Documents" means this Agreement, the Note, the Security Agreement, and all other documents, instruments, notes and agreements executed in connection therewith or contemplated thereby, as the same may be amended, restated or otherwise modified and in effect from time to time.

"Loans" has the meaning ascribed to it in the recitals.

"Note" is defined in Section 2.3(a).

"Obligations" means all amounts owing by Borrower to Lender or any other Person or any of their respective successors and assigns pursuant to or in connection with this Agreement or any other Loan Document or otherwise with respect to any Loan, including without limitation, all principal, interest (including any interest accruing after the filing of any petition in bankruptcy or the commencement of any proceeding under any debtor relief law relating to Borrower, or would accrue but for such filing or commencement, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding), all reimbursement obligations, fees, expenses, indemnification and reimbursement payments, costs and expenses (including all fees and expenses of counsel to Lender incurred pursuant to this Agreement or any other Loan Document), whether direct or indirect, absolute or contingent, liquidated or unliquidated, now existing or hereafter arising hereunder or thereunder, together with all renewals, extensions, modifications or re-financings thereof.

"Person" means an individual, a corporation, a partnership, an association, a trust or other entity or organization, including a government or political subdivision or an agency or an instrumentality thereof.

"Restricted Payment" means (a) any distribution, dividend or other payment of a similar nature paid to holders of equity interests of Borrower or any of its Subsidiaries (expressly excluding any Tax Distributions (as defined in Borrower's Limited Liability Company Agreement) and, with respect to holders of equity interests of Borrower or any of its Subsidiaries who are employees of Borrower or such Subsidiary, any payments with respect to such employment), and (b) any redemption, retirement or other acquisition by Borrower or a Subsidiary or affiliate thereof of any equity interest of Borrower or such Subsidiary.

"Security Agreement" means the Security Agreement, dated as of the date hereof, between Borrower and Lender, as the same may be amended from time to time, pursuant to which Borrower grants Lender a security interest in and to all of Borrower's assets.

"Subsidiary" means any corporation, partnership or limited liability company of which Borrower owns, directly or indirectly, such number of shares, partnership interests or membership interests as have more than 50% of the ordinary voting power and any limited liability company in which Borrower has invested in which it is also the manager.

1.2     References.  All references in this Agreement to particular Sections or Articles shall, unless expressly otherwise provided or unless the context otherwise requires, be deemed to refer to the specific sections or articles in this Agreement.  In addition, the words "hereof," "herein," "hereunder," and words of similar import, refer to this Agreement as a whole and not to any particular section or article.

## ARTICLE II
## THE LOANS

2.1     Loans.  Lender agrees, upon the terms and subject to the conditions of this Agreement, to make the Loans to Borrower on any Business Day and from time to time from the

Closing Date to the Commitment Termination Date in an aggregate principal amount at any one time outstanding not to exceed the Commitment.

2.2  Borrowing Procedures.

(a)  Borrower shall give at least seven (7) Business Days' prior written notice to Lender of each Borrowing.  Each such notice in order to be effective must be received by Lender not later than 11:00 am (Chicago time) on the day required and shall specify the Business Day on which such Loan is to be made and the aggregate principal amount of the requested Loan.

(b)  Subject to Article IV, on the borrowing date specified in such notice, Lender shall disburse funds in the amount of the requested Borrowing to Borrower via wire transfer into an account specified by Borrower.

2.3  Notes; Repayment.

(a)  The Loans made by Lender shall be evidenced by a secured promissory note substantially in the form of Exhibit A hereto (the "Note") in the face amount equal to the Commitment, duly executed on behalf of Borrower and dated as of the date hereof.  The outstanding principal amount of the Loans as evidenced by the Note shall be payable in full on the Commitment Termination Date, subject to acceleration as provided in Article VI.

(b)  Lender is hereby authorized by Borrower, but not obligated, to enter on the last page of the Note the amount of the Loans made by Lender hereunder and the other information provided for on such last page; provided, however, that the failure of Lender to set forth the amount of such Loans, or the other information, or any error with respect thereto, shall not in any manner affect the obligation of Borrower to repay the Loans and all other Obligations due hereunder.

2.4  Interest; Default Interest.

(a)  The Note shall bear and accrue interest on the outstanding principal amount thereof at the Interest Rate.  Interest shall accrue from the most recent date to which interest has been paid or, if no interest has been paid, from the end of the most recent Interest Period.  Interest shall be payable quarterly, on a calendar quarter basis, and, subject to Section 2.4(b) and Article VI, shall be due in full at the earlier of (i) the Commitment Termination Date, and (ii) the Borrower's payment in full of all outstanding Loans pursuant to Section 2.6.  Borrower may elect not to pay the accrued interest in cash on any interest due date, in which event such interest shall be paid in kind and shall accrete as additional principal on the Loans on the applicable payment date and shall thereafter accrue interest as part of the principal amount of the Loans at the Interest Rate.

(b)  If the Borrower shall default in the payment of the principal of, or interest on, any Loan or any other amount becoming due hereunder, whether at the Commitment Termination Date, by acceleration or otherwise, Borrower shall on demand from time to time pay interest, to the extent permitted by applicable law, on overdue amounts outstanding up to the date

of actual payment of such defaulted amount at a rate equal to the Interest Rate plus 300 basis points.

(c)    Anything in this Agreement or the Note to the contrary notwithstanding, the interest rate on the Loans shall in no event be in excess of the maximum rate permitted by applicable law.

2.5    <u>Termination of Commitment</u>.    The Commitment shall be automatically and permanently reduced to zero Dollars ($0) on the Commitment Termination Date. Simultaneously with the termination of the Commitment, Borrower shall pay Lender an amount equal to the principal amount of Loans outstanding, together with (a) all accrued interest thereon and (b) all other Obligations (other than contingent and other inchoate obligations for which no claim has been made) due hereunder.

2.6    <u>Permissive Prepayment of Loans</u>.    Borrower shall have the right at its option at any time and from time to time to prepay the Loans, in whole or in part, upon at least one (1) Business Day's prior written notice to Lender.    All prepayments shall be accompanied by accrued but unpaid interest on the principal amount being prepaid to the date of (but not including) the date of prepayment.

2.7    <u>Manner of Payment</u>.    All payments of interest and principal in respect of the Loans shall be made directly to Lender without offset or counterclaim, in Dollars, in immediately available funds, at the offices of Lender specified in <u>Section 7.8</u>.    All payments made by Borrower to Lender shall be applied first to accrued and unpaid interest on the Loans and the remainder thereof to the unpaid principal amount of the Loans.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES

Borrower hereby represents and warrants to Lender as follows:

3.1    <u>Authority</u>.    Borrower has the full power, right and legal authority to execute and perform the Loan Documents in accordance with their respective terms.

3.2    <u>Validity</u>.    The Loan Documents have been duly and validly executed by Borrower and, upon delivery thereof by Borrower, will constitute a legal, valid and binding obligation of Borrower enforceable against it in accordance with their respective terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally or by general equitable principles relating to enforceability, regardless of whether such enforceability is considered in a proceeding at law or in equity.

