**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

-----------------------------------------------------------------x

|  |  |  |
|---|---|---|
| ML FASHION, LLC and ML RETAIL, LLC, | : | Case No. 1:20-cv-05124 |
|  | : |  |
| Plaintiffs, | : |  |
|  | : | <u>VERIFIED COMPLAINT</u> |
| v. | : |  |
|  | : | **<u>JURY DEMAND</u>** |
| NOBELLE GW, LLC, STEPHANIE MENKIN, | : |  |
| SARIT MAMAN NAGRANI, and | : |  |
| NICOLAS GOUREAU, | : |  |
|  | : |  |
| Defendants. | : |  |
|  | : |  |

-----------------------------------------------------------------x

**AMENDED VERIFIED COMPLAINT AND APPLICATION FOR IMMEDIATE,**
**PRELIMINARY, AND PERMANENT INJUNCTIVE RELIEF**

Plaintiff ML Fashion, LLC ("ML Fashion") and ML Retail, LLC ("ML Retail") (collectively, "Plaintiffs"), by their undersigned attorneys, as and for its Amended Complaint and Application for Immediate, Preliminary, and Permanent Injunctive Relief (the "Complaint") against Defendants Nobelle GW, LLC ("Nobelle"), Stephanie Menkin ("Menkin"), Sarit Maman Nagrani ("Nagrani"), and Nicolas Goureau ("Goureau") (collectively, "Defendants"), alleges as follows:

**<u>NATURE OF THE ACTION</u>**

1. This is an action for conversion, breach of fiduciary duty, breach of contract, tortious interference, fraud, violations of the Lanham Act, Defend Trade Secrets Act, and Computer Fraud and Abuse Act, as well as request for immediate, preliminary and permanent injunction. Plaintiff ML Fashion operates a retail clothing business, while Plaintiff ML Retail is one of three members of ML Fashion and a party to the governing LLC agreement. Defendants

Menkin and Goureau are also members and/or officers of Plaintiff ML Fashion. Defendant Nagrani is a former employee of ML Fashion.

2.      In violation of their fiduciary duties, applicable law, and/or contractual obligations to Plaintiffs, Defendants have embezzled funds from ML Fashion for their own personal use; illegally seized computers, fixtures, clothing and other inventory owned by ML Fashion; opened up a retail store called Nobelle in direct competition with ML Fashion at a property formerly operated by ML Fashion, at which Defendants have no right to operate; and are selling ML Fashion's inventory at that competing retail store for Defendants' own benefit, all the while jeopardizing the jobs of ML Fashion's part-time and full time employees, the continuing viability of ML Fashion and depleting collateral for loans made to ML Fashion by ML Retail allowing it to operate.

3.      Worse still, inexplicably Defendants are conducting this scheme and continuing misconduct while Menkin and Goureau *themselves* brought unsupported claims against ML Retail and ML Fashion in two lawsuits pending in Delaware and New York to divert attention from their own misconduct. Plaintiffs are entitled to protect the jobs of their employees; protect ML Retail's collateral, protect the on-going business, seek the return of their property, recover damages, and obtain injunctive relief to prevent Defendants continued improper sale of ML Fashion's inventory and operation of a competing retail business.

## PARTIES

4.      Plaintiff ML Fashion is a limited liability company organized under the laws of Delaware with its principal place of business in New York. Plaintiff owns and operates fashion brands and retail stores across the country.

5.     Plaintiff ML Retail is a limited liability company organized under the laws of Delaware with its principal place of business in Illinois.  ML Retail owns a 33.34% membership interest in ML Fashion.  The sole member of ML Retail is Marcus Lemonis, a citizen of Illinois.

6.     Defendant Nobelle GW, LLC is a newly formed limited liability company organized under the laws of New York with its principal place of business in Connecticut.

7.     Defendant Stephanie Menkin is an individual residing in New York.  Menkin owns a 33.33% membership interest in, and is an officer of, ML Fashion.  Defendant Menkin has already been served.

8.     Defendant Sarit Maman Nagrani is an individual residing in Hewlett, New York, Nassau County.  On information and belief, Defendant Nagrani is a founder and co-owner of Nobelle along with Defendant Menkin.  Defendant Nagrani has already been served.

9.     Defendant Nicolas Goureau is an individual residing in Florida.  Goureau owns a 33.33% membership interest in ML Fashion.  Defendant Goureau has already been served.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, and over the state law claims pursuant to ancillary, pendent and supplemental jurisdiction, including under 28 U.S.C. § 1367.

11.     This Court has personal jurisdiction over Defendants by reason of, among other things, their systematic and continuous contacts with this forum by virtue of establishing a business, ML Fashion, that intended to and did operate retail stores in Illinois; their misappropriation of property and goods, and moving that property out of this forum; and because they have tortiously interfered with agreements between Plaintiffs that have mandatory choice-of-law, jurisdiction, and venue provisions in Chicago, Illinois.  As President of ML Fashion, Menkin

was responsible for all of ML Fashion's retail stores in Illinois and regularly travelled to Illinois to manage their operation. As part of his employment with ML Fashion, Goureau moved to Chicago to oversee the initial buildout of ML Fashion's retail stores in Illinois. Further, Menkin and Goureau are closely related parties to those agreements as Menkin signed on behalf of ML Fashion and Goureau is 33.33% member of ML Fashion, therefore both could foresee their tortious interference with these agreements would bring them within the scope of the agreements.

12.     Defendants Menkin and Goureau have also committed tortious and illegal behavior, as outlined below, that occurred in Cook County, Illinois, and/or were specifically and purposefully aimed at harming Plaintiffs in Cook County, Illinois, thus subjecting themselves to this Court's general and specific personal jurisdiction pursuant to due process and/or the Illinois long arm statute, 735 ILCS 5/2-209.

13.     This Court has personal jurisdiction over all Defendants because, among other things, they intentionally and tortiously interfered with a contract having a personal jurisdiction provision limited to Cook County, Illinois, thus subjecting themselves to this Court's general personal jurisdiction pursuant to due process and/or the Illinois long arm statute, 735 ILCS 5/2-209. Defendants Nobelle and Nagrani have also committed tortious and illegal behavior, as outlined below, that occurred in Cook County, Illinois, and/or were specifically and purposefully aimed at harming Plaintiffs in Cook County, Illinois.

14.     Venue is proper in this District under 28 U.S.C. § 1391(a) and because: (1) a substantial part of the events giving rise to the claims occurred in the Northern District of Illinois; (2) a mandatory venue provision requires exclusive venue in Cook County, Illinois, and (3) Defendants are otherwise subject to personal jurisdiction in this venue.

**FACTS**

**A.    Background.**

15.    In or about 2014, Defendants Menkin and Goureau solicited an investment from Marcus Lemonis ("Lemonis") to rescue their failing fashion retail business, operating under the brand name "Courage.B."

16.    Lemonis resides in Illinois.

17.    In connection with their solicitation of an investment from Lemonis to rescue their business, in or about 2014, Defendants Menkin and Goureau appeared on Lemonis' popular CNBC television series, "The Profit."

18.    While appearing on "The Profit," Defendants Menkin and Goureau admitted that their business had been poorly run and had lost more than $500,00 the year before and that they just completed a lawsuit against their step-father involving the business.

19.    In or about 2014, Lemonis agreed to invest $800,000 in Menkin's and Goureau's failing business in order to allow their business to purchase inventory, pay other fees and for Goureau to receive monies for the first time in exchange for ML Retail, for which Lemonis serves as managing member, receiving an ownership stake in that business.

20.    After Lemonis invested in, and became a part owner of, Menkin and Goureau's business, the business acquired new brands and opened new stores.

21.    In or about 2016, Menkin, Goureau, and Plaintiff ML Retail formed ML Fashion to oversee and operate their expanding fashion retail business.  Menkin, Goureau, and ML Retail formed ML Fashion with the specific intent to conduct business in and across Illinois.

22.    From the outset of their new venture, Menkin, Goureau, and ML Retail intended and agreed that ML Fashion would aim their operations at Illinois. Menkin and Goureau formed ML Fashion envisioning a continuing and wide-ranging presence in Illinois, with Menkin and

Goureau specifically interested in the Chicago market. Menkin and Goureau planned to capture this market for ML Fashion via the suburb model. Indeed, and as set forth in more detail below, ML Fashion's first retail store opened in the Chicago suburb of Lake Forest, Illinois.

23.     ML Fashion advertises and sells its products in interstate commerce.

24.     Lemonis is ML Fashion's managing member.

**B.     The Agreements.**

25.     On or about March 29, 2016, Menkin, Goureau, and ML Retail entered into a limited liability company agreement for ML Fashion (the "LLC Agreement") (attached hereto as **Exhibit 1** to the Complaint). Menkin and Goureau each signed the LLC Agreement individually.

