# Exhibit 3

# SECURITY AGREEMENT

**THIS SECURITY AGREEMENT** (this "Agreement") dated as of March 29, 2016, is made by **ML FASHION, LLC**, a Delaware limited liability company (the "Debtor"), and **ML RETAIL LLC**, a Delaware limited liability company (the "Lender").

## W I T N E S S E T H:

**WHEREAS**, Debtor and Lender have entered into a Credit Agreement of even date herewith (as amended or otherwise modified from time to time, the "Credit Agreement"), pursuant to which Lender has agreed to make loans and other financial accommodations to Debtor; and

**WHEREAS**, the obligations of Debtor under the Credit Agreement are to be secured pursuant to this Agreement;

**NOW, THEREFORE**, for and in consideration of any loan, advance or other financial accommodation heretofore or hereafter made to Debtor under or in connection with the Credit Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. Definitions. When used herein, (a) the terms "Certificated Security," "Chattel Paper," "Commercial Tort Claims," "Deposit Account," "Document," "Equipment, " "Financial Asset," Fixture, Goods," "Letter-of-Credit Rights," "Inventory," "Instrument," "Investment Property," Security," "Security Entitlement" and "Uncertificated Security" have the respective meanings assigned thereto in the UCC (as defined below); (b) capitalized terms which are not otherwise defined have the respective meanings assigned thereto in the Credit Agreement; and (c) the following terms have the following meanings (such definitions to be applicable to both the singular and plural forms of such terms):

"Account Debtor" means the party who is obligated on or under any Account Receivable, Contract Right or General Intangible.

"Account Receivable" means any right of Debtor to payment for goods sold or leased or for services rendered.

"Assignee Deposit Account" is defined in Section 4.

"Collateral" means all property and rights of Debtor in which a security interest is granted hereunder.

"Computer Hardware and Software" means all of Debtor's rights (including rights as licensee and lessee) with respect to (a) computer and other electronic data processing hardware, including all integrated computer systems, central processing units, memory units, display terminals, printers, computer elements, card readers, tape drives, hard and soft disk drives, cables, electrical supply hardware, generators, power equalizers, accessories, peripheral devices and other related computer hardware; (b) all software programs designed for use on the computers and electronic data processing hardware described in clause (a) above, including all

25738943.1

operating system software, utilities and application programs in whatsoever form (source code and object code in magnetic tape, disk or hard copy format or any other listings whatsoever); (c) any firmware associated with any of the foregoing; and (d) any documentation for hardware, software and firmware described in clauses (a), (b) and (c) above, including flow charts, logic diagrams, manuals, specifications, training materials, charts and pseudo codes.

"Contract Right" means any right of Debtor to payment under a contract for the sale or lease of goods or the rendering of services, which right is at the time not yet earned by performance.

"General Intangibles" means all of Debtor's "general intangibles" as defined in the UCC and, in any event, includes (without limitation) all of Debtor's trademarks, trade names, patents, copyrights, trade secrets, customer lists, inventions, designs, software programs, mask works, goodwill, registrations, licenses, franchises, tax refund claims, guarantee claims, security interests and rights to indemnification.

"Intellectual Property" means all past, present and future: trade secrets and other proprietary information; trademarks, service marks, business names, designs, logos, indicia and other source and/or business identifiers, and the goodwill of the business relating thereto and all registrations or applications for registrations which have heretofore been or may hereafter be issued thereon throughout the world; copyrights (including copyrights for computer programs) and copyright registrations or applications for registrations which have heretofore been or may hereafter be issued throughout the world and all tangible property embodying the copyrights; unpatented inventions (whether or not patentable); patent applications and patents; industrial designs, industrial design applications and registered industrial designs; license agreements related to any of the foregoing and income therefrom; books, records, writings, computer tapes or disks, flow diagrams, specification sheets, source codes, object codes and other physical manifestations, embodiments or incorporations of any of the foregoing; the right to sue for all past, present and future infringements of any of the foregoing; and all common law and other rights throughout the world in and to all of the foregoing.

