## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| ML FASHION, LLC, and ML RETAIL, LLC, | ) ) ) | Case No. 1:20-cv-05124 |
| Plaintiffs, | ) ) | |
| v. | ) ) | Judge Steven C. Seeger |
| NOBELLE GW, LLC, STEPHANIE MENKIN, SARIT MAMAN NAGRANI, and NICOLAS GOUREAU, | ) ) ) ) | |
| Defendants. | ) ) | |

## AFFIDAVIT LAUREN M. GREENE IN SUPPORT OF
## DEFENDANTS' MOTION TO STAY THIS ACTION PENDING RESOLUTION
## OF THE DELAWARE LITIGATION

I, Lauren M. Greene, do hereby declare and state as follows:

1.      I am an attorney duly licensed to practice in the State of California.  I am a Partner at Gerard Fox Law P.C., attorneys of record for Defendants Nobelle GW LLC, Stephanie Menkin ("Menkin"), Sarit Maman Nagrani, and Nicolas Goureau ("Goureau") (collectively "Defendants"). I am over the age of 18 and have personal knowledge of each and every fact herein, except as to those facts to which I am informed and believe, where I have indicated as such.  If called to testify, I could testify competently thereto.

2.      I submit this affidavit in support of Defendants' Motion to Stay This Action Pending Resolution of the Delaware Litigation.

3.      On June 18, 2020, my law firm, on behalf of Goureau and Menkin, filed a verified complaint against both of the entities that are proceeding as Plaintiffs in the instant action, ML

Fashion LLC ("ML Fashion") and ML Retail LLC ("ML Retail" and, collectively with ML Fashion, "Plaintiffs"), with the Delaware Court of Chancery as *Goureau, et al. v. Lemonis, et al.*, No. 2020-0486 (the "Delaware Litigation"). The complaint was served on or around June 26, 2020. The complaint was amended on August 25, 2020. A true and correct copy of the Verified First Amended Complaint, without the referenced exhibits, is attached hereto as **Exhibit 1**.

4.     The same day the complaint was filed, Goureau and Menkin filed a motion to expedite the proceedings in the Delaware Litigation. A true and correct copy of the docket for the Delaware Litigation, pulled on January 4, 2021 and reflecting all filings to date, is attached hereto as **Exhibit 2**.

5.     On July 14, 2020, Plaintiffs attempted to remove the Delaware Litigation to federal court. A week later, Plaintiffs filed a motion seeking to dismiss the claims. The action, however, was successfully remanded back to the Court of Chancery on August 21, 2020.

6.     Following remand back to the Court of Chancery, ML Retail, among other defendants, moved to dismiss the claims in the Delaware Litigation. The motion has been fully submitted after full briefing and oral argument was held on December 4, 2020.

7.     The Chancery Court ultimately issued a Status Quo Order in response to the motion to expedite on September 8, 2020. A true and correct copy of the Chancery Court's Status Quo Order is attached hereto as **Exhibit 3**.

8.     Following the issuance of the Status Quo Order, ML Retail began seeking discovery from Goureau and Menkin. To that end, my office received discovery requests from ML Retail on or around September 22, 2020 and additional requests on November 3, 2020. Some of this discovery is currently at issue in a motion to compel brought by ML Retail in the Delaware Litigation.

9.    Menkin and Goureau have also propounded their own discovery.  Indeed, on December 11, 2020, my office, on behalf of Menkin and Goureau, sent out discovery requests to the defendants in the Delaware Litigation, including ML Retail.

10.    On November 23, 2020, Plaintiffs here also filed a separate lawsuit in the Circuit Court of Cook County, Illinois styled as *ML Fashion, LLC, et al. v. Goureau, et al*., No. 2020L012546 (the "Illinois State Court Action").  A true and correct copy of the complaint in the Illinois State Court Action is attached hereto as **Exhibit 4**.

11.    On December 15, 2020, Menkin and Goureau filed a motion in the Delaware Litigation seeking to enforce the Status Quo Order and for sanctions based on Plaintiffs' initiation of the Illinois State Court Action.  That motion is currently being briefed before the Delaware Chancery Court.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.


Dated: January 4, 2021

_____
Lauren M. Greene

EXHIBIT 1

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

NICOLAS GOUREAU and STEPHANIE
MENKIN, individually and derivatively on
behalf of ML FASHION, LLC, a Delaware
limited liability company,

            Plaintiffs,

     v.

MARCUS LEMONIS, an individual, ML
RETAIL, LLC, a Delaware limited
liability company, MARCUS LEMONIS,
LLC, a Delaware limited liability
company, ROBERTA RAFFEL aka
Bobbi Lemonis, an individual, and MLG
RETAIL, LLC, a Delaware limited
liability company,

            Defendants,

   and

ML FASHION, LLC, a Delaware limited
liability company,

            Nominal Defendant.

C.A. No. 2020-0486

## VERIFIED FIRST AMENDED COMPLAINT

Nicolas Goureau ("Goureau") and Stephanie Menkin ("Menkin"),
(collectively "Plaintiffs"), by and through their undersigned counsel, individually
and derivatively on behalf of ML Fashion, LLC ("ML Fashion" or the "Company"),
bring this Verified First Amended Complaint against Marcus Lemonis ("Lemonis"),

1

ML Retail, LLC ("ML Retail"), Marcus Lemonis, LLC ("ML, LLC"), Roberta Raffel aka Bobbi Lemonis ("Raffel"), and MLG Retail, LLC ("MLG Retail") (collectively "Defendants"), and allege as follows:

## **INTRODUCTION**

1.      This limited liability derivative action arises from the bad faith actions by, and breaches of the fiduciary duties of, Marcus Lemonis, the Manager, Chairman/CEO, and, via his entity ML Retail, LLC, the most powerful owner of Delaware limited liability company, ML Fashion, LLC.  Defendants Lemonis, ML Retail, and ML, LLC have knowingly and purposefully mismanaged the Company and used it solely for their own personal gain.  Defendants are siphoning money from the Company, actively preventing it from meeting its obligations, and looting its assets.

2.      Defendant Marcus Lemonis is a wolf in sheep's clothing.  Through his television show, "The Profit," he presents himself as a savior to struggling small business owners, all the while preying on the business he purports to be saving. Lemonis strategically and deliberately drowns these businesses in debt to him and his entities in order to foreclose on them and take their assets and intellectual property to expand his own empire.

3.      Plaintiffs Goureau and Menkin's family-owned high-end women's clothing store, Courage.B, was featured on a 2014 episode of "The Profit."

Courage.B began in 2008 as a business owned and operated by Neomi Goureau and her children, Plaintiffs Goureau and Menkin, through their entity Gooberry Corporation ("Gooberry") which owned the Courage.B brand and stores.

4.     Over the next six years, Plaintiffs' family business, Courage.B, became very successful.  In 2014, Courage.B had seven different retail stores around the country, including locations in Greenwich, CT, Palm Beach, FL, Bethesda, MD, Aspen, CO, New York, NY, Southampton, NY, and Fairfax, VA, and was valued at over $2.6M based on Lemonis' own investment.

5.     In their episode of "The Profit," Lemonis agreed to invest in Courage.B by acquiring a 30% interest in Gooberry for $800,000.  That $800,000 investment was supposed to be broken down as follows: $300,000 new inventory, $40,000 to eliminate high interest debt, $150,000 in working capital, $200,000 to renovate the stores, $50,000 to create a new e-commerce site and an extra $60,000 the use of which was to be determined.

6.     However, while the show was filming, and before the deal was finalized, Lemonis spent millions of dollars to renovate the Company's stores. Lemonis represented to Plaintiffs that he was taking care of the renovations, that Plaintiffs did not have to worry about the costs involved, and that they should "trust the process."  Plaintiffs had no idea that Lemonis was vastly exceeding the $200,000 renovations budget.

7.     When Plaintiffs received the exorbitant bills for the renovations and questioned the costs being incurred on Gooberry's behalf, Lemonis said if they no longer wanted to do the deal, they would have to pay him back the millions he spent on Gooberry—a demand that was impossible for Plaintiffs to meet.

8.     Thus, the parties moved forward.  On November 18, 2014, the deal reached on the show was memorialized, and Lemonis purchased his stake in Gooberry through Defendant ML Retail, LLC.

9.     Eventually, Lemonis needed more control over the women's fashion business he entered into with Plaintiffs.  By March 2016, Lemonis had destroyed Gooberry's profit margins and saddled it with debt owed to himself and his entities that neither Gooberry nor the Plaintiffs could ever repay.  Lemonis represented to Plaintiffs that the only way they could make money from their business venture now was to join him in investing in other businesses.

10.    Thus, Lemonis convinced Goureau and Menkin to start a new entity with him, ML Fashion.  Lemonis represented to Plaintiffs that ML Fashion would be the umbrella entity through which the parties invest in various retail clothing and fashion businesses, brands, and stores.

11.    As detailed below, Lemonis was sure to give himself unbridled control over ML Fashion as its Manager, Chairman/CEO, and owner of ML Retail, LLC, the most powerful member of the Company.  Lemonis discouraged Plaintiffs from

having independent attorneys review the documentation by having attorneys that were supposedly representing the Company draft the documents. These attorneys however, represented Lemonis in a variety of other business and personal matters.

12. Lemonis used his unchecked control over ML Fashion for his personal gain to the detriment of the Company and Plaintiffs. Time and time again, Lemonis forced ML Fashion to take on unnecessary debts in order to force the Company to obtain loans from another entity controlled by Lemonis, often ML, LLC, to meet its obligations, such as payroll and rent. Whenever Plaintiffs questioned his decisions, Lemonis would respond with threats to either foreclose on the Company, fire their mother Neomi, or fire Plaintiffs themselves. The Company was now Plaintiffs' livelihood, and they had no choice but to fall in line.

13. In 2016, Lemonis met Defendant Raffel at a trade show in New York City. Raffel wanted Lemonis to invest in her business, Runway Boutique ("Runway"), which operated a store in Deerfield, Illinois. Lemonis was smitten with Raffel and forced Gooberry to purchase her business, renovate her store, and buy new product for the store. With their romance in full swing, Lemonis and Raffel then decided to use ML Fashion, and its infrastructure built by Plaintiffs, to grow their personal fashion brand and retail concept, MARCUS, instead of Plaintiffs' brand, Courage.B.

14.     Recently however, Lemonis has taken his misconduct, mismanagement, and misuse of power of ML Fashion to the next level. Lemonis is actively removing money from the Company's bank accounts so that its debts—which debit automatically from its bank accounts—cannot be paid.

15.     Even worse, Lemonis is actively using the global pandemic to continue to loot ML Fashion. Lemonis has been unilaterally closing its retail stores and moving the Company's inventory, furniture, fixtures, and equipment to other entities and/or businesses owned or controlled by Lemonis.

16.     Without the Court's intervention, the Company will be irreparably harmed. Through this Complaint, Plaintiffs seek redress for Defendants' fraud and mismanagement of the Company, the appointment of a receiver to prevent Defendants from further harming the Company, the judicial dissolution of the Company, and to hold Defendants accountable for breaching their fiduciary duties, the Company's LLC Agreement (defined and described below), wasting the Company's corporate assets, and operating the Company as a self-enrichment vehicle for themselves to harm the Company and Plaintiffs.

## PARTIES

17.     Plaintiff Goureau is an individual residing in Florida and is one of the co-founders of ML Fashion. Goureau is an entrepreneur and clothing and retail executive. Goureau is a signatory to the Limited Liability Company Agreement

(defined and described below) and owns a 33.33% membership interest in the Company.

18. Plaintiff Menkin is an individual residing in New York and is one of the co-founders and the President of ML Fashion. Menkin is an entrepreneur and clothing and retail executive. Menkin is a signatory to the Limited Liability Company Agreement (defined and described below) and owns a 33.33% membership interest in the Company.

19. Nominal Defendant ML Fashion is a privately held Delaware limited liability company. ML Fashion has its principal place of business in New York, New York and owns and operates a number of fashion brands and retail stores across the country.

20. Defendant Marcus Lemonis is an individual residing in Illinois and the Manager and Chairman/CEO of ML Fashion. Lemonis is an investor and television personality of CNBC's reality show, "The Profit." Lemonis owns a 33.34% membership interest in the Company through his entity ML Retail, LLC. Lemonis signed the Limited Liability Company Agreement on behalf of ML Retail, LLC. He is also chairman and CEO of Camping World, Good Sam Enterprises, Gander Outdoors, and The House Boardshop.

21. Defendant ML Retail, LLC is a Delaware limited liability company with its principal place of business in Illinois. Defendant Lemonis is the sole

member of ML Retail and has complete control over ML Retail.  ML Retail is the alter ego or agent of Lemonis, and ML, LLC and operates as Lemonis' personal holding company.

22.    Defendant Marcus Lemonis, LLC is a Delaware limited liability company with its principal place of business in Illinois.  The sole member of ML, LLC is Marcus Lemonis Enterprises, LLC, whose sole member is the Marcus Lemonis Revocable Trust, whose trustee is Marcus Lemonis.  ML, LLC is the alter ego or agent of Lemonis, and ML Retail and operates as Lemonis' personal holding company.

23.    Defendant Roberta Raffel aka Bobbi Lemonis is an individual residing in Illinois.

24.    Defendant MLG Retail, LLC is a Delaware limited liability company. MLG Retail has its principal place of business in New York, New York.  MLG Retail's sole member is ML Fashion.

25.    At all times relevant to this action, Defendant Marcus Lemonis had exclusive and complete dominion and control over ML Retail, LLC and Marcus Lemonis LLC, such that these entities were his alter egos and the acts of ML Retail and ML, LLC as set forth in this Complaint are also the acts of Defendant Marcus Lemonis.

26.    There is such a unity of interest and ownership between Defendant Marcus Lemonis on one hand and ML Retail and ML, LLC on the other hand, that the individuality of ML Retail and ML, LLC or their separateness from Defendant Marcus Lemonis have ceased because, upon information and belief:

    a.    ML Retail and ML, LLC are completely influenced and governed by Defendant Marcus Lemonis, the sole natural person involved in each entity;

    b.    Defendant Marcus Lemonis completely controls ML Retail and ML, LLC;

    c.    Defendants Lemonis, ML Retail, and ML, LLC share the same address as their principal place of business;

    d.    ML Retail and ML, LLC were at all times material to this matter, instrumentalities used for the benefit of Defendant Marcus Lemonis;

    e.    ML Retail and ML, LLC are, and at all times herein mentioned were, kept under-capitalized by Defendant Marcus Lemonis, in relation to the reasonable needs of its business;

    f.    The corporate forms of ML Retail and ML, LLC are a mere façade for the operation of Defendant Lemonis;

    g.    The corporate form, entity, and structure of ML Retail and ML, LLC were at all times disregarded by Defendant Marcus Lemonis;

h.    The assets of ML Retail and ML, LLC were or are intermingled with the assets of Defendant Marcus Lemonis, or transferred without consideration, to Defendant Marcus Lemonis in disregard of the purported separate corporate form, entity and structure of ML Retail and ML, LLC, so as to make it impossible to separate from individual liabilities;

i.    The business and corporate affairs of ML Retail and ML, LLC are intermingled with those of Defendant Marcus Lemonis;

j.    ML Retail and ML, LLC have failed to abide by corporate formalities; and

k.    Defendant Lemonis uses his control over ML Retail, ML, LLC and their assets to further his own personal interest.

27.    Upon information and belief, Defendants ML Retail and ML, LLC were never intended to have, and have never had, any true existence as a corporation. Indeed ML Retail and ML, LLC are and were organized and designed to act as a device by which Defendant Marcus Lemonis could evade his obligation, responsibility and liability to third parties, including Plaintiffs, by engaging in unlawful activity without personal liability.

28.    Continued adherence to the fiction of the separate existence of ML Retail and ML, LLC would sanction fraud and promote injustice, in that Defendant

Marcus Lemonis is attempting to escape liability for his unlawful activity, as set forth below, by hiding behind ML Retail and ML, LLC and manipulating assets and liabilities to avoid responsibility for the unlawful acts that he directed and caused for his own benefit.

## JURISDICTION AND VENUE

29. The Court of Chancery has subject matter jurisdiction over this matter pursuant to 8 Del. C. § 111, 10 Del. C. § 341, 10 Del. C. § 343, and 6 Del. C. § 18-1001.

30. The Court of Chancery has personal jurisdiction over nominal Defendant ML Fashion in this action under 6 Del. C. § 18-105. ML Fashion is organized under Delaware law and is subject to service of process by service on its registered agent in Delaware.

31. The Court of Chancery has personal jurisdiction over Defendant Lemonis in this action as the non-resident manager, and the Chairman/CEO, of a limited liability company (ML Fashion) organized under the laws of the State of Delaware pursuant to 6 Del. C. § 18-109. Further, Lemonis came into the State of Delaware to benefit from the powers and protections of the laws of the State of Delaware in order to create ML Retail, a Delaware limited liability company, and ML LLC, a Delaware limited liability company, both which Lemonis controlled and directed as their alter ego or as their agent, to organize, control, and operate ML

Fashion for Lemonis' benefit causing injuries to ML Fashion that occurred in ML Fashion's state of organization, Delaware.

32.     The Court of Chancery has personal jurisdiction over Defendant ML Retail in this action under 6 Del. C. § 18-105.  ML Retail is organized under Delaware law and is subject to service of process by service on its registered agent in Delaware.

33.     The Court of Chancery has personal jurisdiction over Defendant ML, LLC in this action under 6 Del. C. § 18-105.  ML, LLC is organized under Delaware law and is subject to service of process by service on its registered agent in Delaware.

34.     The Court of Chancery has personal jurisdiction over Defendant MLG Retail in this action under 6 Del. C. § 18-105.  MLG Retail is organized under Delaware law and is subject to service of process by service on its registered agent in Delaware.

35.     The Court of Chancery has personal jurisdiction over Defendant Raffel under 10 Del. C. § 3104 in that the claims asserted against Raffel arise from Raffel either in person or through one or more agents: (1) causing tortious injury in Delaware to Delaware limited liability companies by an act or omission in Delaware or (2) causing tortious injury in Delaware or outside of Delaware by an act or omission outside of Delaware and regularly engaging in a persistent course of conduct in Delaware or deriving substantial revenue from services, or things used or

consumed in the State of Delaware. Delaware has a substantial interest in defining, regulating and enforcing the fiduciary obligations of managers and other persons, who manage, direct or otherwise control the limited liability companies formed by them.

## SUBSTANTIVE ALLEGATIONS

### A.    Courage.B is a Successful Business

36.    Along with their mother, Neomi Goureau ("Neomi"), Plaintiffs Goureau and Menkin began the luxury women's fashion line and retail stores Courage.B in 2008. The brand focused on high-end garments and accessories, inspired by the family's French roots.

37.    Plaintiffs' retail stores and Courage.B brand were owned by the trio's corporation called Gooberry Corporation. Goureau owned 100% of the stock of Gooberry and was its CEO, Menkin was Gooberry's President, and Neomi was the Chief Designer for the brand.

38.    The story of Courage.B began over twenty years ago, in 1987, when Neomi and her husband Patrick began the family interest in owning and operating retail stores when they opened up Fopp's in New York City. However, Patrick sadly passed away just a year later from after losing the fight to cancer, leaving Neomi to continue the business while raising Goureau and Menkin, who were both young children at the time.

39.     Over time, Goureau and Menkin became more involved in Fopp's so that Noemi could focus on her passion—designing the upscale clothing their retail stores would sell.  As an adult, Goureau took the reins of managing the business, and eventually began Courage.B.

40.     Courage.B's first store opened in Greenwich, Connecticut on November 4, 2008.  The store was featured in several local news publications when it opened.

41.     The business was a success and began to do $6.5 Million in sales within the first twenty months of opening.  Through their hard work over the next six years, the three were able to grow their company and expand to seven different retail boutiques across the country.

42.     The Courage.B stores carried their exclusive Courage.B label clothing and items which were designed by Noemi.  This created a loyal customer base that was interested in the Courage.B label.  Often, Courage.B customers would shop in various Courage.B locations in order to shop the exclusive Courage.B line.  For example, Plaintiffs had customers that lived in Greenwich, visited family in New York City, wintered in Palm Beach, and summered in Aspen shopping at each Courage.B store along the way.

43.     Courage.B's success continued and the company was doing roughly $5.5 Million in sales each year.  As a result of their success, Plaintiffs and Noemi

were ready to take their business to the next level.  Plaintiffs developed a growth plan and began meeting with potential investors.  They were looking for an investor that understood family businesses and that had experience in retail stores.  Unfortunately, Marcus Lemonis represented himself as the perfect investor for Plaintiffs' business.

**B.** **"The Profit" Comes to Help Courage.B**

44.    Marcus Lemonis is an entrepreneur and reality television personality who is featured in the documentary reality series, "The Profit."  "The Profit" has aired for roughly seven years and has featured around one hundred businesses.

45.    On each episode of the show, Lemonis visits an ailing business and purportedly offers his business acumen and a financial investment in exchange for an ownership interest in the entity.

46.    On the intro of "The Profit," Lemonis speaks to the viewers, stating "my name is Marcus Lemonis and I fix failing businesses.  I make the tough decisions and I back them up spending my own money.  It's not always pretty, but this is business.  I do it to save jobs, and I do it to make money.  This is The Profit."

47.    During commercial breaks in the episodes, Lemonis invites struggling businesses to apply for his help, stating "if your business is in trouble and you need my help, log on to the profitcasting.com."  That page represents that Lemonis "has been called America's number one business turnaround artist.  He will do whatever

it takes to fix YOUR failing business.  When Marcus Lemonis isn't running his multi-billion dollar company, Camping World, he is on the hunt for struggling businesses that are desperate for cash and ripe for a deal. In the past 10 years, he's successfully turned around over 100 companies."  Interested business owners are then invited to "Apply now for a chance to save your business!"

48.    CNBC's website for "The Profit" promotes Lemonis' tactics, stating that Lemonis "goes on the hunt for struggling businesses that are desperate for cash and ripe for a deal. In each one-hour episode of The Profit, Lemonis makes an offer that's impossible to refuse; his cash for a piece of the business and a percentage of the profits."

49.    As Plaintiffs would soon learn, Lemonis uses the show to prey upon desperate and often less sophisticated business owners to build his own individual wealth at the expense of the very businesses he was supposed to be helping.

50.    Indeed, "The Profit" often features small, family-owned businesses where the family members are often over-worked and fulfilling multiple roles in the company.  These business owners often don't have formal business training.  Even more, these companies often don't have a general counsel or independent attorneys who can review the company's involvement with Lemonis, his various entities, and the show.

51.     Goureau first learned about "The Profit" when he saw an episode on television.  The episode featured a company called Sweet Pete's, a small family-run candy shop in Florida.  On the episode, Lemonis is portrayed as an expert investor who can help the business achieve the success its owners dreamed of.

52.     Plaintiffs' family business had experienced success and growth, and the trio were ready to take the next step in their business.  Goureau, Menkin, and Neomi believed that "The Profit" and Lemonis would be able to help their growing business make it to the next level.  Goureau e-mailed the television show and applied for Courage.B to appear on the show.

53.     Around spring 2014, the production company for "The Profit," Machete Corporation dba Machete Productions ("Machete") reached out to Goureau about Courage.B's application for the show.

54.     In or around spring 2014, Plaintiffs had a Skype interview with Kim Donnan ("Donnan"), a producer working for Machete, about their involvement in the show.   During the Skype interview, Donnan represented that the stories, investments, and successes portrayed on the show are real.   Donnan further represented that if Lemonis was interested in investing, they would make a deal while the show was being filmed and that the deal would be real.

55.     Eventually, Plaintiffs were selected to appear on "The Profit."  During the course of filming the television show, Plaintiffs and Lemonis reached an

agreement for Lemonis to invest in Courage.B and Gooberry. Lemonis was to purchase a 30% stake in Gooberry for $800,000.

56.     In June 2014, Plaintiffs' episode of the show was filmed. During the filming, the producers created a story for Plaintiffs to follow and present on the show. Producers consistently told Plaintiffs that their mother Noemi was a problem, that she didn't know what she was doing, and that Goureau had to fix what she was doing. This, of course, was not the reality for Plaintiffs' business.

57.     During the filming of the episode, Lemonis spoke to Plaintiffs and explained, "[a]nd you know what's even more amazing to me? You're doing $5 million with this product. Can you imagine what you would do if your product was right?" He further explained his belief in the company, and that it was close to where it needed to be already, stating to Plaintiffs, "[t]his has the makings of being something great, but the business needs money, and all I have to get my head around is, we're talking about changing the product and changing the process, and it's extreme, and putting money in at the same time."

58.     In fact, Lemonis doubled-down on his belief that Courage.B was not far off from obtaining even greater success when, during a cut scene where Lemonis is speaking to the viewers, Lemonis explained that, "[t]he real problem is, the company doesn't have the right product on the ground and if I can fix the product

going forward and then merchandise it in a creative way, I know I can make money immediately."

59.    Despite these beliefs, when the time came to make his offer to Plaintiffs, Lemonis first offered $800,000 for full control of Courage.B and 50% of the stock, after which he chimed in "and before you answer, just know that if you don't do a deal with me, you may not make it."

60.    In what has since turned out to be a prophetic statement, after having his first offer rejected by Goureau, Lemonis responded to Goureau's counterproposal of $800,000 for 10% of the company's stock stating: "I'll give you a half-a-million-dollar loan and take the stock of the company as collateral. I mean, if you default, I'll take the business. So you don't want that option. The option you want is you want me to be just as excited as you are."  What Lemonis failed to mention is that he would run the business in a way which overloaded it with debt, allowing him to foreclose on a whim.

61.    While the episode was being filmed, Lemonis made renovations to a Gooberry store in Greenwich, Connecticut.  Plaintiffs were told by Lemonis and production that they could not visit the store while it was undergoing the renovations. On "The Profit," renovations are done during the filming of the episode so that the episode can show the supposedly great improvements that Lemonis makes to the

businesses. The owners are purposefully kept in the dark about how much the renovations are costing and who ultimately will be paying for them.

62.    The same was true here. Lemonis did not tell Plaintiffs how much he was spending on the renovations, and when Plaintiffs asked, he told them, "I got it," that they "didn't have to deal with it," and to "trust the process."

63.    During the course of the show, when the parties discussed the terms of Lemonis' potential investment, Lemonis told Plaintiffs that $200,000 of his initial investment would be used towards renovations. Lemonis led Plaintiffs to believe that the work he had done to the Greenwich location during the show would be covered by that $200,000 investment.

64.    After the show finished filming, but before the deal was formalized, Lemonis began taking control over Gooberry and Courage.B. Lemonis started renovating Gooberry's additional stores. Once again, Lemonis told Plaintiffs not to worry about the renovations and that he was taking care of it. Because of Lemonis' representations, Plaintiffs believed that Lemonis was staying within the $200,000 renovations budget. Lemonis, however, forced Gooberry to incur upwards of $2M in debt renovating Gooberry's stores in only six months. Lemonis and his representative, Johnny Sirpilla, completely controlled the renovations and did not allow Plaintiffs to give any input or inform them of how much the renovations were costing Gooberry. Lemonis consistently told Plaintiffs to just "trust the process."

65. During the filming of the show, Lemonis represented himself as an expert in retail and promised to introduce Plaintiffs to his team of expert retail and business executives who would help Plaintiffs grow the brand. Lemonis explained that "Neomi is the face of the brand, and it's still her eye that I trust. But in order to make sure that she's successful, I'm gonna hire legitimate designers with legitimate track records." Lemonis additionally stated to viewers that he was hiring "professional visual merchandisers to come in and assist in the renovations of the show."

66. Plaintiffs believed Lemonis' representations that he was there to help their business grow and that he believed in their family business. Lemonis told Plaintiffs that he cared about their family, that he would always take care of their mother Noemi, and that he wouldn't let anything bad happen to her.

67. However, all of these purported executives were employees of Camping World—a now public company that Lemonis serves as its CEO. Lemonis did not tell Plaintiffs how much Gooberry was paying these so-called expert executives. Again, whenever Plaintiffs inquired about the costs, Lemonis would tell them that he had it covered and not to worry about it. Eventually, however, Plaintiffs learned that these executives were charging Gooberry exorbitant fees.

68. When Plaintiffs learned about the skyrocketing renovation and executive costs, Lemonis berated them, called them ungrateful, and told them that if

they want to back out of the deal, all they had to do was pay him back for the renovations. At that point, of course, Plaintiffs were not able to repay Lemonis the over $2M that Lemonis had unilaterally decided to spend on the store—despite telling Plaintiffs that renovations would only cost $200,000 and keeping them in the dark about how much was being spent on the renovations. Feeling entrapped and like they had no other choice, Plaintiffs moved forward with Lemonis.

69. On or around November 18, 2014, the parties executed the paperwork memorializing Lemonis' investment. Lemonis' entity, Defendant ML Retail, purchased 32% of the shares of Gooberry for $800,000.

70. At the same time, the shareholders of Gooberry, Goureau, Menkin, Neomi, and ML Retail, entered into a Shareholder Agreement ("Gooberry Shareholder Agreement"). The Gooberry Shareholder Agreement gave ML Retail broad power over Gooberry. Gooberry needed ML Retail's affirmative shareholder vote in order to, among other things: (1) enter into any contract outside of the normal course of business, (2) make any distributions to shareholders, (3) make any expenditure over $50,000, and (4) hire or replace any member of Gooberry's executive team.

71. The Gooberry Shareholder Agreement also gave ML Retail the sole power to, among other things: (1) manage and control Gooberry's bank accounts,

(2) open certain retail locations, and (3) control Gooberry's revolving line of credit with Lemonis' entities.

72.    Lemonis made clear that if Plaintiffs objected to the Gooberry documents that he would force them to repay the money that he had put into the renovations—which would wipe them out—and take their business from them.

73.    Not long after the deal was finalized, Lemonis sent IT personnel from Camping World to the Gooberry offices to upgrade their e-mail and computing systems. During the process, the IT technicians, allegedly on accident, deleted all of the e-mails from Gooberry's system. This meant that years and years of Gooberry's e-mail records were now gone.

74.    Plaintiffs were then given new @courageb e-mail addresses. Eventually, Plaintiffs' e-mails were transitioned to @marcuslemonis e-mail addresses. Plaintiffs used these e-mails to conduct the business of Gooberry and eventually ML Fashion. However, as discussed below, one by one, Plaintiffs, and their mother Neomi, were removed from the business venture and lost access to their @marcuslemonis e-mail accounts.

75.    ML Retail used the power bestowed upon it in the formation documents to take over Gooberry and Courage.B. ML Retail, through Lemonis, had all of Gooberry's retail stores renovated and changed the products that the stores were selling. However, despite making these changes himself, Lemonis later determined

that he did not like the changes he had implemented or the new products that he had added. Lemonis then forced the company to do further renovations and buy even more new product.

76.     In 2015, a retail concept called Blues Jean Bar was featured on an episode of "The Profit." Lemonis unilaterally determined that Gooberry would purchase the Blues Jean Bar business and its three stores. Lemonis rebranded the Blues Jean Bar stores and two Courage.B locations as Denim & Soul. Lemonis then renovated all of the stores, including Gooberry stores that he had just renovated, for hundreds of thousands of dollars, all on Gooberry's dime, only growing its debts to him and his entities.

77.     The new inventory did not appeal to Gooberry's loyal customer base. Several customers came to Courage.B to shop their exclusive fashion line. The product that Lemonis forced on the stores was often purchased at trade shows and widely available at department stores and boutiques. This type of product brought in price comparison shoppers who were looking to get the best deal on this type of clothing. Gooberry was often unable to compete against department stores carrying the same clothes and offering various friends and family, VIP and rewards programs.

78.     In addition, the inventory Lemonis purchased was often from a previous season, which was not appealing to Gooberry's fashion savvy customer base.

79.     As the inventory did not work for the stores, Lemonis forced Gooberry to sell the new inventory that he had previously forced the company to acquire at a steep discount.  Lemonis now wanted the stores to carry younger and hipper brands. While on the show Lemonis represented that all Gooberry needed to do to take its business to the next level was get the proper inventory, Lemonis' new inventory tanked the business' margins.  Indeed, this change in inventory reduced Gooberry's typical profit margins from 73% to 52%.

80.     Destroying Gooberry's profit margins was part of Lemonis' practice. On one occasion, Lemonis purchased over $150,000 in inventory from a factory in Milan in styles and colors that the stores had not carried before.  Shortly thereafter, Lemonis determined that he did not like the order and forced the stores to sell the items for pennies on the dollar.

81.     All of the renovations, inventory purchases, and other large expenses were funded through Gooberry's line of credit with Lemonis' entities.  By making these large purchases, reducing Gooberry's profit margins, and forcing the company to sell inventory at a loss, Lemonis ensured that Gooberry would need to rely on its revolving line of credit with Lemonis' entities to meet its normal financial obligations, such as payroll.  This practice insured that Gooberry was always heavily indebted to Lemonis, giving Lemonis the power to convert on its assets at any time.

Lemonis used the threat of foreclosing on his loans to Gooberry to keep Plaintiffs in line.

**C.   Lemonis Wants More and Insists on the Formation of ML Fashion, LLC**

82.   Eventually, Plaintiffs and Lemonis decided to expand beyond the Courage.B brand and begin investing in additional business entities together.  The idea was that Plaintiffs would be investors, and equal partners, with Lemonis on various fashion and retail-related business investments.  Those ventures often included businesses that Lemonis encountered through his television show. Lemonis told Plaintiffs that investing in these other businesses was the only way to make profits—this was, of course, after Lemonis slashed Gooberry's profit margins.

83.   Despite wielding an incredible amount of control over Gooberry, Lemonis wanted more.  In the beginning of 2016, Lemonis began selling Plaintiffs on starting a new business venture with Lemonis.

84.   Lemonis represented that Plaintiffs would be able to make more money in this new business venture than they were making with Gooberry.

85.   During this time, Lemonis told Plaintiffs that he wanted to be equals in the business with them.  Lemonis praised Menkin telling her that she would take on a larger management role in the new business venture and that her equity share should be equal to his and Goureau's.  Lemonis sold Menkin on ML Fashion by

representing that she would be its President and would be heavily involved in running the business.

86.     However, in order to make Plaintiffs own a roughly equal membership interest with Lemonis, Lemonis removed Neomi's equity and placed it with Menkin. Lemonis told Plaintiffs that their mother's equity laid with, them, her children.  This was the start of Lemonis attempting to build a wedge between Plaintiffs and their mother in order to boost his control of the business.

87.     Lemonis also represented that he and Plaintiffs would work to grow a fashion empire that they would eventually be able to sell for millions in profit. Lemonis represented that Plaintiffs and Lemonis would split any such profits equally—after Lemonis' debts were repaid.  Over time, however, Lemonis drowned ML Fashion in so much debt that Plaintiffs' equity in the Company eventually became meaningless.  This meant that Plaintiffs had to keep working for Lemonis in order to derive any value from the business they started and to be able to support their families.

88.     Lemonis represented to Plaintiffs that ML Fashion would be an umbrella entity to hold the parties' various business ventures.  He told Plaintiffs that he wanted to help them grow their business and that they could build something special together.  Lemonis represented that a limited liability company, as opposed to a corporation, would be more beneficial for everyone.

89.     ML Fashion was formed on March 29, 2016 as a Delaware limited liability company.  On March 29, 2016, the Limited Liability Company Agreement of ML Fashion, LLC ("LLC Agreement") was entered into among the members, Goureau, Menkin, and ML Retail.  *See* ML Fashion LLC Agreement, Declaration of Sean Bellew ("Bellew Decl."), Ex. A.

90.     The formation documents for the Company were prepared by the attorneys that Lemonis used in a lot of his business and personal matters.  Lemonis told Plaintiffs that the attorneys represented all three of them to deter Plaintiffs from seeking independent counsel.  Based on these representations, Plaintiffs did not seek independent counsel and relied on Lemonis' attorneys.  When the attorneys presented the formation documents to Plaintiffs for execution, Plaintiffs believed that the attorneys, and Lemonis, had their best interest in mind and signed the documents.

91.     Exhibit A to the LLC Agreement lists the Company's members and membership interest as follows:

| Member | Membership Interest |
|---|---|
| ML Retail, LLC | 33.34% |
| Nicolas Goureau | 33.33% |
| Stephanie Menkin | 33.33% |

| Total | 100.00% |
|-------|---------|

92.     The LLC Agreement names Marcus Lemonis as the Company's manager.  *Id*. at § 6.1(b).  The LLC Agreement gives ML Retail the sole power to remove a manager and appoint any successor.  *Id*.

93.     The LLC Agreement gives the Manager broad powers:

**6.1**     **Manager (a).** The management of the Company shall be vested entirely and exclusively in the Manager. Except as expressly provided for in this Agreement or prohibited by the Act, the Manager shall have the full, exclusive and unilateral power and authority to make all decisions affecting the business and affairs of the Company. No Member acting as such shall have any voting, approval, or management rights whatsoever or any authority to bind the Company, except as expressly provided for in this Agreement or the Act.

LLC Agreement § 6.1(a), Bellew Decl., Ex. A.

94.     Additionally, the LLC Agreement gives the Manager the power to appoint and remove officers of the Company and to determine when to make distributions to members.  *Id*. at §§ 5 and 6.1(c).

95.     The LLC Agreement then limits the powers of the individual members:

**7.1**     **Rights or Powers.** The Members shall not have any right or power to take part in the management or control of the Company or its business and affairs or to act for or bind the Company in any way. Notwithstanding the foregoing, the Members have all the rights and powers.

LLC Agreement at § 7.1, Bellew Decl., Ex. A.

96.     The LLC Agreement further limits the members' voting rights:

**7.2** **Voting Rights.** No Member has any voting rights except as otherwise provided in this Agreement and with respect to the following, which shall require the Approval of the Members:

(a)     any conversion of the Company to any other entity; or

(b)     any merger of the Company with or into any other entity that is not subject to a Drag Transaction; and

in each case, such Approval of the Members shall only be required in the event such conversion or merger would divest or diminish the rights of, or otherwise disproportionately disadvantage or unfairly discriminate against, any Member, with respect to that Member's Membership Interests in relation to other Membership Interests having similar rights, or increase the liabilities or obligations of any Member.

LLC Agreement at §7.2, Bellew Decl., Ex. A.

97.     The LLC Agreement discusses the duties and obligations of the Manager stating:

**6.2** **Duties and Obligations of the Manager; Discretion.**

(a)     In lieu of any duty (including fiduciary duties) imposed on the Manager or any Members in acting as a Manager by the Act or otherwise at law or equity, the sole duty of the Manager or any such Member shall be to comply with the terms of this Agreement, and the Manager (including any Former Manager) or any such Member shall not have or incur any liability to the Company or to any Member relating thereto, except where the claim at issue is based on the Misconduct of such Person.

(b)     Subject to the foregoing but notwithstanding any other provision of this Agreement to the contrary or other applicable provision of law or equity, whenever in this Agreement a Manager or an Officer is permitted or required to make a decision or take an action (i) in his "sole discretion" or "discretion" or under a similar grant of authority or latitude, in making such decisions or taking such actions, he shall be entitled to take into account his own interests as well as the interests of the Members as a whole or (ii) in "good faith" or under another

expressed standard, he shall act under such express standard and shall not be subject to any other or different standard.

LLC Agreement at 6.2, Bellew Decl., Ex. A.

98.    The LLC Agreement defines Misconduct as "fraud, breach of fiduciary duty, bad faith, a knowing violation of law or willful misconduct." *Id*. at p. 5.

99.    When it comes to limiting the duties of the officers of the Company, the agreement is silent and has no such limiting language.

100.    The LLC Agreement lists the officers of the Company as follows:

| Office | Name |
|---|---|
| Chairman/CEO | Marcus Lemonis |
| President | Stephanie Menkin |
| Chief Financial Officer | Manish Karna |

LLC Agreement at Schedule A, Bellew Decl., Ex. A.

101.    The LLC Agreement selected ML Retail as the "tax matters partner," and gave it the sole power to "make any and all elections for federal, state, local, and foreign tax purposes…." (*Id*. at § 8.) Indeed, Section 8 of the LLC Agreement gives ML Retail sole and broad power over ML Fashion's tax matters. (*Id*.)

102.    Lemonis as the Manager and Chairman/CEO of the Company and ML Retail, owner of the most powerful membership share of the Company, formed a

control group due to their significant voting power coupled with their formidable managerial power ("ML Control Group").

103. By virtue of being a control group, the ML Control Group owes fiduciary duties to the Company, Goureau, and Menkin.

104. Eventually, Lemonis sought to transfer the assets of Gooberry to an entity called MLG Retail, LLC ("MLG Retail"). MLG Retail is owned by ML Fashion and ML Fashion is MLG Retail's manager. Transferring the assets and operations of Gooberry to MLG Retail would have finally given Lemonis the complete, unfettered control over Gooberry that he wanted. While Lemonis was successful in transferring some of Gooberry's assets to MLG Retail, he did not transfer all of its assets, such as the Runway brand, to MLG Retail.

105. Nevertheless, Lemonis, ML Retail, and ML, LLC began operating MLG Retail under ML Fashion to run several of ML Fashion's retail stores. Lemonis also set up a similar credit structure between MLG Retail and ML Fashion. On October 1, 2016, MLG Retail and ML Fashion entered into a Credit Agreement whereby MLG Retail could borrow up to $10,000,000 from ML Fashion at an interest rate of 7.5% per annum.

106. Of course, ML Fashion's ability to loan funds to MLG Retail came from its own credit agreement with ML, LLC. Thus, as explained below, when MLG

Retail drew on its line of credit from ML Fashion, it was really drawing from Lemonis and ML, LLC.

### D. Lemonis Mismanages ML Fashion And Uses It For Personal Gain

107.   As detailed above, the LLC Agreement gave Lemonis enormous power over ML Fashion.  Lemonis used this power to mismanage ML Fashion in order to benefit himself, ML Retail, and ML, LLC.

108.   Lemonis' misconduct often related to credit agreements and loans he made to the Company through entities he controlled.  Indeed, the very day that ML Fashion was formed, it entered into a Credit Agreement with ML Retail.  *See* Bellew Decl. Ex. B.   Under this Credit Agreement, ML Fashion could receive up to $30,000,000 in loans from ML Retail at a rate of 6% interest per annum.  Lemonis represented that this Credit Agreement would provide ML Fashion with a reliable source of capital that would be used to fund the Company.

109.   While the agreement is signed by Menkin, the decision for ML Fashion to enter into the Credit Agreement was solely Lemonis' decision.  Lemonis often used Menkin to sign documents on ML Fashion's behalf to attempt to add legitimacy to his actions.  However, he would often have his attorney send packages with hundreds of pages and several documents to her with the instruction to sign them.  Menkin trusted Lemonis and his attorney and simply signed all of the documents they presented.

110. Concurrent with the execution of the Credit Agreement, ML Fashion and ML Retail entered into a Security Agreement. *See* Bellew Decl. Ex. C. The Security Agreement gave ML Retail a continuing security interest in essentially all of ML Fashion's assets. *Id*.

111. Also on March 29, 2016, ML Retail entered into a Credit Agreement and a Security Agreement with Defendant ML, LLC (collectively, the "ML, LLC Credit Agreements"). *See* Bellew Decl. Exs. E and F. These agreements mirrored the Credit Agreement and Security Agreement that ML Fashion entered into with ML Retail only now ML Retail was the borrower and ML, LLC was the lender. *Id*. Thus, whenever ML Fashion drew on its line of credit with ML Retail, it was in reality drawing from ML, LLC, a Lemonis controlled non-member.

112. This arrangement gave Lemonis the power to funnel his predatory lending practices through ML, LLC who was not a member of ML Fashion or a signatory on the LLC Agreement. Lemonis attempted to shield his lending from the fiduciary duties that an ML Fashion member and LLC Agreement signatory would have otherwise had. Lemonis could now foreclose on ML Fashion, through ML Retail, without regard to any membership obligations ML Retail may have had.

113. There can be no doubt that this funding arrangement was set up to thwart fiduciary duties, obligations under the LLC Agreement, and potential

creditors. This is just one example of Defendants using the fraudulent corporate structure to perpetrate fraud against Plaintiffs.

114. Together, these agreements combined gave Defendants the unfettered ability to misuse the assets of ML Fashion. Again, the LLC Agreement gave Lemonis the sole power to run the operations of ML Fashion. Thus, Lemonis forced ML Fashion to buy assets, leaving it unable to meet its current obligations, and then forced ML Fashion to take a loan from ML Retail which would then take a loan from ML, LLC. Eventually, he could render ML Fashion insolvent such that ML, LLC could foreclose on all of the assets owned by ML Fashion.

115. Indeed, as of February 2020, ML Fashion's line of credit with ML Retail had an outstanding balance of nearly Twelve Million Dollars, far exceeding ML Fashion's assets of roughly Five Million Dollars. Further, as of 2018, ML Retail had made nearly $500,000 in interest from its loans to ML Fashion.

116. Lemonis, acting on his behalf and for ML Retail and ML, LLC, used his power to grow ML Fashion's debts to himself and his entities a number of times. Lemonis was only interested in growing his personal brand and his television show. Lemonis would often use the businesses featured on "The Profit" to boost his image and add debt to ML Fashion.

117. Often "The Profit" would show Lemonis helping needy business owners by renovating their stores or finding buyers for their products. However,

improving those businesses was not Lemonis' intentions, rather he was using ML Fashion to pay for those renovations and large purchases as a means to strap it with more debt.

118. Lemonis represented to Plaintiffs that the businesses they were investing in through ML Fashion were making money and would be good investments for ML Fashion. Lemonis represented to Plaintiffs that the strategy he was employing for ML Fashion was how he built Camping World, and that his methods would help make ML Fashion become as successful as Camping World. However, as discussed herein, the businesses Lemonis forced ML Fashion to invest in were often failing and Lemons used ML Fashion to provide an influx of capital to those businesses by forcing ML Fashion to purchase their inventory and hire their personnel.

119. For example, a November 2016 episode of the show featured the brand Susan Monaco, and on the show, the parties reached a deal where Lemonis would invest $600,000 for 50% of the business. However, Susan Monaco ended up being a huge loss on the ML Fashion books. In order to put money in the Susan Monaco business, ML Fashion had to buy all of Susan Monaco's old inventory. That inventory was a loss for ML Fashion because they had to sell what they could at a Street Sell for negligible profits and donate the rest. Often when ML Fashion had to

donate excess product Lemonis had forced on it, Lemonis made sure that he got the tax write-off for the donation personally.

120. A June 2017 episode featured a brand called Swim by Chuck Handy. Once again, the show touts a deal where Lemonis would invest $600,000 for 55% of the business. However, it was ML Fashion that produced hundreds of thousands of dollars of product before the deal was finalized. The deal with the owners of Swim by Chuck Handy fell through, and it was ML Fashion that was left holding the bag. ML Fashion was forced to donate all of the product it produced again, taking a complete loss.

121. Similarly, a June 2018 episode featured the brand Ellison Eyewear that produced sunglasses in Greece. According to the show, Lemonis would invest $350,000 for 50% of the business. Once again, ML Fashion spent hundreds of thousands of dollars producing inventory in Greece. Then, the deal fell through, and ML Fashion was forced to try to sell the inventory in its retail stores. The inventory is still on ML Fashion's books as a loss.

122. Several times, ML Fashion was forced to hire the business owners and employees featured on "The Profit" solely because their own business could not afford to pay them. These persons primarily worked on their own business while Menkin was forced to find special projects at ML Fashion for them to work on. This happened with the production manager of the Susan Monaco brand featured in

season four, the owner of Ben's Garden featured in season six, the owners of Flex Watches featured in season four, and with the winner of another Lemonis television program called "The Partner."

123.   Lemonis used the constant brand acquisitions, store openings, store rebrandings, store closings, personnel changes, and inventory changes to distract Plaintiffs from the mismanagement and misconduct he was orchestrating as the Manager of ML Fashion.   Lemonis purposefully kept Plaintiffs overworked and overextended so that all they could focus on was the ground level ML Fashion work that Lemonis was having them do.   Plaintiffs knew that if they were not able to keep up with the workload, Lemonis would threaten to give the work opportunity to someone else, fire them, or foreclose on the Company.

124.   Time and time again, Lemonis used "The Profit" to bolster his own image as a small business savior when in reality the deals being made on the show were being used to force debt upon ML Fashion.   This debt not only forced ML Fashion to continually take loans from Lemonis and his entities, it also allowed Lemonis to write-off income he made as the Chief Executive Officer of Camping World and income from his other personal endeavors.

125.   At the end of the year, Lemonis and his accountants would use the debts incurred by ML Fashion as tax write-offs to help offset his personal income.   Indeed, on or around April 16, 2018, Lemonis expressly instructed Menkin on the write-off

telling her to "[d]rive the number as high as you can," and confirmed that he wanted the tax benefit personally.  *See* Bellew Decl. Ex. G.

126.    By keeping ML Fashion saddled in debt, Lemonis was consistently able to lower his personal tax liability.  Moreover, because these write-offs decreased ML Fashion's indebtedness to ML Retail and ML, LLC, Lemonis often represented to Plaintiffs that he was taking the write-offs as a favor to them.

127.    Additionally, Lemonis represented that ML Fashion would purchase retail stores, renovate them, and flip them for a profit.  Lemonis represented that Plaintiffs and Lemonis would split these profits evenly, after Lemonis' debts were repaid.  While ML Fashion purchased or opened around thirty stores, none of those stores were ever converted to profits and all were eventually closed.  Often Lemonis would spend exorbitant amounts of money to renovate the stores—often several times per store—and swap out the stores inventories.  These upfront costs meant that the stores could never be sold for a profit due to how far in debt each venture was to Lemonis.

128.    Once the stores failed, ML Fashion would be forced to liquidate the stores at a huge loss.  This meant hiring a close down crew, paying for staff termination and severance packages, and often paying early buy out charges on the stores' leases.

129.	Forcing debt onto ML Fashion was not the only way in which Defendants engaged in misconduct.  Lemonis and ML Retail used promissory notes that his entities had from other businesses to make sham contributions to the Company on behalf of ML Retail.

130.	One such sham contribution related to the assets of a shoe company Inkkas.  Inkkas was featured on an episode of "The Profit" and as part of the deal from the show, Gooberry purchased the company's assets.  Then, through a string of transactions, the Inkkas assets became owned by an entity called Inkkas, LLC.  On or around June 6, 2017, ML Retail purchased the assets of Inkkas, LLC for $429,937.34.  In agreements dated the same day, ML Retail transferred the assets of Inkkas, LLC to ML Fashion as a membership contribution *then* transferred those very assets from ML Fashion to a company called ML Footwear LLC.  Essentially, Lemonis and ML Retail used assets that were already owned by the joint business venture as a contribution by ML Retail to ML Fashion, then transferred the assets out of ML Fashion.

131.	Contributions like this ensured that ML Retail was first in line if the Company ever issued distributions.  Under the LLC Agreement, distributions are made "first, 100% to and among the Members in proportion to and to the extent of their respective Unreturned Capital Contributions."  *See* LLC Agreement at § 5.1(b), Bellew Decl. Ex A.  This allowed ML Retail to receive distributions for purporting

to contribute assets that already belonged to the joint business venture. Between the sham contributions and Lemonis' debt position, Lemonis made sure that any monies coming out of ML Fashion were owed to him first.

132. Lemonis also treated the bank accounts of ML Fashion, and its wholly-owned subsidiary MLG Retail, as his own personal piggy bank. Lemonis used his personal American Express card to make purchases for the Company; however, Lemonis also used this card to make personal and non-business-related purchases.

133. Lemonis would then take money directly from the MLG Retail bank account to pay off his American Express card. The funds taken from MLG Retail to pay the card were not correlated to the amount of actual business expenses that Lemonis put on the card. Instead, Lemonis would see how much money was in the MLG Retail account, then take whatever he could and put it towards his personal card. Lemonis made payments to his personal American Express card from MLG Retail's bank accounts several times a month. Lemonis took up to $100,000 at a time to pay off his card.

134. Between March 2019 and February 2020, Lemonis took $3,023,004.47 from MLG Retail's bank account to make payments to his personal credit card. In addition, Lemonis benefited by keeping the American Express rewards points from these payments and using them for his personal gain.

135.   There were times where, as a result of Lemonis taking money from the Company's bank accounts to pay, at least in part, his personal obligations, MLG Retail and ML Fashion could not pay its vendors.  Then, as always, ML Fashion would have to borrow money from Lemonis' entities to pay those vendors.

136.   Another example of Lemonis using ML Fashion for personal gain related to the retail boutique Runway.  In early 2016, Lemonis met Defendant Raffel, owner of Runway, at a trade show in New York City.  Raffel approached Lemonis and Menkin because she wanted Lemonis to purchase her Runway store in Deerfield, Illinois.

137.   Shortly thereafter, Lemonis visited Runway and decided that ML Fashion would purchase the store.  On March 23, 2016, Gooberry purchased Runway.  In May 2016, Gooberry and ML Fashion paid to completely renovate Runway and stock it with new inventory.  Once again, these expenditures forced the companies to take on additional debt from Lemonis to meet their basic expenses.

138.   On information and belief, Lemonis wanted Gooberry to acquire Runway because Lemonis was romantically interested in its owner Raffel, not because he believed the acquisition would help Gooberry or ML Fashion, which was formed shortly after the acquisition.

139.   Not long after Gooberry acquired Runway, Raffel was buying inventory for ML Fashion's other retail stores despite not having a position with ML

Fashion. Indeed, on or around March 24, 2016, the day after the acquisition closed on March 23, 2016, Raffel purchased inventory for non-Runway stores.

140. Soon, Lemonis and Raffel began buying inventory together and spending far more than ML Fashion's allocated budget on inventory. Again, overspending on inventory forced ML Fashion further into debt to Lemonis' entities.

141. There can be no doubt that Lemonis and Raffel knew they were exceeding ML Fashion's budget for purchasing inventory because ML Fashion's controller prepared detailed monthly budgets and a quarterly purchasing budget for future inventory orders called an open-to-buys. Lemonis and Raffel were sent these budgets.

142. Further, every day, the controller informed Lemonis of the status of ML Fashion's debt with ML Retail and ML, LLC and the Company's daily sales, cash, and payables positions. This report also included Lemonis and Raffel's inventory orders so they could see how much they were buying compared to the Company's ability to purchase inventory.

143. Despite having all of this information showing that ML Fashion could not afford the inventory the two were purchasing, Lemonis and Raffel continued to overspend without regard for the Company's financial abilities. The more Lemonis and Raffel overspent, the more indebted the Company would need to become to Lemonis and his entities.

144.  At one point in 2018, Lemonis and Raffel were over-buying inventory at a rate of approximately $1M per quarter.  Indeed, some of the stores did not even have the physical space to receive the inventory that Lemonis and Raffel were purchasing.  Stores complained to both Lemonis and Raffel that they did not have the space for any more inventory, yet Lemonis and Raffel continued their purchasing unabated.

145.  Lemonis forced ML Fashion to open liquidation stores called Sample Sale in order to sell the excess inventory that he and Raffel were buying for the Company.  Once again, ML Fashion incurred debt to open these Sample Sale stores, but the stores had no chance of making enough revenue to stay afloat as they were selling inventory at liquidation prices.  These Sample Sale stores only added to ML Fashion's indebtedness with Lemonis.

146.  Whenever Plaintiffs complained about Lemonis' and Raffel's overspending, Lemonis would threaten to foreclose on ML Fashion because of the huge debt it owed to ML Retail and ML, LLC.  Plaintiffs knew that if they did not play ball, Lemonis would foreclose on the debt and take the company they worked so hard to build from them.

147.  Indeed, Plaintiffs witnessed Lemonis do this with several entities he encountered through "The Profit".  For example, a January 19, 2016 episode of the

"The Profit" featured the brand Inkkas Shoes. On the show, the parties agreed to a deal where Lemonis would invest $750,000 for 51% of the business.

148. After the episode aired, but before the acquisition was completed under the ML Fashion umbrella, Lemonis forced Inkkas Shoes to hold a sale called "Free Shoe Friday." Lemonis tweeted a code which allowed shoppers to buy shoes from the Inkkas website for zero dollars. This led to $200,000 of inventory being given away in six hours.

149. Lemonis used this and other tactics to force debt on Inkkas and a few months later, foreclosed on the business, took its assets, and removed the original owners.

150. Similarly, a September 2016 episode of "The Profit" featured the brand Flex Watches based in Los Angeles, California. During the episode, Lemonis agreed to invest $400,000 in exchange for 40% of the business. This gave Flex Watches, Inc., the company running the brand, a valuation of $1,000,000.

151. Lemonis had ML Fashion open a Los Angeles office for Flex Watches, forcing the Company to incur debt. Lemonis also forced debt on Flex Watches, Inc. By September 2016, Lemonis had saddled Flex Watches, Inc. with over $300,000 in debt. When it came time to formalize his investment in Flex Watches, Lemonis used that debt to offset the $400,000 purchase price and was able to move the assets for

Flex Watches, Inc. to a company called Flex Watches, LLC which was wholly owned by ML Fashion.

152.   As is to be expected, the Flex Watches brand floundered under Lemonis' control and its debts to Lemonis grew insurmountable.  In August 2019, almost three years after their episode aired, Lemonis sold Flex Watches back to one of the original owners for $10 plus $52,175 in inventory, $13,437.63 in the company's cash accounts, and $128,231.95 in accounts payable—a tiny fraction of Flex Watches' $1,000,000 valuation prior to Lemonis' involvement.

153.   This happened again with a business called Ben's Garden that was featured on "The "Profit" in January 2019.  Ben's Garden produced home and gift items like greeting cards, paperweights, and picture frames.  On the show, Lemonis agreed to invest $400,000 for 40% of the business.  Ben's Garden needed an influx of cash to pay unpaid bills so Lemonis funded the company by forcing MLG Retail—one of ML Fashion's biggest assets—to purchase its old inventory and put it into its retail stores.  ML Fashion and MLG Retail had not been in the home good market before, so the sudden addition of home goods to their stores did not go well. The product did not sell and ended up being a loss on the Company's books.

154.   As seems to always happen, by June 2019, Lemonis and the owner of Ben's Garden had a falling out.  After that, Lemonis, just as he had tried to do with Plaintiffs before the Gooberry deal was signed, told the Ben's Garden owner that he

had to repay Lemonis for all of the money he put into his business on the show or else Lemonis would take the business from him.

155. Lemonis used the new businesses, new retail stores, and constant acquisitions to keep Plaintiffs distracted from what he was doing with the ML Fashion assets. Lemonis was constantly having Plaintiffs open new retail locations, change retail locations to different brands, close new locations, and clean up after Raffel's messes to create a fog where Plaintiffs were too overworked to closely examine the wellbeing of the Company. Whenever Plaintiffs did question what Lemonis was doing with the Company, Lemonis would respond with threats to either fire their mother Neomi, foreclose on his debt and take the Company from them, or fire them from the Company. Lemonis made it clear that they had no power to prevent him from doing as he pleased with the Company. Again, after watching Lemonis do this with other business owners they knew he would make good on his threats.

### E. Lemonis Uses ML Fashion To Grow His Personal Brand

156. Furthermore, Lemonis was not actually interested in growing the Courage.B brand or any of the other brands ML Fashion acquired such as Denim & Soul. Instead, Lemonis, together with Raffel, his new wife, sought to use ML Fashion's assets and Plaintiffs' know-how to grow his new retail concept MARCUS.

157. On information and belief, Lemonis and Raffel wanted to grow MARCUS to have a venture together, further promoting Lemonis' personal brand and the couple's image. Lemonis and Raffel married in February of 2017 in Los Angeles.

158. In 2017, Lemonis wanted to open a store in downtown Chicago. At the time, Menkin and Goureau advised that opening a retail store in that location would be extremely expensive. Despite their concern, Lemonis opened a retail store branded MARCUS.

159. Once the new MARCUS store was opened, around fall 2017, Lemonis renovated and rebranded ML Fashion's other retail locations from Courage.B, Denim & Soul, and Runway as MARCUS stores. For the most part, these were stores that ML Fashion had recently spent hundreds of thousands of dollars renovating that the Company now had to spend even more money to renovate and change branding and inventory to become MARCUS stores.

160. In addition, the stores had to purchase new signage, websites, and branded materials such as shopping bags, tissue paper, displays, etc. All of the old signage and branded materials had to be thrown out. Again, the renovations and rebranding forced ML Fashion to take on more loans from Lemonis to cover its expenses.

161.  Then, on information and belief, on or around July 31, 2018, Lemonis applied to trademark the word MARCUS for the products sold under the brand, such as handbags, clothing, and footwear.  However, instead of applying for the mark under ML Fashion, the company that was running the MARCUS retail stores, Lemonis tried to obtain the trademark for MARCUS under ML Creative, LLC, an entity which Plaintiffs have no ownership interest in and, under information and belief, is owned and controlled solely by Lemonis.

162.  Additionally, Lemonis sought to build strife between Plaintiffs and their mother, Neomi.  After the creation of ML Fashion, Neomi continued to earn a salary from ML Fashion, like she did from Gooberry, as a management fee.  However, after about a year, Lemonis told Neomi that he hated all of her designs and that Neomi should let Lemonis and Plaintiffs do all of the work for the Company.

163.  Lemonis attempted to pit Plaintiffs against their mother by consistently telling Plaintiffs that they would make more money if the Company was not paying their mother.

164.  Lemonis also used Neomi as a pawn to ensure that Plaintiffs did not question how much influence over the Company he had given Raffel.  Raffel did not have experience buying inventory for a multi-store chain, did not understand the different markets and needs of the stores, and was unfamiliar with the software

systems ML Fashion used to manage its inventory. This forced other ML Fashion staff to fix errors and mistakes that she made, costing the Company time and money.

165. When Plaintiffs questioned why Raffel was making purchases for the Company, Lemonis would tell them that they had to deal with Raffel being involved because Lemonis was keeping their mother Neomi on the payroll. Lemonis often threatened to fire Neomi whenever Plaintiffs did not simply fall in line.

### F. Lemonis Removes Plaintiffs From Their Business

166. In September 2019, Lemonis made good on his threats to remove Neomi and abruptly terminated her employment with the Company. Giovanni Senafe, one of Lemonis' agents, called Neomi to tell her that she was terminated, effective immediately, that she would receive no further compensation moving forward, and that her health insurance was being cut off.

167. Indeed, one by one, Lemonis has sought to cut Plaintiffs out of the business they created with their family. In March 2016, Lemonis moved Goureau from ML Fashion to ML, LLC in an attempt to drive a rift between Goureau and Menkin. Lemonis had Goureau work on other businesses that Lemonis invested in through "The Profit" that did not fall under the ML Fashion umbrella. As part of the transition, Lemonis prohibited Goureau from entering the stores owned by ML Fashion or having any opinion or influence in a company he created. Goureau knew

that if he pushed back Lemonis would fire his sister Menkin and his mother Neomi who relied on ML Fashion and Gooberry to make a living.

168.    Then, in May 2017, Lemonis moved Goureau from ML, LLC to Camping World.  Lemonis represented that working at Camping World would be beneficial for Goureau because it was a publicly traded company that could offer stock vesting and other employment benefits.  However, Lemonis fired Goureau from Camping World in December 2018.

169.    On or around December 2019, Lemonis and Menkin discussed how she could separate from the Company and Lemonis' businesses.  The two discussed terms of a departure, however, once the COVID-19 pandemic started, around April 2020, Lemonis abruptly cut off Menkin and removed her access to her company e-mail and all of her company files.

170.    Further, ML Fashion has not paid Menkin since the end of March 2020.  As the President of ML Fashion, Menkin received compensation of $11,558 on the first and fifteenth of each month.  Menkin's compensation came from an account in the name of MLG Retail but was for her work as the President of ML Fashion.

171.    Thus, in six years, Lemonis effectively separated all three founders of Courage.B from their business and from the Company that he was supposed to be helping and growing.

### G.    Lemonis Seeks to Benefit From the Pandemic

172. While the entire world is dealing with the devastating COVID-19 pandemic, Lemonis has been using the shutdown to further loot ML Fashion.

173. Starting in April 2020, Lemonis began shutting down some of the Company's retail stores and sending employees across the country to take the assets and inventory from the stores. On or around April 30, 2020, Lemonis sent employees to close a MARCUS branded store located in Glencoe, Illinois where MLG Retail is the lessee of the store and ML Fashion is the guarantor. Lemonis had the employees remove roughly $110,034 worth of inventory and $60,772 worth of fixtures, furniture, and equipment ("FFE") from the Glencoe location. Plaintiffs do not know what Lemonis has done with the inventory and FFE that was removed.

174. Lemonis has continued closing stores—and taking their assets—all over the country during the pandemic. Also, on or around April 30, 2020, Lemonis sent employees to close a MARCUS branded store located in Dallas, Texas owned and operated by ML Fashion. Closing this store was directly against ML Fashion's interest because this location was one of ML Fashion's strongest performing stores. Lemonis removed roughly $149,215 worth of inventory and $75,451 worth of FFE from the Dallas location.

175. Lemonis is also looting the assets of one of ML Fashion's biggest assets, MLG Retail. On May 1, 2020, Lemonis sent employees to close a MARCUS location in Palm Beach, Florida and remove its inventory and FFE. Those

employees removed roughly $118,128.00 in inventory and $61,032 in FFE. The lease for that Palm Beach location is personally guaranteed by Goureau, yet Lemonis did not tell Goureau he was shutting down the stores and taking its inventory and FFE. Again, Plaintiffs do not know what Lemonis is doing with the assets he took.

176. On or around August 13, 2020, Lemonis closed on of ML Fashion's MARCUS branded stores in Newtown, Massachusetts. Once again, Lemonis has taken hundreds of thousands of dollars in inventory and FFE from that location and Plaintiffs are in the dark as to the current location of those assets.

177. Moreover, starting on April 27, 2020, Lemonis, or someone acting at his direction, began systematically moving funds out of the MLG Retail account that was used to automatically pay several of MLG Retail's debts. Importantly, the account was used to pay a payment plan for the Company's corporate American Express credit card that is tied to Goureau personally.

178. This American Express corporate card was ML Fashion and MLG Retail's regular business credit card which employees in the Company used to purchase inventory, office supplies, and other business goods. American Express requirements meant that an individual had to be tied to the card, and in this case the individual tied to the card was Goureau.

179. Starting around 2018, Lemonis began using this credit card for larger Company purchases. Previously, the card had a standing balance of around

$200,000. Through 2018 and 2019, Lemonis increased the balance to over $600,000. On information and belief, this was done because the card was tied to Goureau personally which allowed Lemonis to use the threat of defaulting on the card, and triggering hundreds of thousands of personal liability for Goureau, to keep Menkin from questioning his decisions.

180. On or around April 4, 2019, MLG Retail entered into a payment plan with American Express and agreed to pay the balance due, roughly $688,762, in monthly installments of $18,696. *See* March 17, 2020 Letter from S. Menkin to N. Goureau, Bellew Decl. Ex. D. Lemonis expressly approved this payment plan. *Id*. at p. 2. Under the agreement, the installment payments were drawn directly out of one of MLG Retail's bank accounts.

181. While Lemonis has no problem making regular payments of several thousands of dollars to his personal American Express card, he made sure that the corporate American Express card tied to Goureau had a payment plan where any missed payments triggered the entire amount due. Lemonis often used the threat of stopping the automatic payments—which would automatically make Goureau personally liable for hundreds of thousands of dollars—to keep Menkin in line.

182. On or around March 17, 2020, ML Fashion and MLG Retail confirmed that the companies would continue to pay the amount due on the American Express account, now around $463,112. *See* March 17, 2020 Letter from S. Menkin to N.

Goureau, Bellew Decl. Ex. D. However, Lemonis has been purposefully depleting the account used for the automatic payments so that there are no funds in the account when American Express attempts to debit the automatic payments.

183. Again, under the payment plan, the entire amount outstanding becomes due upon a default. Thus, Lemonis is forcing MLG Retail to default on the payments, triggering not only the entire debt for the Company, but also for Goureau as the credit card is in his name. After the initial filing of this Complaint, Defendants had left funds in the account for the Amex payments to draw on. This allowed the Amex payments to become current. However, on or around August 4, 2020, Defendants have reversed roughly $94,049 in payments on the American Express card.

184. Goureau has been informed by American Express that if payments are not made soon, it will begin collections proceedings against Goureau personally. This would have an extremely negative impact on Goureau's credit and personal finances.

185. Lemonis has further benefited from the pandemic through the government's Paycheck Protection Program ("PPP"). Without Plaintiffs' consent or knowledge, Lemonis applied for a PPP loan and on May 1, 2020, the Company received $818,394 in PPP funds.

186. Upon information and belief, on or around May 22, 2020, Lemonis, or someone acting at his direction, transferred all funds (roughly $601,324.02) in the ML Fashion and MLG Retail bank accounts into a new bank account under the name of MLG Retail. The new bank account was not tied to any of ML Fashion or MLG Retail's other accounts, and Menkin, a signatory on all of the bank accounts for both companies, does not have access to the account and cannot see any transactions being done in that account.

187. Since the original filing of this Complaint on June 18, 2020, Defendants have continued to deplete the assets of ML Fashion. Defendants have held several fire sales liquidating the inventory of ML Fashion by selling it at up to 90% off.

188. Further, despite the fact that several retail stores are closed due to the pandemic and stay at home orders are in effect, Defendants have hosted private liquidation events at the Company's store in Deerfield, Illinois, where Defendants invited Camping World employees and gave them massive discounts. Even more, holding these large private events during a pandemic, in violation of state and local rules about large gatherings and retail stores, creates potential liability for ML Fashion.

189. Based on all of Lemonis' recent actions, it is clear that he is planning on rendering ML Fashion and its asset, MLG Retail, insolvent so that he can

foreclose on the companies, remove Plaintiffs from the business, and use the assets to continue his MARCUS brand.

190.   While setting up ML Fashion and MLG Retail, the parties worked to register the Company to do business in several states.  As part of the process, Menkin and/or Goureau were listed as the individuals associated with ML Fashion and MLG Retail in several states including Illinois, Connecticut, Minnesota, and Florida. Now, Defendants have failed to make ML Fashion's required annual payments to those states, leaving Menkin and/or Goureau personally responsible for the payments.  For example, on August 5, 2020, the Minnesota Department of Revenue sent a letter to Goureau explaining that MLG Retail had missed the deadline to file and pay its taxes and stating that if the return was not filed, and taxes not paid, before September 4, 2020, that there would be additional penalties.  *See* Bellew Decl. Ex. H.   These outstanding debts have hindered Plaintiffs' ability to start separate businesses in Illinois, Connecticut, Minnesota, and Florida.

## DERIVATIVE ALLEGATIONS

191.   Plaintiffs bring this action directly and derivatively in the right of and for the benefit of ML Fashion to redress injuries suffered, and to be suffered, by ML Fashion as a direct result of Defendants' gross mismanagement, breaches of fiduciary duty, breach of the LLC Agreement, and use of ML Fashion solely as a vehicle for personal gain at the detriment of the Company.

192. ML Fashion is named as a Nominal Defendant in this case solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have. Plaintiffs were members of ML Fashion at the time of the transgressions of which they complain and continue to be members of the Company.

193. Plaintiffs will adequately and fairly represent the interests of ML Fashion and its members in prosecuting and enforcing their rights. Prosecution of this action, independent of the current Manager, is in the best interests of the Company.

194. The wrongful acts complained of herein subject, and will continue to subject, ML Fashion to continuing harm because the adverse actions are continuing and the consequences of those actions are still in effect and ongoing.

## DERIVATIVE DEMAND FUTILITY

195. Plaintiffs have not made any demand to Lemonis as ML Fashion's Manager to bring suit and assert the claims set forth herein because such a pre-suit demand would clearly be futile and is, therefore, excused as a matter of law.

196. As ML Fashion's sole Manager and sole owner of ML Retail, the only member that can remove a manager, Lemonis obviously suffers from a patent conflict of interest which would prevent him from exercising independent business judgment in evaluating the merits of the claims asserted against him herein. Stated

differently, a demand for Lemonis to bring this suit and assert the claims set forth herein is excused by the simple fact that such a demand would essentially require Lemonis to sue himself and, in that regard, potentially subject himself to personal liability.

197.   As the manager of ML Fashion, Lemonis used the Company's assets to enrich himself and the Lemonis entities by, among other things, taking actions that financially favored the member ML Retail, LLC, while decreasing the value and viability of the Company to the detriment of the other shareholders.

198.   Further, Lemonis used his control of the Company force the Company to assume increasing debt by taking on loans and promissory notes from his other entities that would allow him to foreclose on the Company at any time.  Lemonis also benefited from his use of the Company to acquire the fledgling brands, businesses, and products featured on the "Profit" to boost his own image at the expense of the Company.  Moreover, Lemonis has since removed assets of the Company and transferred them to other entities and/or businesses owned or controlled by Lemonis.

199.   In addition to Lemonis' self-interest, demand is further excused here because Lemonis forced the Company to undertake actions and engage in transactions that were so egregious on their face that they could not have been the products of sound business judgment.  As the manager of ML Fashion, Lemonis

consistently mismanaged the Company's assets and pursued a business strategy that was so reckless and vastly against the Company's interests that his decisions could not have been the products of sound business judgment.  Lemonis' actions include: (1) saddling the Company with expensive inventory then forcing the Company to sell that inventory at a loss, (2) purposefully decreasing the Company's profit margins making it reliant on loans from Lemonis and his entities, (3) purposefully removing capital from the Company so that its debts could not be paid, (4) purposefully increasing the debt of the Company and forcing it to take loans from Lemonis, and/or other companies owned and/or controlled by him, in order to meet its financial obligations, (5) taking actions that financially favored member ML Retail, LLC, decreasing the value and viability of the Company to the direct detriment of the other members of the Company, (6) using the assets of the Company to grow Lemonis' personal brand MARCUS, (7) taking a personal tax write-off on ML Fashion's charitable donations, (8) using ML Fashion as a vehicle to defraud and foreclose upon small business owners Lemonis was purporting to save, (9) closing the Company's retail stores and removing at least $377,377 worth of inventory and $197,255 worth of fixtures, furniture, and equipment from the stores, (10) improperly removing at least $601,324.02 from the Company's bank accounts, and (11) improperly taking at least $3,023,004.47 from ML Fashion and MLG Retail to pay personal, non-Company related, expenses that Defendants put on Defendant

Lemonis' personal credit card and keeping and/or using the rewards points from those payments for Defendants' benefit.

200.   Even if Lemonis acceded to a demand from Plaintiffs and pursued litigation against himself on behalf of the company, there is no reason to believe that he would appoint the proper persons to conduct the litigation or fully pursue any and all available remedies.

201.   In short, it is readily apparent that Lemonis would either be incapable or unwilling to take the actions required to seek the relief requested in this Complaint.

## COUNT I
### (Fraudulent Inducement – Direct Claim Against Lemonis, ML Retail, and ML, LLC)

Plaintiffs repeat and reallege each allegation contained above as though fully set forth herein.

202.   Defendants, and each of them through their agent and/or alter ego Lemonis, knowingly made numerous material misrepresentations to Plaintiffs and/or failed to disclose material information to Plaintiffs in order to induce them into the LLC Agreement.

203.   As the only natural person involved in the management of Defendants ML Retail and ML, LLC, when Lemonis made representations to Plaintiffs, he did so in his individual capacity and on behalf of ML Retail and ML, LLC.

204.    Defendants' material misrepresentations and/or failures to disclose material information described above include but are not limited to: (1) representing that Defendants wanted to help Plaintiffs expand their business through ML Fashion, (2) representing that Plaintiffs and Lemonis would be treated as equals in running ML Fashion, (3) representing that Defendants would run ML Fashion in a way that would benefit Plaintiffs and the Company, (4) representing that ML Fashion would invest in other business to and help grow and develop the businesses in their profile, and (5) representing that ML Fashion's Credit Agreement with ML Retail, and the corresponding agreement with ML Retail and ML, LLC, would be used to provide the Company with cost-effective capital not to make the Company insurmountably indebted to ML Retail and ML, LLC.

205.    At all times, Defendants knew these misrepresentations were false and that Defendants intended to use ML Fashion as a vehicle for self-enrichment to the detriment of Plaintiffs and the Company itself.  Defendants further knew that they would use credit agreements to force debt upon ML Fashion, allowing them to foreclose on the Company on a whim, and that they would use ML Fashion to defraud other small business owners Lemonis purported to save.

206.    Defendants intended that Plaintiffs rely upon these misrepresentations and fraudulent omissions of material facts.

207. Plaintiffs were ignorant of the falsity of the representations and justifiably relied on the misrepresentations and fraudulent omissions of material facts and entered into the LLC Agreement with Defendants. Plaintiffs would not have entered into the LLC Agreement with Defendants if they knew that Defendants' representations we false.

208. Defendants' actions were willful, wanton, malicious and oppressive.

209. As a direct and proximate result of Defendants' fraud, Plaintiffs have been harmed. As a result of Defendants' fraud, Plaintiffs entered into the LLC Agreement, and put their time and energy into ML Fashion and away from their brand Courage.B and original company Gooberry.

<u>COUNT II</u>
**(Fraud – Direct Claim Against Lemonis, ML Retail, and ML, LLC)**

Plaintiffs repeat and reallege each allegation contained above as though fully set forth herein.

210. Defendants, and each of them through their agent and/or alter ego Lemonis, knowingly made numerous material misrepresentations to Plaintiffs and/or failed to disclose material information to Plaintiffs.

211. As the only natural person involved in the management of Defendants ML Retail and ML, LLC, when Lemonis made representations to Plaintiffs, he did so in his individual capacity and on behalf of ML Retail and ML, LLC.

212. Defendants' material misrepresentations and/or failures to disclose material information described above include but are not limited to: (1) representing that ML Fashion was investing in stores, brands, and retail businesses in order to further grow those businesses and ML Fashion, (2) representing that purchases made for ML Fashion were done to benefit the brand and not increase ML Retail and ML, LLC's debt position in ML Fashion, (3) representing that ML Fashion and MLG Retail would make payments towards the American Express balance on the account in Goureau's name, (4) representing to Plaintiffs that ML Fashion would make required company state tax payments in the states where Plaintiffs were made personally liable and (5) representing that funds ML Fashion obtained through its Credit Agreement with ML Retail, and the corresponding agreement with ML Retail and ML, LLC, would be used to provide the Company with cost-effective capital not to make the Company insurmountably indebted to ML Retail and ML, LLC.

213. At all times, Defendants knew these misrepresentations were false and that Defendants intended to use ML Fashion as a vehicle for self-enrichment to the detriment of Plaintiffs and the Company itself. Defendants further knew that they would use credit agreements to force debt upon ML Fashion, allowing Lemonis, through his alter ego entities ML Retail and ML, LLC, to foreclose on the Company on a whim and that Defendants would use ML Fashion to defraud other small business owners Lemonis purported to save. Defendants further had no intention of

fully paying the American Express balance in Goureau's name and intended to use the balance as a sword over Plaintiffs to keep them in line.

214. Defendants intended that Plaintiffs rely upon these misrepresentations and fraudulent omissions of material facts.

215. Plaintiffs were ignorant of the falsity of the representations and justifiably relied on the misrepresentations and fraudulent omissions of material facts. Plaintiffs relied on Defendants' representations by such things, including but not limited to, continuing the business venture with Defendants, and using the American Express card, tied to Goureau personally, to make Company purchases.

216. Defendants' actions were willful, wanton, malicious and oppressive.

217. As a direct and proximate result of Defendants' fraud, Plaintiffs have been harmed. As a result of Defendants' fraud Plaintiffs have been prevented from starting new business ventures to the state tax liabilities, and Goureau's ability to obtain financing has been hindered due to the American Express debt.

## COUNT III
**(Breach of Fiduciary Duty – Derivative Claim Against Lemonis)**

Plaintiffs repeat and reallege each allegation contained above as though fully set forth herein.

218. Lemonis currently serves as the Manager of ML Fashion. Under the LLC Agreement, a Manager can be liable to the Company when he engages in what the LLC Agreement describes as Misconduct. *See* LLC Agreement at p. 5, § 6.2,

Bellew Decl. Ex. A. Such Misconduct includes breach of fiduciary duty. By including a breach of fiduciary duty as Misconduct, the LLC Agreement contemplates and authorizes claims for breach of fiduciary duty as separate claims from breaches of the LLC Agreement.

219. Lemonis currently serves as the Chairman/CEO of ML Fashion, and, as an officer of ML Fashion, Lemonis owes the Company the fiduciary duties of care, loyalty, and good faith. The fiduciary duties that Lemonis owes to the Company as an officer, are separate and apart from, and in addition to, the fiduciary duties he owes to the Company as its Manager.

220. Lemonis engaged in Misconduct and breached his fiduciary duty to ML Fashion, as described above, by doing the following, among other things: (1) saddling the Company with expensive inventory then forcing the Company to sell that inventory at a loss, (2) purposefully decreasing the Company's profit margins making it reliant on loans from Lemonis and his entities, (3) purposefully removing capital from the Company so that its debts could not be paid, (4) purposefully increasing the debt of the Company and forcing it to take loans from Lemonis, and/or other companies owned and/or controlled by him, in order to meet its financial obligations, (5) taking actions that financially favored member ML Retail, LLC, decreasing the value and viability of the Company to the direct detriment of the other members of the Company, (6) using the assets of the Company to grow Lemonis'

personal brand MARCUS, (7) taking a personal tax write-off on ML Fashion's charitable donations, (8) using ML Fashion as a vehicle to defraud and foreclose upon small business owners Lemonis was purporting to save, (9) closing the Company's retail stores and removing at least $377,377 worth of inventory and $197,255 worth of fixtures, furniture, and equipment from the stores, (10) improperly removing at least $601,324.02 from the Company's bank accounts, (11) improperly taking at least $3,023,004.47 from ML Fashion and MLG Retail to pay personal, non-Company related, expenses that Defendants put on Defendant Lemonis' personal credit card and keeping and/or using the rewards points from those payments for Defendants' benefit, and (12) preventing ML Fashion from paying the business American Express card tied to Goureau personally.

221.  As a direct and proximate result of Lemonis' breaches of his fiduciary duty, Plaintiffs and the Company have been harmed in an amount to be proven at trial, but at least $4,198,960.49.

## COUNT IV
### (Breach of Fiduciary Duty – Direct and Derivative Claim Against Defendants Lemonis, ML Retail, and ML, LLC)

Plaintiffs repeat and reallege each allegation contained above as though fully set forth herein.

222.  As a control group wielding unbridled power to control the Company, the ML Control Group owes a fiduciary duty to the Company and Plaintiffs.  The

ML Control Group is connected by common ownership, as Lemonis is the only natural person with an interest in ML Retail and ML, LLC, and worked together towards their shared goal of running ML Fashion to benefit themselves to the detriment of the Company and Plaintiff. The fiduciary duties owed to the Company and to Plaintiffs by the Control Group do not arise from the LLC Agreement.

223. The fiduciary duties that Lemonis owes to the Company and to Plaintiffs as a result of being in the ML Control Group are separate and apart from, and in addition to, the fiduciary duties he owes to the Company as its Manager and an officer.

224. The ML Control Group breached its fiduciary duty to the Company, Goureau, and Menkin, as described above, by doing the following, among other things: (1) saddling the Company with expensive inventory then forcing the Company to sell that inventory at a loss, (2) purposefully decreasing the Company's profit margins making it reliant on loans from Lemonis and his entities, (3) purposefully removing capital from the Company so that its debts could not be paid, (4) purposefully increasing the debt of the Company and forcing it to take loans from Lemonis, and/or ML Retail and/or ML, LLC, in order to meet its financial obligations, (5) taking actions that financially favored member ML Retail, LLC, decreasing the value and viability of the Company to the direct detriment of the other members of the Company, (6) using the assets of the Company to grow Lemonis'

personal brand MARCUS, (7) having Lemonis take personal tax write-offs on ML Fashion's charitable donations, (8) using ML Fashion as a vehicle to defraud and foreclose upon small business owners Lemonis was purporting to save, (9) closing the Company's retail stores and removing at least $377,377 worth of inventory and $197,255 worth of fixtures, furniture, and equipment from the stores, (10) improperly removing at least $601,324.02 from the Company's bank accounts, and (11) improperly taking at least $3,023,004.47 from ML Fashion and MLG Retail to pay personal, non-Company related, expenses that Defendants put on Defendant Lemonis' personal credit card and keeping and/or using the rewards points from those payments for Defendants' benefit.

225. As a direct and proximate result of the ML Control Group's breaches of their fiduciary duty, Plaintiffs and the Company have been harmed in an amount to be proven at trial, but at least $4,198,960.49.

## COUNT V
### (Aiding and Abetting – Direct Claim Against Raffel)

Plaintiffs repeat and reallege each allegation contained above as though fully set forth herein.

226. As stated above, Defendants Lemonis, ML Retail, and ML, LLC as the alter ego of Lemonis and ML Retail, owed fiduciary duties to the Company and Plaintiffs.

227.    Defendant Raffel knew that Defendants Lemonis, ML Retail, and ML, LLC owed fiduciary duties to ML Fashion.

228.    Defendant Raffel knowingly aided and abetted Defendants' breaches of their fiduciary duties by: (1) working with Lemonis to buy product for ML Fashion's retail stores far above ML Fashion's budget for product thus forcing ML Fashion to incur more debt from Lemonis so it was not able to cover its normal business expenses, such as payroll and rent, (2) making business decisions that were outside of her understanding such as managerial, staffing, discounting, and merchandising decisions, knowing that ML Fashion would have to expend time and resources to correct and redo her work, and (3) working with Defendants to make ML Fashion insolvent and indebted to ML Retail and ML, LLC so that they could use the assets of ML Fashion to grow Lemonis and Raffel's MARCUS brand.

229.    As a direct and proximate result of Defendant Raffel's conduct, Plaintiffs and the Company have been harmed in an amount to be proven at trial.

## COUNT VI
**(Breach of the Implied Covenant of Good Faith and Fair Dealing – Direct and Derivative Claim Against Defendants Lemonis, ML Retail, and ML, LLC)**

Plaintiffs repeat and reallege each allegation contained above as though fully set forth herein.

230.    The LLC Agreement contains an implied covenant of good faith and fair dealing.  The implied covenant of good faith and fair dealing attaches whenever

an LLC Agreement gives a party the ability to take an action in their "sole discretion." As discussed above, the LLC Agreement gave Lemonis the sole discretion to manage the day to day affairs of ML Fashion, gave ML Retail the sole discretion to change the Company's manager, and gave ML Retail the sole discretion to handle ML Fashion's tax matters.

231. The implied covenant of good faith and fair dealing applies in an LLC agreement that, like the LLC Agreement here, attempts to limit the liability of its managers and members.

232. Defendants breached this covenant by abusing, unreasonably and in bad faith and for their own interests and to the detriment of the Company, the managerial power over the Company provided to them in the LLC Agreement. Actions which breached the covenant, described above, include, but are not limited to: (1) saddling the Company with expensive inventory then forcing the Company to sell that inventory at a loss, (2) purposefully decreasing the Company's profit margins making it reliant on loans from Lemonis and his entities, (3) purposefully removing capital from the Company so that its debts could not be paid, (4) purposefully increasing the debt of the Company and forcing it to take loans from Lemonis, and/or other companies owned and/or controlled by him, in order to meet its financial obligations, (5) taking actions that financially favored member ML Retail, LLC, decreasing the value and viability of the Company to the direct detriment of the other

members of the Company, (6) using the assets of the Company to grow Lemonis'
personal brand MARCUS, (7) having Lemonis take personal tax write-offs on ML
Fashion's charitable donations, (8) using ML Fashion as a vehicle to defraud and
foreclose upon small business owners Lemonis was purporting to save, (9) closing
the Company's retail stores and removing at least $377,377 worth of inventory and
$197,255 worth of fixtures, furniture, and equipment from the stores, (10)
improperly removing at least $601,324.02 from the Company's bank accounts, and
(11) improperly taking at least $3,023,004.47 from ML Fashion and MLG Retail to
pay personal, non-Company related, expenses that Defendants put on Defendant
Lemonis' personal credit card and keeping and/or using the rewards points from
those payments for Defendants' benefit.

233. As a direct and proximate result of Defendants' breaches of the implied
duty of good faith and fair dealing, Plaintiffs and the Company have been harmed in
an amount to be proven at trial, but at least $4,198,960.49.

## COUNT VII
**(Breach of ML Fashion's LLC Agreement – Direct and Derivative Claim
Against Defendants Lemonis, ML Retail, and ML, LLC)**

Plaintiffs repeat and reallege each allegation contained above as though fully
set forth herein.

234. This is a direct and derivative action for money damages arising out of
Defendants' breach of the duties and obligations owed to ML Fashion and the

Company's members under the LLC Agreement, and the resulting damages that were incurred.

235.   At all times material to this action, Defendant Lemonis was the Manager and Chairman/CEO of ML Fashion, Defendant ML Retail owned the largest and most powerful membership interest in the Company, and ML, LLC was an agent and alter ego of both Lemonis and ML Retail.  As such, Defendants agreed to fulfill and discharge certain managerial duties and obligations that were expressly set forth in the LLC Agreement.

236.   Specifically, under Section 2.8 of the LLC Agreement, Defendants agreed that "[t]he Company's credit and assets shall be used solely for the benefit of the Company."  *See* LLC Agreement at § 2.8, Bellew Decl. Ex A.

237.   Defendants materially breached Section 2.8 of the LLC Agreement, by removing the assets of the Company, including money in its bank accounts and inventory in its stores, and using the assets of the Company to promote Lemonis' personal brand MARCUS, thus clearly not using them solely for the benefit of the Company.  Indeed, the removal of these assets have prevented the Company from being able to satisfy its financial obligations.

238.   Lemonis further breached this provision of the LLC Agreement by improperly taking at least $3,023,004.47 from ML Fashion and MLG Retail to pay personal, non-Company related, expenses that Defendants put on Defendant

Lemonis' personal credit card and keeping and/or using the rewards points from those payments for Defendants' benefit.

239. Further, Section 6.2(b) required Lemonis to act in good faith and to take actions for the benefit of all of the members as a whole:

**6.2    Duties and Obligations of the Manager; Discretion**:

(b)    Subject to the foregoing but notwithstanding any other provision of this Agreement to the contrary or other applicable provision of law or equity, whenever in this Agreement a Manager or an Officer is permitted or required to make a decision or take an action (i) in his "sole discretion" or "discretion" or under a similar grant of authority or latitude, in making such decisions or taking such actions, he shall be entitled to take into account his own interests as well as the interests of the Members as a whole or (ii) in "good faith" or under another expressed standard, he shall act under such express standard and shall not be subject to any other or different standard.

*See* LLC Agreement at § 6.2(b), Bellew Decl. Ex A.

240. Lemonis materially breached Section 6.2 by taking actions that failed to take into account "the interests of the Members as a whole" and failing to act in good faith. Specifically, Lemonis made ML Fashion take on debt and forced ML Fashion to take loans from ML Retail in transactions that solely benefited ML Retail and harmed ML Fashion and its other members.

241. Moreover, Lemonis' actions of draining ML Fashion's bank accounts and transferring funds to MLG Retail so that ML Fashion could not pay its debt clearly were not done in good faith.

242. The LLC Agreement prohibits the Manager from engaging in Misconduct. The LLC Agreement defines Misconduct as "fraud, breach of fiduciary duty, bad faith, a knowing violation of law or willful misconduct." *See* LLC Agreement at p. 5, Bellew Decl. Ex A.

243. Lemonis' Misconduct as the manager of ML Fashion includes, but is not limited to: (1) forcing the Company to take on debt making it reliant on credit from Lemonis and his entities to meet its regular obligations, such as payroll, and allowing Lemonis to further encumber ML Fashion, (2) using ML Fashion as a vehicle to defraud and foreclose upon the businesses Lemonis was purporting to save, (3) removing funds from the Company's bank accounts in order to ensure that its automated payments could not be made out of the account forcing ML Fashion to become delinquent on its debts, (4) closing ML Fashion's retail stores during a global pandemic and converting at least $377,377 worth of inventory and $197,255 worth of fixtures, furniture, and equipment from the stores, (5) moving all of the funds out of ML Fashion's bank accounts (roughly $601,324.02) and transferring them to a different company and making the new account invisible to the other owners and signatories on ML Fashion's bank accounts, and (6) improperly taking at least $3,023,004.47 from ML Fashion and MLG Retail to pay personal, non-Company related, expenses that Defendants put on Defendant Lemonis' personal

credit card and keeping and/or using the rewards points from those payments for Defendants' benefit.

244. Further, the LLC Agreement limits the Manager's and Members' ability to take assets and distributions from the Company. Section 2.7 confirms that "no Member shall have ownership interest" in the Company's property as all of it belongs to the Company itself. *See* LLC Agreement at § 2.7, Bellew Decl. Ex A. Section 3.4 prevents Members from seeking capital of the Company in return for contributions "prior to termination of the Company." *Id*. at § 3.4.

245. Similarly, no cash distributions are allowed where, as here, the Company's trade accounts are past due. *Id.* at § 5.1(a). Even if the trade accounts were not past due, however, the distributions can be made only within the Manager's "reasonable business judgment" and only to ***all*** the Members pursuant to the specific mechanism set forth in the LLC Agreement. *Id.* at § 5.1(b).

246. An additional limitation on cash distributions is that they cannot be made at all if the effect of the distributions is for all the Company's liabilities to exceed the fair value of its assets. *Id.* at ¶ 5.4.

247. Defendants have breached these provisions of the LLC Agreement by removing cash from the Company's bank accounts and removing inventory from the Company's retail stores to the benefit of Defendants and detriment of the Company and Plaintiffs.

248.   As a direct and proximate result of Defendants' material breaches of the LLC Agreement, Plaintiffs and the Company have been harmed in an amount to be proven at trial, but at least $4,198,960.49.

## COUNT VIII
### (Unjust Enrichment – Direct and Derivative Claim Against Defendants Lemonis, ML Retail, and ML, LLC)

Plaintiffs repeat and reallege each allegation contained in Paragraph 1 – Paragraph 233 above as though fully set forth herein.

249.   Plaintiffs bring this claim for Unjust Enrichment in the alternative to their claim for Breach of the LLC Agreement (Count VII) above.  Such alternative pleading is proper where, as here, Plaintiffs are seeking rescission of the LLC Agreement through their claim for Fraudulent Inducement (Count I).

250.   Plaintiffs allege that the Company has no adequate remedy at law and bring this unjust enrichment claim against Defendants.

251.   By their wrongful acts and omissions, as alleged herein, the Defendants were unjustly enriched at the expense of, and to the detriment of, the Company.  The Defendants used the Company as a self-enrichment vehicle while forcing the Company to take actions counter to the Company's interests and to assume increasing debt.

252.   As the manager of ML Fashion, Lemonis used the Company's assets to enrich himself and his entities by, among other things: (1) purposefully decreasing the Company's profit margins making it reliant on loans from Lemonis and his

entities, (2) purposefully increasing the debt of the Company and forcing it to take loans from Lemonis, and/or other companies owned and/or controlled by him, in order to meet its financial obligations, (3) taking actions that financially favored member ML Retail, LLC, decreasing the value and viability of the Company to the direct detriment of the other members of the Company, (4) using the assets of the Company to grow Lemonis' personal brand MARCUS, (5) having Lemonis take personal tax write-offs on ML Fashion's charitable donations, (6) closing the Company's retail stores and removing at least $377,377 worth of inventory and $197,255 worth of fixtures, furniture, and equipment from the stores, (7) improperly removing at least $601,324.02 from the Company's bank accounts, (8) improperly taking at least $3,023,004.47 from ML Fashion and MLG Retail to pay personal, non-Company related, expenses that Defendants put on Defendant Lemonis' personal credit card and keeping and/or using the rewards points from those payments for Defendants' benefit, (9) receiving at least approximately $500,000 in interest from ML Fashion on ML Retail and ML, LLC's line of credit with ML Fashion, and (10) using the assets, relationships, good will, and trade secrets of ML Fashion to grow Defendants' own retail concept MARCUS.

253. Plaintiffs, as members and representatives of the Company, seek restitution from the Defendants, and seek an order from this Court requiring the

Defendants to disgorge all profits, benefits, and other compensation obtained by the Defendants from their wrongful conduct and fiduciary breaches.

254.   Further, it is against equity and good conscience to permit Defendants to retain what is sought to be recovered because Defendants used the Company's assets to enrich themselves at the expense of the Company and its other members. There is no justification for Defendants' actions.

**COUNT IX**
**(Gross Mismanagement – Direct and Derivative Claim Against Defendants Lemonis, ML Retail, and ML, LLC)**

Plaintiffs repeat and reallege each allegation contained above as though fully set forth herein.

255.   As the manager of ML Fashion, Lemonis has grossly mismanaged the Company and its assets.   Lemonis' gross mismanagement, described above, includes, but is not limited to: (1) saddling the Company with expensive inventory then forcing the Company to sell that inventory at a loss, (2) purposefully decreasing the Company's profit margins making it reliant on loans from Lemonis and his entities, (3) purposefully removing capital from the Company so that its debts, including the American Express payment plan, could not be paid, (4) purposefully increasing the debt of the Company and forcing it to take loans from Lemonis, and/or other companies owned and/or controlled by him, in order to meet its financial obligations, (5) taking actions that financially favored member ML Retail, LLC,

decreasing the value and viability of the Company to the direct detriment of the other members of the Company, (6) using the assets of the Company to grow Lemonis' personal brand MARCUS, (7) having Lemonis take personal tax write-offs on ML Fashion's charitable donations, (8) using ML Fashion as a vehicle to defraud and foreclose upon small business owners Lemonis was purporting to save, (9) closing the Company's retail stores and removing at least $377,377 worth of inventory and $197,255 worth of fixtures, furniture, and equipment from the stores, (10) improperly removing at least $601,324.02 from the Company's bank accounts, (11) improperly taking at least $3,023,004.47 from ML Fashion and MLG Retail to pay personal, non-Company related, expenses that Defendants put on Defendant Lemonis' personal credit card and keeping and/or using the rewards points from those payments for Defendants' benefit, (12) receiving at least approximately $500,000 in interest from ML Fashion on ML Retail and ML, LLC's line of credit with ML Fashion, (13) using the assets, relationships, good will, and trade secrets of ML Fashion to grow Defendants' own retail concept MARCUS, and (14) creating personal liability for Plaintiffs due to the failure to pay the American Express and failure to pay required tax and business fees in Illinois, Connecticut, Minnesota, Florida.

256.    As a direct and proximate result of Defendants' gross mismanagement, Plaintiffs and the Company have been harmed in an amount to be proven at trial, but

at least $4,198,960.49. Plaintiff Goureau has been harmed by Defendants' gross mismanagement as Defendants' failure to pay the American Express debt triggers' Goureau's personal obligation to pay the outstanding amount. Plaintiff Menkin has been harmed by Defendants' gross mismanagement by being personally liable for state tax and business fees in Illinois, Connecticut, Minnesota, and Florida, thus hindering her ability to start separate businesses in those states.

## COUNT X
### (Waste and Misappropriation of Corporate Assets – Derivative Claim Against Defendants Lemonis, ML Retail, and ML, LLC)

Plaintiffs repeat and reallege each allegation contained above as though fully set forth herein.

257. This is an action for relief arising out of the waste of corporate assets caused solely by Defendants' malfeasance, acts or omissions, to the detriment of the Company.

258. Defendants have taken at least $3,023,004.47 in funds from ML Fashion and MLG Retail's bank accounts to pay personal, non-Company related, expenses that Defendants put on Defendant Lemonis' personal credit card.

259. Since April 2020, Defendants have been closing retail stores all over the country owned and/or operated by either ML Fashion or MLG Retail, and have removed the Company's assets from those stores. In total, Defendants have removed at least $377,377 worth of inventory and $197,255 worth of fixtures, furniture, and

equipment from the Company's stores in Palm Beach, Florida, Glencoe, Illinois, and Dallas, Texas. Defendants have also taken hundreds of thousands of dollars from the Company's Newtown, Massachusetts store.

260.  On or around May 22, 2020, Defendants moved roughly $601,324.02 out of ML Fashion's bank accounts and transferred the funds to an account in the name of MLG Retail that was not tied to either company's other accounts preventing the accounts' other signatory, Plaintiff Menkin, from being able to access or view the account.

261.  Since the filing of Plaintiffs' initial Complaint on June 18, 2020, Defendants have held fire sales selling large portions of ML Fashions inventory for up to 90% off forcing the Company to take huge losses on that inventory.

262.  These actions by Defendants amount to a waste and misappropriation of corporate assets.

263.  As a direct and proximate result of Defendants' malfeasance, acts or omissions, Plaintiffs and the Company have been harmed in an amount to be proven at trial, but at least $4,198,960.49.

## COUNT XI
### (Conversion – Derivative Claim Against Defendants)

Plaintiffs repeat and reallege each allegation contained above as though fully set forth herein.

264.   ML Fashion had a property interest in the funds in its bank accounts and inventory and furniture, fixtures, and equipment in its retail stores and a right to possess those funds and inventory and have them utilized for legitimate business purposes.

265.   Defendants converted these funds by removing such funds from ML Fashion's bank accounts for no legitimate business purpose, including removing roughly $601,324.02 from the Company's bank accounts.

266.   Defendants additionally converted ML Fashion's property by taking at least $3,023,004.47 from ML Fashion and MLG Retail's bank accounts to pay personal, non-Company related, expenses that Defendants put on Defendant Lemonis' personal credit card.

267.   To the extent that any of the $3,023,004.47 was used towards legitimate business expenses, Defendants converted the American Express rewards points associated with those credit card payments.

268.   Defendants converted ML Fashion's inventory by removing at least $377,377 worth of inventory and $197,255 worth of fixtures, furniture, and equipment from the Company's stores in Palm Beach, Florida, Glencoe, Illinois, and Dallas, Texas for no legitimate business purpose.   Defendants have also taken hundreds of thousands of dollars from the Company's Newtown, Massachusetts store.

269.   On information and belief, Defendants are converting ML Fashion's inventory and FFE, at least in part, to support Lemonis and Raffel's MARCUS brand and move the brand from ML Fashion to ML, LLC.

270.   Defendants' actions were willful, wanton, malicious and oppressive.

271.   As a direct and proximate result of Defendants' actions, Plaintiffs and the Company have been harmed in an amount to be proven at trial, but at least $4,198,960.49.

## COUNT XII
### (Receiver)

Plaintiffs repeat and reallege each allegation contained above as though fully set forth herein.

272.   Defendants are actively removing assets from ML Fashion, purposefully rendering it unable to meet its current obligations.  Defendants have prevented the Company from making the agreed upon automatic monthly payments to the American Express credit card in Goureau's name.  American Express has informed Goureau that if payments are not made before June 26, 2020 it will take action against Goureau personally and seek the entire outstanding balance of roughly $463,112.

273.   As of the filing of this Complaint, Defendants have closed three of the Company's stores and removed at least $377,377 worth of inventory and $197,255 worth of fixtures, furniture, and equipment from the stores.

274. Further, on or around May 22, 2020, Defendants moved roughly $601,324.02 from the Company's bank accounts.

275. As a result of Defendants' current misappropriation of the Company's funds and assets, the appointment of a custodian or receiver to direct and supervise ML Fashion's business and affairs pending a decision on the merits of Plaintiff's claims is necessary and appropriate to avoid irreparable harm to the Company and its members.

## COUNT XIII
### (Temporary, Preliminary and Permanent Injunction)

Plaintiffs repeat and reallege each allegation contained above as though fully set forth herein.

276. By purposefully rendering ML Fashion unable to pay its debts, removing funds from ML Fashion's bank accounts, closing its stores and removing its assets, and seeking to misappropriate ML Fashion's funds for their personal benefit, Defendants' actions threaten to cause irreparable harm to Plaintiffs and the Company. To preserve the status quo and prevent damage to ML Fashion, Plaintiffs seek an order immediately restraining and enjoining all Defendants, or those acting in privity with them, from (or as appropriate, requiring them to take the following action):

i. Spending, transferring or dissipating any funds of ML Fashion except as absolutely necessary in the ordinary course of business for ML Fashion, and including specifically that no funds will be expended for:

    a. Any payments whatsoever to Defendants or their affiliates, for any purpose, including bonuses; or

    b. Any payments whatsoever to Defendants' personal attorney from the Company's funds.

ii. Entering into any banking, borrowing and/or investment arrangements on behalf of the Company.

iii. Closing any retail stores of ML Fashion and/or moving, or removing any of the inventory, furniture, fixtures, and equipment and any other assets located in such stores.

277. The issuance of a temporary restraining order will prevent further harm to the Company until a preliminary injunction hearing is held and will not unduly prejudice Defendants.

## COUNT XIV
### (Dissolution under 6 Del. C. § 18-802)

Plaintiffs repeat and reallege each allegation contained above as though fully set forth herein.

278. 6 Del. C. § 18-802 authorizes a member or manager of a limited liability company to petition the Court for dissolution of the company whenever it is not

reasonably practicable to carry on the business in conformity with a limited liability company agreement.

279. Pursuant to 6 Del. C. § 18-802, Plaintiffs, as members of ML Fashion, allege that it is "not reasonably practicable to carry on the business in conformity with a limited liability company agreement" and therefore ask this Court to order a dissolution of the Company.

280. Lemonis, ML Retail, and the ML Control Group have beached their duties owed to the Company and its members. They have forced the Company to take on debt forcing it to take loans from Defendants, purposely transferred funds from the Company's bank accounts so that the Company could not pay its debts, closed the Company's stores and removed its assets, and actively used the Company as a self-enrichment vehicle constantly acting to benefit themselves to the detriment of the Company and Plaintiffs.

281. Plaintiffs accordingly request that the Court dissolve ML Fashion pursuant to Section 18-802. Plaintiffs further request that a liquidating trustee be appointed to oversee the dissolution and winding up of ML Fashion pursuant to Section 18-803, instead of the Defendants. A liquidating trustee would ensure that Plaintiffs are protected from further harm caused by the Defendants—who have demonstrated a history of mismanagement and misappropriating of the Company's funds.

## COUNT XV
### (Breach of Contract – Direct Claim by Plaintiff Menkin Against Defendants ML Fashion and MLG Retail)

Plaintiffs repeat and reallege each allegation contained above as though fully set forth herein.

282.   Since its inception, Plaintiff Menkin served Defendants ML Fashion and MLG Retail as their President.  In exchange for her services, Menkin and ML Fashion and MLG Retail agreed that she would receive bimonthly payments of $11,558.  Those bimonthly payments were made on the 1st and 15th of every month.

283.   Thus, a valid and enforceable contract existed between Menkin, ML Fashion, and MLG Retail where Menkin received compensation of bimonthly payments of $11,558 in exchange for serving as the President of the companies.

284.   Beginning on April 1, 2020, ML Fashion and MLG Retail ceased paying Menkin the compensation due under the agreement.  By failing to pay Menkin, ML Fashion and MLG Retail have breached the agreement between it and Menkin.

285.   As a direct and proximate result of Defendants' actions, Plaintiff Menkin has been harmed in an amount to be proved at trial, but not less than $69,348.

286.   Plaintiffs repeat and reallege each allegation contained above as though fully set forth herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants as follows:

A.  Compensatory damages in an amount to be determined at trial, but not less than $4,268,308.49;

B.  Punitive damages;

C.  Rescission of the LLC Agreement as it was obtained by fraud;

D.  Compelling the Defendants to account for all assets they misappropriated from the Company, as well as any benefits they have realized from those assets;

E.  Disgorging from the Defendants all assets they misappropriated from the Company, as well as any benefits they have realized from those assets;

F.  The appointment of a receiver as set forth in Count XII.

G.  A temporary, preliminary, and permanent injunction set forth in Count XIII.

H.  A judgment that ML Fashion is dissolved;

I.  The appointment of an independent liquidating trustee to wind up the affairs of ML Fashion;

J.  An award of the costs and disbursements of this action, including reasonable attorneys' fees, costs and expenses; and

K.  All such other and further relief as the Court deems just and proper under the circumstances.

*     *     *

Dated: August 24, 2020        */s/ Sean J. Bellew*
                                 Sean J. Bellew (#4072)
                                 **Bellew LLC**
                                 Red Clay Center at Little Falls
                                 2961 Centerville Road, Suite 302
                                 Wilmington, Delaware 19808
                                 Telephone: (302) 353-4951
                                 sjbellew@bellewllc.com

                                 **Gerard Fox Law P.C.**
                                 Gerard P. Fox (*pro hac vice forthcoming*)
                                 Lauren M. Greene (*pro hac vice forthcoming*)
                                 1880 Century Park East, Suite 1410
                                 Los Angeles, CA 90067
                                 Telephone: (310) 441-0500
                                 Facsimile: (310) 441-4447
                                 gfox@gerardfoxlaw.com
                                 lgreene@gerardfoxlaw.com

# EXHIBIT 2

       Printed on: 1/4/2021 15:32:47 GMT-0500 (Eastern Standard Time)

**Case History Search**

Search Created:
1/4/2021 15:32:47 GMT-0500 (Eastern
Standard Time)

---

| | | | |
|---|---|---|---|
| **Court:** | DE Court of Chancery Civil Action | **Judge:** | Zurn, Morgan |
| **Division:** | N/A | **Case Number:** | 2020-0486-MTZ |
| **Case Type:** | Breach of Fiduciary Duties | **Case Name:** | Nicolas Goureau vs Marcus Lemonis et al. |

| | |
|---|---|
| **File & ServeXpress Live Date:** | 6/18/2020 |
| **Document(s) Filed:** | 173 |
| **Date Range:** | All |

1-65 of 65 transactions    <<Prev   Page 1 of 1   Next>>

| Transaction | ▼Date/Time | Option | Case Number Case Name | Authorizer Organization | # | Document Type | Document Title | Review Status | Size |
|---|---|---|---|---|---|---|---|---|---|
| 66211822 | 12/28/2020 12:34 PM EST | File Only | 2020-0486-MTZ Nicolas Goureau vs Marcus Lemonis et al. | Jeanne K Cahill, DE Court of Chancery Civil Action | 79 | Official Transcript (Addl Fees Apply) | 12-4-2020 ORAL ARGUMENT RE DEFENDANTS' MOTION TO DISMISS HELD VIA ZOOM | Accepted | 0.2MB |
| 66208179 | 12/23/2020 11:56 AM EST | File And Serve | 2020-0486-MTZ Nicolas Goureau vs Marcus Lemonis et al. | Michael Farnan, Farnan LLP | 78 | Reply | Defendants' Reply Brief in Support of Motion to Compel Answers and Production in Response to Requests for Production and Interrogatories <br> • Linked to (1) | Accepted | 0.1MB |
| | | | | | | Certificate of Service | Certificate of Service for Defendants' Reply Brief in Support of Motion to Compel Answers and Production in Response to Requests for Production and Interrogatories | Accepted | 0.1MB |
| | | | | | | Declaration | Declaration of Michael D. Wexler in Support of Defendants' Motion to Compel Answers and Production in Response to Requests for Production and Interrogatories | Accepted | 0.1MB |

| | | | | | | Exhibits | Exhibit 1 to Declaration of Michael D. Wexler in Support of Defendants' Motion to Compel Answers and Production in Response to Requests for Production and Interrogatories | Accepted | 0.3MB |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Certificate of Service | Certificate of Service for Declaration of Michael D. Wexler in Support of Defendants' Motion to Compel Answers and Production in Response to Requests for Production and Interrogatories | Accepted | 0.1MB |
| 66202468 | 12/21/2020 4:04 PM EST | File And Serve | 2020-0486-MTZ Nicolas Goureau vs Marcus Lemonis et al. | Morgan Zurn, DE Court of Chancery Civil Action | 77 | Order | Granted (Stipulation and Proposed Order Governing the Briefing on Plaintiffs' Motion to Enforce the Status Quo Order)<br>• Linked to (1) | Accepted | 0.2MB |
| 66201825 | 12/21/2020 2:38 PM EST | File And Serve | 2020-0486-MTZ Nicolas Goureau vs Marcus Lemonis et al. | Sean J Bellew, Bellew LLC | 76 | Stipulation & (Proposed) Order | Stipulation and Proposed Order Governing the Briefing on Plaintiffs' Motion to Enforce the Status Quo Order<br>• Linked to (1)<br>• Linked from (1) | Accepted | 0.1MB |
| 66199573 | 12/18/2020 6:05 PM EST | Serve Only - Private | 2020-0486-MTZ Nicolas Goureau vs Marcus Lemonis et al. | Sean J Bellew, Bellew LLC | | Response to Request for Production | Plaintiffs Nicolas Goureau's and Stephanie Menkin's Responses to Defendants' First Set of Requests for Production | N/A | 0.5MB |
| 66199556 | 12/18/2020 6:01 PM EST | Serve Only - Private | 2020-0486-MTZ Nicolas Goureau vs Marcus Lemonis et al. | Sean J Bellew, Bellew LLC | | Answer to Interrogatories | Plaintiffs Nicolas Goureau's and Stephanie Menkin's Objections and Responses to | N/A | 0.3MB |

| | | | | | | | | Defendants' ML Retail, LLC's First Set of Interrogatories | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 66192980 | 12/16/2020 5:42 PM EST | File And Serve | 2020-0486-MTZ Nicolas Goureau vs Marcus Lemonis et al. | Sean J Bellew, Bellew LLC | 75 | Notice of Service | Notice of Service of Plaintiffs' First Set of Interrogatories to All Defendants and Plaintiffs' First Set of Requests for the Production of Documents with Certificate of Service  • Linked to (1) | Accepted | 0.1MB |
| 66191107 | 12/16/2020 11:50 AM EST | File And Serve | 2020-0486-MTZ Nicolas Goureau vs Marcus Lemonis et al. | Register in Chancery, DE Court of Chancery Civil Action | 74 | Judicial Action Form | Oral argument on Motion to Dismiss held via Zoom on December 4, 2020; motion taken under advisement. Counsel will advise the court on any updates in the SDNY action. | Accepted | 0.1MB |
| 66189651 | 12/15/2020 7:02 PM EST | File And Serve | 2020-0486-MTZ Nicolas Goureau vs Marcus Lemonis et al. | Sean J Bellew, Bellew LLC | 73 | Motion | Plaintiffs' Motion to Enforce the Status Quo Order with Certificate of Service  • Linked to (1)  • Linked from (1) | Accepted | 0.1MB |
| | | | | | | Exhibits | Exhibit A to Plaintiffs' Motion to Enforce the Status Quo Order | Accepted | 0.2MB |
| | | | | | | Exhibits | Exhibit B to Plaintiffs' Motion to Enforce the Status Quo Order | Accepted | 4.1MB |
| | | | | | | Exhibits | Exhibit C to Plaintiffs' Motion to Enforce the Status Quo Order | Accepted | 0.2MB |
| | | | | | | Exhibits | Exhibit D to Plaintiffs' Motion to Enforce the Status Quo Order | Accepted | 0.1MB |

| | | | | | | Proposed Order | Proposed Order to Plaintiffs' Motion to Enforce the Status Quo Order | Accepted | 0.1MB |
|---|---|---|---|---|---|---|---|---|---|
| 66185533 | 12/14/2020 5:24 PM EST | Serve Only - Private | 2020-0486-MTZ Nicolas Goureau vs Marcus Lemonis et al. | Sean J Bellew, Bellew LLC | | Interrogatories | Plaintiffs' First Set of Interrogatories to All Defendants | N/A | 0.1MB |
| | | | | | | Discovery Requests | Plaintiffs' First Set of Requests for the Production of Documents | N/A | 0.1MB |
| 66152525 | 12/2/2020 11:55 AM EST | File And Serve | 2020-0486-MTZ Nicolas Goureau vs Marcus Lemonis et al. | Morgan Zurn, DE Court of Chancery Civil Action | 72 | Order | Granted (Stipulation and [Proposed] Briefing Schedule regarding Defendants' Motion to Compel) • Linked to (1) | Accepted | 0.1MB |
| 66151694 | 12/2/2020 8:51 AM EST | File And Serve | 2020-0486-MTZ Nicolas Goureau vs Marcus Lemonis et al. | Michael Farnan, Farnan LLP | 71 | Stipulation & (Proposed) Order | Stipulation and [Proposed] Briefing Schedule regarding Defendants' Motion to Compel • Linked to (1) • Linked from (1) | Accepted | 0.1MB |
| | | | | | | Certificate of Service | Certificate of Service for Stipulation and [Proposed] Briefing Schedule regarding Defendants' Motion to Compel | Accepted | 0.1MB |
| 66132114 | 11/20/2020 4:33 PM EST | File And Serve | 2020-0486-MTZ Nicolas Goureau vs Marcus Lemonis et al. | Brian E Farnan, Farnan LLP | 70 | Motion to Compel | Defendants' Motion to Compel Answers and Production in Response to Requests for Production and Interrogatories • Linked to (1) • Linked from (4) | Accepted | 0.2MB |
| | | | | | | Exhibits | Exhibits 1-10 to Defendants' Motion to | Accepted | 7.3MB |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Compel Answers and Production in Response to Requests for Production and Interrogatories | | | |
| | | | | | | Proposed Order | Proposed Order granting Defendants' Motion to Compel Answers and Production in Response to Requests for Production and Interrogatories | Accepted | 0.1MB |
| | | | | | | Certificate of Service | Certification of Service for Defendants' Motion to Compel Answers and Production in Response to Requests for Production and Interrogatories | Accepted | 0.1MB |
| 66089706 | 11/6/2020 4:02 PM EST | Serve Only - Private | 2020-0486-MTZ Nicolas Goureau vs Marcus Lemonis et al. | Sean J Bellew, Bellew LLC | | Response to Request for Production | Plaintiff Goureau's Supplemental Objections and Responses to Defendants' Expedited Request for Production | N/A | 0.1MB |
| | | | | | | Answer to Interrogatories | Plaintiff Goureau's Supplemental Objections and Responses to Defendants' Expedited Interrogatories | N/A | 0.6MB |
| 66077383 | 11/3/2020 4:37 PM EST | File And Serve | 2020-0486-MTZ Nicolas Goureau vs Marcus Lemonis et al. | Brian E Farnan, Farnan LLP | 69 | Notice of Service | Notice of Service of: (i) Defendant ML Retail, LLC's First Set of Interrogatories to Plaintiffs Nicolas Goureau and Stephanie Menkin; (ii) Defendants' First Set of Requests for Production to Plaintiffs Nicolas Goureau and Stephanie Menkin; and (iii) this Notice of Service • Linked to (1) | Accepted | 0.1MB |

| 66077357 | 11/3/2020 4:32 PM EST | Serve Only - Private | 2020-0486-MTZ Nicolas Goureau vs Marcus Lemonis et al. | Brian E Farnan, Farnan LLP | | Interrogatories | Defendant ML Retail, LLC's First Set of Interrogatories to Plaintiffs Nicolas Goureau and Stephanie Menkin with Certificate of Service | N/A | 0.1MB |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Request For Production (First) | Defendants' First Set of Requests for Production to Plaintiffs Nicolas Goureau and Stephanie Menkin with Certificate of Service | N/A | 0.1MB |
| 66073802 | 11/2/2020 3:51 PM EST | File And Serve | 2020-0486-MTZ Nicolas Goureau vs Marcus Lemonis et al. | Brian E Farnan, Farnan LLP | 68 | Reply Brief | Defendants' Reply Brief in Support of Motion to Dismiss • Linked to (1) | Accepted | 0.2MB |
| | | | | | | Certificate of Service | Certificate of Service for Defendants' Reply Brief in Support of Motion to Dismiss | Accepted | 0.1MB |
| 66073456 | 11/2/2020 3:03 PM EST | File And Serve | 2020-0486-MTZ Nicolas Goureau vs Marcus Lemonis et al. | Brian E Farnan, Farnan LLP | 67 | Notice | Defendants' Notice of Subpoena to American Express Company • Linked to (1) | Accepted | 0.1MB |
| | | | | | | Exhibits | Exhibit A to Defendants' Notice of Subpoena to American Express Company | Accepted | 0.1MB |
| | | | | | | Certificate of Service | Certificate of Service for Defendants' Notice of Subpoena to American Express Company | Accepted | 0.1MB |
| 66065856 | 10/29/2020 3:36 PM EDT | File And Serve | 2020-0486-MTZ Nicolas Goureau vs Marcus Lemonis et al. | Morgan Zurn, DE Court of Chancery Civil Action | 66 | Letter | Letter to Counsel from Vice Chancellor Zurn, dated October 29, 2020, confirming | Accepted | 0.1MB |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | that the hearing on the Motion to Dismiss scheduled in this matter for December 4, 2020 will now be held via Zoom | | |
| 66032546 | 10/19/2020 12:38 PM EDT | File And Serve | 2020-0486-MTZ Nicolas Goureau vs Marcus Lemonis et al. | Sean J Bellew, Bellew LLC | 65 | Answering Brief | Plaintiffs' Answering Brief in Opposition to Defendants' Motion to Dismiss with Certificate of Service <br> • Linked to (1) | Accepted | 0.2MB |
| 66001039 | 10/8/2020 9:02 AM EDT | File Only | 2020-0486-MTZ Nicolas Goureau vs Marcus Lemonis et al. | Neith Ecker, DE Court of Chancery Civil Action | 64 | Official Transcript (Addl Fees Apply) | September 1, 2020 - Telephonic Oral Argument and Rulings of the Court on Plaintiffs' Motion to Expedite Proceedings and for Status Quo Order | Accepted | 0.1MB |
| 65974174 | 9/29/2020 2:58 PM EDT | File And Serve | 2020-0486-MTZ Nicolas Goureau vs Marcus Lemonis et al. | Sean J Bellew, Bellew LLC | 63 | Notice of Service | Notice of Service of Plaintiff Goureau's Objections and Responses to Defendants' Expedited Interrogatories and Objections and Responses to Defendants' Expedited Request for Production with Certificate of Service | Accepted | 0.1MB |
| 65973994 | 9/29/2020 2:35 PM EDT | Serve Only - Private | 2020-0486-MTZ Nicolas Goureau vs Marcus Lemonis et al. | Sean J Bellew, Bellew LLC | | Answer to Interrogatories | Plaintiff Goureau's Objections and Responses to Defendants' Expedited Interrogatories | N/A | 0.1MB |
| | | | | | | Response to Other Motion | Plaintiff Goureau's Objections and Responses to Defendants' Expedited Request for Production | N/A | 0.1MB |
| 65958037 | 9/23/2020 2:52 PM | File And Serve | 2020-0486-MTZ Nicolas | Brian E Farnan, | 62 | Subpoena | Defendants' Subpoena to | Accepted | 0.2MB |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | EDT | | Goureau vs Marcus Lemonis et al. | Farnan LLP | | | American Express Company with Return of Service attached<br>• Linked to (1) | | |
| 65957858 | 9/23/2020 2:26 PM EDT | File And Serve | 2020-0486-MTZ Nicolas Goureau vs Marcus Lemonis et al. | Morgan Zurn, DE Court of Chancery Civil Action | 61 | Order | Granted (Stipulation and [Proposed] Order Governing Briefing on Defendants' Motion to Dismiss the First Amended Complaint)<br>• Linked to (1) | Accepted | 0.1MB |
| 65956081 | 9/23/2020 10:13 AM EDT | File And Serve | 2020-0486-MTZ Nicolas Goureau vs Marcus Lemonis et al. | Brian E Farnan, Farnan LLP | 60 | Notice | Defendants' Notice of Subpoena to American Express Company<br>• Linked to (1)<br>• Linked from (1) | Accepted | 0.1MB |
| | | | | | | Exhibits | Exhibit A to Defendants' Notice of Subpoena to American Express Company | Accepted | 0.1MB |
| | | | | | | Certificate of Service | Certificate of Service for Defendants' Notice of Subpoena to American Express Company | Accepted | 0.1MB |
| 65954619 | 9/22/2020 4:12 PM EDT | File And Serve | 2020-0486-MTZ Nicolas Goureau vs Marcus Lemonis et al. | Sean J Bellew, Bellew LLC | 59 | Stipulation & (Proposed) Order | Stipulation and [Proposed] Order Governing Briefing on Defendants' Motion to Dismiss the First Amended Complaint<br>• Linked to (1)<br>• Linked from (1) | Accepted | 0.1MB |
| 65953440 | 9/22/2020 1:20 PM EDT | File And Serve | 2020-0486-MTZ Nicolas Goureau vs Marcus Lemonis et al. | Brian E Farnan, Farnan LLP | 58 | Notice of Service of Other Discovery | Notice of Service of: (i) Defendant ML Retail, LLC's Expedited Interrogatories to Plaintiff Nicolas Goureau; (ii) | Accepted | 0.1MB |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Defendants' Expedited Request for Production to Plaintiff Nicolas Goureau; and (iii) this Notice of Service<br>• Linked to (1)<br>• Linked from (1) | | |
| 65953422 | 9/22/2020 1:17 PM EDT | Serve Only - Private | 2020-0486-MTZ Nicolas Goureau vs Marcus Lemonis et al. | Brian E Farnan, Farnan LLP | | Request For Production (First) | Defendants' Expedited Request for Production to Plaintiff Nicolas Goureau with Certificate of Service | N/A | 0.1MB |
| | | | | | | Interrogatories | Defendant ML Retail, LLC's Expedited Interrogatories to Plaintiff Nicolas Goureau with Certificate of Service | N/A | 0.1MB |
| 65938397 | 9/16/2020 4:07 PM EDT | File And Serve | 2020-0486-MTZ Nicolas Goureau vs Marcus Lemonis et al. | Brian E Farnan, Farnan LLP | 57 | Motion to Dismiss | Defendants ML Retail, LLC, Marcus Lemonis, LLC, MLG Retail, LLC, Marcus Lemonis, and Roberta Raffel's Motion to Dismiss Plaintiffs' First Amended Complaint<br>• Linked to (1)<br>• Linked from (4) | Accepted | 0.1MB |
| | | | | | | Proposed Order | Proposed Order granting Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint | Accepted | 0.1MB |
| | | | | | | Opening Brief | Opening Brief in Support of Defendants ML Retail, LLC, Marcus Lemonis, LLC, MLG Retail, LLC, Marcus Lemonis, and Roberta Raffel's Motion to Dismiss Plaintiffs' First | Accepted | 0.2MB |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Amended Complaint • Linked from (1) | | |
| | | | | | | Certificate of Service | Certificate of Service for Defendants ML Retail, LLC, Marcus Lemonis, LLC, MLG Retail, LLC, Marcus Lemonis, and Roberta Raffel's Motion to Dismiss Plaintiffs' First Amended Complaint | Accepted | 0.1MB |
| | | | | | | Exhibits | Exhibit 1 to Defendants' Opening Brief in Support of Motion to Dismiss Plaintiffs' First Amended Complaint | Accepted | 22.8MB |
| | | | | | | Exhibits | Exhibit 2 to Defendants' Opening Brief in Support of Motion to Dismiss Plaintiffs' First Amended Complaint | Accepted | 4.0MB |
| | | | | | | Exhibits | Exhibit 3 to Defendants' Opening Brief in Support of Motion to Dismiss Plaintiffs' First Amended Complaint | Accepted | 0.1MB |
| | | | | | | Exhibits | Exhibit 4 to Defendants' Opening Brief in Support of Motion to Dismiss Plaintiffs' First Amended Complaint | Accepted | 0.1MB |
| 65937740 | 9/16/2020 2:56 PM EDT | File And Serve | 2020-0486-MTZ Nicolas Goureau vs Marcus Lemonis et al. | Michael Farnan, Farnan LLP | 56 | Entry of Appearance | Entry of Appearance of Brian E. Farnan and Michael J. Farnan on behalf of Defendants | Accepted | 0.1MB |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Marcus Lemonis and Roberta Raffel<br>• Linked to (1) | | |
| | | | | | | Certificate of Service | Certificate of Service for Entry of Appearance | Accepted | 0.1MB |
| 65910802 | 9/8/2020 4:06 PM EDT | File And Serve | 2020-0486-MTZ Nicolas Goureau vs Marcus Lemonis et al. | Morgan Zurn, DE Court of Chancery Civil Action | 55 | Order | Status Quo Order, issued September 8, 2020<br>• Linked from (1) | Accepted | 0.1MB |
| 65909900 | 9/8/2020 2:11 PM EDT | File And Serve | 2020-0486-MTZ Nicolas Goureau vs Marcus Lemonis et al. | Michael Farnan, Farnan LLP | 54 | Letter | Letter to The Honorable Morgan T. Zurn from Michael J. Farnan regarding Response to Plaintiffs' September 4, 2020 letter<br>• Linked to (1) | Accepted | 0.1MB |
| | | | | | | Exhibits | Attachment to the Letter to The Honorable Morgan T. Zurn from Michael J. Farnan regarding Response to Plaintiffs' September 4, 2020 letter | Accepted | 0.1MB |
| 65907179 | 9/4/2020 5:36 PM EDT | File And Serve | 2020-0486-MTZ Nicolas Goureau vs Marcus Lemonis et al. | Sean J Bellew, Bellew LLC | 53 | Letter | Letter to The Honorable Morgan T. Zurn from Sean J. Bellew regarding Proposed Status Quo Order<br>• Linked to (1) | Accepted | 0.1MB |
| | | | | | | Exhibits | Exhibit A to Letter to The Honorable Morgan T. Zurn from Sean J. Bellew regarding Proposed Status Quo Order | Accepted | 2.2MB |
| | | | | | | Proposed Order | Proposed Status Quo Order | Accepted | 0.2MB |
| 65906081 | 9/4/2020 2:20 PM EDT | File And Serve | 2020-0486-MTZ Nicolas Goureau vs Marcus Lemonis et al. | Michael Farnan, Farnan LLP | 52 | Letter | Letter to The Honorable Morgan T. Zurn from Michael J. Farnan regarding | | 0.1MB |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Proposed Status Quo Order<br>• Linked to (1) | | |
| | | | | | | Exhibits | Proposed Status Quo Order | Accepted | 0.1MB |
| 65900698 | 9/3/2020 8:49 AM EDT | File And Serve | 2020-0486-MTZ Nicolas Goureau vs Marcus Lemonis et al. | Morgan Zurn, DE Court of Chancery Civil Action | 50 | Order - Pro Hac Vice | Granted (Fox, Gerard; [Proposed] Order granting Motion for Admission Pro Hac Vice of Gerard Fox on behalf of Plaintiffs Nicolas Goureau and Stephanie Menkin)<br>• Linked to (1) | Accepted | 0.2MB |
| | | | | | 51 | Order - Pro Hac Vice | Granted (Greene, Lauren M.; [Proposed] Order granting Motion for Admission Pro Hac Vice of Lauren M. Greene on behalf of Plaintiffs Nicolas Goureau and Stephanie Menkin)<br>• Linked to (1) | Accepted | 0.2MB |
| 65899508 | 9/2/2020 4:26 PM EDT | File And Serve | 2020-0486-MTZ Nicolas Goureau vs Marcus Lemonis et al. | Morgan Zurn, DE Court of Chancery Civil Action | 49 | So Ordered | SO ORDERED - Defendants' request to file their motion in response to Plaintiffs' First Amended Complaint on or before September 16, 2020 is granted. | Accepted | 0.1MB |
| 65898636 | 9/2/2020 2:42 PM EDT | File And Serve | 2020-0486-MTZ Nicolas Goureau vs Marcus Lemonis et al. | Michael Farnan, Farnan LLP | 48 | Letter | Letter to The Honorable Morgan T. Zurn from Michael J. Farnan regarding Reply in Support of Motion to Strike<br>• Linked to (2) | Accepted | 0.1MB |
| 65897302 | 9/2/2020 11:08 AM EDT | File And Serve | 2020-0486-MTZ Nicolas Goureau vs Marcus Lemonis et al. | Register in Chancery, DE Court of Chancery Civil Action | 47 | Judicial Action Form | Telephone Conference on Plaintiffs' Motion for Expedited Proceedings and for Status Quo Order. Notes: | Accepted | 0.1MB |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Motion to Strike held under advisement upon hearing from Defendants' counsel by Sept 3rd whether they will be filing a reply brief. Counsel to confer on threshold issues in Status Quo Order which is to include payment of company credit cards. If counsel cannot agree on a Status Quo Order, they are to submit their proposed versions. The Court finds no basis for expediting proceedings.<br>• Linked from (7) | | |
| 65892576 | 9/1/2020 10:47 AM EDT | File And Serve | 2020-0486-MTZ Nicolas Goureau vs Marcus Lemonis et al. | Sean J Bellew, Bellew LLC | 45 | Motion for Pro Hac Vice | Fox, Gerard; Motion for Admission Pro Hac Vice of Gerard Fox on behalf of Plaintiffs Nicolas Goureau and Stephanie Menkin with Certificate of Service<br>• Linked to (1) | Accepted | 0.1MB |
| | | | | | 46 | Motion for Pro Hac Vice | Greene, Lauren M.; Motion for Admission Pro Hac Vice of Lauren M. Greene on behalf of Plaintiffs Nicolas Goureau and Stephanie Menkin with Certificate of Service<br>• Linked to (1) | Accepted | 0.1MB |
| | | | | | | Certification for Pro Hac Vice | Fox, Gerard; Certification of Gerard Fox in Support of Motion for | Accepted | 0.2MB |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Admission Pro Hac Vice on behalf of Plaintiffs Nicolas Goureau and Stephanie Menkin | | |
| | | | | | | Proposed Order - Pro Hac Vice | Fox, Gerard; [Proposed] Order granting Motion for Admission Pro Hac Vice of Gerard Fox on behalf of Plaintiffs Nicolas Goureau and Stephanie Menkin<br>• Linked from (1) | Accepted | 0.1MB |
| | | | | | | Certification for Pro Hac Vice | Greene, Lauren M.; Certification of Lauren M. Greene Support of Motion for Admission Pro Hac Vice on behalf of Plaintiffs Nicolas Goureau and Stephanie Menkin | Accepted | 0.3MB |
| | | | | | | Proposed Order - Pro Hac Vice | Greene, Lauren M.; [Proposed] Order granting Motion for Admission Pro Hac Vice of Lauren M. Greene on behalf of Plaintiffs Nicolas Goureau and Stephanie Menkin<br>• Linked from (1) | Accepted | 0.1MB |
| 65892122 | 9/1/2020 8:58 AM EDT | File And Serve | 2020-0486-MTZ Nicolas Goureau vs Marcus Lemonis et al. | Morgan Zurn, DE Court of Chancery Civil Action | 43 | Order - Pro Hac Vice | Granted (Wexler, Michael D.: Proposed Order for Admission Pro Hac Vice on behalf of Defendants ML Retail, LLC, Marcus Lemonis, LLC, and MLG Retail, LLC)<br>• Linked to (1) | Accepted | 0.2MB |
| | | | | | 44 | Order - Pro Hac Vice | Granted (Coleman, Jesse: | Accepted | 0.2MB |

| | | | | | | | Proposed Order for Admission Pro Hac Vice on behalf of Defendants ML Retail, LLC, Marcus Lemonis, LLC, and MLG Retail, LLC)<br>• Linked to (1) | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 65890134 | 8/31/2020 5:54 PM EDT | File And Serve | 2020-0486-MTZ Nicolas Goureau vs Marcus Lemonis et al. | Brian E Farnan, Farnan LLP | 42 | Supplemental Submissions | Supplemental Declaration of Marcus Lemonis<br>• Linked to (2) | Accepted | 0.3MB |
| | | | | | | Exhibits | Exhibits A-D for Supplemental Declaration of Marcus Lemonis | Accepted | 4.2MB |
| | | | | | | Certificate of Service | Certificate of Service for Supplemental Declaration of Marcus Lemonis | Accepted | 0.1MB |
| 65889895 | 8/31/2020 5:04 PM EDT | File And Serve | 2020-0486-MTZ Nicolas Goureau vs Marcus Lemonis et al. | Sean J Bellew, Bellew LLC | 41 | Reply | Plaintiffs' Reply Memorandum in Further Support of Motion to Expedite Proceedings - with Certificate of Service<br>• Linked to (1) | Accepted | 0.3MB |
| | | | | | | Declaration | Declaration of Stephanie Menkin in Support of Plaintiffs' Motion to Expedite Proceedings | Accepted | 0.5MB |
| | | | | | | Declaration | Declaration of Nicolas Goureau in Support of Plaintiffs' Motion to Expedite Proceedings | Accepted | 0.5MB |
| | | | | | | Exhibits | Exhibit A to Declaration of Stephanie Menkin in Support of Plaintiffs' Motion to Expedite Proceedings | Accepted | 5.0MB |
| | | | | | | Exhibits | Exhibit B to Declaration of Stephanie Menkin in Support of Plaintiffs' Motion | Accepted | 0.2MB |

| | | to Expedite Proceedings | | |
|---|---|---|---|---|
| | Exhibits | Exhibit C to Declaration of Stephanie Menkin in Support of Plaintiffs' Motion to Expedite Proceedings | Accepted | 3.3MB |
| | Exhibits | Exhibit D to Declaration of Stephanie Menkin in Support of Plaintiffs' Motion to Expedite Proceedings | Accepted | 1.5MB |
| | Exhibits | Exhibit E to Declaration of Stephanie Menkin in Support of Plaintiffs' Motion to Expedite Proceedings | Accepted | 0.1MB |
| | Exhibits | Exhibit F to Declaration of Stephanie Menkin in Support of Plaintiffs' Motion to Expedite Proceedings | Accepted | 0.4MB |
| | Exhibits | Exhibit G to Declaration of Stephanie Menkin in Support of Plaintiffs' Motion to Expedite Proceedings | Accepted | 0.1MB |
| | Exhibits | Exhibit H to Declaration of Stephanie Menkin in Support of Plaintiffs' Motion to Expedite Proceedings | Accepted | 0.4MB |
| | Exhibits | Exhibit I to Declaration of Stephanie Menkin in Support of Plaintiffs' Motion to Expedite Proceedings | Accepted | 0.1MB |
| | Exhibits | Exhibit 1 to Declaration of | Accepted | 0.1MB |

| | | | | | | | | Nicolas Goureau in Support of Plaintiffs' Motion to Expedite Proceedings | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Exhibits | Exhibit 2 to Declaration of Nicolas Goureau in Support of Plaintiffs' Motion to Expedite Proceedings | Accepted | 0.8MB |
| | | | | | | Exhibits | Exhibit 3 to Declaration of Nicolas Goureau in Support of Plaintiffs' Motion to Expedite Proceedings | Accepted | 0.1MB |
| 65887874 | 8/31/2020 11:54 AM EDT | File And Serve | 2020-0486-MTZ Nicolas Goureau vs Marcus Lemonis et al. | Brian E Farnan, Farnan LLP | 40 | Letter | Letter to The Honorable Morgan T. Zurn from Brian E. Farnan enclosing copies of: (i) Defendants ML Retail, LLC, Marcus Lemonis, LLC, MLG Retail, LLC's Motion to Strike and or Deem Void Plaintiffs' First Amended Complaint and (ii) Defendants ML Retail, LLC, Marcus Lemonis, LLC, MLG Retail, LLC's Opposition to Plaintiffs' Motion to Expedite Proceedings and for Status Quo Order and Declaration of Marcus Lemonis  • Linked to (2) | Accepted | 0.1MB |
| 65887826 | 8/31/2020 11:50 AM EDT | File And Serve | 2020-0486-MTZ Nicolas Goureau vs Marcus Lemonis et al. | Brian E Farnan, Farnan LLP | 39 | Letter | The Honorable Morgan T. Zurn from Brian E. Farnan regarding Response to the Court's August 31, 2020 Order  • Linked to (1) | Accepted | 0.1MB |
| | | | | | | Exhibits | Exhibit A to Letter regarding Response to the | Accepted | 0.1MB |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Court's August 31, 2020 Order |
| | | | | | | Exhibits | Exhibit B to Letter regarding Response to the Court's August 31, 2020 Order | Accepted | 0.1MB |
| | | | | | | Exhibits | Exhibit C to Letter regarding Response to the Court's August 31, 2020 Order | Accepted | 0.1MB |
| | | | | | | Exhibits | Exhibit D to Letter regarding Response to the Court's August 31, 2020 Order | Accepted | 0.3MB |
| | | | | | | Exhibits | Exhibit E to Letter regarding Response to the Court's August 31, 2020 Order | Accepted | 0.1MB |
| | | | | | | Exhibits | Exhibit F to Letter regarding Response to the Court's August 31, 2020 Order | Accepted | 0.1MB |
| 65887674 | 8/31/2020 11:14 AM EDT | File And Serve | 2020-0486-MTZ Nicolas Goureau vs Marcus Lemonis et al. | Morgan Zurn, DE Court of Chancery Civil Action | 38 | Order | The Court does not have access to the District Court docket, and therefore cannot review the briefing that Defendants incorporate by reference. Defendants shall file a copy of the District Court docket, as well as all briefing on the motion to dismiss, including Plaintiffs', by 2:00 p.m. today | Accepted | 0MB |
| 65886080 | 8/28/2020 4:46 PM EDT | File And Serve | 2020-0486-MTZ Nicolas Goureau vs Marcus Lemonis et al. | Brian E Farnan, Farnan LLP | 37 | Opposition | Defendants ML Retail, LLC, Marcus Lemonis, LLC, MLG Retail, LLC's Opposition to Plaintiffs' Motion to Expedite Proceedings and for Status Quo Order<br>• Linked to (2)<br>• Linked from (3) | Accepted | 0.5MB |

| | | | | | | | Proposed Order | Proposed Order denying Plaintiffs' Motion to Expedite Proceedings and for Status Quo Order | Accepted | 0.1MB |
| | | | | | | | Declaration | Declaration of Marcus Lemonis<br>• Linked from (1) | Accepted | 0.2MB |
| | | | | | | | Certificate of Service | Certificate of Service for Defendants ML Retail, LLC, Marcus Lemonis, LLC, MLG Retail, LLC's Opposition to Plaintiffs' Motion to Expedite Proceedings and for Status Quo Order and the Declaration of Marcus Lemonis | Accepted | 0.1MB |
| 65885671 | 8/28/2020 3:37 PM EDT | File And Serve | 2020-0486-MTZ Nicolas Goureau vs Marcus Lemonis et al. | Brian E Farnan, Farnan LLP | 36 | Motion | Defendants ML Retail, LLC, Marcus Lemonis, LLC, MLG Retail, LLC's Motion to Strike and or Deem Void Plaintiffs' First Amended Complaint<br>• Linked to (1)<br>• Linked from (3) | Accepted | 0.1MB |
| | | | | | | Proposed Order | Proposed Order granting Defendants ML Retail, LLC, Marcus Lemonis, LLC, MLG Retail, LLC's Motion to Strike and or Deem Void Plaintiffs' First Amended Complaint | Accepted | 0.1MB |
| | | | | | | Certificate of Service | Certificate of Service for Defendants ML Retail, LLC, Marcus Lemonis, LLC, MLG Retail, LLC's Motion to Strike and or Deem Void Plaintiffs' First | Accepted | 0.1MB |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Amended Complaint | | |
| 65884569 | 8/28/2020 12:22 PM EDT | File And Serve | 2020-0486-MTZ Nicolas Goureau vs Marcus Lemonis et al. | Brian E Farnan, Farnan LLP | 34 | Motion for Pro Hac Vice | Motion for Admission Pro Hac Vice of Michael D. Wexler on behalf of Defendants ML Retail, LLC, Marcus Lemonis, LLC, and MLG Retail, LLC <br> • Linked to (1) | Accepted | 0.2MB |
| | | | | | 35 | Motion for Pro Hac Vice | Motion for Admission Pro Hac Vice of Jesse Coleman on behalf of Defendants ML Retail, LLC, Marcus Lemonis, LLC, and MLG Retail, LLC <br> • Linked to (1) | Accepted | 0.1MB |
| | | | | | | Certification for Pro Hac Vice | Certification of Michael D. Wexler on behalf of Defendants ML Retail, LLC, Marcus Lemonis, LLC, and MLG Retail, LLC | Accepted | 0.3MB |
| | | | | | | Proposed Order - Pro Hac Vice | Wexler, Michael D.: Proposed Order for Admission Pro Hac Vice on behalf of Defendants ML Retail, LLC, Marcus Lemonis, LLC, and MLG Retail, LLC <br> • Linked from (1) | Accepted | 0.1MB |
| | | | | | | Certificate of Service | Certificate of Service for Motion for Admission Pro Hac Vice of Michael D. Wexler on behalf Defendants ML Retail, LLC, Marcus Lemonis, LLC, and MLG Retail, LLC | Accepted | 0.1MB |
| | | | | | | Certification for Pro Hac Vice | Certification of Jesse Coleman on behalf of Defendants ML | Accepted | 0.1MB |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Retail, LLC, Marcus Lemonis, LLC, and MLG Retail, LLC | | |
| | | | | | | Proposed Order - Pro Hac Vice | Coleman, Jesse: Proposed Order for Admission Pro Hac Vice on behalf of Defendants ML Retail, LLC, Marcus Lemonis, LLC, and MLG Retail, LLC<br>• Linked from (1) | Accepted | 0.1MB |
| | | | | | | Certificate of Service | Certificate of Service for Motion for Admission Pro Hac Vice of Jesse Coleman on behalf Defendants ML Retail, LLC, Marcus Lemonis, LLC, and MLG Retail, LLC | Accepted | 0.1MB |
| 65883949 | 8/28/2020 9:54 AM EDT | File And Serve | 2020-0486-MTZ Nicolas Goureau vs Marcus Lemonis et al. | Sean J Bellew, Bellew LLC | 33 | Letter | Letter to Vice Chancellor Morgan T. Zurn to confirm scheduling of the telephonic oral argument on Plaintiffs' Motion to Expedite | Accepted | 0.1MB |
| 65881599 | 8/27/2020 1:57 PM EDT | File And Serve | 2020-0486-MTZ Nicolas Goureau vs Marcus Lemonis et al. | Michael Farnan, Farnan LLP | 32 | Letter | Letter to The Honorable Morgan T. Zurn from Michael J. Farnan regarding Response the Court's August 25, 2020 Order<br>• Linked to (1) | Accepted | 0.1MB |
| | | | | | | Exhibits | Attachment to Letter - District Court's August 21, 2020 Order | Accepted | 0.1MB |
| 65875673 | 8/25/2020 4:35 PM EDT | File And Serve | 2020-0486-MTZ Nicolas Goureau vs Marcus Lemonis et al. | Morgan Zurn, DE Court of Chancery Civil Action | 31 | Order | In response to Plaintiff's August 25 letter, Defendants' opposition to the motion to expedite shall be due on August 28; Plaintiff's | Accepted | 0MB |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | reply shall be due on August 31; and argument shall be held at 9:15 on September 1 unless counsel notifies chambers of a conflict. The parties' submissions shall include proposed trial dates. Defendants shall file the District Court's removal opinion.<br>• Linked from (2) | | |
| 65875018 | 8/25/2020 3:05 PM EDT | File And Serve | 2020-0486-MTZ Nicolas Goureau vs Marcus Lemonis et al. | Sean J Bellew, Bellew LLC | 30 | Letter | Letter to Vice Chancellor Morgan T. Zurn requesting rescheduling of proceedings on Plaintiffs' Motion to Expedite | Accepted | 0.1MB |
| 65874789 | 8/25/2020 2:54 PM EDT | File And Serve | 2020-0486-MTZ Nicolas Goureau vs Marcus Lemonis et al. | Sean J Bellew, Bellew LLC | 17 | Amended Complaint | Verified First Amended Complaint<br>• Linked from (4) | Accepted | 0.4MB |
| | | | | | 18 | Exhibits | Blackline version Amended Complaint | Accepted | 0.4MB |
| | | | | | 19 | Verification to Complaint | Verification Pursuant to 10 Del. C 3927 of Nicolas Goureau | Accepted | 0.5MB |
| | | | | | 20 | Verification to Complaint | Verification Pursuant to 10 Del. C 3927 of Stephanie Menkin | Accepted | 0.5MB |
| | | | | | 21 | Declaration | Declaration of Sean Bellew in Support of Plaintiffs Nicolas Goureau and Stephanie Menkin's Verified First Amended Complaint | Accepted | 0.1MB |
| | | | | | 22 | Exhibits | Exhibit A Limited Liability Company Agreement of ML Fashion LLC | Accepted | 1.9MB |

| | | | | | 23 | Exhibits | Exhibit B Credit Agreement between ML Fashion and ML Retail | Accepted | 0.7MB |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | 24 | Exhibits | Exhibit C Security Agreement between ML Fashion and ML Retail | Accepted | 0.8MB |
| | | | | | 25 | Exhibits | Exhibit D Letter from Stephanie Menkin to Nicolas Goureau | Accepted | 0.2MB |
| | | | | | 26 | Exhibits | Exhibit E Credit Agreement between ML Retail and Marcus Lemonis | Accepted | 0.9MB |
| | | | | | 27 | Exhibits | Exhibit F Security Agreement between ML Retail and Marcus Lemonis | Accepted | 0.8MB |
| | | | | | 28 | Exhibits | Exhibit G Email chain between Marcus Lemonis, Stephanie Menkin and Jeremy Dombroski | Accepted | 0.1MB |
| | | | | | 29 | Exhibits | Exhibit H Letter from Minnesota Department of Revenue to MLG Retail | Accepted | 0.3MB |
| 65766888 | 7/14/2020 12:59 PM EDT | File And Serve | 2020-0486-MTZ Nicolas Goureau vs Marcus Lemonis et al. | Morgan Zurn, DE Court of Chancery Civil Action | 16 | Minute Order | In light of the Notice of Removal filed in this matter today by defendants ML Retail, LLC, Marcus Lemonis, LLC, MLG Retail, LLC, and ML Fashion, LLC, the telephonic hearing regarding the Motion to Expedite Proceedings scheduled for Thursday, July 16, 2020 at 3:15 p.m. is hereby | Accepted | 0MB |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | cancelled. IT IS SO ORDERED. | | |
| 65765784 | 7/14/2020 9:14 AM EDT | File And Serve | 2020-0486-MTZ Nicolas Goureau vs Marcus Lemonis et al. | Brian E Farnan, Farnan LLP | 14 | Entry of Appearance | Entry of Appearance of Brian E. Farnan and Michael J. Farnan on behalf of Defendants ML Retail, LLC, Marcus Lemonis, LLC, MLG Retail, LLC, and ML Fashion, LLC • Linked to (1) • Linked from (2) | Accepted | 0.1MB |
| | | | | | 15 | Notice | Defendants ML Retail, LLC, Marcus Lemonis, LLC, MLG Retail, LLC, and ML Fashion, LLC's Notice of Removal • Linked to (1) | Accepted | 0.1MB |
| | | | | | | Certificate of Service | Certificate of Service for Entry of Appearance | Accepted | 0.1MB |
| | | | | | | Exhibits | Exhibit A to Defendants ML Retail, LLC, Marcus Lemonis, LLC, MLG Retail, LLC, and ML Fashion, LLC's Notice of Removal | Accepted | 12.4MB |
| | | | | | | Certificate of Service | Certificate of Service for Defendants ML Retail, LLC, Marcus Lemonis, LLC, MLG Retail, LLC, and ML Fashion, LLC's Notice of Removal | Accepted | 0.1MB |
| 65764407 | 7/13/2020 3:44 PM EDT | File Only | 2020-0486-MTZ Nicolas Goureau vs Marcus Lemonis et al. | Sean J Bellew, Bellew LLC | 13 | Letter | Letter to The Honorable Morgan T. Zurn from Sean J. Bellew regarding telephonic hearing dial-in information • Linked to (1) | Accepted | 0.1MB |
| 65758967 | 7/10/2020 11:16 AM EDT | File Only | 2020-0486-MTZ Nicolas Goureau vs | Sean J Bellew, Bellew LLC | 12 | Affidavit | Affidavit of Service of Granted with Modifications | Accepted | 0.5MB |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | Marcus Lemonis et al. | | | | (Proposed Order Scheduling Plaintiffs' Motion to Expedite Proceedings)<br>• Linked to (2) | | |
| 65756489 | 7/9/2020 1:40 PM EDT | File Only | 2020-0486-MTZ Nicolas Goureau vs Marcus Lemonis et al. | Sean J Bellew, Bellew LLC | 9 | Summons | Summons Served Pursuant to 10 Del. C. Sec. 3114 upon Defendant Marcus Lemonis on June 26, 2020 with Affidavit of Service<br>• Linked to (2) | Accepted | 0.8MB |
| | | | | | 10 | Summons | Summons Served Pursuant to 8 Del.C. Sec. 132 upon Defendants ML Retail, LLC, Marcus Lemonis, LLC, ML Fashion LLC and MLG Retail, LLC on June 26, 2020 with Affidavit of Service<br>• Linked to (2) | Accepted | 1.1MB |
| | | | | | 11 | Summons | Summons Served Pursuant to 10 Del.C. Sec. 3104 upon Defendant Roberta Raffel aka Bobbi Lemonis on June 29, 2020 with Affidavit of Service<br>• Linked to (2) | Accepted | 1.4MB |
| 65756000 | 7/9/2020 11:32 AM EDT | File And Serve | 2020-0486-MTZ Nicolas Goureau vs Marcus Lemonis et al. | Morgan Zurn, DE Court of Chancery Civil Action | 8 | Order | Granted with Modifications (Proposed Order Scheduling Plaintiffs' Motion to Expedite Proceedings)<br>• Linked to (1)<br>• Linked from (2) | Accepted | 0.4MB |
| 65750847 | 7/7/2020 4:21 PM EDT | File Only | 2020-0486-MTZ Nicolas Goureau vs Marcus Lemonis et al. | Sean J Bellew, Bellew LLC | 7 | Letter | Letter to The Honorable Morgan T. Zurn from Sean J. Bellew regarding Proposed Scheduling Order for Plaintiffs' Motion | Accepted | 0.2MB |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | to Expedite Proceedings | | |
| | | | | | | Proposed Order | Proposed Order Scheduling Plaintiffs' Motion to Expedite Proceedings<br>• Linked from (1) | Accepted | 0.2MB |
| | | | | | | Affidavit | Affidavit of Service of Complaint and Summons | Accepted | 2.7MB |
| 65727891 | 6/26/2020 1:37 PM EDT | File And Serve | 2020-0486-MTZ Nicolas Goureau vs Marcus Lemonis et al. | Register in Chancery, DE Court of Chancery Civil Action | 6 | Issuance of Summons | Issued (1) 3114 summons to special process server (1 copy); Issued (1) 3104 summons to law firm (1 copy); Issued (1) summons to special process server (4 copies) on 6.26.20<br>• Linked to (1)<br>• Linked from (3) | Accepted | 0.4MB |
| 65716365 | 6/22/2020 4:09 PM EDT | File Only | 2020-0486-MTZ Nicolas Goureau vs Marcus Lemonis et al. | Sean J Bellew, Bellew LLC | 5 | Motion | Plaintiffs' Motion for Entry of A Status Quo Order<br>• Linked to (2) | Accepted | 0.1MB |
| 65716338 | 6/22/2020 4:04 PM EDT | File Only | 2020-0486-MTZ Nicolas Goureau vs Marcus Lemonis et al. | Sean J Bellew, Bellew LLC | 4 | Summons Instructions | Summons Instruction Letter to Verified Complaint for Breach of Fiduciary Duties<br>• Linked to (1)<br>• Linked from (1) | Accepted | 0.1MB |
| 65710305 | 6/18/2020 3:15 PM EDT | File Only | 2020-0486-MTZ Nicolas Goureau vs Marcus Lemonis et al. | Sean J Bellew, Bellew LLC | 1 | Complaint - 3114 Service <= 10 Defs | Verified Complaint for Breach of Fiduciary Duties<br>• Linked from (11) | Accepted | 0.6MB |
| | | | | | 2 | Motion to Expedite | Plaintiffs' Motion to Expedite Proceedings and for Status Quo Order<br>• Linked from (2) | Accepted | 0.3MB |
| | | | | | 3 | Proposed Order | Proposed Status Quo Order<br>• Linked from (1) | Accepted | 0.2MB |

| | | | | | Exhibits | Exhibit A to Verified Complaint for Breach of Fiduciary Duties | Accepted | 1.9MB |
|---|---|---|---|---|---|---|---|---|
| | | | | | Exhibits | Exhibit B to Verified Complaint for Breach of Fiduciary Duties | Accepted | 0.7MB |
| | | | | | Exhibits | Exhibit C to Verified Complaint for Breach of Fiduciary Duties | Accepted | 0.8MB |
| | | | | | Exhibits | Exhibit D to Verified Complaint for Breach of Fiduciary Duties | Accepted | 0.2MB |
| | | | | | Declaration | Declaration of Sean J. Bellew | Accepted | 0.2MB |
| | | | | | Verification to Complaint | Verification of Nicolas Goureau to Complaint for Breach of Fiduciary Duties | Accepted | 0.5MB |
| | | | | | Verification to Complaint | Verification of Stephanie Menkin to Complaint for Breach of Fiduciary Duties | Accepted | 0.5MB |
| | | | | | Supplemental Information Sheet | Supplemental Information Sheet to Verified Complaint for Breach of Fiduciary Duties | Accepted | 0.1MB |
| | | | | | Proposed Order | Proposed Order Granting Plaintiffs' Motion to Expedite Proceedings and for Status Quo Order | Accepted | 0.2MB |

1-65 of 65 transactions    <<Prev   Page 1 of 1   Next>>

# EXHIBIT 3

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| NICOLAS GOUREAU and STEPHANIE MENKIN, individually and derivatively on behalf of ML FASHION, LLC, a Delaware limited liability company, | ) ) ) ) ) | |
| *Plaintiffs*, | ) ) ) | |
| v. | ) ) | C.A. No. 2020-0486-MTZ |
| MARCUS LEMONIS, an individual, ML RETAIL, LLC, a Delaware limited liability company, MARCUS LEMONIS, LLC, a Delaware limited liability company, ROBERTA RAFFEL aka Bobbi Lemonis, an individual, and MLG RETAIL, LLC, a Delaware limited liability company, | ) ) ) ) ) ) ) ) ) | |
| *Defendants*, | ) ) | |
| and | ) ) | |
| ML FASHION, LLC, a Delaware limited liability company, | ) ) ) | |
| *Nominal Defendant*. | ) | |

## STATUS QUO ORDER

WHEREAS, on June 18, 2020, Plaintiffs Nicolas Goureau ("Goureau") and Stephanie Menkin ("Menkin"), (collectively "Plaintiffs"), filed a Verified Complaint (the "Complaint") against Defendants Marcus Lemonis ("Lemonis"), ML Retail, LLC ("ML Retail"), Marcus Lemonis, LLC ("ML, LLC"), Roberta Raffel a/k/a Bobbi Lemonis ("Raffel"), and MLG Retail, LLC ("MLG Retail") (collectively

1

"Defendants") and nominal Defendant ML Fashion, LLC ("ML Fashion" or the "Company");

WHEREAS, on September 1, 2020, the Court held the oral argument on Plaintiffs' Motion to Expedite Proceedings and Motion for Entry of Status Quo Order;

WHEREAS, the Court ordered the parties to confer on a joint proposed Status Quo Order, or, alternatively, submit proposed Status Quo Orders consistent with what the Court discussed at the oral argument;

WHEREAS, on September 4, 2020, both parties submitted proposed Status Quo Orders with substantially different terms;

IT IS ORDERED this eighth day of September, 2020, for good cause shown, that pending final resolution of the above-captioned action (excluding any period of appeal) that:

1.    No party shall, except upon (a) order of the Court, or (b) prior written consent of all parties:

        a.    Make any individual purchase or incur any individual expense on behalf of ML Fashion (the "Company") exceeding $125,000.

        b.    Make any purchases or expenses on behalf of the Company exceeding in the aggregate $400,000 in any given calendar month, exclusive of payroll, utilities, rent, and taxes.

c.     Alter, destroy or remove any files, documents, computer equipment, books, records, proprietary information or other assets or property of the Company from the offices of the Company.

d.     Amend or modify any operating agreement or other governing documents of the Company, or otherwise alter the corporate structure or management composition of the Company, including the formation of, or merger with, any other corporate entity.

e.     Initiate bankruptcy, dissolution, liquidation, or winding up of the Company.

f.     Hire any employee or independent contractor of the Company outside the ordinary course of business.

g.     Terminate any employee or independent contractor of the Company outside the ordinary course of business.

h.     Materially amend or modify the salary or compensation of any employee or independent contractor of the Company.

i.     Incur indebtedness or other financial obligations on behalf of the Company outside the ordinary course of business.

j.     Transfer, encumber, exchange, expend, pledge, loan, or otherwise dispose of, directly or indirectly, any asset outside the ordinary course of business.

k.     Transfer money to Defendants or any related entities outside of the ordinary course of business.

2.     The parties shall limit their use of the American Express credit card of Nicolas Goureau ending in #9002 (the "AMEX Card") to those expenses that relate to the Company and are incurred in the ordinary course of business. The Company shall pay its obligations on the AMEX Card in the ordinary course of business.

a.     Marcus Lemonis has agreed, within the next ten (10) days, either individually or through a legal entity that he wholly owns, to loan ML Fashion sufficient money to pay in full the current balance of the AMEX Card;

b.     All AMEX Card payments are without prejudice to any subsequent claim the Company or Mr. Lemonis (or lending company) may make for repayment of any amounts that it demonstrates were not legitimate and authorized ML Fashion company expenses, as well as any subsequent claims about the terms of the loan.

3.     The parties may waive the restrictions imposed by this Order on a case-by-case basis.

4.    The Court may modify the restrictions of this Order upon motion of any party for good cause shown.

> */s/ Morgan T. Zurn*
> Vice Chancellor

# EXHIBIT 4

FILED
11/23/2020 4:20 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
11242484

**FIRM NO. 90747**

**IN THE CIRCUIT COURT OF COOK COUNTY ILLINOIS**
**COUNTY DEPARTMENT – LAW DIVISION**

-----------------------------------------------------------------x

ML FASHION, LLC and ML RETAIL, LLC,

        Plaintiffs,

      v.

NICOLAS GOUREAU, STEPHANIE MENKIN,
and NOEMI GOUREAU,

        Defendants.

-----------------------------------------------------------------x

Case No. 2020L012546

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiffs ML Fashion, LLC ("ML Fashion") and ML Retail, LLC ("ML Retail") (collectively, "Plaintiffs"), by their undersigned attorneys, as and for their Complaint against Defendants Nicolas Goureau ("Goureau"), Stephanie Menkin ("Menkin"), and Noemi Goureau ("Noemi") (collectively, "Defendants"), allege as follows:

## NATURE OF THE ACTION

1.     This is an action for breach of contract, breach of fiduciary duty, unjust enrichment, fraud, and tortious interference with contracts. Plaintiff ML Fashion operates a retail clothing business. ML Retail is a member of, and has loaned money to, ML Fashion and those loans are secured by, among other things, ML Fashion's cash and other assets. Defendants Menkin and Goureau are also members and/or officers of Plaintiff ML Fashion, while Defendant Noemi is Menkin's and Goureau's mother.

2.     As set forth in greater detail below, Defendants Menkin, Goureau, and Noemi have for years embarked on a scheme to steal funds from ML Fashion (and, by extension, ML Retail) for their own personal gain. Defendants have used a company American Express corporate card

(the "AMEX Card") as their own personal piggybank, using it to pay everything from steakhouse dinners to travel to monthly subscriptions to the dating website "Match.com."  Menkin and Goureau also improperly paid a $175,000 annual salary to their mother using ML Fashion funds, despite the fact that Noemi did not perform work for ML Fashion and despite the fact that the manager of ML Fashion specifically directed that these payments cease.  Defendants also misappropriated ML Fashion funds for other unauthorized, personal purposes, including to make car payments, car insurance payments, Menkin's nanny, a mortgage for Noemi's house in the Hamptons, and Menkin's and Goureau's paying for Noemi's lifestyle on top of Noemi's improper annual salary.

3.       After being confronted with some of these unauthorized charges, Defendants then lied to ML Fashion and its manager, claiming, for example, that they had ceased using the AMEX Card and ML Fashion funds for personal purposes and improperly paying Noemi.  Yet Defendants, in fact, continued to improperly steal ML Fashion's funds for years more.

4.       Recently, Defendants have took their misconduct to the next level by making false representations to Plaintiffs and a Delaware Court regarding the AMEX.  Menkin and Goureau obtained an order requiring ML Fashion to make payments on the AMEX Card.

5.       After ML Fashion paid off the outstanding balance of the AMEX Card, totaling hundreds of thousands of dollars, Goureau belatedly produced the AMEX Card billing statements.  It was quickly apparent why Goureau had tried to hide the truth for so long: the statements revealed Defendants had embezzled funds from ML Fashion for their own personal use, totaling hundreds of thousands if not millions of dollars.  Plaintiffs accordingly seek to recover these and other ML Fashion funds (which secure loans from ML Retail) that Defendants have misappropriated for their own personal use as part of their years-long, fraudulent scheme to attempt to loot ML Fashion.

FILED DATE: 11/23/2020 4:20 PM   2020L012546

## PARTIES

6.      Plaintiff ML Fashion is a limited liability company organized under the laws of Delaware with its principal place of business in New York.  Plaintiff owns and operates fashion brands and retail stores across the country, including in Illinois.

7.      Plaintiff ML Retail is a limited liability company organized under the laws of Delaware with its principal place of business in Illinois.  ML Retail owns a 33.34% membership interest in ML Fashion.  The sole member of ML Retail is Marcus Lemonis, a citizen of Illinois.

8.      Defendant Nicolas Goureau is an individual residing in Florida.  Goureau owns a 33.33% membership interest in ML Fashion.  Defendant Goureau may be served with process at 138 E. 71st Street, New York, New York 10021-5011 and 45 SW 9th Street, Apt. 3603, Miami, Florida 33130, or wherever he may be found.

9.      Defendant Stephanie Menkin is an individual residing in New York.  Menkin owns a 33.33% membership interest in, and is an officer of, ML Fashion.  Defendant Menkin may be served with process at 332 South Shore Road Bastrop, Texas 78602, 188 East 70th Street, Apt. 17A New York, New York 10021, 175 E. 62nd Street, Apt. 7D, New York, New York 10065-1991, or wherever she may be found.

10.     Defendant Noemi Goureau is an individual residing in New York.  She is the mother of Goureau and Menkin.  Defendant Noemi may be served with process at 190 East 72nd Street, Apt. 8B, New York, New York 10021, 251 Sebonac Road, Southampton, New York 11968, or wherever she may be found.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over the parties because the parties conduct business in Illinois, and the Defendants have committed tortious acts in Illinois.

12.     Specifically, this Court has personal jurisdiction over Defendants by reason of, among other things, their systematic and continuous contacts with this forum by virtue of establishing a business, ML Fashion, that intended to and did operate retail stores in Illinois; their misappropriation of funds rightfully belonging to ML Fashion and/or ML Retail in Illinois; and because they have tortiously interfered with agreements between Plaintiffs that have mandatory choice-of-law, jurisdiction, and venue provisions in Chicago, Illinois.   As President of ML Fashion, Menkin was responsible for all of ML Fashion's retail stores in Illinois and regularly travelled to Illinois to manage their operation and was in constant contact by telephone with ML Fashion employees in Illinois.  As part of his employment with ML Fashion, Goureau moved to Chicago to oversee the initial buildout of ML Fashion's retail stores in Illinois.

13.     Defendants Menkin, Goureau, and Noemi have also committed tortious and illegal behavior, as outlined below, that occurred in Cook County, Illinois, and/or were specifically and purposefully aimed at harming Plaintiffs in Cook County, Illinois, thus subjecting themselves to this Court's general and specific personal jurisdiction pursuant to due process and/or the Illinois long arm statute, 735 ILCS 5/2-209.

14.     This Court has personal jurisdiction over all Defendants because, among other things, they intentionally and tortiously interfered with a contract having a personal jurisdiction provision limited to Cook County, Illinois, thus subjecting themselves to this Court's general personal jurisdiction pursuant to due process and/or the Illinois long arm statute, 735 ILCS 5/2-209.  Further, Menkin, Goureau, and Noemi are closely related parties to those agreements as Menkin signed on behalf of ML Fashion, Goureau is 33.33% member of ML Fashion, and Noemi is their mother and was supposed employee of ML Fashion, therefore all Defendants could foresee

4

FILED DATE: 11/23/2020 4:20 PM    2020L012546

their tortious interference with these agreements would bring them within the scope of the agreements.

15.      Venue is proper in Cook County because (1) a substantial part of the events giving rise to the claims occurred in Cook County; (2) a mandatory venue provision requires exclusive venue in Cook County, Illinois, and (3) Defendants are otherwise subject to personal jurisdiction in this venue.

**FACTS**

**A.      Background.**

16.      In or about 2014, Defendants Menkin and Goureau solicited an investment from Marcus Lemonis ("Lemonis") to rescue their failing fashion retail business, operating under the brand name "Courage.B."

17.      Lemonis resides in Illinois.

18.      In connection with their solicitation of an investment from Lemonis to rescue their business, in or about 2014, Defendants Menkin and Goureau appeared on Lemonis' popular CNBC television series, "The Profit."

19.      While appearing on "The Profit," Defendants Menkin and Goureau admitted that their business had been poorly run and had lost more than $500,00 the year before and that they just completed a lawsuit against their step-father involving the business.

20.      In or about 2014, Lemonis agreed to invest $800,000 in Menkin's and Goureau's failing business in order to allow their business to purchase inventory, pay other fees and for Goureau to receive monies for the first time in exchange for ML Retail, for which Lemonis serves as managing member, receiving an ownership stake in that business.

21.      After Lemonis invested in, and became a part owner of, Menkin and Goureau's business, the business acquired new brands and opened new stores.

FILED DATE: 11/23/2020 4:20 PM    2020L012546

22.     In or about 2016, Menkin, Goureau, and ML Retail formed ML Fashion to oversee and operate their expanding fashion retail business.  Menkin, Goureau, and ML Retail formed ML Fashion with the specific intent to conduct business in and across Illinois.

23.     From the outset of their new venture, Menkin, Goureau, and ML Retail intended and agreed that ML Fashion would aim their operations at Illinois.  Menkin and Goureau formed ML Fashion envisioning a continuing and wide-ranging presence in Illinois, with Menkin and Goureau specifically interested in the Chicago market.  Menkin and Goureau planned to capture this market for ML Fashion via the suburb model.   Indeed, and as set forth in more detail below, ML Fashion's first retail store opened in the Chicago suburb of Lake Forest, Illinois.

**B.     The Agreements.**

24.     On or about March 29, 2016, Menkin, Goureau, and ML Retail entered into a limited liability company agreement for ML Fashion (the "LLC Agreement") (attached hereto as **Exhibit 1** to the Complaint).  Menkin and Goureau each signed the LLC Agreement individually.

25.     Lemonis signed the LLC Agreement on behalf of ML Retail in Illinois.

26.     **Exhibit A** of the LLC Agreement provides that ML Retail owned a 33.34% membership interest in ML Fashion, and that Menkin and Goureau each owned a 33.33% membership interest in ML Fashion.

27.     **Exhibit B** of the LLC Agreement provides that Lemonis is the chairman and CEO of ML Fashion, and that Menkin serves as ML Fashion's president.

28.     Section 2.3 of the LLC Agreement provides that "[t]he purpose of the Company is to, directly or indirectly through one or more partnerships, limited liability companies or other entities, acquire, hold, maintain, manage, improve, finance, sell, dispose of or otherwise invest in businesses focused on the distribution and sale of apparel, footwear and accessories and sale of apparel, footwear and accessories, via owned and leased retail stores and online (the 'Business')."

FILED DATE: 11/23/2020 4:20 PM    2020L012546

29.     Section 1 of the LLC Agreement further defines "Business Day" as "a day of the year on which banks are not required or authorized to close in Chicago, Illinois."

30.     Section 2.8 of the LLC Agreement provides that ML Fashion's "credit and assets shall be used solely for the benefit of the Company, and no asset of the Company shall be Transferred or encumbered for, or in payment of, **any individual obligation of any Member**" (emphasis added).

31.     Section 6 of the LLC Agreement provides that the management of ML Fashion is "vested entirely and exclusively in" the manager of ML Fashion (the "Manager").

32.     Section 6.1(b) of the LLC Agreement provides that the Manager of ML Fashion is Marcus Lemonis.

33.     Section 7.1 of the LLC Agreement provides that ML Fashion's members do not have any right to participate in the management or control of ML Fashion, or to act for or bind ML Fashion in any way.

34.     Also on or about March 29, 2016, the same day they formed ML Fashion, the parties further executed additional agreements in order to obtain funding for the newly created entity. Specifically, the parties arranged for a revolving multi-million dollar loan between ML Fashion as borrower and ML Retail and lender ("Loan"), which is secured by a Credit Agreement (attached hereto as **Exhibit 2** to the Complaint) and a Security Agreement (attached hereto as **Exhibit 3** to the Complaint).

35.     The Loan was specifically contemplated in the LLC Agreement as, among other things, a "Member Loan" under Section 5.1(a).

FILED DATE: 11/23/2020 4:20 PM   2020L012546

36.     Section 5.3 of the Credit Agreement provides that ML Fashion could not incur indebtedness beyond what was provided for in the Credit Agreement, meaning the Loan was ML Fashion's sole source of capital funding.

37.     Section 7.4 of the Credit Agreement provides the agreement is governed by the laws of Illinois and that "the parties hereby agree to irrevocably submit to the personal and subject matter jurisdiction of the federal and state courts sitting in Chicago, Cook County, Illinois, and agree not to object to such venue for any reason at law or in equity."

38.     Section 2 of the Security Agreement provides that ML Retail has a security interest in, among other things, ML Fashion's "[f]inancial assets" and "money."

39.     Section 8 of the Security Agreement provides:

ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, SHALL BE BROUGHT AND MAINTAINED EXCLUSIVELY IN THE COURTS OF THE STATE OF ILLINOIS OR IN THE UNITED STATES DISTRICT COURT FOR WITH JURISDICTION IN CHICAGO, ILLINOIS; PROVIDED THAT ANY SUIT SEEKING ENFORCEMENT AGAINST ANY COLLATERAL OR OTHER PROPERTY MAY BE BROUGHT, AT LENDER'S OPTION, IN THE COURTS OF ANY JURISDICTION WHERE SUCH COLLATERAL OR OTHER PROPERTY MAY BE FOUND. DEBTOR HEREBY EXPRESSLY AND IRREVOCABLY SUBMITS TO THE JURISDICTION OF THE COURTS OF THE STATE OF ILLINOIS AND OF THE UNITED STATES DISTRICT COURT WITH JURISDICTION IN CHICAGO, ILLINOIS FOR THE PURPOSE OF ANY SUCH LITIGATION AS SET FORTH ABOVE. … DEBTOR HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN ANY SUCH COURT REFERRED TO ABOVE AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

40.     Menkin signed both the Credit Agreement and the Security Agreement on behalf of ML Fashion.

FILED DATE: 11/23/2020 4:20 PM    2020L012546

41.     Menkin, Goureau, and Noemi were each specifically aware of both the Credit and Security Agreements as the mechanism to provide funding to ML Fashion and consented to them. They also knew that without the money provided by these agreements, ML Fashion would not exist because neither Menkin nor Goureau made any capital contributions nor otherwise invested any of their own money in the business.

**C.     ML Fashion's business expansion strategy in Illinois and beyond.**

42.     Beginning in or about 2016, ML Fashion began its business operations and took its first planned step toward the eventual goal of opening retail stores across the country by permanently establishing its first retail store in Illinois.

43.     Using the capital provided to ML Fashion under the Credit and Security Agreements, Menkin and Goureau opened ML Fashion's first store in their desired location of Lake Forest, Illinois.

44.     Goureau physically moved to Chicago, Illinois to handle the initial buildout and installation of fixtures at the Lake Forest location.  While living in Illinois, Goureau oversaw the buildout of additional ML Fashion retail stores across Illinois, including in Hinsdale, Halsted, and Winnetka.

45.     As President of ML Fashion, Menkin was ultimately responsible for managing all of ML Fashion's Illinois locations.  As part of this responsibility, Menkin regularly travelled to Illinois to manage ML Fashion's Illinois stores.  Menkin further took a specific interest in ML Fashion's downtown Chicago location and worked to open that location.

46.     Ultimately, Goureau and Menkin's activities in Illinois led to the systematic expansion of at least ten ML Fashion retail outlets in Illinois.

47.     ML Fashion owns and operates retail stores throughout the country.

48.     ML Fashion currently operates at least four stores in Illinois.

49.     ML Fashion is predominantly situated and conducting business in Illinois as the state with the most retail locations over the rest of the country.

**D.     Defendants' fraudulent misrepresentations and misappropriation of company funds.**

50.     Following the formation of ML Fashion, Menkin served as ML Fashion's president.

51.     Following the formation of ML Fashion, Menkin and Goureau began using ML Fashion funds to pay their mother, Noemi Goureau, one of the highest salaries in the company, $175,000 annually.

52.     Menkin and Goureau both falsely represented to ML Fashion's manager, Lemonis, that in exchange for this salary Noemi was performing services on behalf of ML Fashion.

53.     When Lemonis inquired about the nature of Noemi's services, Menkin and Goureau falsely represented that Noemi was running an ML Fashion store in New York City.

54.     In reality, Noemi hardly performed any services for ML Fashion and rarely, if ever, even showed up at the New York City store—much less run it.

55.     Upon discovering this scheme, Lemonis told Menkin and Goureau that Noemi could not be paid not to work and instructed that Noemi stop being paid.

56.     Lemonis further provided a written instruction, on behalf of ML Fashion, to Menkin and Goureau directing that they stop paying Noemi on behalf of ML Fashion.

57.     Menkin and Goureau falsely told Lemonis and other ML Fashion employees that they had stopped paying Noemi.  Yet they nevertheless continued to pay Noemi her "salary" through misappropriation of ML Fashion funds.

58.     Following the formation of ML Fashion, Goureau, Menkin and Goureau's mother Noemi took in excess of $2,000,000 from ML Fashion including the $175,000 in annual payments to Noemi.

FILED DATE: 11/23/2020 4:20 PM    2020L012546

59. From 2016 through at least 2019, Menkin, Goureau, and Noemi charged significant amounts of personal expenses to the company's AMEX Card issued in Goureau's name, despite the fact that the AMEX Card was only authorized for inventory purchases.

60. Many of these AMEX Card charges made by Menkin, Goureau, and Noemi occurred in Illinois.

61. In addition to Defendants' misuse of the AMEX Card, Defendants misappropriated ML Fashion funds to make personal car payments, car insurance payments, payments to Menkin's nanny, payments for the mortgage on Noemi's house in the Hamptons (Long Island, New York), and other payments to support Noemi's lifestyle on top of her exorbitant, unauthorized salary.

62. None of these expenditures by Defendants for cars, car insurance, a nanny, a mortgage, and to support Noemi's lifestyle were authorized by ML Fashion, and all of these expenditures were made for personal purposes using ML Fashion funds.

63. When Lemonis began hearing about improper and unauthorized personal expenditures (for which he had no idea and no reason to know of the total breadth and scope of misappropriation), he spoke to Menkin and Goureau and asked them to stop any such expenditures. Both Menkin and Goureau promised they would stop using company resources for their personal benefit.

64. Menkin even told her brother Goureau not to use the AMEX Card for personal expenses.

65. When Lemonis would check in with Menkin on this issue, she would say " I know, I know; I am dealing with it."

66. Menkin and Goureau lied, however, and continued to use the AMEX Card and ML Fashion funds for their personal use throughout their entire tenures with ML Fashion.

FILED DATE: 11/23/2020 4:20 PM    2020L012546

67.     Lemonis received no monies from ML Fashion.

68.     Following the formation of ML Fashion, ML Retail invested significant sums into ML Fashion and its related businesses to keep them afloat.

69.     Lemonis was never paid a salary or reimbursed for expenses in his role as the manager and an officer of ML Fashion, and never otherwise took any money out of the company as the company did not have sufficient funds to pay Lemonis.

70.     Following the formation of ML Fashion, neither Menkin nor Goureau put any money into ML Fashion or its related businesses, despite paying themselves through ML Fashion funds hundreds of thousands of dollars a year in "consulting fees."

71.     In or about early 2020, Lemonis began discovering Defendants' misconduct, improper use of ML Fashion's funds for their personal expenses, and diversion of company assets.

72.     Upon discovery, Lemonis began discussions with Menkin and Goureau about their exit from ML Fashion.  Lemonis and Menkin proposed that Menkin would exchange all of her equity in ML Fashion and exit from the company for mutually agreeable inventory.

73.     Lemonis and Goureau similarly discussed a deal where Goureau would exchange all of his equity in ML Fashion and exit from the company for mutually agreeable inventory and to make payments on the AMEX Card for ML Fashion-authorized charges.

74.     Ultimately, Menkin and Goureau did not follow through with transferring their equity to Lemonis and instead stopped all communications with Lemonis in early 2020.  Then in June 2020, they filed their lawsuits, as set forth below.

75.     Despite Lemonis' good-faith attempts to resolve the parties' differences, it has become apparent that all of Menkin's and Goureau's negotiations with Lemonis about exchanging their equity for inventory were a smoke-screen to fraudulently mislead Lemonis into thinking they

FILED DATE: 11/23/2020 4:20 PM 2020L012546

were resolving their disputes, all while Defendants were secretly preparing offensive lawsuits so they could appear as the purported victims.

**E.** **Menkin and Goureau's lawsuits.**

76.     On or about June 18, 2020, Menkin and Goureau filed simultaneous, duplicative lawsuits against, *inter alia*, Lemonis and ML Retail in Delaware state court (the "Delaware Action") and in the United States District Court for the Southern District of New York (the "New York Action") in an attempt to recast their culpability for improper actions regarding ML Fashion in a misguided scheme to attempt to extract even more money from ML Fashion, ML Retail, and Lemonis.

77.     Among other things, the Delaware Action seeks to prevent Lemonis and ML Retail from continuing to operate ML Fashion and to dissolve ML Fashion so that Menkin and Goureau can take ML Fashion's assets for themselves.

**F.** **Menkin and Goureau Makes Misrepresentations to the Delaware Court and to Plaintiffs.**

78.     On June 18, 2020, Goureau and Menkin filed a motion in the Delaware Action seeking, *inter alia*, to compel ML Fashion to pay the balance of the AMEX Card and monthly payments on that card going forward.

79.     As part of that motion, Goureau and Menkin asserted that the AMEX Card was a "corporate" company card that was "tied to Goureau personally."

80.     Goureau and Menkin further asserted that "Goureau has been informed by American Express that if payments are not made before June 26, 2020 it will come after him personally for the entire balance amount of roughly $463,112."

13

FILED DATE: 11/23/2020 4:20 PM    2020L012546

81.     In a sworn declaration to the Delaware Court dated August 31, 2019, Goureau stated: "…[I] cannot afford to make the required payments on the [AMEX Card] myself, nor should I as the card was used for Company purchases."

82.     In his August 31, 2019 declaration to the Delaware Court, Goureau also stated: "I have not used [ML Fashion] funds to purchase fancy cars or take lavish trips."

83.     In a sworn declaration to the Delaware Court dated August 31, 2019, Menkin stated: "I never made Company transactions without Lemonis's knowledge and/or approval and have not misappropriated Company Funds. . . .  I have not use [sic] Company funds to purchase fancy cars or take lavish trips."

84.     On September 4, 2020, Lemonis informed the Delaware Court that he would make a loan, either individually or through a wholly-owned company, to ML Fashion to ensure that ML Fashion would have sufficient funds to pay the balance of the AMEX Card.

85.     Lemonis' agreement to loan the funds was conditioned upon his reserving the right to pursue claims for repayment of any amounts that ML Fashion could demonstrate were not legitimate and authorized ML Fashion company expenses.

86.     On September 8, 2020, the Delaware Court entered an Order (the "September 8 Order") that, among other things, directed ML Fashion to make payments on the AMEX Card, without prejudice to Plaintiffs' rights to pursue claims regarding unauthorized purchases.

87.     After entry of the September 8 Order, Lemonis, while in Illinois, loaned funds to ML Fashion, individually or through a wholly-owned entity, to pay the balance of the AMEX Card.

88.     After entry of the September 8 Order and after receiving the loan from Lemonis in Illinois, ML Fashion paid the balance of the AMEX Card.

FILED DATE: 11/23/2020 4:20 PM   2020L012546

### G.    Discovery Reveals Plaintiffs' Fraud

89.    In the Delaware Action, ML Fashion sought discovery from Goureau and Menkin regarding, *inter alia*, the AMEX Card.

90.    In response to those requests, Goureau objected to the discovery sought, asserting that "***the AMEX card is a corporate card—not a personal card***—that is linked to Nicolas Goureau.  As such, all information regarding the card is in the possession of the company" (emphasis added).

91.    On or about November 6 and November 13, 2020, after ML Fashion had paid the balance on the AMEX Card, Goureau belatedly produced certain billing statements for the AMEX Card.

92.    The AMEX Card statements revealed that Goureau, Menkin, and Noemi made ***hundreds of thousands (if not millions) of dollars of charges that had nothing to do with ML Fashion's business***, including:

- Restaurants, fast food chains, and coffee;

- Gym and other exercise-related memberships (*e.g.*, Soulcycle, Equinox);

- Taxi, Uber, and limousine services;

- Haircuts and beauty salons;

- Airline flights, including numerous flights to Paris and one to Israel;

- Hotels;

- Home décor and furnishings;

- Cable TV and streaming services (*e.g.*, Hulu);

- Internet radio and streaming music (*e.g.*, Pandora, Amazon Music);

- Dry cleaning tabs;

- Mass transportation services;

15

- Auto Insurance;

- Jewelry stores;

- Parking meters;

- Trips to an "Escape Room" game in Chicago;

- Bar tabs;

- Medical services;

- Personal clothing from high-end retailers such as Barney's, Saks Fifth Avenue, and Bergdorf Goodman; and

- Ongoing monthly subscriptions to the dating website "Match.com" for Noemi Goureau.

93. None of these charges on Goureau's "corporate" card were authorized by Lemonis or ML Fashion, and none of these charges reflect legitimate Company expenses.

94. Many of the improper charges made by Menkin, Goureau, and Noemi were made while they were physically present in Illinois and/or were charges for payments to businesses located in Illinois.

95. Defendants' improper charges on the AMEX Card have cost ML Fashion and, by extension, ML Retail hundreds of thousands, if not millions of dollars, in misappropriated funds.

## FIRST CAUSE OF ACTION
**(Breach of Contract by Plaintiffs Against Menkin and Goureau)**

96. Plaintiffs hereby repeat and reallege each and every allegation contained in paragraphs 1 through 95 of this Complaint as if fully set forth herein.

97. ML Retail, Menkin, and Goureau are parties to the LLC Agreement.

98. The LLC Agreement is a valid contract.

99. Menkin and Goureau owe obligations to both ML Retail and ML Fashion under the terms of the LLC Agreement.

FILED DATE: 11/23/2020 4:20 PM  2020L012546

FILED DATE: 11/23/2020 4:20 PM    2020L012546

100.    ML Retail and ML Fashion have each fully performed their obligations under the LLC Agreement.

101.    Menkin and Goureau have breached the LLC Agreement by, *inter alia*, using ML Fashion funds for personal purposes in violation of Section 2.8 of the LLC Agreement, and disregarding written and oral directives from ML Fashion's manager, Lemonis, regarding improper payments to Noemi, improper AMEX Card charges, and improper misappropriation of ML Fashion funds for personal expenditures relating to car payments, car insurance, Menkin's nanny, the mortgage on Noemi's house in the Hamptons, and Noemi's lifestyle.

102.    ML Fashion has been damaged by Menkin's and Goureau's breaches of the LLC Agreement, including in the form of lost funds that were misappropriated by Menkin and Goureau in order to make payments to Noemi, improper charges on the AMEX Card, and improper misappropriation of ML Fashion funds for personal expenditures relating to car payments, car insurance, Menkin's nanny, the mortgage on Noemi's house in the Hamptons, and Noemi's lifestyle.

103.    ML Retail has been damaged by Menkin's and Goureau's breaches of the LLC Agreement, including because of the impact of Menkin's and Goureau's improper conduct on the value of ML Retail's membership interests in ML Fashion.

104.    In addition, Menkin and Goureau's improper conduct diminished the collateral on the loan between ML Fashion and ML Retail. This further harmed ML Fashion by risking default on the loan, and it harmed ML Retail by reducing the value of the Loan and the likelihood of full repayment. Moreover, the jobs of the employees of ML Fashion will be jeopardized if ML Fashion ceases to operate due to its inability to repay its loans or pay for its operations.

FILED DATE: 11/23/2020 4:20 PM     2020L012546

105.    By reason of the foregoing, Plaintiffs are entitled to damages in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### (Breach of Fiduciary Duty by ML Fashion Against Menkin and Goureau)

106.    Plaintiffs hereby repeat and reallege each and every allegation contained in paragraphs 1 through 106 of this Complaint as if fully set forth herein.

107.    Menkin is a member and officer of ML Fashion.

108.    Goureau is a member of ML Fashion.

109.    As members and/or officers of ML Fashion, Menkin and Goureau owed fiduciary duties to ML Fashion.

110.    Menkin and Goureau have breached their fiduciary duties to ML Fashion by, among other things repeatedly, intentionally, and improperly misusing and embezzling ML Fashion funds (secured through the Credit and Security Agreements) for personal use, including, without limitation, unauthorized payments to their mother, Noemi, improper, unauthorized charges made for personal purposes on the AMEX Card, and improper, unauthorized misappropriation of ML Fashion funds for personal expenditures relating to car payments, car insurance, Menkin's nanny, the mortgage on Noemi's house in the Hamptons, and Noemi's lifestyle.

111.    ML Fashion has been harmed and damaged by Menkin's and Goureau's breaches of their fiduciary duties, including because their conduct jeopardizes the existence of ML Fashion's business, the jobs of its employees, and its reputation.

112.    By reason of the foregoing, ML Fashion is entitled to damages in an amount to be determined at trial.

## THIRD CAUSE OF ACTION
### (Unjust Enrichment by Plaintiffs Against Noemi)

113.    Plaintiffs hereby repeat and reallege each and every allegation contained in paragraphs 1 through 113 of this Complaint as if fully set forth herein.

114.    Noemi has retained improper benefits, in the form of improper salary payments despite not performing work for ML Fashion, in the form of improper charges through her use of the AMEX Card, and in the form of improper payments for the mortgage on her house in the Hamptons and to support her lifestyle.

115.    Noemi's retention of improper benefits has been to the detriment of ML Fashion, which has had its cash depleted as a result of Noemi's receipt of an improper salary, without receiving commensurate work from Noemi in return, Noemi's improper use of the AMEX Card for personal purposes, and her receipt of other unauthorized payments to pay for her mortgage and her lifestyle.

116.    Noemi's retention of improper benefits has been to the detriment of ML Retail, including because of the impact of Noemi's improper conduct on the value of ML Retail's membership interests in ML Fashion and the diminishment of the collateral on the loan between ML Fashion and ML Retail.

117.    Noemi's retention of these improper benefits violates the fundamental principles of justice, equity, and good conscience because none of these benefits were authorized by ML Fashion or its manager, Lemonis, and are injuring ML Fashion and ML Retail.

118.    Moreover, the jobs of the employees of ML Fashion are jeopardized if ML Fashion ceases to operate as a result of the misappropriation and improper depletion of its funds.

119.    By reason of the foregoing, Plaintiffs are entitled to damages from Noemi in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION
### (Fraud by Plaintiffs Against Menkin and Goureau)

120.    Plaintiffs hereby repeat and reallege each and every allegation contained in paragraphs 1 through 119 of this Complaint as if fully set forth herein.

121.    Menkin and Goureau each made false statements of material fact they knew were false or made with culpable ignorance of their truth or falsity, specifically that Noemi's salary was for services rendered to ML Fashion; that the payments would stop as requested by ML Fashion's manager, Lemonis; that ML Fashion funds and the AMEX Card would only be used for proper business expenses and not personal gain; and that Menkin and Goureau would only use their positions of trust within ML Fashion to advance the company's interests.

122.    Plaintiffs reasonably relied upon Menkin's and Goureau's false statements to their detriment, including because ML Retail continued to provide funding to ML Fashion for operations in reliance on Menkin's and Goureau's false statements and because ML Fashion continued to allow Menkin, Goureau, and Noemi to access the AMEX Card and other company funds in reliance on Menkin's and Goureau's misrepresentations.

123.    Even as Plaintiffs relied upon Menkin's and Goureau's false statements, Menkin and Goureau went behind Plaintiffs' backs, continuing to pay Noemi an unauthorized salary, continuing to make improper charges on the AMEX Card for personal purposes, and continuing their improper misappropriation of ML Fashion funds for personal expenditures relating to car payments, car insurance, Menkin's nanny, the mortgage on Noemi's house in the Hamptons, and Noemi's lifestyle.

124.    When ML Fashion discovered at least some of Menkin's and Goureau's misconduct in or about late 2019, Menkin and Goureau made further intentional misrepresentations to ML Fashion's manager, Lemonis, regarding their desire to resolve any disputes between the parties.

FILED DATE: 11/23/2020 4:20 PM    2020L012546

125.     Menkin and Goureau made these additional misrepresentations in order to induce ML Fashion to delay in seeking to vindicate its rights while Menkin and Goureau prepared their own lawsuits seeking to portray themselves as victims.

126.     ML Fashion delayed in seeking to vindicate its rights based upon its reliance on Menkin's and Goureau's intentional misrepresentations, to ML Fashion's detriment.

127.     Menkin and Goureau also made misrepresentations to Plaintiffs and to the Delaware Court in the Delaware Action by claiming that the AMEX Card was used for proper business purposes only and not for personal purposes.

128.     Based upon those misrepresentations to Plaintiffs and the Delaware Court, Lemonis, acting in Illinois, agreed to lend funds to ML Fashion to pay the AMEX Card, and the Delaware Court directed ML Fashion to pay the balance of the AMEX Card, totaling more than $450,000.

129.     As a result of Menkin's and Goureau's fraud, Plaintiffs have suffered damages in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION
### (Tortious Interference with Credit and Security Agreements Against Defendants)

130.     Plaintiffs hereby repeat and reallege each and every allegation contained in paragraphs 1 through 130 of this Complaint as if fully set forth herein.

131.     The Credit and Security Agreements are valid, enforceable, and binding contracts between Plaintiffs.

132.     All Defendants had knowledge of the Credit and Security Agreements and ML Fashion's obligations under these agreements, at least through Menkin and Goureau who are 33.33% owners of ML Fashion.

FILED DATE: 11/23/2020 4:20 PM 2020L012546

133.     As set forth above, Defendants intentionally engaged in actions in ways they knew would cause violation of the terms of these agreement, including but not limited to repeatedly, intentionally, and improperly utilizing ML Fashion's funds obtained through the Credit and Security agreements for their own personal purposes via the AMEX Card, unauthorized salary payments to Noemi, and improper misappropriation of ML Fashion funds for personal expenditures relating to car payments, car insurance, Menkin's nanny, the mortgage on Noemi's house in the Hamptons, and Noemi's lifestyle.

134.     Defendants' tortious interference resulted in a situation where ML Fashion's full performance under the Credit Agreement and Security Agreement has been compromised, ML Fashion is in jeopardy of defaulting and breaching the agreements, and its performance will be rendered impossible.

135.     As a result of Defendants intentional interference with Plaintiffs agreements, Plaintiffs have suffered damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter an Order:

(a)     On the First Cause of Action for Breach of Contract, awarding all general, specific, actual, economic, and non-economic damages to ML Fashion and ML Retail in an amount to be determined at trial;

(b)     On the Second Cause of Action for Breach of Fiduciary Duty, awarding injunctive relief and all general, specific, actual, economic, and non-economic damages to ML Fashion in an amount to be determined at trial;

FILED DATE: 11/23/2020 4:20 PM    2020L012546

(c)     On the Third Cause of Action for Unjust Enrichment, awarding all general, specific, actual, economic, and non-economic damages to ML Fashion and ML Retail in an amount to be determined at trial;

(d)     On the Fourth Cause of Action for Fraud, awarding all general, specific, actual, economic, and non-economic damages to ML Fashion and ML Retail in an amount to be determined at trial;

(e)     On the Fifth Cause of Action for Tortious Interference with Credit and Security Agreements, awarding all general, specific, actual, economic, and non-economic damages to ML Fashion and ML Retail in an amount to be determined at trial;

(f)     Awarding judgment that Defendants are liable under each of the above Counts;

(g)     Awarding compensatory damages in an amount to be proved after the discovery of all relevant evidence and trial;

(h)     Award the disgorgement of all improperly gained monies by Defendants;

(i)     Awarding Plaintiffs their reasonable attorneys' fees and costs incurred in connection with this action and the enforcement of their rights;

(j)     Costs and expenses in this action; and

(k)     For such other and further relief as the Court deems just and proper.

Dated:  November 23, 2020

SEYFARTH SHAW LLP

By: _Michael D. Wexler_
   Michael D. Wexler (mwexler@seyfarth.com)
   Robyn E. Marsh (rmarsh@seyfarth.com)

233 S. Wacker Drive, Suite 8000
Chicago, Illinois 60606-6448
Telephone:  (312) 460-5559
Firm No. 90747

Jesse M. Coleman (*pro hac vice* application to
be filed)
700 Milam Street, Suite 1400
Houston, Texas  77002
(713) 238-1805

*Attorneys for Plaintiffs ML Fashion, LLC and
ML Retail, LLC*

FILED
11/23/2020 4:20 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2020L012546
11242484

# EXHIBIT 1

LIMITED LIABILITY COMPANY AGREEMENT

OF

ML FASHION, LLC

The interests evidenced by this Agreement have not been registered under the Securities Act of 1933, as amended, or applicable state securities laws. The interests are subject to restrictions on transferability and resale and may not be transferred or resold except as permitted under the Securities Act and applicable state securities laws and in accordance with the provisions of this Agreement.

# TABLE OF CONTENTS

SECTION 1      DEFINITIONS.................................................................................. 1

SECTION 2      THE COMPANY ........................................................................... 7

2.1    Formation of the Company ................................................................ 7

2.2    Name .................................................................................................. 7

2.3    Purpose; Powers................................................................................. 7

2.4    Principal Place of Business ............................................................... 7

2.5    Term .................................................................................................. 7

2.6    Registered Agent and Registered Office.......................................... 7

2.7    Title to Property ............................................................................... 7

2.8    Payments of Individual Obligations................................................. 7

2.9    Independent Activities; Transactions with Affiliates ...................... 8

2.10   Override of Certain Statutory Defaults ............................................ 8

SECTION 3      INITIAL CAPITALIZATION AND CAPITAL CONTRIBUTIONS ........... 8

3.1    Capital Contributions....................................................................... 8

3.2    Additional Capital Contributions..................................................... 8

3.3    Additional Members ........................................................................ 8

3.4    Limitation on Withdrawal of Capital ............................................... 9

SECTION 4      CAPITAL ACCOUNTS; PROFITS AND LOSSES ...................................... 9

4.1    Capital Accounts............................................................................... 9

4.2    Allocation of Profits and Losses ...................................................... 9

SECTION 5      DISTRIBUTIONS .............................................................................. 11

5.2    Amounts Withheld.......................................................................... 12

5.3    Tax Distributions ............................................................................ 12

5.4    Limitations on Distributions .......................................................... 13

5.5    Certain Liquidity Events ................................................................ 13

SECTION 6      MANAGEMENT ............................................................................... 13

6.1    Manager .......................................................................................... 13

6.2    Duties and Obligations of the Manager; Discretion ....................... 14

6.3    Reimbursements.............................................................................. 14

6.4    Indemnification of the Manager and Officers................................. 14

FILED DATE: 11/23/2020 4:20 PM    2020L012546

SECTION 7      ROLE OF MEMBERS ......................................................... 15

7.1    Rights or Powers ............................................................. 15

7.2    Voting Rights ................................................................ 15

7.3    Member Liability ............................................................ 16

7.4    Partition ...................................................................... 16

7.5    Transactions Between a Member and the Company ............................ 16

7.6    Other Instruments ........................................................... 16

7.7    Non-Solicitation and Non-Competition .................................... 16

7.8    Investment Representations and Warranties .............................. 17

SECTION 8      ACCOUNTING, BOOKS AND RECORDS .............................. 18

8.1    Bank Accounts; Accounting, Books and Records ......................... 18

8.2    Tax Matters ................................................................... 19

8.3    Certificates ................................................................... 21

SECTION 9      AMENDMENTS ............................................................... 21

9.1    Amendments Generally ..................................................... 21

9.2    Amendments by the Manager .............................................. 21

SECTION 10     TRANSFERS; DRAG-ALONG RIGHTS ................................. 21

10.1   Restrictions on Transfers ................................................... 21

10.2   Permitted Transfers ......................................................... 21

10.3   Conditions to Permitted Transfers ........................................ 22

10.4   Prohibited Transfers ........................................................ 22

10.5   Rights of Unadmitted Assignees .......................................... 23

10.6   Admission of Substituted Members ....................................... 23

10.7   Distributions in Respect of Transferred Membership Interests .......... 23

10.8   Sale of the Company; Drag-Along Rights ................................ 24

SECTION 11     REDEMPTION ............................................................... 24

SECTION 12     DISSOLUTION AND WINDING UP ................................... 24

12.1   Dissolution Events ........................................................... 24

12.2   Winding Up ................................................................... 25

12.3   Liquidating Trust; Reserves ................................................ 26

FILED DATE: 11/23/2020 4:20 PM   2020L012546

FILED DATE: 11/23/2020 4:20 PM   2020L012546

| | | |
|---|---|---|
| 12.4 | Rights of Members | 26 |
| 12.5 | Notice of Dissolution/Termination | 26 |
| 12.6 | Character of Liquidating Distributions | 26 |
| 12.7 | The Liquidator | 27 |
| 12.8 | Form of Liquidating Distributions | 27 |
| SECTION 13 | MISCELLANEOUS | 27 |
| 13.1 | Notices | 27 |
| 13.2 | Binding Effect | 27 |
| 13.3 | Effect of Consent or Waiver | 27 |
| 13.4 | Construction | 28 |
| 13.5 | Time | 28 |
| 13.6 | Headings and References | 28 |
| 13.7 | Severability | 28 |
| 13.8 | Incorporation by Reference | 28 |
| 13.9 | Governing Law | 28 |
| 13.10 | Waiver of Jury Trial | 28 |
| 13.11 | Specific Performance | 28 |
| 13.12 | Counterparts; Signatures | 29 |
| 13.13 | Trustee Exculpation | 29 |

FILED DATE: 11/23/2020 4:20 PM 2020L012546

# LIMITED LIABILITY COMPANY AGREEMENT
## OF
## ML FASHION, LLC

**THIS LIMITED LIABILITY COMPANY AGREEMENT OF ML FASHION, LLC**, a Delaware limited liability company (the **"Company"**), is entered and effective as of March 29, 2016 (the **"Effective Date"**), and is entered into by and among the Persons identified as Members on Exhibit A hereto, and such additional Persons as are hereinafter admitted as Members. Capitalized terms and phrases not otherwise defined herein shall have the meanings ascribed to them in Section 1 hereof.

**WHEREAS**, the Company is organized as a limited liability company under and pursuant to the Limited Liability Company Act of the State of Delaware, as amended; and

**WHEREAS**, the Members desire to set forth the terms and conditions in which the Company shall be operated, all as more particularly set forth below.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements herein contained and other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged, the parties hereto do hereby agree as follows:

## SECTION 1

## DEFINITIONS

In addition to terms defined elsewhere in this Agreement, the following capitalized words and phrases used in this Agreement shall have the following meanings:

**"2015 Budget Act"** means the Bipartisan Budget Act of 2015 (Pub. L. 114-74).

**"2015 Budget Act Audit Rules"** means the provisions of Subchapter C of Chapter 63 of the Code, as revised by Section 1101 of the 2015 Budget Act, as such provisions may thereafter be amended and including Treasury regulations or other guidance issued thereunder.

**"Act"** means the Delaware Limited Liability Company Act, 6 Del. C. §18-101, *et seq.*, as amended from time to time (or any corresponding provisions of succeeding law).

**"Additional Member"** shall have the meaning set forth in Section 3.3 hereof.

**"Adjusted Capital Account Deficit"** means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the applicable fiscal year after (a) crediting thereto any amounts which such Member is, or is deemed to be, obligated to restore pursuant to Regulations Section 1.704-2(g)(1) and Section 1.704-2(i)(5) and (b) debiting such Capital Account by the amount of the items described in Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) and (6). The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

**"Affiliate"** means, with respect to any Person (i) any Person directly or indirectly controlling, controlled by or under common control with such Person, (ii) any officer, director, general partner, member or trustee of such Person or (iii) any Person who is an officer, director, general partner, member or trustee of any Person described in clauses (i) or (ii) of this sentence. For purposes of this definition, the terms "controlling," "controlled by" or "under common control with" shall mean the possession, direct or

1

FILED DATE: 11/23/2020 4:20 PM 2020L012546

indirect, of the power to direct or cause the direction of the management and policies of a Person or entity, whether through the ownership of voting securities, by contract or otherwise, or the power to elect at least 50% of the directors, managers, general partners, or persons exercising similar authority with respect to such Person or entities.

"**Agreement**" or "**Limited Liability Company Agreement**" means this Limited Liability Company Agreement of ML Fashion, LLC, including all Exhibits and Schedules attached hereto, as amended from time to time. Words such as "herein," "hereinafter," "hereof," "hereto" and "hereunder" refer to this Agreement as a whole, unless the context otherwise requires.

"**Approval of the Members**" means the written consent of Members holding, in the aggregate, more than fifty percent (50%) of the Percentage Interests.

"**Business**" shall have the meaning set forth in <u>Section 2.3(a)</u> hereof.

"**Business Day**" means a day of the year on which banks are not required or authorized to close in Chicago, Illinois.

"**Capital Account**" means, with respect to each Member, the Capital Account maintained for such Member in accordance with <u>Section 4</u>.

"**Capital Contributions**" means, with respect to any Member, the amount of money and the initial net fair market value of any Property (other than money) contributed to the Company with respect to the Membership Interests in the Company held or purchased by such Member.

"**Carrying Value**" means, with respect to any Company asset, the asset's adjusted basis for U.S. federal income tax purposes, except as otherwise provided in this definition. The Carrying Value of an asset contributed to the Company shall be equal to its Fair Market Value at the time of contribution. The Carrying Values of all Company assets shall be adjusted to equal their respective Fair Market Values in accordance with the rules set forth in Regulations Section 1.704-1(b)(2)(iv)(f), except as otherwise provided herein, in connection with (a) the acquisition of any additional interest in the Company by any new or existing Member in exchange for more than a de minimis Capital Contribution; (b) the distribution of more than a de minimis amount of Company Property to a Member as consideration for an interest in the Company; (c) the distribution of Company Property (other than money) to a Member; (d) the grant of any Membership Interest or other equity interest in the Company (other than a de minimis interest) as consideration for the provision of services to or for the benefit of the Company within the meaning of Regulations Section 1.704-1(b)(2)(iv)(f)(5)(iii); or (e) the issuance by the Company of a noncompensatory option (a "warrant") (other than a warrant for a de minimis Company interest); <u>provided</u>, that, in the case of an exercise of a warrant to acquire Membership Interests, the adjustment of Carrying Values shall also take account of Regulations Section 1.704-1(b)(2)(iv)(s); and, provided further that adjustments pursuant to clauses (a) and (b) above shall be made only if the Manager in good faith determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members. The Carrying Value of any Company asset other than cash denominated in Dollars distributed to any Member shall be adjusted immediately prior to such Distribution to equal its Fair Market Value. In the case of any asset that has a Carrying Value that differs from its adjusted tax basis, Carrying Value shall be adjusted by the amount of depreciation calculated for purposes of the definition of "Profits" and "Losses" rather than the amount of depreciation determined for U.S. federal income tax purposes.

"**Certificate of Cancellation**" means a certificate filed in accordance with 6 Del. C. § 18-203.

"**Certificate of Formation**" means the certificate filed pursuant to 6 Del. C.§ 18-201 of the Act to form the Company.

"**Change in Control**" means the following and shall be deemed to occur if any of the following events occur:

(a)     Any Person becomes, after the date of this Agreement, the beneficial owner (within the meaning of Rule 13d-3 promulgated under the Exchange Act) of 50% or more of either the combined fair market value of the Company's then outstanding Membership Interests or the combined voting power of the Company's then outstanding securities entitled to vote generally in the election of managers, except that any change in the ownership of the Membership Interests of the Company as a result of a private financing of the Company that is approved by the Manager will not be considered a Change in Control unless the Manager specifically states that such change is a Change in Control for purposes of this Agreement;

(b)     Consummation by the Company of a Reorganization; or

(c)     Approval by the Manager and the Voting Members of the Company or any order by a court of competent jurisdiction of a plan of liquidation of the Company.

Notwithstanding the foregoing, unless determined otherwise by the Manager, a Change in Control shall not be deemed to occur solely on account of any of the following:

(i)     a Reorganization that would result in the voting securities of the Company outstanding immediately prior thereto (or, in the case of a Reorganization that is preceded or accomplished by an acquisition or series of related acquisitions by any Person, by tender or exchange offer or otherwise, of voting securities representing 5% or more of the combined voting power of all securities of the Company, immediately prior to such acquisition or the first acquisition in such series of acquisitions) continuing to represent, either by remaining outstanding or by being converted into voting securities of another entity, more than fifty percent (50%) of the combined voting power of the voting securities of the Company or such other entity outstanding immediately after such Reorganization (or series of related transactions involving such a Reorganization);

(ii)     a Reorganization effected to implement a recapitalization or reincorporation of the Company (or similar transaction) that does not result in a material change in beneficial ownership of the voting securities of the Company or its successor;

(iii)     any acquisition by a lender of the Company pursuant to a debt restructuring thereof; or

(iv)     any acquisition by, or consummation of a Reorganization with, an Affiliate of the Company.

(d)     A Change in Control of the type described in paragraph (a)(ii), (b) or (c) shall be deemed to be completed on the date it occurs, and a Change in Control of the type described in paragraph (a)(i) shall be deemed to be completed as of the date the entity or group attaining 50% or greater ownership has elected its representative(s) as the managers of the Company and/or caused its nominees to become Officers with the authority to terminate or alter the terms of employees' employment.

"**Code**" means the United States Internal Revenue Code of 1986, as amended from time to time.

FILED DATE: 11/23/2020 4:20 PM 2020L012546

"**Company Minimum Gain**" shall have the same meaning attributed to "partnership minimum gain" as set forth in Regulations Section 1.704-2(b)(2) and Section 1.704-2(d).

"**Dissolution Event**" shall have the meaning set forth in <u>Section 12.1(a)</u> hereof.

"**Distribution**" means any distributions by the Company to the Members with respect to their Membership Interests in accordance with this Agreement.

"**Drag-Along Members**" shall have the meaning set forth in <u>Section 10.8(a)</u> hereof.

"**Dragging Member**" shall have the meaning set forth in <u>Section 10.8(a)</u> hereof.

"**Drag Notice**" shall have the meaning set forth in <u>Section 10.8(a)</u> hereof.

"**Drag Transaction**" shall have the meaning set forth in <u>Section 10.8(a)</u> hereof.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended, or any successor statute or statutes thereto.

"**Fair Market Value**" means, with respect to any asset, the fair market value of such asset, as reasonably determined by the Manager, except as otherwise expressly provided herein.

"**GAAP**" means generally accepted accounting principles in effect in the United States of America from time to time.

"**Liquidator**" has the meaning set forth in <u>Section 12.7(a)</u> hereof.

"**Manager**" means, at any point in time, the Person then serving the Company as Manager pursuant to <u>Section 6</u> hereof.

"**Member**" means any Person (i) who is referred to as such on <u>Exhibit A</u> to this Agreement, or who has become a Member pursuant to the terms of this Agreement and (ii) who has not ceased to be a Member pursuant to the terms of this Agreement. "**Members**" means all such Persons.

"**Member Nonrecourse Debt**" shall have the meaning attributed to "partner nonrecourse debt" as set forth in Regulations Section 1.704-2(b)(4).

"**Member Nonrecourse Debt Minimum Gain**" means an amount with respect to each Member Nonrecourse Debt equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a nonrecourse liability (as defined in Regulations Section 1.752-1(a)(2)) determined in accordance with Regulations Section 1.704-2(i)(3).

"**Member Nonrecourse Deductions**" shall have the meaning attributed to "partner nonrecourse deductions" as set forth in Regulation Section 1.704-2(i)(2).

"**Membership Interest**" means, with respect to any Member at any time, the entire interest of such Member in the Company at such time. Such interest includes, without limitation, the Percentage Interest of such Member, as well as any and all other rights of a Member to receive distributions of revenues, allocations of income and loss and distributions of liquidation proceeds arising under this Agreement, and management rights, voting rights or rights to consent by a Member arising hereunder.

FILED DATE: 11/23/2020 4:20 PM 2020L012546

**"Misconduct"** means fraud, breach of fiduciary duty, bad faith, a knowing violation of law or willful misconduct.

**"ML Retail"** means ML Retail LLC, a Delaware limited liability company, and its successors and assigns.

**"Net Cash Flow"** means the gross cash proceeds of the Company less the portion thereof used to pay or establish reserves for all Company expenses, debt payments (including debt payments to Members or their Affiliates), capital improvements, replacements, and contingencies, all as determined by the Manager. **"Net Cash Flow"** shall not be reduced by depreciation, amortization, cost recovery deductions, or similar allowances, but shall be increased by any reductions of reserves previously established pursuant to the first sentence of this definition.

**"Nonrecourse Deductions"** has the meaning set forth in Regulation Sections 1.704-2(b)(1).

**"Officers"** has the meaning set forth in Section 6.1(c) hereof.

**"Partnership Representative"** has the meaning set forth in Section 8.3(d)(iii) hereof.

**"Percentage Interest"** means, with respect to any Member as of any date, the percentage of Membership Interests held by such Member set forth on Exhibit A hereto, as such percentage may be adjusted from time to time pursuant to Section 9.2.

**"Permitted Transfer"** has the meaning set forth in Section 10.2 hereof.

**"Person"** means any individual, limited liability company, corporation, general partnership, limited partnership, trust, estate, governmental agency, cooperative, association, nominee or other entity, and the heirs, executors, administrators, legal representatives, successors and assigns of such person, as the context may require.

**"Profits"** and **"Losses"** means, for each fiscal year of the Company or other period, the Company's taxable income or loss for such year or period, or particular items thereof, determined in accordance with the accounting method used by the Company for U.S. federal income tax purposes and in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(a)     Any income of the Company that is exempt from U.S. federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be added to such taxable income or loss;

(b)     Any expenditures of the Company described in Code Section 705(a)(2)(B), or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv)(i), which are not deductible in computing taxable income or loss, not properly capitalizable, and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be treated as deductible items and shall be subtracted from such taxable income or loss;

(c)     If the Carrying Value of any Company asset is adjusted pursuant to the definition of "Carrying Value" herein, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits or Losses;

5

FILED DATE: 11/23/2020 4:20 PM    2020L012546

(d)     Gain or loss resulting from any disposition of property with respect to which gain or loss is recognized for U.S. federal income tax purposes shall be computed by reference to the Carrying Value of the property disposed of notwithstanding that the adjusted tax basis of such property differs from its Carrying Value in accordance with Regulations Section 1.704-1(b)(2)(iv);

(e)     If the Carrying Value of any asset differs from its adjusted tax basis for U.S. federal income tax purposes, the amount of depreciation, amortization or cost recovery deductions with respect to such asset for purposes of determining Profits and Losses shall be an amount which bears the same ratio to such Carrying Value as the U.S. federal income tax depreciation, amortization or other cost recovery deductions bears to such adjusted tax basis (provided, that if the U.S. federal income tax depreciation, amortization or other cost recovery deduction is zero, the Manager may use any reasonable method for purposes of determining depreciation, amortization or other cost recovery deductions in calculating Profits and Losses); and

(f)     Notwithstanding anything to the contrary herein, items that are specially allocated pursuant to Section 4.2(b) shall not be taken into account in computing Profits and Losses.

"**Property**" means all real and personal property acquired by the Company, including cash, and any improvements thereto, and shall include both tangible and intangible property.

"**Reconstitution Period**" has the meaning set forth in Section 12.1(b) hereof.

"**Regulations**" means the Income Tax Regulations, including Temporary Regulations, promulgated under the Code, as such regulations are amended from time to time.

"**Reorganization**" means any merger, consolidation, sale or other disposition of all or substantially all of the assets of the Company or other reorganization.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Subsidiary**" means any Person of which a majority of the outstanding shares or other equity interests having the power to vote for directors, managers, general partners or persons exercising similar authority are owned, directly or indirectly, by the Company.

"**Tax Distributions**" has the meaning set forth in Section 5.3(a) hereof.

"**Tax Matters Member**" has the meaning set forth in Section 8.3(d)(i) hereof.

"**Third Party Purchaser**" means, with respect to a proposed sale of Membership Interests pursuant to Section 10.8, a Person, other than an Affiliate or Permitted Transferee of any Member, who offers to purchase outstanding Membership Interests pursuant to a bona fide written offer.

"**Transfer**" means, as a noun, any voluntary or involuntary transfer, sale, pledge or hypothecation or other disposition and, as a verb, voluntarily or involuntarily to transfer, sell, pledge or hypothecate or otherwise dispose of (including in each case, without limitation, by way of merger, consolidation, reorganization, forced sale or otherwise).

"**Unreturned Capital Contributions**" means, with respect to any Member, the difference between (a) the sum of (i) such Member's initial Capital Contribution plus (ii) any subsequent Capital Contribution(s) made by such Member, less (b) any distributions previously made to such Member pursuant to Sections 5.1(b)(i) and 12.2(c).

FILED DATE: 11/23/2020 4:20 PM 2020L012546

## SECTION 2

## THE COMPANY

**2.1** **Formation of the Company**. The Company shall operate as a Delaware limited liability company under and pursuant to the Act, and pursuant to the terms of this Agreement. A Certificate of Formation was filed on March 29, 2016, with the Office of the Delaware Secretary of State by the organizer of the Company acting as agent for the Company. The Members shall be the "members" of the Company within the meaning of the Act, and except as expressly provided herein to the contrary, the rights and obligations of the Members shall be as provided in the Act.

**2.2** **Name**. The name of the Company shall be "ML Fashion, LLC" and all business of the Company shall be conducted in such name. The Manager may change the name of the Company at any time.

**2.3** **Purpose; Powers**.

(a) The purpose of the Company is to, directly or indirectly through one or more partnerships, limited liability companies or other entities, acquire, hold, maintain, manage, improve, finance, sell, dispose of or otherwise invest in businesses focused on the distribution and sale of apparel, footwear and accessories, via owned and leased retail stores and online (the "**Business**").

(b) The Company has the power to do any and all acts necessary, appropriate, proper, advisable, incidental or convenient to or in furtherance of the purposes of the Company set forth in Section 2.3(a) hereof.

**2.4** **Principal Place of Business**. The principal place of business of the Company shall be located at such place as the Manager may determine from time to time. The initial principal place of business of the Company shall be at 38 E. 29th Street, New York, New York 10016.

**2.5** **Term**. The term of the Company commenced on the date the Certificate of Formation was filed in the office of the Secretary of State of the State of Delaware in accordance with the Act and shall continue until the winding up and liquidation of the Company and its business is completed following a Dissolution Event, as provided in Section 12 hereof.

**2.6** **Registered Agent and Registered Office**. The registered agent and registered office of the Company in the State of Delaware shall be The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware, 19801, or any successor as appointed by the Manager.

**2.7** **Title to Property**. All Property owned by the Company shall be owned by the Company as an entity and no Member shall have any ownership interest in such Property in his or its individual name, and each Member's interest in the Company shall be personal property for all purposes. At all times, the Company shall hold title to all of its Property in the name of the Company and not in the name of any Member.

**2.8** **Payments of Individual Obligations**. The Company's credit and assets shall be used solely for the benefit of the Company, and no asset of the Company shall be Transferred or encumbered for, or in payment of, any individual obligation of any Member.

**2.9    Independent Activities; Transactions with Affiliates.**

(a)    The Manager shall be required to devote only such time to the affairs of the Company as may be necessary to manage and operate the Company, and shall be free to serve any other Person or enterprise in any capacity that such Manager may deem appropriate in his, her or its discretion.

(b)    Except as otherwise set forth in <u>Section 7.7</u> and insofar as permitted by applicable law, neither this Agreement nor any activity undertaken pursuant hereto shall prevent any Member or the Manager or their Affiliates from engaging in whatever activities they choose, whether the same are competitive with the Company or otherwise, and any such activities may be undertaken without having or incurring any obligation to offer any interest in such activities to the Company or any Member, or require any Member or the Manager to permit the Company or any other Member or the Manager or its Affiliates to participate in any such activities.

(c)    To the extent permitted by applicable law and subject to the provisions of this Agreement, the Manager is hereby authorized to cause the Company to purchase Property from, sell Property to or otherwise deal with any Member, acting on its own behalf, or any Affiliate of any Member on terms that are arms' length market terms or are more favorable to the Company than arms' length market terms.

**2.10    Override of Certain Statutory Defaults.**  To the extent permitted by law, the provisions of this Agreement shall govern over all provisions of the Act which would apply but for (and that are inconsistent with) this Agreement.  For each issue (a) with respect to which the Act provides a rule (a **"default rule"**) but permits a limited liability company's operating agreement to provide a different rule and (b) which is addressed by this Agreement, the default rule shall not apply to the Company.  Without limiting the generality of the foregoing, except as expressly provided in this Agreement, the following provisions of the Act shall not apply to the Company: Section 18-604 (Distribution upon Resignation), Section 18-801 (Dissolution) and Section 18-804 (Distribution of Assets).

# SECTION 3

# INITIAL CAPITALIZATION AND CAPITAL CONTRIBUTIONS

**3.1    Capital Contributions.**  Each Member has made such Capital Contributions as are set forth in the books and records of the Company.

**3.2    Additional Capital Contributions.**  No Member shall be required to make any additional Capital Contribution.

**3.3    Additional Members.**  By approval of the Manager and the Approval of the Members, the Company is authorized to admit any Person as an additional member of the Company (each, an **"Additional Member"**).  In connection with the admission of an Additional Member, the Manager shall agree with the Person to be admitted as an Additional Member as to what Capital Contribution, if any, such Additional Member shall make to the Company.  The Percentage Interest to be issued to any Additional Member shall represent the value of the Capital Contribution made by such Additional Member relative to the value of the Company at the time of such Capital Contribution and shall dilute all existing Members' Percentage Interests proportionately unless otherwise agreed by the Members.  Each Person admitted as an Additional Member will be deemed admitted at the time such Person (a) executes this Agreement or a counterpart of this Agreement and such other documents as are requested by the Manager and (b) is named as a Member on <u>Exhibit A</u> hereto.  In the event any Additional Members are admitted to the Company, the Manager shall cause <u>Exhibit A</u> to be updated to accurately reflect the

FILED DATE: 11/23/2020 4:20 PM    2020L012546

Additional Member and the related changes in the Members' Percentage Interests. The legal fees and expenses associated with such admission shall be borne by the Company.

**3.4    Limitation on Withdrawal of Capital**. Except as expressly provided in this Agreement, no Member (a) shall have the right to withdraw or receive any return on such Member's Capital Contributions (including any part of its Capital Account) or a claim to any Company capital prior to termination of the Company pursuant to Section 12 hereof, (b) shall have any right to demand and receive property other than cash in return for such Member's contributions to the capital of the Company, or (c) shall be liable to any other Member for the return of such other Member's contributions to the capital of the Company, or any portion thereof (except as otherwise expressly required under the Act), it being expressly understood that such return shall be made solely from Company assets.

## SECTION 4

## CAPITAL ACCOUNTS; PROFITS AND LOSSES

**4.1    Capital Accounts**. The Company shall establish and maintain a separate Capital Account for each Member in accordance with Regulations Section 1.704-1(b).

**4.2    Allocation of Profits and Losses**.

(a)    Profits and Losses. After giving effect to the special allocations in Section 4.2(b) and after adjusting for all Capital Contributions and Distributions made during such taxable year, Profits and Losses (and, if necessary, individual items of gross income or loss) shall be allocated annually (and at such other times in which it is necessary to allocate Profits or Losses) in a manner such that, after such allocations have been made, the balance of each Member's Capital Account shall, to the extent possible, be equal to (i) an amount that would be distributed to such Member if (A) the Company were to sell its assets for their Carrying Values, (B) all Company liabilities were satisfied (limited with respect to each nonrecourse liability to the Carrying Values of the assets securing such liability), (C) the Company were to distribute the proceeds of sale pursuant to Section 12.2 and (D) the Company were to dissolve pursuant to Section 12, minus (ii) the sum of (1) such Member's share of Company Minimum Gain or Member Nonrecourse Debt Minimum Gain, and (2) the amount, if any, that such Member is obligated (or deemed obligated) to contribute, in its capacity as a Member, to the Company, computed immediately prior to the hypothetical sale of assets.

(b)    Special Allocations.

(i)    Nonrecourse Deductions. Notwithstanding the general rule on allocation of Losses stated in Section 4.2(a), Nonrecourse Deductions will be allocated to and among the Members in accordance with their respective Percentage Interests, and Member Nonrecourse Deductions will be allocated to and among those Members bearing the economic risk of loss for such debt in accordance with each Member's share of such risk. The allocation of liabilities to a property, the determination of Nonrecourse Deductions and Member Nonrecourse Deductions, the effect of property revaluations and all other issues affecting the allocation of such items will be determined in accordance with the Regulations under Code Section 704(b).

(ii)    Minimum Gain Chargeback. Notwithstanding the general rule on allocation of Profits stated in Section 4.2(a), if there is a net decrease in Company Minimum Gain for any fiscal year, each Member will be allocated items of Company income or gain for such year equal to such Member's share of the net decrease in Company Minimum Gain. If there is a net decrease in Member Nonrecourse Debt Minimum Gain for any fiscal year, each Member

FILED DATE: 11/23/2020 4:20 PM 2020L012546

having a share of such Member Nonrecourse Debt Minimum Gain will be allocated items of Company income or gain equal to such Member's share of such net decrease in Member Nonrecourse Debt Minimum Gain. The determination of net decreases in Company Minimum Gain and Member Nonrecourse Debt Minimum Gain, allocations of such net decreases, exceptions to minimum gain chargebacks and all other issues affecting the minimum gain chargeback requirements will be determined in accordance with the Regulations under Code Section 704(b).

(iii)  <u>Qualified Income Offset</u>.  If a Member unexpectedly receives an adjustment, allocation or distribution described in Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6) that causes or increases an Adjusted Capital Account Deficit with respect to such Member, items of Company gross income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate such Adjusted Capital Account Deficit as quickly as possible.

(iv)  <u>Section 754 Adjustments</u>.  To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Section 734(b) or 743(b) of the Code is required to be taken into account in determining Capital Accounts in accordance with Regulations Section 1.704-1(b)(2)(iv)(m), the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such Section of the Regulations.

(v)  <u>Loss Limitation</u>.  Losses allocated pursuant to <u>Section 4.2(a)</u> hereof shall not exceed the maximum amount of Losses that can be allocated without causing any Member to have or increase an Adjusted Capital Account Deficit at the end of any fiscal year of the Company or other allocation period in which any other Member does not have an Adjusted Capital Account Deficit. In the event some but not all of the Members would have an Adjusted Capital Account Deficit as a consequence of an allocation of Losses pursuant to <u>Section 4.2(a)</u>, the limitation set forth in this <u>Section 4.2(b)(v)</u> shall be applied on a Member by Member basis and Losses not allocable to a Member as a result of such limitation shall be allocated proportionately to the other Members without an Adjusted Capital Account Deficit so as to allocate the maximum permissible Losses to each Member under Regulations Section 1.704-1(b)(2)(ii)(d).

(vi)  <u>Interpretation</u>.  The foregoing provisions of this <u>Section 4.2(b)</u> (**"Regulatory Allocations"**) are intended to comply with Regulations Sections 1.704-1(b) and 1.704-2 and shall be interpreted consistently with this intention. Any terms used in such provisions that are not specifically defined in this Agreement shall have the meaning, if any, given such terms in such Regulations. The amounts of the items of Company income, gain, loss, or deduction available to be specially allocated pursuant to this <u>Section 4.2(b)</u> shall be determined by applying rules analogous to those set forth in <u>subparagraphs (a)</u> through <u>(e)</u> of the definition of "Profits" and "Losses" in <u>Section 1.1</u>.

(vii)  <u>Curative Allocations</u>.  If any allocation of gain, income, loss, expense or any other item is made pursuant to the Regulatory Allocations with respect to one or more Members, then the balance of such items for the current and all subsequent fiscal years shall be allocated among the Members so that, to the extent possible and without requiring further Regulatory Allocations, the Members receive aggregate net allocations under <u>Section 4.2</u> equal to the net allocations that would have been made to the Members if the Regulatory Allocations had

FILED DATE: 11/23/2020 4:20 PM 2020L012546

not occurred. This Section 4.2(b)(vii) is intended to minimize to the extent possible and to the extent necessary any economic distortions which may result from application of Regulations Section 1.704-1(b) and shall be interpreted in a manner consistent therewith.

**4.3    Tax Allocations.**  For income tax purposes only, each item of income, gain, loss and deduction of the Company shall be allocated among the Members in the same manner as the corresponding items of Profits and Losses and specially allocated items are allocated for Capital Account purposes; provided, that in the case of any Company asset the Carrying Value of which differs from its adjusted tax basis for U.S. federal income tax purposes, income, gain, loss and deduction with respect to such asset shall be allocated solely for income tax purposes in accordance with the principles of Sections 704(b) and (c) of the Code (in any reasonable manner determined by the Manager) so as to take account of the difference between the Carrying Value and adjusted basis of such asset.

**4.4    Other Allocation Provisions.**  The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations Section 1.704-1(b) and shall be interpreted and applied in a manner consistent with such Regulations. Sections 4.1 to and including Section 4.4 hereof may be amended at any time by the Manager if, in the opinion of tax counsel to the Company, it is necessary to comply with Regulations Section 1.704-1(b), so long as any such amendment does not change the relative economic interests of the Members.

**4.5    Authority to Withhold; Treatment of Withheld Tax.**  Notwithstanding any other provision of this Agreement, each Member hereby authorizes the Company to withhold and to pay over, or otherwise pay, any withholding or other Taxes payable by the Company with respect to such Member or as a result of such Member's participation in the Company.  If and to the extent that the Company shall be required to withhold or pay any such withholding or other taxes with respect to a Member, such Member shall be deemed for all purposes of this Agreement to have received a Distribution from the Company as of the time such withholding or other tax is required to be paid.  In the event that the Company receives a payment in respect of which Tax has been withheld, the Company shall be deemed to have received cash in an amount equal to the amount of such withheld Tax, and each Member shall be deemed to have received as a Distribution the portion of such amount that is attributable to such Member's interest as equitably determined by the Manager.  Any Distribution deemed made to a Member pursuant to this Section 4.5 shall reduce the amounts the Member would otherwise be entitled to receive pursuant to Section 5.1(a).

<br>

## SECTION 5

## DISTRIBUTIONS

**5.1    Distributions of Net Cash Flow.**

(a)    <u>Conditions to Cash Distributions to Members</u>.  No Distributions may be made to the Members unless (i) the Company is current on all payments of interest due and payable by the Company to any Member that has made a loan to the Company (each, a **"Member Loan"**), and (ii) the Company has no trade accounts payable in excess of sixty (60) days past due.  Further, at any time any amount is due and owing under any Member Loan, no Distributions may be made to the Members unless an amount equal to the Distribution is used to pay down the principal balance and any related accrued and unpaid interest of such loan, pro rata to and among the Members holding Member Loans in accordance with the relative remaining balances of their respective Member Loans.

11

FILED DATE: 11/23/2020 4:20 PM   2020L012546

(b)   <u>Cash Distributions to Members</u>.  Subject to the requirements and limitations of this <u>Section 5.1(a)</u> and <u>5.4</u>, the timing and amount of Distributions shall be determined by the Manager in his reasonable business judgment.  Except as set forth in <u>Section 5.3</u> and <u>Section 12.2</u> and subject to the requirements and limitations of this <u>Section 5.1(a)</u> and <u>5.4</u>, the Manager, in his discretion, may distribute Net Cash Flow to and among the Members, provided that any such Distribution shall be made as follows:

(i)   first, 100% to and among the Members in proportion to and to the extent of their respective Unreturned Capital Contributions; and

(ii)   second, pro rata among the Members, provided that any such distribution shall be made pro rata to and among the Members in accordance with their respective Percentage Interests at such time.

**5.2   Amounts Withheld**.  All amounts withheld pursuant to the Code or any provision of any state, local or foreign tax law with respect to any payment, distribution or allocation to the Company or the Members shall be treated as amounts paid or distributed, as the case may be, to the Members with respect to which such amount was withheld pursuant to this <u>Section 5.2</u> for all purposes under this Agreement but only to the extent such amounts are paid by the Company to such taxing authority.  The Company is authorized to withhold from payments and distributions, or with respect to allocations to the Members, and to pay over to any federal, state and local government or any foreign government, any amounts required to be so withheld pursuant to the Code or any provisions of any other federal, state or local law or any foreign law, and shall allocate any such amounts to the Members with respect to which such amount was withheld and paid to the taxing authority.

**5.3   Tax Distributions**.

(a)   If the distributions to the Members pursuant to <u>Section 5.1</u> above (exclusive of Tax Distributions) for a taxable year are not expected to cover each Member's federal and state taxes on its distributive share of the Company's taxable income for such taxable year, then the Company shall be required to make additional distributions pursuant to this Section (**"Tax Distributions"**) to the Members in accordance with their Percentage Interests in such amount as determined pursuant to <u>Section 5.3(b)</u> below, to the extent the Company has sufficient Net Cash Flow.  If the distributions to the Members during the taxable year pursuant to <u>Section 5.1</u> above (exclusive of Tax Distributions) are expected to cover each Member's federal and state taxes on its distributive share of the Company's taxable income, then no distributions shall be made pursuant to this <u>Section 5.3</u>.   Any distribution deemed made to a Member pursuant to this <u>Section 5.3</u> shall reduce the amounts the Member would otherwise be entitled to receive pursuant to <u>Section 5.1(b)(i)</u> or <u>5.1(b)(ii)</u>.

(b)   The aggregate amount of the Tax Distributions shall be determined by the Manager and shall equal the amount of cash the Manager deems necessary to enable each Member to pay its federal and state taxes on its distributive share of the Company's taxable income for the taxable year, taking into account the distributions expected to be received from the Company (exclusive of Tax Distributions) during the taxable year.  To the extent the Company has sufficient Net Cash Flow, the Manager shall attempt to make the Tax Distributions on a quarterly basis to enable the Members to make their quarterly state and federal estimated tax payments.  In any event the Manager shall, to the extent the Company has sufficient Net Cash Flow, cause the Company to make the Tax Distribution no later than the April 10 following the taxable year to which the Tax Distribution relates.  The Manager shall be entitled to make reasonable assumptions concerning Member's tax rates and, when making quarterly Tax Distributions, the Company's ultimate taxable income for the entire taxable year.

FILED DATE: 11/23/2020 4:20 PM 2020L012546

**5.4    Limitations on Distributions**.

(a)    The Company shall make no Distributions to the Members except (i) as provided in this <u>Section 5</u> and in <u>Section 12</u> hereof, or (ii) as determined by the Manager.

(b)    The Company shall not make, and a Member may not receive, a Distribution from the Company to the extent that, after giving effect to the Distribution, all liabilities of the Company, other than liability to Members on account of their Capital Contributions and liabilities for which the recourse of creditors is limited to specific property of the Company, would exceed the fair value of the Company's assets.

**5.5    Certain Liquidity Events.**  Notwithstanding any other provision of this Agreement to the contrary, if a Change in Control occurs in which the Members dispose of all Membership Interests in the Company (whether in a merger or sale of all of the equity of the Company), the Members agree and acknowledge that the consideration paid to each Member for their Membership Interests shall be redistributed among them to equal that which each Member would have received if the Company had sold all of its assets for an amount equal to the aggregate consideration payable under such transaction plus all Company liabilities (including transaction expenses, brokers' commissions, attorney's and accountants' fees, debt repayment and other similar charges), and the sales proceeds (net of such liabilities) were distributed in accordance with <u>Section 12.2</u>.  Notwithstanding any other provision of this Agreement to the contrary, if a Change in Control occurs in which the Company disposes of assets, with proceeds from such transaction received by the Company, then the Distribution of any such proceeds to the Members shall be made in accordance with <u>Section 12.2</u>.

# SECTION 6

# MANAGEMENT

**6.1    Manager**.

(a)    The management of the Company shall be vested entirely and exclusively in the Manager.  Except as expressly provided for in this Agreement or prohibited by the Act, the Manager shall have the full, exclusive and unilateral power and authority to make all decisions affecting the business and affairs of the Company.  No Member acting as such shall have any voting, approval, or management rights whatsoever or any authority to bind the Company, except as expressly provided for in this Agreement or the Act.

(b)    The Manager need not be a Member of the Company.  The initial Manager of the Company as of the Effective Date shall be Marcus Lemonis.  The Manager shall serve as the Manager until his or its death, dissolution, voluntary resignation, or appointment of a successor Manager.  ML Retail shall have the sole power to remove a Manager and to appoint any successor Manager.

(c)    The Company may, but shall not be required to, have officers (the **"Officers"**), who shall be appointed by the Manager and may include a President, a Vice President, a Secretary and a Treasurer or Chief Financial Officer.  The Manager may also appoint a Chairman, more than one Vice President, and one or more Assistant Secretaries and Assistant Treasurers.  The Manager may appoint such other Officers and agents as he shall deem necessary, who shall hold their offices for such terms and shall exercise such powers and perform such duties as shall be determined from time to time by the Manager. Any number of offices may be held by the same Person.  The Manager may, in his own

FILED DATE: 11/23/2020 4:20 PM    2020L012546

discretion, fix the salaries of all Officers and agents of the Company, in their capacity as such. Each of the Officers of the Company shall hold office until such Officer's successor is appointed or until such Officer's earlier death, resignation or removal. Any Officer may be removed at any time by the Manager. Any vacancy occurring in any office of the Company may be filled by the Manager. The initial officers of the Company shall be the persons identified as such on the attached <u>Schedule A</u>.

(d)     The Manager may engage on behalf of, and at the expense of, the Company, such Persons as the Manager in his judgment shall deem advisable for the conduct and operation of the business of the Company.

(e)     The Manager shall not be liable under a judgment, decree or order of court, or in any other manner, for a debt, obligation or liability of the Company.

(f)     Instruments and documents of the Company shall be valid and binding upon the Company if executed by the Manager or a duly designated officer by the Manager, and Persons dealing with the Company shall be entitled to rely conclusively on such power and authority of the Manager and such officers.

(g)     The Manager is hereby authorized to enter into any contract or execute and deliver any instrument in the name of and on behalf of the Company. The Manager may authorize any Officer or agent of the Company to enter into any contract or execute and deliver any instrument in the name of and on behalf of the Company, and such authority may be general or confined to specific instances.

**6.2     Duties and Obligations of the Manager; Discretion.**

(a)     In lieu of any duty (including fiduciary duties) imposed on the Manager or any Members in acting as a Manager by the Act or otherwise at law or equity, the sole duty of the Manager or any such Member shall be to comply with the terms of this Agreement, and the Manager (including any Former Manager) or any such Member shall not have or incur any liability to the Company or to any Member relating thereto, except where the claim at issue is based on the Misconduct of such Person.

(b)     Subject to the foregoing but notwithstanding any other provision of this Agreement to the contrary or other applicable provision of law or equity, whenever in this Agreement a Manager or an Officer is permitted or required to make a decision or take an action (i) in his "sole discretion" or "discretion" or under a similar grant of authority or latitude, in making such decisions or taking such actions, he shall be entitled to take into account his own interests as well as the interests of the Members as a whole or (ii) in "good faith" or under another expressed standard, he shall act under such express standard and shall not be subject to any other or different standard.

**6.3     Reimbursements.** The Company may reimburse the Manager for all expenses incurred and paid in the conduct of the Company's business, including, but not limited to, expenses of maintaining an office, telephones, travel, office equipment and secretarial and other personnel as may reasonably be attributable to the Company. Such reimbursement shall be treated as expenses of the Company and shall not be deemed to constitute distributions to any Member of profit, loss or capital of the Company.

**6.4     Indemnification of the Manager and Officers.**

(a)     Unless otherwise provided in <u>Section 6.4(c)</u> hereof, the Company, its receiver, or its trustee (in the case of its receiver or trustee, to the extent of the Property) shall indemnify, save harmless, and pay all judgments and claims against the Manager, any former Manager, Officer, former

FILED DATE: 11/23/2020 4:20 PM    2020L012546

Officer or any agent of the Company (each such Person, a **"Covered Person"**) relating to any liability or damage incurred by reason of any act performed or omitted by the Covered Person in connection with the Company, including reasonable attorneys' fees and expenses incurred by the Covered Person in connection with the defense of any action based on any such act or omission, which attorneys' fees and expenses may be paid as incurred.

(b)    Unless otherwise provided in Section 6.4(c) hereof, in the event of any action by a Member against the Covered Person including a Company derivative suit, the Company shall indemnify, save harmless, and pay all expenses of the Covered Person, including reasonable attorneys' fees and expenses incurred in the defense of such action.

(c)    Notwithstanding the provisions of Sections 6.4(a) and 6.4(b) above, such Sections shall be enforced only to the maximum extent permitted by law and the Covered Person shall only be indemnified (i) if such Person acted in good faith and without Misconduct and in a manner that he or it reasonably believed to be in or not opposed to the best interests of the Company, and (ii) with respect to any criminal action or proceeding, if such Person had no reasonable cause to believe his or its conduct was unlawful, unless the conduct in question involved actual (rather than simply alleged) criminal conduct, fraud, willful and wanton misconduct or gross negligence.

(d)    The obligations of the Company set forth in this Section 6 are expressly intended to create third party beneficiary rights of the Covered Person and any Manager, any Member, or any Officer is authorized, on behalf of the Company, to give written confirmation to the Covered Persons of the existence and extent of the Company's obligations to the Covered Persons hereunder.

(e)    The provisions of this Section 6.4 shall survive the dissolution, liquidation, winding up and termination of the Company.

## SECTION 7

## ROLE OF MEMBERS

**7.1    Rights or Powers**.  The Members shall not have any right or power to take part in the management or control of the Company or its business and affairs or to act for or bind the Company in any way.  Notwithstanding the foregoing, the Members have all the rights and powers specifically set forth in this Agreement and, to the extent not inconsistent with this Agreement, in the Act.

**7.2    Voting Rights**.  No Member has any voting rights except as otherwise provided in this Agreement and with respect to the following, which shall require the Approval of the Members:

(a)    any conversion of the Company to any other entity; or

(b)    any merger of the Company with or into any other entity that is not subject to a Drag Transaction; and

in each case, such Approval of the Members shall only be required in the event such conversion or merger would divest or diminish the rights of, or otherwise disproportionately disadvantage or unfairly discriminate against, any Member, with respect to that Member's Membership Interests in relation to other Membership Interests having similar rights, or increase the liabilities or obligations of any Member.

15

FILED DATE: 11/23/2020 4:20 PM 2020L012546

**7.3    Member Liability**.  No Member shall be liable under a judgment, decree or order of a court, or in any other manner for the debts or any other obligations or liabilities of the Company.  A Member shall be liable only to make its Capital Contributions and shall not be required to restore a deficit balance in its Capital Account or to lend any funds to the Company or, after its Capital Contributions have been made, to make any additional contributions, assessments or payments to the Company, *provided* that a Member may be required to repay distributions made to it as provided in 6 Del. C.§ 18-607 of the Act.  No Manager shall have any personal liability for the repayment of any Capital Contributions of any Member.

**7.4    Partition**.  While the Company remains in existence, each Member agrees and waives its rights to have any Property partitioned, or to file a complaint or to institute any suit, action or proceeding at law or in equity to have any Property partitioned, and each Member, on behalf of itself, its successors and its assigns hereby waives any such right.

**7.5    Transactions Between a Member and the Company**.  Except as otherwise provided by applicable law, any Member may, but shall not be obligated to, lend money to the Company, act as surety for the Company and transact other business with the Company and has the same rights and obligations when transacting business with the Company as a Person who is not a Member. A Member, any Affiliate thereof or an employee, stockholder, member, manager, agent, director or officer of a Member or any Affiliate thereof, may also be an employee or be retained as an agent of the Company.  The existence of these relationships and acting in such capacities will not result in the Member being deemed to be participating in the control of the business of the Company or otherwise affect the limited liability of the Member.

**7.6    Other Instruments**.  Each Member shall execute and deliver to the Company within five (5) days after receipt of a written request therefor, such other and further documents and instruments, statements of interest and holdings, designations, powers of attorney and other instruments and to take such other action as the Manager deems necessary, useful or appropriate to comply with any laws, rules or regulations as may be necessary to enable the Company to fulfill its responsibilities under this Agreement, so long as any such documents do not materially or substantially change the rights of a Member under this Agreement.

**7.7    Non-Solicitation and Non-Competition**.

(a)    While a Member or Manager, and during the twelve (12) months immediately following the date on which such Member no longer owns any Membership Interests, directly or indirectly, or such Manager ceases to be a manager of the Company, each Member and Manager shall not (and shall cause his or its Affiliates not to), directly or indirectly (including, without limitation, through any of his, her or its Affiliates or immediate family members, i.e., spouse and unemancipated children), in any capacity: (i) employ any employee of the Company or a Subsidiary; or (ii) solicit or induce any employee of the Company or a Subsidiary to cease employment with the Company or any Subsidiary.

(b)    While a Member or Manager, and during the twelve (12) months immediately following the date on which such Member no longer owns any Membership Interests, directly or indirectly, or such Manager ceases to be a manager of the Company, each Member and Manager shall not (and shall cause his or its Affiliates not to) directly or indirectly (including, without limitation, through any of his or its Affiliates or immediate family members, i.e., spouse and unemancipated children), anywhere in the United States, alone or as a partner, member, manager, owner, joint venturer, officer, director, employee, consultant, agent, independent contractor, stockholder or in any other capacity of any company or entity, engage in any business, have any financial interest in any company or entity that engages in any business or make any loans to any company or entity that engages in any business that

16

FILED DATE: 11/23/2020 4:20 PM    2020L012546

engages in or competes, directly or indirectly, with the Business; provided, however, that the ownership by any Person of not more than five percent (5%) of the outstanding shares of stock of any corporation having a class of securities actively traded on a national securities exchange or on the NASDAQ Stock Market shall not be deemed, in and of itself, to violate the provisions of this Section 7.7(b).

(c)    If a Member or Manager breaches any obligation under Section 7.7(a) or 7.7(b), such breach will suspend and toll the running of the restrictive period for such obligation for such Member or Manager from the date of breach until such time as such violation ceases.

(d)    Each Member and the Manager agrees that any violations of Section 7.7(a) or 7.7(b) would be highly injurious and cause irreparable harm to the Company and its Members. Therefore, each Member and the Manager consents and agrees that if the terms of Section 7.7(a) and/or 7.7(b) are violated, the Company shall be entitled, in addition to any other rights and remedies that it may have (including monetary damages), to apply to any court of competent jurisdiction for specific performance and/or injunctive or other relief in order to enforce, or prevent any continuing or threatened violation of, the provisions of Section 7.7(a) and/or 7.7(b) by such Member, Manager, or any of their respective Affiliates. If the Company shall institute any action or proceeding to enforce the provisions of Section 7.7(a) and/or 7.7(b), each Member and the Manager hereby irrevocably waives any claim or defense that such Member or Manager may have that an adequate remedy at law is available, and each Member and each Manager hereby agrees not to interpose in any such action or proceeding any claim or defense that a remedy exists at law. Notwithstanding the foregoing provisions, the Manager in his sole discretion may waive or otherwise modify the restrictions set forth in Section 7.7(a) and/or 7.7(b) pursuant to a written agreement with any Member (or their Affiliate), as applicable. Further, if any Member (or their Affiliate) or Manager is subject to a separate written agreement with the Company containing similar restrictive covenants, then the terms of such other agreement shall govern and these restrictive covenants shall not apply to such Person.

(e)    It is the Members' and the Manager's intent that each of the restrictive covenants contained in Section 7.7(a) and/or 7.7(b) be read and interpreted with every reasonable inference given to its enforceability. However, it is also the Members' and the Manager's intent that if any term, provision or condition of such restrictive covenants is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions thereof shall remain in full force and effect and shall in no way be affected, impaired or invalidated. Further, it is also the Members' and the Manager's intent that if a court should determine any of such restrictive covenants are unenforceable because of over-breadth, then the court shall modify said covenant to the minimum extent possible so as to make it enforceable under the circumstances.

(f)    Notwithstanding the foregoing subsections (a) through (e) of this Section 7.7, neither Marcus Lemonis nor ML Retail or any other entity controlled by Marcus Lemonis is subject to the restrictions set forth in this Section 7.7.

**7.8    Investment Representations and Warranties.** Each Member executing this Agreement hereby represents and warrants to the Company and each other Member that: (a) if such Member is not a natural person, that it is organized, validly existing, and in good standing under the laws of its state of organization and that it has full organizational power to execute and agree to this Agreement and to perform its obligations hereunder; (b) such Member is acquiring his, her or its Membership Interests in the Company for such Member's own account as an investment and without an intent to distribute the Membership Interests; (c) such Member acknowledges that the Membership Interests have not been registered under federal securities laws, or any state securities laws, and may not be resold or transferred by such Member without appropriate registration or the availability of an exemption from such requirements; (d) such Member has such knowledge and experience in financial and business matters so

17

FILED DATE: 11/23/2020 4:20 PM   2020L012546

that such Member is capable of evaluating the merits and risks of an investment in the Company; and (e) such Member has been given the opportunity to ask questions of and receive information from the Company.

**SECTION 8**

**ACCOUNTING, BOOKS AND RECORDS**

    **8.1**    **Bank Accounts; Accounting, Books and Records.**

        (a)    All funds of the Company shall be deposited in its name in accounts designated by the Manager. The Manager, the Chief Financial Officer of the Company, if any, and such person or persons as the Manager may designate shall have the right to draw checks thereon and make, deliver, accept and endorse negotiable instruments in connection with the Company business.

        (b)    The Company shall keep on site at its principal place of business each of the following:

        (i)    Separate books of account for the Company which shall show a true and accurate record of all costs and expenses incurred, all charges made, and all income derived in connection with the conduct of the Company in accordance with this Agreement;

        (ii)    A current list of the full name and last known business, residence, or mailing address of each Member and Manager;

        (iii)    A copy of the Certificate of Formation and all amendments thereto, together with executed copies of any powers of attorney pursuant to which any amendment has been executed;

        (iv)    Copies of the Company's federal, state, and local income tax returns and reports, if any, for the three most recent years;

        (v)    Copies of this Agreement;

        (vi)    Copies of any writings permitted or required under Section 18-502 of the Act regarding the obligation of a Member to perform any enforceable promise to contribute cash or property or to perform services as consideration for such Member's Capital Contribution;

        (vii)    Unless contained in this Agreement, a statement prepared and certified as accurate by the Manager of the Company which describes:

        (A)    The amount of cash and a description and statement of the agreed value of the other property or services contributed by each Member and which each Member has agreed to contribute in the future;

        (B)    The times at which or events on the happening of which any additional Capital Contributions agreed to be made by each Member are to be made;

        (C)    If agreed upon, the time at which or the events on the happening of which a Member may terminate its Membership Interests in the Company and

18

FILED DATE: 11/23/2020 4:20 PM    2020L012546

the amount of, or the method of determining, the distribution to which he may be entitled respecting its Membership Interests and the terms and conditions of the termination and distribution;

(D)    Any right of a Member to receive distributions, which include a return of all or any part of a Member's contribution; and

(viii)    Any written consents obtained from Members pursuant to 6 Del. C.§ 18-302 of the Act regarding action taken by Members without a meeting.

(c)    Any Member or its designated representative has the right to have reasonable access to and inspect the books and records of the Company to the extent required by law.  The rights granted to a Member pursuant to this <u>Section 8.1</u> are expressly subject to compliance by such Member with the safety, security and confidentiality procedures and guidelines of the Company, as such procedures and guidelines may be established from time to time.

**8.2    Tax Matters**.

(a)    **Tax Elections**.  ML Retail shall, without any further consent of the Members being required (except as specifically required herein), make any and all elections for federal, state, local, and foreign tax purposes including, without limitation, any election, if permitted by applicable law:  (i) to adjust the basis of Property pursuant to Code Sections 754, 734(b) and 743(b), or comparable provisions of state, local or foreign law, in connection with Transfers of Membership Interests and Company distributions;  (ii) with the consent of all of the Members, to extend the statute of limitations for assessment of tax deficiencies against the Members with respect to adjustments to the Company's federal, state, local or foreign tax returns; and  (iii) to the extent provided in Code Sections 6221 through 6231 and similar provisions of federal, state, local, or foreign law, to represent the Company and the Members before taxing authorities or courts of competent jurisdiction in tax matters affecting the Company or the Members in their capacities as Members, and to file any tax returns and execute any agreements or other documents relating to or affecting such tax matters, including agreements or other documents that bind the Members with respect to such tax matters or otherwise affect the rights of the Company and the Members.

(b)    **Tax Information**.  Necessary tax information shall be delivered to each Member as soon as practicable after the end of each taxable year of the Company but not later than five (5) months after the end of each taxable year.

(c)    **Tax Classification**.

(i)    The Manager shall take such action as may be required under the Code and the Regulations to cause the Company to be taxable as a partnership for Federal income tax purposes.

(ii)    To the extent <u>Section 8.2(c)(i)</u> does not govern the state and local tax classification of the Company, the Manager shall take such action as may be required under any state and/or local law applicable to the Company to cause the Company to be taxable as, and in a manner consistent with, a partnership (or the functional equivalent thereof under applicable law) for state and/or local income tax purposes.

FILED DATE: 11/23/2020 4:20 PM 2020L012546

(d)     **Tax Matters Member and 2015 Budget Act Audit Rules**.

(i)     *Tax Matters Member*.  ML Retail shall be the "tax matters partner" of the Company within the meaning of Code § 6231(a)(7) as in effect immediately prior to the effective date of its amendment by the 2015 Budget Act (the **"Tax Matters Member"**) for any period during which the Company is permitted or required to have such a tax matters partner, and shall serve as such until its successor is duly designated by the Manager.  The Tax Matters Member shall have authority to take any action that may be taken by a "tax matters partner" under Code §§ 6221 through 6234.  The Company shall indemnify and hold harmless the Tax Matters Member for any liabilities and all reasonable and documented costs and expenses incurred by the Tax Matters Member in its capacity as such.  Notwithstanding any other provision of this Agreement, the Tax Matters Member, in its capacity as Tax Matters Member, shall have no authority with respect to matters subject to the 2015 Budget Act Audit Rules.

(ii)     *No Early Election into the 2015 Budget Act Audit Rules*.  The Company shall not elect, under Section 1101(g)(4) of the 2015 Budget Act or otherwise, for any portion of the 2015 Budget Act Audit Rules to apply to the Company for any taxable years beginning before January 1, 2018.

(iii)     *Partnership Representative*.  ML Retail shall be the "partnership representative" of the Company within the meaning of Code § 6223 (as amended by the 2015 Budget Act) (the **"Partnership Representative"**) for any period during which the Company is permitted or required to have a Partnership Representative and shall serve as such until its successor is duly designated by the Manager.  The Partnership Representative shall have authority to take any action that may be taken by a "partnership representative" under the 2015 Budget Act Audit Rules.  The Company shall indemnify and hold harmless the Partnership Representative for any liabilities, costs and expenses reasonably incurred by the Partnership Representative in its capacity as such.

(iv)     *Notification of Members*.  The Partnership Representative shall, on a timely basis, provide the Company with copies of all notices received by the Partnership Representative in connection with any proceeding or potential adjustment relating to the Company that is subject to the 2015 Budget Act Audit Rules.  With respect to any proceeding or potential adjustment subject to the 2015 Budget Act Audit Rules, the Company shall, on a timely basis, provide each Member with copies of all notices received by the Company or the Partnership Representative from the Internal Revenue Service.

(v)     *Election Out of Imputed Underpayment*.  To the maximum extent permitted under the 2015 Budget Act Audit Rules, the Company shall elect, and each Member shall cooperate in electing, under Code § 6226(a) (as amended by the 2015 Budget Act) or otherwise, for Code § 6225 (as amended by the 2015 Budget Act) not to apply, and for each Member to take any adjustment into account as provided in Code § 6226(a) (as amended by the 2015 Budget Act).

(vi)     *Survival*.  The provisions of this Section 8.2 shall survive the termination of the Company or the termination of any Membership Interests and shall remain binding on the Members for as long a period of time as is necessary to resolve with the Internal Revenue Service any and all matters regarding the federal income taxation of the Company or the Members (relating to the operations of the Company).

FILED DATE: 11/23/2020 4:20 PM   2020L012546

**8.3**     **Certificates**.  No certificates or other evidence of ownership shall be issued in respect of the Membership Interests in the Company except this Agreement.

## SECTION 9

## AMENDMENTS

**9.1**     **Amendments Generally**.    Except as otherwise provided in Section 9.2, and notwithstanding any contrary provision of the Act, any amendments to this Agreement may be adopted with the Approval of the Members; provided, however, that no part of Section 6 may be amended without the approval of the Manager.

**9.2**     **Amendments by the Manager**.  Without limiting the power to amend this Agreement granted by Section 9.1 hereof, this Agreement may be amended by the Manager (a) to effect changes of a ministerial nature that do not materially and adversely affect the rights, duties or obligations of the Members; (b) to amend Exhibit A to add, remove or change any Member and/or Percentage Interests held by a Member, in accordance with the terms hereof; (c) to conform the terms of this Agreement with any Regulations, *provided* that, in the opinion of counsel to the Company, such amendment does not adversely affect the rights or interests of any of the Members; (d) with respect to the Company's status as a partnership (and not as an association taxable as a corporation) for federal tax purposes, (i) to comply with the requirements of the Regulations, or (ii) to ensure the continuation of partnership status; provided, however, that, in the opinion of counsel of the Company, such amendment does not adversely affect the rights or interests of any of the Members; and (e) to change the name of the Company.

## SECTION 10

## TRANSFERS; DRAG-ALONG RIGHTS

**10.1**     **Restrictions on Transfers**.  Except as otherwise permitted by this Agreement, including Section 10.8, no Member shall Transfer all or any portion of its Membership Interests without the approval of the Manager. In the event that any Member pledges or otherwise encumbers all or any part of its Membership Interests as security for the payment of a debt, any such pledge or hypothecation shall be made pursuant to a pledge or hypothecation agreement that requires the pledgee or secured party to be bound by all of the terms and conditions of this Section 10.  Each Member hereby acknowledges the reasonableness of the restrictions on the Transfer of Membership Interests imposed by this Agreement in view of the Company's purposes and the relationship of the Members.  Accordingly, the restrictions on Transfer contained herein shall be specifically enforceable.

**10.2**     **Permitted Transfers**.  Subject to the conditions and restrictions set forth in Section 10.3 hereof, (a) a Member may at any time Transfer all or any portion of its Membership Interests to the Company pursuant to Section 11; and (b) with respect to ML Retail, ML Retail may Transfer all or any part of its Membership Interests to Affiliates of ML Retail (any such Transfer described in (a) or (b) being referred to in this Agreement as a **"Permitted Transfer"**).  **"Permitted Transfer"** shall also include, any Transfer by a Member to a Person that is (i) a trust, estate, guardianship or custodianship, including those established under any of the Uniform Gifts to Minors Act of any state, established for such Member or one or more of such Member's spouse and/or natural or adoptive lineal ancestors or descendants, (ii) an entity in which all of the equity interests are beneficially owned by such Member and/or its Permitted Transferees, and (iii) if such Member is an entity, the holders of its equity securities in a liquidating distribution of such entity's assets in proportion to their ownership thereof.  The subsequent Transfer of any Membership Interests by a Permitted Transferee shall be subject to the same restrictions of this Section 10 in the same manner as if the Membership Interests to be Transferred were still owned by the

21

FILED DATE: 11/23/2020 4:20 PM    2020L012546

Member from whom such Permitted Transferee acquired such Membership Interests; and for this purpose, references herein to a Transfer by a Member shall include any Transfer by the Permitted Transferee(s) that acquired such Member's Membership Interests, and references to a Member in the context of Transfer restrictions and related provisions shall include its Transferees. If at any time a Member is required to Transfer its Membership Interests pursuant to this Agreement, such Transfer shall include or be applicable to all Membership Interests owned by such Member's Permitted Transferees and other Transferees.

10.3    **Conditions to Permitted Transfers**. Except for a Transfer to the Company, a Transfer shall not be treated as a Permitted Transfer under Section 10.2 hereof unless and until the following conditions are satisfied:

(a)    Except in the case of a Transfer involuntarily by operation of law, the transferor and transferee shall execute and deliver to the Company such documents and instruments of conveyance as may be necessary or appropriate in the opinion of counsel to the Company to effect such Transfer. In the case of a Transfer of Membership Interests involuntarily by operation of law, the Transfer shall be confirmed by presentation to the Company of legal evidence of such Transfer, in form and substance satisfactory to counsel to the Company. In all cases, the Company shall be reimbursed by the transferor and/or transferee for all costs and expenses that it reasonably incurs in connection with such Transfer.

(b)    The transferor and transferee shall furnish the Company with the transferee's taxpayer identification number, sufficient information to determine the transferee's initial tax basis in the Membership Interests transferred, and any other information reasonably necessary to permit the Company to file all required federal and state tax returns and other legally required information statements or returns. Without limiting the generality of the foregoing, the Company shall not be required to make any distribution otherwise provided for in this Agreement with respect to any transferred Membership Interests until it has received such information.

(c)    In addition to the foregoing, each Transfer of Membership Interests shall satisfy the following conditions: (i) the Transfer will not require registration of Membership Interests under the Securities Act or any state securities laws and (ii) if requested by the Manager, the transferor delivers to the Company an opinion of counsel, which opinion and counsel shall be reasonably satisfactory to the Manager, to the effect that such Transfer is exempt from all applicable registration requirements and that such Transfer will not violate any applicable laws regulating the Transfer of securities.

10.4    **Prohibited Transfers**. Any purported Transfer of Membership Interests that is not a Permitted Transfer shall be null and void and of no force or effect whatever; *provided* that, if the Company is required to recognize a Transfer that is not a Permitted Transfer (or if the Manager approves a Transfer that is not a Permitted Transfer pursuant to Section 10.1 hereof), the Membership Interests Transferred shall be strictly limited to the transferor's rights to allocations and distributions as provided by this Agreement with respect to the transferred Membership Interests, which allocations and distributions may be applied (without limiting any other legal or equitable rights of the Company) to satisfy any debts, obligations, or liabilities for damages that the transferor or transferee of such Membership Interests may have to the Company.

In the case of a Transfer or attempted Transfer of Membership Interests that is not a Permitted Transfer, the parties engaging or attempting to engage in such Transfer shall be liable to indemnify and hold harmless the Company and the other Members from all cost, liability, and damage that any of such indemnified Members may incur (including, without limitation, incremental tax liabilities, lawyers' fees and expenses) as a result of such Transfer or attempted Transfer and efforts to enforce the indemnity granted hereby.

FILED DATE: 11/23/2020 4:20 PM 2020L012546

**10.5   Rights of Unadmitted Assignees**. A Person who acquires Membership Interests but who is not admitted as a substituted Member pursuant to <u>Section 10.6</u> hereof shall be entitled only to allocations and distributions with respect to such Membership Interests in accordance with this Agreement, and shall have no right to any information or accounting of the affairs of the Company, shall not be entitled to inspect the books or records of the Company, and shall not have any of the rights of a Member under the Act or this Agreement.

**10.6   Admission of Substituted Members**. Subject to the other provisions of this <u>Section 10</u>, a transferee of Membership Interests may be admitted to the Company as a substituted Member only upon satisfaction of the conditions set forth in this <u>Section 10.6</u>:

(a)   The Membership Interests with respect to which the transferee is being admitted were acquired by means of a Permitted Transfer or a Transfer otherwise approved by the Manager;

(b)   The transferee of Membership Interests (other than, with respect to clause (i) below, a transferee that was a Member prior to the Transfer) shall, by written instrument in form and substance reasonably satisfactory to the Manager (and, in the case of clause (ii) below, the transferor Member), (i) accept and adopt the terms and provisions of this Agreement, including this <u>Section 10</u> and (ii) assume the obligations of the transferor Member under this Agreement with respect to the transferred Membership Interests. The transferor Member shall be released from all such assumed obligations except (x) those obligations or liabilities of the transferor Member arising out of a breach of this Agreement, (y) in the case of a Transfer to any Person other than a Member or any of its Affiliates, those obligations or liabilities of the transferor Member based on events occurring, arising or maturing prior to the date of Transfer, and (z) in the case of a Transfer to any of its Affiliates, any Capital Contribution or other financing obligation of the transferor Member under this Agreement;

(c)   The transferee pays or reimburses the Company for all reasonable legal, filing, and publication costs that the Company incurs in connection with the admission of the transferee as a Member with respect to the Transferred Membership Interests; and

(d)   Except in the case of a Transfer involuntarily by operation of law, if required by the Manager, the transferee (other than a transferee that was a Member prior to the Transfer) shall deliver to the Company evidence of the authority of such Person to become a Member and to be bound by all of the terms and conditions of this Agreement, and the transferee and transferor shall each execute and deliver such other instruments as the Manager reasonably deems necessary or appropriate to effect, and as a condition to, such Transfer.

**10.7   Distributions in Respect of Transferred Membership Interests**. If any Membership Interests are Transferred during any taxable year in compliance with the provisions of this <u>Section 10</u>, all distributions on or before the date of such Transfer shall be made to the transferor, and all distributions thereafter shall be made to the transferee. Solely for purposes of making such distributions, the Company shall recognize such Transfer not later than the end of the calendar month during which it is given notice of such Transfer, *provided* that, if the Company is given notice of a Transfer at least five (5) Business Days prior to the Transfer, the Company shall recognize such Transfer as of the date of such Transfer. If the Company has not received notice of a Transfer prior to a distribution date, all distributions shall be made to the Person who, according to the books and records of the Company, was the owner of the Membership Interests on the record date of such distribution. Neither the Company nor any Member shall incur any liability for making distributions in accordance with the provisions of this <u>Section 10.7</u>, whether or not any Manager or the Company has knowledge of any Transfer of ownership of any Membership Interests.

FILED DATE: 11/23/2020 4:20 PM 2020L012546

**10.8    Sale of the Company; Drag-Along Rights**.

(a)    Notwithstanding any Transfer restrictions contained in this <u>Section 10</u>, in the event that ML Retail (the **"Dragging Member"**) proposes to sell all of its Membership Interests to a Third Party Purchaser, whether by merger or otherwise (the **"Drag Transaction"**), the Dragging Member may elect to require all other holders of Membership Interests, including unadmitted assignees (the **"Drag-Along Members"**), to sell to the Third Party Purchaser their Membership Interests on the same terms and conditions (including, without limitation, making customary representations, warranties and indemnification covenants applicable to the ownership of the Membership Interests of such Drag-Along Members) upon which the Dragging Member sells, transfers or assigns its Membership Interests. The Dragging Member shall cause the Drag Transaction to be reduced to writing and shall provide a written notice (the **"Drag Notice"**) of the Drag Transaction to the Drag-Along Member at least thirty (30) days prior to the anticipated closing of the Drag Transaction. The Drag Notice shall contain written notice of the exercise of rights pursuant to this <u>Section 10.8</u> and shall set forth the consideration to be paid by the Third Party Purchaser and the other material terms and conditions of the Drag Transaction. If, prior to the closing of the Drag Transaction, the terms of the Drag Transaction change from those set forth in the original Drag Notice, the Dragging Member shall issue a revised Drag Notice stating such revised terms.

(b)    Each holder of Membership Interests agrees to (i) use commercially reasonable efforts, in good faith and in a commercially prompt manner, to take, or cause to be taken, all action and to do, or cause to be done, all things necessary, proper or advisable, under applicable laws and regulations (including, without limitation, to ensure that all appropriate legal and other requirements are met and all consents of third persons are obtained), to consummate the Drag Transaction, (ii) vote all of its Membership Interests in favor of the Drag Transaction (if necessary, depending on the form of the transaction and the voting rights of such Membership Interests) and (iii) raise no objection to, bring no claim against and not contest such Drag Transaction. Execution of this Agreement or a joinder hereto constitutes each holder of Membership Interests' (and its Transferees') binding agreement to sell all his, her or its Membership Interests on the same terms and conditions set forth in the Drag Notice, as adjusted in accordance with this <u>Section 10.8</u>. Upon the closing of a Drag Transaction, such Third Party Purchaser shall pay to each holder of Membership Interests his, her or its share of the proceeds thereof.

## SECTION 11

## REDEMPTION

The Company shall redeem, and any Member shall sell to the Company, any of the Member's Membership Interests pursuant to the terms and provisions of any agreement binding upon the Company and such Member.

## SECTION 12

## DISSOLUTION AND WINDING UP

**12.1    Dissolution Events**.

(a)    **Dissolution**. The Company shall dissolve and shall commence winding up and liquidating upon the first to occur of any of the following (each a **"Dissolution Event"**):

(i)    The written consent of the Manager and the Approval of the Members to dissolve, wind up, and liquidate the Company; or

        (ii)      The entry of a decree of judicial dissolution under Section 18-802 of the Act.

The Members hereby agree that, notwithstanding any provision of the Act, the Company shall not dissolve prior to the occurrence of a Dissolution Event.

        (b)    **Reconstitution**.  If it is determined, by a court of competent jurisdiction, that the Company has dissolved prior to the occurrence of a Dissolution Event, then within an additional ninety (90) days after such determination (the **"Reconstitution Period"**), the Manager and the Members holding at least fifty percent (50%) of the Percentage Interests may elect to reconstitute the Company and continue its business on the same terms and conditions set forth in this Agreement by forming a new limited liability company on terms identical to those set forth in this Agreement.  Unless such an election is made within the Reconstitution Period, the Company shall liquidate and wind up its affairs in accordance with Section 12.2 hereof.  If such an election is made within the Reconstitution Period, then:

        (i)      The reconstituted limited liability company shall continue until the occurrence of a Dissolution Event as provided in Section 12.1(a);

        (ii)      Unless otherwise agreed to by the Manager and the Members holding at least fifty percent (50%) of the Percentage Interests, the Certificate of Formation and this Agreement shall automatically constitute the Certificate of Formation and Agreement of such new Company.  All of the assets and liabilities of the dissolved Company shall be deemed to have been automatically assigned, assumed, conveyed and transferred to the new Company.  No bond, collateral, assumption or release of any Member's or the Company's liabilities shall be required; provided, that the right of the Members to select a successor manager and to reconstitute and continue the Company's business shall not exist and may not be exercised unless the Company has received an opinion of counsel that the exercise of the right would not result in the loss of limited liability of any Member and neither the Company nor the reconstituted limited liability company would cease to be treated as a partnership for federal income tax purposes upon the exercise of such right to continue.

    **12.2**    **Winding Up**.  Upon the occurrence of (i) a Dissolution Event or (ii) the determination by a court of competent jurisdiction that the Company has dissolved prior to the occurrence of a Dissolution Event (unless the Company is reconstituted pursuant to Section 12.1(b) hereof), the Company shall continue solely for the purposes of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors and Members, and no Member shall take any action that is inconsistent with, or not necessary to or appropriate for, the winding up of the Company's business and affairs, provided, that all covenants contained in this Agreement and obligations provided for in this Agreement shall continue to be fully binding upon the Members until such time as the Property has been distributed pursuant to this Section 12.2 and the Certificate of Formation has been canceled pursuant to the Act.  The Liquidator shall be responsible for overseeing the winding up and dissolution of the Company, which winding up and dissolution shall be completed within ninety (90) days of the occurrence of the Dissolution Event and within ninety (90) days after the last day on which the Company may be reconstituted pursuant to Section 12.1(b) hereof.  The Liquidator shall take full account of the Company's liabilities and Property and shall cause the Property or the proceeds from the sale thereof (as determined pursuant to Section 12.7 hereof), to the extent sufficient therefor, to be applied and distributed, to the maximum extent permitted by law, in the following order:

        (a)    First, to the payment of the debts and liabilities of the Company (including any loans or advances made by any of the Members to the Company or any of its Subsidiaries), and the expenses of liquidation;

FILED DATE: 11/23/2020 4:20 PM    2020L012546

(b)    Second, to the creation of any reserves which the Manager deems reasonably necessary for the payment of any contingent, unliquidated or unforeseen liabilities or obligations of the Company or any of its Subsidiaries or the Members (to the extent the Company is liable therefor) arising out of or in connection with the business and operations of the Company and its Subsidiaries;

(c)    Third, 100% to and among the Members in proportion to and to the extent of their respective Unreturned Capital Contributions; and

(d)    Finally, the balance, if any, to the Members, pro rata to and among the Members in accordance with their respective Percentage Interests at such time.

No Member or Manager shall receive additional compensation for any services performed pursuant to this Section 12.2.

**12.3    Liquidating Trust; Reserves**.  In the discretion of the Liquidator, a pro rata portion of the distributions that would otherwise be made to the Members pursuant to this Section 12 may be:

(a)    Distributed to a trust established for the benefit of the Members for the purposes of liquidating Company assets, collecting amounts owed to the Company, and paying any contingent or unforeseen liabilities or obligations of the Company.  The assets of any such trust shall be distributed to the Members from time to time, in the reasonable discretion of the Liquidator, in the same proportions as the amount distributed to such trust by the Company would otherwise have been distributed to the Members pursuant to Section 12.2 hereof; or

(b)    Withheld to provide a reasonable reserve for Company liabilities (contingent or otherwise) and to reflect the unrealized portion of any installment obligations owed to the Company, *provided* that such withheld amounts shall be distributed to the Members as soon as practicable.

**12.4    Rights of Members**.  Except as otherwise provided in this Agreement, each Member shall look solely to the Property of the Company for the return of its Capital Contribution and has no right or power to demand or receive Property other than cash from the Company.  If the assets of the Company remaining after payment or discharge of the debts or liabilities of the Company are insufficient to return such Capital Contribution, the Members shall have no recourse against the Company or any other Member or Manager.

**12.5    Notice of Dissolution/Termination**.

(a)    In the event a Dissolution Event occurs, the Manager shall, within thirty (30) days thereafter, provide written notice thereof to each of the Members and to all other parties with whom the Company regularly conducts business (as determined in the discretion of the Manager).

(b)    Upon completion of the distribution of the Company's Property as provided in this Section 12, the Company shall be terminated, and the Liquidator shall cause the filing of the Certificate of Cancellation pursuant to Section 18-203 of the Act and shall take all such other actions as may be necessary to terminate the Company.

**12.6    Character of Liquidating Distributions**.  All payments made in liquidation of the interest of a Member in the Company shall be made in exchange for the interest of such Member in Property pursuant to Section 736(b)(1) of the Code, including the interest of such Member in Company goodwill.

26

**12.7    The Liquidator.**

(a)    **Definition**. The **"Liquidator"** shall mean the Manager or a Person appointed by the Manager to oversee the liquidation of the Company.

(b)    **Fees**. The Company is authorized to pay a reasonable fee to the Liquidator for its services performed pursuant to this <u>Section 12</u> and to reimburse the Liquidator for its reasonable costs and expenses incurred in performing those services.

(c)    **Indemnification**. The Company shall indemnify, save harmless, and pay all judgments and claims against such Liquidator or any officers, directors, agents or employees of the Liquidator relating to any liability or damage incurred by reason of any act performed or omitted to be performed by the Liquidator, or any officers, directors, agents or employees of the Liquidator in connection with the liquidation of the Company, including reasonable attorneys' fees incurred by the Liquidator, officer, director, agent or employee in connection with the defense of any action based on any such act or omission, which attorneys' fees may be paid as incurred, except to the extent such liability or damage is caused by the fraud, intentional misconduct of, or a knowing violation of the laws by the Liquidator which was material to the cause of action.

**12.8    Form of Liquidating Distributions**. For purposes of making distributions required by <u>Section 12.2</u> hereof, the Liquidator may determine whether to distribute all or any portion of the Property in-kind or to sell all or any portion of the Property and distribute the proceeds therefrom.

## SECTION 13

## MISCELLANEOUS

**13.1    Notices**. Any notice, payment, demand, or communication required or permitted to be given by any provision of this Agreement shall be in writing and shall be deemed to have been delivered, given, and received for all purposes (i) if delivered personally to the Person or to an officer of the Person to whom the same is directed, (ii) on the date sent by e-mail of a PDF document if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient, or (iii) when the same is actually received, if sent either by registered or certified mail, postage and charges prepaid, addressed as follows, or to such other address as such Person may from time to time specify by notice to the Members and the Manager:

(a)    If to the Company, to the address determined pursuant to <u>Section 2.4</u> hereof;

(b)    If to the Manager, at the same address of the Company;

(c)    If to a Member, to the address of such Member according to the Company's books and records;

or at such other address of a Person as such Person may furnish to the Company from time to time.

**13.2    Binding Effect**. Except as otherwise provided in this Agreement, every covenant, term, and provision of this Agreement shall be binding upon and inure to the benefit of the Members and their respective heirs, executors, legal representatives, administrators, successors, transferees, and assigns.

**13.3    Effect of Consent or Waiver**. No consent or waiver, express or implied, by any Member to or of any breach or default by any other Member (or Transferee) in the performance by such other

FILED DATE: 11/23/2020 4:20 PM 2020L012546

Member (or Transferee) of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any breach or default by such other Person in the performance by such other Person of the same or any other obligations of such Person hereunder. Failure on the part of any Member to object to or complain of any act or failure to act of any of the other Members (or Transferees) or to declare any of the other Members (or Transferees) in default, regardless of how long such failure continues, shall not constitute a waiver by any such Member of its rights hereunder.

**13.4     Construction**. Every covenant, term, and provision of this Agreement shall be construed simply according to its fair meaning and not strictly for or against any Member.

**13.5     Time**. In computing any period of time pursuant to this Agreement, the day of the act, event or default from which the designated period of time begins to run shall not be included, but the time shall begin to run on the next succeeding day. The last day of the period so computed shall be included, unless it is a Saturday, Sunday or legal holiday, in which event the period shall run until the end of the next day which is not a Saturday, Sunday or legal holiday.

**13.6     Headings and References**. Section and other headings contained in this Agreement are for reference purposes only and are not intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement or any provision hereof. References herein to the singular shall include the plural and to the plural shall include the singular, and references to one gender shall include the other, except where inappropriate.

**13.7     Severability**. Except as otherwise provided in the succeeding sentence, every provision of this Agreement is intended to be severable, and, if any term or provision of this Agreement is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity or legality of the remainder of this Agreement. The preceding sentence of this Section 13.7 shall be of no force or effect if the consequence of enforcing the remainder of this Agreement without such illegal or invalid term or provision would be to cause any Member to lose the material benefit of its economic bargain.

**13.8     Incorporation by Reference**. Every exhibit, schedule, and other appendix attached to this Agreement and referred to herein is incorporated in this Agreement by reference unless this Agreement expressly otherwise provides.

**13.9     Governing Law**. The laws of the State of Delaware shall govern the validity of this Agreement, the construction of its terms, and the interpretation of the rights and duties arising hereunder. To the extent this Agreement is inconsistent with the Act, this Agreement shall govern (to the maximum extent permitted by the Act).

**13.10     Waiver of Jury Trial**. Each of the Members irrevocably waives to the extent permitted by law, all rights to trial by jury and all rights to immunity by sovereignty or otherwise in any action, proceeding or counterclaim arising out of or relating to this Agreement.

**13.11     Specific Performance**. Because Members would be irreparably damaged if any of the provisions of this Agreement are not performed in accordance with their specific terms and that monetary damages would not provide an adequate remedy in such event, in addition to any other remedy to which the nonbreaching Members may be entitled, at law or in equity, the nonbreaching Members shall be entitled to injunctive relief to prevent breaches of the provisions of this Agreement and specifically to enforce the terms and provisions hereof in any action instituted in any court of the United States or any state thereof having subject matter jurisdiction thereof.

FILED DATE: 11/23/2020 4:20 PM  2020L012546

**13.12  Counterparts; Signatures**.    This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together constitute one and the same document.  This Agreement may be executed and delivered by electronic mail in portable document format (.pdf) and, if executed and delivered in such manner, shall be binding as though an executed original shall have been delivered by hand.

**13.13  Trustee Exculpation**.    When and if this Agreement is executed by the trustee of any trust, such execution is by the trustee, not individually but solely as trustee in the exercise of and under the power and authority conferred upon and invested in such trustee, and it is expressly understood and agreed that nothing herein contained shall be construed as creating any liability on any such trustee personally to pay any amounts required to be paid hereunder, or to perform any covenant, either express or implied, contained herein, all such liability, if any, being expressly waived by the parties hereto by their execution hereof.  Any liability of any party which is a trust to the Company or another party shall be only that of such trust to the full extent of its trust estate and shall not be a personal liability of any trustee, grantor or beneficiary thereof.

{Remainder of page intentionally left blank.}

FILED DATE: 11/23/2020 4:20 PM   2020L012546

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be duly executed as of the date first above written.

**MEMBERS:**

**ML RETAIL LLC**

By:_____
        Marcus Lemonis, Authorized Person

_____
Nicolas Goureau

_____
Stephanie Menkin

**THE COMPANY:**

**ML FASHION, LLC**

By:_____
        Marcus Lemonis, Manager

30

## EXHIBIT A

## MEMBERS

| Members | Percentage Interest |
|---------|---------------------|
| ML Retail LLC | 33.34% |
| Nicolas Goureau | 33.33% |
| Stephanie Menkin | 33.33% |
| **Total** | 100.0% |

FILED DATE: 11/23/2020 4:20 PM   2020L012546

## SCHEDULE A
### Officers


Chairman/CEO:                              Marcus Lemonis

President:                                 Stephanie Menkin

Chief Financial Officer:                   Manish Karna


24649273.3

FILED DATE: 11/23/2020 4:20 PM    2020L012546

FILED
11/23/2020 4:20 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2020L012546
11242484

# EXHIBIT 2

FILED DATE: 11/23/2020 4:20 PM   2020L012546

# CREDIT AGREEMENT

**THIS CREDIT AGREEMENT** is made and entered into as of March 29, 2016, by and between **ML FASHION, LLC**, a Delaware limited liability company ("Borrower"), and **ML RETAIL LLC**, a Delaware limited liability company ("Lender").

## W I T N E S S E T H:

**WHEREAS**, subject to the terms and conditions set forth herein, Lender is willing to make revolving loans (the "Loans") to Borrower in amounts not to exceed $30,000,000 in the aggregate.

**NOW, THEREFORE,** in consideration of the foregoing, of the mutual covenants set forth herein and for other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged, the parties hereto, intending legally to be bound, hereby agree as follows:

## ARTICLE I
## DEFINITIONS; ETC.

1.1    Definitions.  As used in this Agreement, the following terms and phrases shall have the following meanings:

"Agreement" means this Credit Agreement, as the same may hereafter be amended, modified, supplemented or restated.

"Borrower" is defined in the first paragraph.

"Borrowing" means a future borrowing of a Loan by Borrower.

"Business Day" means each day other than a Saturday, a Sunday or any other day on which banks are permitted to be closed in the City of New York, New York.

"Closing Date" means the date on which both of the following shall have occurred: (a) Lender has received counterparts of, or signature pages to, the Loan Documents executed by Borrower, and (b) the conditions set forth in Article IV have been satisfied.

"Collateral" means all property and interests in property now owned or hereafter acquired by Borrower in or upon which a security interest, lien or mortgage is granted to Lender by Borrower, whether under this Agreement, or under any other documents executed by Borrower and delivered to Lender.

"Collateral Documents" means, collectively, (a) the Security Agreement, and all other security agreements, mortgages, deeds of trust, patent and trademark assignments, lease assignments, guarantees and other similar agreements made by Borrower for the benefit of Lender now or hereafter delivered to Lender pursuant to or in connection with the transactions contemplated hereby, and all financing statements (or comparable documents now or hereafter

FILED DATE: 11/23/2020 4:20 PM 2020L012546

filed in accordance with the Uniform Commercial Code or comparable law) against Borrower as debtor in favor of Lender as secured party, and (b) any amendments, supplements, modifications, renewals, replacements, consolidations, substitutions and extensions of any of the foregoing.

"Commitment" means the commitment of Lender to make Loans to Borrower in an aggregate amount at any time outstanding not in excess of $30,000,000.

"Commitment Termination Date" means the earlier of (a) Borrower's sale, transfer, pledge or other disposition of all or any substantial part of its assets, Borrower's consolidation or merger with any other entity or the sale, transfer, pledge or other disposition of all or substantially all of the membership interests of Borrower, other than to an affiliate, (b) the date on which the Commitment shall terminate pursuant to Article VI, and (c) the date that is three (3) years from the date hereof; provided, however, that Borrower and Lender shall extend the initial 3-year term, and any subsequent term thereof, automatically for so long as Borrower is "current" in the payment of its accounts payable.

"Default" means any event, act or condition which with notice or lapse of time, or both, would constitute an Event of Default.

"Dollars" and "$" mean the lawful money of the United States of America.

"Event of Default" has the meaning ascribed to it in Article VI.

"Indebtedness" means (a) indebtedness for borrowed money or the deferred purchase price of property or services purchased (other than amounts constituting accrued expenses and trade payables arising in the ordinary course of Borrower's business), (b) obligations arising in respect of letters of credit or similar instruments, (c) obligations under capital leases, (d) indebtedness of the type described in clauses (a), (b) and (c) which have been directly or indirectly assumed or guaranteed.

"Interest Period" means the period commencing on the date of a Loan or the last day of the preceding Interest Period (with the first Interest Period to commence on the date of this Agreement) and ending on the last day of the calendar month which is one month thereafter; provided, however, that if any Interest Period would end on a day which shall not be a Business Day, such Interest Period shall be extended to the next succeeding Business day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day.

"Interest Rate" means, for each loan, six percent (6%) per annum with annual compounding.

"Lender" is defined in the first paragraph.

"Loan Documents" means this Agreement, the Note, the Security Agreement, and all other documents, instruments, notes and agreements executed in connection therewith or contemplated thereby, as the same may be amended, restated or otherwise modified and in effect from time to time.

25725673.4

"Loans" has the meaning ascribed to it in the recitals.

"Note" is defined in Section 2.3(a).

"Obligations" means all amounts owing by Borrower to Lender or any other Person or any of their respective successors and assigns pursuant to or in connection with this Agreement or any other Loan Document or otherwise with respect to any Loan, including without limitation, all principal, interest (including any interest accruing after the filing of any petition in bankruptcy or the commencement of any proceeding under any debtor relief law relating to Borrower, or would accrue but for such filing or commencement, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding), all reimbursement obligations, fees, expenses, indemnification and reimbursement payments, costs and expenses (including all fees and expenses of counsel to Lender incurred pursuant to this Agreement or any other Loan Document), whether direct or indirect, absolute or contingent, liquidated or unliquidated, now existing or hereafter arising hereunder or thereunder, together with all renewals, extensions, modifications or re-financings thereof.

"Person" means an individual, a corporation, a partnership, an association, a trust or other entity or organization, including a government or political subdivision or an agency or an instrumentality thereof.

"Restricted Payment" means (a) any distribution, dividend or other payment of a similar nature paid to holders of equity interests of Borrower or any of its Subsidiaries (expressly excluding any Tax Distributions (as defined in Borrower's Limited Liability Company Agreement) and, with respect to holders of equity interests of Borrower or any of its Subsidiaries who are employees of Borrower or such Subsidiary, any payments with respect to such employment), and (b) any redemption, retirement or other acquisition by Borrower or a Subsidiary or affiliate thereof of any equity interest of Borrower or such Subsidiary.

"Security Agreement" means the Security Agreement, dated as of the date hereof, between Borrower and Lender, as the same may be amended from time to time, pursuant to which Borrower grants Lender a security interest in and to all of Borrower's assets.

"Subsidiary" means any corporation, partnership or limited liability company of which Borrower owns, directly or indirectly, such number of shares, partnership interests or membership interests as have more than 50% of the ordinary voting power and any limited liability company in which Borrower has invested in which it is also the manager.

1.2    References.  All references in this Agreement to particular Sections or Articles shall, unless expressly otherwise provided or unless the context otherwise requires, be deemed to refer to the specific sections or articles in this Agreement.  In addition, the words "hereof," "herein," "hereunder," and words of similar import, refer to this Agreement as a whole and not to any particular section or article.

-3-

# ARTICLE II
# THE LOANS

2.1 <u>Loans</u>. Lender agrees, upon the terms and subject to the conditions of this Agreement, to make the Loans to Borrower on any Business Day and from time to time from the Closing Date to the Commitment Termination Date in an aggregate principal amount at any one time outstanding not to exceed the Commitment.

2.2 <u>Borrowing Procedures</u>.

(a) Borrower shall give at least seven (7) Business Days' prior written notice to Lender of each Borrowing. Each such notice in order to be effective must be received by Lender not later than 11:00 am (Chicago time) on the day required and shall specify the Business Day on which such Loan is to be made and the aggregate principal amount of the requested Loan.

(b) Subject to <u>Article IV</u>, on the borrowing date specified in such notice, Lender shall disburse funds in the amount of the requested Borrowing to Borrower via wire transfer into an account specified by Borrower.

2.3 <u>Notes; Repayment</u>.

(a) The Loans made by Lender shall be evidenced by a secured promissory note substantially in the form of <u>Exhibit A</u> hereto (the "<u>Note</u>") in the face amount equal to the Commitment, duly executed on behalf of Borrower and dated as of the date hereof. The outstanding principal amount of the Loans as evidenced by the Note shall be payable in full on the Commitment Termination Date, subject to acceleration as provided in <u>Article VI</u>.

(b) Lender is hereby authorized by Borrower, but not obligated, to enter on the last page of the Note the amount of the Loans made by Lender hereunder and the other information provided for on such last page; <u>provided</u>, <u>however</u>, that the failure of Lender to set forth the amount of such Loans, or the other information, or any error with respect thereto, shall not in any manner affect the obligation of Borrower to repay the Loans and all other Obligations due hereunder.

2.4 <u>Interest; Default Interest</u>.

(a) The Note shall bear and accrue interest on the outstanding principal amount thereof at the Interest Rate. Interest shall accrue from the most recent date to which interest has been paid or, if no interest has been paid, from the end of the most recent Interest Period. Interest shall be payable quarterly, on a calendar quarter basis, and, subject to <u>Section 2.4(b)</u> and <u>Article VI</u>, shall be due in full at the earlier of (i) the Commitment Termination Date, and (ii) the Borrower's payment in full of all outstanding Loans pursuant to <u>Section 2.6</u>. Borrower may elect not to pay the accrued interest in cash on any interest due date, in which event such interest shall be paid in kind and shall accrete as additional principal on the Loans on the applicable payment date and shall thereafter accrue interest as part of the principal amount of the Loans at the Interest Rate.

25725673.4

FILED DATE: 11/23/2020 4:20 PM    2020L012546

(b)    If the Borrower shall default in the payment of the principal of, or interest on, any Loan or any other amount becoming due hereunder, whether at the Commitment Termination Date, by acceleration or otherwise, Borrower shall on demand from time to time pay interest, to the extent permitted by applicable law, on overdue amounts outstanding up to the date of actual payment of such defaulted amount at a rate equal to the Interest Rate plus 300 basis points.

(c)    Anything in this Agreement or the Note to the contrary notwithstanding, the interest rate on the Loans shall in no event be in excess of the maximum rate permitted by applicable law.

2.5    <u>Termination of Commitment</u>.    The Commitment shall be automatically and permanently reduced to zero Dollars ($0) on the Commitment Termination Date. Simultaneously with the termination of the Commitment, Borrower shall pay Lender an amount equal to the principal amount of Loans outstanding, together with (a) all accrued interest thereon and (b) all other Obligations (other than contingent and other inchoate obligations for which no claim has been made) due hereunder.

2.6    <u>Permissive Prepayment of Loans</u>.    Borrower shall have the right at its option at any time and from time to time to prepay the Loans, in whole or in part, upon at least one (1) Business Day's prior written notice to Lender.    All prepayments shall be accompanied by accrued but unpaid interest on the principal amount being prepaid to the date of (but not including) the date of prepayment.

2.7    <u>Manner of Payment</u>.    All payments of interest and principal in respect of the Loans shall be made directly to Lender without offset or counterclaim, in Dollars, in immediately available funds, at the offices of Lender specified in <u>Section 7.8</u>.    All payments made by Borrower to Lender shall be applied first to accrued and unpaid interest on the Loans and the remainder thereof to the unpaid principal amount of the Loans.

# ARTICLE III
## REPRESENTATIONS AND WARRANTIES

Borrower hereby represents and warrants to Lender as follows:

3.1    <u>Authority</u>.    Borrower has the full power, right and legal authority to execute and perform the Loan Documents in accordance with their respective terms.

3.2    <u>Validity</u>.    The Loan Documents have been duly and validly executed by Borrower and, upon delivery thereof by Borrower, will constitute a legal, valid and binding obligation of Borrower enforceable against it in accordance with their respective terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally or by general equitable principles relating to enforceability, regardless of whether such enforceability is considered in a proceeding at law or in equity.

3.3    <u>Compliance with Laws and Contracts</u>.    The execution, delivery and performance of the Loan Documents by Borrower in compliance with their respective terms and provisions do

25725673.4

FILED DATE: 11/23/2020 4:20 PM 2020L012546

not and will not conflict with, or result in a breach of, any of the terms, conditions or provisions of any mortgage, lien or other security arrangement or any agreement, instrument, order, judgment, decree or any other restriction of similar kind or character to which Borrower is a party or is otherwise bound.

3.4 <u>Organization</u>. Borrower is a limited liability company duly organized, validly existing and in good standing under the laws of its jurisdiction of organization.

3.5 <u>Representations to Be Continuing</u>. Each of the foregoing representations and warranties are true and correct as of the date of this Agreement and will continue to be true at the date of the disbursement of each Loan hereunder. By submitting to Lender a request for Borrowing hereunder, Borrower shall be deemed to have restated each of such representations and warranties as of the date of such request.

# ARTICLE IV
# <u>CONDITIONS</u>

4.1 <u>Conditions Precedent to the Initial Loans</u>. The obligation of Lender to make the initial Loan hereunder shall be subject to the satisfaction by Borrower or waiver by Lender on or prior to the Closing Date of the following conditions precedent:

(a) Lender shall have received the Note duly executed by Borrower, dated the date hereof and payable to the order of Lender in the principal amount of the Commitment.

(b) Lender shall have received the Security Agreement, duly executed by Borrower and dated the date hereof.

(c) No action, suit, claim or proceeding before any domestic court, governmental agency, commission, or administrative or regulatory authority shall have been commenced by a party other than Lender and be pending which (i) seeks to restrain, prevent, or materially restructure the Loans contemplated hereby or which otherwise questions the validity or legality thereof, or (ii) could, in Lender's reasonable judgment, impair Borrower's ability to satisfy the Obligations.

4.2 <u>Conditions Precedent to each Loan</u>. The obligation of Lender to make any Loan hereunder shall be subject to the satisfaction by Borrower or waiver by Lender on or prior to the requested Borrowing date of the following conditions precedent:

(a) Lender shall have received a written notice with respect to such Borrowing as required by <u>Section 2.2(a)</u>.

(b) The representations and warranties of Borrower set forth in <u>Article III</u> shall be true and correct on and as of the date of each Borrowing, with the same effect as if made on and as of such date.

(c) On the date of each Borrowing, no Event of Default or Default shall have occurred and be continuing.

25725673.4

FILED DATE: 11/23/2020 4:20 PM 2020L012546

(d)    Lender, in its sole and absolute discretion, shall have determined there is no malfeasance by Borrower.

Each Borrowing hereunder shall be deemed to be a representation and warranty by Borrower on the date of such Borrowing as to the matters and to the extent specified by paragraphs (b) and (c) of this Section.

## ARTICLE V
## COVENANTS

5.1    <u>Affirmative Covenants</u>.  From the Closing Date and for so long as the Commitment shall be in effect or any Obligations (other than contingent and other inchoate obligations for which no claim has been made) shall remain outstanding hereunder, Borrower shall (a) use the proceeds of the Loans to make investments and for working capital and other general corporate purposes (including without limitation, for avoidance of doubt, to make loans or advances to any of its Subsidiaries), (b) deliver to Lender such information from time to time concerning the financial condition of Borrower and its Subsidiaries as Lender may request, (c) file all tax returns when due and pay and discharge, when due, all taxes reflected on such returns; and pay, when due, all assessments and other liabilities, except such liabilities which are contested in good faith and by proper proceedings and for which appropriate reserves have been established in accordance with generally accepted accounting principles then in effect, (d) comply with the requirements of all applicable laws, rules, regulations and orders of any governmental authority (federal, state, local or foreign), a breach of which would adversely affect the interest of Lender hereunder, and (e) preserve its company existence.

5.2    <u>Indemnification</u>.  From the Closing Date and for so long as the Commitment shall be in effect or any Obligations (other than contingent and other inchoate obligations for which no claim has been made) shall remain outstanding hereunder, Borrower shall indemnify and hold Lender and its affiliates harmless from and against any and all claims, damages, losses, liabilities, costs, expenses and fees resulting from Borrower's breach of any representation, warranty, agreement or covenant made by Borrower to Lender in any of the Loan Documents. The indemnification provisions of this <u>Section 5.2</u> shall survive each Loan and any termination of this Agreement.

5.3    <u>Limitation on Indebtedness</u>.  From the Closing Date and for so long as the Commitment shall be in effect or any Obligations (other than contingent and other inchoate obligations for which no claim has been made) shall remain outstanding hereunder, without the prior written consent of Lender, Borrower shall not create, incur, assume or suffer to exist any Indebtedness, except Indebtedness hereunder.

5.4    <u>Limitation on Restricted Payments</u>.  From the Closing Date and for so long as the Commitment shall be in effect or any Obligations (other than contingent and other inchoate obligations for which no claim has been made) shall remain outstanding hereunder, Borrower shall not declare, make or incur any liability to make any Restricted Payments without Lender's prior written consent.

25725673.4

## ARTICLE VI
## EVENTS OF DEFAULT

In the case of the happening and during the continuance of any of the following events (herein called "Events of Default"):

(a)     default shall be made in the payment of any principal of, or interest on, the Note when and as the same shall become due and payable, whether at the due date thereof or at the date fixed for prepayment thereof or acceleration thereof or otherwise;

(b)     default shall be made in the due performance of any covenant or agreement contained in any of the Loan Documents (other than a payment covenant of the kind contemplated by clause (a) of this Article VI) and such default shall remain unremedied for ten (10) Business Days after receipt by Borrower of a written notice of such default;

(c)     any representation or warranty of Borrower contained in any of the Loan Documents shall be false or misleading as of the date made or deemed made;

(d)     any of the Loan Documents shall cease, for any reason, to be in full force and effect;

(e)     default in payment, after the expiration of any applicable grace period, shall be made with respect to any Indebtedness of Borrower other than the Indebtedness hereunder in an amount or amounts over $25,000.00 in the aggregate; or other default in connection with such Indebtedness, if the effect of such default is to accelerate or permit the holder thereof to accelerate the maturity of such Indebtedness or to permit the holder thereof to cause such Indebtedness to become due prior to its stated maturity;

(f)     Borrower or any of its Subsidiaries is generally unable to pay its debts as they become due or admits in writing its inability to pay its debts, or makes a general assignment for the benefit of creditors; or Borrower or any of its Subsidiaries commences any case, proceeding or other action seeking to have an order for relief entered on its behalf as debtor or to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, liquidation, dissolution or composition of it or its debts under any law relating to bankruptcy, insolvency, reorganization or relief of debtors or seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its property or shall file an answer or other pleading in any such case, proceeding or other action admitting the material allegations of any petition, complaint or similar pleading filed against it or consenting to the relief sought therein; or Borrower or any of its Subsidiaries shall take any action to authorize any of the foregoing;

(g)     any involuntary case, proceeding or other action against Borrower or any of its Subsidiaries shall be commenced seeking to have an order for relief entered against it as debtor or to adjudicate it a bankrupt or insolvent or seeking reorganization, arrangement, adjustment, liquidation, dissolution or composition of it or its debts under any law relating to bankruptcy, insolvency, reorganization or relief of debtors or seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its property,

FILED DATE: 11/23/2020 4:20 PM 2020L012546

and such case proceeding or other action (i) shall result in the entry of any order for relief against it or (ii) shall remain undismissed or undischarged for a period of 60 days; or

(h)     final judgment(s) for the payment of money in excess of $100,000 shall be rendered in the aggregate against Borrower or any of its Subsidiaries which within 60 days from the entry of such judgment(s) shall not have been discharged or stayed pending appeal or which shall not have been discharged within 60 days from the entry of a final order of affirmance on appeal from which no further appeal may be taken;

then, in every such event and at any time thereafter during the continuance of such event, the Lender may take, in its sole discretion, any or all of the following actions, at the same or different times:

(i)     terminate forthwith the Commitment;

(ii)     declare the principal of, and interest on, the Loans and the Note and all other Obligations (other than contingent and other inchoate obligations for which no claim has been made) payable hereunder or thereunder to be forthwith due and payable, without presentment, demand, protest, notice of acceleration, notice of intent to accelerate or other notice of any kind, all of which are hereby expressly waived, anything in this Agreement or the Note to the contrary notwithstanding; and/or

(iii)     exercise any and all rights and remedies available to Lender under law.

If an Event of Default specified in paragraphs (f), (g) or (h) above shall have occurred with respect to Borrower or any of its Subsidiaries, the Loans, the Note and all other Obligations (other than contingent and other inchoate obligations for which no claim has been made) payable hereunder or thereunder shall thereupon and concurrently become due and payable, without presentment, demand, protest, notice of acceleration, notice of intent to accelerate or other notice of any kind, all of which are hereby expressly waived, anything in this Agreement or the Note to the contrary notwithstanding and the Commitment shall thereupon forthwith terminate.

## ARTICLE VII
## MISCELLANEOUS

7.1     No Waiver.  No failure or delay on the part of Lender in exercising any right, power or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy hereunder.

7.2     Amendments, Etc.  No amendment, waiver, modification, supplementation or termination of any term or provision of this Agreement nor any consent to any departure by Borrower therefrom shall in any event be effective unless the same shall be in writing and signed by Lender and then (if in respect of a waiver or consent) shall be effective only in the specific instance and for the specific purpose for which given.

25725673.4

7.3     Binding Effect.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; provided, however, that Borrower may not assign this Agreement or its rights or obligations hereunder without the prior written consent of Lender.

7.4     Governing Law; Venue.  **THIS AGREEMENT SHALL BE A CONTRACT MADE UNDER AND GOVERNED BY THE LAWS OF THE STATE OF ILLINOIS, WITHOUT GIVING EFFECT TO PRINCIPLES OF CONFLICTS OF LAW.  THE PARTIES HEREBY AGREE TO IRREVOCABLY SUBMIT TO THE PERSONAL AND SUBJECT MATTER JURISDICTION OF THE FEDERAL AND STATE COURTS SITTING IN CHICAGO, COOK COUNTY, ILLINOIS, AND AGREE NOT TO OBJECT TO SUCH VENUE FOR ANY REASON AT LAW OR IN EQUITY.**

7.5     Severability of Provisions.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

7.6     Counterparts; Effectiveness.  This Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all such counterparts shall together constitute one and the same Agreement.

7.7     Complete Agreement.  The Loan Documents, and the other documents and agreements expressly referred to herein and therein collectively embody the complete agreement and understanding among the parties hereto and supersede and preempt any prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter hereof in any way.

7.8     Notices.  Any notice, waiver, consent or other communication required or permitted hereunder shall be in writing and shall be delivered personally (including delivery by a internationally recognized courier service), by email transmission, or by pre-paid certified or registered mail, return receipt requested, addressed as follows:

|  |  |
|---|---|
| To Borrower: | ML Fashion, LLC |
|  | 38 E. 29th Street |
|  | New York, NY 10016 |
|  | Attention:  President |
|  | Email:     stephanie.menkin@marcuslemonis.com |

|  |  |
|---|---|
| To Lender: | ML Retail LLC |
|  | c/o Marcus Lemonis LL |
|  | 4192 IL Route 83, Suite C |
|  | Long Grove, Illinois 60047 |
|  | Attention:  Marcus Lemonis |
|  | Email: marcus@marcuslemonis.com |

FILED DATE: 11/23/2020 4:20 PM   2020L012546

Notice hereunder shall be deemed to have been received and be effective for all purposes hereunder (a) if given by prepaid certified or registered mail, return receipt requested, on the third Business Day after mailing or (b) if given by any other means, when delivered at the address specified in this Section. The address and facsimile number of any party hereto may be changed by notice given in accordance with the provisions hereof.

      7.9    <u>Survival</u>. All warranties, representations and covenants made by Borrower herein shall be considered to have been relied upon by Lender and shall survive the making of the Loans and the issuance and delivery to Lender of the Note regardless of any investigation made by Lender and shall continue in full force and effect so long as any Obligation due or to become due is outstanding and unpaid and so long as the Commitment has not been terminated in its entirety.

      7.10    <u>Waiver of Jury Trial</u>. **TO THE EXTENT PERMITTED BY APPLICABLE LAW, THE PARTIES HEREBY IRREVOCABLY WAIVE ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.**

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

25725673.4

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

**BORROWER**:

ML FASHION, LLC,
a Delaware limited liability company

By: _____
Name:  Stephanie Menkin
Title:  President

**LENDER**:

ML RETAIL LLC,
a Delaware limited liability company

By: _____
Name:  Marcus Lemonis
Title:  CEO

[SIGNATURE PAGE TO CREDIT AGREEMENT]

FILED DATE: 11/23/2020 4:20 PM   2020L012546

# EXHIBIT A

## <u>FORM OF SECURED PROMISSORY NOTE</u>

Attached

EXHIBIT C

25725673.4

# SECURED PROMISSORY NOTE

U.S. $30,000,000                                                                      Chicago, Illinois
original principal amount                                                        as of March 29, 2016

**FOR VALUE RECEIVED**, the undersigned ("Maker") hereby promises to pay to the order of **ML RETAIL LLC**, a Delaware limited liability company ("Payee"), at the address of Payee set forth in the Credit Agreement (as hereinafter defined), in lawful money of the United States of America in immediately available funds, the principal amount of U.S.$30,000,000 plus the amount of interest which as accrued thereon pursuant to Section 2.4 of the Credit Agreement, or the aggregate principal amount of all Loans (as defined in the Credit Agreement) made by Lender to Maker pursuant to the Credit Agreement, whichever is less, on such date or dates as is provided in the Credit Agreement, and to pay interest on the unpaid principal amount from time to time outstanding hereunder, in like money, at such address and at such times and in such amounts, as set forth in the Credit Agreement.

Maker and any and all sureties, guarantors and endorsers of this Secured Promissory Note (this "Note") and all other parties now or hereafter liable hereon, severally waive all grace periods (except grace periods expressly provided for in the Credit Agreement), demand, presentment for payment, protest, notice of any kind and diligence in collecting and bringing suit against any party hereto and agree to the extent permitted by applicable law (i) to all extensions and partial payments, with or without notice, before or after maturity, (ii) to any substitution, exchange or release of any security now or hereafter given for this Note, (iii) to the release of any party primarily liable hereon, and (iv) that it will not be necessary for any holder of this Note to first institute or exhaust such holder's remedies against the Maker or any other party liable herefor or against any security for this Note. The non-exercise by any holder of this Note of any of its rights hereunder in any particular instance shall not constitute a waiver in that or any subsequent instance.

This Note is secured under and pursuant to the terms of certain Collateral Documents, to which reference is hereby made for a statement of their respective terms and conditions and a description of the collateral security for this Note.

This Note is the Note referred to in that certain Credit Agreement dated as of the date hereof (the "Credit Agreement") by and between Maker and Payee, to which reference is hereby made for a statement of said terms and provisions. Capitalized terms used herein shall have the meanings set forth in the Credit Agreement unless otherwise defined herein or unless the context otherwise requires.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

FILED DATE: 11/23/2020 4:20 PM    2020L012546

FILED DATE: 11/23/2020 4:20 PM   2020L012546

IN WITNESS WHEREOF, Maker has executed and delivered this Note as of the day and year first above written.

**MAKER:**

ML FASHION LLC,
a Delaware limited liability company

By: _____
Name:  Stephanie Menkin
Title:  President

25725673.4

Schedule attached to Secured Promissory Note dated as of March 29, 2016
of ML Fashion, LLC payable to the order of ML Retail LLC

## LOANS AND PRINCIPAL PAYMENTS

| Date | Amount of Loan Made | Amount of Principal Repaid | Unpaid Principal Balance | Notation made by |
|------|------|------|------|------|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

The aggregate unpaid principal amount shown on this schedule shall be rebuttable presumptive evidence of the principal amount owing and unpaid on this Note.  The failure to record the date and amount of any Loan on this schedule shall not, however, limit or otherwise affect the obligations of Borrower under the Credit Agreement or under this Note to repay the principal amount of the Loans together with all interest accruing thereon.

25725673.4

FILED DATE: 11/23/2020 4:20 PM   2020L012546

FILED
11/23/2020 4:20 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2020L012546

11242484

# EXHIBIT 3

FILED DATE: 11/23/2020 4:20 PM 2020L012546

# SECURITY AGREEMENT

**THIS SECURITY AGREEMENT** (this "Agreement") dated as of March 29, 2016, is made by **ML FASHION, LLC**, a Delaware limited liability company (the "Debtor"), and **ML RETAIL LLC**, a Delaware limited liability company (the "Lender").

## W I T N E S S E T H:

**WHEREAS,** Debtor and Lender have entered into a Credit Agreement of even date herewith (as amended or otherwise modified from time to time, the "Credit Agreement"), pursuant to which Lender has agreed to make loans and other financial accommodations to Debtor; and

**WHEREAS**, the obligations of Debtor under the Credit Agreement are to be secured pursuant to this Agreement;

**NOW, THEREFORE**, for and in consideration of any loan, advance or other financial accommodation heretofore or hereafter made to Debtor under or in connection with the Credit Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.      Definitions.  When used herein, (a) the terms "Certificated Security," "Chattel Paper," "Commercial Tort Claims," "Deposit Account," "Document," "Equipment, " "Financial Asset," "Fixture, Goods," "Letter-of-Credit Rights," "Inventory," "Instrument," "Investment Property," Security," "Security Entitlement" and "Uncertificated Security" have the respective meanings assigned thereto in the UCC (as defined below); (b) capitalized terms which are not otherwise defined have the respective meanings assigned thereto in the Credit Agreement; and (c) the following terms have the following meanings (such definitions to be applicable to both the singular and plural forms of such terms):

"Account Debtor" means the party who is obligated on or under any Account Receivable, Contract Right or General Intangible.

"Account Receivable" means any right of Debtor to payment for goods sold or leased or for services rendered.

"Assignee Deposit Account" is defined in Section 4.

"Collateral" means all property and rights of Debtor in which a security interest is granted hereunder.

"Computer Hardware and Software" means all of Debtor's rights (including rights as licensee and lessee) with respect to (a) computer and other electronic data processing hardware, including all integrated computer systems, central processing units, memory units, display terminals, printers, computer elements, card readers, tape drives, hard and soft disk drives, cables, electrical supply hardware, generators, power equalizers, accessories, peripheral devices and other related computer hardware; (b) all software programs designed for use on the computers and electronic data processing hardware described in clause (a) above, including all

operating system software, utilities and application programs in whatsoever form (source code and object code in magnetic tape, disk or hard copy format or any other listings whatsoever); (c) any firmware associated with any of the foregoing; and (d) any documentation for hardware, software and firmware described in clauses (a), (b) and (c) above, including flow charts, logic diagrams, manuals, specifications, training materials, charts and pseudo codes.

"Contract Right" means any right of Debtor to payment under a contract for the sale or lease of goods or the rendering of services, which right is at the time not yet earned by performance.

"General Intangibles" means all of Debtor's "general intangibles" as defined in the UCC and, in any event, includes (without limitation) all of Debtor's trademarks, trade names, patents, copyrights, trade secrets, customer lists, inventions, designs, software programs, mask works, goodwill, registrations, licenses, franchises, tax refund claims, guarantee claims, security interests and rights to indemnification.

"Intellectual Property" means all past, present and future: trade secrets and other proprietary information; trademarks, service marks, business names, designs, logos, indicia and other source and/or business identifiers, and the goodwill of the business relating thereto and all registrations or applications for registrations which have heretofore been or may hereafter be issued thereon throughout the world; copyrights (including copyrights for computer programs) and copyright registrations or applications for registrations which have heretofore been or may hereafter be issued throughout the world and all tangible property embodying the copyrights; unpatented inventions (whether or not patentable); patent applications and patents; industrial designs, industrial design applications and registered industrial designs; license agreements related to any of the foregoing and income therefrom; books, records, writings, computer tapes or disks, flow diagrams, specification sheets, source codes, object codes and other physical manifestations, embodiments or incorporations of any of the foregoing; the right to sue for all past, present and future infringements of any of the foregoing; and all common law and other rights throughout the world in and to all of the foregoing.

"Liabilities" means all obligations and liabilities of Debtor under the Credit Agreement, any Note, any other Loan Document or any other instrument, document or agreement, now existing or hereafter arising, evidencing any financing, leasing, or other extensions of credit of whatever type or form from time to time made by Lender to or for the benefit of Debtor in each case howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, now or hereafter existing, or due or to become due.

"Non-Tangible Collateral" means collectively Debtor's Accounts Receivable, Contract Rights and General Intangibles.

"UCC" means the Uniform Commercial Code as in effect in the State of Illinois on the date of this Agreement; provided that, as used in Section 8 hereof, "UCC" shall mean the Uniform Commercial Code as in effect from time to time in any applicable jurisdiction.

FILED DATE: 11/23/2020 4:20 PM 2020L012546

2. <u>Grant of Security Interest</u>. As security for the payment of all Liabilities, Debtor hereby assigns to Lender, and grants to Lender a continuing security interest in, the following, whether now or hereafter existing or acquired:

All of Debtor's:

(a)       Accounts Receivable;

(b)       Certificated Securities;

(c)       Chattel Paper;

(d)       Commercial Tort Claims;

(e)       Computer Hardware and Software and all rights with respect thereto, including, any and all licenses, options, warranties, service contracts, program services, test rights, maintenance rights, support rights, improvement rights, renewal rights and indemnifications, and any substitutions, replacements, additions or model conversions of any of the foregoing;

(f)       Contract Rights;

(g)       Deposit Accounts;

(h)       Documents;

(i)       Financial Assets;

(j)       General Intangibles;

(k)       Goods (including all of its Equipment, Fixtures and Inventory), and all accessions, additions, attachments, improvements, substitutions and replacements thereto and therefor;

(l)       Instruments;

(m)       Intellectual Property;

(n)       Investment Property;

(o)       Letter-of-Credit Rights;

(p)       money (of every jurisdiction whatsoever);

(q)       Security Entitlements;

(r)       Uncertificated Securities; and

FILED DATE: 11/23/2020 4:20 PM 2020L012546

(s) to the extent not included in the foregoing, other personal property of any kind or description;

together with all books, records, writings, data bases, information and other property relating to, used or useful in connection with, or evidencing, embodying, incorporating or referring to any of the foregoing, and all proceeds, products, offspring, rents, issues, profits and returns of and from any of the foregoing; <u>provided</u> that to the extent that the provisions of any lease or license of Computer Hardware and Software or Intellectual Property expressly prohibit (which prohibition is enforceable under applicable law) the assignment thereof, and the grant of a security interest therein, Debtor's rights in such lease or license shall be excluded from the foregoing assignment and grant for so long as such prohibition continues, <u>it being understood</u> that upon request of Lender, Debtor will in good faith use reasonable efforts to obtain consent for the creation of a security interest in favor of Lender in Debtor's rights under such lease or license.

3. <u>Warranties</u>. Debtor warrants that: (a) no financing statement (other than any which may have been filed on behalf of Lender or in connection with liens expressly permitted by the Credit Agreement ("<u>Permitted Liens</u>")) covering any of the Collateral is on file in any public office; (b) Debtor is and will be the lawful owner of all Collateral, free of all liens and claims whatsoever, other than the security interest hereunder and Permitted Liens, with full power and authority to execute this Agreement and perform Debtor's obligations hereunder, and to subject the Collateral to the security interest hereunder; (c) all information with respect to Collateral and Account Debtor set forth in any schedule, certificate or other writing at any time heretofore or hereafter furnished by Debtor to Lender is and will be true and correct in all material respects as of the date furnished; (d) Debtor's principal place of business and jurisdiction of organization are as set forth on <u>Schedule I</u> hereto; (e) each other location where Debtor and its subsidiaries maintain a place of business is set forth on <u>Schedule II</u> hereto; (f) Debtor is not now known and during the five years preceding the date hereof has not previously been known by any trade name; (g) <u>Schedule III</u> hereto contains a complete listing of all of Debtor's Intellectual Property; (h) Debtor does not own any motor vehicles; (i) Debtor is a limited liability company duly formed, validly existing and in good standing under the laws of the state of its organization; (j) the execution and delivery of this Agreement and the performance by Debtor of its obligations hereunder are within Debtor's company powers, have been duly authorized by all necessary company action, have received all necessary governmental approval (if any shall be required), and do not and will not contravene or conflict with any provision of law or certificate of formation of Debtor or of any material agreement, indenture, instrument or other document, or any material judgment, order or decree, which is binding upon Debtor; (k) this Agreement is a legal, valid and binding obligation of Debtor, enforceable in accordance with its terms, except that the enforceability of this Agreement may be limited by bankruptcy, insolvency, fraudulent conveyance, fraudulent transfer, reorganization, moratorium or other similar laws now or hereafter in effect relating to creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law); and (l) Debtor is in compliance with the requirements of all applicable laws (including the provisions of the Fair Labor Standards Act), rules, regulations and orders of every governmental authority.

FILED DATE: 11/23/2020 4:20 PM 2020L012546

4. <u>Collections, etc.</u> Until such time during the existence of an Event of Default as Lender shall notify Debtor of the revocation of such power and authority, Debtor (a) may, in the ordinary course of its business, at its own expense, sell, lease or furnish under contracts of service any of the Inventory normally held by Debtor for such purpose, use and consume, in the ordinary course of its business, any raw materials, work in process or materials normally held by Debtor for such purpose, and use, in the ordinary course of its business (but subject to the terms of the Credit Agreement), the cash proceeds of Collateral and other money which constitutes Collateral, (b) will, at its own expense, endeavor to collect, as and when due, all amounts due under any of the Non-Tangible Collateral, including the taking of such action with respect to such collection as Lender may reasonably request or, in the absence of such request, as Debtor may deem advisable, and (c) may grant, in the ordinary course of business, to any party obligated on any of the Non-Tangible Collateral, any rebate, refund or allowance to which such party may be lawfully entitled, and may accept, in connection therewith, the return of Goods, the sale or lease of which shall have given rise to such Non-Tangible Collateral. Lender, however, may, at any time that an Event of Default exists, whether before or after any revocation of such power and authority or the maturity of any of the Liabilities, notify any parties obligated on any of the Non-Tangible Collateral to make payment to Lender of any amounts due or to become due thereunder and enforce collection of any of the Non-Tangible Collateral by suit or otherwise and surrender, release or exchange all or any part thereof, or compromise or extend or renew for any period (whether or not longer than the original period) any indebtedness thereunder or evidenced thereby. Upon the request of Lender during the existence of an Event of Default, Debtor will, at its own expense, notify any or all parties obligated on any of the Non-Tangible Collateral to make payment to Lender of any amounts due or to become due thereunder.

Upon request by Lender during the existence of an Event of Default, Debtor will forthwith, upon receipt, transmit and deliver to Lender, in the form received, all cash, checks, drafts and other instruments or writings for the payment of money (properly endorsed, where required, so that such items may be collected by Lender) which may be received by Debtor at any time in full or partial payment or otherwise as proceeds of any of the Collateral. Except as Lender may otherwise consent in writing, any such items which may be so received by Debtor will not be commingled with any other of its funds or property, but will be held separate and apart from its own funds or property and upon express trust for the Lender until delivery is made to Lender. Debtor will comply with the terms and conditions of any consent given by Lender pursuant to the foregoing sentence.

Upon demand by Lender, whether or not an Event of Default shall have occurred and be continuing, all items or amounts which are delivered by Debtor to Lender on account of partial or full payment or otherwise as proceeds of any of the Collateral shall be deposited to the credit of a deposit account (each an "<u>Assignee Deposit Account</u>") of Debtor with a financial institution selected by Lender over which Lender has sole dominion and control, as security for payment of the Liabilities. Debtor shall have no right to withdraw any funds deposited in the applicable Assignee Deposit Account. Lender may, from time to time, in its discretion, and shall upon request of Debtor made not more than once in any week, apply all or any of the then balance, representing collected funds, in the Assignee Deposit Account toward payment of the Liabilities, whether or not then due, in such order of application as Lender may determine, and Lender may, from time to time, in its discretion, release all or any of such balance to Debtor.

25738943.1                                                    5

FILED DATE: 11/23/2020 4:20 PM 2020L012546

Lender (or any designee of Lender) is authorized to endorse, in the name of Debtor, any item, howsoever received by Lender, representing any payment on or other proceeds of any of the Collateral.

5.  <u>Certificates, Schedules and Reports</u>.  Debtor will from time to time, as Lender may reasonably request, deliver to Lender such schedules, certificates and reports respecting all or any of the Collateral at the time subject to the security interest hereunder, and the items or amounts received by Debtor in full or partial payment of any of the Collateral, as Lender may reasonably request.  Any such schedule, certificate or report shall be executed by a duly authorized officer of Debtor and shall be in such form and detail as Lender may specify.  Debtor shall immediately notify Lender of the occurrence of any event causing any loss or depreciation in the value of its Inventory or other Goods which is likely to have a material adverse effect on Debtor and such notice shall specify the amount of such loss or depreciation.

6.  <u>Agreements of the Debtor</u>.  Debtor (a) will, upon request of Lender, execute such financing statements and other documents (and pay the cost of filing or recording the same in all public offices reasonably deemed appropriate by Lender) and do such other acts and things (including delivery to Lender of any Instruments or Certificated Securities which constitute Collateral), all as Lender may from time to time reasonably request, to establish and maintain a valid security interest in the Collateral (free of all other liens, claims and rights of third parties whatsoever, other than Permitted Liens) to secure the payment of the Liabilities; (b) will keep all its Inventory at, and will not maintain any place of business at any location other than, its address(es) shown on <u>Schedules I</u> and <u>II</u> hereto or at such other addresses of which Debtor shall have given Lender not less than 10 days' prior written notice, (c) will keep its records concerning the Non-Tangible Collateral in such a manner as will enable Lender or its designees to determine at any time the status of the Non-Tangible Collateral; (d) will furnish Lender such information concerning Debtor, the Collateral and the Account Debtor as Lender may from time to time reasonably request; (e) will permit Lender and its designees, from time to time, on reasonable notice and at reasonable times and intervals during normal business hours (or at any time without notice during the existence of an Event of Default) to inspect Debtor's Inventory and other Goods, and to inspect, audit and make copies of and extracts from all records and other papers in the possession of Debtor pertaining to the Collateral and the Account Debtor, and will, upon request of Lender during the existence of an Event of Default, deliver to Lender copies of all of such records and papers; (f) will, upon request of Lender, stamp on its records concerning the Collateral, and add on all Chattel Paper constituting a portion of the Collateral, a notation, in form satisfactory to Lender, of the security interest of the Lender hereunder; (g) except for the sale or lease of Inventory in the ordinary course of its business and sales of Equipment which is no longer useful in its business or which is being replaced by similar Equipment, will not sell, lease, assign or create or permit to exist any Lien on any Collateral other than Permitted Liens; (h) will at all times keep all of its Inventory and other Goods insured under policies maintained with reputable, financially sound insurance companies against loss, damage, theft and other risks to such extent as is customarily maintained by companies similarly situated, and cause all such policies to provide that loss thereunder shall be payable to Lender as its interest may appear (it being understood that (A) so long as no Event of Default shall be existing, Lender shall deliver any proceeds of such insurance which may be received by it to Debtor and (B) whenever an Event of Default shall be existing, Lender may apply any proceeds of such insurance which may be received by it toward payment of the Liabilities, whether or not due, in such order of

application as the Lender may determine), and such policies or certificates thereof shall, if the Lender so requests, be deposited with or furnished to Lender; (i) will take such actions as are reasonably necessary to keep its Inventory in good repair and condition; (j) will take such actions as are reasonably necessary to keep its Equipment in good repair and condition and in good working order, ordinary wear and tear excepted; (k) will promptly pay when due all license fees, registration fees, taxes, assessments and other charges which may be levied upon or assessed against the ownership, operation, possession, maintenance or use of its Equipment and other Goods; (1) will, upon request of Lender, (i) cause to be noted on the applicable certificate, in the event any of its Equipment is covered by a certificate of title, the security interest of Lender in the Equipment covered thereby, and (ii) deliver all such certificates to Lender or its designees; (m) will take all steps reasonably necessary to protect, preserve and maintain all of its rights in the Collateral; (n) will keep all of the tangible Collateral in the United States; (o) will reimburse Lender for all expenses, including reasonable attorney's fees and charges (including time charges of attorneys who are employees of Lender), incurred by Lender in seeking to collect or enforce any rights in respect of Debtor's Collateral; and (p) will promptly notify Lender of its acquisition of any motor vehicle or Commercial Tort Claim not listed, from time to time, on any Schedule hereto.

Any expenses incurred in protecting, preserving or maintaining any Collateral shall be borne by Debtor. Whenever an Event of Default shall be existing, Lender shall have the right to bring suit to enforce any or all of the Intellectual Property or licenses thereunder, in which event Debtor shall at the request of Lender do any and all lawful acts and execute any and all proper documents required by Lender in aid of such enforcement and Debtor shall promptly, upon demand, reimburse and indemnify Lender for all costs and expenses incurred by Lender in the exercise of its rights under this <u>Section 6</u>. Notwithstanding the foregoing, Lender shall have no obligation or liability regarding the Collateral or any portion thereof by reason of, or arising out of, this Agreement.

7.    <u>Event of Default</u>. Whenever an Event of Default shall be existing, Lender may exercise from time to time any right or remedy available to it under applicable law. Debtor agrees, in case of an Event of Default, (i) to assemble, at its expense, all its Inventory and other Goods (other than Fixtures) at a convenient place or places acceptable to Lender, and (ii) at Lender's request, to execute all such documents and do all such other things which may be necessary or desirable in order to enable Lender or its nominee to be registered as owner of the Intellectual Property with any competent registration authority. Any notification of intended disposition of any of the Collateral required by law shall be deemed reasonably and properly given if given at least ten days before such disposition. Any proceeds of any disposition by Lender of any of the Collateral may be applied by Lender to payment of expenses in connection with the Collateral, including reasonable attorneys' fees and charges (including time charges of attorneys who are employees of Lender), and any balance of such proceeds may be applied by Lender toward the payment of such of the Liabilities, and in such order of application, as Lender may from time to time elect.

8.    <u>General</u>. Lender shall be deemed to have exercised reasonable care in the custody and preservation of any of the Collateral in its possession if it takes such action for that purpose as any Debtor requests in writing, but failure of Lender to comply with any such request shall not of itself be deemed a failure to exercise reasonable care, and no failure of Lender to preserve or

FILED DATE: 11/23/2020 4:20 PM 2020L012546

protect any right with respect to such Collateral against prior parties, or to do any act with respect to the preservation of such Collateral not so requested by Debtor, shall be deemed of itself a failure to exercise reasonable care in the custody or preservation of such Collateral.

Any notice from Lender to Debtor, if mailed, shall be deemed given five days after the date mailed, postage prepaid, addressed to Debtor either at Debtor's address shown on Schedule I hereto or at such other address as Debtor shall have specified in writing to Lender as its address for notices hereunder.

Debtor agrees to pay all expenses, including reasonable attorneys' fees and charges (including time charges of attorneys who are employees of Lender) paid or incurred by Lender in endeavoring to collect the Liabilities of Debtor, or any part thereof and in enforcing this Agreement against Debtor, and such obligations will themselves be Liabilities.

No delay on the part of Lender in the exercise of any right or remedy shall operate as a waiver thereof, and no single or partial exercise by Lender of any right or remedy shall preclude other or further exercise thereof or the exercise of any other right or remedy.

This Security Agreement shall remain in full force and effect until all Liabilities have been paid in full and all Commitment has terminated. If at any time all or any part of any payment theretofore applied by Lender to any of the Liabilities is or must be rescinded or returned by Lender for any reason whatsoever (including the insolvency, bankruptcy or reorganization of Debtor), such Liabilities shall, for the purposes of this Agreement, to the extent that such payment is or must be rescinded or returned, be deemed to have continued in existence, notwithstanding such application by Lender, and this Agreement shall continue to be effective or be reinstated, as the case may be, as to such Liabilities, all as though such application by Lender had not been made.

This Agreement shall be construed in accordance with and governed by the laws of the State of Illinois applicable to contracts made and to be performed entirely within such State. Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

The rights and privileges of Lender hereunder shall inure to the benefit of its successors and assigns.

This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts, and each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute one and the same Agreement. At any time after the date of this Agreement, one or more additional Persons may become parties hereto by executing and delivering to the Lender a counterpart of this Agreement together with supplements to the Schedules hereto setting forth all relevant information with respect to such party as of the date of such delivery. Immediately upon such execution and delivery (and

without any further action), each such additional Person will become a party to, and will be bound by all the terms of, this Agreement.

ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, SHALL BE BROUGHT AND MAINTAINED EXCLUSIVELY IN THE COURTS OF THE STATE OF ILLINOIS OR IN THE UNITED STATES DISTRICT COURT FOR WITH JURISDICTION IN CHICAGO, ILLINOIS; PROVIDED THAT ANY SUIT SEEKING ENFORCEMENT AGAINST ANY COLLATERAL OR OTHER PROPERTY MAY BE BROUGHT, AT LENDER'S OPTION, IN THE COURTS OF ANY JURISDICTION WHERE SUCH COLLATERAL OR OTHER PROPERTY MAY BE FOUND. DEBTOR HEREBY EXPRESSLY AND IRREVOCABLY SUBMITS TO THE JURISDICTION OF THE COURTS OF THE STATE OF ILLINOIS AND OF THE UNITED STATES DISTRICT COURT WITH JURISDICTION IN CHICAGO, ILLINOIS FOR THE PURPOSE OF ANY SUCH LITIGATION AS SET FORTH ABOVE. DEBTOR FURTHER IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS BY REGISTERED MAIL, POSTAGE PREPAID, TO THE ADDRESS SET FORTH ON SCHEDULE I HERETO (OR SUCH OTHER ADDRESS AS IT SHALL HAVE SPECIFIED IN WRITING TO LENDER AS ITS ADDRESS FOR NOTICES HEREUNDER) OR BY PERSONAL SERVICE WITHIN OR WITHOUT THE STATE OF ILLINOIS. DEBTOR HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN ANY SUCH COURT REFERRED TO ABOVE AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

**EACH OF DEBTOR AND LENDER HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS UNDER THIS AGREEMENT, THE NOTE, ANY OTHER LOAN DOCUMENT AND ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR WHICH MAY IN THE FUTURE BE DELIVERED IN CONNECTION HEREWITH OR THEREWITH OR ARISING FROM ANY FINANCING RELATIONSHIP EXISTING IN CONNECTION WITH ANY OF THE FOREGOING, AND AGREES THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.**

FILED DATE: 11/23/2020 4:20 PM 2020L012546

**IN WITNESS WHEREOF**, this Agreement has been duly executed as of the day and year first above written.

**DEBTOR:**

ML FASHION, LLC,
a Delaware limited liability company

By: _____
Name: Stephanie Menkin
Title:   President

**LENDER:**

ML RETAIL LLC,
a Delaware limited liability company

By: _____
Name:  Marcus Lemonis
Title:   CEO

## Schedule I
## To Security Agreement

## **Principal Place of Business**
## **and Jurisdiction of Organization**

Principal Place of Business:

38 E. 29th Street
New York, New York 10016

Jurisdiction of Formation:

Delaware

25738943.1

## Schedule II
## To Security Agreement

### Addresses

Denim & Soul
348 Jericho Turnpike
Syosset, NY 11791

Runway
85 Greenwich Ave.
Greenwich, CT 06830

Runway
7125 Bethesda Ln.
Bethesda, MD 20814

Runway
325 Worth Ave.
Palm Beach, FL 33480

Denim & Soul
4742 River City Drive, Unit #113
Jacksonville, FL 32246

Denim & Soul
2210 N. Halsted St.
Chicago, IL 60614

Denim & Soul
267 East Westminster Ave.
Lake Forest, IL 60045

Runway
720 Waukegan Rd.
Deerfield, IL 60015

Denim & Soul
6810 Snider Plaza
Dallas, TX 75205

Runway
205 South Mill Street
Aspen, CO 81611

Denim & Soul
1827 Union Street
San Francisco, CA 94123

25738943.1

Schedule III
To Security Agreement

**Intellectual Property**

| MARK | APP./REG. NO. | FILING/REG/ DATE | GOODS/SERVICES |
|------|---------------|------------------|----------------|
| FSALE (Stylized) | 87218904 | 10/28/2016 | Retail and online retail store services featuring clothing and fashion accessories |

25738943.1