UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ML FASHION, LLC and<br>ML RETAIL, LLC,<br><br>      Plaintiffs,<br><br>    v.<br><br>NOBELLE GW, LLC,<br>STEPHANIE MENKIN,<br>SARIT MAMAN NAGRANI, and<br>NICOLAS GOUREAU,<br><br>      Defendants. | Case No. 20-cv-5124<br><br>Hon. Steven C. Seeger |

## MEMORANDUM OPINION AND ORDER

Plaintiffs ML Fashion, LLC and ML Retail, LLC filed a complaint about the formation of a would-be competitor that operates a clothing store in Greenwich, Connecticut. Plaintiffs moved for a temporary restraining order and a preliminary injunction, seeking to prevent Defendants from operating the business and using and selling Plaintiffs' property. The motion is denied.

### Background

The case involves a soured business relationship between Marcus Lemonis and Defendants Stephanie Menkin and Nicolas Goureau (a sister-brother tandem). Lemonis is an investor and a personality on a reality TV show on CNBC, "The Profit." *See* Am. Cplt., at ¶ 17 (Dckt. No. 35); *see also The Profit*, CNBC, https://www.cnbc.com/the-profit/ (last visited Jan. 15, 2021) ("In each one-hour episode of The Profit, Lemonis makes an offer that's impossible to refuse; his cash for a piece of the business and a percentage of the profits."). In 2014, Menkin and Goureau appeared on the show "to rescue their failing fashion retail business, operating

under the brand name 'Courage.B.'" *See* Am. Cplt., at ¶ 15. Lemonis ultimately invested $800,000 and became part owner of the company. *Id.* at ¶¶ 19–20.

For a while, the new venture apparently succeeded. The business "acquired new brands and opened new stores." *Id.* at ¶ 20. The company's fashion retail business was "expanding." *Id.* at ¶ 21.

The three of them later formed a new company, Plaintiff ML Fashion, LLC, to operate their growing retail business. *Id.* at ¶ 21. The members of the newly-formed LLC included Defendant Menkin, Defendant Goureau, and Plaintiff ML Retail, LLC, a limited liability company formed and controlled by Lemonis. *Id.* at ¶¶ 5, 25; *see also* Limited Liability Company Agreement of ML Fashion, LLC (Dckt. No. 35-1). Menkin and Goureau each owned a 33.33% stake in ML Fashion, and ML Retail (again, Lemonis's company) owned the remaining 33.34%. *See* Am. Cplt., at ¶ 27.

The LLC Agreement provides that ML Fashion holds title to all of the company's property. *See* Limited Liability Company Agreement of ML Fashion, LLC, at § 2.7 (Dckt. No. 35-1). Lemonis served as chairman and CEO of ML Fashion, and Menkin served as its president. *See* Am. Cplt., at ¶ 28. But the agreement vests management power "entirely and exclusively" in the Manager. *See* Limited Liability Company Agreement of ML Fashion, LLC, at § 6.1(a). And the Manager is Marcus Lemonis. *Id.* at § 6.1(b). So, for all intents and purposes, Lemonis held the managerial reins.

The LLC Agreement also includes a non-compete provision. A member "shall not . . . anywhere in the United States . . . engage in any business, have any financial interest in any company or entity that engages in any business or make any loans to any company or entity that engages in any business that engages in or competes, directly or indirectly, with the Business."

2

*Id.* at § 7.7(b). The prohibition extends for 12 months after that person ceases to be a member. *Id.* The parties agreed that a violation of the non-compete provision "would be highly injurious and cause irreparable harm to the Company and its Members." *Id.* at § 7.7(d).

As of 2016, ML Fashion opened its first retail store and began working toward its goal of operating stores "across the country." *See* Am. Cplt., at ¶ 44. ML Fashion currently operates more than 10 stores in Illinois, and more than 30 other stores from coast to coast, including in California, Colorado, Connecticut, Florida, Louisiana, Maryland, Massachusetts, Minnesota, New York, South Carolina, and Texas. *Id.* at ¶¶ 49–50.

At some point, the relationship between the business partners deteriorated. In 2019, Menkin and Lemonis began discussing how Menkin could separate from ML Fashion. *See* Menkin Decl., at ¶ 7 (Dckt. No. 19-1).

