**IN THE UNITED STATES DISTRICT COURT FOR THE**
**NORTHER DISTRICT OF ILLINOIS**

| | |
|---|---|
| ML FASHION, LLC, and ML RETAIL, | |
| Plaintiffs, | |
| v. | C.A. No. 1:20-cv-05124 |
| NOBELLE, STEPHANIE MENKIN, SARIT MAMAN NAGRANI, and NICOLAS GOUREAU, | |
| Defendants. | |

**DECLARATION OF STEPHANIE MENKIN IN SUPPORT OF DEFENDANTS'**
**RESPONSE TO THE COURT'S QUESTIONS IN ITS JANUARY 19, 2021 MINUTE**
**ORDER (DKT. NO. 55)**

I, Stephanie Menkin, hereby declare as follows:

1.　　I am over the age of eighteen and a defendant in this case.  I make this declaration in support of Defendants' Defendants' Response To The Court's Questions In Its January 19, 2021 Minute Order (Dkt. No. 55).  I have personal knowledge of the matters stated herein and, if called upon, I could and would competently testify thereto.

2.　　The inventory that I received from ML Fashion and Marcus Lemonis, as authorized by Lemonis, was inventory that did not sell in ML Fashion or Lemonis' stores.  The inventory had been offered in MARCUS stores at up to 40% off, then moved to an ML Fashion discount store where it was offered at up to 75%.  After that, the items were moved to one Lemonis' other companies, Front Door Fashion where it was styled into subscription boxes for their subscribers.

3.　　What was left over and had never been sold was sent to me.  By the time I received the inventory, its value had greatly depreciated from its original cost.  In addition, the items had gotten dirty, had some damage, and was in the bottom of the barrel in terms of style and fit.

4.　　Moreover, the inventory that was sent to me was old and was mainly broken sizes or single items.  For example, I received one style of a dress in size Large only.  This is an issue because if someone who is not a size Large wants the item, we cannot provide them something in their size and lose the sale.  However, after I was cut off from ML Fashion, I was struggling financially and felt that I needed to include the inventory that worked for Nobelle's brand in Nobelle's store.

5.　　I received Plaintiffs' demand letter on August 31, 2020 and promptly removed any items that ML Fashion and Lemonis had provided to me.  Before receiving the demand letter, I did not know that ML Fashion or Lemonis claimed that any of the inventory items they had given to me still somehow belonged to ML Fashion.  I removed all of the inventory in question from the

sales floor when I received Plaintiffs' demand letter. This inventory had only been on the sales floor at Nobelle for approximately fourteen days before I removed it.

6.    The remaining items, with their original costs, are detailed below. Again, the items have greatly depreciated from their original costs, and in all, based on my expertise in the retail and fashion industries, I believe is now valued at roughly $600.

- 25 Sweaters: original cost $550 total
- 10 Tees/Tanks: original cost $100 total
- 1 Button Down Shirt: original cost $200 total
- 15 Dresses: approximate original cost $1,275 total

7.    After I removed the items listed above from the sales floor, I learned that Plaintiffs had filed this instant action the same day they sent the demand letter. As litigation was pending, I did not feel comfortable returning the items without going through the proper Court channels.

8.    I consigned the inventory that I received from ML Fashion and Lemonis to Nobelle to sell. As the consignment vendor, I received 50% of the amount that Nobelle sold the inventory for. Nobelle started selling clothing on August 15, 2020, and removed the inventory in question from the sales floor on August 31, 2020. In that time period, Nobelle sold $6,812.32 of the inventory I consigned, and I received $3,397.91 from those sales. Attached as **<u>Exhibit 1</u>** is a true and correct copy of Nobelle's sales report showing these items being sold.

9.    That said, I would like to note to the Court that the issues regarding my separation from ML Fashion are currently being litigated in the Delaware action. In that action, my brother and I have asked for judicial dissolution of ML Fashion which I understand would include an accounting of the company's assets and potential distribution to members. I believe the inventory I was given from ML Fashion and Lemonis may be subject to that process.

10.    I was also unaware that ML Fashion claimed to still own any of the FFE that it had abandoned at the Greenwich location. That FFE was abandoned by ML Fashion and left in the

space when ML Fashion moved out and returned the key to the space to the landlord.  In June, I received a photograph of the Greenwich space taken by a friend who works in the area.  This photo, taken on June 19, 2020 is attached hereto as **<u>Exhibit 2</u>**.  The photos show the storefront covered up, MARCUS signage removed, and the space for rent.

11.     Defendant Nagrani and I had not begun discussing starting a new business venture together until after ML Fashion had abandoned the Greenwich location.  When I learned that the space was available for rent, I began thinking about opening a store there as I was familiar with the location and consumers there.  On or around July 15, 2020, Nobelle entered into a new lease for the space and took the space as-is.  A true and correct copy of the lease agreement is attached hereto as **<u>Exhibit 3</u>**.

12.     The laptop computer at issue is from 2009 and originally belonged to Gooberry Corp., the company that my brother and I ran the brand Courage.B out of prior to our involvement with Lemonis.  The username on the account on the computer was Nicolas because Defendant Goureau was the CEO of Gooberry.  Though the computer was used by different employees in the company, the username of Nicolas was never changed.  Attached hereto as **<u>Exhibit 4</u>** is a true and correct copy of a screenshot showing the system information for the laptop computer.

13.     Since 2017, the laptop computer was being used by ML Fashion's part-time bookkeeper, Nelly Bose.  At the beginning of the pandemic, in March 2020, ML Fashion furloughed Ms. Bose.  No one at ML Fashion made any attempt to get the computer used by Ms. Bose so she delivered the laptop computer to me because she did not want to keep it.  Around the same time, I was cut off from ML Fashion.  No one from ML Fashion ever contacted me about the laptop computer.

14. When I opened Nobelle the budget for the store was very tight. Again, I was cut-off from ML Fashion, was strapped for money and could not put a lot of capital into the business. I attempted to find a reasonably priced laptop that could run Nobelle's point-of-sale system. However, due to the pandemic and tons of people having to work from home and school their children at home, the price of laptops increased due to the sudden demand. As a result, I could not find a laptop that would fit my budget and run the point-of-sale system. Because the store needed a computer, I decided to use the laptop computer that ML Fashion had abandoned.

15. When I began using the laptop computer for Nobelle, I did not access any files or programs that were already on the computer. All I did was install Nobelle's point-of-sale system. I was the only person who used the laptop computer. As I never looked for any ML Fashion information, I am unaware of what ML Fashion information, if any, exists on the computer.

16. In addition, ML Fashion had abandoned a desktop computer used by a former employee in ML Fashion's New York office. Similarly, that employee was furloughed at the beginning of the pandemic, and ML Fashion never made any attempt to obtain the computer. Nobelle used this desktop computer as the front end for Nobelle's point-of-sale system at the store. Employees would ring in the purchases and it would tie into the point-of-sale system on the laptop computer. Once I received Plaintiffs demand letter, I removed the desktop computer from the stores and Nobelle purchased another computer with its own independent funds.

17. At no point did Defendant Goureau access the laptop computer or the desktop computer at issue. Again, the username on the computer is Nicolas solely because the computer used to be used by Gooberry. Goureau has absolutely no involvement in Nobelle. Attached hereto as **Exhibit 5** is a true and correct copy of Nobelle's July 9, 2020 Resolution showing the members of Defendant Nobelle as me and Defendant Nagrani.

