# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| ML FASHION, LLC, and ML RETAIL, LLC, | **)** | |
| | ) | Case No. 1:20-cv-05124 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| NOBELLE GL, LLC, STEPHANIE MENKIN, SARIT MAMAN NAGRANI, and NICOLAS GOUREAU, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANTS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THEIR MOTION TO DISMISS AMENDED VERIFIED COMPLAINT

# TABLE OF CONTENTS

A.  Plaintiffs' Entire Jurisdictional Theory Has Been Rejected by the Seventh Circuit ............... 1

B.  Plaintiffs' "Home-Court Advantage" Venue Theory Has Been Rejected by This Court ....... 6

C.  Plaintiffs' Claims Still Fail on Their Merits .......................................................................... 8

   1.  The Statutory Claims Lack Adequate Support, and So Does Federal Question .................. 9

   2.  Plaintiffs Cannot State Valid Common Law Claims ........................................................ 15

**Cases**

*Adams v. City of Indianapolis,*
  742 F.3d 720 (7th Cir. 2014)................................................................ 1

*Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.,*
  751 F.3d 796 (7th Cir. 2014)............................................................ 5, 6

*Ariel Investments, LLC v. Ariel Capital Advisors LLC,*
  881 F.3d 520 (7th Cir. 2018)............................................................ 2, 6

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ........................................................................ 17

*Bogie v. Rosenberg,*
  705 F.3d 603 (7th Cir. 2013)............................................................ 17

*Burger King Corp. v. Rudzewicz,*
  471 U.S. 462 (1985) .......................................................................... 2

*CardioNet, Inc. v. LifeWatch Corp.,*
  2008 WL 567031 (N.D. Ill. Feb. 27, 2008)...................................... 10

*Cassetica Software, Inc. v. Computer Scis. Corp.,*
  2009 WL 1703015 (N.D. Ill. June 18, 2009) ................................... 13

*Cenco Inc. v. Seidman & Seidman,*
  686 F.2d 449 (7th Cir. 1982)........................................................... 19

*Champions Golf Club, Inc. v. The Champions Golf Club, Inc.,*
  78 F.3d 1111 (6th Cir. 1996)........................................................... 10

*CMBB LLC v. Lockwood Mfg., Inc.,*
  628 F. Supp. 2d 881 (N.D. Ill. 2009) .............................................. 14

*Complete Bus. Sols., Inc. v. Mauro,*
  2001 WL 290196 (N.D. Ill. Mar. 16, 2001) .................................... 15

*Control Sols., LLC v. Oshkosh Corp.,*
  2011 WL 1131329 (N.D. Ill. Mar. 28, 2011) .................................. 11

*Curry v. Revolution Laboratories, LLC,*
  949 F.3d 385 (7th Cir. 2020)....................................................... 1, 2, 3

*Custom Vehicles, Inc. v. Forest River, Inc.,*
  476 F.3d 481 (7th Cir. 2007)........................................................... 11

*Dastar Corp. v. Twentieth Century Fox Film Corp.*,
  539 U.S. 23 (2003) ........................................................................................ 11

*Domino's Pizza, Inc. v. El-Tan, Inc.*,
  1995 WL 367893 (N.D. Okla. Apr. 28, 1995) ........................................................ 11

*E.R. James Real Estate v. Spinell*,
  2011 WL 5078873 (N.D. Ill. Oct. 26, 2011) ........................................................ 12

*Eli Lilly & Co. v. Arla Foods, Inc.*,
  893 F.3d 375 (7th Cir. 2018) ............................................................................ 9

*Fastpath, Inc. v. Arbela Techs. Corp.*,
  760 F.3d 816 (8th Cir. 2014) ............................................................................ 2

*Felland v. Clifton*,
  682 F.3d 665 (7th Cir. 2012) ............................................................................ 3

*First Fin. Bank, N.A. v. Bauknecht*,
  71 F. Supp. 3d 819 (C.D. Ill. 2014) .................................................................. 12

*Flip Flop Shops Franchise Co., LLC v. Neb*,
  2016 WL 9275403 (C.D. Cal. Dec. 5, 2016) ........................................................ 19

*Ford-Reyes v. Progressive Funeral Home*,
  418 F.Supp.3d 286 (N.D. Ill. 2019) .................................................................... 7

*Garelli Wong & Assocs., Inc. v. Nichols*,
  551 F.Supp.2d 704 (N.D. Ill. 2008) .................................................................. 12

*George A. Fuller Co., Div. of Northrop Corp. v. Chicago Coll. of Osteopathic Med.*,
  719 F.2d 1326 (7th Cir. 1983) .......................................................................... 20

*GK Skaggs, Inc. v. Hartford Cas. Ins. Co.*,
  579 F. App'x 542 (9th Cir. 2014) ...................................................................... 10

*Grand Vehicle Workd Holdings Corp. v. Frey*,
  2004 WL 742085 (N.D. Ill. Apr. 6, 2004) ............................................................ 3

*Guaranteed Rate, Inc. v. Conn*,
  264 F.Supp.3d 909 (N.D. Ill. 2017) .................................................................... 2

*Hasan v. Foley & Lardner, LLP*,
  2007 WL 2225831 (N.D. Ill. July 26, 2007) ........................................................ 13

*Innovative Networks, Inc. v. Satellite Airlines Ticketing Centers, Inc.*,
  871 F. Supp. 709 (S.D.N.Y. 1995) .................................................................... 10

*Interlease Aviation Inv'rs II (Aloha) L.L.C. v. Vanguard Airlines, Inc.*,
    262 F. Supp. 2d 898 (N.D. Ill. 2003) ............................................................. 2, 5

*Jackson v. N'Genuity Enterprises, Co.*,
    2014 WL 4269448 (N.D. Ill. Aug. 28, 2014) ............................................... 2, 7

*John Crane Inc. v. Shein Law Ctr., Ltd.*,
    2017 WL 1105490 (N.D. Ill. Mar. 23, 2017) ............................................... 3, 5

*Johnson v. Carrington Mortg. Servs.*,
    638 F. App'x 523 (7th Cir. 2016) ............................................................... 17

*Kerrigan v. Am. Orthodontics Corp.*,
    960 F.2d 43 (7th Cir. 1992) ...................................................................... 17

*Kronenberg v. Katz*,
    872 A.2d 568 (Del. Ch. 2004) .................................................................. 18

*Land's End, Inc. v. Remy*,
    447 F. Supp. 2d 941 (W.D. Wis. 2006) ....................................................... 9

*Lee v. Ne. Illinois Reg'l Commuter R.R. Corp.*,
    912 F.3d 1049 (7th Cir. 2019) .................................................................... 9

*Lewis v. Faulkner*,
    689 F.2d 100 (7th Cir. 1982) ..................................................................... 9

*Martino v. Orchard Enterprises, Inc.*,
    2020 WL 6287400 (N.D. Ill. Oct. 27, 2020) ................................................. 3

*Maui Jim, Inc. v. SmartBuy Guru Enterprises*,
    459 F. Supp. 3d 1058 (N.D. Ill. 2020) ...................................................... 12

*MCI WorldCom Network Servs., Inc. v. Atlas Excavating, Inc.*,
    2006 WL 3542332 (N.D. Ill. Dec. 6, 2006) ................................................. 9

*McLeod v. Arrow Marine Transp., Inc.*,
    258 F.3d 608 (7th Cir. 2001) ..................................................................... 8

*Meridian Labs., Inc. v. OncoGenerix USA, Inc.*,
    2020 WL 2468174 (N.D. Ill. May 13, 2020) .............................................. 16

*Mgmt. Registry, Inc. v. Batinich*,
    2018 WL 1586244 (N.D. Ill. Apr. 2, 2018) .................................................. 7

*Mintel Int'l Grp., Ltd. v. Neergheen*,
    2010 WL 145786 (N.D. Ill. Jan. 12, 2010) ................................................ 12

*Miyano Mach. USA, Inc. v. MiyanoHitec Mach., Inc.*,
    576 F. Supp. 2d 868 (N.D. Ill. 2008) ................................................................. 10

*Monco v. Zoltek Corp.*,
    2019 WL 952138 (N.D. Ill. Feb. 27, 2019) .......................................................... 8

*Monco v. Zoltek Corp.*,
    342 F.Supp.3d 829 (N.D. Ill. 2018) ...................................................................... 2