3.3    <u>Compliance with Laws and Contracts</u>.    The execution, delivery and performance of the Loan Documents by Borrower in compliance with their respective terms and provisions do not and will not conflict with, or result in a breach of, any of the terms, conditions or provisions of any mortgage, lien or other security arrangement or any agreement, instrument, order, judgment, decree or any other restriction of similar kind or character to which Borrower is a party or is otherwise bound.

3.4     Organization.  Borrower is a corporation duly organized, validly existing and in good standing under the laws of its jurisdiction of organization.

3.5     Representations to Be Continuing.  Each of the foregoing representations and warranties are true and correct as of the date of this Agreement and will continue to be true at the date of the disbursement of each Loan hereunder.  By submitting to Lender a request for Borrowing hereunder, Borrower shall be deemed to have restated each of such representations and warranties as of the date of such request.

# ARTICLE IV
# CONDITIONS

4.1     Conditions Precedent to the Initial Loans.  The obligation of Lender to make the initial Loan hereunder shall be subject to the satisfaction by Borrower or waiver by Lender on or prior to the Closing Date of the following conditions precedent:

(a)     Lender shall have received the Note duly executed by Borrower, dated the date hereof and payable to the order of Lender in the principal amount of the Commitment.

(b)     Lender shall have received the Security Agreement, duly executed by Borrower and dated the date hereof.

(c)     No action, suit, claim or proceeding before any domestic court, governmental agency, commission, or administrative or regulatory authority shall have been commenced by a party other than Lender and be pending which (i) seeks to restrain, prevent, or materially restructure the Loans contemplated hereby or which otherwise questions the validity or legality thereof, or (ii) could, in Lender's reasonable judgment, impair Borrower's ability to satisfy the Obligations.

4.2     Conditions Precedent to each Loan.  The obligation of Lender to make any Loan hereunder shall be subject to the satisfaction by Borrower or waiver by Lender on or prior to the requested Borrowing date of the following conditions precedent:

(a)     Lender shall have received a written notice with respect to such Borrowing as required by Section 2.2(a).

(b)     The representations and warranties of Borrower set forth in Article III shall be true and correct on and as of the date of each Borrowing, with the same effect as if made on and as of such date.

(c)     On the date of each Borrowing, no Event of Default or Default shall have occurred and be continuing.

(d)     Lender, in its sole and absolute discretion, shall have determined there is no malfeasance by Borrower.

Each Borrowing hereunder shall be deemed to be a representation and warranty by Borrower on the date of such Borrowing as to the matters and to the extent specified by paragraphs (b) and (c) of this Section.

## ARTICLE V
## COVENANTS

5.1     <u>Affirmative Covenants</u>.    From the Closing Date and for so long as the Commitment shall be in effect or any Obligations (other than contingent and other inchoate obligations for which no claim has been made) shall remain outstanding hereunder, Borrower shall (a) use the proceeds of the Loans to make acquisitions of retail stores and brands and for working capital and other general corporate purposes (including without limitation, for avoidance of doubt, to make loans or protective advances to any of its Subsidiaries), (b) deliver to Lender such information from time to time concerning the financial condition of Borrower and its Subsidiaries as Lender may request, (c) file all tax returns when due and pay and discharge, when due, all taxes reflected on such returns; and pay, when due, all assessments and other liabilities, except such liabilities which are contested in good faith and by proper proceedings and for which appropriate reserves have been established in accordance with generally accepted accounting principles then in effect, (d) comply with the requirements of all applicable laws, rules, regulations and orders of any governmental authority (federal, state, local or foreign), a breach of which would adversely affect the interest of Lender hereunder, (e) preserve its company existence, and (f) not change the state where it is located or organized.

5.2     <u>Indemnification</u>.  From the Closing Date and for so long as the Commitment shall be in effect or any Obligations (other than contingent and other inchoate obligations for which no claim has been made) shall remain outstanding hereunder, Borrower shall indemnify and hold Lender and its affiliates harmless from and against any and all claims, damages, losses, liabilities, costs, expenses and fees resulting from Borrower's breach of any representation, warranty, agreement or covenant made by Borrower to Lender in any of the Loan Documents. The indemnification provisions of this <u>Section 5.2</u> shall survive each Loan and any termination of this Agreement.

5.3     <u>Limitation on Indebtedness</u>.    From the Closing Date and for so long as the Commitment shall be in effect or any Obligations (other than contingent and other inchoate obligations for which no claim has been made) shall remain outstanding hereunder, without the prior written consent of Lender, Borrower shall not create, incur, assume or suffer to exist any Indebtedness, except Indebtedness hereunder.

5.4     <u>Limitation on Restricted Payments</u>.  From the Closing Date and for so long as the Commitment shall be in effect or any Obligations (other than contingent and other inchoate obligations for which no claim has been made) shall remain outstanding hereunder, Borrower shall not declare, make or incur any liability to make any Restricted Payments without Lender's prior written consent.

# ARTICLE VI
## EVENTS OF DEFAULT

In the case of the happening and during the continuance of any of the following events (herein called "Events of Default"):

(a)     default shall be made in the payment of any principal of, or interest on, the Note when and as the same shall become due and payable, whether at the due date thereof or at the date fixed for prepayment thereof or acceleration thereof or otherwise;

(b)     default shall be made in the due performance of any covenant or agreement contained in any of the Loan Documents (other than a payment covenant of the kind contemplated by clause (a) of this Article VI) and such default shall remain unremedied for ten (10) Business Days after receipt by Borrower of a written notice of such default;

(c)     any representation or warranty of Borrower contained in any of the Loan Documents shall be false or misleading as of the date made or deemed made;

(d)     any of the Loan Documents shall cease, for any reason, to be in full force and effect;

(e)     default in payment, after the expiration of any applicable grace period, shall be made with respect to any Indebtedness of Borrower other than the Indebtedness hereunder in an amount or amounts over $25,000.00 in the aggregate; or other default in connection with such Indebtedness, if the effect of such default is to accelerate or permit the holder thereof to accelerate the maturity of such Indebtedness or to permit the holder thereof to cause such Indebtedness to become due prior to its stated maturity;

(f)     Borrower or any of its Subsidiaries is generally unable to pay its debts as they become due or admits in writing its inability to pay its debts, or makes a general assignment for the benefit of creditors; or Borrower or any of its Subsidiaries commences any case, proceeding or other action seeking to have an order for relief entered on its behalf as debtor or to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, liquidation, dissolution or composition of it or its debts under any law relating to bankruptcy, insolvency, reorganization or relief of debtors or seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its property or shall file an answer or other pleading in any such case, proceeding or other action admitting the material allegations of any petition, complaint or similar pleading filed against it or consenting to the relief sought therein; or Borrower or any of its Subsidiaries shall take any action to authorize any of the foregoing;