26.     Lemonis signed the LLC Agreement on behalf of ML Retail in Illinois.

27.     **Exhibit A** of the LLC Agreement provides that ML Retail owned a 33.34% membership interest in ML Fashion, and that Menkin and Goureau each owned a 33.33% membership interest in ML Fashion.

28.     **Exhibit B** of the LLC Agreement provides that Lemonis is the chairman and CEO of ML Fashion, and that Menkin serves as ML Fashion's president.

29.     Section 2.3 of the LLC Agreement provides that "[t]he purpose of the Company is to, directly or indirectly through one or more partnerships, limited liability companies or other entities, acquire, hold, maintain, manage, improve, finance, sell, dispose of or otherwise invest in businesses focused on the distribution and sale of apparel, footwear and accessories and sale of apparel, footwear and accessories, via owned and leased retail stores and online (the 'Business')."

30.     Section 1 of the LLC Agreement further defines "Business Day" as "a day of the year on which banks are not required or authorized to close in Chicago, Illinois."

31.     Section 2.7 of the LLC Agreement provides that ML Fashion holds title to all of its property, and that no member of ML Fashion has an ownership interest in ML Fashion's property.

32.    Section 6 of the LLC Agreement provides that the management of ML Fashion is "vested entirely and exclusively in" the manager of ML Fashion (the "Manager").

33.    Section 6.1(b) of the LLC Agreement provides that the Manager of ML Fashion is Marcus Lemonis.

34.    Section 7.1 of the LLC Agreement provides that ML Fashion's members do not have any right to participate in the management or control of ML Fashion, or to act for or bind ML Fashion in any way.

35.    Section 7.7(b) of the LLC Agreement provides that the members of ML Fashion, including Menkin and Goureau, during the time that they are members and in the twelve months following the end of their membership in ML Fashion, shall not, *inter alia*, "engage in any business, have any financial interest in any company or entity that engages in any business or make any loans to any company or entity that engages in any business that engages in or competes, directly or indirectly, with" ML Fashion's business.

36.    Section 7.7(d) of the LLC Agreement provides that the members of ML Fashion, including Menkin and Goureau, agree that breaches of Section 7.7(b) of the LLC Agreement "would be highly injurious and cause irreparable harm" to ML Fashion, and that ML Fashion is accordingly entitled to seek specific performance or injunctive relief as a result of any such breaches.

37.    Also on or about March 29, 2016, the same day they formed ML Fashion, the parties further executed additional agreements in order to obtain funding for the newly created entity. Specifically, the parties arranged for a revolving multi-million dollar loan between ML Fashion as borrower and ML Retail and lender ("Loan"), which is secured by a Credit Agreement (attached

hereto as **Exhibit 2** to the Complaint) and a Security Agreement (attached hereto as **Exhibit 3** to the Complaint).

38.     The Loan was specifically contemplated in the LLC Agreement as, among other things, a "Member Loan" under Section 5.1(a).

39.     Section 5.1 of the Credit Agreement provides, among other things, that ML Fashion covenants to use the Loan proceeds "to make investments and for working capital and other general corporate purposes…."

40.     Section 5.3 of the Credit Agreement provides that ML Fashion could not incur indebtedness beyond what was provided for in the Credit Agreement, meaning the Loan was ML Fashion's sole source of capital funding.

41.     Section 7.4 of the Credit Agreement provides the agreement is governed by the laws of Illinois and that "the parties hereby agree to irrevocably submit to the personal and subject matter jurisdiction of the federal and state courts sitting in Chicago, Cook County, Illinois, and agree not to object to such venue for any reason at law or in equity."

42.     Section 8 of the Security Agreement provides:

ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, SHALL BE BROUGHT AND MAINTAINED EXCLUSIVELY IN THE COURTS OF THE STATE OF ILLINOIS OR IN THE UNITED STATES DISTRICT COURT FOR WITH JURISDICTION IN CHICAGO, ILLINOIS; PROVIDED THAT ANY SUIT SEEKING ENFORCEMENT AGAINST ANY COLLATERAL OR OTHER PROPERTY MAY BE BROUGHT, AT LENDER'S OPTION, IN THE COURTS OF ANY JURISDICTION WHERE SUCH COLLATERAL OR OTHER PROPERTY MAY BE FOUND. DEBTOR HEREBY EXPRESSLY AND IRREVOCABLY SUBMITS TO THE JURISDICTION OF THE COURTS OF THE STATE OF ILLINOIS AND OF THE UNITED STATES DISTRICT COURT WITH JURISDICTION IN CHICAGO, ILLINOIS FOR THE PURPOSE OF ANY SUCH LITIGATION AS SET FORTH ABOVE. … DEBTOR HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO

THE LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN ANY SUCH COURT REFERRED TO ABOVE AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

43.     Menkin and Goureau were each specifically aware of both the Credit and Security Agreements as the mechanism to provide funding to ML Fashion and consented to them.  They also knew that without the money provided by these agreements, ML Fashion would not exist because neither Menkin nor Goureau made any capital contributions nor otherwise invested any of their own money in the business.

**C.     ML Fashion's business expansion strategy in Illinois and beyond.**

44.     Beginning in or about 2016, ML Fashion began its business operations  took their first planned step toward their eventual goal of opening retail stores across the country by permanently establishing their first  retail store in Illinois.

45.     Using the capital provided to ML Fashion under the Credit and Security Agreements, Menkin and Goureau opened ML Fashion's first store in their desired location of Lake Forest, Illinois.

46.     Goureau physically moved to Chicago, Illinois to handle the initial buildout and installation of fixtures at the Lake Forest location.  While living in Illinois, Goureau oversaw the buildout of additional ML Fashion retail stores across Illinois, including in Hinsdale, Halsted, and Winnetka.

47.     As President of ML Fashion, Menkin was ultimately responsible for managing all of ML Fashion's Illinois locations.  As part of this responsibility, Menkin regularly travelled to Illinois to manage ML Fashion's Illinois stores.  Menkin further took a specific interest in ML Fashion's downtown Chicago location and worked to open that location.

48.     Ultimately, Goureau and Menkin's activities in Illinois led to the systematic expansion of at least ten ML Fashion retail outlets in Illinois.

49. In Illinois, ML Fashion owns and operates retail stores at the following locations:

- Arlington Heights ("ARL Store") at 12 South Dunton Ave., Arlington Heights, Illinois 60005;

- Glencoe ("GCO Store") at 339 Park Avenue, Glencoe, Illinois 60022;

- Delaware Place ("GLD Store") at 110 E. Delaware Place, Suite 101, Chicago, Illinois 60611;

- Halsted ("HAL Store") at 2030 North Halsted, Chicago, Illinois 60614;

- Hinsdale ("HIN Store") at 101 S. Washington Street, Hinsdale, Illinois 60521;

- Highland Park ("HP Store") at 1883 2nd Street, Highland Park, Illinois 60035;

- Lake Forest ("LF Store") at 267 East Westminster Avenue, Lake Forest, Illinois 60045;

- Deerfield ("MSS Store") at 720 Waukegan Rd., Suite F, Deerfield, Illinois 60015;

- Michigan Avenue ("NBR Store") at 520 North Michigan Ave., Chicago, Illinois 60611;

- Naperville ("NPV Store") at 26 W. Jefferson, Naperville, Illinois 60540; and

- Winnetka ("WKA Store") at 559 Chestnut St., Winnetka, Illinois 60093.

50. In addition to Illinois, ML Fashion operates more than thirty other retail stores across the country in California, Colorado, Connecticut, Florida, Louisiana, Maryland, Massachusetts, Minnesota, New York, South Carolina, and Texas.

51. With ten stores in Illinois, however, ML Fashion is predominantly situated and conducting business in Illinois as the state with the most retail locations over the rest of the country.

**D. The Greenwich Retail Store.**

52. As part of ML Fashion's expansion strategy, ML Fashion opened and operated a "MARCUS" store at 85 Greenwich Avenue, Greenwich, Connecticut (the "Greenwich Property").

53.     Nagrani was the manager of the Greenwich Property, in addition to the manager of an additional ML Fashion store in New York City's Meatpacking District located at 402 W. 13th Street, New York, New York 10014 (the "Meatpacking Store").

54.     Nagrani, Menkin and Goureau viewed the New York and Greenwich markets as one, and wanted to establish the Greenwich Property to serve both markets. Nagrani and other ML Fashion employees often travelled back and forth between Greenwich and New York. As part of her employment Nagrani also travelled to Illinois on at least one occasion, visiting several Illinois ML Fashion stores to participate in education and training exercises.

55.     ML Fashion sold clothing and other fashion-related retail products at the Greenwich Property until in or about 2020.