"Liabilities" means all obligations and liabilities of Debtor under the Credit Agreement, any Note, any other Loan Document or any other instrument, document or agreement, now existing or hereafter arising, evidencing any financing, leasing, or other extensions of credit of whatever type or form from time to time made by Lender to or for the benefit of Debtor in each case howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, now or hereafter existing, or due or to become due.

"Non-Tangible Collateral" means collectively Debtor's Accounts Receivable, Contract Rights and General Intangibles.

"UCC" means the Uniform Commercial Code as in effect in the State of Illinois on the date of this Agreement; provided that, as used in Section 8 hereof, "UCC" shall mean the Uniform Commercial Code as in effect from time to time in any applicable jurisdiction.

2. <u>Grant of Security Interest</u>. As security for the payment of all Liabilities, Debtor hereby assigns to Lender, and grants to Lender a continuing security interest in, the following, whether now or hereafter existing or acquired:

All of Debtor's:

(a) Accounts Receivable;

(b) Certificated Securities;

(c) Chattel Paper;

(d) Commercial Tort Claims;

(e) Computer Hardware and Software and all rights with respect thereto, including, any and all licenses, options, warranties, service contracts, program services, test rights, maintenance rights, support rights, improvement rights, renewal rights and indemnifications, and any substitutions, replacements, additions or model conversions of any of the foregoing;

(f) Contract Rights;

(g) Deposit Accounts;

(h) Documents;

(i) Financial Assets;

(j) General Intangibles;

(k) Goods (including all of its Equipment, Fixtures and Inventory), and all accessions, additions, attachments, improvements, substitutions and replacements thereto and therefor;

(l) Instruments;

(m) Intellectual Property;

(n) Investment Property;

(o) Letter-of-Credit Rights;

(p) money (of every jurisdiction whatsoever);

(q) Security Entitlements;

(r) Uncertificated Securities; and

(s) to the extent not included in the foregoing, other personal property of any kind or description;

together with all books, records, writings, data bases, information and other property relating to, used or useful in connection with, or evidencing, embodying, incorporating or referring to any of the foregoing, and all proceeds, products, offspring, rents, issues, profits and returns of and from any of the foregoing; provided that to the extent that the provisions of any lease or license of Computer Hardware and Software or Intellectual Property expressly prohibit (which prohibition is enforceable under applicable law) the assignment thereof, and the grant of a security interest therein, Debtor's rights in such lease or license shall be excluded from the foregoing assignment and grant for so long as such prohibition continues, it being understood that upon request of Lender, Debtor will in good faith use reasonable efforts to obtain consent for the creation of a security interest in favor of Lender in Debtor's rights under such lease or license.

3. Warranties. Debtor warrants that: (a) no financing statement (other than any which may have been filed on behalf of Lender or in connection with liens expressly permitted by the Credit Agreement ("Permitted Liens")) covering any of the Collateral is on file in any public office; (b) Debtor is and will be the lawful owner of all Collateral, free of all liens and claims whatsoever, other than the security interest hereunder and Permitted Liens, with full power and authority to execute this Agreement and perform Debtor's obligations hereunder, and to subject the Collateral to the security interest hereunder; (c) all information with respect to Collateral and Account Debtor set forth in any schedule, certificate or other writing at any time heretofore or hereafter furnished by Debtor to Lender is and will be true and correct in all material respects as of the date furnished; (d) Debtor's principal place of business and jurisdiction of organization are as set forth on Schedule I hereto; (e) each other location where Debtor and its subsidiaries maintain a place of business is set forth on Schedule II hereto; (f) Debtor is not now known and during the five years preceding the date hereof has not previously been known by any trade name; (g) Schedule III hereto contains a complete listing of all of Debtor's Intellectual Property; (h) Debtor does not own any motor vehicles; (i) Debtor is a limited liability company duly formed, validly existing and in good standing under the laws of the state of its organization; (j) the execution and delivery of this Agreement and the performance by Debtor of its obligations hereunder are within Debtor's company powers, have been duly authorized by all necessary company action, have received all necessary governmental approval (if any shall be required), and do not and will not contravene or conflict with any provision of law or certificate of formation of Debtor or of any material agreement, indenture, instrument or other document, or any material judgment, order or decree, which is binding upon Debtor; (k) this Agreement is a legal, valid and binding obligation of Debtor, enforceable in accordance with its terms, except that the enforceability of this Agreement may be limited by bankruptcy, insolvency, fraudulent conveyance, fraudulent transfer, reorganization, moratorium or other similar laws now or hereafter in effect relating to creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law); and (l) Debtor is in compliance with the requirements of all applicable laws (including the provisions of the Fair Labor Standards Act), rules, regulations and orders of every governmental authority.