In 2020, Lemonis allegedly discovered that Menkin and Goureau were engaged in misconduct. Defendants allegedly "embezzled funds from ML Fashion for their own personal use." *See* Am. Cplt., at ¶ 2 (Dckt. No. 35); *see also id.* at ¶ 71 (alleging an "improper use of ML Fashion's funds for Menkin's and Goureau's personal expenses and diverting company assets"). According to the amended complaint, Defendants Menkin and Goureau "repeatedly, intentionally, and improperly utilized ML Fashion's funds . . . for their own personal purposes, including payments for personal expenses, payments to family members, 'consulting' fees, cars, extensive travel, hotel stays, and even a nanny." *Id.* at ¶ 63; *see also id.* at ¶ 64 (alleging that Defendants Menkin and Goureau "charged significant amounts of personal expenses to the company's American Express credit card"). The complaint alleges that "Goureau, Menkin and

3

Goureau's mother Noemi took in excess of $2,000,000 from ML Fashion including paying monies to Goureau's mother ($175,000 annually)." *Id.* at ¶ 62.[1]

Those allegations add a certain jolt to the amended complaint. But in the end, they don't play much of a role in the request for a temporary restraining order and a preliminary injunction. The argument for immediate equitable relief doesn't have much to do with the alleged misappropriation of funds. In fact, in the motion, Plaintiffs don't mention the alleged diversion of funds at all, except in the background section.

Instead, the request for immediate equitable relief is about the use of the company's property (*e.g.,* inventory) after Defendants formed their own business. So the motion isn't about siphoning money off the top while Defendants worked at ML Fashion. Instead, it is about what happened after they left.

Litigation ensued. On three fronts, in three jurisdictions. In June 2020, Menkin and Goureau filed suit against Lemonis and ML Retail (again, his company) in Delaware state court. *Id.* at ¶ 76; *see also* Cplt. in *Goureau v. Lemonis*, C.A. No. 2020-0486 (Del. Ch.) (filed on this Court's docket at Dckt. No. 14-3). The Delaware lawsuit seeks to prevent Lemonis and ML Retail from continuing to operate ML Fashion. *See* Am. Cplt., at ¶ 77 (Dckt. No. 35). At the same time, Menkin and Goureau also filed a second lawsuit against Lemonis and ML Retail in the United States District Court for the Southern District of New York. *Id.* at ¶ 76. The New York case is a shareholder derivative action alleging breaches of contractual and fiduciary duties by Lemonis when operating ML Fashion. *See* Cplt. in *Goureau v. Lemonis*, 20-cv-4691 (S.D.N.Y.) (filed on this Court's docket at Dckt. No. 14-4).

---

[1] It is not clear from the amended complaint if Plaintiffs are alleging that the entire $2 million was misappropriated. Maybe that figure included legitimate payments, such as their salaries. In the surrounding paragraphs, the amended complaint alleges that Goureau's mother received a salary (but, according to Plaintiffs, didn't deserve it). *See* Am. Cplt., at ¶¶ 60–62.

4

After litigation began, Menkin and Goureau allegedly opened "Nobelle," a clothing store. *See* Am. Cplt., at ¶ 79 (Dckt. No. 35). According to the amended complaint, they formed the store with Defendant Sarit Nagrani, a former employee of ML Fashion. *Id.* at ¶¶ 1, 79. Nobelle operates at a single location – at a storefront in Greenwich, Connecticut. *Id.* at ¶ 80. In fact, Nobelle operates at the very location where ML Fashion formerly operated a store until some point in 2020. *Id.* at ¶¶ 2, 52, 80, 84, 90–91, 93; *see also id.* at ¶ 55 ("ML Fashion sold clothing and other fashion-related retail products at the Greenwich Property until in or about 2020.").