18.     It is my understanding that there was a technical error in an e-mail where Lemonis authorized my use of the inventory in question that was filed with the Court by Plaintiffs on September 9, 2020.  (Dkt. No. 14-1.)  As such, attached hereto as **Exhibit 6** is a true and correct copy of that January 24, 2020 e-mail correspondence without the technical errors.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 3rd day of February 2021 at New York, NY          .

_____
Stephanie Menkin


EXHIBIT 1



EXHIBIT 2



EXHIBIT 3

This Commercial Lease Agreement ("Lease") made this ___ day July 2020 and between **Sutton Land LLC**, a Florida limited liability company, having an office at 87 Greenwich Avenue, Greenwich, CT 06830, ("Landlord") and Nobelle GW, LLC, a New York limited liability company, having offices at 1498 Kew Avenue, Hewlett, N.Y. 11557 hereinafter referred to as the Tenant.

Landlord is the owner of the land and improvements commonly known, numbered and designated as follows:  83-89 Greenwich Avenue, Greenwich, Connecticut 06830 ("Building").

Landlord hereby leases the portion of the Building known as 85 Greenwich Avenue consisting of 1,081± square feet and 200± square feet of basement space (the "Leased Premises") for the term, at the rental rate, and upon the covenants, conditions and provisions herein set forth.

**THEREFORE**, in consideration of the mutual promises herein contained and other good and valuable consideration, it is agreed:

**1      TERM**

To have and to hold said Leased Premises unto the Tenant, its heirs, legal representatives and permitted assigns, for a term (the "Term") commencing on the commencement date of this Lease (the "Commencement Date") as herein defined and expiring on the expiration date (the "Expiration Date"), as hereinafter defined, unless said term shall sooner cease and expire pursuant to the terms, conditions or provisions of this Lease.

**The Lease Commencement Date is July 15, 2020.**

**The Rent Commencement Date is September 1, 2020.**

**The Expiration Date is July 31, 2023.**

**2      RENT**

2.01    The Tenant covenants and agrees to pay to Landlord during this Lease, without previous demand therefore and without any set off or deduction whatsoever, Rent, Additional Rent, charges and expenses as may be provided for herein, payable at the following annual rates monthly on the first day of each month.  The terms Rent and. Additional Rent may be collectively referred to as "Rent" when and as the term logically applies.

2.02    The Base Rent for the Lease Term is equal to **$318,816.00** payable as follows:

**Commencing September 1, 2020: Six Thousand Hundred Dollars ($6,000.00) Monthly**

**Commencing October 1, 2020: Seven Thousand Five Hundred Dollars ($7,500.00) Monthly ($15,000.00 for 2 months)**

**Commencing December 1, 2020 through July 31st 2021: Nine Thousand Dollars ($ 9,000.00) Monthly ($72,000.00 for 8 months)**

**Commencing August 1, 2021 through July 31st 2022: Nine Thousand Two Hundred Seventy Dollars ($ 9,270.00) Monthly ($111,240.00 annually)**

**Commencing August 1, 2022 through July 31st 2023: Nine Thousand Five Hundred Forty-Eight Dollars ($ 9,548.00) Monthly ($114,576.00 annually)**

**Said rent and any additional rent as defined herein shall be paid at the offices of Sutton Land LLC, 87 Greenwich Avenue, Greenwich, CT 06830, or as may be otherwise directed by the Landlord in writing** at least ten (10) days prior to the date the same is due.

**2.03 OPTION TO RENEW**: Upon giving not less than six (6) months written notice to Landlord prior to the expiration of the Original Lease Term and provided that tenant is not in violation of any provision of this Lease, time being of the essence, Tenant shall have the right to renew for an additional three (3) year term.

It is expressly agreed that the base rent for the Option period is **$364,752.00** payable as follows:

**Commencing July 1, 2023 Nine Thousand Eight Hundred Thirty-Four Dollars ($ 9,834.00) Monthly ($118,008.00 Annually)**

**Commencing July 1, 2024 Ten Thousand One Hundred Twenty-Nine Dollars ($10,129.00) Monthly ($121,548.00 Annually)**

**Commencing July 1, 2024 Ten Thousand Four Hundred Thirty-Three Dollars ($10,433.00) Monthly ($125,196.00 Annually)**

2.04    Tenant shall pay the Landlord the sum of Eighteen Thousand Dollars ($18,000.00) to as a Security Deposit for Tenant's faithful performance of all of the terms, covenants, conditions, and obligations required to be performed by Tenant hereunder.  If said option to renew is exercised, the Tenant agrees to increase the amount of the Security Deposit at that time, consistent with twice the average monthly rent then payable upon request by the Landlord.  After notice, should Tenant default in its performance of any such terms, covenants, conditions, or obligations, Landlord may, from time to time and without prejudice to any other remedy, (i) apply the Security Deposit to the extent necessary to make good any arrearages of Rent; or to pay any sums owed to Landlord by Tenant; and (ii) pay for any damage, injury, expense, or liability sustained by Landlord as a result of any default, including, but not limited to, any actual damages or deficiencies incurred in the re-letting of the Premises, and any actual attorneys' fees associated therewith, regardless of whether the accrual of such damages or deficiencies occurs before or after an eviction.  Should Landlord use all or any portion of the Security Deposit to cure any default by Tenant, Tenant shall be required to replace and replenish all or any portion of the Security Deposit used in connection with such cure within ten (10) days from Tenant's receipt of written demand by Landlord therefor.  Failure by Tenant to replace or replenish the Security Deposit within said time shall constitute an Event of Default and shall enable Landlord to resort to any of its remedies hereunder, at law or in equity.  The Security Deposit shall not be considered an advance payment of Rent nor a measure of Landlord's damages in case of default by Tenant.  Landlord shall not be required to account separately for the Security Deposit and may commingle same with any of Landlord's funds.  If Tenant performs all of its obligations hereunder, the Security Deposit shall be returned without payment of interest thereon to Tenant within thirty (30) days after the Expiration Date or earlier termination of this Lease.

2



2.04   If Tenant fails to make when due two (2) consecutive payments of Monthly Rent or makes two (2) consecutive payments of Monthly Rent which are returned to Landlord by Tenant's financial institution for insufficient funds, Landlord may require, by giving written notice to Tenant, that all future payments of Rent shall be made in cashier's check or by money order.  The foregoing is in addition to any other remedies of Landlord hereunder, at law or in equity.

## 3   USE

The Tenant covenants and agrees to use the demised premises as a store selling ladies apparel and accessories. A violation of this Use provision shall be considered a material breach of this Lease by the Tenant and be the basis of a Notice to Terminate the Lease by the Landlord, after any applicable notice and cure period, and any failure of the Landlord to enforce this provision with respect to any such breach shall not constitute a waiver to enforce this provision as to any subsequent breach.

4.02   Tenant may not sublet portions, the whole or substantially the whole of the Leased Premises without the prior written consent of the Landlord. All subleases made by the Tenant shall be, and are hereby, assigned to the Landlord with the privilege, however, on the part of Tenant to collect the rents and charges under such subleases so long as Tenant is not in default under this Lease.  In no event may Tenant collect any advance rent for a period beyond a current month, and Tenant covenants not to make any such advance collections of rent. Such assignment of any subleases does not hereby impose any liability on Landlord in respect to the Tenant's obligations under such leases; and no such liability shall arise unless and until Landlord resumes possession of the premises. Tenant agrees that any such sublease made by Tenant will contain a provision in substance calling attention to the assignment of the sublease as above set forth and the prohibition against the collection of advance rent beyond the period above set forth, and also the limitation of Landlord's liability under the assignment as above stated. Tenant further agrees that it will execute such further instruments and assurances in confirmation of the foregoing assignment of sublease as may be reasonably required by Landlord.  Tenant further agrees that each sublease made by Tenant will contain a provision in substance if there be any termination whatsoever of the within lease between the Landlord and Tenant, then the subtenant, at the request of the Landlord, will attorn to the Landlord and the sublease shall not continue in effect with the Landlord. However, in any event, the Landlord may be bound under the sublease only by agreement of the Landlord.