*Motorola, Inc. v. Lemko Corp.*,
    609 F. Supp. 2d 760 (N.D. Ill. 2009) .................................................................. 12

*My Canary LLC v. Cessna Aircraft Co.*,
    2017 WL 201373 (N.D. Ill. Jan.18, 2017) ............................................................ 2

*Mylan Labs., Inc. v. Matkari*,
    7 F.3d 1130 (4th Cir. 1993) ................................................................................. 10

*Nicholas J. Murlas Living Tr. v. Mobil Oil Corp.*,
    1994 WL 130778 (N.D. Ill. Apr. 13, 1994) ......................................................... 19

*Northbound Grp., Inc. v. Norvax, Inc.*,
    5 F. Supp. 3d 956 (N.D. Ill. 2013) ....................................................................... 18

*Ocean Tomo, LLC v. PatentRatings, LLC*,
    375 F.Supp.3d 915 (N.D. Ill. 2019) ..................................................................... 13

*Opus Fund Servs. (USA) LLC v. Theorem Fund Servs.*, LLC,
    2018 WL 1156246 (N.D. Ill. Mar. 5, 2018) ........................................................ 14

*Outlaw Lab., LP v. Shenoor Enter., Inc.*,
    371 F. Supp. 3d 355 (N.D. Tex. 2019) ................................................................ 10

*Packaging Corp. of Am., Inc. v. Croner*,
    419 F. Supp. 3d 1059 (N.D. Ill. 2020) ................................................................ 15

*Palda v. Gen. Dynamics Corp.*,
    47 F.3d 872 (7th Cir. 1995) ................................................................................... 8

*Perkins Sch. for the Blind v. Maxi-Aids, Inc.*,
    274 F. Supp. 2d 319 (E.D.N.Y. 2003) ................................................................. 11

*Quizno's Corp. v. Kampendahl*,
    2002 WL 1012997 (N.D. Ill. May 20, 2002) ................................................. 11, 19

*Rosenblum v. Travelbyus.com Ltd.*,
    299 F.3d 657 (7th Cir. 2002) ................................................................................. 8

*Ruebe v. PartnerRe Ireland Ins. DAC*,
    470 F. Supp. 3d 829 (N.D. Ill. 2020) .................................................................. 17

*Stifel, Nicolaus & Co. v. Lac du Flambeau Band of Lake Superior Chippewa Indians*,
    807 F.3d 184 (7th Cir. 2015) .............................................................................. 8

*Szabo v. Bridgeport Machines, Inc.*,
    249 F.3d 672 (7th Cir. 2001) .............................................................................. 8

*Tamburo v. Dworkin*,
    601 F.3d 693 (7th Cir. 2010) .......................................................................... 3, 4

*Tesla Wall Sys., LLC v. Related Companies, L.P.*,
    2018 WL 2225002 (S.D.N.Y. May 14, 2018) .................................................... 18

*Vera Bradley Designs, Inc. v. Denny*,
    2018 WL 3633986 (N.D. Ind. July 30, 2018) .................................................... 7

*Walden v. Fiore*,
    571 U.S. 277 (2014) ...................................................................................... 2, 6

*Xavian Ins. Co. v. Boeing Capital Corp.*,
    2019 WL 4750105 (N.D. Ill. Sept. 30, 2019) .................................................... 14

*Zellweger Analytics, Inc. v. Milgram*,
    1997 WL 667778 (N.D. Ill. Oct. 21, 1997) ........................................................ 15

**Statutes**

28 U.S.C. § 1391 ....................................................................................................... 7

**Rules**

Fed. R. Civ. P. 9 ............................................................................................ 10, 11, 16
Fed. R. Civ. P. 12 ................................................................................................ 8, 18

Plaintiffs offer nothing to contradict the inescapable conclusion that this action does not belong in Illinois.[1]  Indeed, Plaintiffs hang their jurisdictional hat on the outdated "aiming" concept for minimum contacts that has been rejected by the Seventh Circuit thus eviscerating the very fundament for Plaintiffs' jurisdictional house of cards here.  Unsurprisingly, it easily falls.  Should the Court decide to reach Plaintiffs' claims on their merits, it would be greeted with nothing but statutes that offer a poor fit for the allegations and implausible theories that do not withstand scrutiny.  At the end of the day, Plaintiffs' complaint is nothing more than a hastily compiled retaliation action in response to the Delaware litigation, and even Plaintiffs' extensive amendments could not resuscitate the asserted claims.  This duplicative and wasteful action should be dismissed.

## A.  Plaintiffs' Entire Jurisdictional Theory Has Been Rejected by the Seventh Circuit

Plaintiffs' opposition on the jurisdictional front is more notable for what it concedes than what it opposes.[2]  *First*, Plaintiffs concede that Defendants are not subject to general jurisdiction in Illinois, as Plaintiffs' arguments are limited to specific jurisdiction. (Opp'n at 8.)  *Second*, Plaintiffs appear to drop their jurisdictional allegations based on certain Defendants' alleged "closely-related" party status vis-à-vis the Credit/Security Agreements and forum selection clauses contained therein.  (*Compare* FAC ¶ 11, *with* Opp'n at 11; *see also* FAC ¶¶ 87 & 89.)  And for a good reason, since such a theory is incompatible with Due Process.  (Def. Br. at 12 n.16.)[3]

---

[1]  All internal alterations, quotation marks, footnotes and citations herein are omitted, and all emphasis is added unless otherwise noted.  All "Ex." references are to the documents attached to Plaintiffs' Amended Complaint, unless otherwise noted.  All defined terms are the same as those defined in Defendants' opening papers.

[2]  Plaintiffs insist that any factual disputes on this point should be resolved in their favor citing the standard applicable in the absence of an evidentiary hearing. (Opp'n at 7-8.)  Plaintiffs do not explain why they assume that the Court would not hold such a hearing, and Defendants submit that it should, to the extent any contested facts should bear on disposition of the jurisdictional issues.  *See Curry v. Revolution Laboratories, LLC,* 949 F.3d 385, 401 n.40 (7th Cir. 2020) ("Where an evidentiary hearing is held, the plaintiff must establish jurisdiction by a preponderance of the evidence.").  In any event, although little of what Plaintiffs have submitted is actual evidence, since it often lacks proper foundation and/or personal knowledge, it still fails to add up even to the *prima facie* case for personal jurisdiction that Plaintiffs are required to establish in the absence of an evidentiary hearing.  *See id.* at 393.

[3]  While these contracts (to which Plaintiffs are the only parties) and their forum selection clauses do show up in Plaintiffs' "fair play and substantial justice" analysis (Opp'n at 10), the Court need not reach

1

What is left is the outdated "aiming" theory of minimum contacts that has been rejected by the Seventh Circuit. (*See* Def. Br. at 11, discussing *Ariel Investments, LLC v. Ariel Capital Advisors LLC*, 881 F.3d 520, 522 (7th Cir. 2018).) Remarkably, Plaintiffs fail to address even a single authority cited by Defendants in their opening brief—let alone the very authorities that show that Plaintiffs' jurisdictional theory is no longer good law. Indeed, the Court will be hard pressed to find any relevant cases in Plaintiffs' opposition papers that ***post***-date *Walden v. Fiore*, 571 U.S. 277, 285 (2014), the seminal authority that rejected Plaintiffs' theory that supposedly "aiming" intentional conduct at the forum state with an intent of causing an injury there would suffice for the requisite minimum contacts. (*Compare* Opp'n at 8-9, *with* Def. Br. at 11, citing *Ariel*, 881 F.3d at 522 (following *Walden* and rejecting the argument that a defendant may be "subject to personal jurisdiction in any state at which it 'aimed its actions,'" or that "sett[ing] out to injure plaintiff's business, knowing that it is located in Illinois" suffices for specific personal jurisdiction).)[4] *Accord Monco v. Zoltek Corp.*, 342 F.Supp.3d 829, 835-36 (N.D. Ill. 2018) (calling

---

that analysis in the absence of any sufficient minimum contacts, which Plaintiffs failed to establish here. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985). Even if considered, however, they should be rejected as still incompatible with Due Process. Finally, as part of the same inquiry, Illinois' alleged interest in resolving the dispute at hand (Opp'n at 10) is not a valid substitute for the requisite minimum contacts either. *See, e.g., Fastpath, Inc. v. Arbela Techs. Corp.*, 760 F.3d 816, 824 (8th Cir. 2014) (holding that the forum state's interest cannot overcome an "absence of minimum contacts").