(g)     any involuntary case, proceeding or other action against Borrower or any of its Subsidiaries shall be commenced seeking to have an order for relief entered against it as debtor or to adjudicate it a bankrupt or insolvent or seeking reorganization, arrangement, adjustment, liquidation, dissolution or composition of it or its debts under any law relating to bankruptcy, insolvency, reorganization or relief of debtors or seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its property,

and such case proceeding or other action (i) shall result in the entry of any order for relief against it or (ii) shall remain undismissed or undischarged for a period of 60 days; or

(h)     final judgment(s) for the payment of money in excess of $100,000 shall be rendered in the aggregate against Borrower or any of its Subsidiaries which within 60 days from the entry of such judgment(s) shall not have been discharged or stayed pending appeal or which shall not have been discharged within 60 days from the entry of a final order of affirmance on appeal from which no further appeal may be taken;

then, in every such event and at any time thereafter during the continuance of such event, the Lender may take, in its sole discretion, any or all of the following actions, at the same or different times:

(i)     terminate forthwith the Commitment;

(ii)     declare the principal of, and interest on, the Loans and the Note and all other Obligations (other than contingent and other inchoate obligations for which no claim has been made) payable hereunder or thereunder to be forthwith due and payable, without presentment, demand, protest, notice of acceleration, notice of intent to accelerate or other notice of any kind, all of which are hereby expressly waived, anything in this Agreement or the Note to the contrary notwithstanding; and/or

(iii)     exercise any and all rights and remedies available to Lender under law.

If an Event of Default specified in paragraphs (f), (g) or (h) above shall have occurred with respect to Borrower or any of its Subsidiaries, the Loans, the Note and all other Obligations (other than contingent and other inchoate obligations for which no claim has been made) payable hereunder or thereunder shall thereupon and concurrently become due and payable, without presentment, demand, protest, notice of acceleration, notice of intent to accelerate or other notice of any kind, all of which are hereby expressly waived, anything in this Agreement or the Note to the contrary notwithstanding and the Commitment shall thereupon forthwith terminate.

## ARTICLE VII
## MISCELLANEOUS

7.1     No Waiver.  No failure or delay on the part of Lender in exercising any right, power or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy hereunder.

7.2     Amendments, Etc.  No amendment, waiver, modification, supplementation or termination of any term or provision of this Agreement nor any consent to any departure by Borrower therefrom shall in any event be effective unless the same shall be in writing and signed by Lender and then (if in respect of a waiver or consent) shall be effective only in the specific instance and for the specific purpose for which given.

7.3    Binding Effect.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; provided, however, that Borrower may not assign this Agreement or its rights or obligations hereunder without the prior written consent of Lender.

7.4    Governing Law; Venue.  **THIS AGREEMENT SHALL BE A CONTRACT MADE UNDER AND GOVERNED BY THE LAWS OF THE STATE OF ILLINOIS, WITHOUT GIVING EFFECT TO PRINCIPLES OF CONFLICTS OF LAW.  THE PARTIES HEREBY AGREE TO IRREVOCABLY SUBMIT TO THE PERSONAL AND SUBJECT MATTER JURISDICTION OF THE FEDERAL AND STATE COURTS SITTING IN CHICAGO, COOK COUNTY, ILLINOIS, AND AGREE NOT TO OBJECT TO SUCH VENUE FOR ANY REASON AT LAW OR IN EQUITY.**

7.5    Severability of Provisions.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

7.6    Counterparts; Effectiveness.  This Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all such counterparts shall together constitute one and the same Agreement.

7.7    Complete Agreement.   The Loan Documents, and the other documents and agreements expressly referred to herein and therein collectively embody the complete agreement and understanding among the parties hereto and supersede and preempt any prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter hereof in any way.

7.8    Notices.   Any notice, waiver, consent or other communication required or permitted hereunder shall be in writing and shall be delivered personally (including delivery by a internationally recognized courier service), by email transmission, or by pre-paid certified or registered mail, return receipt requested, addressed as follows:

To Borrower:    Gooberry Corp.
                38 E. 29th Street, 6th Floor
                New York, NY 10016
                Attention:  President
                Email:    stephanie.menkin@marcuslemonis.com

To Lender:      ML Fashion, LLC
                c/o Marcus Lemonis LL
                4192 IL Route 83, Suite C
                Long Grove, Illinois 60047
                Attention:  Marcus Lemonis
                Email: marcus@marcuslemonis.com

Notice hereunder shall be deemed to have been received and be effective for all purposes hereunder (a) if given by prepaid certified or registered mail, return receipt requested, on the third Business Day after mailing or (b) if given by any other means, when delivered at the address specified in this Section. The address and facsimile number of any party hereto may be changed by notice given in accordance with the provisions hereof.

7.9 <u>Survival</u>. All warranties, representations and covenants made by Borrower herein shall be considered to have been relied upon by Lender and shall survive the making of the Loans and the issuance and delivery to Lender of the Note regardless of any investigation made by Lender and shall continue in full force and effect so long as any Obligation due or to become due is outstanding and unpaid and so long as the Commitment has not been terminated in its entirety.

7.10 <u>Waiver of Jury Trial</u>. **TO THE EXTENT PERMITTED BY APPLICABLE LAW, THE PARTIES HEREBY IRREVOCABLY WAIVE ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.**

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

CANCELLED

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

**BORROWER:**

GOOBERRY CORP.,
a New York corporation


By: _____
Name:  Stephanie Menkin
Title:  President


**LENDER:**

ML FASHION, LLC,
a Delaware limited liability company


By: _____
Name:  Marcus Lemonis
Title:  CEO

**EXHIBIT A**

**<u>FORM OF SECURED PROMISSORY NOTE</u>**

Attached

EXHIBIT C

27318421.1

CANCELLED

## SECURED PROMISSORY NOTE

U.S. $10,000,000                                                   Chicago, Illinois
original principal amount                                   as of October 1, 2016

      **FOR VALUE RECEIVED**, the undersigned ("<u>Maker</u>") hereby promises to pay to the order of **ML FASHION, LLC**, a Delaware limited liability company ("<u>Payee</u>"), at the address of Payee set forth in the Credit Agreement (as hereinafter defined), in lawful money of the United States of America in immediately available funds, the principal amount of U.S.$10,000,000 plus the amount of interest which as accrued thereon pursuant to Section 2.4 of the Credit Agreement, or the aggregate principal amount of all Loans (as defined in the Credit Agreement) made by Lender to Maker pursuant to the Credit Agreement, whichever is less, on such date or dates as is provided in the Credit Agreement, and to pay interest on the unpaid principal amount from time to time outstanding hereunder, in like money, at such address and at such times and in such amounts, as set forth in the Credit Agreement.

      Maker and any and all sureties, guarantors and endorsers of this Secured Promissory Note (this "<u>Note</u>") and all other parties now or hereafter liable hereon, severally waive all grace periods (except grace periods expressly provided for in the Credit Agreement), demand, presentment for payment, protest, notice of any kind and diligence in collecting and bringing suit against any party hereto and agree to the extent permitted by applicable law (i) to all extensions and partial payments, with or without notice, before or after maturity, (ii) to any substitution, exchange or release of any security now or hereafter given for this Note, (iii) to the release of any party primarily liable hereon, and (iv) that it will not be necessary for any holder of this Note to first institute or exhaust such holder's remedies against the Maker or any other party liable herefor or against any security for this Note. The non-exercise by any holder of this Note of any of its rights hereunder in any particular instance shall not constitute a waiver in that or any subsequent instance.