56.     ML Fashion remains the owner of the fixtures, furniture, and equipment ("FFE") in the Greenwich Property and remains the owner of the leasehold on the Greenwich Property. The FFE at the Greenwich Property is collateral for a multi-million dollar loan between ML Retail and ML Fashion.

57.     ML Fashion operated the Greenwich Property using computers which contain ML Fashion's confidential, proprietary, and trade secret information, including but not limited to financial records, customer data, company property, databases, and other information as set forth below.

**E.      Defendants' fraudulent misrepresentations and misappropriation of company funds.**

58.     Following the formation of ML Fashion, Menkin served as ML Fashion's president.

59.     Following the formation of ML Fashion, Menkin and Goureau began using ML Fashion funds to pay their mother, Noemi Goureau, one of the highest salaries in the company, $175,000 annually.

60. Menkin and Goureau both falsely represented to Lemonis that in exchange for this salary Noemi was performing services on behalf of ML Fashion. When Lemonis inquired about the nature of Noemi's services, Menkin and Goureau falsely represented that Noemi was running the Meatpacking Store. Nagrani joined Menkin and Goureau in falsely claiming Noemi ran the Meatpacking Store, and would cover for Noemi by falsely representing to Lemonis and other ML Fashion employees that Noemi was present at the Meatpacking Store when in fact she was not. In reality, Noemi hardly performed any services for ML Fashion and rarely, if ever, even showed up at the Meatpacking Store—much less run it.

61. Upon discovering this scheme, Lemonis told Menkin and Goureau that Noemi could not be paid not to work and instructed that Noemi stop being paid. Menkin and Goureau falsely told Lemonis and other ML Fashion employees that they had stopped paying Noemi while they nevertheless continued to pay Noemi her "salary" through misappropriation of ML Fashion funds.

62. Following the formation of ML Fashion, Goureau, Menkin and Goureau's mother Noemi took in excess of $2,000,000 from ML Fashion including paying monies to Goureau's mother ($175,000 annually) who provided no services to ML Fashion.

63. From 2016 through at least early 2020, Defendants Menkin and Goureau repeatedly, intentionally, and improperly utilized ML Fashion's funds (which were in turn obtained from the Credit and Security Agreements) for their own personal purposes, including payments for personal expenses, payments to family members, "consulting" fees, cars, extensive travel, hotel stays, and even a nanny.

64. Throughout this time, Menkin and Goureau also continued to use, without authority, company credit cards and shipping accounts for their own personal use. Menkin and

Goureau charged significant amounts of personal expenses to the company's American Express credit card (the "AMEX Card") issued in Goureau's name. The AMEX Card was only authorized for inventory purchases. Many of these AMEX charges made by Menkin and Goureau occurred in Illinois. When Lemonis spoke to Menkin and Goureau about these improper and unauthorized personal expenditures, both Menkin and Goureau promised they would stop using company resources for their personal benefit. Menkin even told her brother Goureau not to use the AMEX Card for personal expenses. When Lemonis would check in with Menkin on this issue, she would say " I know, I know; I am dealing with it." Menkin and Goureau lied, however, and continued to use the AMEX Card and ML Fashion funds for their personal use throughout nearly their entire tenures with ML Fashion.

65.     From 2016 through at least early 2020, Defendants Menkin and Goureau utilized Lemonis' name, image, and likeness, and his "The Profit" television series, to promote themselves and their business ventures and appeared on the show on several occasions to further promote themselves and their "successful business partnership with Lemonis."

66.     Menkin and Goureau intended to harm ML Fashion through their misconduct and knew their misconduct would harm ML Fashion, yet did so anyway.

67.     Lemonis received no monies from ML Fashion.

68.     Following the formation of ML Fashion, ML Retail invested significant sums into ML Fashion and its related businesses to keep them afloat.

69.     Lemonis was never paid a salary or reimbursed for expenses in his role as the manager and an officer of ML Fashion, and never otherwise took any money out of the company as the company did not have sufficient funds to pay Lemonis. All the while, the business was

paying Goureau's mother Noemi $175,000 annually even though she provided no services, and Menkin was specifically instructed not to pay such monies to her mother.

70.     Following the formation of ML Fashion, neither Menkin nor Goureau put any money into ML Fashion or its related businesses, despite paying themselves through ML Fashion funds hundreds of thousands of dollars a year in "consulting fees."

71.     In or about early 2020, Lemonis discovered Menkin's and Goureau's misconduct and improper use of ML Fashion's funds for Menkin's and Goureau's personal expenses and diverting company assets.

72.     Upon discovery, Lemonis began discussions with Menkin and Goureau about their exit from ML Fashion.  Lemonis and Menkin proposed that Menkin would exchange all of her equity in ML Fashion and exit from the company for mutually agreeable inventory.  They discussed that no more ML Fashion inventory was to be diverted to Noemi, and Menkin agreed to this.  Lemonis never agreed that Menkin could compete with ML Fashion.

73.     Lemonis and Goureau similarly discussed a deal where Goureau would exchange all of his equity in ML Fashion and exit from the company for mutually agreeable inventory and to make payments on the AMEX Card for ML Fashion-authorized charges.  Lemonis never agreed that Goureau could compete with ML Fashion.

74.     Ultimately, Menkin and Goureau did not follow through with transferring their equity to Lemonis and instead stopped ceased all communications with Lemonis in early 2020. Then in June 2020, they filed their lawsuits, as set forth below.  Despite Lemonis's good faith attempts to resolve the parties' differences, it has become apparent that all of Menkin's and Goureau's negotiations with Lemonis about exchanging their equity for inventory, however, were

a smoke-screen to fraudulently mislead Lemonis into thinking they were resolving their disputes, all the while they were secretly preparing lawsuits so they could appear as the purported victims.

75.     Meanwhile, Menkin continued to utilize her position as titular President to unduly influence ML Fashion employees and misappropriate ML Fashion funds and inventory both during and after these separation discussions.  In fact, as the end of her tenure at ML Fashion became clear, Menkin embarked on a surge of involvement in ML Fashion's inventory operations in Illinois in order to exert control over ML Fashion's products for her, Goureau, Nagrani, and Nobelle's personal gain.  For example, on or about January 13, 2020, Menkin used her status as President to direct that 1,296 units of inventory costing $119,266.78 be shipped to Sample Sale New York, her mother Noemi's unaffiliated store in New York City.  On information and belief, much of this inventory derived from ML Fashion's Illinois locations.  She also implemented an invoice approval policy in Illinois stores where she had to approve purchases, and her calls to Illinois management jumped from every other week to every other day.  As recently as May 2020, Menkin continued to abuse her position as President of ML Fashion to divert more inventory belonging to ML Fashion and deriving from Illinois to her and Nagrani for Nobelle.  In each of these transactions, Menkin has misrepresented to ML Fashion employees that these transfers were authorized and she was acting on behalf of ML Fashion. In reality, these transfers were unauthorized and Menkin was acting in her own personal interests, and those of Goureau, Noemi, Nagrani, and Nobelle.

**F.      Menkin and Goureau's lawsuits.**

76.     On or about June 18, 2020, Menkin and Goureau filed simultaneous, duplicative lawsuits against, *inter alia*, Lemonis and ML Retail in Delaware state court (the "Delaware Action") and in the United States District Court for the Southern District of New York (the "New York Action") in an attempt to avoid culpability for their improper use of ML Fashion's funds for

their own personal use and in a misguided scheme to attempt to extract even more money from ML Fashion, ML Retail, and Lemonis.

77.     Among other things, the Delaware Action seeks to prevent Lemonis and ML Retail from continuing to operate ML Fashion and to dissolve ML Fashion so that Menkin and Goureau can take ML Fashion's assets for themselves.

78.     Following the filing of the Delaware Action and the New York Action, Menkin and Goureau engaged in this further scheme and misconduct as described herein.

**G.     Menkin, Goureau, and Nagrani form "Nobelle" and steal ML Fashion property.**

79.     In or about 2020, Menkin, Goureau, and Nagrani formed "Nobelle," a competing clothing store. Nagrani claims on social media posts that she is president of Nobelle, while both Nagrani and Menkin admit to founding Nobelle.

80.     In or about August 2020, Nobelle, Menkin, and Nagrani, seized ML Fashion's inventory, private brands, and products (the "Inventory") out of ML Fashion's locations in Illinois and began occupying and operating a retail store at the Greenwich Property in Connecticut under the "Nobelle" brand name to sell the Inventory, all without Lemonis', ML Fashion's or ML Retail's authorization or consent.

81.     Specifically, assets and Inventory belonging to ML Fashion were removed from various locations in Illinois at Menkin's direction as titular President of ML Fashion and now are located in the Nobelle store, causing harm in Illinois. For example, Menkin diverted sweaters (among other items) from the MSS Store, ML Fashion's Deerfield location, by telling ML Fashion employees that "Marcus told me I could [take the inventory]," and directly offered them for sale on Nobelle's Instagram page.