4. <u>Collections, etc</u>. Until such time during the existence of an Event of Default as Lender shall notify Debtor of the revocation of such power and authority, Debtor (a) may, in the ordinary course of its business, at its own expense, sell, lease or furnish under contracts of service any of the Inventory normally held by Debtor for such purpose, use and consume, in the ordinary course of its business, any raw materials, work in process or materials normally held by Debtor for such purpose, and use, in the ordinary course of its business (but subject to the terms of the Credit Agreement), the cash proceeds of Collateral and other money which constitutes Collateral, (b) will, at its own expense, endeavor to collect, as and when due, all amounts due under any of the Non-Tangible Collateral, including the taking of such action with respect to such collection as Lender may reasonably request or, in the absence of such request, as Debtor may deem advisable, and (c) may grant, in the ordinary course of business, to any party obligated on any of the Non-Tangible Collateral, any rebate, refund or allowance to which such party may be lawfully entitled, and may accept, in connection therewith, the return of Goods, the sale or lease of which shall have given rise to such Non-Tangible Collateral. Lender, however, may, at any time that an Event of Default exists, whether before or after any revocation of such power and authority or the maturity of any of the Liabilities, notify any parties obligated on any of the Non-Tangible Collateral to make payment to Lender of any amounts due or to become due thereunder and enforce collection of any of the Non-Tangible Collateral by suit or otherwise and surrender, release or exchange all or any part thereof, or compromise or extend or renew for any period (whether or not longer than the original period) any indebtedness thereunder or evidenced thereby. Upon the request of Lender during the existence of an Event of Default, Debtor will, at its own expense, notify any or all parties obligated on any of the Non-Tangible Collateral to make payment to Lender of any amounts due or to become due thereunder.

Upon request by Lender during the existence of an Event of Default, Debtor will forthwith, upon receipt, transmit and deliver to Lender, in the form received, all cash, checks, drafts and other instruments or writings for the payment of money (properly endorsed, where required, so that such items may be collected by Lender) which may be received by Debtor at any time in full or partial payment or otherwise as proceeds of any of the Collateral. Except as Lender may otherwise consent in writing, any such items which may be so received by Debtor will not be commingled with any other of its funds or property, but will be held separate and apart from its own funds or property and upon express trust for the Lender until delivery is made to Lender. Debtor will comply with the terms and conditions of any consent given by Lender pursuant to the foregoing sentence.

Upon demand by Lender, whether or not an Event of Default shall have occurred and be continuing, all items or amounts which are delivered by Debtor to Lender on account of partial or full payment or otherwise as proceeds of any of the Collateral shall be deposited to the credit of a deposit account (each an "<u>Assignee Deposit Account</u>") of Debtor with a financial institution selected by Lender over which Lender has sole dominion and control, as security for payment of the Liabilities. Debtor shall have no right to withdraw any funds deposited in the applicable Assignee Deposit Account. Lender may, from time to time, in its discretion, and shall upon request of Debtor made not more than once in any week, apply all or any of the then balance, representing collected funds, in the Assignee Deposit Account toward payment of the Liabilities, whether or not then due, in such order of application as Lender may determine, and Lender may, from time to time, in its discretion, release all or any of such balance to Debtor.

25738943.1      5

Lender (or any designee of Lender) is authorized to endorse, in the name of Debtor, any item, howsoever received by Lender, representing any payment on or other proceeds of any of the Collateral.