The opening of that business sparked this litigation, the third lawsuit between the parties. ML Fashion and ML Retail filed a complaint against Menkin, Goureau, and Nagrani (plus Nobelle, the store) and advanced nine counts, including: (1) conversion; (2) breach of fiduciary duty; (3) breach of contract; (4) fraud; (5) tortious interference with Credit and Security Agreements; (6) tortious interference with Noncompetition Agreement; (7) aiding and abetting; (8) false advertising under the Lanham Act; and (9) unfair competition under the Lanham Act.[2] *See* Cplt. (Dckt. No. 1). Later, Plaintiffs filed an amended complaint and added three new counts, including claims under (10) the Computer Fraud and Abuse Act; (11) the Defend Trade Secrets Act, for the misappropriation of trade secrets; and (12) the Defend Trade Secrets Act, for the threatened misappropriation of trade secrets.[3] *See* Am. Cplt. (Dckt. No. 35).

The gist of the lawsuit is that Nobelle is a competing business (in violation of the non-compete) and is expropriating the property of ML Fashion. By and large, the allegations fall into four broad categories.

---

[2] This Court later ordered Plaintiffs to explain how the complaint states a claim under the Lanham Act. *See* 9/3/20 Order (Dckt. No. 12).

[3] Plaintiffs filed an amended complaint on November 16, 2020, more than two months after filing the motion for a temporary restraining order and a preliminary injunction on August 31, 2020. Plaintiffs did not file an amended motion. So Plaintiffs did not move for immediate equitable relief based on the new claims in the amended complaint.

5

First, the complaint alleges that Defendants took possession of property that belongs to ML Fashion. Defendants "illegally seized computers, fixtures, clothing and other inventory owned by ML Fashion." *See* Am. Cplt., at ¶ 2. "In or about August 2020, Nobelle,[4] Menkin, and Nagrani[] seized ML Fashion's inventory, private brands, and products (the 'Inventory') out of ML Fashion's locations in Illinois and began occupying and operating a retail store at the Greenwich Property in Connecticut under the 'Nobelle' brand name to sell the Inventory, all without Lemonis'[s], ML Fashion's or ML Retail's authorization or consent." *Id.* at ¶ 80.

Second, the complaint alleges that Nobelle is using ML Fashion's fixtures, furniture, and equipment at the Greenwich property. *Id.* at ¶¶ 2, 56, 85. That is, the new company is using the fixtures, furniture, and equipment left behind by ML Fashion when it exited the storefront. That property is the collateral for a multi-million dollar loan between ML Retail and ML Fashion, that is, a loan from one Plaintiff to another. *Id.* at ¶ 56.

Third, the complaint alleges that Defendants are selling ML Fashion's property. Defendants allegedly are "selling ML Fashion's inventory at that competing retail store for Defendants' own benefit." *Id.* at ¶ 2. "Nobelle, Menkin, and Nagrani are selling ML Fashion's Inventory at the Greenwich Property without ML Fashion's authorization or consent, and are keeping the proceeds from such sales for themselves, without making any payments to ML Fashion." *Id.* at ¶ 84. So Nobelle is selling clothing that belongs to ML Fashion.

Finally, the complaint contends that Defendants are competing against ML Fashion by selling clothes in Greenwich, Connecticut. *Id.* at ¶ 2 (alleging that Nobelle is in "direct competition" with ML Fashion); *id.* at ¶ 110 (same). ML Fashion sells clothes at a MARCUS store in New York City. An hour's drive away.

---

[4] Perhaps Plaintiffs meant Goureau instead of Nobelle (the store).

6

## Analysis

Temporary restraining orders and preliminary injunctions are extraordinary and drastic remedies that "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original, citation omitted). The party seeking such relief must show (1) a likelihood of success on the merits; (2) an inadequate remedy at law; and (3) an irreparable harm that is likely without the requested relief. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020). If the moving party fails to satisfy any of the threshold requirements, the Court must deny the request for relief. *See Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the U.S.A., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008).