4.03   Tenant may not assign this Lease without the prior written consent of the Landlord which consent shall not be unreasonably withheld, conditioned or delayed, except that Tenant shall have the right to assign or sublet the premises to an affiliate, parent or successor entity of which control thereof shall be vested in 80% of the principal financial interests of the Tenant and who shall continue to be liable under this Lease. Any assignment should be for a personal service use that would be consistent with the character of the building and that would not negatively impact the neighboring spa space. Any consent shall be on condition that no assignment shall have any validity unless the assignee shall assume all agreements, undertakings, and covenants on the Tenant's part to be performed, and a duplicate original of such assumption agreement is delivered to the Landlord within ten (10) days before the making of the assignment.

4.04   Tenant shall pay Landlord any monies received from subletting and/or assigning this Lease including but not limited to rental in excess of that which Tenant is paying to Landlord. Tenant shall pay Landlord's reasonable attorney fees for review and/or preparation of subletting and/or assignment documents not to exceed $2,500.00.

3

4.05   Any transfer, by operation of law or otherwise, of Tenant's interest in this lease (in whole or in part) shall be deemed an assignment of this Lease within the meaning of this Article.

## 5   REPAIRS

Landlord shall be responsible for all repairs and maintenance of the Building and common areas, inclusive of sidewalks.  Except in the case of emergency, Tenant shall have the right to advance notice from the Landlord for any repairs on the Building and the right to schedule repairs at a time that is convenient for the Tenant.  Landlord may retain keys to Tenant's space to make emergency repairs.

During the Lease Term, Tenant shall make, at the Tenant's expense, all necessary non-structural repairs to the Leased Premises. Repairs shall include such items as mechanical systems, routine repairs of floors, walls, ceilings, and other parts of the Leased Premises damaged or worn through normal occupancy of Tenant. Tenant is responsible to repair any and all systems, which solely service the Leased Premises; Landlord shall be responsible for the replacement of any and all systems, however, the Tenant is responsible for the full repair and/or replacement of the entire system that was damaged solely by the Tenant, its employees, and/or its agents or if the system has been modified by the Tenant, which modification results in damage to the system; removal of its refuse, and for all of its utility services within the Leased Premises, at Tenant's sole cost and expense. Landlord shall be responsible for maintaining the structural systems, roof and common areas in a first class manner and for removal of ice and snow in the parking lot. In the case of plumbing within the space Tenant will not be responsible to repair a plumbing problem unless it is caused by the negligence of its employees or customers.

## 6   ALTERATIONS AND IMPROVEMENTS

6.01   Landlord shall deliver the premises "as is".

6.02   Tenant shall be responsible for properly filing with, and securing permits and certificates of occupancy, if required, from the Town of Greenwich and/or the State of Connecticut, for all of its improvements.

6.03   Tenant shall maintain at its expense the heating, ventilating and air-conditioning (HVAC) unit within the Leased Premises, which on the Commencement Date shall be in good working condition.

6.04   Tenant is solely responsible for the cost and expense of all interior lighting, flooring, painting, moldings, saddles, any and all partitions and any and all internal fit up construction.

6.05   Tenant, at Tenant's expense, shall have the right with the Landlord's prior written approval, which approval shall not be unreasonably withheld or delayed, to make alterations, additions improvements and replacements of and to all or any part of the Leased Premises from time to time as Tenant may deem desirable, provided the same are made in a workmanlike manner and utilizing good quality materials.

6.06   Tenant shall deposit its garbage in the designated trash container at the exterior of the Building. The cost of garbage removal shall be borne by Tenant.

6.07   Tenant's improvements shall include all work required to be done in preparing the Leased Premises so that it may be operated for Tenant's business, as well as alterations, decorations, installations, additions, or improvements to the Leased Premises occurring thereafter. Tenant covenants and agrees that all such Tenant's improvements shall be done at Tenant's full cost and expense, shall comply with all applicable governmental regulations, and such work shall be done only by licensed and insured contractors and mechanics with respect to whom Landlord has consented, which consent shall

4

not be unreasonably withheld or delayed, and shall be done in a manner which will assure labor harmony at the site. Tenant agrees to provide Landlord copies of all plans and specifications for such improvements, alterations, replacements or accessions and with the name of the general contractor and names of any subcontractors and mechanics that are to perform such work at least ten (10) calendar days in advance of the commencement of any such work. Landlord shall, within ten (10) calendar days of receipt of such notice from Tenant, notify Tenant as to whether Landlord consents to such plans, specifications, contractors, subcontractors, etc., which consent shall not be unreasonably withheld, conditioned or delayed, or whether such consent is withheld, in which case Tenant's contemplated construction shall not commence and Landlord's failure to respond within such time shall be deemed consent. Notwithstanding the aforesaid, Landlord's consent to Tenant's plans, specifications, contractors, subcontractors, etc., shall not be construed as Landlord's consent to Tenant causing work to be done in the Leased Premises in a manner or under conditions which entitle the person doing the work or furnishing the materials to a mechanic's or material man's lien. Tenant shall indemnify Landlord against liability in connection with any and all such mechanics' or materialmen's liens filed in connection with any such work. Notwithstanding the foregoing, if any mechanic's lien is filed against the Premises or the Landlord's Building for work claimed to have been done for, or materials claimed to have been furnished to Tenant, it shall be discharged by Tenant within thirty (30) days after Tenant has received actual notice thereof, at Tenant's expense, by filing the bond required by law, or by payment or otherwise. Tenant covenants and agrees to indemnify Landlord and hold Landlord harmless of and from any and all claims, costs, suits, damages and liability whatsoever arising out of or as a result of any such work done by Tenant or Tenant's contractors, subcontractors, agents or employees, including reasonable attorney's fees for the defense thereof. Landlord shall not be liable for any failure of any building facilities or services caused by alterations, installations and/or additions by Tenant for the cost thereof. Such sum due Landlord shall be deemed additional rent and shall be paid by Tenant promptly upon being billed therefore.

Prior to commencing any work pursuant to this provision, Tenant shall additionally furnish to Landlord: (i) copies of all governmental permits and authorizations which may be required in connection with such work; (ii) a certificate evidencing that Tenant for Tenant's agents or contractors has or have procured workers compensation insurance (if required by law) covering all persons employed in connection with the work who might assert claims for death or bodily injury against Landlord, Tenant or Landlord's Building; and (iii) such additional personal injury and property damage insurance as Landlord may reasonably require because of the nature of the work to be done by Tenant.

All Tenant improvements upon the Leased Premises and any replacements therefore, including all paneling, decorations, partitions, railings, plumbing or any other structure affixed to the realty, except furniture or movable trade fixtures, unless Landlord elects otherwise (by giving written notice to Tenant before or after Tenant vacates) shall become the property of Landlord and shall remain upon, and be surrendered with the Premises as a part therefore at the termination of this Lease, without compensation to Tenant; PROVIDED, HOWEVER, that in the event the Tenant makes any erections alterations, additions and improvements to the Leased Premises whether temporary or permanent in character, the Landlord shall have the option at the expiration of this Lease to require Tenant, at the Tenant's expense, to restore said premises to their condition at the commencement of the Term hereof, as if no erections, alterations, additions and improvements had been made, ordinary wear and tear excepted.