[4] The single exception is *Curry,* 949 F.3d at 395 & 398, which Plaintiffs cite only to set forth the standard for specific jurisdiction and the unremarkable proposition that physical presence in the forum is not necessary to establish personal jurisdiction. (Opp'n at 8.) While Plaintiffs also cite *Jackson v. N'Genuity Enterprises, Co.*, 2014 WL 4269448, at *6 (N.D. Ill. Aug. 28, 2014), this decision came out shortly after *Walden*, so it is unclear if the *Jackson* court had an opportunity to analyze its full impact; indeed, the court in *Guaranteed Rate, Inc. v. Conn*, 264 F.Supp.3d 909 (N.D. Ill. 2017) (cited in Def. Br. at 7, 8 & 12), appears to distinguish *Jackson* on that very basis. *See* 264 F.Supp.3d 922 n.17 ("[U]nder *Walden* it is irrelevant how foreseeable the impact on the plaintiff in the forum state is if there is no alleged conduct connecting the defendant to the forum. The basis for the ruling in *Jackson* was not foreseeability alone, but foreseeability ***plus in-state conduct*** by the defendant that is simply not present here.").

Plaintiffs' other outdated authorities are distinguishable for similar reasons. *See, e.g., My Canary LLC v. Cessna Aircraft Co.*, 2017 WL 201373, at *4 (N.D. Ill. Jan.18, 2017) (refusing to follow another of Plaintiffs' cases, *Interlease Aviation Inv'rs II (Aloha) L.L.C. v. Vanguard Airlines, Inc.*, 262 F. Supp. 2d 898, 910 (N.D. Ill. 2003), since its central proposition that "specific jurisdiction is proper in Illinois if the injury transpires in Illinois" could no longer be followed after *Walden*); *see also Grand Vehicle Workd Holdings Corp. v. Frey*, 2004 WL 742085, at *4 & *6 (N.D. Ill. Apr. 6, 2004) (another Plaintiffs' authority similarly relying on the outdated proposition that "the state in which the injury (and therefore the tort) occurs" is a controlling factor; also finding that the contracts at issue were partially negotiated in Illinois).

into "significant doubt" any decision that relies on Plaintiffs' jurisdictional theory after *Walden* and specifically noting that the reasoning in Plaintiffs' lead authority here, *Tamburo v. Dworkin*, 601 F.3d 693 (7th Cir. 2010), cannot be followed: "even conduct aimed at injuring plaintiff's forum state business is ***insufficient*** where that conduct does not connect the defendant to the forum state itself"); *John Crane Inc. v. Shein Law Ctr., Ltd.*, 2017 WL 1105490, at *8 (N.D. Ill. Mar. 23, 2017) (cited in Def. Br. at 9 & 10) (rejecting plaintiff's jurisdictional theory where "[m]ost of the caselaw on which [plaintiff] relies predates *Walden* ..., and its response brief takes on neither" and specifically distinguishing another Plaintiffs' authority, *Felland v. Clifton*, 682 F.3d 665 (7th Cir. 2012), as standing for "the proposition that a defendant's communications with a forum state plaintiff, standing alone, provide jurisdictionally sufficient minimum contacts with the forum, [which] stands in considerable tension with *Walden*"), *aff'd*, 891 F.3d 692 (7th Cir. 2018).

The Seventh Circuit's recent decision in *Curry*, 949 F.3d at 398, is not to the contrary. This is because in *Curry*, defendants specifically targeted Illinois consumers (by designing their website to allow consumers to choose Illinois for shipment and sending a confirmation email with the Illinois shipping address listed therein), ***and*** the claims arose from that targeting. *See Martino v. Orchard Enterprises, Inc.*, 2020 WL 6287400, at *4 (N.D. Ill. Oct. 27, 2020) (distinguishing *Curry* on those facts); *cf. Curry*, 949 F.3d at 401 ("The defendant's activity in the state is the very activity that allegedly caused the confusion at the heart of this litigation."). By contrast, Plaintiffs' claims here, aside from lacking in any adequate targeting, do not even purport to arise from that supposed targeting, even though this is one of the requirements for specific personal jurisdiction, as Plaintiffs' own authorities confirm. *See id.* at 400-01 (explaining that forum contacts are irrelevant unless they give rise to the alleged wrongful activity serving as the predicate for the claims). (*See also* Opp'n at 8, citing *Tamburo*, 601 F.3d at 702 (underscoring that it is "the conduct ***underlying***

*the claims*" that must be "purposely directed at the forum state"); *accord* Def. Br. at 8 & 12-13.)

Indeed, out of the four theories of alleged wrongdoing—unfair competition, inventory misappropriation, intangible property misappropriation, and misappropriation of company funds—only the alleged inventory misappropriation could be argued to trigger both the targeting and "arising from" prongs, yet any supposed targeting here is illusory. This is because Plaintiffs' evidence on this point—which, notably, does not even purport to set forth any actions by anyone but Menkin (*see* Opp'n at 9, citing FAC ¶¶ 75, 80-84 & Opp'n, Ex. 2 at ¶¶ 11-12, 27-44)—shows only that Menkin directed a vendor that sought to "return" 1,296 items to ship the items from Dallas, Texas (based on the FedEx tracking information (Opp'n, Ex. 2 at 3 n.1)) to New York. Thus, the alleged targeting here is that: (1) Menkin knew these items had originally come from Illinois before they ended up in Texas, and (2) Menkin could somehow predict these items would have ended up in Illinois but for her directing the shipment to New York. Yet neither proposition is actually supported by the evidence submitted; rather, they are nothing but pure speculation.[5] Most tellingly, both Lemonis and Ms. Griep, the declarant supplying this evidence, are copied on the email from Menkin thanking the vendor for forwarding the items to New York! (*See* Ex. A to Opp'n, Ex. 2.) Since that email is dated ***January 14, 2020***, it is puzzling that both Lemonis and Griep have not taken any issue with the direction of the shipment until now. In any event, this submission certainly does little to refute Menkin's sworn affidavit explaining that her inventory-gathering focused on a warehouse in Vermont (in addition to the Texas shipment) and, as such, had no element of any pre-planned Illinois targeting whatsoever. (*See* Menkin Aff. at ¶ 18; *see*

---

[5] The purported evidence provides no distinguishable basis for the proposition that Menkin would have known the past origin or the ultimate future destination for these items; rather, the declarant merely offers statements supporting the *declarant*'s supposed knowledge, not Menkin's—without explaining why Menkin would necessarily know the same. (*See* Opp'n, Ex. 2 at ¶¶ 11-12 (purporting to deduce the origin of the items based on "*my* knowledge of [the vendor]'s business, and the locations where it stores and sells merchandise").) In the same vein, the voluminous spreadsheets pertaining to the 1,296 items at issue (Ex. B to Opp'n, Ex. 2) provide no clue as to where they came from or where they would be going.

*also Interlease*, 262 F.Supp.2d at 905 (cited in Opp'n at 7-8) ("the court accepts as true any facts

contained in the defendants' affidavits *that remain unrefuted by the plaintiffs*").)[6]

As for the remaining three categories, none of the alleged contacts with Illinois gives rise

to the claims alleged. While Plaintiffs focus on Menkin and Goureau travelling to Illinois to help

with ML Fashion's stores (Opp'n at 10),[7] Plaintiffs allege no wrongdoing that arose from those

alleged contacts.[8] Indeed, while Plaintiffs claim that these defendants misappropriated ML

Fashion's funds,[9] they certainly did not need to travel to Illinois to do it—after all, the funds were

wherever ML Fashion was headquartered, which was New York at all the relevant times.[10] As for

---

[6]    Plaintiffs' supposed "gotcha" moment that Defendants purportedly "conceded" the items' Illinois origin by simply restating the complaint's allegation (Opp'n at 11, citing Def. Br. at 9) is nothing short of bizarre, since the restated allegation does not even match the story of the alleged diversion as set forth in Plaintiffs' opposition papers but rather has Menkin ordering inventory directly out of the Illinois stores— the allegation she squarely denied, which remains unrefuted. (*See* Menkin Aff. at ¶¶ 17-20.)

[7]    Menkin and Goureau's *first-hand* account contradicts Plaintiffs' Illinois-centric picture of their activities, as Menkin testified that she travelled to help with stores in other states and, unlike the Illinois locations, actually took part in those store openings; indeed, she specifically attested that she "had no specific interest in opening a Chicago, Illinois location." (Menkin Aff. at ¶¶ 10 & 12-13.) In turn, Goureau testified that his brief move to Illinois was not related to ML Fashion. (Goureau Aff. at ¶ 6.)