      This Note is secured under and pursuant to the terms of certain Collateral Documents, to which reference is hereby made for a statement of their respective terms and conditions and a description of the collateral security for this Note.

      This Note is the Note referred to in that certain Credit Agreement dated as of the date hereof (the "<u>Credit Agreement</u>") by and between Maker and Payee, to which reference is hereby made for a statement of said terms and provisions. Capitalized terms used herein shall have the meanings set forth in the Credit Agreement unless otherwise defined herein or unless the context otherwise requires.


### [REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

CANCELLED

**IN WITNESS WHEREOF**, Maker has executed and delivered this Note as of the day and year first above written.

<div style="margin-left: 40%;">

**MAKER:**

GOOBERRY CORP.,
a New York corporation

By: _____
Name: Stephanie Menkin
Title: President

</div>

Schedule attached to Secured Promissory Note dated as of October 1, 2016
of Gooberry Corp. payable to the order of ML Fashion, LLC

## LOANS AND PRINCIPAL PAYMENTS

| Date | Amount of Loan Made | Amount of Principal Repaid | Unpaid Principal Balance | Notation made by |
|------|--------------------|---------------------------|-------------------------|------------------|
|      |                    |                           |                         |                  |
|      |                    |                           |                         |                  |
|      |                    |                           |                         |                  |
|      |                    |                           |                         |                  |
|      |                    |                           |                         |                  |
|      |                    |                           |                         |                  |
|      |                    |                           |                         |                  |
|      |                    |                           |                         |                  |
|      |                    |                           |                         |                  |
|      |                    |                           |                         |                  |
|      |                    |                           |                         |                  |
|      |                    |                           |                         |                  |
|      |                    |                           |                         |                  |
|      |                    |                           |                         |                  |

The aggregate unpaid principal amount shown on this schedule shall be rebuttable presumptive evidence of the principal amount owing and unpaid on this Note. The failure to record the date and amount of any Loan on this schedule shall not, however, limit or otherwise affect the obligations of Borrower under the Credit Agreement or under this Note to repay the principal amount of the Loans together with all interest accruing thereon.

## ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (the "Agreement") is made and entered into as of this 1st day of January 2018, by and among **GOOBERRY CORP.**, a New York corporation ("Assignor"); **MLG RETAIL, LLC**, a Delaware limited liability company ("Assignee"); and **ML FASHION, LLC**, a Delaware limited liability company ("Lender"). All capitalized terms not otherwise defined herein shall have the meanings set forth in the Credit Agreement (as defined below).

## W I T N E S S E T H:

WHEREAS, Assignor and Lender are parties to that certain Credit Agreement, dated as of October 1, 2016 (the "Credit Agreement"), pursuant to which Lender provided a $10 million credit facility to Assignor;

WHEREAS, Assignor issued a Promissory Note in favor of Lender on October 1, 20116 in the original principal amount of $10,000,000 (the "Note");

WHEREAS, pursuant to Section 7.3 of the Credit Agreement, Assignor may not assign its rights and obligations under the Credit Agreement without the prior written consent of Lender;

WHEREAS, Assignor desires to assign to Assignee all of its rights under the Credit Agreement and the Note, Assignee desires to assume all of Assignor's obligations of under the Credit Agreement and Lender, upon the terms and conditions of this Agreement, desires to consent to such assignment and assumption; and

WHEREAS, Assignee and Lender desire to set forth certain additional understandings regarding the Credit Agreement.

NOW, THEREFORE, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto do hereby agree as follows:

1.  **Assignment of Rights.** Assignor hereby assigns, transfers and conveys to Assignee all of Assignor's right, title and interest in and to the Credit Agreement and the Note, and Assignee hereby accepts such assignment.

2.  **Assumption of Obligations**. Assignee hereby assumes, covenants, undertakes and agrees to pay, perform, discharge or otherwise satisfy all of Assignor's duties and obligations under the Credit Agreement.

3.  **Consent to Assignment.** In reliance upon the terms hereof, Lender hereby consents to the foregoing assignment of rights by Assignor to Assignee, and to the foregoing assumption by Assignee of the obligations of Assignor.

4. **Covenants and Warranties.** To induce the other parties to enter into this Agreement, each of the parties hereto warrants and represents to the other that:

(a) *Existence.* Such party is a corporation and/or limited liability company, as the case may be, duly existing under the laws of the jurisdiction of its incorporation or formation and is duly existing under the laws of such jurisdiction and is in good standing.

(b) *Authority.* Such party is duly authorized to execute, deliver and perform this Agreement.

(c) *No Conflict.* The execution, delivery and performance of this Agreement does not conflict with any provision of law or of the charter or by-laws (or equivalent constituent documents) of such party, or of any agreement binding upon it, and it shall notify the other parties promptly upon its becoming aware that any change in applicable laws shall have made it unlawful for it to continue to perform its obligations under this Agreement.

(d) *Consents.* All necessary consents, licenses, approvals, authorizations of and registrations or declarations with, any governmental or regulatory authority or body presently required in connection with such party's execution, delivery and performance of this Agreement or for the enforcement of this Agreement against such party have been obtained or made and are in full force and effect.

(e) *Valid and Binding.* All acts, conditions and things required to be done and performed and to have occurred prior to the execution, delivery and performance of this Agreement, and to constitute the same legal, valid and binding obligation of such party enforceable against such party in accordance with its terms, have been done and performed and have occurred in due and strict compliance with all applicable laws.

(f) *No Default.* Assignor specifically represents and warrants to Assignee that there are no Events of Default existing under the Credit Agreement

5. **Miscellaneous.**

(a) *Section Headings.* Section and other headings and captions contained in this Agreement are for reference purposes only and are in no way intended to interpret, define, or limit the scope, extent, or intent of this Agreement, the Credit Agreement, the Note or any provision hereof or thereof.

(b) *Counterparts.* This Agreement and any amendment hereto may be executed in any number of counterparts with the same effect as if the parties hereto had signed the same documents; *provided, however*, that the counterparts in the aggregate shall have been executed by all of the parties hereto. Counterparts may be delivered via facsimile, electronic mail (including pdf) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes. All counterparts shall be construed together and shall constitute one and the same instrument.

(c)  *Applicable Law*.  The validity of this Agreement and the interpretation and performance of all its terms shall be construed and enforced in accordance with the laws of the State of Illinois, without respect to its conflicts of laws provisions.

(d)  *Severability*.  If any provision in this Agreement is found by a court of competent jurisdiction to be illegal, invalid, unlawful, void, or unenforceable, then such provision shall be enforced to the extent that it is not illegal, invalid, unlawful, void or unenforceable, and the remainder of this Agreement shall continue in full force and effect.