82.     Included among the Inventory Menkin and Goureau removed from ML Fashion's Illinois stores are exclusive privately branded ML Fashion products. These privately branded ML Fashion products have tags sewn inside them displaying ML Fashion's exclusive branding.

83.     These privately branded ML Fashion products are exclusive to ML Fashion, and no other retailer is authorized to carry, market, or sell these products.

84.     Nobelle, Menkin, and Nagrani are selling ML Fashion's Inventory at the Greenwich Property in interstate commerce without ML Fashion's authorization or consent, and are keeping the proceeds from such sales for themselves, without making any payments to ML Fashion.

85.     Nobelle, Menkin, and Nagrani are also utilizing the FFE owned by ML Fashion at the Property, without ML Fashion's authorization or consent.

86.     Nobelle, Menkin, and Nagrani have also utilized images of MARCUS products taken by Marcus employees and passed them off as Nobelle's own, without ML Fashion's authorization or consent.

87.     Both the Inventory and FFE are collateral for the Loan, which are secured by the Credit Agreement and the Security Agreement, both of which have mandatory choice-of-law, forum, and/or venue provisions in Illinois. Menkin signed both of these Agreements on behalf of ML Fashion, making her a closely-related party to these agreements. Goureau, as member of ML Fashion and signatory to the LLC Agreement individually, is also a closely-related party to the Credit and Security Agreements. Lemonis, while in Illinois, signed the Credit Agreement and Security Agreement on behalf of ML Retail, both of which are located in Illinois.

88.     Without the Inventory and the FFE, and the proceeds from the sale of the Inventory, ML Fashion's full performance under the Credit Agreement and Security Agreement has been compromised, ML Fashion is in jeopardy of defaulting and breaching the agreements, and its

performance will be rendered impossible.  Further, the jobs of the existing part-time and full-time employees are jeopardized.

89.     Menkin and Goureau, as closely related parties, are tortiously interfering with Illinois contracts (*e.g*., the Credit and Security agreements) with mandatory choice-of-law, jurisdiction, forum, and venue provisions.

90.     Nobelle, Menkin, and Nagrani, are promoting Nobelle's illicit business at the Greenwich Property through a website and social media pages, including on Facebook and Instagram, which depict Defendants' exclusive possession of the Greenwich Property, sales of the Inventory and use of the FFE.  Examples of these social media pages are attached as **Exhibits 4-6** to this Complaint.  (**Exhibit 4** - Nobelle's Website as of August 31, 2020; **Exhibit 5** - Nobelle's Instagram Account as of August 31, 2020; **Exhibit 6** - Nobelle's Facebook page as of August 31, 2020).  Menkin admits her affiliation as a co-founder of Nobelle, along with Nagrani, in her Instagram post.  (*See* Ex. 5)

91.     Upon information and belief, Goureau has aided and abetted Nobelle's and Menkin's improper seizure and sale of ML Fashion's Inventory, and their improper occupation and use of the Greenwich Property and the FFE, by, *inter alia*, the misappropriation and unauthorized use of ML Fashion computers to set up computer software accounts on Nobelle's behalf at the Greenwich Property.

92.     In addition to their advertising, Nobelle, Menkin, and Nagrani are further offering for sale and/or selling ML Fashion's Inventory in interstate commerce.  On information and belief, Nobelle has sold ML Fashion and other products in interstate commerce through the internet, postal or shipping service, and other means.  Indeed, Nobelle's website includes a standard "Shop" category where anyone with an internet connection can peruse Nobelle's real-time inventory of

"accessories, dresses & jumpsuits, jackets & outerwear, jewelry, pants, skirts, sweaters, tops, and demin," add items to their cart, and check out online via PayPal or traditional credit card means, with shipping anywhere in the U.S. *See* **Exhibit 7**.

**H.    Defendants' computer fraud, trade secret misappropriation, and unlawful competition.**

93.    During August 2020, ML Fashion employees noticed that a decommissioned computer from ML Fashion's former New York corporate office was online, when it should have been offline since that location had closed. The computer was active and logged in to the user "Nicolas." On or about August 6, 2020, ML Fashion remote accessed the computer while the user "Nicolas" was logged in. On information and belief, during the remote access period the user "Nicolas" was actively setting up the computer to connect to various ML Fashion programs and/or utilize point of sale features for Nobelle's operation at the Greenwich Property. Within one minute of ML Fashion remote accessing the computer, the user "Nicolas" removed the program to sever ML Fashion's remote access and preclude future access to the computer. This computer belonged to a former accounts payable employee and contained ML Fashion's confidential, proprietary, and trade-secret information described below.

94.    On or about August 31, 2020, ML Fashion located yet another decommissioned computer from its former New York corporate office that appeared online without authorization. Upon investigation, the last application accessed before it disconnected was an email with the footer "Nobelle" in the signature block. This computer formerly belonged to ML Fashion's controller and contained highly confidential, proprietary, and trade secret financial information.

95.    The computers that Defendants have stolen from ML Fashion contain ML Fashion's confidential, proprietary, and trade-secret information, which Defendants have misappropriated as set forth below.

96.     The relationships that ML Fashion has with its customers are highly dependent on the attention and service that ML Fashion gives to them on an ongoing basis. Such attention enables customers to develop confidence in the quality of the products offered, and an increased recognition of, and familiarity with, the ML Fashion brand as a provider of quality fashion clothing. Indeed, repeat business with its established customers allows ML Fashion to maintain its strategic position in this competitive industry.

97.     ML Fashion spends extensive time and substantial money identifying and maintaining key customer relationships, designing customer initiatives, determining strategic acquisitions, allocating resources for new technologies and initiatives, creating annual business and marketing plans, and developing and launching new products. For example, ML Fashion works closely with its customers, suppliers, and vendors to develop customized products and services to meet its customers' particular specifications.

98.     To maintain these longstanding customer relationships and develop new relationships, ML Fashion expends substantial time, effort, and expense developing confidential, proprietary, and trade-secret business information, which includes, without limitation: ML Fashion's customer information, including, without limitation: detailed information about customer identities, customer personae, individual customer requirements, and quality standards; detailed information about the ordering and sales histories of customers, including historical and current pricing paid, pricing strategies for current and prospective customers; sales goals; billing information; sales and margin data; methods and strategies for serving current and prospective customers and gaining new business; and customized marketing techniques to maximize sales;

99.     ML Fashion's supply chain network, including, without limitation: detailed information about supplier (and vendor) sources, products, services, prices and capacities; detailed

information about the relationships with vendors, suppliers, manufacturing sites, and warehouses; detailed information regarding ML Fashion's asset locations and inventory of available products; logistical solutions; detailed information related to supply chain processes and procedures; and

100. ML Fashion's business strategies, including, without limitation: strategies on how ML Fashion differentiates its position and products in the marketplace; confidential compilations and analyses of market intelligence (including market size, key players, and trends); go-to-market business methods, strategies, forecasts and plans, including approaching and winning business from prospective customers; current and future development and expansion or contraction plans of the company overall and in key product and service lines; sales and marketing techniques; pricing strategies; industry goals; analysis of the competitive landscape; financial information; insights, analyses, and intelligence on existing competition, including product and service comparisons; and pricing strategies, including margin policies by customer product line and type of service. (Collectively, ML Fashion's "confidential, proprietary, and trade-secret information.")

101. ML Fashion's confidential, proprietary, and trade-secret information is the subject of efforts that are reasonable under the circumstances to maintain the secrecy of such information. The confidential, proprietary, and trade-secret information is generally not distributed to any other party external to ML Fashion. Further, ML Fashion does not release this information to the general public, nor could others properly acquire or duplicate it without ML Fashion's permission. No one else can generate this information without knowledge of ML Fashion's confidential operations. The information is specific to ML Fashion, which makes it nearly impossible to duplicate without detailed information from ML Fashion.

102. ML Fashion took, and continues to take, extensive measures to safeguard its highly valuable confidential, proprietary, and trade-secret information, such as requiring employees,

temporary workers, and contractors to sign confidentiality agreements, requiring employees to execute acknowledgments promising to limit access to confidential information on a "need to know" basis and otherwise maintain the confidentiality of ML Fashion information, and requiring passwords and other security measures for access. ML Fashion controls dissemination of such information even within the confines of the company.

103.    ML Fashion has devoted significant resources over many years to develop and compile its confidential, proprietary, and trade-secret information. The development of ML Fashion's confidential, proprietary, and trade-secret information represents the combined efforts of senior-level employees in a variety of departments.