5. <u>Certificates, Schedules and Reports</u>. Debtor will from time to time, as Lender may reasonably request, deliver to Lender such schedules, certificates and reports respecting all or any of the Collateral at the time subject to the security interest hereunder, and the items or amounts received by Debtor in full or partial payment of any of the Collateral, as Lender may reasonably request. Any such schedule, certificate or report shall be executed by a duly authorized officer of Debtor and shall be in such form and detail as Lender may specify. Debtor shall immediately notify Lender of the occurrence of any event causing any loss or depreciation in the value of its Inventory or other Goods which is likely to have a material adverse effect on Debtor and such notice shall specify the amount of such loss or depreciation.

6. <u>Agreements of the Debtor</u>. Debtor (a) will, upon request of Lender, execute such financing statements and other documents (and pay the cost of filing or recording the same in all public offices reasonably deemed appropriate by Lender) and do such other acts and things (including delivery to Lender of any Instruments or Certificated Securities which constitute Collateral), all as Lender may from time to time reasonably request, to establish and maintain a valid security interest in the Collateral (free of all other liens, claims and rights of third parties whatsoever, other than Permitted Liens) to secure the payment of the Liabilities; (b) will keep all its Inventory at, and will not maintain any place of business at any location other than, its address(es) shown on <u>Schedules I</u> and <u>II</u> hereto or at such other addresses of which Debtor shall have given Lender not less than 10 days' prior written notice, (c) will keep its records concerning the Non-Tangible Collateral in such a manner as will enable Lender or its designees to determine at any time the status of the Non-Tangible Collateral; (d) will furnish Lender such information concerning Debtor, the Collateral and the Account Debtor as Lender may from time to time reasonably request; (e) will permit Lender and its designees, from time to time, on reasonable notice and at reasonable times and intervals during normal business hours (or at any time without notice during the existence of an Event of Default) to inspect Debtor's Inventory and other Goods, and to inspect, audit and make copies of and extracts from all records and other papers in the possession of Debtor pertaining to the Collateral and the Account Debtor, and will, upon request of Lender during the existence of an Event of Default, deliver to Lender copies of all of such records and papers; (f) will, upon request of Lender, stamp on its records concerning the Collateral, and add on all Chattel Paper constituting a portion of the Collateral, a notation, in form satisfactory to Lender, of the security interest of the Lender hereunder; (g) except for the sale or lease of Inventory in the ordinary course of its business and sales of Equipment which is no longer useful in its business or which is being replaced by similar Equipment, will not sell, lease, assign or create or permit to exist any Lien on any Collateral other than Permitted Liens; (h) will at all times keep all of its Inventory and other Goods insured under policies maintained with reputable, financially sound insurance companies against loss, damage, theft and other risks to such extent as is customarily maintained by companies similarly situated, and cause all such policies to provide that loss thereunder shall be payable to Lender as its interest may appear (it being understood that (A) so long as no Event of Default shall be existing, Lender shall deliver any proceeds of such insurance which may be received by it to Debtor and (B) whenever an Event of Default shall be existing, Lender may apply any proceeds of such insurance which may be received by it toward payment of the Liabilities, whether or not due, in such order of

application as the Lender may determine), and such policies or certificates thereof shall, if the Lender so requests, be deposited with or furnished to Lender; (i) will take such actions as are reasonably necessary to keep its Inventory in good repair and condition; (j) will take such actions as are reasonably necessary to keep its Equipment in good repair and condition and in good working order, ordinary wear and tear excepted; (k) will promptly pay when due all license fees, registration fees, taxes, assessments and other charges which may be levied upon or assessed against the ownership, operation, possession, maintenance or use of its Equipment and other Goods; (l) will, upon request of Lender, (i) cause to be noted on the applicable certificate, in the event any of its Equipment is covered by a certificate of title, the security interest of Lender in the Equipment covered thereby, and (ii) deliver all such certificates to Lender or its designees; (m) will take all steps reasonably necessary to protect, preserve and maintain all of its rights in the Collateral; (n) will keep all of the tangible Collateral in the United States; (o) will reimburse Lender for all expenses, including reasonable attorney's fees and charges (including time charges of attorneys who are employees of Lender), incurred by Lender in seeking to collect or enforce any rights in respect of Debtor's Collateral; and (p) will promptly notify Lender of its acquisition of any motor vehicle or Commercial Tort Claim not listed, from time to time, on any Schedule hereto.