A movant must do better than show a "better than negligible" chance of success. *See Illinois Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020) ("We note this to remind both district courts and ourselves that the 'better than negligible' standard was retired by the Supreme Court."); *see also Winter*, 555 U.S. at 20–21. A "possibility of success is not enough." *Illinois Republican Party*, 973 F.3d at 763. The movant "need not show that it definitely will win the case," which would "spill too far into the ultimate merits." *Id.* But the showing must be "strong" nonetheless, and include a "demonstration of how the applicant proposes to prove the key elements of its case." *Id.*

If the moving party makes that threshold showing, the next step is a balancing analysis. The Court must "weigh the harm the denial of the preliminary injunction would cause the plaintiff against the harm to the defendant if the [C]ourt were to grant it." *Mays*, 974 F.3d at 818. "This balancing process involves a 'sliding scale' approach: the more likely the plaintiff is to win on the merits, the less the balance of harms needs to weigh in [her] favor, and vice

7

versa." *Id.* Where appropriate, the Court's balancing process should also consider the public interest, that is, "any effects that granting or denying the preliminary injunction would have on nonparties." *Girl Scouts*, 549 F.3d at 1086. "[T]he moving party bears the burden of showing that a preliminary injunction [or TRO] is warranted." *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1068 (7th Cir. 2018).

The decision rests on the district court's discretion, based on a preliminary look at the merits and an assessment of the likely outcome with and without an injunction. "Taking into account all these considerations, the district court must exercise its discretion 'to arrive at a decision based on a subjective evaluation of the import of the various factors and a personal, intuitive sense about the nature of the case.'" *Girl Scouts*, 549 F.3d at 1086 (quoting *Lawson Prods., Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1436 (7th Cir. 1986)). "The sliding scale approach is not mathematical in nature, rather 'it is more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief.'" *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 895–96 (7th Cir. 2001) (quoting *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 12 (7th Cir. 1992)). "Stated another way, the district court sits as would a chancellor in equity and weighs all the factors, seeking at all times to minimize the costs of being mistaken." *Stuller v. Steak N Shake Enters.*, 695 F.3d 676, 678 (7th Cir. 2012) (cleaned up).

The Court concludes that Plaintiffs have not carried their burden on any of the elements, let alone all of them. Plenty of question marks cast a shadow over the likelihood of success. Even if Plaintiffs were to prevail, there is an adequate remedy at law, and Plaintiffs would suffer no irreparable injury in the meantime. Overall, the windy complaint feels overblown.

By and large, Plaintiffs offer generalities, not specifics. And they did not support their factual allegations with evidentiary support, either. Plaintiffs did not file a declaration or an affidavit with their motion. Defendants, on the other hand, offered a declaration from Menkin (Dckt. No. 19-1) and from Goureau (Dckt. No. 19-2). Plaintiffs did offer a declaration of Lemonis in the reply (Dckt. No. 20-1), but it is limited in scope and general in content.

True, Plaintiffs did not have the benefit of full-blown discovery before they filed their motion. Still, if the allegations have any merit, Plaintiffs should have been able to muster more evidentiary support, even without discovery. The Court is left with generalities from the Plaintiffs, and specifics from the Defendants. And the specific triumphs over the general.

*The Inventory*

A good example is the allegation about the inventory. Plaintiffs allege that unidentified "assets and Inventory belonging to ML Fashion were removed from various locations in Illinois . . . and now are located in the Nobelle store[.]" *See* Am. Cplt., at ¶ 81 (Dckt. No. 35). But Plaintiffs are short on specifics, and there is no evidentiary support, either. The motion puts a little more meat on the bone, but not much. *See* Mem. in Support of Mtn., at 6 (Dckt. No. 7) ("Included among the Inventory Menkin and Goureau removed from ML Fashion's Illinois stores are exclusive, privately-branded ML Fashion products."); *see also* Am. Cplt., at ¶ 81 (referring to "sweaters" from a store in Deerfield, Illinois). Surely Plaintiffs must know what inventory was taken – they must have had *some* idea before filing the complaint. The Court is left wondering what inventory was taken, and when, and how, and how much it is worth.

Defendants, for their part, came forward with declarations. Defendant Menkin declared under penalty of perjury that the "items from ML Fashion account for only five percent of Nobelle's total inventory." *See* Menkin Decl., at ¶ 13 (Dckt. No. 19-1). Menkin and Nagrani

9

"purchased 95% of the inventory that Nobelle holds with our own funds." *Id.* at ¶ 18. And the five percent "consists of tee shirts, one style dress, and two to three styles of sweaters." *Id.* at ¶ 13. A pallet of sweaters and t-shirts isn't the stuff of emergency injunctive relief, especially when they aren't going anywhere.