Notwithstanding the foregoing, provided that a new tenant shall not then be occupying the Leased Premises, the Tenant shall have a right to put up and keep in place a "new location" sign in the Leased Premises for a period of two weeks after surrendering the Leased Premises.

5

## 8  INDEMNIFICATION OF LANDLORD

The Tenant shall keep, save, and hold harmless the Landlord from any and all damages and liability for anything and everything whatsoever arising from or out of the occupancy of the Leased Premises by or under the Tenant, the Tenant's agents, servants or invitees, and from any actual loss or actual damage arising directly from any fault or negligence by the Tenant or any failure on the Tenant's part to comply with any of the covenants, terms and conditions herein contained.

## 9  CASUALTY INSURANCE: RESTORATION

9.01    Tenant shall maintain and pay for fire, smoke, water and casualty insurance for the Leased Premises and all alterations, extensions, and improvements thereto and replacements thereof, against loss or damage by fire and the risks contemplated within the extended coverage endorsements and against such other risks as shall reasonably be required by the Landlord, or as shall be reasonably required by any institutional lender holding a mortgage affecting the Landlord's interest in the Leased Premises pursuant to the terms of said mortgage, in such amounts as may be reasonably required by the Landlord, or as may be reasonably required by the holder of such mortgage pursuant to the term thereof, but in no event in an amount less than ninety (90%) percent of the replacement cost, from time to time, of the improvements to the Leased Premises. [Tenant's insurance should only be for its property and liability]. If Tenant's use (other than the use permitted by paragraph 3 hereinabove) causes an increase in Landlord's casualty insurance then Tenant shall pay to Landlord the cost and expense, as additional rent, of such additional premium to insure and keep insured, in reasonable insurance companies authorized to do business in the state where the Leased Premises are located, the Building on the Leased Premises. All policies of fire and other insurance as aforesaid shall be for the benefit of the Landlord, and with respect to property insurance policies, loss payable to the Landlord, and any institutional lender holding a mortgage on Landlord's interest in the Leased Premises, as their interests may appear. The interest of any such mortgagee shall be covered by the customary mortgage endorsement employed in this state.

9.02    A. If the Leased Premises or any part thereof shall be damaged by fire, smoke, water or other casualty, Tenant shall give immediate notice thereof to Landlord and this lease shall continue in full force and effect except as hereinafter set forth.

B. If the Leased Premises are partially damaged or rendered partially unusable by fire or other casualty and the same is not caused by Tenant, the rent and any other additional rent, until such repair shall be substantially completed, shall be apportioned from the day following the casualty according to the part of the Leased Premises rendered unusable, provided that the Tenant may continue to conduct its business in substantially the same manner as before casualty.

C. If the Leased Premises are substantially damaged or rendered substantially unusable by fire or other casualty not caused by the Tenant, then the rent and any additional rent shall be proportionately paid up to the time of the casualty and thenceforth shall cease until the date when the premises shall have been repaired and restored by the Landlord, subject to Landlord's right to elect not to restore the same as hereinafter provided.

D. If the Leased Premises are rendered substantially unusable or (whether or not the Leased Premises are damaged in whole or in part) if the building shall be so damaged that Landlord shall decide to demolish it or to rebuild it, then in any of such event, Landlord may elect to terminate this lease by written notice to Tenant given within sixty (60) days after such fire or casualty specifying a date for the expiration of the lease, which date shall not be more than 60 days after the giving of such notice, and upon the date specified in such notice the term of this lease shall expire as fully and completely as if such date were the date set forth above for the termination of this lease and Tenant shall forthwith quit,

surrender and vacate the Leased Premises without prejudice however, to Landlord's right and remedies against Tenant under the lease provisions in effect prior to such termination, and any rent owed shall be paid up to the date of the casualty and any payments of rent made by Tenant which were on account of any period subsequent to such date shall be returned to Tenant, together with the Security Deposit. Unless Landlord shall serve a termination notice as provided herein, Landlord shall make the repairs and restorations under the conditions of B and C hereof, with all reasonable expedition subject to delays due to adjustment of insurance claims, labor troubles and causes beyond Landlord's control. After any such casualty, Tenant shall cooperate with Landlord's restoration by removing from the premises, as promptly and as reasonably as possible, all of Tenant's salvageable inventory and movable equipment, furniture, and other property. Tenant's liability for rent shall resume five (5) days after a Certificate of Occupancy or Use has been issued by the Town of Greenwich Building department and the Premises are ready for Tenant's occupancy. If the major damage has not been caused by Tenant, Tenant shall have the right to terminate within thirty (30) days of the date the premises becomes unusable.

E. Nothing contained hereinabove shall relieve Tenant from liability that may exist as a result of damage from fire, smoke, water or other casualty caused by Tenant, its agents and/or employees. Notwithstanding the foregoing, each party may look first to any insurance in its favor before making any claim against the other party for recovery for loss or damage resulting from fire or other casualty and to the extent that insurance is in force and collectible and to the extent permitted by law, Landlord and Tenant each thereby releases and waives all right of recovery against the other or any one claiming through or under each of them by way of subrogation or otherwise. The foregoing release and waiver will be in force only if both releasers' insurance policies contain a clause providing that such a release or waiver will not invalidate the insurance and also, provided that such a policy can be obtained without additional premiums, Tenant acknowledges that Landlord shall not carry insurance on Tenant's furniture, and/or furnishing and any fixtures or equipment improvements or appurtenances removable by Tenant and agrees that Landlord shall not be obligated to repair any damage thereto or replace the same.

## 10  LIABILITY INSURANCE

Tenant shall provide for and pay the cost and expense, to carry general liability insurance for the benefit of Tenant, naming Landlord as additional insured, issued by an insurance company authorized to conduct business in the State of Connecticut, and has a Best Rating of A or better indemnifying Landlord against claims for personal injuries sustained in or about the Leased Premises, sidewalks, alleyways, driveways adjacent thereto, and exterior signs which are the responsibility of the Tenant to maintain or keep clean or safe in an amount not less than One Million ($1,000,000.00) Dollars for injuries or death to one person and Two Million ($2,000,000.00) Dollars for injuries or death arising out of the same accident where more than one person is involved, and for not less than Three Hundred Thousand ($300,000.00) Dollars in respect to property damage. The public liability insurance shall extend to any sidewalks, alleyways, driveways and exterior signs. Tenant shall not be liable for Landlord's negligence and/or its intentional acts that result in a claim.

## 11  UTILITIES

Tenant shall pay all charges for utilities serving the Leased Premises, during the term of this lease. Electricity and gas are metered separately so that Tenant shall pay for its use directly to the utility company. Water shall be supplied by Landlord.

## 12  SIGNS

With the Landlord's prior written consent, Tenant shall have the right, at its sole cost and expense, to place signage subject to Landlord's approval which shall not be unreasonably withheld or delayed. Landlord may refuse consent to any proposed signage that is in Landlord's reasonable opinion too large, deceptive, unattractive or otherwise inconsistent with or inappropriate to the Leased Premises or use of any other tenant. Landlord shall assist and cooperate with Tenant in obtaining any necessary permission from governmental authorities or adjoining owners and occupants for Tenant to place or construct the foregoing signage. Tenant shall repair all damage to and restore the Leased Premises resulting from the removal of signs or awning installed by Tenant. Tenant shall be obligated to conform to building rules and regulations pertaining to signage.