[8]    While Plaintiffs contend that it is those travels that "enabled" Defendants to take inventory and create a competing business (Opp'n at 10), this is quite a leap. Based on the evidence, it is solely Menkin's position as ML Fashion's president that inserted her into directing the Texas shipment to New York (Opp'n, Ex. 2 at ¶ 5)—the position that had nothing to do with Illinois, since Menkin presided over a *Delaware* company with headquarters in *New York* (FAC at ¶ 4). As for the expertise in fashion retail, even assuming that it derived from ML Fashion (which it did not, since ML Fashion was not Defendants' first fashion retail experience), it certainly did not derive from any Illinois travels, since Menkin's management extended in equal measure to all the other dozens of stores operating across the country. (*See* Menkin Aff. at ¶¶ 12-14.) In this connection, Plaintiffs' contention that Menkin and Goureau "profited for years" from the company's Illinois presence (Opp'n at 10) is similarly inept, since they supposedly also derived profits from ML Fashion's non-Illinois locations, and there is no evidence that more profit was derived from Illinois as compared to any other state, or that Defendants knew of any such disparity.

[9]    The alleged misrepresentations to Lemonis concerning Noemi's salary or any other purported personal use of company funds (Opp'n at 9, citing FAC at ¶ 60 & Opp'n, Ex. 1 at ¶ 19) is just another example of insufficient "aiming" discussed above. *See John Crane*, 2017 WL 1105490, at *8 (cited in Def. Br. at 9 & 10) (rejecting "the proposition that fraudulent representations made to a plaintiff can provide minimum contacts" as inconsistent with *Walden* and the Seventh Circuit's most recent precedent), citing *Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 802 (7th Cir. 2014) (cited in Def. Br. at 6) (finding that defendant's misleading communications to residents of the forum state were insufficient to confer personal jurisdiction). Notably, although Plaintiffs purport to implicate Nagrani in these communications (Opp'n at 9, citing FAC ¶ 60 & Opp'n, Ex. 1 at ¶ 19), none of the cited evidence provides even one instance of Nagrani communicating with Lemonis—indeed, the complaint omits Nagrani from these allegations altogether, and Lemonis does not explain why Nagrani would be discussing company funds with him (since her position did not allow for access to such funds) or when she supposedly did so.

[10]    The cited evidence in support of Plaintiffs' attempt to show that ML Fashion's "nerve center" was in Illinois "at all relevant times" is based solely on Lemonis' residence (Opp'n at 2, citing Opp'n, Ex. 1 at ¶¶ 5-6), which is an insufficient jurisdictional nexus in itself as a matter of law. In this connection,

the alleged competitive conduct and computer usage, there is no dispute that the only alleged contact here is the Illinois injury since all the relevant actors acted out of Connecticut.

Plaintiffs offer nothing but Defendants' "aware[ness] that harm caused by their actions would be felt in Illinois" (Opp'n at 9), yet "[k]nowing about a potential for harm in a particular state is not the same as acting *in* that state, and it takes the latter to permit personal jurisdiction …." (Def. Br. at 11, citing *Ariel*, 881 F.3d at 522 (original emphasis).) But under the current law, defendants' conduct must "connect him to the forum in a meaningful way," and that connection cannot be "defendant's relationship with a plaintiff or third party …." (Def. Br. at 9-10, citing *Walden*, 571 U.S. at 290.) But the only connection to the forum here is Lemonis' residence in Illinois—indeed, he concedes that it was his residence that was the reason for ML Fashion's alleged Illinois focus (assuming any such focus even existed). (Opp'n, Ex. 1 at ¶ 8.) As all of Defendants' subsequent alleged "aiming" at Illinois thus stemmed from Lemonis' residence alone, there is no valid jurisdiction. (Def. Br. at 6 n.4, citing *Advanced Tactical*, 751 F.3d at 802 ("[A]fter *Walden* there can be no doubt that 'the plaintiff cannot be the only link between the defendant and the forum.' Any decision that implies otherwise can no longer be considered authoritative.").)

**B. Plaintiffs' "Home-Court Advantage" Venue Theory Has Been Rejected by This Court**

As the above discussion and Defendants' opening papers make clear, no substantial events occurred in this District because all the conduct that gives rise to the claims occurred outside of it, and Plaintiffs' residence alone does not make the venue proper here. (Def. Br. at 13-14, citing *Ford-Reyes v. Progressive Funeral Home*, 418 F.Supp.3d 286, 291 (N.D. Ill. 2019) (Seeger, J.).)

---

Plaintiffs' attempt to import knowledge of any supposed Illinois focus to Menkin and Goureau based on Lemonis' testimony (Opp'n at 3, citing Opp'n, Ex. 1at ¶¶ 8-9) is invalid, since Lemonis has no first-hand knowledge as to what Menkin and Goureau "understood" when forming the company, and both Menkin and Goureau's sworn understanding was that the company was New York-centric with no hint of any Illinois focus. (*See* Menkin Aff. at ¶¶ 6-7 & 10; Goureau Aff. at ¶¶ 7 & 11.) For the same reason, Defendants' alleged breaches of their fiduciary duties (Opp'n at 9) owed to a *Delaware* company headquartered in *New York* (FAC at ¶ 4) provide no additional jurisdictional nexus to Illinois either.

Plaintiffs respond with the "historical predicate" test, essentially contending that certain Defendants' travelling to Illinois and managing Illinois stores in the past should count as part of "a substantial part of events" under 28 U.S.C. § 1391(b)(2). (Opp'n at 12.) But the "historical predicate" does not mean events that do not give rise to any claims—on the contrary, the events forming the predicate "must have a 'close nexus' to the plaintiff's alleged claim." *Jackson*, 2014 WL 4269448, at *6 (cited by Plaintiffs' "historical precedent" authority, *Mgmt. Registry, Inc. v. Batinich*, 2018 WL 1586244, at *2 (N.D. Ill. Apr. 2, 2018)).

Plaintiffs' remaining venue arguments merely rehash their insufficient jurisdictional allegations, which are inadequate for the reasons already discussed. This is especially true with regard to their renewed insistence on finding venue proper in this District just because Defendants purportedly knew that their "acts were causing harm in this District." (Opp'n at 12.) This Court has specifically rejected this very notion in *Ford-Reyes*, and Plaintiffs simply ignore its holding to the effect that "it is not enough to allege that one of the Plaintiffs suffered harm in Illinois. Otherwise, a plaintiff could always have a home-court advantage. Indeed, it takes only a moment's thought to realize that if economic harm to a plaintiff were really enough …, [no other prongs] would ever have to be looked at, for a plaintiff could *always* bring suit at its home based on the premise that it has suffered harm there…. The test is not where a plaintiff suffered harm." (Def. Br. at 14 n.19, citing *Ford-Reyes*, 418 F.Supp.3d at 291.) Other courts in this Circuit are in accord on this point. *See, e.g., Vera Bradley Designs, Inc. v. Denny*, 2018 WL 3633986, at *3 (N.D. Ind. July 30, 2018) ("[V]enue would be rendered meaningless if a plaintiff could always bring suit in its home district simply because it had suffered damages."). Finally, Plaintiffs' attempt to ground venue against Menkin and Goureau on their alleged "close-relatedness" to the Credit and Security Agreements between the Plaintiffs (Opp'n at 13) is a non-starter, since Menkin's execution of one

of the agreements in her representative capacity as ML Fashion's president just does not cut it (let alone Goureau's passive member status),[11] and while Plaintiffs' well-pleaded *factual* allegations must be accepted as true for purposes of a motion to dismiss, their *legal conclusions* do not enjoy the same privilege, *see McLeod v. Arrow Marine Transp., Inc.*, 258 F.3d 608, 614 (7th Cir. 2001).[12]

## C. **Plaintiffs' Claims Still Fail on Their Merits**

As an initial matter, Defendants note that Plaintiffs' opposition to Defendants' motion to dismiss brought under Rule 12(b)(6) improperly raises matters outside of the complaint by citing various affidavits submitted as part of Plaintiffs' opposition papers. *See Palda v. Gen. Dynamics Corp.*, 47 F.3d 872, 875 (7th Cir. 1995) ("[W]e will not look beyond the four corners of the complaint itself to determine whether [plaintiff] can state a claim …."); *see also Rosenblum v. Travelbyus.com Ltd.*, 299 F.3d 657, 661 (7th Cir. 2002) ("As a general rule, on a Rule 12(b)(6) motion, the court may consider only the plaintiff's complaint."). Plaintiffs' impermissible reliance on matters outside of their complaint cannot be construed as responding to Defendants' opening evidence since the content of the latter was properly limited to matters pertaining to jurisdiction and venue under Rules 12(b)(2) and 12 (b)(3). As such, Defendants' responses below will not address any evidence outside of the complaint. Should the Court elect to treat their motion as one for summary judgment, Defendants reserve their "reasonable opportunity" to address Plaintiffs'

---

[11]     Def. Br. at 12 n.16 (collecting cases and citing, *inter alia, Monco v. Zoltek Corp.*, 2019 WL 952138, at *15-17 (N.D. Ill. Feb. 27, 2019) (holding that nonparty officer's signing a contract in his representative capacity does not establish the required "corporate affiliation" to apply the "closely related party" theory to bind him to a forum selection clause)).