(e)  *Prior Agreements*.  This Agreement and the Purchase Agreement contain all of the agreements of the parties hereto with respect to any matter covered or mentioned therein, and no other prior agreement or understanding, oral or written, express or implied, pertaining to any such matter shall be effective for any purpose.

(f)  *Binding Effect*.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

**IN WITNESS WHEREOF**, the parties hereto have executed this Assignment and Assumption Agreement as of the day and year first above written.

<u>**ASSIGNOR:**</u>

**GOOBERRY CORP.**

By: _____
　　　Stephanie Menkin, President

<u>**ASSIGNEE:**</u>

**MLG RETAIL, LLC**

By: _____
　　　Stephanie Menkin, its President

<u>**LENDER:**</u>

**ML FASHION, LLC**

By: _____
　　　Marcus Lemonis, its Chairman and CEO

# EXHIBIT D

CANCELLED

# SECURITY AGREEMENT

**THIS SECURITY AGREEMENT** (this "Agreement") dated as of October 1, 2016, is made by **GOOBERRY CORP.**, a New York corporation (the "Debtor"), and **ML FASHION, LLC**, a Delaware limited liability company (the "Lender").

## W I T N E S S E T H:

**WHEREAS,** Debtor and Lender have entered into a Credit Agreement of even date herewith (as amended or otherwise modified from time to time, the "Credit Agreement"), pursuant to which Lender has agreed to make loans and other financial accommodations to Debtor; and

**WHEREAS**, the obligations of Debtor under the Credit Agreement are to be secured pursuant to this Agreement;

**NOW, THEREFORE**, for and in consideration of any loan, advance or other financial accommodation heretofore or hereafter made to Debtor under or in connection with the Credit Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.     Definitions.  When used herein, (a) the terms "Certificated Security," "Chattel Paper," "Commercial Tort Claims," "Deposit Account," "Document," "Equipment, " "Financial Asset," Fixture, Goods," "Letter-of-Credit Rights," "Inventory," "Instrument," "Investment Property," Security," "Security Entitlement" and "Uncertificated Security" have the respective meanings assigned thereto in the UCC (as defined below); (b) capitalized terms which are not otherwise defined have the respective meanings assigned thereto in the Credit Agreement; and (c) the following terms have the following meanings (such definitions to be applicable to both the singular and plural forms of such terms):

"Account Debtor" means the party who is obligated on or under any Account Receivable, Contract Right or General Intangible.

"Account Receivable" means any right of Debtor to payment for goods sold or leased or for services rendered.

"Assignee Deposit Account" is defined in Section 4.

"Collateral" means all property and rights of Debtor in which a security interest is granted hereunder.

"Computer Hardware and Software" means all of Debtor's rights (including rights as licensee and lessee) with respect to (a) computer and other electronic data processing hardware, including all integrated computer systems, central processing units, memory units, display terminals, printers, computer elements, card readers, tape drives, hard and soft disk drives, cables, electrical supply hardware, generators, power equalizers, accessories, peripheral devices and other related computer hardware; (b) all software programs designed for use on the computers and electronic data processing hardware described in clause (a) above, including all

operating system software, utilities and application programs in whatsoever form (source code and object code in magnetic tape, disk or hard copy format or any other listings whatsoever); (c) any firmware associated with any of the foregoing; and (d) any documentation for hardware, software and firmware described in clauses (a), (b) and (c) above, including flow charts, logic diagrams, manuals, specifications, training materials, charts and pseudo codes.

"Contract Right" means any right of Debtor to payment under a contract for the sale or lease of goods or the rendering of services, which right is at the time not yet earned by performance.

"General Intangibles" means all of Debtor's "general intangibles" as defined in the UCC and, in any event, includes (without limitation) all of Debtor's trademarks, trade names, patents, copyrights, trade secrets, customer lists, inventions, designs, software programs, mask works, goodwill, registrations, licenses, franchises, tax refund claims, guarantee claims, security interests and rights to indemnification.

"Intellectual Property" means all past, present and future: trade secrets and other proprietary information; trademarks, service marks, business names, designs, logos, indicia and other source and/or business identifiers, and the goodwill of the business relating thereto and all registrations or applications for registrations which have heretofore been or may hereafter be issued thereon throughout the world; copyrights (including copyrights for computer programs) and copyright registrations or applications for registrations which have heretofore been or may hereafter be issued throughout the world and all tangible property embodying the copyrights; unpatented inventions (whether or not patentable); patent applications and patents; industrial designs, industrial design applications and registered industrial designs; license agreements related to any of the foregoing and income therefrom; books, records, writings, computer tapes or disks, flow diagrams, specification sheets, source codes, object codes and other physical manifestations, embodiments or incorporations of any of the foregoing; the right to sue for all past, present and future infringements of any of the foregoing; and all common law and other rights throughout the world in and to all of the foregoing.

"Liabilities" means all obligations and liabilities of Debtor under the Credit Agreement, any Note, any other Loan Document or any other instrument, document or agreement, now existing or hereafter arising, evidencing any financing, leasing, or other extensions of credit of whatever type or form from time to time made by Lender to or for the benefit of Debtor in each case howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, now or hereafter existing, or due or to become due.

"Non-Tangible Collateral" means collectively Debtor's Accounts Receivable, Contract Rights and General Intangibles.

"UCC" means the Uniform Commercial Code as in effect in the State of Illinois on the date of this Agreement; provided that, as used in Section 8 hereof, "UCC" shall mean the Uniform Commercial Code as in effect from time to time in any applicable jurisdiction.

2.     <u>Grant of Security Interest</u>.  As security for the payment of all Liabilities, Debtor hereby assigns to Lender, and grants to Lender a continuing security interest in, the following, whether now or hereafter existing or acquired:

All of Debtor's:

      (a)      Accounts Receivable;

      (b)      Certificated Securities;

      (c)      Chattel Paper;

      (d)      Commercial Tort Claims;

      (e)      Computer Hardware and Software and all rights with respect thereto, including, any and all licenses, options, warranties, service contracts, program services, test rights, maintenance rights, support rights, improvement rights, renewal rights and indemnifications, and any substitutions, replacements, additions or model conversions of any of the foregoing;

      (f)      Contract Rights;

      (g)      Deposit Accounts;

      (h)      Documents;

      (i)      Financial Assets;

      (j)      General Intangibles;

      (k)      Goods (including all of its Equipment, Fixtures and Inventory), and all accessions, additions, attachments, improvements, substitutions and replacements thereto and therefor;

      (l)      Instruments;

      (m)      Intellectual Property;

      (n)      Investment Property;

      (o)      Letter-of-Credit Rights;

      (p)      money (of every jurisdiction whatsoever);

      (q)      Security Entitlements;

      (r)      Uncertificated Securities; and

(s)     to the extent not included in the foregoing, other personal property of any kind or description;

together with all books, records, writings, data bases, information and other property relating to, used or useful in connection with, or evidencing, embodying, incorporating or referring to any of the foregoing, and all proceeds, products, offspring, rents, issues, profits and returns of and from any of the foregoing; provided that to the extent that the provisions of any lease or license of Computer Hardware and Software or Intellectual Property expressly prohibit (which prohibition is enforceable under applicable law) the assignment thereof, and the grant of a security interest therein, Debtor's rights in such lease or license shall be excluded from the foregoing assignment and grant for so long as such prohibition continues, it being understood that upon request of Lender, Debtor will in good faith use reasonable efforts to obtain consent for the creation of a security interest in favor of Lender in Debtor's rights under such lease or license.