104.    ML Fashion derives independent economic value from its confidential, proprietary, and trade-secret information not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use. Maintaining this information's secrecy gives ML Fashion a distinct economic and competitive advantage in the marketplace.

105.    Disclosure of ML Fashion's confidential, proprietary, and trade-secret information would be extremely valuable to ML Fashion's competitors. Disclosure of ML Fashion's confidential, proprietary, and trade-secret information would also be extremely harmful to ML Fashion and undermine ML Fashion's position in the marketplace.

106.    For example, disclosure would allow ML Fashion's competitors, such as Nobelle, to obtain an unlawful head start and business advantage to more effectively compete against ML Fashion. Specifically, disclosure would allow competitors such as Nobelle to have an unfair inside look at the inner workings of ML Fashion and how it competes. Competitors such as Nobelle would then be able to duplicate or attempt to improve on ML Fashion's products, technologies,

and services, as well as their internal business strategies and methodologies, all without the significant costs that ML Fashion spent to develop them. This includes using ML Fashion's negative information to avoid costly pitfalls and move right to key innovative solutions that took ML Fashion significant time and resources to achieve.

107.    The value of ML Fashion's confidential, proprietary, and trade-secret information is considerable, and its disclosure would cause ML Fashion substantial competitive injury beyond any monetary amount. Ultimately, disclosure of ML Fashion's confidential, proprietary, and trade-secret information would cause irreparable harm to ML Fashion.

108.    ML Fashion's confidential, proprietary, and trade secret information as described above was on the computers which Defendants' stole and remain in Defendants' possession.

109.    Defendants' access and use of these computers, and ML Fashion's confidential, proprietary, and trade secret information contained within, is unauthorized. Any authority Defendants had to access these computers was exceeded when Defendants used them to operate a competing business. The value of the information on these computers exceeds $5,000 as will the costs at forensic review and remediation when these computers are ultimately returned. Defendants' use of Plaintiffs' confidential, proprietary, and trade-secret information is further causing Plaintiffs irreparable harm.

110.    Moreover, Menkin and Goureau are breaching their obligations to both ML Fashion and ML Retail under the LLC Agreement by operating a business, Nobelle, that is in direct competition with ML Fashion.

I.      **Plaintiffs' attempts at remediation and Defendants' blatant refusal to return Plaintiffs' property.**

111.    ML Fashion has previously demanded return of company funds misused by Menkin and Goureau for personal expenses.

112.     Prior to filing this Complaint, ML Fashion demanded that Defendants return the improperly seized Inventory and FFE.  ML Fashion additionally demanded return of its computers containing ML Fashion's confidential information.

113.     In response, Defendants admitted to both ***possession*** and ***use*** of at least one of ML Fashion's computers containing its confidential information.  (*See* September 1, 2020, letter from Defendants, attached hereto as **Exhibit 8**.)  Defendants even specifically touted their willingness to return the computer as the basis why no irreparable harm exists.

114.     In light of Defendants' admissions, Plaintiffs once again demanded return of ML Fashion's computer Defendants' admitted to having in their possession.  On October 2, 2020, Defendants reversed course and now refuse to turn over the computer they admitted to having.  (*See* October 2, 2020, letter from Defendants, attached here as **Exhibit 9**.)  Importantly, neither this letter nor Defendants' original letter provide any assurances they would cease their unlawful and admitted use of the computer, nor admit to their full possession of multiple ML Fashion computers.

115.     Plaintiffs have been and continue to be damaged by Defendants' ongoing misconduct, including due to the fact that Defendants' unauthorized sale of ML Fashion Inventory at a store formerly operated by, ML Fashion is confusing consumers and damaging ML Fashion's reputation and goodwill, is preventing ML Fashion from being able to perform under the Credit and Security Agreements, and is jeopardizing the continued employment of ML Fashion's employees.

116.     Lemonis, as the manager of each of the Plaintiffs, has authorized them to bring this suit.

## FIRST CAUSE OF ACTION
### (Conversion by ML Fashion Against All Defendants)

117. Plaintiffs hereby repeat and reallege each and every allegation contained in paragraphs 1 through 116 of this Complaint as if fully set forth herein.

118. ML Fashion owns the Inventory currently being held and/or offered for sale by Nobelle at the Greenwich Property. ML Fashion also owns the computers Nobelle is currently using, which also contain ML Fashion confidential financial information.

119. Nagrani, Goureau, and Menkin, on behalf of Nobelle, at the direction of Menkin, and utilizing the computer system set up by Goureau on ML Fashion's stolen computers (containing confidential ML Fashion financial information), have stolen ML Fashion's Inventory and FFE, and have prevented ML Fashion from utilizing or possessing that Inventory and FFE.

120. ML Fashion has demanded the return of the computers, Inventory and FFE from Defendants.

121. Menkin and Goureau also repeatedly, intentionally, and improperly used ML Fashion's company money for personal purposes as set forth above. Menkin and Goureau further utilized Lemonis' name, image, and likeness, and his "The Profit" television series, to promote themselves and their business ventures. ML Fashion previously demanded possession and return of company funds improperly used on personal expenses and/or was excused from demanding such possession.

122. ML Fashion has suffered damages as a result of Defendants' misconduct, including but not limited to loss of exclusive possession of its property, loss of company funds and use of company funds for company expenses, lost profits from the sale of the Inventory, and the value of the stolen computers, Inventory and FFE. In addition, by unlawfully seizing the collateral of the Loan, Defendants' actions risk default on the Loan, further causing ML Fashion harm

123. By reason of the foregoing, ML Fashion is entitled to injunctive relief for the return of the Inventory and FFE as well as damages in an amount to be determined at trial and an order requiring Defendants to return the unsold, converted Inventory and FFE to ML Fashion.

## SECOND CAUSE OF ACTION
### (Breach of Fiduciary Duty by ML Fashion Against Menkin and Goureau)

124. Plaintiffs hereby repeat and reallege each and every allegation contained in paragraphs 1 through 116 of this Complaint as if fully set forth herein.

125. Menkin is a member and officer of ML Fashion.

126. Goureau is a member of ML Fashion.

127. As members and/or officers of ML Fashion, Menkin and Goureau owed fiduciary duties to ML Fashion.

128. Menkin and Goureau have breached their fiduciary duties to ML Fashion by, among other things: (a) repeatedly, intentionally, and improperly misusing and embezzling ML Fashion funds (secured through the Credit and Security Agreements) and company inventory for personal use, including, without limitation unauthorized payments and inventory diversion to their mother, Noemi; (b) seizing computers, Inventory and FFE owned by ML Fashion without ML Fashion's authorization or consent; (c) using ML Fashion's Inventory and FFE to generate profits for Menkin, Goureau, and Nobelle; (d) occupying the Greenwich Property formerly operated by ML Fashion and excluding ML Fashion from that property; and (e) operating a business, Nobelle, that is competing with ML Fashion.

129. ML Fashion has been irreparably harmed and damaged by Menkin's and Goureau's breaches of their fiduciary duties, including jeopardizing the existence of the business, jobs and reputation, which money cannot make whole, as well as lost profits, the lost value of the Inventory and FFE improperly seized, and loss of use of the Greenwich Property.

130.    By reason of the foregoing, ML Fashion is entitled to injunctive relief and damages in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
**(Breach of Contract by Plaintiffs Against Menkin and Goureau)**

131.    Plaintiffs hereby repeat and reallege each and every allegation contained in paragraphs 1 through 116 of this Complaint as if fully set forth herein.

132.    ML Retail, Menkin, and Goureau are parties to the LLC Agreement.

133.    The LLC Agreement is a valid contract.

134.    Menkin and Goureau owe obligations to both ML Retail and ML Fashion under the terms of the LLC Agreement.

135.    ML Retail and ML Fashion have each fully performed their obligations under the LLC Agreement.

136.    Menkin and Goureau have breached the LLC Agreement by, *inter alia*, operating a fashion retail business, Nobelle, that is in direct competition with ML Fashion's business, in violation of Section 7.7 of the LLC Agreement.

137.    ML Fashion has been damaged by Menkin's and Goureau's breaches of the LLC Agreement, including in the form of lost profits due to Nobelle's competition with ML Fashion.

138.    ML Retail has been damaged by Menkin's and Goureau's breaches of the LLC Agreement, including because of the impact of Menkin's and Goureau's improper competition on the value of ML Retail's membership interests in ML Fashion.

139.    In addition, Menkin and Goureau's unlawful competition diminishes the collateral on the loan between ML Fashion and ML Retail. This further harms ML Fashion by risking default on the loan, and it harms ML Retail by reducing the value of the Loan and the likelihood of full

repayment. Moreover, the jobs of the employees of ML Fashion are jeopardized if ML Fashion ceases to operate.