Any expenses incurred in protecting, preserving or maintaining any Collateral shall be borne by Debtor. Whenever an Event of Default shall be existing, Lender shall have the right to bring suit to enforce any or all of the Intellectual Property or licenses thereunder, in which event Debtor shall at the request of Lender do any and all lawful acts and execute any and all proper documents required by Lender in aid of such enforcement and Debtor shall promptly, upon demand, reimburse and indemnify Lender for all costs and expenses incurred by Lender in the exercise of its rights under this Section 6. Notwithstanding the foregoing, Lender shall have no obligation or liability regarding the Collateral or any portion thereof by reason of, or arising out of, this Agreement.

7. Event of Default. Whenever an Event of Default shall be existing, Lender may exercise from time to time any right or remedy available to it under applicable law. Debtor agrees, in case of an Event of Default, (i) to assemble, at its expense, all its Inventory and other Goods (other than Fixtures) at a convenient place or places acceptable to Lender, and (ii) at Lender's request, to execute all such documents and do all such other things which may be necessary or desirable in order to enable Lender or its nominee to be registered as owner of the Intellectual Property with any competent registration authority. Any notification of intended disposition of any of the Collateral required by law shall be deemed reasonably and properly given if given at least ten days before such disposition. Any proceeds of any disposition by Lender of any of the Collateral may be applied by Lender to payment of expenses in connection with the Collateral, including reasonable attorneys' fees and charges (including time charges of attorneys who are employees of Lender), and any balance of such proceeds may be applied by Lender toward the payment of such of the Liabilities, and in such order of application, as Lender may from time to time elect.

8. General. Lender shall be deemed to have exercised reasonable care in the custody and preservation of any of the Collateral in its possession if it takes such action for that purpose as any Debtor requests in writing, but failure of Lender to comply with any such request shall not of itself be deemed a failure to exercise reasonable care, and no failure of Lender to preserve or

protect any right with respect to such Collateral against prior parties, or to do any act with respect to the preservation of such Collateral not so requested by Debtor, shall be deemed of itself a failure to exercise reasonable care in the custody or preservation of such Collateral.

Any notice from Lender to Debtor, if mailed, shall be deemed given five days after the date mailed, postage prepaid, addressed to Debtor either at Debtor's address shown on Schedule I hereto or at such other address as Debtor shall have specified in writing to Lender as its address for notices hereunder.

Debtor agrees to pay all expenses, including reasonable attorneys' fees and charges (including time charges of attorneys who are employees of Lender) paid or incurred by Lender in endeavoring to collect the Liabilities of Debtor, or any part thereof and in enforcing this Agreement against Debtor, and such obligations will themselves be Liabilities.

No delay on the part of Lender in the exercise of any right or remedy shall operate as a waiver thereof, and no single or partial exercise by Lender of any right or remedy shall preclude other or further exercise thereof or the exercise of any other right or remedy.

This Security Agreement shall remain in full force and effect until all Liabilities have been paid in full and all Commitment has terminated. If at any time all or any part of any payment theretofore applied by Lender to any of the Liabilities is or must be rescinded or returned by Lender for any reason whatsoever (including the insolvency, bankruptcy or reorganization of Debtor), such Liabilities shall, for the purposes of this Agreement, to the extent that such payment is or must be rescinded or returned, be deemed to have continued in existence, notwithstanding such application by Lender, and this Agreement shall continue to be effective or be reinstated, as the case may be, as to such Liabilities, all as though such application by Lender had not been made.

This Agreement shall be construed in accordance with and governed by the laws of the State of Illinois applicable to contracts made and to be performed entirely within such State. Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

The rights and privileges of Lender hereunder shall inure to the benefit of its successors and assigns.

This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts, and each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute one and the same Agreement. At any time after the date of this Agreement, one or more additional Persons may become parties hereto by executing and delivering to the Lender a counterpart of this Agreement together with supplements to the Schedules hereto setting forth all relevant information with respect to such party as of the date of such delivery. Immediately upon such execution and delivery (and

without any further action), each such additional Person will become a party to, and will be bound by all the terms of, this Agreement.

ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, SHALL BE BROUGHT AND MAINTAINED EXCLUSIVELY IN THE COURTS OF THE STATE OF ILLINOIS OR IN THE UNITED STATES DISTRICT COURT FOR WITH JURISDICTION IN CHICAGO, ILLINOIS; PROVIDED THAT ANY SUIT SEEKING ENFORCEMENT AGAINST ANY COLLATERAL OR OTHER PROPERTY MAY BE BROUGHT, AT LENDER'S OPTION, IN THE COURTS OF ANY JURISDICTION WHERE SUCH COLLATERAL OR OTHER PROPERTY MAY BE FOUND. DEBTOR HEREBY EXPRESSLY AND IRREVOCABLY SUBMITS TO THE JURISDICTION OF THE COURTS OF THE STATE OF ILLINOIS AND OF THE UNITED STATES DISTRICT COURT WITH JURISDICTION IN CHICAGO, ILLINOIS FOR THE PURPOSE OF ANY SUCH LITIGATION AS SET FORTH ABOVE. DEBTOR FURTHER IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS BY REGISTERED MAIL, POSTAGE PREPAID, TO THE ADDRESS SET FORTH ON SCHEDULE I HERETO (OR SUCH OTHER ADDRESS AS IT SHALL HAVE SPECIFIED IN WRITING TO LENDER AS ITS ADDRESS FOR NOTICES HEREUNDER) OR BY PERSONAL SERVICE WITHIN OR WITHOUT THE STATE OF ILLINOIS. DEBTOR HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN ANY SUCH COURT REFERRED TO ABOVE AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

EACH OF DEBTOR AND LENDER HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS UNDER THIS AGREEMENT, THE NOTE, ANY OTHER LOAN DOCUMENT AND ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR WHICH MAY IN THE FUTURE BE DELIVERED IN CONNECTION HEREWITH OR THEREWITH OR ARISING FROM ANY FINANCING RELATIONSHIP EXISTING IN CONNECTION WITH ANY OF THE FOREGOING, AND AGREES THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.

**IN WITNESS WHEREOF**, this Agreement has been duly executed as of the day and year first above written.

**DEBTOR:**

ML FASHION, LLC,
a Delaware limited liability company

By: _____
Name: Stephanie Menkin
Title: President

**LENDER:**

ML RETAIL LLC,
a Delaware limited liability company

By: _____
Name: Marcus Lemonis
Title: CEO

[SIGNATURE PAGE TO SECURITY AGREEMENT]

**Schedule I**
**To Security Agreement**

**Principal Place of Business**
**and Jurisdiction of Organization**

Principal Place of Business:

38 E. 29th Street
New York, New York 10016

Jurisdiction of Formation:

Delaware

**Schedule II**
**To Security Agreement**

**<u>Addresses</u>**

Denim & Soul
348 Jericho Turnpike
Syosset, NY 11791

Runway
85 Greenwich Ave.
Greenwich, CT 06830

Runway
7125 Bethesda Ln.
Bethesda, MD 20814

Runway
325 Worth Ave.
Palm Beach, FL 33480

Denim & Soul
4742 River City Drive, Unit #113
Jacksonville, FL 32246

Denim & Soul
2210 N. Halsted St.
Chicago, IL 60614

Denim & Soul
267 East Westminster Ave.
Lake Forest, IL 60045

Runway
720 Waukegan Rd.
Deerfield, IL 60015

Denim & Soul
6810 Snider Plaza
Dallas, TX 75205

Runway
205 South Mill Street
Aspen, CO 81611

Denim & Soul
1827 Union Street
San Francisco, CA 94123

Schedule II

25738943.1

Schedule III
To Security Agreement

**Intellectual Property**

| MARK | APP./REG. NO. | FILING/REG/ DATE | GOODS/SERVICES |
|---|---|---|---|
| FSALE (Stylized) | 87218904 | 10/28/2016 | Retail and online retail store services featuring clothing and fashion accessories |