There is a dispute about whether Defendants were authorized to possess that inventory in the first place. Plaintiffs allege that it was improperly seized, but Defendant Menkin claims that Lemonis authorized her to possess the inventory. *See* Menkin Decl., at ¶¶ 10–13 (Dckt. No. 19-1). She attached supporting emails and texts. *See generally* Dckt. No. 14.

Maybe there is more to the story, but at first blush, the communications give the impression that Lemonis knew that Menkin was starting a business and obtaining property from the warehouse. She sent an email proposing a shipment from the warehouse totaling $134,722, and Lemonis responded "[a]bso[l]ute[l]y." *See* Dckt. No. 14-1, at 5–6 of 10.[5] On January 19, 2020, Lemonis sent texts saying "[b]esides front door what else have you shipped to *your new location*. Want to keep air tight records." *See* Dckt. No. 14-1, at 8 of 10 (emphasis added). And: "*We have to make sure you have something to sell*. . . . What about warehouse ? [sic]" *Id.* (emphasis added).

Plaintiffs argue that the parties were simply negotiating and that they never reached a deal. *See* Lemonis Decl., at ¶¶ 5–8 (Dckt. No. 20-1). Maybe so. But even if Plaintiffs prevail on that point, there is an adequate remedy at law. ML Fashion could recover damages for any misappropriated property. *See Roland Machinery Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984); *In re Aimster Copyright Litig.*, 334 F.3d 643, 655 (7th Cir. 2003) ("The only harm that is relevant to the decision to grant a preliminary injunction is irreparable harm, since if

---

[5] For some reason, the emails from Menkin seem to be missing some letters in a number of the words. For example, it says "sung asses" instead of "sunglasses," and "sh p" instead of "ship."

it is reparable by an award of damages at the end of trial there is no need for preliminary relief."). Or, perhaps Defendants would be willing to return voluntarily what doesn't belong to them. There is no basis for concluding that Plaintiffs will suffer an irreparable harm in the meantime. The clothing in question does not seem particularly important for the continuation of Plaintiffs' business.

Defendant Menkin also addressed the allegation that she is in the process of liquidating the disputed property. According to her declaration, Menkin "removed all of those items from Nobelle's sales floor the day we received the demand letter [dated September 1, 2020]." *See* Menkin Decl., at ¶ 13 (Dckt. No. 19-1). There is nothing in the record to suggest that Defendants are continuing to liquidate property belonging to Plaintiffs.

So, the Court is left with the conclusion that Defendants possess, at most, a relatively discrete amount of inventory belonging to ML Fashion. Defendants stated under oath that they are not selling that property, and Plaintiffs offer no basis to conclude that the inventory is for sale. On the current record, there is no reason to conclude that there is a continuing harm that requires immediate equitable relief.

### *The Fixtures, Furniture, and Equipment*

Another example of an insubstantial allegation is the notion that Defendants are using Plaintiffs' fixtures, furniture, and equipment. Plaintiffs never divulge what, exactly, Defendants are supposedly using, and why it is inflicting an irreparable harm.

But Defendants filled in the blanks. According to Menkin's declaration, ML Fashion vacated the storefront in Greenwich, Connecticut on or about May 12, 2020. *See* Menkin Decl., at ¶ 19 (Dckt. No. 19-1). ML Fashion "abandoned" the space. *Id.* at ¶ 20. It left some things behind, such as shelves, racks, and light fixtures. *Id.* And to top it off, ML Fashion returned the

11

key to the landlord and "confirmed with the landlord that it was abandoning the location, that the lease was terminated, and that any items left behind were abandoned." *Id.* at ¶ 21. Months later, in mid-August 2020, Nobelle moved in. *Id.* at ¶ 9.

In response, Plaintiffs offer no countervailing evidence. They don't even address the compelling points about the abandonment of the property. Their silence in the face of a persuasive declaration says a lot.

It is more than a little difficult to see why Plaintiffs should receive emergency equitable relief to prevent the use of some lights and shelving. Plaintiffs claim that the fixtures, furniture, and equipment were the "collateral for a multi-million dollar loan." *See* Am. Cplt., at ¶ 56 (Dckt. No. 35); *see also id.* at ¶ 87. But Defendants are using it, not selling it. And if Plaintiffs abandoned the property, it probably wasn't worth all that much anyway.