## 13  ENTRY

Landlord shall have the right during business hours with reasonable notice to Tenant, to enter upon the Leased Premises at reasonable hours to inspect the same, provided Landlord shall not thereby unreasonably interfere with Tenant's business on the Leased Premises. Landlord may enter premises at any time without notice to Tenant in matters of emergency.

## 14  PARKING

Landlord shall assign two reserved parking spaces for Tenant in the parking lot behind the leased premises.

## 15  COVENANTS OF LANDLORD

15.01  Landlord covenants with Tenant that Landlord has good right to lease said Leased Premises in the manner aforesaid. Tenant shall be entitled (Tenant keeping all the covenants on Tenant's part, as herein contained) to occupy, possess and enjoy said Leased Premises during the term aforesaid, without hindrance or molestation from Landlord or any person claiming by, from or under Landlord.

15.02  Landlord covenants that it will maintain the structure exterior and roof of the building and real property in good working order and make required repairs in a timely manner, unless repairs and/or replacement is due to Tenant's actions or cause.

15.03  The Landlord shall be responsible for the acts of the Landlord's agents or servants.

15.04  In the event of a breach or default by Landlord, in respect of any of its obligations  under this Lease, or otherwise relating to the tenancy or use of the Leased Premises by Tenant or to this Lease, Tenant shall look solely to the then equity of the then Landlord in said land and building comprising the Leased Premises for the satisfaction of each and every remedy of Tenant, such exculpation of personal and additional liability which is in excess of any such interest in the land and building comprising the Leased Premises being absolute and without any exception whatsoever.  Landlord shall have thirty (30) days to cure any and all breaches and defaults alleged by Tenant.  The thirty days for said cure shall commence on the day in which Landlord receives notice in writing from Tenant alleging the breach or default.  In the event said breach or default cannot be cured by Landlord within thirty days, Landlord will advise Tenant of such, and will be obligated to cure said breach or default within a reasonable time thereafter, however, in no event will said cure time be greater than one hundred and twenty (120) days from Tenant's written notice to Landlord.

8

15.05  Landlord shall maintain, including all repairs and replacements, if required, a central monitored Fire and Smoke Alarm System for the Leased Premises.

15.06  Landlord represents that, to the best of Landlord's knowledge, the Leased Premises are free of Hazardous Materials that, if known to State or Federal authorities, would result in mandatory remediation. Landlord agrees to release, indemnify and hold harmless Tenant, its agents, employees, officers and directors, from and against all claims, losses, demands, penalties, fines, liabilities, settlements, charges, damages or judgments of any kind, and all costs and expenses of whatever kind or nature (including but not limited to costs and expenses), arising out of or in any way related to:  (1) the violation of any Environmental Law y Landlord; (2) the presence, use, generation, storage or Release of Hazardous Materials in or on the Demised Premises caused by Landlord, or (3) the breach by Landlord of the representations of Landlord contained in this Section.  This indemnification shall survive the expiration or earlier termination of the Lease.

## 16  COVENANTS OF TENANT

16.01  Tenant covenants with Landlord to hire said Leased Premises and to pay the Base Annual Rent and Additional Rent therefor, as hereinbefore and hereinafter set forth, that Tenant will commit no  waste, nor suffer the same to be committed thereon, nor injure nor misuse the same, nor use the same for any purpose but that hereinbefore authorized, and will deliver up the same at the expiration or sooner termination of Tenant's tenancy, in as good condition as at the time of initial occupancy, reasonable wear and tear expected.

16.02  Tenant covenants to operate Tenant's business in said Leased Premises in accordance with the laws of the United States, the State of Connecticut, and the rules, regulations and ordinances of the Town of Greenwich, relating to health, nuisance, fire, use of highways, sidewalks, and parking areas, and all other law or rule of law, ordinance or regulation, so far as the same relates to the conduct of Tenant's business; and Tenant further covenants and agrees to comply with all rules and regulations of New England Board of Fire Underwriters on any fire, public liability, or other insurance policies upon said building or upon any property contained in said Leased Premises. The Tenant shall save and hold the Landlord harmless from and against any fines, penalties and costs incurred because of Tenant's violation of or noncompliance with the terms of this Paragraph, including holding Landlord harmless from reasonable attorney's fees, and court costs, incurred by Landlord in defending against any fines, penalties or costs. In the event of noncompliance by the Tenant and without fault of the Landlord, and if the Tenant has not taken any legal steps in a reasonable period after notification and in a reasonable period after notification of violation and in good faith to determine if it has failed to comply, the Landlord may, but shall not be obliged to, after three (3) days' notice to cure, take the necessary steps to correct any noncompliance, including the expenditure of funds, and in such event the Tenant will reimburse the Landlord on demand for all sums expended and for all other costs, including reasonable legal fees, if any, incurred by the Landlord in correcting such noncompliance. Such reimbursement shall be considered additional rent and be due in full together with the next rent installments.

16.03  The Tenant further agrees to keep said Leased Premises and all parts therefore in a clean, safe and sanitary condition and free from trash, and inflammable material. Any water and wash closets and other plumbing fixtures available for use by the Tenant shall not be used for any other purpose than those for which they were designed or constructed, and no sweepings, rubbish, rags, or other improper substances shall be deposited therein. The Tenant shall be responsible for all  interior painting of the premises and will perform and make all reasonable and necessary interior repairs to the Leased Premises including all heating, electrical, and plumbing systems that solely service the Leased Premises; however, the Tenant is responsible for the full repair and/or replacement of the entire system that was damaged by Tenant, its employees, and/or its agents or if the system has been modified by the Tenant, which

modification results in damage to the system; Tenant shall be responsible for the provision of janitorial and other related maintenance services as are necessary by Tenant's use of the Leased Premises and as are required for the proper maintenance of the Leased Premises in the first class condition. In the event Tenant fails to maintain and repair the Leased Premises in good order and condition following ten (10) days written notice, Landlord may enter the Leased Premises upon prior notice to Tenant, to do the necessary maintenance work, or make the necessary repairs, and charge Tenant a reasonable amount therefore as additional rent, which shall be immediately due and payable on the completion of such repairs or maintenance.

16.04 Except as otherwise agreed to by the Landlord, the Tenant agrees that all repairs and replacements resulting from damage to any part of the Leased Premises covered in whole or in part by Tenant's insurance without the fault of the Landlord and all repairs, maintenance and replacements of or to the Leased Premises, including, but not limited to, janitorial requirements, window cleaning, window and plate glass and light bulb replacement, and snow, ice, and rubbish removal from the sidewalk in front of the Building entrance to the Leased Premises shall be made by the Tenant at its expense.

16.05   Tenant shall, at Tenant's sole cost, maintain an environment in the Leased Premises that is odor free.
16.06   Tenant shall keep the areas around emergency exits of the Leased Premises clean and free of obstructions or debris.

## 17   DEFAULT

17.01   Each of the following shall be deemed a default by Tenant and a breach of this lease, namely:
      A. A failure on the part of Tenant to pay any installment of Rent or to pay any Additional Rent, when any installment of Rent or Additional Rent is due without demand.