[12]     Plaintiffs point to Defendants' statement that the Court must accept as true the close-relatedness allegation for purposes of their motion to dismiss but that statement pertained to Defendants' motion ***as brought under Rule 12(b)(6)*** (Opp'n at 13, citing Def. Br. at 29). Motions to dismiss based on improper venue under Rule 12(b)(3) are different because they allow outside evidence contradicting the allegations. *See, e.g., Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 676-77 (7th Cir. 2001). The evidence here shows that neither Menkin nor Goureau make any managerial decisions. Yet Plaintiffs' authorities on this point require active participation in the decision making (*see* Opp'n at 13, citing, *inter alia, Stifel, Nicolaus & Co. v. Lac du Flambeau Band of Lake Superior Chippewa Indians*, 807 F.3d 184, 213 (7th Cir. 2015) (observing that the nonparty in question was "intimately involved" with the transaction)). Thus, on the venue point, the allegation is in dispute, even if it could be viewed as anything but a legal conclusion.

evidence then. *Lewis v. Faulkner*, 689 F.2d 100, 101 (7th Cir. 1982).

### 1. **The Statutory Claims Lack Adequate Support, and So Does Federal Question**

**Lanham Act's False Advertising Claims Lack Any Actionable Statements.** As

Defendants demonstrated in their opening brief, the purported false advertising claim under the

Lanham Act lacks the main ingredient: namely, any false advertising. (Def. Br. at 14-16.)

Plaintiffs come back with a purported representation to the effect that Nobelle is "selling goods

belonging to Nobelle" yet they can point to no such specific statement—be it in their complaint's

allegations or in any of the advertisements at issue here. (Opp'n at 13, citing FAC at ¶¶ 80-92,

172-175 & 178-81.)[13] If this is a claim based on an *implied* representation, Plaintiffs' own

authorities require dismissal, since there is simply no false advertising claim without an actual

statement. (Opp'n at 13, citing *Eli Lilly & Co. v. Arla Foods, Inc.*, 893 F.3d 375, 382 (7th Cir.

2018) (confirming that the claim requires "actionable **statements**").) *Accord Land's End, Inc. v.

Remy*, 447 F. Supp. 2d 941, 949 (W.D. Wis. 2006) ("Plaintiff's Lanham Act claim fails for obvious

reasons: defendants made no statements to the consumers ...."). In turn, if the alleged statement

here is a false designation of origin, it is similarly lacking because the mere selling of the products

does not make any statement, let alone the statement Plaintiffs seek to imply—namely, that the

goods Nobelle sells "belong[] to Nobelle." *See, e.g., Innovative Networks, Inc. v. Satellite Airlines

Ticketing Centers, Inc.*, 871 F. Supp. 709, 725 (S.D.N.Y. 1995) (finding that the complaint "fails

to allege the crux of [the] false designation of origin claim, namely that the ... Defendants

---

[13]     Notably, these cited allegations confirm that Goureau is not even alleged to be among the speakers
here; rather, he supposedly "aided and abetted" the misappropriation of the inventory (FAC ¶ 91). Despite
Defendants' specifically pointing to this deficiency in the opening brief (Def. Br. at 15 n.22), Plaintiffs fail
to respond thereto and thus implicitly concede there is no valid false advertising claim against Goureau.
*See MCI WorldCom Network Servs., Inc. v. Atlas Excavating, Inc.*, 2006 WL 3542332, at *3 (N.D. Ill. Dec.
6, 2006) ("The general rule in the Seventh Circuit is that a party's failure to respond to an opposing party's
argument implies concession."); *cf. Lee v. Ne. Illinois Reg'l Commuter R.R. Corp.*, 912 F.3d 1049, 1053-
54 (7th Cir. 2019) (holding that dismissal is proper where "a litigant effectively abandons the litigation by
not responding to alleged deficiencies in a motion to dismiss").

distributed the [product] with [Defendants'] logo placed over [plaintiff]'s name").[14] The absence

of any specific statements in Plaintiffs' allegations is especially jarring given Rule 9(b)'s

heightened specificity requirement, which Plaintiffs do not deny applies here. (Def. Br. at 15-16,

citing, *inter alia*, *CardioNet, Inc. v. LifeWatch Corp.*, 2008 WL 567031, at *2 (N.D. Ill. Feb. 27,

2008) (dismissing false advertising claims where "[t]he particulars of the false and misleading

statements [were] … absent," and mere allegations that "unspecified advertisements *had the effect*

*of implying*" the message at issue were insufficient) (original emphasis).)

Given the absence of any actual false or misleading statements, any likelihood of some

confusion caused thereby becomes an even more attenuated proposition. Plaintiffs point to some

confused vendors as supposedly evidencing the likelihood of consumer confusion,[15] yet Plaintiffs'

own authorities establish that these isolated incidents only show "minimal" confusion that "weighs

[only] slightly" in the analysis. (Opp'n at 15, citing *Champions Golf Club, Inc. v. The Champions*

*Golf Club, Inc.*, 78 F.3d 1111, 1119-20 (6th Cir. 1996) (also observing that "four incidents is not

a considerable quantum of evidence of actual confusion"), and *Miyano Mach. USA, Inc. v.*

*MiyanoHitec Mach., Inc.*, 576 F. Supp. 2d 868, 886 (N.D. Ill. 2008).)[16]

---

[14]     *Accord* Def. Br. at 15 n.23, citing *GK Skaggs, Inc. v. Hartford Cas. Ins. Co.*, 579 F. App'x 542, 543 (9th Cir. 2014) (finding that plaintiff's allegation that defendant's "marketing and sales … falsely implies an authority to sell those brands in Wisconsin, when in fact, [plaintiff] had the exclusive distribution rights in that state" fails to state a claim that defendant "said anything about [defendant]'s rights, much less that [defendant] claimed to have the exclusive right to distribute … in Wisconsin").) *Cf. Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1138-39 (4th Cir. 1993) (rejecting logic similar to Plaintiffs' that "the very *act* of placing a drug on the market … somehow implies (falsely) that the drug had been 'properly approved by the FDA'" without an actual statement by the defendant representing such approval: "Such a theory is, quite simply, too great a stretch under the Lanham Act.") (original emphasis); *Outlaw Lab., LP v. Shenoor Enter., Inc.*, 371 F. Supp. 3d 355, 366-68 (N.D. Tex. 2019) (concluding that merely placing products on display and selling them "is not commercial speech for the purposes of the Lanham Act").

[15]     The cited affidavit (Opp'n, Ex. 3 at ¶ 14) is improper as evidence outside of the complaint; moreover, it presents nothing but a short description of some hearsay calls without offering any specifics as to who called and when, let alone provide any first-person accounts of the purported confusion.

[16]     Plaintiffs' reliance on franchise cases dealing with competing stores opening at the same locations as the terminated franchises (Opp'n at 14, citing *Quizno's Corp. v. Kampendahl*, 2002 WL 1012997, at *6-7 (N.D. Ill. May 20, 2002), and *Domino's Pizza, Inc. v. El-Tan, Inc.*, 1995 WL 367893, at *3 (N.D. Okla. Apr. 28, 1995)) is similarly unpersuasive, since these cases have nothing to do with the required element of confusion for false advertising claims under the Lanham Act (indeed, *Domino* involved no Lanham Act claims at all); moreover, both are based on evidentiary findings for preliminary injunctions.