3.      Warranties.  Debtor warrants that: (a) no financing statement (other than any which may have been filed on behalf of Lender or in connection with liens expressly permitted by the Credit Agreement ("Permitted Liens")) covering any of the Collateral is on file in any public office; (b) Debtor is and will be the lawful owner of all Collateral, free of all liens and claims whatsoever, other than the security interest hereunder and Permitted Liens, with full power and authority to execute this Agreement and perform Debtor's obligations hereunder, and to subject the Collateral to the security interest hereunder; (c) all information with respect to Collateral and Account Debtor set forth in any schedule, certificate or other writing at any time heretofore or hereafter furnished by Debtor to Lender is and will be true and correct in all material respects as of the date furnished; (d) Debtor's principal place of business and jurisdiction of organization are as set forth on Schedule I hereto; (e) each other location where Debtor and its subsidiaries maintain a place of business is set forth on Schedule II hereto; (f) Debtor is not now known and during the five years preceding the date hereof has not previously been known by any trade name; (g) Schedule III hereto contains a complete listing of all of Debtor's Intellectual Property; (h) Debtor does not own any motor vehicles; (i) Debtor is a limited liability company duly formed, validly existing and in good standing under the laws of the state of its organization; (j) the execution and delivery of this Agreement and the performance by Debtor of its obligations hereunder are within Debtor's company powers, have been duly authorized by all necessary company action, have received all necessary governmental approval (if any shall be required), and do not and will not contravene or conflict with any provision of law or certificate of formation of Debtor or of any material agreement, indenture, instrument or other document, or any material judgment, order or decree, which is binding upon Debtor; (k) this Agreement is a legal, valid and binding obligation of Debtor, enforceable in accordance with its terms, except that the enforceability of this Agreement may be limited by bankruptcy, insolvency, fraudulent conveyance, fraudulent transfer, reorganization, moratorium or other similar laws now or hereafter in effect relating to creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law); and (l) Debtor is in compliance with the requirements of all applicable laws (including the provisions of the Fair Labor Standards Act), rules, regulations and orders of every governmental authority.

4.    Collections, etc.  Until such time during the existence of an Event of Default as Lender shall notify Debtor of the revocation of such power and authority, Debtor (a) may, in the ordinary course of its business, at its own expense, sell, lease or furnish under contracts of service any of the Inventory normally held by Debtor for such purpose, use and consume, in the ordinary course of its business, any raw materials, work in process or materials normally held by Debtor for such purpose, and use, in the ordinary course of its business (but subject to the terms of the Credit Agreement), the cash proceeds of Collateral and other money which constitutes Collateral, (b) will, at its own expense, endeavor to collect, as and when due, all amounts due under any of the Non-Tangible Collateral, including the taking of such action with respect to such collection as Lender may reasonably request or, in the absence of such request, as Debtor may deem advisable, and (c) may grant, in the ordinary course of business, to any party obligated on any of the Non-Tangible Collateral, any rebate, refund or allowance to which such party may be lawfully entitled, and may accept, in connection therewith, the return of Goods, the sale or lease of which shall have given rise to such Non-Tangible Collateral.  Lender, however, may, at any time that an Event of Default exists, whether before or after any revocation of such power and authority or the maturity of any of the Liabilities, notify any parties obligated on any of the Non-Tangible Collateral to make payment to Lender of any amounts due or to become due thereunder and enforce collection of any of the Non-Tangible Collateral by suit or otherwise and surrender, release or exchange all or any part thereof, or compromise or extend or renew for any period (whether or not longer than the original period) any indebtedness thereunder or evidenced thereby.  Upon the request of Lender during the existence of an Event of Default, Debtor will, at its own expense, notify any or all parties obligated on any of the Non-Tangible Collateral to make payment to Lender of any amounts due or to become due thereunder.

Upon request by Lender during the existence of an Event of Default, Debtor will forthwith, upon receipt, transmit and deliver to Lender, in the form received, all cash, checks, drafts and other instruments or writings for the payment of money (properly endorsed, where required, so that such items may be collected by Lender) which may be received by Debtor at any time in full or partial payment or otherwise as proceeds of any of the Collateral.  Except as Lender may otherwise consent in writing, any such items which may be so received by Debtor will not be commingled with any other of its funds or property, but will be held separate and apart from its own funds or property and upon express trust for the Lender until delivery is made to Lender.  Debtor will comply with the terms and conditions of any consent given by Lender pursuant to the foregoing sentence.

Upon demand by Lender, whether or not an Event of Default shall have occurred and be continuing, all items or amounts which are delivered by Debtor to Lender on account of partial or full payment or otherwise as proceeds of any of the Collateral shall be deposited to the credit of a deposit account (each an "Assignee Deposit Account") of Debtor with a financial institution selected by Lender over which Lender has sole dominion and control, as security for payment of the Liabilities.  Debtor shall have no right to withdraw any funds deposited in the applicable Assignee Deposit Account.  Lender may, from time to time, in its discretion, and shall upon request of Debtor made not more than once in any week, apply all or any of the then balance, representing collected funds, in the Assignee Deposit Account toward payment of the Liabilities, whether or not then due, in such order of application as Lender may determine, and Lender may, from time to time, in its discretion, release all or any of such balance to Debtor.

Lender (or any designee of Lender) is authorized to endorse, in the name of Debtor, any item, howsoever received by Lender, representing any payment on or other proceeds of any of the Collateral.

5.   Certificates, Schedules and Reports.  Debtor will from time to time, as Lender may reasonably request, deliver to Lender such schedules, certificates and reports respecting all or any of the Collateral at the time subject to the security interest hereunder, and the items or amounts received by Debtor in full or partial payment of any of the Collateral, as Lender may reasonably request.   Any such schedule, certificate or report shall be executed by a duly authorized officer of Debtor and shall be in such form and detail as Lender may specify.  Debtor shall immediately notify Lender of the occurrence of any event causing any loss or depreciation in the value of its Inventory or other Goods which is likely to have a material adverse effect on Debtor and such notice shall specify the amount of such loss or depreciation.