140. In Section 7.7(d) of the LLC Agreement, Menkin and Goureau expressly agreed that Plaintiffs could seek specific performance of Menkin's and Goureau's obligations under Section 7.7.

141. Menkin and Goureau have further breached the LLC Agreement by, *inter alia*, repeatedly, intentionally, and improperly utilizing ML Fashion's funds for their own personal purposes as set forth above.

142. By reason of the foregoing, Plaintiffs are being irreparably harmed and the existing jobs and membership interests in the business are jeopardized. Plaintiffs are also entitled to damages in an amount to be determined at trial and an order requiring Menkin and Goureau to specifically perform their obligations under Section 7.7 of the LLC Agreement by, among other things, ceasing their operation of Nobelle and any other business in competition with ML Fashion's business.

## FOURTH CAUSE OF ACTION
### (Fraud by Plaintiffs Against All Defendants)

143. Plaintiffs hereby repeat and reallege each and every allegation contained in paragraphs 1 through 116 of this Complaint as if fully set forth herein.

144. All Defendants made false statements of material fact they knew were false or made with culpable ignorance of their truth or falsity, and specifically that they would not personally take possession, custody, and control of ML Fashion FFE and Inventory; that Noemi's salary was for services rendered to ML Fashion; that the payments would stop as requested; that ML Fashion funds would only be used for proper business expenses not personal gain; that Defendants would only use their positions of trust within ML Fashion to advance the company's interests; that

Nobelle's products were exclusively their own and for sale; and other representations and misrepresentations as set forth above. Moreover, in reliance on these representations, ML Retail continued to provide funding to ML Fashion for operations.

145. Plaintiffs relied upon Defendants' false statements to their detriment.

146. Even as Plaintiffs relied upon Defendants' false statements that they would only use ML Fashion FFE and Inventory for ML Fashion business, Defendants went behind Plaintiffs' backs, removed the ML Fashion FFE and Inventory, and are now falsely advertising to the public that ML Fashion's FFE and Inventory are their own and further retaining the proceeds of the sales.

147. As a result of Defendants' fraud, Plaintiffs have suffered damages in an amount to be determined at trial.

**FIFTH CAUSE OF ACTION**
**(Tortious Interference with Credit and Security Agreements Against All Defendants)**

148. Plaintiffs hereby repeat and reallege each and every allegation contained in paragraphs 1 through 116 of this Complaint as if fully set forth herein.

149. The Credit and Security Agreements are valid, enforceable, and binding contracts between Plaintiffs.

150. All Defendants had knowledge of the Credit and Security Agreements and ML Fashion's obligations under these agreements, at least through Menkin and Goureau who are 33.33% owners of ML Fashion.

151. As set forth above, Defendants intentionally engaged in actions in ways they knew would cause violation of the terms of these agreement, including but not limited to repeatedly, intentionally, and improperly utilizing ML Fashion's funds obtained through the Credit and Security agreements for their own personal purposes and misappropriating Inventory, FFE, and assets secured by these agreements.

152. Defendants' tortious interference resulted in a situation where ML Fashion's full performance under the Credit Agreement and Security Agreement has been compromised, ML Fashion is in jeopardy of defaulting and breaching the agreements, and its performance will be rendered impossible.

153. As a result of Defendants intentional interference with Plaintiffs agreements, Plaintiffs have suffered damages in an amount to be determined at trial, including but not limited to the value of the Inventory misappropriated.

## SIXTH CAUSE OF ACTION
### (Tortious Interference with Noncompetition Agreement Against All Defendants)

154. Plaintiffs hereby repeat and reallege each and every allegation contained in paragraphs 1 through 116 of this Complaint as if fully set forth herein.

155. The LLC Agreement is a valid, enforceable, and binding contract between Plaintiffs and Defendants Menkin and Goureau.

156. Menkin and Goureau had knowledge of the LLC Agreement and its non-competition provisions as signatories to the LLC Agreement and owners of ML Fashion.

157. Nobelle had knowledge of the LLC Agreement and its non-competition provisions by virtue of the fact that it is controlled by Menkin, who signed and is a party to the LLC Agreement

158. Upon information and belief, Nagrani had knowledge of the LLC Agreement and its non-competition provisions by virtue of her past employment with ML Fashion and her interactions with Menkin.

159. Menkin and Goureau intentionally sought information and elicited actions from one another in ways that they knew would cause the other to violate the terms of the LLC Agreement.

160.     Nobelle and Nagrani elicited actions from Menkin and Goureau that they knew would cause Menkin and Goureau to violate the terms of the LLC Agreement.

161.     As a result of Defendants' intentional interference with Menkin and Goureau's contractual relationships with ML Fashion, Plaintiffs have suffered damages in an amount to be determined at trial.

### SEVENTH CAUSE OF ACTION
**(Aiding and Abetting Against Menkin, Goureau, and Nagrani)**

162.     Plaintiffs hereby repeat and reallege each and every allegation contained in paragraphs 1 through 116 of this Complaint as if fully set forth herein.

163.     By competing with ML Fashion using its own store, products, and Inventory, Nobelle performed a wrongful act which caused Plaintiffs injury.

164.     Menkin, Goureau, and Nagrani were aware of their roles as part of the overall or tortious activity at the time they provided the assistance.

165.     Menkin, Goureau, and Nagrani knowingly and substantially assisted the principal violation and benefitted from the wrongful conduct by, among other things, profiting from Nobelle's competition with ML Fashion.

166.     Further, by breaching the noncompetition provision of the LLC Agreement, Menkin and Goureau performed wrongful acts which caused Plaintiffs injury.

167.     Nagrani was aware of her role as part of the overall tortious activity at the time she provided the assistance.

168.     Nagrani knowingly and substantially assisted the principal violation of the LLC Agreement by Menkin and Goureau and benefitted from the wrongful conduct by, among other things, profiting from Nobelle's competition with ML Fashion.

169. As a result of Menkin, Goureau, and Nagrani's aiding and abetting with Nobelle's, Menkin's, and/or Goureau's wrongful and injurious acts, Plaintiffs have suffered damages in an amount to be determined at trial.

## EIGHTH CAUSE OF ACTION
### (False Advertising under Lanham Act Against All Defendants)

170. Plaintiffs hereby repeat and reallege each and every allegation contained in paragraphs 1 through 116 of this Complaint as if fully set forth herein.

171. The acts and omissions of Defendants described above constitute false advertising in violation of 15 U.S.C. § 1125(a) and Illinois common and statutory law.

172. In their commercial advertising and promotion, Defendants have used in interstate commerce words, false designations of origin, and/or false or misleading descriptions and representations of fact, which are likely to cause confusion, or to cause mistake, or to confuse or deceive as to the nature, characteristics, qualities, or geographic origin of Plaintiffs' goods, services, and commercial activities.

173. Plaintiffs have been damaged as a proximate result of the acts and omissions of false advertising committed by Defendants.

174. Defendants conduct has been willful and in bad faith, making this an exceptional case under 15 U.S.C. § 1117.

175. Defendants' conduct has caused and is causing irreparable injury to Plaintiffs, including damage to Plaintiffs' reputation and goodwill and ML Fashion's ability to continue to employ its employees, and unless enjoined by this Court, will continue to damage and irreparably harm Plaintiffs and to deceive the public in a manner that is not compensable by money damages. Plaintiffs have no adequate remedy at law with respect to Defendants acts of false advertising.

## NINTH CAUSE OF ACTION
### (Unfair Competition under Lanham Act Against All Defendants)

176.   Plaintiffs hereby repeat and reallege each and every allegation contained in paragraphs 1 through 116 of this Complaint as if fully set forth herein.

177.   The acts and omissions of Defendants described above constitute unfair competition in violation of 15 U.S.C. § 1125(a) and Illinois common and statutory law.

178.   Defendants have used in interstate commerce words, false designations of origin, and/or false or misleading descriptions and representations of fact, which are likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of Defendants to the origin, sponsorship, or approval of the Inventory the subject of this lawsuit, the fruits thereof, and the commercial activities associated therewith.

179.   Plaintiffs have been damaged as a proximate result of the acts and omissions of unfair competition committed by Defendants.

180.   Defendants conduct has been willful and in bad faith, making this an exceptional case under 15 U.S.C. § 1117.

181.   Defendants' conduct has caused and is causing irreparable injury to Plaintiffs, including damage to Plaintiffs' reputation and goodwill and ML Fashion's ability to continue to employ its employees, and unless enjoined by this Court, will continue to damages Plaintiffs and to deceive the public in a manner that is not compensable by money damages.  Plaintiffs have no adequate remedy at law with respect to Defendants acts of false advertising.

## TENTH CAUSE OF ACTION
### (Violation of the Computer Fraud and Abuse Act ("CFAA") 18 U.S.C. §§ 1034, et seq. Against All Defendants)

182.   Plaintiffs hereby repeat and reallege each and every allegation contained in paragraphs 1 through 116 of this Complaint as if fully set forth herein.