Plaintiffs argue that Defendants are "operating a business at a location at which they have no legal right to be." *See* Mem. in Support of Mtn., at 14 (Dckt. No. 7). But Defendants offered evidence that they leased the property after ML Fashion moved out. *See* Menkin Decl., at ¶ 22 (Dckt. No. 19-1) ("Nobelle has an entirely new lease for the space which the company is paying for with its own funds."). It is hard to see how Nobelle's renting of the storefront under a new lease could be an "improper occupation and use of the Greenwich Property," defined as 85 Greenwich Avenue in Greenwich, Connecticut. *See* Mem. in Support of Mtn., at 4, 7 (Dckt. No. 7). A new lease of a vacant property is not an invasion.

Overall, Defendants offered evidence that ML Fashion moved out and left property behind, and formally abandoned what was left. Plaintiffs mustered nothing in response. The Court is left with the conclusion that fixtures, furniture, and equipment weren't that important

12

when ML Fashion left the building. And after abandoning the property, ML Fashion presumably does not continue to own that property anyway.

### *The Computer(s)*

In a similar vein, Plaintiffs allege that Defendants misappropriated "computers" (plural) that "contain ML Fashion's confidential, proprietary, and trade-secret information." *See* Am. Cplt., at ¶ 95 (Dckt. No. 35); *see also id.* at ¶¶ 91, 108, 109. Plaintiffs go so far as to call the computers "stolen." *Id.* at ¶ 95.

It is unclear how many computers there are, let alone what confidential information they contain. And how, exactly, did Defendants allegedly come to possess the computer(s) in question? In her declaration, Defendant Menkin says that she lost access to the company computers in the Spring of 2020. *See* Menkin Decl., at ¶ 8 (Dckt. No. 19-1). But maybe not *physical* access. Defendants apparently did possess one computer that possibly belonged to ML Fashion, one way or another. Defendants contend that the computer was "abandoned." *See* 9/1/20 Letter (Dckt. No. 35-8).

Even so, Defendants offered to return the computer in their letter to Plaintiffs' counsel on September 1, 2020. *See* Defs.' Resp., at 13 (Dckt. No. 19); 9/1/20 Letter (Dckt. No. 35-8). "[O]ur clients have agreed to return the computer to ML Fashion." *See* 9/1/20 Letter. And apparently, Plaintiffs took a pass. One month later, defense counsel sent another letter, noting that Plaintiffs did not accept the invitation to return the computer. *See* 10/2/20 Letter (Dckt. No. 35-9). It is a bit of a mystery why Plaintiffs did not take Defendants up on their offer.

The amended complaint suggests that Plaintiffs demanded the return of the computer(s). *See* Am. Cplt., at ¶¶ 112, 114. But the correspondence suggests otherwise. If Plaintiffs actually demanded the return of the computer(s), they could have attached supporting correspondence –

13

like Defendants did. But the only documents in the record memorialize an offer by Defendants that Plaintiffs seemingly rebuffed.

Equity helps those who help themselves. *See Paterson–Leitch Co., Inc. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985, 989 (1st Cir. 1988) ("Courts, like the Deity, are most frequently moved to help those who help themselves."); *see also Dam v. Gen. Elec. Co.*, 144 F. Supp. 175, 181 (E.D. Wash. 1956) ("Ordinarily, equity puts out its assisting arm only to those who have shown a disposition to help themselves."). Courts are unlikely to come to the relief of litigants who demand emergency injunctive relief but sit on their hands. *See Lantz v. C.I.R.*, 607 F.3d 479, 483 (7th Cir. 2010) ("'[E]quity aids the vigilant, not those who sleep on their rights.'"); 11A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure* § 2946 (3d ed. 2020) ("In accord with the discretionary character of the injunction remedy and the venerable maxim that 'equity aids the vigilant, not those who slumber on their rights,' a plaintiff who is guilty of laches will be denied an injunction.") (citation omitted); *Legal Maxims*, Black's Law Dictionary (11th ed. 2019) ("*Vigilantibus et non dormientibus jura subveniunt*. The laws aid the vigilant, not those who sleep.").