      B. A failure on the part of Tenant to observe or perform any of the other terms, covenants, agreements or conditions of this lease on the part of Tenant to be observed and performed, which failure persists after the expiration of ten (10) days after the Tenant receives written notice from the Landlord indicating the existence of such failure, but , if the matter that is the subject of the notice is of such a nature that it cannot  reasonably be corrected within ten (10) days of the notice such default shall not be deemed to have occurred if Tenant promptly, upon the giving of the notice, commences the curing of the failure and diligently prosecutes the same to completion.

      C. The adjudication of Tenant in bankruptcy; the taking by Tenant of the benefit of any other insolvency act or procedure, which term includes any form of proceeding for reorganization or arrangement or rearrangement under the National Bankruptcy Act as well as an assignment for the benefit of creditors; or the appointment of a receiver for Tenant and such receiver remains undischarged for thirty (30) days.

17.02   In the event of any default by Tenant as hereinabove provided in this Article, except for default in the payment of any rent installment or additional rent, and after any applicable notice and cure period, Landlord at any time thereafter may, at its option, give Tenant fifteen (15) days written notice, at their last known address, of intention to end the term of this lease and thereupon at the expiration of said fifteen (15) days the term of this lease shall expire as fully and completely as if that date were the date herein definitely fixed for the expiration of the term and Tenant will then quit and surrender the demised premise to Landlord, but Tenant shall remain liable as herein provided.

17.03   If the notice provided for herein shall have been given and the term shall expire as aforesaid, or if Tenant shall abandon the demised premises, the Landlord may without notice re-enter the demised



premises either by force or otherwise and dispossess Tenant by summary proceedings or otherwise, and Tenant or other occupant or occupants of the demised premises will remove their effects and hold them from the premises as if this lease had not been made. Any property not so removed after ten (10) days notice to their last known address shall be deemed abandoned.

17.04  In case of any default, re-entry, and expiration or dispossess by summary proceedings or otherwise, the following shall occur:

A. The rent shall become due thereupon and be paid up to the time of such re-entry, dispossess or expiration, together with such actual and reasonable expenses as Landlord may incur for expenses including reasonable legal expenses, including those incident to the recovery of possession, brokerage and putting the demised premises in good order, or for preparing the same for re-rental;

B. Landlord may re-let the premises or any part or parts thereof, either in the name of Landlord or otherwise, for a term or terms which may at Landlord's option be less than or exceed the period which would otherwise have constituted the balance of the term of this lease and may grant concessions or free rent without thereby in any way affecting Tenant's liability for the rental payable hereunder for the period of concession or free rent; and

C. Tenant shall also pay Landlord as liquidated damages for the failure of Tenant to observe and perform said Tenant's covenants herein contained any deficiency between rent hereby reserved to be paid and the net amount, if any, of the rents collected by reason of the re-letting of the Leased Premises for each month of the period which would otherwise have constituted the balance of the term of possession of the premises and the re-letting, relating, such as, but not limited to, legal expenses, attorneys' fees, brokerage expenses, for keeping the Leased Premises in good order and for preparing the same for re-letting. Any such liquidated damages shall be paid in monthly installments by Tenant on the rent day specified in this lease and any suit brought to collect the amount of the deficiency for any month shall not prejudice in any way the rights of Landlord to collect the deficiency for any subsequent month by a similar action or proceeding. Landlord at Landlord's option may make such alterations and decorations in the Leased Premises as Landlord in Landlord's sole judgment considers advisable and necessary for the purpose of re-letting the Leased Premises; and the making of such alterations or decorations shall not operate or be construed to release Tenant from liability as aforesaid. Landlord shall in no event be liable and Tenant's liability shall not be affected or diminished in any way whatsoever for failure to re-let the Leased Premises, or in the event that the Leased Premises are re-let, for failure to collect the rent hereof under such re-letting; provided Landlord makes commercially reasonable efforts to re-let the Leased Premises. In the event of a breach or threatened breach by Tenant of any of the covenants or provisions hereof, Landlord shall have the right of injunction and the right to invoke any remedy allowed at law or in equity as if re-entry, summary dispossess proceedings or other remedies were not herein provided for. Mention in this lease of any particular remedy shall not preclude Landlord from any other remedy, in law or in equity.

17.05  If Landlord shall enter into and repossess the Leased Premises by reason of the default of Tenant in the performance of any of the terms, covenants or conditions herein contained, then Tenant hereby covenants and agrees that Tenant will not claim the right to redeem or re-enter the said premises or restore the operation of this instrument, and Tenant hereby waives the right to such redemption and reentrance under any present agreement or instrument expressly waiving its right, if any, to make payment of any sum or sums of rent, or otherwise, of which Tenant shall have made default under any of the covenants of this lease, and to claim any subrogation to the rights of Tenant under these presents, or any of the covenants thereof, by reason of such payment.

17.06 Any action taken by Landlord under this Article shall not operate as a waiver of any right which Landlord would otherwise have against Tenant for rent hereby reserved or otherwise, and Tenant shall remain responsible to Landlord for any loss and damage suffered by Landlord by any reason of Tenant's default or breach. The words "re-enter" and "re-entry" as used in this lease are not restricted to their technical legal meaning.

17.07 With respect to any litigation arising out of this lease, the parties hereby expressly waive the right to a trial by jury and the right to file any countersuit or cross claim against the other, except in summary dispossess or holdover proceeding.

17.08 Notwithstanding anything to the contrary herein contained, in case of any default, re-entry, and expiration or dispossess by summary proceedings or otherwise, Landlord agrees to use all commercially reasonable means to mitigate any damages or losses incurred by Landlord and due from Tenant.

## 18   CURING TENANT'S DEFAULTS

Should Tenant fail to perform any of the terms of this lease on its part to be performed beyond any applicable notice and cure period, except the payment of rent and additional rent herein, within ten (10) days after the giving written notice to Tenant the Landlord may perform the same and any such sum or sums paid or expended in such performance to any rent then due or thereafter falling due hereunder shall apply with like effect as if an original part of such installment, and such sum or sums shall be and become additional rental. It is further agreed that the ten-day notice provided by this section is the same ten-day noticed provided by subdivision (B) of Section 17.01 and not an additional one.

## 19   NO REINSTATEMENT

19.01 No receipt of monies by the Landlord from the Tenant after the termination or cancellation of this lease, in any lawful manner, shall reinstate, continue or extend the term of this lease, or affect any notice theretofore given to the Tenant, or operate as a waiver of the right of the Landlord to enforce the payment of fixed or additional rent or rents due, or thereafter falling due, or operate as a waiver of the right of the Landlord to recover possession of the demised premises by proper suit, action, proceeding or remedy; it being agreed that, after the service of notice to terminate or cancel this lease, or the commencement of suit, action or summary proceedings, or any other remedy, or after a final order or judgment for the possession of the said demised premises, the Landlord may demand, receive and collect any monies due, or thereafter falling due, without in any manner affecting such notice, proceedings suit, action or judgment; and any and all such monies collected shall be deemed to be payments on account of the use and occupation of the Tenant's liability hereunder.

19.02 The failure of the Landlord to enforce any agreement, condition, covenant or term, by reason of its breach by the Tenant, after notice had, shall not be deemed to void or affect the right of the Landlord to enforce the same agreement, condition, covenant or term on the occasion of a subsequent default or breach.

## 20   QUIET POSSESSION

Landlord covenants and warrants that upon performance by Tenant of its material obligations hereunder, Landlord will keep and maintain Tenant in exclusive, quiet, peaceable and undisturbed and uninterrupted possession of the Leased Premises during the term of this Lease.