**<u>Lanham Act's Unfair Competition Claims Fail for Similar Reasons.</u>**  Although Plaintiffs' unfair competition claims repeat their false advertising claims word for word (*compare* FAC ¶ 172, *with id.* ¶ 178), Plaintiffs take issue with applying the heightened pleading standard of Rule 9(b) to these claims (Opp'n at 14-15), even though courts dealing with such claims sounding in fraud do not hesitate to subject them to this demanding standard.  *See, e.g., Control Sols., LLC v. Oshkosh Corp.*, 2011 WL 1131329, at *2 (N.D. Ill. Mar. 28, 2011).  And just like Plaintiffs' false advertising claims, their unfair competition claims similarly fail this standard (or even simple notice pleading).  This is because Plaintiffs' claim that Defendants are supposedly "passing off" Plaintiffs' goods as their own (Opp'n at 15), which is essentially a "reverse passing off" claim,[17] finds no support in Plaintiffs' allegations.  Indeed, as Defendants showed in their opening brief (Def. Br. at 15 n.23), and as Plaintiffs' own authorities confirm,[18] there is no Lanham Act claim here because Nobelle did nothing to repackage Plaintiffs' private labels as its own—rather, Nobelle's consumers know they are buying ML Fashion's brand because the label has been unaltered and still says so.  *See, e.g., Perkins Sch. for the Blind v. Maxi-Aids, Inc.*, 274 F. Supp. 2d 319, 325 (E.D.N.Y. 2003) (collecting cases to establish that reverse passing off "generally entail[s] the defendant removing the plaintiff's trademark and replacing it with the defendant's own mark" and finding that distributor's unauthorized distribution of manufacturer's "Perkins Braillers" did not amount to reverse palming off, since the complaint was "devoid of any allegations tending to establish that the defendants misidentified the braillers and tried to pass off the braillers under their own name instead of the plaintiff's name"); *accord Maui Jim, Inc. v. SmartBuy Guru Enterprises*, 459 F. Supp. 3d 1058, 1100 n.23 (N.D. Ill. 2020) ("We follow the precise words used by the

---

[17]     Reverse passing off is a claim that "the defendant is trying to pass off the plaintiff's product as the defendant's …." *Custom Vehicles, Inc. v. Forest River, Inc.*, 476 F.3d 481, 484 (7th Cir. 2007).
[18]     Opp'n at 15, citing *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 31 (2003), for the proposition that one would have a valid claim under the statute where the evidence shows that defendants bought plaintiff's products and "***repackaged*** them as its own."

Supreme Court and the controlling Seventh Circuit and hold that Defendants must have substituted its own name for the true manufacturer to be liable for reverse passing off.").

Finally, Plaintiffs provide no other basis for their request for attorneys' fees and do not oppose the request to strike their prayer for the fees should their Lanham Act claims be dismissed. (Def. Br. at 17 n.30.)

**CFAA Claim Pleads No Cognizable Damages**. As Defendants showed, this claim fails on its face because Plaintiffs failed to allege any cognizable damages under the statute. (Def. Br. at 17-18.) This statute was intended to protect against "destruction or impairment to the integrity of the underlying data," not the alleged unauthorized access to confidential information that causes no damage to any data. (Def. Br. at 17 nn.32 & 33, citing, *inter alia*, *James Real Estate*, 2011 WL 5078873, at *3 (N.D. Ill. Oct. 26, 2011) ("Absconding with confidential information is not 'damage' unless the theft impairs the underlying data."), and *Garelli Wong & Assocs., Inc. v. Nichols*, 551 F.Supp.2d 704, 709-11 (N.D. Ill. 2008) (unauthorized access of computer network to copy information is not covered by CFAA).)[19] Where no such destruction or impairment took place, investigating the incident is not cognizable as the required "loss" under the statute either. (Def. Br. at 17-18, citing *Cassetica Software, Inc. v. Computer Scis. Corp.*, 2009 WL 1703015, at *4 (N.D. Ill. June 18, 2009).) In this connection, Plaintiffs' misleading citation to *Cassetica* is most telling, since Plaintiffs specifically omit from their quote the part that requires the investigation to pertain to a violation "***that caused impairment or damage to a computer.***"

---

[19]     *Accord First Fin. Bank, N.A. v. Bauknecht*, 71 F. Supp. 3d 819, 851 (C.D. Ill. 2014) ("In this case, all Plaintiff has alleged Bauknecht did is access documents to which he had no right. He did not delete or corrupt those files …. For that reason, any argument that Bauknecht caused damage as defined by [CFAA] is untenable."); *Mintel Int'l Grp., Ltd. v. Neergheen*, 2010 WL 145786, at *9 (N.D. Ill. Jan. 12, 2010) ("Neergheen did not erase any files from Mintel's database, nor did he install any destructive software that would compromise the integrity of the data or disable Mintel's computers or its networks. Thus, Mintel has not demonstrated that it suffered the type of damage contemplated [by the statute]."); *Motorola, Inc. v. Lemko Corp.*, 609 F. Supp. 2d 760, 769 (N.D. Ill. 2009) ("The plain language of the statutory definition refers to situations in which data is lost or impaired because it was erased or because (for example) a defendant smashed a hard drive with a hammer.").

(*Compare* Opp'n at 17, *with Cassetica*, 2009 WL 1703015, at *4.)

Aside from leaving out crucial language from the cited authorities, Plaintiffs come back with a creative, but ultimately insufficient, ground to squeeze their claim into the statute's coverage: what they claim was altered was their *access* to the remote computer at issue. (Opp'n at 17.) But access is not data. *See, e.g., Ocean Tomo, LLC v. PatentRatings, LLC*, 375 F.Supp.3d 915, 954 (N.D. Ill. 2019) (rejecting CFAA's applicability where there was "no[] claim that [defendant] 'altered' the information in the servers" but rather "prevented or limited [plaintiffs]' access to the information"). For all Plaintiffs know, the data on the computer remains intact—just like their own data after Defendants' purported access thereto. Plaintiffs' speculation that the alleged installation of software on the computer alone is somehow sufficient for a claim that it "likely damaged or erased existing data" (Opp'n at 17) is nonsensical. *See, e.g., Hasan v. Foley & Lardner, LLP*, 2007 WL 2225831, at *5 (N.D. Ill. July 26, 2007) (holding that installation of software does not, by itself, cause the required data damage under the statute), *rev'd in part on other grounds*, 552 F.3d 520 (7th Cir. 2008). The bottom line is that the statute just does not fit.

**DTSA Claims Fail for Lack of Secrecy.** In their opening brief, Defendants showed that Plaintiffs had no secrets—not from these Defendants anyway. (Def. Br. at 19-20.) Indeed, Plaintiffs fail to allege that these Defendants have ever signed any nondisclosure agreements; moreover, the ease of access to the abandoned computers negates any notion of secrecy.

Plaintiffs come back with their newly minted "locked office" theory, which is nowhere to be found in their complaint, but still cannot show that any of the Defendants were parties to any nondisclosure agreements—even though this is how Plaintiffs purportedly protect their supposed secrets (Opp'n at 20). If three former employees have not come across these supposed protections, how many more are out there? Notably, it is the fact that defendants were bound by such

nondisclosure agreements that was the determinative factor in *Xavian Ins. Co. v. Boeing Capital Corp.*, 2019 WL 4750105, at *6 (N.D. Ill. Sept. 30, 2019), Plaintiffs' lead authority on the secrecy point. Moreover, Plaintiffs' claim that there are "passwords [and] security measures" is debunked by their own allegations, given that the computers were purportedly accessed by "Nicolas," who, as we may safely presume, is neither the former controller nor the bookkeeper that allegedly owned these laptops (Opp'n, Ex. 2 at ¶ 52). These are hardly "appropriate and necessary" means of keeping the information secret, and Defendants showed as much in their opening brief. (Def. Br. at 19 n.37, citing *Opus Fund Servs. (USA) LLC v. Theorem Fund Servs.*, LLC, 2018 WL 1156246, at *2-3 (N.D. Ill. Mar. 5, 2018) (holding that "[a]n employer must use additional measures to protect the confidentiality of information he considers to be a trade secret" and finding such measures as password protection, confidentiality agreements, and prohibiting disclosure to third parties to be insufficient to establish a trade secret because they were merely normal business practice for protecting ordinary information).) All Plaintiffs say in response is that their case is "unlike" *Opus* (Opp'n at 20) but they never say how. Finally, Plaintiffs are silent vis-à-vis Defendants' authorities demonstrating that Plaintiffs' failure to clear the supposedly "confidential" data from these "decommissioned" computers (FAC ¶ 93) conclusively debunks any secrecy. (Def. Br. at 20 & *id.* n.39, citing *CMBB LLC v. Lockwood Mfg., Inc.*, 628 F. Supp. 2d 881, 885 (N.D. Ill. 2009)). This failure to respond is yet another concession that these are not secrets.