6.   Agreements of the Debtor.  Debtor (a) will, upon request of Lender, execute such financing statements and other documents (and pay the cost of filing or recording the same in all public offices reasonably deemed appropriate by Lender) and do such other acts and things (including delivery to Lender of any Instruments or Certificated Securities which constitute Collateral), all as Lender may from time to time reasonably request, to establish and maintain a valid security interest in the Collateral (free of all other liens, claims and rights of third parties whatsoever, other than Permitted Liens) to secure the payment of the Liabilities; (b) will keep all its Inventory at, and will not maintain any place of business at any location other than, its address(es) shown on Schedules I and II hereto or at such other addresses of which Debtor shall have given Lender not less than 10 days' prior written notice, (c) will keep its records concerning the Non-Tangible Collateral in such a manner as will enable Lender or its designees to determine at any time the status of the Non-Tangible Collateral; (d) will furnish Lender such information concerning Debtor, the Collateral and the Account Debtor as Lender may from time to time reasonably request; (e) will permit Lender and its designees, from time to time, on reasonable notice and at reasonable times and intervals during normal business hours (or at any time without notice during the existence of an Event of Default) to inspect Debtor's Inventory and other Goods, and to inspect, audit and make copies of and extracts from all records and other papers in the possession of Debtor pertaining to the Collateral and the Account Debtor, and will, upon request of Lender during the existence of an Event of Default, deliver to Lender copies of all of such records and papers; (f) will, upon request of Lender, stamp on its records concerning the Collateral, and add on all Chattel Paper constituting a portion of the Collateral, a notation, in form satisfactory to Lender, of the security interest of the Lender hereunder; (g) except for the sale or lease of Inventory in the ordinary course of its business and sales of Equipment which is no longer useful in its business or which is being replaced by similar Equipment, will not sell, lease, assign or create or permit to exist any Lien on any Collateral other than Permitted Liens; (h) will at all times keep all of its Inventory and other Goods insured under policies maintained with reputable, financially sound insurance companies against loss, damage, theft and other risks to such extent as is customarily maintained by companies similarly situated, and cause all such policies to provide that loss thereunder shall be payable to Lender as its interest may appear (it being understood that (A) so long as no Event of Default shall be existing, Lender shall deliver any proceeds of such insurance which may be received by it to Debtor and (B) whenever an Event of Default shall be existing, Lender may apply any proceeds of such insurance which may be received by it toward payment of the Liabilities, whether or not due, in such order of

application as the Lender may determine), and such policies or certificates thereof shall, if the Lender so requests, be deposited with or furnished to Lender; (i) will take such actions as are reasonably necessary to keep its Inventory in good repair and condition; (j) will take such actions as are reasonably necessary to keep its Equipment in good repair and condition and in good working order, ordinary wear and tear excepted; (k) will promptly pay when due all license fees, registration fees, taxes, assessments and other charges which may be levied upon or assessed against the ownership, operation, possession, maintenance or use of its Equipment and other Goods; (l) will, upon request of Lender, (i) cause to be noted on the applicable certificate, in the event any of its Equipment is covered by a certificate of title, the security interest of Lender in the Equipment covered thereby, and (ii) deliver all such certificates to Lender or its designees; (m) will take all steps reasonably necessary to protect, preserve and maintain all of its rights in the Collateral; (n) will keep all of the tangible Collateral in the United States; (o) will reimburse Lender for all expenses, including reasonable attorney's fees and charges (including time charges of attorneys who are employees of Lender), incurred by Lender in seeking to collect or enforce any rights in respect of Debtor's Collateral; and (p) will promptly notify Lender of its acquisition of any motor vehicle or Commercial Tort Claim not listed, from time to time, on any Schedule hereto.

Any expenses incurred in protecting, preserving or maintaining any Collateral shall be borne by Debtor. Whenever an Event of Default shall be existing, Lender shall have the right to bring suit to enforce any or all of the Intellectual Property or licenses thereunder, in which event Debtor shall at the request of Lender do any and all lawful acts and execute any and all proper documents required by Lender in aid of such enforcement and Debtor shall promptly, upon demand, reimburse and indemnify Lender for all costs and expenses incurred by Lender in the exercise of its rights under this <u>Section 6</u>. Notwithstanding the foregoing, Lender shall have no obligation or liability regarding the Collateral or any portion thereof by reason of, or arising out of, this Agreement.

7. <u>Event of Default</u>. Whenever an Event of Default shall be existing, Lender may exercise from time to time any right or remedy available to it under applicable law. Debtor agrees, in case of an Event of Default, (i) to assemble, at its expense, all its Inventory and other Goods (other than Fixtures) at a convenient place or places acceptable to Lender, and (ii) at Lender's request, to execute all such documents and do all such other things which may be necessary or desirable in order to enable Lender or its nominee to be registered as owner of the Intellectual Property with any competent registration authority. Any notification of intended disposition of any of the Collateral required by law shall be deemed reasonably and properly given if given at least ten days before such disposition. Any proceeds of any disposition by Lender of any of the Collateral may be applied by Lender to payment of expenses in connection with the Collateral, including reasonable attorneys' fees and charges (including time charges of attorneys who are employees of Lender), and any balance of such proceeds may be applied by Lender toward the payment of such of the Liabilities, and in such order of application, as Lender may from time to time elect.

8. <u>General</u>. Lender shall be deemed to have exercised reasonable care in the custody and preservation of any of the Collateral in its possession if it takes such action for that purpose as any Debtor requests in writing, but failure of Lender to comply with any such request shall not of itself be deemed a failure to exercise reasonable care, and no failure of Lender to preserve or

protect any right with respect to such Collateral against prior parties, or to do any act with respect to the preservation of such Collateral not so requested by Debtor, shall be deemed of itself a failure to exercise reasonable care in the custody or preservation of such Collateral.

Any notice from Lender to Debtor, if mailed, shall be deemed given five days after the date mailed, postage prepaid, addressed to Debtor either at Debtor's address shown on Schedule I hereto or at such other address as Debtor shall have specified in writing to Lender as its address for notices hereunder.

Debtor agrees to pay all expenses, including reasonable attorneys' fees and charges (including time charges of attorneys who are employees of Lender) paid or incurred by Lender in endeavoring to collect the Liabilities of Debtor, or any part thereof and in enforcing this Agreement against Debtor, and such obligations will themselves be Liabilities.

No delay on the part of Lender in the exercise of any right or remedy shall operate as a waiver thereof, and no single or partial exercise by Lender of any right or remedy shall preclude other or further exercise thereof or the exercise of any other right or remedy.

This Security Agreement shall remain in full force and effect until all Liabilities have been paid in full and all Commitment has terminated. If at any time all or any part of any payment theretofore applied by Lender to any of the Liabilities is or must be rescinded or returned by Lender for any reason whatsoever (including the insolvency, bankruptcy or reorganization of Debtor), such Liabilities shall, for the purposes of this Agreement, to the extent that such payment is or must be rescinded or returned, be deemed to have continued in existence, notwithstanding such application by Lender, and this Agreement shall continue to be effective or be reinstated, as the case may be, as to such Liabilities, all as though such application by Lender had not been made.

This Agreement shall be construed in accordance with and governed by the laws of the State of Illinois applicable to contracts made and to be performed entirely within such State. Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

The rights and privileges of Lender hereunder shall inure to the benefit of its successors and assigns.