183.    As set forth above, Defendants have violated the CFAA by intentionally accessing Plaintiffs' computers used for interstate commerce or communication, without authorization, and/or by exceeding authorized access to such computers and by obtaining information from such a protected computer, and so causing significant damage.

184.    Defendants knowingly, and with intent to defraud Plaintiffs through their wrongful actions, by accessing Plaintiffs' protected computers without authorization or by exceeding authorized access to such computers, and by means of such conduct, furthering their intended fraud and obtaining one or more things of value, including but not limited to significant confidential, proprietary, and trade secret information relating to Plaintiffs' business.  Such confidential, proprietary, and trade secret information was exclusively Plaintiffs' property.

185.    Defendants have violated the CFAA by intentionally accessing Plaintiffs' protected computers, without authorization and/or beyond the scope of authorization granted, causing damage to Plaintiffs, recklessly or without regard for their actions.

186.    Through Defendants' unauthorized access on Plaintiffs' protected computers and systems, Defendants knowingly, and with intent to defraud, transmitted information and/or programs, misappropriated and caused harm to Plaintiffs' trade secrets and confidential information,  and impaired the integrity and availability of data, metadata, programs, systems, and other information.  Defendants' actions as set forth above are direct violations of the CFAA—at minimum, 18 U.S.C §§ 1030(a)(2), 1030(a)(4), and 1030(a)(5)—for which Plaintiffs are entitled to injunctive relief.  *See* 18 U.S.C § 1030(g).

187.    As a direct and proximate result of Defendants' unauthorized access to Plaintiffs' protected computers, Plaintiffs have suffered damages in excess of $5,000.00, including but not limited to costs associated with investigation of the nature and extent of Defendants' unlawful

actions, including employee time spent uncovering and investigating Defendants' unauthorized access; the loss, dilution, and unlawful use of Plaintiffs' confidential, proprietary, and trade secret information on the computers in competition to ML Fashion; the anticipated forensic damage assessment of the computers, hiring consultants, and/or employee time spent investigating Defendants' unauthorized access; lost revenues and/or other consequential damages resulting from Defendants' interruption of service; and/or anticipated remediation of Defendants' unlawful actions, including restoring the data, systems, and information prior to the offense and/or implementing security enhancements and remedial measures to Plaintiffs' computer systems.

188.    As a direct and proximate result of Defendants' unauthorized access to Plaintiffs' protected computers, Defendants have further been unjustly enriched.

189.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have also suffered and will continue to suffer incalculable financial losses, imminent and permanent irreparable harm, loss of the confidentiality of their trade secrets, and other continuing harm.  The losses and harm to Plaintiffs are ongoing and cannot be remedied by damages alone.

### ELEVENTH CAUSE OF ACTION
**(Defend Trade Secrets Act 18 U.S.C. §§ 1832, 1836, *et seq.*—Misappropriation of Trade Secrets Against All Defendants)**

190.    Plaintiffs hereby repeat and reallege each and every allegation contained in paragraphs 1 through 116 of this Complaint as if fully set forth herein.

191.    As set forth more fully above, Plaintiffs possess confidential, proprietary, and trade secret information necessary for Plaintiffs' to conduct their business in a competitive market place.

192.    Plaintiffs' trade secrets relate to products and services used in, or intended for use in, interstate commerce.

193.     Plaintiffs' trade secrets are of great value Plaintiffs, as set forth above.  They are also valuable to Defendants, who are competitors of Plaintiffs, as is clearly demonstrated by the extent to which Defendants engaged in the gathering, misappropriation, and transfer of such information to Defendants, including without limitation Defendants' refusal to return computers containing such confidential, proprietary, and trade secret information.

194.     Plaintiffs' kept their trade secrets from disclosure through all appropriate and necessary means, such that they were not generally known or available to individuals or entities outside of Plaintiffs.

195.     Plaintiffs' trade secrets revealed to Defendants are critical to the success of Plaintiffs' business and provide Plaintiffs with a distinct competitive advantage in the market place.

196.     Defendants were aware that Plaintiffs' trade secrets were to be kept confidential and not to be disclosed to competitors, customers, and others.

197.     Defendants knew that the confidential, proprietary, and trade secret information being obtained from Plaintiffs' computers and other sources was confidential and in the nature of trade secrets and, nevertheless, Defendants chose to gather, receive, and utilize it.

198.     As further set forth above, Defendants misappropriated Plaintiffs' trade secrets by acquiring them through unlawful means, and with intent to convert them, and/or disclosing and using them on behalf of Plaintiffs' competitors and in derogation of Plaintiffs'' interest, and continuing to retain possession of them to this day, all in violation of the Defend Trade Secrets Act, 18 U.S.C §§ 1832, 1836, *et seq*.

199.     Plaintiffs' trade secrets have been transferred to and maintained on Defendants' computers and other electronic devices.

200.     Plaintiffs' trade secrets remain in the possession of Defendants.

201.     Defendants have refused to provide at least one computer known to be taken from Plaintiffs and utilized by Defendants and, therefore, Plaintiffs cannot uncover the full extent of Defendants' theft and misappropriation of Plaintiffs' trade secrets without a forensic examination of Defendants' computers and other electronic devices.

202.     Because Defendants continue to use Plaintiffs' confidential, proprietary, and trade secret information, along with electronic records and documents, Defendants' misappropriation of Plaintiffs' trade secrets is continuing and ongoing.

203.     As a direct and proximate cause of Defendants' wrongful conduct, Plaintiffs have suffered and will continue to suffer incalculable financial losses, imminent and permanent irreparable harm, loss of the confidentiality of their trade secrets, loss of goodwill, loss of business opportunities, and other continuing harm.

204.     The losses and harm to Plaintiffs are ongoing and cannot be remedied by damages alone.

205.     Plaintiffs have no adequate remedy at law for sufficient compensation for the wrongs committed by Defendants.

206.     Defendants have acted willfully, maliciously, and with reckless disregard to the rights of Plaintiffs.

## TWELFTH CAUSE OF ACTION
### (Defend Trade Secrets Act 18 U.S.C. §§ 1832, 1836, *et seq.*—Threatened Misappropriation of Trade Secrets Against All Defendants)

207.     Plaintiffs hereby repeat and reallege each and every allegation contained in paragraphs 1 through 116 of this Complaint as if fully set forth herein.

208.    As set forth more fully above, Plaintiffs' possess confidential, proprietary, and trade secret information necessary for Plaintiffs' to conduct their business in a competitive market place.

209.    Plaintiffs' trade secrets are of great value Plaintiffs, as set forth above.  They are also valuable to Defendants, who are competitors of Plaintiffs, as is clearly demonstrated by the extent to which Defendants engaged in the gathering, misappropriation, and transfer of such information to Defendants, including without limitation Defendants' refusal to return computers containing such confidential, proprietary, and trade secret information.

210.    Plaintiffs' kept their trade secrets from disclosure through all appropriate and necessary means, such that they were not generally known or available to individuals or entities outside of Plaintiffs.

211.    Plaintiffs' trade secrets revealed to Defendants are critical to the success of Plaintiffs' business and provide Plaintiffs with a distinct competitive advantage in the market place.

212.    Defendants were aware that Plaintiffs' trade secrets were to be kept confidential and not to be disclosed to competitors, customers, and others.

213.    Defendants knew that the confidential, proprietary, and trade secret information being obtained from Plaintiffs' computers and other sources was confidential and in the nature of trade secrets and, nevertheless, Defendants chose to receive and utilize it.

214.    As further set forth above, Defendants have threatened to misappropriate Plaintiffs' trade secrets through unlawful means, including but not limited to partnering and hiring former employees of Plaintiffs with knowledge of Plaintiffs' trade secrets and by refusal to return Plaintiffs computers containing Plaintiffs' confidential, proprietary, and trade secret information.

215. Upon information and belief, Defendants intend to further misappropriate and unlawfully use Plaintiffs' confidential trade secret information from Plaintiffs' former employees and Plaintiffs' computers containing Plaintiffs' confidential, proprietary, and trade secret information.

216. As a direct and proximate cause of Defendants' wrongful conduct, Plaintiffs are threatened with incalculable financial losses, imminent and permanent irreparable harm, loss of the confidentiality of their trade secrets, loss of goodwill, loss of business opportunities, and other continuing harm.

217. The threatened losses and harm to Plaintiffs are ongoing and cannot be remedied by damages alone.

218. Plaintiffs have no adequate remedy at law for sufficient compensation for the wrongs committed by Defendants.

219. Defendants have acted willfully, maliciously, and with reckless disregard to the rights of Plaintiffs justifying an award of punitive or exemplary damages.