Plaintiffs did not pursue the return of the computer when they had the chance. The apparent unwillingness of Plaintiffs to accept the return of a computer – supposedly chock-full of confidential information – suggests that the contents of the computer are not all that important. At the very least, it is not so important that it requires immediate injunctive relief.

### *Competition*

Even the core allegation of the complaint – competition by Nobelle – is insubstantial. Over and over again, Plaintiffs proclaim that Nobelle is a "competing retail business." *See* Am. Cplt., at ¶ 3 (Dckt. No. 35); *see also id.* at ¶ 2 ("in direct competition with ML Fashion"); *id.* at

14

¶ 79 (a "competing clothing store"); *id.* at ¶ 110 ("in direct competition with ML Fashion"); *id.* at ¶¶ 128, 136–37.

But once again, the general allegations are unadorned with specifics. How, exactly, is Nobelle competing with the ML Fashion stores? Simply by selling clothes? Do they sell the same products? Or, similar products with a similar style? Or what? The exhibits to the amended complaint include screenshots from the Nobelle website, and its pages on Instagram and Facebook. *See* Dckt. Nos. 35-4 to 35-6. They show glamorous people in fashionable attire, but they don't include any mention of ML Fashion or any of its products. *Id.*

Defendants, for their part, respond with specifics. "Nobelle does not carry the same products that ML Fashion or MARCUS stores carry." *See* Menkin Decl., at ¶ 14 (Dckt. No. 19-1); *see also id.* at ¶ 18 ("The brands we purchased for Nobelle are not MARCUS label brands or brands that only MARCUS stores can sell."). Nobelle "caters to a different clientele than MARCUS." *Id.* at ¶ 15. The "marketing scheme" is "new, unique, and not like any other store." *Id.* "MARCUS is a luxury high-end retail store and we focus on unique ready-to-wear items." *Id.*

And Nobelle is competing with what, exactly? All of the retail stores operated by ML Fashion? Some of them? The one in New York? Or the one in (an unidentified town in) Connecticut?

Location matters, and so does geography. In the reply brief, Defendants offer a declaration from Lemonis. And he points to one and only one store: a MARCUS store in the meatpacking district in Manhattan. *See* Lemonis Decl., at ¶ 3 (Dckt. No. 20-1). The amended complaint points to that store, too. *See* Am. Cplt., at ¶ 53 (Dckt. No. 35). So the Court assumes that the case is about competition between the MARCUS store in New York City and the

15

Nobelle store in Greenwich, Connecticut. The Greenwich store is "approximately one hour away." *See* Lemonis Decl., at ¶ 3.

According to Lemonis, based on his "years of experience in the retail clothing industry," a "consumer of MARCUS brand products from the Manhattan store would consider the products that Nobelle is selling at the Greenwich store when deciding where to purchase clothes." *Id.*

Surely there are thousands of retail stores selling clothes in the greater New York City area. The city is chock-full of fashion. And the internet overflows with clothing for sale. The Court is no expert in this area, and does not have its finger on the pulse of the fashion industry. But it seems unlikely that very many shoppers will visit a clothing store in Manhattan, and then hop in a car and drive for an hour to Greenwich, Connecticut to do some comparison shopping.

To the extent that there is any competition at all, it seems modest, at best. Nothing in the record supports the notion that Nobelle is inflicting any immediate, real-world harm on any of ML Fashion's stores. ML Fashion offers no concrete showing of a loss of business or a loss of customers. The competition seems theoretical. And in any case, it's hard for a big established business to persuasively complain about the crippling competition from a tiny startup.

There does not appear to be competition online, either. According to Menkin, "Nobelle does not sell goods through the internet." *See* Menkin Decl., at ¶ 16 (Dckt. No. 19-1). Plaintiffs did attach pages from Nobelle's website, which appear to show an ability to order online. *See* Dckt. No. 35-7. But the Court attempted to visit the website, and was unable to do so. In any event, Plaintiffs have not made a showing that Nobelle's presence on the vast internet – with a world of fashion possibilities at the user's fingertips – would make an ounce of competitive difference.