## 21   CONDEMNATION

21.01 If any municipality, public, private or otherwise shall at any time during the term hereby demised lawfully condemn and by reason thereof acquire title to Landlord's interest in the demised premises, in or by condemnation proceedings in pursuance of law, general, special or otherwise, the Landlord shall be entitled to and shall, except as hereinafter provided, receive any award that may be made, including the award, if any, to the Tenant for the value of the unexpired term of this lease, and the Tenant shall assign and hereby does assign and transfer to Landlord any award that may be so made to Tenant for any damages to the term of years hereby dismissed. Such assignment shall not include any award for taking of or damage to the trade fixtures of Tenant or its subtenants or their moving expenses allowed by statute. [Tenant should have a claim for its expenses as well]

21.02 In the event of a partial taking by condemnation as aforesaid, this lease (except as hereinafter provided) shall nevertheless continue, but the annual rental to be paid by the Tenant herein shall thereafter be reduced by a sum equal to the amount of net rental multiplied by square footage taken from Tenant, provided that Tenant may continue to conduct its business in substantially the same manner as before the taking, provided if such continued operations cannot be performed, then Tenant shall have the option to terminate this Lease by written notice.

## 22  SUBORDINATION

Tenant accepts this lease subject and subordinate to any mortgage, deed of trust or other lien presently existing or hereafter arising upon the Leased Premises, or upon the Building and to any renewals, refinancing and extensions thereof. Landlord is hereby irrevocably vested with full power and authority to subordinate this lease to any mortgage, deed or trust or other lien now existing or hereafter placed upon the Leased premises of the Building, and Tenant agrees upon demand to execute such further instruments subordinating this Lease or attorning to the holder of any such liens as Landlord may reasonably request. Upon written request by Tenant, Landlord shall request and use in its best efforts to obtain from the holder of any such mortgage, deed of trust or other lien presently existing or hereafter arising upon the Leased Premises, or upon the building, a subordination, Non-Disturbance and Attornment Agreement ("SNDA") for the benefit of Tenant under this Lease.  Tenant agrees that it will from time to time upon request by Landlord execute and deliver to such persons as Landlord shall reasonably request a statement in recording form certifying that this Lease is unmodified and in full force and effect (or if there have been modifications, that is the same is in full force and effect as so modified), stating the dates to which rent and other charges payable under this Lease have been paid, stating that Landlord is not in default hereunder (or if Tenant alleges a default stating the nature of such alleged default) and further stating such other matters as Landlord shall reasonably require [Mutual – Landlord to provide estoppel to Tenant]. In any such instance where Tenant is requested to subordinate this lease to any mortgage, deed of trust or lien, Landlord will use his best efforts to provide Tenant with a standard Non-Disturbance Agreement.

## 23  BROKERS

Tenant and Landlord acknowledge that no brokers were involved in this lease transaction as real estate brokers, and shall be paid by Landlord pursuant to a separate agreement. Tenant covenants that should any other broker who Tenant had a relationship with claim a commission that Tenant shall indemnify and hold harmless the Landlord from any such claim, including the advancements and retainers as to Landlord's costs and expenses with respect to any such broker's claims, together with Landlord's reasonable attorney's fees, within five (5) days of written request therefore by Landlord.
## 24 NOTICE

Any notice required or permitted under this lease shall be deemed sufficiently given or served if sent by the United States certified mail, return receipt requested, addressed as follows or by Federal Express or United Parcel Service (UPS) with confirmation of delivery, addressed as follows, or to the extent expressly permitted by the terms of this Lease, addressed as follows:

If to Landlord to:      Stanford Guy Sutton, Managing Member
                       Sutton Land, LLC
                       87 Greenwich Avenue
                       Greenwich, Connecticut 06830

If to Tenant to        Stephanie Goureau
                       85 Greenwich Avenue
                       Greenwich, CT 06830

Landlord and Tenant shall each have the right from time to time to change the place notice is to be given under this paragraph by written notice thereof to the other party.

## 25. Delivery of the premises by Landlord
Upon lease signing Tenant may make arrangements to make improvements to the space as long as it does not interfere with Landlord's work. Tenant shall be given possession of the leased premises in broom clean condition on the commencement date of the lease.

## 26. WAIVER

No Waiver of any default of Landlord or Tenant hereunder shall be implied from any omission to take any action on account of such default if such default persists or is repeated, and no express waiver shall affect any default other than the default specified in the express waiver and that only for the time and to the extent therein stated. One or more waivers by Landlord or Tenant shall not be construed as a waiver of a subsequent breach of the same covenant, term or condition.

## 27. MEMORANDUM OF LEASE

The parties hereto contemplate that this Lease should not and shall not be filed for record, but in lieu thereof, at the request of either party, Landlord and Tenant shall execute a Memorandum of Lease to be recorded for the purpose of giving record notice of the appropriate provisions of this Lease.

## 28. HEADINGS

The headings used in this Lease are for convenience of the parties only and shall not be considered in interpreting the meaning of any provision of this Lease.

## 29. SUCCESSORS

The provisions of this Lease shall extend to and be binding upon Landlord and Tenant and their respective legal representatives, successors and assigns.

14

## 30.  CONSENT

Landlord shall not unreasonably withhold, condition or delay its consent with respect to any matter for which Landlord's consent is required or desirable under this Lease. If Tenant claims that Landlord has unreasonably withheld or delayed its consent, then the Tenant may not claim any damage resulting there from.

## 31.  COMPLIANCE WITH LAW

Tenant shall comply with all laws orders, ordinances and other public requirements now or hereafter pertaining to Tenant's use of the Leased Premises. Landlord shall comply with all laws, orders, ordinances and other public requirements now or hereafter affecting the Leased Premises and Building. Tenant will provide Landlord with a Certificate of Good Standing with the State of Connecticut as to its corporation at the time of its execution of this Lease as well as proof of its designation of an agent for the service of Process within the State of Connecticut.

## 32.  LATE CHARGE

Supplementing provisions in Paragraph 2.08 above, if Landlord shall fail to receive, within ten (10) days after the same is due and payable (hereinafter referred to as the "Penalty and Interest Computation Date"), any rent, additional rent or other amounts or charges to be paid to the Landlord by Tenant, as provided in this Lease, Tenant shall pay a late charge equal to five (5%) percent of the amount of such late payment.  If Tenant is late with any payment of rent or additional rent or any of Tenant's checks for the payment of the same is dishonored by the bank more than twice in any twelve (12) month period, Landlord at its option may require Tenant to remit funds by wire transfer or bank check.

## 33. HOLDING OVER

It is further mutually agreed that no holding over by the Tenant shall operate to renew this Lease without the written consent of the Landlord. If the Tenant shall hold over said premises beyond the period above specified for the termination of this Lease, Landlord may at its option: (i) elect to treat Tenant as one who has not removed at the end of its term, and thereupon be entitled to all remedies against Tenant provided for herein in the event of Default or otherwise provided by law in this situation, or (ii) Landlord may elect to construe such hold over as a tenancy from month-to-month subject to the same terms and pursuant to the same stipulations, covenants and agreements as are herein contained except the duration thereof and, except the monthly rent payable shall be equal to one hundred fifty (150%) percent of the Base Rent as it exists at the end of the term, plus the additional rent and all of the other payments required to be made by Tenant under this Lease.

Landlord and Tenant shall each have the right from time to time to change the place notice is to be given under this paragraph by written notice thereof to the other party.