Plaintiffs' claims also fail on the misappropriation front, as Plaintiffs' opposition simply ignores that "mere possession of trade secrets does not suffice to ***plausibly*** allege disclosure or use of those trade secrets." (Def. Br. at 20, citing *Packaging Corp. of Am., Inc. v. Croner*, 419 F. Supp. 3d 1059, 1066 (N.D. Ill. 2020).) Since Plaintiffs allege no facts supporting their naked pleaded assumptions of usage (let alone facts specific to each defendant thus leaving each of them without

14

simple notice), they can show no valid misappropriation. The newly-minted "locked office" theory does not help them here either, since Plaintiffs' allegations establish that, at least as to Menkin and Nagrani, their former positions within the company would have provided them access to the same information. In other words, they already knew it through lawful means, thus negating any notion of misappropriation. (Def. Br. at 20-21 & *id.* at 21 nn.41 & 42.) Given Plaintiffs' failures vis-à-vis any actual misappropriation, any threatened misappropriation cannot be plausibly maintained either. *See, e.g., Packaging Corp.*, 419 F.Supp.3d at 1071 (where the allegations "do not plausibly establish that [defendant] did, in fact, use trade secrets," any threatened misappropriation claim must fail, too: "While it is ***possible*** that he did so, the complaint alleges no facts that make it ***plausible*** to infer that he did so.") (original emphasis).[20] Although Plaintiffs attempt to buttress their threatened misappropriation theory by relying on "inevitable" disclosure (Opp'n at 21), where, as here, Defendants had preexisting fashion retail experience, Plaintiffs cannot establish that it is the ***Plaintiffs'*** information that Defendants would necessarily use, as opposed to their own preexisting fashion retail knowledge. *See, e.g., Zellweger Analytics, Inc. v. Milgram*, 1997 WL 667778, at *3 (N.D. Ill. Oct. 21, 1997) (no threatened misappropriation where defendants had their own "independently derived" information); *accord Packaging Corp.*, 419 F.Supp.3d at 1070.

Finally, as Defendants also showed, if all of Plaintiffs' federal statutory claims fail, this Court should refuse to exercise supplemental jurisdiction over the remaining claims. (Def. Br. at 22.) As Plaintiffs offer no opposition on this point, it has been conceded.

### 2. __Plaintiffs Cannot State Valid Common Law Claims__

__Fraud Claim Is Deficient on Many Levels.__ As Defendants showed in their opening brief,

---

[20] *Accord Complete Bus. Sols., Inc. v. Mauro*, 2001 WL 290196, at *5 & n.7 (N.D. Ill. Mar. 16, 2001) (dismissing the claim where plaintiffs alleged no facts that defendant "has, in fact, used trade secrets," and their fear that the secrets "*could* [be] misuse[d]" is insufficient) (original emphasis).

Plaintiffs' fraud allegations fail to carry the heavy burden of particularity imposed by Rule 9(b), as Plaintiffs allege nothing but non-actionable unfulfilled promises—and even as to those, state no requisite details. (Def. Br. at 22-25.) In response, Plaintiffs rest on their generalized allegations (Opp'n at 22-22), choosing to ignore the litany of authorities that reject such allegations limited to "the general subject matter of the alleged misrepresentations" as insufficient a matter of law— especially where, as here, they lack any detail as to the time, the place and the manner of the alleged statements and lump together multiple defendants. (Def. Br. at 23-24 nn.49 & 51.)[21] In turn, their attempt to counter Defendants' argument that Plaintiffs alleged nothing but unfulfilled contractual promises confirms that the fraud claim is really a dressed up breach of contract claim, since Plaintiffs openly concede that the alleged statements concerned "contemporaneous obligations" (Opp'n at 22), and the only such obligations here were grounded in the LLC Agreement. (Def. Br. at 24 n.52.) Finally, Plaintiffs claim they sufficiently alleged Defendants' intention not to perform their alleged promises by showing that ***they failed to fulfill them*** (Opp'n at 22-23)—in other words, the exact same circular logic that courts consistently reject as insufficient to allege the requisite intent for promissory fraud (Def. Br. at 24-25 & *id.* at 24 n.53).[22]

**Plaintiffs Plead Themselves Out of Conversion.** Aside from failing to properly address partial preemption of this claim,[23] Plaintiffs misinterpret the import of Defendants' argument that

---

[21] Despite Defendants' argument that there are no statements by Nobelle (Def. Br. at 23), Plaintiffs' opposition still fails to point to any such statements, despite Plaintiffs' claim lumping Nobelle together with the others (FAC ¶ 144). Plaintiffs' failure to respond is a concession that no such statements exist.

[22] *Meridian Labs., Inc. v. OncoGenerix USA, Inc.*, 2020 WL 2468174 (N.D. Ill. May 13, 2020), offers no support for Plaintiffs' position as it involved very different allegations. In that case, plaintiff alleged a series of misrepresentations made during "protracted" contract negotiations that involved "not only … future 'intention' but also … present 'capability,' some of which appear to be separate from and independent of intention." *Id.* at *4. Moreover, plaintiff there pointed to exact dates and meetings, *id.* at *5-6—something Plaintiffs do not even bother doing here. The combined effect of these allegations led the *Meridian Labs.* court to conclude that they "amount[ed] to 'specific manifestations of fraudulent intent' that provide[d] a plausible, non-speculative basis to distinguish plaintiff's failure to perform from a mere broken promise or 'change of mind.'" *Id.* at *6. All Plaintiffs allege here is the latter.

[23] Plaintiffs contend that the claim is limited to "physical property and funds" (Opp'n at 24 n.1), while their statement of the claim also discusses "confidential financial information." (FAC ¶¶ 118-119.) Plaintiffs do not appear to oppose partial preemption (as set forth in Def. Br. at 27 & *id.* n.58) to the extent

16

Plaintiffs' own exhibit to the complaint defeats their conversion claim. (Def. Br. at 26-27, citing Ex. 8 (texts between Lemonis and Menkin discussing inventory turn-over).) In their rush to dispute the contents of the exhibit by improperly introducing outside evidence (Opp'n at 23), Plaintiffs ignore that the exhibit, on its face, makes their intentional conversion allegations *implausible*. (Def. Br. at 27 n.57, citing, *inter alia*, *Ruebe v. PartnerRe Ireland Ins. DAC*, 470 F. Supp. 3d 829, 840 (N.D. Ill. 2020) ("The complaint alleges that the Third Layer insurers unequivocally denied coverage, but the exhibit to the complaint shows otherwise. When a complaint is at odds with one of its own exhibits, the exhibit typically prevails. 'When an exhibit incontrovertibly contradicts the allegations in the complaint, the exhibit ordinarily controls, even when considering a motion to dismiss.'"), citing *Johnson v. Carrington Mortg. Servs*., 638 F. App'x 523, 525 (7th Cir. 2016), and *Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013).) The exhibit attached to Plaintiffs' complaint demonstrates that Menkin thought she had been authorized to take the inventory at issue. The allegations that she *intentionally converted* the inventory are thus implausible and must be dismissed. *See Ashcroft v. Iqbal*, 556 U.S. 662, 696 (2009); *cf. Kerrigan v. Am. Orthodontics Corp*., 960 F.2d 43, 45 (7th Cir. 1992) ("Conversion is an intentional tort[.]").[24]

**Plaintiffs Plead Themselves Out of Fiduciary Breaches.** Plaintiffs strain to impose a fiduciary duty on Defendants here despite their own allegations that "the management of ML Fashion is vested *entirely and exclusively*" in Lemonis (Def. Br. at 25, citing FAC ¶¶ 32-34). Indeed, Plaintiffs cite cases that confirm that "Delaware common law does not impose fiduciary and other related duties to members of LLCs *who are neither managers or controlling members*,"

---

the claim pertains to such information.
[24] Plaintiffs also contend that the economic loss doctrine does not bar their recovery for conversion because the doctrine only bars losses that "arise from the contractual relationship" between Plaintiffs and Defendants. (Opp'n at 23-24; Def. Br. at 26 & *id.* n.56.) They do here, since ownership of the inventory is defined by the LLC Agreement, along with the power to manage and assign it. (*See* Ex. 1 at § 1 (defining company "Property"); § 2.7 (Title to Property); § 8.1(a) (Bank Accounts).)