This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts, and each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute one and the same Agreement. At any time after the date of this Agreement, one or more additional Persons may become parties hereto by executing and delivering to the Lender a counterpart of this Agreement together with supplements to the Schedules hereto setting forth all relevant information with respect to such party as of the date of such delivery. Immediately upon such execution and delivery (and

without any further action), each such additional Person will become a party to, and will be bound by all the terms of, this Agreement.

ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, SHALL BE BROUGHT AND MAINTAINED EXCLUSIVELY IN THE COURTS OF THE STATE OF ILLINOIS OR IN THE UNITED STATES DISTRICT COURT FOR WITH JURISDICTION IN CHICAGO, ILLINOIS; <u>PROVIDED</u> THAT ANY SUIT SEEKING ENFORCEMENT AGAINST ANY COLLATERAL OR OTHER PROPERTY MAY BE BROUGHT, AT LENDER'S OPTION, IN THE COURTS OF ANY JURISDICTION WHERE SUCH COLLATERAL OR OTHER PROPERTY MAY BE FOUND. DEBTOR HEREBY EXPRESSLY AND IRREVOCABLY SUBMITS TO THE JURISDICTION OF THE COURTS OF THE STATE OF ILLINOIS AND OF THE UNITED STATES DISTRICT COURT WITH JURISDICTION IN CHICAGO, ILLINOIS FOR THE PURPOSE OF ANY SUCH LITIGATION AS SET FORTH ABOVE. DEBTOR FURTHER IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS BY REGISTERED MAIL, POSTAGE PREPAID, TO THE ADDRESS SET FORTH ON <u>SCHEDULE I</u> HERETO (OR SUCH OTHER ADDRESS AS IT SHALL HAVE SPECIFIED IN WRITING TO LENDER AS ITS ADDRESS FOR NOTICES HEREUNDER) OR BY PERSONAL SERVICE WITHIN OR WITHOUT THE STATE OF ILLINOIS. DEBTOR HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN ANY SUCH COURT REFERRED TO ABOVE AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

**EACH OF DEBTOR AND LENDER HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS UNDER THIS AGREEMENT, THE NOTE, ANY OTHER LOAN DOCUMENT AND ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR WHICH MAY IN THE FUTURE BE DELIVERED IN CONNECTION HEREWITH OR THEREWITH OR ARISING FROM ANY FINANCING RELATIONSHIP EXISTING IN CONNECTION WITH ANY OF THE FOREGOING, AND AGREES THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.**

CANCELLED

**IN WITNESS WHEREOF**, this Agreement has been duly executed as of the day and year first above written.

**DEBTOR:**

GOOBERRY CORP.,
a New York corporation

By: _____
Name: Stephanie Menkin
Title:  President

**LENDER:**

ML FASHION, LLC,
a Delaware limited liability company

By: _____
Name:  Marcus Lemonis
Title:   Chairman and CEO

**Schedule I**
**To Security Agreement**

**Principal Place of Business**
**and Jurisdiction of Organization**

<u>Principal Place of Business</u>:

38 E. 29th Street
New York, New York 10016

<u>Jurisdiction of Formation</u>:

New York

**Schedule II**
**To Security Agreement**

**Addresses**

27436535.1

**Schedule III**
**To Security Agreement**

**Intellectual Property**

| MARK | APP./REG. NO. | FILING/REG/ DATE | GOODS/SERVICES |
|------|---------------|------------------|----------------|
| | 85957524 | January 28, 2014 | **Services** IC 025. US 022 039. G & S: Briefs; Button down shirts; Denim jackets; Denims; Flip flops; Jackets; Jeans; Pants; Shoes; Slacks; Sweaters; T-shirts; Women's clothing, namely, shirts, dresses, skirts, blouses. FIRST USE: 20061201. USED IN ANOTHER FORM The mark was first used anywhere in a different form other than that sought to be registered at least as early as 10/08/2004. FIRST USE IN COMMERCE: 20061201 |
| BELLY UP TO THE BAR AND WE'LL COVER YOUR ASS | 85693512 | April 2, 2013 | IC 035. US 100 101 102. G & S: Retail clothing store services. FIRST USE: 20040810. FIRST USE IN COMMERCE: 20040810 |

| JEAN BAR | 85287842 | April 6, 2011 | IC 025. US 022 039. G & S: Briefs; Button down shirts; Flip flops; Footwear; Jeans; Knit tops; Pants; Skirts; Slacks; Sleeved or sleeveless jackets; Sweaters; Sweatshirts; T-shirts; Tops. FIRST USE: 20120104. USED IN ANOTHER FORM The mark was first used anywhere in a different form other than that sought to be registered at least as early as 08/10/2004. FIRST USE IN COMMERCE: 20120104 |
|---|---|---|---|
| COURAGE.B | 85179652 | August 9, 2011 | IC 018. US 001 002 003 022 041. G & S: Handbags, wallets; bags, namely, all-purpose carrying bags, sports bags, book bags; cases, namely, key cases, credit card cases, travel cases, business card cases; small leather goods, namely, leather wallets, leather business card cases, leather key cases. FIRST USE: 20080814. FIRST USE IN COMMERCE: 20080814<br><br>IC 025. US 022 039. G & S: Clothing, namely, shirts, vests, sweaters, footwear, shorts, pants, jackets, blouses, dresses, scarves, hats, skirts. FIRST USE: 20080814. FIRST USE IN COMMERCE: 20080814<br><br>IC 035. US 100 101 102. G & S: Retail store services featuring clothing and fashion accessories; on-line retail store services featuring clothing and fashion accessories. FIRST USE: 20080814. FIRST USE IN COMMERCE: 20080814 |

| | 85195577 | November 29, 2011 | IC 018. US 001 002 003 022 041. G & S: Handbags, wallets, bags, namely, all-purpose carrying bags, sports bags, book bags; cases, namely, key cases, credit card cases, travel cases, business card cases; small leather goods, namely, leather wallets, leather business card cases, leather key cases. FIRST USE: 20080710. FIRST USE IN COMMERCE: 20080710 |
|---|---|---|---|
| | | | IC 025. US 022 039. G & S: Clothing, namely, shirts, vests, sweaters, shoes, caps, bandannas, shorts, sweat shirts, pants, belts for clothing, socks, swim wear, jackets, rain wear, blouses, dresses, footwear, hosiery, scarves, hats, head bands, pajamas, sleep wear, coats, skirts. FIRST USE: 20080710. FIRST USE IN COMMERCE: 20080710 |
| | | | IC 035. US 100 101 102. G & S: Retail store services featuring clothing and fashion accessories; on-line retail store services featuring clothing and fashion accessories. FIRST USE: 20080710. FIRST USE IN COMMERCE: 20080710 |
| THE BLUES JEAN BAR | 76654651 | January 9, 2007 | IC 035. US 100 101 102. G & S: RETAIL CLOTHING STORE SERVICES. FIRST USE: 20040810. FIRST USE IN COMMERCE: 20040810 |

27436535.1