### INJUNCTIVE RELIEF
**(Temporary Restraining Order, Preliminary and Permanent Injunction by Plaintiffs Against All Defendants)**

220. Plaintiffs hereby repeat and reallege each and every allegation contained in paragraphs 1 through 116 of this Complaint as if fully set forth herein.

221. As set forth above, Plaintiffs are likely to succeed, and will succeed, on the merits of their claims, because Defendants have blatantly seized Inventory and FFE to which ML Fashion holds sole title under the terms of the LLC Agreement; have seized the Greenwich Property, to which ML Fashion has the exclusive right of possession and for which ML Fashion continues to be the lessee; have misappropriated ML Fashion's trade secrets on stolen computers; and are operating a competing business in violation of the LLC Agreement.

222.     Plaintiffs are being irreparably harmed by, *inter alia*, the loss of unique fashion inventory; their loss of use of a unique retail location, the Greenwich Property; the damage to ML Fashion's brands and businesses by Defendants' operation of a competing business; the harm to Plaintiffs' reputation and goodwill; the misappropriation of trade secrets which are now being used against ML Fashion in unlawful competition; and the prospect that ML Fashion will be unable to fully perform under the Credit and Security Agreement, jeopardizing the employment of ML Fashion's employees.

223.     Menkin and Goureau expressly conceded in Section 7.7(d) of the LLC Agreement that competition against ML Fashion would cause irreparable harm to ML Fashion, and that ML Fashion could accordingly seek injunctive relief to stop their competitive conduct.

224.     Plaintiffs have no adequate remedy at law because money damages are not sufficient to compensate Plaintiffs for the harms they are suffering and will continue to suffer absent injunctive relief.

225.     The balance of the equities weighs heavily in Plaintiffs' favor because Defendants are willfully breaching the LLC Agreement, willfully disregarding ML Fashion's rights to possession of the Greenwich Property, and willfully engaging in a business in direct competition with ML Fashion.

226.     By reason of the foregoing, Plaintiffs are entitled to an injunction immediately (through temporary restraining order), preliminarily and permanently enjoining Defendants, their officers, partners, members, employees, agents, servants, attorneys, representatives, and all others acting under it or on its behalf, or in concert with it, known or unknown, from: (a) utilizing, selling, or otherwise disposing of any stolen computers (and any of the information contained on the stolen computers), inventory or FFE at the Greenwich Property; (b) retaining any computer belonging to

Plaintiffs; (c) operating a retail business at the Greenwich Property; (d) occupying or possessing the Greenwich Property; (e) engaging in business activities in competition with ML Fashion's business activities, including by operating Nobelle; and (f) using ML Fashion's confidential proprietary, and trade secret information for any purpose.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter an Order:

(a)    On the First Cause of Action for Conversion, awarding injunctive relief and all general, specific, actual, economic, and non-economic damages to ML Fashion in an amount to be determined at trial and requiring Defendants to return computers, unsold Inventory and FFE to ML Fashion;

(b)    On the Second Cause of Action for Breach of Fiduciary Duty, awarding injunctive relief and all general, specific, actual, economic, and non-economic damages to ML Fashion in an amount to be determined at trial;

(c)    On the Third Cause of Action for Breach of Contract, awarding injunctive relief and all general, specific, actual, economic, and non-economic damages to ML Fashion and ML Retail in an amount to be determined at trial and requiring Menkin and Goureau to specifically perform their obligations under the LLC Agreement by ceasing the operation of Nobelle and any other business in competition with ML Fashion's businesses;

(d)    On the Fourth Cause of Action for Fraud, awarding all general, specific, actual, economic, and non-economic damages to ML Fashion and ML Retail in an amount to be determined at trial;

(e)    On the Fifth Cause of Action for Tortious Interference with Credit and Security Agreements, awarding all general, specific, actual, economic, and non-economic damages to ML Fashion and ML Retail in an amount to be determined at trial;

(f)    On the Sixth Cause of Action for Tortious Interference with Noncompetition Agreement, awarding all general, specific, actual, economic, and non-economic damages to ML Fashion and ML Retail in an amount to be determined at trial;

(g)    On the Seventh Cause of Action for Aiding and Abetting, awarding damages to ML Fashion and ML Retail in an amount to be determined at trial;

(h)    On the Eighth Cause of Action for False Advertising under the Lanham Act, awarding all general, specific, actual, economic, and non-economic damages to ML Fashion and ML Retail in an amount to be determined at trial and enjoining Defendants' conduct in violation of the Lanham Act;

(i)    On the Ninth Cause of Action for Unfair Competition under the Lanham Act, awarding all general, specific, actual, economic, and non-economic damages to ML Fashion and ML Retail in an amount to be determined at trial and enjoining Defendants' conduct in violation of the Lanham Act;

(j)    On the Tenth Cause of Action for Violation of the Computer Fraud and Abuse Act, awarding all general, specific, actual, economic, and non-economic damages to ML Fashion and ML Retail in an amount to be determined at trial and enjoining Defendants' conduct in violation of the Computer Fraud and Abuse Act;

(k)    On the Eleventh Cause of Action for Misappropriation of Trade Secrets under the Defend Trade Secrets Act, awarding damages to ML Fashion and ML Retail (including, without limitation, damages for lost profits, the value of the trade

secrets, a reasonable royalty, head-start damages, and/or unjust enrichment) in an amount to be determined at trial and enjoining Defendants' conduct in violation of the Defend Trade Secrets Act;

(l)     On the Twelfth Cause of Action for Threatened Misappropriation of Trade Secrets under the Defend Trade Secrets Act, awarding all general, specific, actual, economic, and non-economic damages to ML Fashion and ML Retail in an amount to be determined at trial and enjoining Defendants' conduct in violation of the Defend Trade Secrets Act;

(m)     On the request for Injunctive Relief, enjoining Defendants, their officers, partners, members, employees, agents, servants, attorneys, representatives, and all others acting under it or on its behalf, or in concert with it, known or unknown, from: (a) utilizing, selling, or otherwise disposing of any computers, inventory, or FFE at the Greenwich Property and returning same to Plaintiffs; (b) retaining any computer belonging to Plaintiffs and returning same to Plaintiffs; (c) operating a retail business at the Greenwich Property; (d) occupying or possessing the Greenwich Property; (e) engaging in business activities in competition with ML Fashion's business activities, including by operating Nobelle; (f) destroying, erasing, disposing of, or otherwise making unavailable for further proceedings in this matter, any discoverable records, documents, or information (including data or information maintained in electronic format or on computer media) pending the outcome of this lawsuit; (g) using ML Fashion's confidential proprietary, and trade secret information for any purpose and returning same to Plaintiffs; (h) allowing expedited discovery, including but not limited to document production, forensic

review, and depositions of all persons and entities necessary to uncover the extent of each Defendants' unlawful conduct;

(n)     Awarding judgment that Defendants are in violation and liable under each of the above Counts;

(o)     Awarding compensatory damages in an amount to be proved after the discovery of all relevant evidence and trial;

(p)     Award the disgorgement of all improperly gained monies by Defendants;

(q)     Awarding exemplary, punitive and other monetary damages allowed by law and equity;

(r)     Awarding all statutory double and treble damages permitted by law;

(s)     Awarding Plaintiffs their reasonable attorneys' fees and costs incurred in connection with this action and the enforcement of their rights;

(t)     Costs and expenses in this action; and

(u)     For such other and further relief as the Court deems just and proper.


Dated:  November 16, 2020                          SEYFARTH SHAW LLP

                                                   By: *Michael D. Wexler*_____
                                                      Michael D. Wexler
                                                      Robyn E. Marsh
                                                   Willis Tower
                                                   233 S. Wacker Drive, Suite 8000
                                                   Chicago, Illinois 60606-6448
                                                   Telephone:  (312) 460-5559

                                                   Jesse M. Coleman (admitted *pro hac vice*)
                                                   700 Milam Street, Suite 1400
                                                   Houston, Texas  77002
                                                   (713) 238-1805


                                                   *Attorneys for Plaintiffs ML Fashion, LLC and*
                                                   *ML Retail, LLC*

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, I, Marcus Lemonis, on behalf of ML Fashion, LLC and ML Retail, LLC, declare under penalty of perjury under the laws of the United States that the factual statements set forth in the foregoing Verified Complaint And Application For Immediate, Preliminary, And Permanent Injunctive Relief are true and correct except as where such statements are made upon information and belief.

Dated: November 16, 2020

Marcus Lemonis
Marcus Lemonis
Manager

## CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that on November 16, 2020, he caused a true and correct copy of the foregoing to be served upon all counsel of record via the Court's ECF system.

/s/ *Michael D. Wexler*
Michael D. Wexler