16

Plaintiffs repeatedly point to the fact that ML Fashion has employees, and that the "jobs of the existing part-time and full-time employees are jeopardized." *See* Am. Cplt., at ¶ 88; *see also id.* at ¶¶ 2, 3, 115, 139, 175, 181, 222. On the current record, there is no reason to believe that the existence of Nobelle places any of those jobs at risk. The allegation seems implausible. ML Fashion has over 40 stores across the country – run by a prominent, well-established business person – and Nobelle is a start-up that is trying to get off the ground in the midst of a pandemic. The notion that Nobelle is threatening the "continuing viability of ML Fashion" is a bit of a stretch. *See* Mem. in Support of Mtn., at 1 (Dckt. No. 7).

### *Other Issues*

Other questions cloud the likelihood of success on the merits, too. The amended complaint includes a fraud claim, but it is non-descript, and does not appear to satisfy the particularity requirements of Rule 9. *See* Am. Cplt., at Count IV (Dckt. No. 35). The amended complaint also includes a fiduciary duty claim. *See* Am. Cplt., at Count II. But ML Fashion, LLC is a Delaware limited liability company, and fiduciary duties do not exist by default for non-managing members. *See, e.g.*, *Beach to Bay Real Estate Ctr. LLC v. Beach to Bay Realtors Inc.*, 2017 WL 2928033, at *5 (Del. Ch. July 10, 2017) ("[I]t is well settled that only managing members or controllers owe fiduciary duties by default in LLCs."); *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 662 (Del. Ch. 2012) ("Managers and managing members owe default fiduciary duties; passive members do not."). Plaintiffs do not make the case that Defendants are managing members – if anything, the amended complaint alleges the opposite – and they point to no language in the LLC Agreement creating fiduciary duties. Also, the viability of the claims under the Lanham Act remains to be seen, and the same is true of the tortious interference claims. It is not obvious that the alleged use of ML Fashion's property by Nobelle could give rise to a claim

that Defendants are tortiously interfering with agreements *between the two Plaintiffs*. *See Prince v. Zazove*, 959 F.2d 1395, 1397 (7th Cir. 1992) (noting that a tortious interference claim involves a contract "between the plaintiff and a third party"); *McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 685 (7th Cir. 2014) ("An action for tortious interference with contract requires the plaintiff to prove that the defendant induced a third party to breach a contract."). Those illustrative issues are on top of serious questions about personal jurisdiction and venue.

The Court makes no ruling on those issues, but can spot enough hurdles to have doubts about the likelihood of success. Even if the claims were viable, Plaintiffs could recover damages, so there is an adequate remedy at law. And there is no real-world reason to believe that Plaintiffs would suffer irreparable harm in the meantime.

Finally, the requested relief is disproportionate, too. Plaintiffs do not merely ask to preserve the status quo, and prevent the Defendants from dissipating ML Fashion's assets. *See Indiana Civil Liberties Union v. O'Bannon*, 259 F.3d 766, 770 (7th Cir. 2001) ("A preliminary injunction is an extraordinary remedy intended to preserve the status quo until the merits of a case may be resolved."); *Benisek v. Lamone*, 138 S. Ct. 1942, 1945 (2018) ("[The] purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."). Instead, Plaintiffs ask this Court to force Nobelle to close up shop. In their proposed order, Plaintiffs ask this Court to enjoin Defendants from "operating a retail business at the Greenwich Property," "occupying or possessing the Greenwich Property," and "engaging in business activities in competition with ML Fashion's business activities, including by operating Nobelle." *See* Proposed Order, at ¶ 15 (Dckt. No. 6-1).

Plaintiffs want this Court to put Nobelle out of business before Plaintiffs prove their case. From an equitable perspective, the magnitude of that potential harm to Nobelle weighs against

18

preliminary relief, especially when compared to the marginal risk to one of ML Fashion's 40+ stores if Nobelle is allowed to continue to operate. *See Stuller*, 695 F.3d at 678 (instructing courts to "weigh[] all the factors, seeking at all times to minimize the costs of being mistaken").

## Conclusion

In sum, Plaintiffs have not carried their burden to show a likelihood of success on the merits, an adequate remedy at law, and an irreparable injury. If anything, the scales tip the other way. The motion is denied.

Date: January 19, 2021

Steven C. Seeger
United States District Judge