## 34. CLOSURE BY ORDER OF LEGAL AUTHORITIES

During the term of this lease, if any legal authority issues an  order affecting  retail establishments on Greenwich Avenue to cease operating  due to an epidemic or pandemic, 50% of the monthly rent for the premises shall be  abated  for  a maximum of three months. The payment of the abated rent for those months shall be deferred and payable in twelve equal installments as additional rent, starting six months from the date that retail stores are permitted to re-open.

## 35. GOVERNING LAW

This Agreement shall be governed, construed and interpreted by, through and under the Laws of the State of Connecticut.

## 36. FINAL AGREEMENT

This Agreement terminates and supersedes all prior understandings or agreements on the subject matter hereof. This Agreement may be modified only by a further writing that is duly executed by both parties.

## 37. COUNTERPARTS / FACSIMILE / ELECTRONIC MAIL.

This Lease may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original, and all of which when taken together shall constitute one and the same Lease. The Parties hereto agree that this Lease may be transmitted between them or their respective attorneys by facsimile **or electronic signature**. The Parties intend that faxed signatures **or electronic signatures** constitute original signatures and that a Lease containing the signatures (original or facsimile **or electronic**) of all the parties is binding on the parties once sent via facsimile or via electronic mail to the opposing counsel.

**IN WITNESS WHEREOF**, the parties have executed this Lease as of the day and year first above written.

**Sutton Land, LLC, Landlord**

BY: _____
Stanford Guy Sutton
Managing Member

**Nobelle GW, LLC, Tenant**

BY: _____
Stephanie Goureau
Managing Member

BY: _____
Sara Nagrani
Managing Member

16

# GUARANTY

In consideration of the execution of the within Lease by the Landlord, at the request of the undersigned and in reliance of this Guaranty, the undersigned, in addition to the security provided for in the Lease, hereby guarantees unto the Landlord, its successors and assigns, payment of the rent due and payable pursuant to the terms of the Lease for the period during which the tenant remains in possession of the Leased Premises (the "Rent), plus an amount up to an additional six months' rent at the time of default less the amount of the security under the terms of the Lease if the Rent is paid, provided however in no event shall said six months' rent extend beyond the period of the Lease.(For example, if there are only four months left on the Lease, then the undersigned is only responsible for the four months rent less the amount of the security). By payment of said payment the Tenant and the Guarantor are released from any further liability The undersigned agrees to pay the Landlord all expenses incurred in enforcing this Guaranty and shall be jointly and severally liable under this Guaranty.

Witnesses:  _____

Witnesses:  _____          By_____(L.S)

                                         Stephanie  Goureau

                                         By_____(L.S.)

Date:       _____

EXHIBIT 4



Control Panel ▸ All Control Panel Items ▸ System

Search Control Panel

Control Panel Home

- Device Manager
- Remote settings
- System protection
- Advanced system settings

## View basic information about your computer

Windows edition

Windows 7 Ultimate

Copyright © 2009 Microsoft Corporation. All rights reserved.

Service Pack 1

System

| | |
|---|---|
| Rating: | **5.9** Windows Experience Index |
| Processor: | Intel(R) Core(TM) i7-3610QM CPU @ 2.30GHz  2.30 GHz |
| Installed memory (RAM): | 8.00 GB (7.90 GB usable) |
| System type: | 64-bit Operating System |
| Pen and Touch: | No Pen or Touch Input is available for this Display |

Computer name, domain, and workgroup settings

| | | |
|---|---|---|
| Computer name: | nicolas-PC | |
| Full computer name: | nicolas-PC | 🛡 Change settings |
| Computer description: | | |
| Workgroup: | WORKGROUP | |

Windows activation

Windows is activated

Product ID: 00426-OEM-8992662-00010



Learn more online...

See also

Action Center

Windows Update

Performance Information and Tools

EXHIBIT 5

# RESOLUTIONS ADOPTED BY ORGANIZER

## OF

_____

    The undersigned, being the Sole Organizer of the Limited Liability Company hereby adopts the following resolutions:

(1)    RESOLVED, that a copy of the Articles of Organization and/or Certificate of Formation of the Limited Liability Company as filed in the Office of the Secretary of **State of New'York** on _____ be, and the same hereby is, inserted in the Records Book of the Limited Liability Company.

(2)    RESOLVED, that from this day hence and in addition to the appointment of the following named Director(s), the undersigned, effective this date, has fulfilled the duties of Sole Organizer and relinquishes all further duties to the newly appointed Director(s) of the Limited Liability Company.

(3)    RESOLVED, that the following persons be, and they hereby are, appointed as Directors of the Limited Liability Company, to conduct and manage all the affairs necessary to the Limited Liability Company's operation:

        a.  _____

        b.  _____

        c.  _____


Dated:

                                    _____
                                    Steven Weiss, Sole Organizer

EXHIBIT 6

From: **Stephanie Menkin** stephanie.menkin@marcuslemonis.com 
Subject: Re: Warehouse inventory Moves
Date: January 24, 2020 at 2:01 PM
To: Marcus Lemonis marcus@marcuslemonis.com

thank you

**Stephanie Menkin**
President
ML Fashion Group
500 7th Avenue, 8th Floor
New York, NY 10014



On Jan 24, 2020, at 1:56 PM, Marcus Lemonis <marcus@marcuslemonis.com> wrote:

Absolutely

Marcus A. Lemonis

The Profit on CNBC

Marcus Lemonis, LLC
ML Acquisition Company www.marcuslemonis.com

On Jan 24, 2020, at 1:25 PM, Stephanie Menkin <stephanie.menkin@marcuslemonis.com> wrote:

can I request some items ship out from the warehouse? Maybe the Line Tee's and broken old colors of travelers? Some sunglasses?

**Stephanie Menkin**
President
ML Fashion Group
500 7th Avenue, 8th Floor
New York, NY 10014

<5ADF5ECF-89EE-4E46-B2FB-535BF7D60B12[30].png>

Begin forwarded message:

**From:** Stephanie Menkin <stephanie.menkin@marcuslemonis.com>
**Subject: Warehouse inventory Moves**

**Date:** December 19, 2019 at 10:28:19 AM EST
**To:** Marcus Lemonis <marcus@marcuslemonis.com>
**Cc:** Stephanie Menkin <stephanie.menkin@marcuslemonis.com>

Attached is what I would happily take from the warehouse if you think it's ok.  Of course, I am torn because I know that Deerfield can sell Amuse and Opaque for another month until Spring:

Amuse- $52,597
Autumn Cashmere (1 style, 15 units)- $2,001
Brodie- $2,552
Broken Heart Totes - $13,548
Ankle Travelers (mainly colors not go forward) - $6,723.70
Ellison - I would take some out of the 814 pairs - @ 200 pairs - $9,450
Opaque - $28,684
The Line (Sweet Romeo Tees) - $19,167.05

TOTAL from WAREHOUSE - **$134,722.75**

Whatever is left - Skin, Core Ankle Traveler, Ellison, the Line and a.M Sweaters can all be moved to Hinsdale. Anderson bros needs to get given away.
The supplies in the warehouse (gift boxes, shopping bags, tissue etc) can go to stores and anything left can go to Bentleys warehouse

This will get us out of Vermont.


**Stephanie Menkin**
President
ML Fashion Group
500 7th Avenue, 8th Floor
New York, NY 10014


<5ADF5ECF-89EE-4E46-B2FB-535BF7D60B12[30].png>

<Inventory to Stephanie.xls>
<5ADF5ECF-89EE-4E46-B2FB-535BF7D60B12[30].png><5ADF5ECF-89EE-4E46-B2FB-535BF7D60B12[30].png>