*Northbound Grp., Inc. v. Norvax, Inc.*, 5 F. Supp. 3d 956, 979 (N.D. Ill. 2013), and only apply default duties to members where it cannot be ascertained whether those members are controlling, *see id.* at 980 (explaining that the court did not have the relevant LLC agreement before it, and that the duties applied "[i]n the absence of a contrary provision in the LLC agreement"). Plaintiffs' attempt to paint Goureau and Menkin as undertaking "roles in the management" of ML Fashion (Opp'n at 25) fails on its face: the cited complaint allegations are limited to covering their work for Illinois stores and set forth no actions showing control or management decisions, while their cited affidavits (to the extent outside evidence is even allowed for purposes of Rule 12(b)(6)) show that Goureau has been frozen out of ML Fashion, and Menkin only performed her duties under Lemonis' management. But, most importantly, this contention is squarely against the LLC Agreement, which expressly forbids members from any managerial involvement. (FAC ¶ 34, citing Ex. 1 at § 7.1; *see also id.* at § 6.1(a).) In fact, Lemonis' own sworn affirmation that he has "the ***full, exclusive and unilateral*** power and authority to make all decisions" (Opp'n, Ex. 1 at ¶ 4) is the death knell in Plaintiffs' fiduciary duty theory. *See, e.g., Tesla Wall Sys., LLC v. Related Companies, L.P.*, 2018 WL 2225002, at *8 (S.D.N.Y. May 14, 2018) (applying Delaware law and rejecting fiduciary duty claim against a passive investor despite the latter's participation in certain aspects of management where the company's actual manager "stated on several occasions that he is the person authorized to manage" the company).[25]

**The Contract Claim is Implausible and Asks for Too Much.** This Court has already observed that Plaintiffs' competition allegations are implausible (ECF No. 54 at 14-17), and

---

[25] Plaintiffs also contend Illinois law would not apply the economic loss doctrine to bar this claim (Opp'n at 25) but this contention is irrelevant, given that this is a Delaware company with a Delaware choice of law in the LLC Agreement (Def. Br. at 22 n.46). *See also Kronenberg v. Katz*, 872 A.2d 568, 589 (Del. Ch. 2004) (Delaware law governs internal affairs of a Delaware LLC including fiduciary duties). Under Delaware law, this claim is barred (Def. Br. at 26 & *id.* n.55), which Plaintiffs do not contest. As with conversion, the rights to the funds and inventory arise from the LLC agreement, triggering application of the doctrine as to this claim as well.

Defendants will not belabor the point, other than noting that Plaintiffs' cases do not require a contrary conclusion. This is because Plaintiffs here allege a breach by "direct competition" (FAC ¶ 136); by contrast, neither the contract in *Flip Flop Shops Franchise Co., LLC v. Neb*, 2016 WL 9275403, at *7 (C.D. Cal. Dec. 5, 2016), nor the contract in *Quizno*, 2002 WL 1012997, at *1, required such a finding to establish a breach. Additionally, to salvage the unreasonably broad anticompetition provision, Plaintiffs, once again, apply Illinois law to a contract governed by Delaware law (Def. Br. at 22 n.46, citing Ex. 1 at § 13.9), while ignoring the Delaware precedent rejecting enforcement without some reasonable limitations (Def. Br. at 27-28).

**Aiding and Abetting Does Not Work.** Instead of addressing the actual argument raised by Defendants that there is no cause of action for aiding and abetting one's *breach of contract* (Def. Br. at 28), Plaintiffs offer the unremarkable proposition that one can generally state a claim for aiding and abetting wrongful conduct (Opp'n at 27-28). Curiously, their own authorities fail to support even that (irrelevant) premise. *See Nicholas J. Murlas Living Tr. v. Mobil Oil Corp*., 1994 WL 130778, at *6 (N.D. Ill. Apr. 13, 1994) ("[T]here is no separate tort under Illinois law for aiding and abetting."), citing *Cenco Inc. v. Seidman & Seidman*, 686 F.2d 449, 453 (7th Cir. 1982). Regardless, allegedly assisting Goureau and Menkin in their purported breaches of the LLC Agreement is not a proper basis for this claim, since Plaintiffs cite no authorities that approve of such a basis; moreover, since neither Nobelle nor Nagrani is bound by the LLC Agreement, assisting them in competing with Plaintiffs' stores is not actionable either. (Opp'n at 28 (conceding that the underlying conduct must be "wrongful").)

**Tortious Interference Does Not Fit.** Plaintiffs' own allegations defeat their tortious interference claim as to the Credit and Security Agreements because they allege that the purportedly wrongful conduct affects ***Plaintiffs***' performance, and nobody else's (indeed,

Plaintiffs are the only parties to these agreements), and the alleged affect is only ***potential*** impossibility of performance rather than actual impossibility of such performance (FAC ¶ 152). Indeed, Plaintiffs' own authority rejects a tortious interference claim on these very grounds. *See George A. Fuller Co., Div. of Northrop Corp. v. Chicago Coll. of Osteopathic Med.*, 719 F.2d 1326, 1331-32 (7th Cir. 1983).[26]  As for the LLC Agreement, Plaintiffs cite no authorities to defeat the well-established proposition that one cannot tortuously interfere with one's own contract (Def. Br. at 29).  The "acting beyond authority" red herring (Opp'n at 29) is just another way of stating that Defendants breached the contract; unsurprisingly, this distinction has nothing to do with the facts at hand—rather, it comes into play only when dealing with persons controlling corporate entities and inducing them to breach their contracts.[27]  Finally, Plaintiffs recite their allegations that Defendants supposedly knew their actions would cause a violation of the relevant agreements (Opp'n at 29), ignoring all the authorities dismissing such allegations as insufficient to allege the requisite "intent to cause the result"—*i.e.*, the breach (Def. Br. at 30 & *id.* n.65), which further dooms their claim.

**No Further Leave to Amend.**  Plaintiffs already amended their complaint (after the first motion to dismiss), and the requested third bite at the pleading apple should be denied.  *See, e.g., Adams v. City of Indianapolis*, 742 F.3d 720, 734 (7th Cir. 2014).  It would be certainly prejudicial for Defendants to bring a *third* motion to dismiss.

Dated: February 24, 2021        */s/ Elizabeth L. Janczak*

---

[26]     An additional wrinkle is that the cited allegations (Opp'n at 28, citing FAC ¶¶ 149-53) never explain how either Nobelle or Nagrani was supposed to know about these contracts, thus further defeating this claim against them. *See, e.g., Empire Indus. Inc. v. Winslyn Indus., LLC*, 327 F. Supp. 3d 1101, 1113 (N.D. Ill. 2018) (explaining that the claim "requires more than … knowledge").  In the same vein, Plaintiffs' attempt to impute Menkin's knowledge of the LLC Agreement to Nobelle (FAC at ¶ 157) is not legally cognizable unless Plaintiffs allege that Nobelle and Menkin are one and the same—which they do not.

[27]     In other words, Plaintiffs "conflate[] the third-party prerequisite to tortious interference with the 'without justification' element of the tort" and "would impose tort liability for conduct by a fellow contracting party because its conduct is inconsistent with the contract.  An unjustified breach of contract, however, should be remedied through contract law and not through tort law." *Tenneco Auto., Inc. v. El Paso Corp.*, 2007 WL 92621, at *6 (Del. Ch. Jan. 8, 2007).

Freeborn & Peters LLP
Elizabeth L. Janczak (Ill. Bar No. 6302864)
311 S. Wacker Dr., Suite 3000
Chicago, IL 60606
Telephone: (312) 360-6000
Facsimile: (312) 360-6520
ejanczak@freeborn.com

**Gerard Fox Law P.C.**
Gerard P. Fox
Lauren M. Greene
1880 Century Park East, Suite 1410
Los Angeles, CA 90067
Telephone: (310) 441-0500
Facsimile: (310) 441-4447
gfox@gerardfoxlaw.com
lgreene@gerardfoxlaw.com

*Attorneys for Defendants*