EXHIBIT – 1 –

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

------------------------------------------------------------x
                                                            :    Case No. _____
ML FASHION, LLC and ML RETAIL, LLC,                         :
                                                            :
                              Plaintiffs,                   :    COMPLAINT
                                                            :
               v.                                           :    **JURY DEMAND**
                                                            :
NOBELLE GW, LLC, STEPHANIE MENKIN,                          :
SARIT MAMAN NAGRANI, and                                    :
NICOLAS GOUREAU,                                            :
                                                            :
                              Defendants.                   :
------------------------------------------------------------x

## COMPLAINT

Plaintiffs ML Fashion, LLC ("ML Fashion") and ML Retail, LLC ("ML Retail") (collectively, "Plaintiffs"), by their undersigned attorneys, as and for their Complaint (the "Complaint") against Defendants Nobelle GW, LLC ("Nobelle"), Stephanie Menkin ("Menkin"), Sarit Maman Nagrani ("Nagrani"), and Nicolas Goureau ("Goureau") (collectively, "Defendants"), alleges as follows:

## NATURE OF THE ACTION

1.      This is an action for conversion, breach of fiduciary duty, breach of contract, tortious interference, fraud, violations of the Lanham Act, Defend Trade Secrets Act, and Computer Fraud and Abuse Act, as well as a request for a preliminary and permanent injunction. Plaintiff ML Fashion operates a retail clothing business, while Plaintiff ML Retail is one of three members of ML Fashion and a party to the governing LLC agreement. Defendants Menkin and Goureau are also members and/or officers of Plaintiff ML Fashion. Defendant Nagrani is a former employee of ML Fashion.

2.     In violation of their fiduciary duties, applicable law, and/or contractual obligations to Plaintiffs, Defendants have illegally seized computers, fixtures, clothing and other inventory owned by ML Fashion; opened up a retail store called Nobelle in direct competition with ML Fashion at a property formerly operated by ML Fashion, at which Defendants have no right to operate; and are selling ML Fashion's inventory at that competing retail store for Defendants' own benefit, all the while jeopardizing the jobs of ML Fashion's part-time and full time employees, the continuing viability of ML Fashion and depleting collateral for loans made to ML Fashion by ML Retail allowing it to operate.

3.     Worse still, inexplicably Defendants conducted this scheme and continuing misconduct while Menkin and Goureau *themselves* brought unsupported claims against ML Retail and ML Fashion in two lawsuits in Delaware and New York to divert attention from their own misconduct, one of which has since been stayed due to Defendants' violation of the prohibition against claim splitting.  Plaintiffs are entitled to protect the jobs of their employees, protect ML Retail's collateral, protect the on-going business, seek the return of their property, recover damages, and obtain injunctive relief to prevent Defendants continued improper sale of ML Fashion's inventory and operation of a competing retail business.

## **PARTIES**

4.     Plaintiff ML Fashion is a limited liability company organized under the laws of Delaware with its principal place of business in Illinois.  Plaintiff owns and operates fashion brands and retail stores across the country.

5.     Plaintiff ML Retail is a limited liability company organized under the laws of Delaware with its principal place of business in Illinois.  ML Retail owns a 33.34% membership interest in ML Fashion.  The sole member of ML Retail is Marcus Lemonis, a citizen of Illinois.

2

6. Defendant Nobelle GW, LLC is a limited liability company organized under the laws of New York with its principal place of business in Connecticut.

7. Defendant Stephanie Menkin is an individual residing in New York. Menkin owns a 33.33% membership interest in, and is an officer of, ML Fashion.

8. Defendant Sarit Maman Nagrani is an individual residing in Hewlett, New York, Nassau County. On information and belief, Defendant Nagrani is a founder and co-owner of Nobelle along with Defendant Menkin.

9. Defendant Nicolas Goureau is an individual residing in Florida. Goureau owns a 33.33% membership interest in ML Fashion.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, and over the state law claims pursuant to ancillary, pendent and supplemental jurisdiction, including under 28 U.S.C. § 1367.

11. This Court has personal jurisdiction over Defendants by reason of, among other things, their systematic and continuous contacts with this forum in the form of Defendants' operation of an illegal, improper competitive enterprise in Greenwich, Connecticut, their sales of stolen inventory in Greenwich, Connecticut, their use of stolen fixtures, furniture, and equipment in Greenwich, Connecticut, and their promoting and advertising in interstate commerce via the Internet their illegal, improper retail store in Greenwich, Connecticut.

12. Venue is proper in this District under 28 U.S.C. § 1391(a) and because: (1) a substantial part of the events giving rise to the claims occurred in the District of Connecticut; and (2) Defendants are otherwise subject to personal jurisdiction in this venue.

## FACTS

**A.    Background.**

13.    In or about 2014, Defendants Menkin and Goureau solicited an investment from Marcus Lemonis ("Lemonis") to rescue their failing fashion retail business, operating under the brand name "Courage.B."

14.    In connection with their solicitation of an investment from Lemonis to rescue their business, in or about 2014, Defendants Menkin and Goureau appeared on Lemonis' popular CNBC television series, "The Profit."

15.    While appearing on "The Profit," Defendants Menkin and Goureau admitted that their business had been poorly run and had lost more than $500,00 the year before and that they just completed a lawsuit against their step-father involving the business.

16.    In or about 2014, Lemonis agreed to invest $800,000 in Menkin's and Goureau's failing business in order to allow their business to purchase inventory, pay other fees and for Goureau to receive monies for the first time in exchange for ML Retail, for which Lemonis serves as managing member, receiving an ownership stake in that business.

17.    After Lemonis invested in, and became a part owner of, Menkin and Goureau's business, the business acquired new brands and opened new stores.

18.    In or about 2016, Menkin, Goureau, and Plaintiff ML Retail formed ML Fashion to oversee and operate their expanding fashion retail business.

19.    ML Fashion advertises and sells its products in interstate commerce.

20.    Lemonis is ML Fashion's managing member.

**B.    The Agreements.**

21.    On or about March 29, 2016, Menkin, Goureau, and ML Retail entered into a limited liability company agreement for ML Fashion (the "LLC Agreement") (attached hereto as **Exhibit 1** to the Complaint).  Menkin and Goureau each signed the LLC Agreement individually.

22.    Lemonis signed the LLC Agreement on behalf of ML Retail in Illinois.

23.    **Exhibit A** of the LLC Agreement provides that ML Retail owned a 33.34% membership interest in ML Fashion, and that Menkin and Goureau each owned a 33.33% membership interest in ML Fashion.

24.    **Exhibit B** of the LLC Agreement provides that Lemonis is the chairman and CEO of ML Fashion, and that Menkin serves as ML Fashion's president.

25.    Section 2.3 of the LLC Agreement provides that "[t]he purpose of the Company is to, directly or indirectly through one or more partnerships, limited liability companies or other entities, acquire, hold, maintain, manage, improve, finance, sell, dispose of or otherwise invest in businesses focused on the distribution and sale of apparel, footwear and accessories and sale of apparel, footwear and accessories, via owned and leased retail stores and online (the 'Business')."

26.    Section 2.7 of the LLC Agreement provides that ML Fashion holds title to all of its property, and that no member of ML Fashion has an ownership interest in ML Fashion's property.

27.    Section 6 of the LLC Agreement provides that the management of ML Fashion is "vested entirely and exclusively in" the manager of ML Fashion (the "Manager").

28.    Section 6.1(b) of the LLC Agreement provides that the Manager of ML Fashion is Marcus Lemonis.

29.    Section 7.1 of the LLC Agreement provides that ML Fashion's members do not have any right to participate in the management or control of ML Fashion, or to act for or bind ML Fashion in any way.

30. Section 7.7(b) of the LLC Agreement provides that the members of ML Fashion, including Menkin and Goureau, during the time that they are members and in the twelve months following the end of their membership in ML Fashion, shall not, *inter alia*, "engage in any business, have any financial interest in any company or entity that engages in any business or make any loans to any company or entity that engages in any business that engages in or competes, directly or indirectly, with" ML Fashion's business.

31. Section 7.7(d) of the LLC Agreement provides that the members of ML Fashion, including Menkin and Goureau, agree that breaches of Section 7.7(b) of the LLC Agreement "would be highly injurious and cause irreparable harm" to ML Fashion, and that ML Fashion is accordingly entitled to seek specific performance or injunctive relief as a result of any such breaches.

**C.     ML Fashion's business expansion.**

32. Beginning in or about 2016, ML Fashion began its business operations and took its first planned step toward their eventual goal of opening retail stores across the country.

33. Menkin and Goureau opened ML Fashion's first store in their desired location of Lake Forest, Illinois.

34. At one point, ML Fashion operated more than thirty other retail stores across the country in California, Colorado, Connecticut, Florida, Louisiana, Maryland, Massachusetts, Minnesota, New York, South Carolina, and Texas.

35. In particular, ML Fashion opened and operated a "MARCUS" store at 85 Greenwich Avenue, Greenwich, Connecticut (the "Greenwich Property").

36. Nagrani was the manager of the Greenwich Property, in addition to the manager of an additional ML Fashion store in New York City's Meatpacking District located at 402 W. 13th Street, New York, New York 10014 (the "Meatpacking Store").

37.     New York and Greenwich are in the same retail market, both because of their physical proximity, but also because many people who live in Greenwich work in, or frequently travel to, New York City.

38.     Many Greenwich residents do their fashion-related shopping in both Greenwich and New York City.

39.     Menkin, Goureau, and Nagrani viewed New York City and Greenwich as being in the same retail market.   Menkin's and Goureau's prior business enterprise, "Courage.B," maintained stores in both Greenwich and New York City for that very reason.

40.     Nagrani, Menkin and Goureau accordingly wanted to establish a store at the Greenwich Property to serve both markets.  Nagrani and other ML Fashion employees often travelled back and forth between Greenwich and New York.

41.     Due to the impact of the COVID-19 pandemic on the brick-and-mortar retail market in New York City, ML Fashion closed its New York City store on or about December 22, 2020. ML Fashion has not relinquished that space to its landlord, however.

42.     ML Fashion sold clothing and other fashion-related retail products at the Greenwich Property until in or about March 2020.

43.     ML Fashion remains the owner of the fixtures, furniture, and equipment ("FFE") in the Greenwich Property and remains the owner of the leasehold on the Greenwich Property.

44.     ML Fashion never advised its landlord at the Greenwich Property or anyone else that it was "abandoning" the FFE in the Greenwich Property, which ML Fashion owns and which it always intended to remove from the Greenwich Property.

45.     ML Fashion intended to retrieve the FFE from the Greenwich Property, but was prevented from doing so when Goureau threatened the ML Fashion employee overseeing the FFE

removal via phone calls, to the point where that employee felt uncomfortable returning to the Greenwich Property.

46.     ML Fashion has never turned in its keys to the landlord of the Greenwich Property and its the lease was never terminated.

47.     ML Fashion has not authorized anyone else to operate at the Greenwich Property.

48.     Although ML Fashion's landlord is not currently demanding rent, ML Fashion has no way of knowing whether the landlord is continuing to accrue rent under ML Fashion's name even while Nobelle is operating at the property.

49.     The FFE at the Greenwich Property is collateral for a multi-million dollar loan between ML Retail and ML Fashion.

50.     At its retail stores and online website, ML Fashion sells products from private-label, exclusive brand names owned by ML Fashion, such as a.M, Brkn Heart, and The Line:



51.     ML Fashion also sells products from third-party brands such as Ankle Traveler, Autumn Cashmere, and Brochu Walker.

**D.      Defendants' fraudulent misrepresentations and misappropriation of company funds.**

52.     Although Lemonis had ultimate management authority over ML Fashion, Menkin and Goureau both had active roles in the management and operations of ML Fashion.

53.     Menkin was for years ML Fashion's president.  In that capacity, she oversaw and managed ML Fashion's retail operations and other endeavors.

54.     Goureau too worked for ML Fashion, overseeing the build-out of ML Fashion stores at one point, and worked for other affiliated entities that assisted ML Fashion's operations.

55.     In other words, Menkin and Goureau were never passive members of ML Fashion who just sat back and collected distribution checks; they were involved in managing and operating ML Fashion's business under Lemonis' direction and subject to his ultimate managerial authority.

56.     In or about early 2020, Lemonis began discussions with Menkin and Goureau about their exit from ML Fashion.  Lemonis and Menkin proposed that Menkin would exchange all of her equity in ML Fashion and exit from the company for mutually agreeable inventory.  They discussed that no more ML Fashion inventory was to be diverted to Noemi, and Menkin agreed to this.  Lemonis never agreed that Menkin could compete with ML Fashion.

57.     Lemonis and Goureau similarly discussed a deal where Goureau would exchange all of his equity in ML Fashion and exit from the company for mutually agreeable inventory. Lemonis never agreed that Goureau could compete with ML Fashion.

58.     During these discussions, Menkin and Goureau made numerous misrepresentations to Plaintiffs, through Lemonis, typically via email, text message or telephone calls.

59.     In particular, Menkin and Goureau represented that they would not take ML Fashion's inventory without Plaintiffs' authorization and approval, or otherwise take actions to compete with, or harm, Plaintiffs.

60.     For example, Menkin texted Lemonis on January 19, 2020 to say that "I wouldn't do it [*i.e.*, take inventory] without [Lemonis'] approval."  (**Ex. 2** pg. 8 of 10).

61.     That was a false statement, however, as Menkin ultimately did take inventory without Lemonis' or Plaintiffs' approval, as set forth further below.

62.     Ultimately, Menkin and Goureau did not follow through with transferring their equity to Lemonis, and never intended to do so.  Instead, they ceased all communications with Lemonis in early 2020.

63.     Then in June 2020, they filed their lawsuits, as set forth below.  Despite Lemonis's good faith attempts to resolve the parties' differences, it has become apparent that all of Menkin's and Goureau's negotiations with Lemonis about exchanging their equity for inventory, however, were a smoke-screen to fraudulently mislead Lemonis into thinking they were resolving their disputes, all the while they were secretly preparing lawsuits so they could appear as the purported victims.

64.     In reliance upon Menkin's and Goureau's misrepresentations to Lemonis, Plaintiffs refrained from bringing suit against Menkin and Goureau during this period, and ML Retail continue to provide funding to ML Fashion.

**E.     Defendants' seizure of ML Fashion inventory for personal purposes.**

65.     Meanwhile, Menkin continued to utilize her position as titular President of ML Fashion to unduly influence ML Fashion employees and misappropriate ML Fashion inventory both during and after these separation discussions.

66.     In fact, as the end of her tenure at ML Fashion became clear, Menkin embarked on a surge of involvement in ML Fashion's inventory in order to exert control over ML Fashion's products for her, Goureau, Nagrani, and Nobelle's personal gain.

67.     To date, Plaintiffs have uncovered four instances where Menkin, on behalf of the competing Nobelle business she formed with Nagrani, took without authorization at least 3,922 items of clothing and other merchandise from ML Fashion, with a wholesale cost of at least $109,443.93, and a retail value of at least $207,473.90.

68.     The foregoing represents only the minimum amount of inventory improperly taken for use by Nobelle, however.  Menkin and Nagrani were both affiliated with ML Fashion at the time they improperly took the inventory.  Based upon Plaintiffs' investigation to date, Plaintiffs believe that Menkin and Nagrani used their positions to take steps to cover their tracks, including by potentially deleting or altering ML Fashion inventory records, and Plaintiffs have only uncovered some of the ways in which Defendants attempted to hide their misconduct.

69.     On January 13, 2020, Lemonis, Menkin (who at that time was still president of ML Fashion), and ML Fashion employee Johnna Griep ("Griep") were contacted by Front Door Fashion ("FDF").

70.     FDF is a company that works with ML Fashion to sell merchandise online on ML Fashion's behalf.

71.     FDF contacted ML Fashion because it wished to return to ML Fashion 1,296 items, including pants, blouses, shirts, skirts, and coats.

72.     The products included items bearing private-label, exclusive brand names owned by ML Fashion, such as a.M, Brkn Heart, and The Line.

73.     The products also included third-party brands sold by ML Fashion, such as Ankle Traveler, Autumn Cashmere, and Brochu Walker.

74.     On January 13, 2020, Menkin responded to tell FDF that she would provide them with a shipping address for the items.

75.     Menkin then apparently emailed FDF separately, without copying Lemonis or Griep, to tell FDF to ship the 1,296 items of clothing to a location on the Upper East Side of Manhattan, New York, 1035 Third Avenue (the "Noemi Store").

76. Since October 2019, the Noemi Store had been controlled exclusively by Menkin's mother, Noemi Goureau.

77. Accordingly, at the time Menkin directed FDF to ship ML Fashion's product to the Noemi Store, the store was not an ML Fashion location or otherwise controlled by ML Fashion, and so Menkin had no authority from ML Fashion to ship items there, and had no reason to do so except in order to use the merchandise for her personal purposes.

78. Plaintiffs only learned that FDF had shipped the goods at all because FDF subsequently sent the Federal Express tracking numbers for the shipments, totaling 46 boxes, to Menkin, Lemonis, and Griep.

79. According to FDF, they shipped 46 boxes to the Noemi Store, at Menkin's direction, via FedEx Tracking Numbers 779663974880, 779664710077, and 779665961437.

80. Notably, Menkin attempted to have FDF ship additional product to her on May 7, 2020.

81. At that time, FDF advised Menkin that it would not ship additional product to her without direct authorization from Lemonis or Griep.

82. The second incident of which Plaintiffs are aware occurred on January 24, 2020, when Menkin directed 2,769 items to be shipped from an ML Fashion warehouse to the Noemi Store.

83. Menkin took this action without notifying ML Fashion.

84. ML Fashion discovered the shipment later when Greip reviewed ML Fashion's inventory records and its Federal Express charges because Meknin used ML Fashion's Federal Express charge account to ship the goods for her personal purposes.

85. The 2,769 items included shirts, hooded sweatshirts, pants, and sunglasses.

86.     The products included products from third-party brands sold by ML Fashion, such as Ankle Traveler, and sunglasses from a company part-owned by Marcus Lemonis, Ellison Eyewear.

87.     Based on ML Fashion's Federal Express invoices, the shipments were delivered to the Noemi Store on January 28, 2020 by Federal Express, in a total of 25 boxes with FedEx Tracking Numbers 779902747497, 779902758314, 779902735975, 779902745369, 779902734795, 779902743377, 779902752809, 779902744101, 779902742072, 779902757400, 779902736798, 779902741444, 779902739499, 779902739238, 779902754444, 779902750975, 779902759387, 779902749033, 779902737990, 779902746148, 779902755337, 779902751504, 779902761034, 779902756447, 779902749489.

88.     On February 3, 2020, in a third instance of misconduct, Menkin shipped an additional 335 items from ML Fashion's warehouse to the Noemi Store.

89.     These items included shirts, sweaters, pants, tote bags, and sunglasses.

90.     The products included third-party brands sold by ML Fashion, such as Ankle Traveler, as well as sunglasses from the Lemonis-affiliated Ellison Eyewear.

91.     The fourth incident of unauthorized shipment of products occurred on February 6, 2020, when Menkin shipped 40 more items from ML Fashion's warehouse to the Noemi Store.

92.     These items included shirts, hooded sweatshirts, and sunglasses, including from Ellison Eyewear.

93.     Plaintiffs believe that Nagrani, as Menkin's business partner and a former ML Fashion employee, assisted Menkin in transporting the stolen product from the Noemi Store to Nobelle during the time when Nagrani was serving as ML Fashion's manager for its New York City and Greenwich retail stores.

94. Among other things, by virtue of her employment with ML Fashion, Nagrani was aware that many of the products Menkin had shipped to the Noemi Store were exclusive, private-label brands sold only by, or with the authorization of, ML Fashion.

95. Plaintiffs did not authorize Defendants to take or sell this exclusive ML Fashion inventory.

**F.     Menkin and Goureau's lawsuits.**

96. On or about June 18, 2020, Menkin and Goureau filed simultaneous, duplicative lawsuits against, *inter alia*, Lemonis and ML Retail in Delaware state court (the "Delaware Action") and in the United States District Court for the Southern District of New York (the "New York Action") in an attempt to avoid culpability for their improper use of ML Fashion's funds for their own personal use and in a misguided scheme to attempt to extract even more money from ML Fashion, ML Retail, and Lemonis.

97. Among other things, the Delaware Action sought to prevent Lemonis and ML Retail from continuing to operate ML Fashion and to dissolve ML Fashion so that Menkin and Goureau can take ML Fashion's assets for themselves.

98. On March 30, 2021, the court in the Delaware Action held that Menkin and Goureau violated the prohibition against claim splitting by filing duplicative lawsuits in Delaware and New York, and stayed the Delaware Action pending the outcome of the New York Action.

99. Following the filing of the Delaware Action and the New York Action, Menkin and Goureau engaged in this further scheme and misconduct as described herein.

**G.     Menkin, Goureau, and Nagrani form "Nobelle" to compete with ML Fashion.**

100. In or about 2020, Menkin, Goureau, and Nagrani formed "Nobelle," a competing clothing store.

101.    In or about August 2020, Nobelle, Menkin, and Nagrani began occupying and operating a retail store at the Greenwich Property in Connecticut under the "Nobelle" brand name (the "Nobelle Store") to sell ML Fashion's stolen inventory, private brands, and products (the "Inventory"), all without Lemonis', ML Fashion's or ML Retail's authorization or consent.

102.    At the time Defendants opened the competing Nobelle Store, ML Fashion was still operating the Meatpacking Store in the same retail market.

103.    Nobelle, Menkin, and Nagrani, are promoting Nobelle's illicit business in interstate commerce through a website and social media pages, including on Facebook and Instagram, which depict Defendants' exclusive possession of the Greenwich Property, sales of the Inventory, and use of the FFE.  Examples of the website and social media pages are attached as **Exhibits 3-6** to this Complaint.  (**Exhibit 3** - Nobelle's Website; **Exhibit 4** - Nobelle's Instagram Account; **Exhibit 5** - Nobelle's Facebook page; **Exhibit 6** - Nobelle's online "Shop").

104.    Menkin and Nagrani admit their affiliation as co-founders of Nobelle on their website and in an Instagram post (**Ex. 3** and **Ex. 4**).

105.    Many of the items from the January 12, January 24, February 3, and February 6, 2020 shipments to the Noemi Store have appeared in the Nobelle Store and in Nagrani's and Menkin's social media posts and pictures promoting Nobelle.

106.    For example, the following image from the Nobelle store shows white-and-black patterned pants and khaki pants from Ankle Traveler, which were part of Menkin's January 13, January 24, and/or February 3, 2020 shipments:



107. ML Fashion sells those same Ankle Traveler pants on its website as well:



108. Another image of the Nobelle Store shows dozens of colored shirts and sweaters that came from ML Fashion's exclusive "The Line" brand, and which were part of either the January 13 or January 24, 2020 shipments:



109.     These privately branded ML Fashion products are exclusive to ML Fashion, and no other retailer is authorized to carry, market, or sell these products.

110.     Defendants are also selling at their Nobelle Store, and to customers nationwide online, at least some of the products identified above, as well products from the same third-party brands and, in some cases, the exact same products as those sold by ML Fashion.

111.     For example, the following image from the Nobelle Store shows that Nobelle is selling sweaters from the brands Brochu Walker and Autumn Cashmere; the Brochu Walker sweater is on the left, and the Autumn Cashmere sweater is on the right:



112.    ML Fashion sells the same or similar sweaters from these same brands, as shown in screenshots taken from the website for ML Fashion's "MARCUS" stores, which show just a few examples of the sweaters ML Fashion sells from these brands:



113.    Nobelle, Menkin, and Nagrani are selling ML Fashion's Inventory at the Greenwich Property in interstate commerce without ML Fashion's authorization or consent, and are keeping the proceeds from such sales for themselves, without making any payments to ML Fashion.

114.    In addition to selling ML Fashion's exclusive, private-label brands like "The Line" and the ML Fashion merchandise stolen on January 13, January 24, February 3, and February 6 2020, Nobelle is selling items that are identical to the products sold by ML Fashion and are obtained from the same vendors used by ML Fashion via Nobelle's website, which is available to customers nationwide.

115.    The Nobelle website postings for these items are identical to those on ML Fashion's website, down to the prices and the photographs and text descriptions of the products on the website.

116.    For example, Nobelle is selling to consumers nationwide silver Sei rings, shown in a screenshot taken from the Nobelle website (https://shopnobelle.com/shop/ols/products/sei-ring-silver):



117.  The same exact product is shown in this screenshot from ML Fashion's MARCUS website (https://shopmarcus.com/collections/everyday-jewelry/products/sei-ring-silver):



118.  Nobelle is selling the exact same product at the exact same price using the same photograph and text description to promote the product.

119.  Another example is the gold rainbow edge bangle, shown in this screenshot from the Nobelle website (https://shopnobelle.com/shop/ols/products/rainbow-edge-bangle-gold):

19



120.  And here is the same product on ML Fashion's website (https://shopmarcus.com/collections/everyday-jewelry/products/rainbow-edge-bangle-gold):



121.  Again, same product, same price, same photograph, and same text description of the product.

122.  The foregoing are just a few examples of Nobelle's competition, rather than an exhaustive list.  A comparison of the two websites reveals many more identical or strikingly similar products, ranging from clothing to handbags and clutch purses to other pieces of jewelry.

123.  As of the date of this Complaint, Nobelle's website for online ordering (https://shopnobelle.com/shop) is active and appears to be accessible to consumers nationwide.

124.     Nobelle's website contains at least one picture taken by ML Fashion employees in connection with ML Fashion's intention to sell those goods, a picture of a stack of jeans shown in the following image taken from Nobelle's website:



125.     Nobelle is sowing confusion in the marketplace, causing consumers and others in the industry to believe that Nobelle is a subsidiary of, other otherwise affiliated with, Plaintiffs or with Lemonis personally.

126.     Nobelle's web address (shopnobelle.com) is quite similar to the website ML Fashion uses to sell goods to consumers nationwide under the MARCUS brand (shopmarcus.com) in that both websites append "shop" in front of the store name (Nobelle and MARCUS, respectively).

127.     Moreover, as recently as February 2021, Menkin was expressly leveraging her association with ML Fashion to promote Nobelle.  As shown in the following screenshot, Menkin's Instagram page referred to her as the "Founder [of] ML Fashion," followed immediately by "also JUST LAUNCHED @shopnobelle":



128.     Although Menkin recently changed her Instagram page to read "Founder of Many things I am proud of," for months Menkin was deliberately using her association with ML Fashion to confuse consumers about whether Nobelle is affiliated with ML Fashion.

129.     Despite removing the reference to her being a founder of ML Fashion after sowing confusion for many months, as of the date of this Complaint, Menkin's Instagram page still includes images indicating an affiliation with Lemonis and/or Plaintiffs, as shown in these screenshots, which include a picture of one of ML Fashion's MARCUS retail stores:



130.     In short, the Nobelle Store and website are like mirror images of ML Fashion's stores and website.  Defendants stole, are selling, and are using promotional photographs of more than $100,000 worth of goods taken without authorization from ML Fashion, including ML

Fashion's exclusive, private label products such as "The Line" brand, to operate their competing business, Nobelle, while also selling other goods identical to those sold by ML Fashion.

131.    Moreover, as set forth above, Defendants are deliberately sowing confusion in the marketplace about their affiliation with, or connection to, Plaintiffs and/or Lemonis.

132.    Defendants efforts to sow confusion have worked.  Since in or about late 2020, ML Fashion has been receiving calls from vendors about unpaid bills or about where to ship certain goods that have turned out to be for Nobelle.

133.    Based upon these discussions, Plaintiffs believe that vendors are extending credit to Nobelle for trade goods based upon the vendors' mistaken assumption that Nobelle's debts are being backed by Lemonis or by Plaintiffs.

134.    If sophisticated vendors active in the fashion industry are confused about whether Nobelle's operations have been authorized by Plaintiffs, then it is very likely that average consumers will be equally or even more confused by Defendants' conduct.

**H.    Defendants improperly use stolen FFE**

135.    Nobelle, Menkin, and Nagrani are also utilizing the FFE owned by ML Fashion at the Property, without ML Fashion's authorization or consent.

136.    The FFE owned by ML Fashion at the Greenwich Property now being utilized by Defendants without authorization includes shelving, permanent brackets (large metal bars coming down from the ceiling into which other fixtures can be fit), and wooden hangers:



137.    In addition to that FFE, ML Fashion believes that Plaintiffs are using FFE taken from other former ML Fashion stores that were closed in 2018 or 2019.

138.    In particular, some of the nesting tables and the t-shaped, metal stand under a chandelier in the Nobelle store appear to be fixtures that were used in other ML Fashion stores:



139. When ML Fashion closed stores in Greenville, South Carolina, Syosset, New York, and San Francisco, California in 2018 and 2019, Menkin handled the removal of the ML Fashion FFE located in those stores.

140. Menkin was in a position to control that FFE as president of ML Fashion, and she abused that position in order to re-route this ML Fashion FFE for Nobelle's use at the Greenwich Property.

141. Both the Inventory and FFE are collateral for the Loan

142. Without the Inventory and the FFE, and the proceeds from the sale of the Inventory, ML Fashion's full performance under the Credit Agreement and Security Agreement has been compromised, ML Fashion is in jeopardy of defaulting and breaching the agreements, and its performance will be rendered impossible. Further, the jobs of the existing part-time and full-time employees are jeopardized.

## I. Defendants' computer fraud and trade secret misappropriation.

143. Defendants have also improperly seized, and have refused to return to Plaintiffs, two computers owned by ML Fashion and containing sensitive, confidential, and trade secret information of ML Fashion.

144. The computers were taken by one of the Defendants, presumably Menkin or someone acting at Menkin's direction, from a locked office in New York not open to the public.

145. In particular, an ML Fashion employee advised Menkin that ML Fashion was closing the office and relocating to a shared workspace operated by WeWork in New York.

146. Menkin, upon learning that the office was to be closed, and rather than transfer the computers to another ML Fashion location, abused her position as then-president of ML Fashion to access the office while no one was there and take two computers that she knew would have confidential information on them.

147.    One of the computers belonged to ML Fashion's former controller, and the other to ML Fashion's former bookkeeper.

148.    Accordingly, given that the computers were utilized by the individuals overseeing, and compiling information regarding, among other things, ML Fashion's finances and performance, as well as the company's books and records, the computers have significant confidential information on them.

149.    Specifically, the computers have, among other things, information regarding ML Fashion's profitability year-over-year; its bills and invoices, including for the products ML Fashion sells at retail; the rent and utility payments at each of ML Fashion's locations; ML Fashion's banking information, including communications between ML Fashion and Chase Bank; documents relating to ML Fashion's landlords for its other retail stores; inventory information; and product levels in each of ML Fashion's retail stores.

150.    The computers also have software on them that allows users to remotely log into ML Fashion's "point of sale" or POS system and obtain ML Fashion's customer information if the computer user has active login credentials.

151.    Based upon the national character of ML Fashion's retail business, these computers were used to conduct business in interstate commerce.

152.    Defendants improperly accessed and utilized the highly confidential information on these computers.

153.    On August 4, 2020, user "Nicolas" (*i.e.*, Goureau) logged into the computer used by ML Fashion's former bookkeeper:



154.     On August 6, 2020, this same "Nicolas" user logged into the computer again, and attempted to install the Nobelle Realtime POS program on that computer:





155.    At that point, Goureau severed Plaintiffs' ability to access the computers remotely, impairing their ability to access data on the computers and also preventing them from seeing what Defendants were doing with the computers.

156.    The second computer, which belonged to ML Fashion's former controller, Manish Karna, was similarly taken by Defendants and used for Nobelle business:





157.    Based upon Plaintiffs' investigation, someone from Nobelle (from what Plaintiffs learned so far, likely Menkin, Goureau, or Nagrani) accessed this computer for Nobelle business, as depicted in the screenshots above, on or about August 31, 2020.

158. The computers that Defendants have stolen from ML Fashion contain ML Fashion's confidential, proprietary, and trade-secret information, which Defendants have misappropriated.

159. As set forth above, the computers contain sensitive, confidential information regarding profits, expenses, banking information, inventory, and store product levels, all of which is information that would give other retailers a competitive advantage against ML Fashion (collectively, "ML Fashion's confidential, proprietary, and trade-secret information").

160. ML Fashion's confidential, proprietary, and trade-secret information is the subject of efforts that are reasonable under the circumstances to maintain the secrecy of such information. The confidential, proprietary, and trade-secret information is generally not distributed to any other party external to ML Fashion.

161. Further, ML Fashion does not release this information to the general public, nor could others properly acquire or duplicate it without ML Fashion's permission. No one else can generate this information without knowledge of ML Fashion's confidential operations. The information is specific to ML Fashion, which makes it nearly impossible to duplicate without detailed information from ML Fashion.

162. ML Fashion took, and continues to take, extensive measures to safeguard its highly valuable confidential, proprietary, and trade-secret information, such as requiring employees, temporary workers, and contractors to sign confidentiality agreements, requiring employees to execute acknowledgments promising to limit access to confidential information on a "need to know" basis and otherwise maintain the confidentiality of ML Fashion information, and requiring passwords and other security measures for access. ML Fashion controls dissemination of such information even within the confines of the company.

163. ML Fashion's security measures are consistent with trade secret protections undertaken by other, similar businesses operating in the fashion-related retail industry.

164. Defendants abused their connection to ML Fashion to circumvent these security measures and steal these trade secrets in order to boost their competitive enterprise, Nobelle.

165. ML Fashion has devoted significant resources over many years to develop and compile its confidential, proprietary, and trade-secret information. The development of ML Fashion's confidential, proprietary, and trade-secret information represents the combined efforts of senior-level employees in a variety of departments.

166. ML Fashion derives independent economic value from its confidential, proprietary, and trade-secret information not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use. Maintaining this information's secrecy gives ML Fashion a distinct economic and competitive advantage in the marketplace.

167. Disclosure of ML Fashion's confidential, proprietary, and trade-secret information would be extremely valuable to ML Fashion's competitors. Disclosure of ML Fashion's confidential, proprietary, and trade-secret information would also be extremely harmful to ML Fashion and undermine ML Fashion's position in the marketplace.

168. For example, disclosure would allow ML Fashion's competitors, such as Nobelle, to obtain an unlawful head start and business advantage to more effectively compete against ML Fashion. Specifically, disclosure would allow competitors such as Nobelle to have an unfair inside look at the inner workings of ML Fashion and how it competes.

169. Competitors such as Nobelle would then be able to duplicate or attempt to improve on ML Fashion's products, technologies, and services, as well as their internal business strategies

31

and methodologies, all without the significant costs that ML Fashion spent to develop them. This includes using ML Fashion's negative information to avoid costly pitfalls and move right to key innovative solutions that took ML Fashion significant time and resources to achieve.

170. The value of ML Fashion's confidential, proprietary, and trade-secret information is considerable, and its disclosure would cause ML Fashion substantial competitive injury beyond any monetary amount. Ultimately, disclosure of ML Fashion's confidential, proprietary, and trade-secret information would cause irreparable harm to ML Fashion.

171. ML Fashion's confidential, proprietary, and trade secret information as described above was on the computers which Defendants' stole and remain in Defendants' possession.

172. Defendants' access and use of these computers, and ML Fashion's confidential, proprietary, and trade secret information contained within, is unauthorized. Any authority Defendants had to access these computers was exceeded when Defendants used them to operate a competing business.

173. Plaintiffs spent over $5,000 in employee time investigating the theft and misuse of these computers before Defendants severed their access to the computers and the information thereon.

174. Plaintiffs also believe that Defendants' installation of software on the computers has damaged or erased existing data on the computers, though Plaintiffs will not know the full extent of the damage until the computers are returned.

175. The value of the information on these computers exceeds $5,000 as will the costs at forensic review and remediation when these computers are ultimately returned. Defendants' use of Plaintiffs' confidential, proprietary, and trade-secret information is further causing Plaintiffs irreparable harm.

176.    Plaintiffs anticipate further losses in connection with restoring the data and information on the computers.

177.    Moreover, Menkin and Goureau are breaching their obligations to both ML Fashion and ML Retail under the LLC Agreement by utilizing the computers and the information thereon to operate a business, Nobelle, that is in direct competition with ML Fashion.

**J.      Plaintiffs' attempts at remediation and Defendants' blatant refusal to return Plaintiffs' property.**

178.    Prior to filing this Complaint, ML Fashion demanded that Defendants return the improperly seized Inventory and FFE.  ML Fashion additionally demanded return of its computers containing ML Fashion's confidential information.

179.    In response, Defendants admitted to both *possession* and *use* of at least one of ML Fashion's computers containing its confidential information.  (*See* September 1, 2020, letter from Defendants, attached hereto as **Exhibit 2**.)  Defendants even specifically touted their willingness to return the computer as the basis why no irreparable harm exists.

180.    In light of Defendants' admissions, Plaintiffs once again demanded return of ML Fashion's computer Defendants' admitted to having in their possession.

181.    On October 2, 2020, Defendants reversed course, reneged on their offer to return one of the stolen computers, and instead refused to turn over the computer they admitted to having. (*See* October 2, 2020, letter from Defendants, attached here as **Exhibit 7**.)  Importantly, neither this letter nor Defendants' original letter provide any assurances they would cease their unlawful and admitted use of the computer, nor admit to their full possession of multiple ML Fashion computers.

182.    Plaintiffs have been and continue to be damaged by Defendants' ongoing misconduct, including due to the fact that Defendants' unauthorized sale of ML Fashion Inventory

at a store formerly operated by ML Fashion is confusing consumers and damaging ML Fashion's reputation and goodwill, is preventing ML Fashion from being able to perform under the Credit and Security Agreements, and is jeopardizing the continued employment of ML Fashion's employees.

### K.    Defendants Raise Baseless Arguments in Response to Plaintiffs' Claims

183.    In light of Defendants' ongoing misconduct, and refusal to cease that misconduct, on August 31, 2020, Plaintiffs filed suit against Defendants in the United States District Court for the Northern District of Illinois (the "Illinois Action").

184.    Sworn declarations from Marcus Lemonis, Johnna Griep, and Giovanni Senafe filed in the Illinois Action detailing Defendants' misconduct are attached here as **Exhibits 8, 9, and 10**.

185.    In response, Defendants raised, among other things, baseless jurisdictional arguments in an attempt to avoid liability for their misconduct.

186.    Incredibly, in light of their own violation of the rule against claim splitting, Defendants also argued that Plaintiffs violated the rule against claim splitting by filing a separate, unrelated action against Defendants in an Illinois state court in Cook County regarding Defendants' misappropriation and misuse of corporate funds and a corporate American Express credit card (the "Cook County Action").

187.    Defendants' arguments in the Illinois Action were all the more incredible because they admitted in court filings to operating a competing business and to having, selling, and/or utilizing the Inventory, FFE, and computers.

188.    In a filing on September 11, 2020, Defendants admitted that "Menkin and Nagrani launched their business, Nobelle, on or around August 17, 2020, and made their first public post regarding the store on August 23, 2020."

189.    In that same filing, Defendants admitted that what they called a "limited fraction of inventory" was "derived from ML Fashion," arguing, contrary to the facts, that Defendants obtained this inventory with Plaintiffs' consent.

190.    In that same filing, Defendants further admitted that they are selling "MARCUS private label brands" because some of the stolen inventory "included t-shirts branded 'The Line.'"

191.    In that same filing, Defendants further admitted that "the FFE used by Defendants" had been ML Fashion's, and argued that the FFE was "abandoned by ML Fashion," contrary to the facts set forth above and ignoring Goureau's role in preventing ML Fashion from recovering the FFE.

192.    In that same filing, Defendants also represented to the court in the Illinois Action that they had "agreed to return . . . the computer" before, as set forth above, later reversing course and refusing to return that stolen computer.

193.    In a filing in the Illinois Action dated October 26, 2020, Defendants admitted that they were selling the same brands as ML Fashion from "third-party designers such as Autumn Cashmere or others."

194.    In that same filing, Defendants admitted that Menkin took "inventories . . . from stores located in Vermont and Texas."

195.    In a filing in the Illinois Action dated January 4, 2021, Defendants again admitted that they are selling items from the "third-party designers such as Autumn Cashmere or others" whose products are also sold by ML Fashion.

196.    In a sworn declaration also dated January 4, 2021 in the Illinois Action, Menkin admitted that she had "inventory shipped to my new store" in New York from "the ML Fashion warehouse located in Vermont" and from "Front Door Fashion."

197.    In that same sworn declaration, Menkin admitted that "I am also the co-founder of Defendant Nobelle GW LLC."

198.    In a sworn declaration also dated January 4, 2021 in the Illinois Action, Nagrani admitted that "I am the Co-Founder and current President of Defendant Nobelle GW LLC," that she "was an employee of ML Fashion LLC," and that "Nobelle's principal place of business has been, and continues to be, Greenwich, Connecticut."

199.    In a filing in the Illinois Action dated February 3, 2021, Defendants again admitted that they held ML Fashion Inventory, relying upon the false claim that "Lemonis gave Menkin this inventory."

200.    In that same filing, Defendants admitted that were using ML Fashion's FFE, arguing that the "FFE is now part of the [Nobelle] leasehold" for the Greenwich Property.

201.    In that same filing, Defendants claimed that they were refusing to "return the items without going through the proper discovery and litigation protocols."

202.    In that same filing, Defendants admitted that "Nobelle sold $6,812.32" worth of this Inventory, for which "Menkin [personally] received $3,397.91."

203.    In that same filing, Defendants also admitted that they took two computers "to run their point-of-sale system" for Nobelle.

204.    In a declaration accompanying this filing, Menkin admitted that Nobelle took at least 25 sweaters, 10 tees/tanks, 1 button down shirt, and 15 dresses owned by ML Fashion.

205.    In that same declaration, Menkin admitted that she "installed Nobelle's point-of-sale system" on one of the stolen computers and removed another from "ML Fashion's New York office."

206.     Despite Defendants' repeated admissions, rather than burden the court in Illinois with Defendants' baseless arguments regarding jurisdiction and claim splitting, on March 26, 2021, Plaintiffs agreed to voluntarily dismiss the Illinois Action, without prejudice.

207.     Plaintiffs are re-filing their claims in this Court, where Defendants cannot in good faith claim that they are not subject to the Court's personal jurisdiction given their operation of an improper retail store in this State, and have eliminated any arguable overlap with the Cook County Action.

208.     Lemonis, as the manager of each of the Plaintiffs, has authorized them to bring this suit.

### FIRST CAUSE OF ACTION
**(Conversion by ML Fashion Against All Defendants)**

209.     Plaintiffs hereby repeat and reallege each and every allegation contained in paragraphs 1 through 208 of this Complaint as if fully set forth herein.

210.     ML Fashion owns the Inventory being held and/or offered for sale by Nobelle at the Greenwich Property.  ML Fashion also owns the computers Nobelle is currently using, which contain ML Fashion confidential financial information, and much of the FFE utilized at the Nobelle Store.

211.     Nagrani, Goureau, and Menkin, on behalf of Nobelle, at the direction of Menkin, and utilizing the computer system set up by Goureau on ML Fashion's stolen computers (containing confidential ML Fashion financial information), have stolen ML Fashion's Inventory and FFE, and have prevented ML Fashion from utilizing or possessing that Inventory and FFE.

212.     Goureau also interfered with Plaintiffs' ability to recover the FFE by intimidating the ML Fashion employee tasked with retrieving the FFE, to ensure that Defendants could convert the FFE for their own personal purposes.

213.    ML Fashion has demanded the return of the computers, Inventory and FFE from Defendants.

214.    ML Fashion has suffered damages as a result of Defendants' misconduct, including but not limited to loss of exclusive possession of its property, lost profits from the sale of the Inventory, and the value of the stolen computers, Inventory and FFE.  In addition, by unlawfully seizing the collateral of the Loan, Defendants' actions risk default on the Loan, further causing ML Fashion harm

215.    By reason of the foregoing, ML Fashion is entitled to injunctive relief for the return of the Inventory and FFE as well as damages in an amount to be determined at trial and an order requiring Defendants to return the unsold, converted Inventory and FFE to ML Fashion.

<p style="text-align:center"><strong><u>SECOND CAUSE OF ACTION</u></strong><br>
<strong>(Breach of Fiduciary Duty by ML Fashion Against Menkin and Goureau)</strong></p>

216.    Plaintiffs hereby repeat and reallege each and every allegation contained in paragraphs 1 through 215 of this Complaint as if fully set forth herein.

217.    Menkin is a member and officer of ML Fashion.

218.    Goureau is a member of ML Fashion.

219.    As members and/or officers of ML Fashion, Menkin and Goureau owed fiduciary duties to ML Fashion, including because they were not passive members of ML Fashion but instead took an active role in the management of ML Fashion.

220.    Menkin and Goureau have breached their fiduciary duties to ML Fashion by, among other things: (a) abusing their positions with ML Fashion to seize computers, Inventory and FFE owned by ML Fashion for Menkin's and Goureau's personal benefit, without ML Fashion's authorization or consent; (b) using ML Fashion's Inventory and FFE to generate profits for Menkin, Goureau, and Nobelle; (c) occupying the Greenwich Property formerly operated by ML

<div style="text-align:center">38</div>

Fashion and excluding ML Fashion from that property; and (d) operating a business, Nobelle, that is competing with ML Fashion.

221.    ML Fashion has been irreparably harmed and damaged by Menkin's and Goureau's breaches of their fiduciary duties, including jeopardizing the existence of the business, jobs and reputation, which money cannot make whole, as well as lost profits, the lost value of the Inventory and FFE improperly seized, and loss of use of the Greenwich Property.

222.    By reason of the foregoing, ML Fashion is entitled to injunctive relief and damages in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
**(Breach of Contract by Plaintiffs Against Menkin and Goureau)**

223.    Plaintiffs hereby repeat and reallege each and every allegation contained in paragraphs 1 through 222 of this Complaint as if fully set forth herein.

224.    ML Retail, Menkin, and Goureau are parties to the LLC Agreement.

225.    The LLC Agreement is a valid contract.

226.    Menkin and Goureau owe obligations to both ML Retail and ML Fashion under the terms of the LLC Agreement.

227.    ML Retail and ML Fashion have each fully performed their obligations under the LLC Agreement.

228.    Menkin and Goureau have breached the LLC Agreement by, *inter alia*, operating a fashion retail business, Nobelle, that is in direct competition with ML Fashion's business, in violation of Section 7.7 of the LLC Agreement.

229.    In particular, Menkin's and Goureau's conduct is preventing ML Fashion from opening another store in the same retail market, and constitutes competition with ML Fashion stores and ML Fashion's website via, *inter alia*, the Nobelle website that sells competing goods to

consumers nationwide, all while creating consumer confusion about whether Nobelle is affiliated with, or authorized by, Plaintiffs.

230.    Defendants are selling the same products and brands as ML Fashion, including private-label, exclusive brands owned by ML Fashion and sold only by ML Fashion and its authorized retailers, at a former ML Fashion retail store that Defendant Nagrani had managed on ML Fashion's behalf, or on a website whose web address mirrors ML Fashion's web address and frequently uses the same photographs and product description text as ML Fashion's website, all while Menkin has leveraged and continues to leverage ML Fashion's and Lemonis' names on social media to promote the competing business.

231.    Section 7.7 of the LLC Agreement prevents any competition by Menkin and Goureau with ML Fashion, which is a reasonable restriction because they are members of the LLC, rather than employees, and because ML Fashion operates its retail business nationwide.

232.    ML Fashion has been damaged by Menkin's and Goureau's breaches of the LLC Agreement, including in the form of lost profits due to Nobelle's competition with ML Fashion.

233.    ML Retail has been damaged by Menkin's and Goureau's breaches of the LLC Agreement, including because of the impact of Menkin's and Goureau's improper competition on the value of ML Retail's membership interests in ML Fashion.

234.    In addition, Menkin and Goureau's unlawful competition diminishes the collateral on the loan between ML Fashion and ML Retail.  This further harms ML Fashion by risking default on the loan, and it harms ML Retail by reducing the value of the Loan and the likelihood of full repayment.  Moreover, the jobs of the employees of ML Fashion are jeopardized if ML Fashion ceases to operate.

235. In Section 7.7(d) of the LLC Agreement, Menkin and Goureau expressly agreed that Plaintiffs could seek specific performance of Menkin's and Goureau's obligations under Section 7.7.

236. By reason of the foregoing, Plaintiffs are being irreparably harmed and the existing jobs and membership interests in the business are jeopardized. Plaintiffs are also entitled to damages in an amount to be determined at trial and an order requiring Menkin and Goureau to specifically perform their obligations under Section 7.7 of the LLC Agreement by, among other things, ceasing their operation of Nobelle and any other business in competition with ML Fashion's business.

### FOURTH CAUSE OF ACTION
**(Fraud by Plaintiffs Against Menkin and Goureau)**

237. Plaintiffs hereby repeat and reallege each and every allegation contained in paragraphs 1 through 236 of this Complaint as if fully set forth herein.

238. Menkin and Goureau made false statements of material fact they knew were false or made with culpable ignorance of their truth or falsity, and specifically that they would not personally take possession, custody, and control of ML Fashion FFE and Inventory without authorization; that Menkin and Goureau would only use their positions of trust within ML Fashion to advance the company's interests; that Nobelle's products were exclusively their own and for sale; and other representations and misrepresentations as set forth above.

239. Among other things, as set forth above, in email, text message, and telephone conversations with Lemonis in 2020, Menkin and Goureau represented that they would not seize ML Fashion Inventory and FFE for their own personal use, would not operate a competing enterprise, and would not otherwise harm Plaintiffs.

240. Plaintiffs relied upon Menkin's and Goureau's false statements to their detriment.

241.     Among other things, in reliance on Menkin's and Goureau's representations, ML Retail continued to provide funding to ML Fashion for operations, and Plaintiffs refrained from bringing suit against Defendants based upon Menkin's and Goureau's misconduct.

242.     Menkin and Goureau never intended to fulfill their obligations.  Even as Plaintiffs relied upon Menkin's and Goureau's false statements that they would only use ML Fashion FFE and Inventory for ML Fashion business, Menkin and Goureau went behind Plaintiffs' backs, removed the ML Fashion FFE and Inventory, and are now falsely advertising to the public that ML Fashion's FFE and Inventory are their own and further retaining the proceeds of the sales.

243.     As a result of Menkin's and Goureau's fraud, Plaintiffs have suffered damages in an amount to be determined at trial, including in the form of lost Inventory and FFE and damage to Plaintiffs' goodwill and reputation.

### FIFTH CAUSE OF ACTION
### (Tortious Interference with Noncompetition Agreement Against All Defendants)

244.     Plaintiffs hereby repeat and reallege each and every allegation contained in paragraphs 1 through 243 of this Complaint as if fully set forth herein.

245.     The LLC Agreement is a valid, enforceable, and binding contract between Plaintiffs and Defendants Menkin and Goureau.

246.     Menkin and Goureau had knowledge of the LLC Agreement and its non-competition provisions as signatories to the LLC Agreement and owners of ML Fashion.

247.     Nobelle had knowledge of the LLC Agreement and its non-competition provisions by virtue of the fact that it is controlled by Menkin, who signed and is a party to the LLC Agreement.

248.     Upon information and belief, Nagrani had knowledge of the LLC Agreement and its non-competition provisions by virtue of her past employment with ML Fashion and her interactions with Menkin.

249.     Menkin and Goureau intentionally sought information and elicited actions from one another in ways that they knew would cause the other to violate the terms of the LLC Agreement, all while acting outside the scope of their authority under the LLC Agreement.

250.     Nobelle and Nagrani elicited actions from Menkin and Goureau that they knew would cause Menkin and Goureau to violate the terms of the LLC Agreement.

251.     As a result of Defendants' intentional interference with Menkin and Goureau's contractual relationships with ML Fashion, Plaintiffs have suffered damages in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION
### (Aiding and Abetting Against Menkin, Goureau, and Nagrani)

252.     Plaintiffs hereby repeat and reallege each and every allegation contained in paragraphs 1 through 251 of this Complaint as if fully set forth herein.

253.     By competing with ML Fashion using its own store, products, and Inventory, Nobelle performed a wrongful act which caused Plaintiffs injury.

254.     Menkin, Goureau, and Nagrani were aware of their roles as part of the overall or tortious activity at the time they provided the assistance.

255.     Menkin, Goureau, and Nagrani knowingly and substantially assisted the principal violation and benefitted from the wrongful conduct by, among other things, profiting from Nobelle's competition with ML Fashion.

256.     Further, by breaching the noncompetition provision of the LLC Agreement, Menkin and Goureau performed wrongful acts that caused Plaintiffs injury.

257.    Nagrani was aware of her role as part of the overall tortious activity at the time she provided the assistance.

258.    Nagrani knowingly and substantially assisted the principal violation of the LLC Agreement by Menkin and Goureau and benefitted from the wrongful conduct by, among other things, profiting from Nobelle's competition with ML Fashion.

259.    As a result of Menkin, Goureau, and Nagrani's aiding and abetting with Nobelle's, Menkin's, and/or Goureau's wrongful and injurious acts, Plaintiffs have suffered damages in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION
### (False Advertising under Lanham Act Against All Defendants)

260.    Plaintiffs hereby repeat and reallege each and every allegation contained in paragraphs 1 through 259 of this Complaint as if fully set forth herein.

261.    The acts and omissions of Defendants described above constitute false advertising in violation of 15 U.S.C. § 1125(a) and Illinois common and statutory law.

262.    In their commercial advertising and promotion, Defendants have used in interstate commerce words, false designations of origin, and/or false or misleading descriptions and representations of fact, which are likely to cause confusion, or to cause mistake, or to confuse or deceive as to the nature, characteristics, qualities, or geographic origin of Plaintiffs' goods, services, and commercial activities.

263.    In particular, Defendants have falsely represented, in interstate commerce via the Internet and social media advertising, that they are selling goods belonging to Nobelle when, in fact, Defendants are selling ML Fashion's Inventory without ML Fashion's authorization, including exclusive, private-label product from brands owned by ML Fashion and sold only by ML Fashion and its authorized retailers.

264.     Because Nobelle's statements to consumers that the Inventory belongs to Nobelle are literally false, they are necessarily deceiving consumers.

265.     Moreover, Defendants are selling goods (including ML Fashion's private-label, exclusive brands and products identical to those sold by ML Fashion) and promoting their business in a manner that is likely to, and actually has, caused confusion, about whether Nobelle is affiliated with or otherwise authorized by ML Fashion—a result Defendants clearly intended.

266.     Plaintiffs have been damaged as a proximate result of the acts and omissions of false advertising committed by Defendants, including through lost sales, the loss of the Inventory, and damage to Plaintiffs' reputation and goodwill.

267.     Defendants conduct has been willful and in bad faith, making this an exceptional case under 15 U.S.C. § 1117.

268.     Defendants' conduct has caused and is causing irreparable injury to Plaintiffs, including damage to Plaintiffs' reputation and goodwill and ML Fashion's ability to continue to employ its employees, and unless enjoined by this Court, will continue to damage and irreparably harm Plaintiffs and to deceive the public in a manner that is not compensable by money damages. Plaintiffs have no adequate remedy at law with respect to Defendants acts of false advertising.

## EIGHTH CAUSE OF ACTION
### (Unfair Competition under Lanham Act Against All Defendants)

269.     Plaintiffs hereby repeat and reallege each and every allegation contained in paragraphs 1 through 268 of this Complaint as if fully set forth herein.

270.     The acts and omissions of Defendants described above constitute unfair competition in violation of 15 U.S.C. § 1125(a) and Illinois common and statutory law.

271.     Defendants have used in interstate commerce words, false designations of origin, and/or false or misleading descriptions and representations of fact, which are likely to cause

confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of Defendants to the origin, sponsorship, or approval of the Inventory the subject of this lawsuit, the fruits thereof, and the commercial activities associated therewith.

272.   Defendants are passing off Plaintiffs' exclusive, private-brand goods, such as products bearing ML Fashion's exclusive "The Line" brand, and other goods owned by ML Fashion to consumers as being Defendants' own goods, giving rise to consumer confusion as a matter of law.

273.   Defendants have also made efforts to sow confusion about whether Nobelle is affiliated with, or authorized by Plaintiffs, which has resulted in actual confusion among vendors.

274.   In particular, Defendants' promotional materials for Nobelle and its products are generating confusion about whether Nobelle is affiliated with, or authorized by, ML Fashion, including through Menkin's Instagram page, and through websites with similar web addresses selling identical and similar products.

275.   Plaintiffs have been damaged as a proximate result of the acts and omissions of unfair competition committed by Defendants, including through lost sales, the loss of the Inventory, and damage to Plaintiffs' reputation and goodwill.

276.   Defendants conduct has been willful and in bad faith, making this an exceptional case under 15 U.S.C. § 1117.

277.   Defendants' conduct has caused and is causing irreparable injury to Plaintiffs, including damage to Plaintiffs' reputation and goodwill and ML Fashion's ability to continue to employ its employees, and unless enjoined by this Court, will continue to damages Plaintiffs and to deceive the public in a manner that is not compensable by money damages.  Plaintiffs have no adequate remedy at law with respect to Defendants acts of false advertising.

## NINTH CAUSE OF ACTION
**(Violation of the Computer Fraud and Abuse Act ("CFAA") 18 U.S.C. §§ 1034, et seq. Against All Defendants)**

278.  Plaintiffs hereby repeat and reallege each and every allegation contained in paragraphs 1 through 277 of this Complaint as if fully set forth herein.

279.  As set forth above, Defendants have violated the CFAA by intentionally accessing Plaintiffs' computers used for interstate commerce or communication, without authorization, and/or by exceeding authorized access to such computers and by obtaining information from such a protected computer, and so causing significant damage.

280.  Defendants knowingly, and with intent to defraud Plaintiffs through their wrongful actions, by accessing Plaintiffs' protected computers without authorization or by exceeding authorized access to such computers, and by means of such conduct, furthering their intended fraud and obtaining one or more things of value, including but not limited to significant confidential, proprietary, and trade secret information relating to Plaintiffs' business.  Such confidential, proprietary, and trade secret information was exclusively Plaintiffs' property.

281.  Defendants have violated the CFAA by intentionally accessing Plaintiffs' protected computers, without authorization and/or beyond the scope of authorization granted, causing damage to Plaintiffs, recklessly or without regard for their actions.

282.  Through Defendants' unauthorized access on Plaintiffs' protected computers and systems, Defendants knowingly, and with intent to defraud, transmitted information and/or programs, misappropriated and caused harm to Plaintiffs' trade secrets and confidential information,  and impaired the integrity and availability of data, metadata, programs, systems, and other information.

283.    Plaintiffs have lost access to the computers and the information thereon as a result of Defendants' severing Plaintiffs access, and also believe that Defendants' installation of software on the computers damaged or erased files on the computers.

284.    Defendants' actions as set forth above are direct violations of the CFAA—at minimum, 18 U.S.C §§ 1030(a)(2), 1030(a)(4), and 1030(a)(5)—for which Plaintiffs are entitled to injunctive relief. *See* 18 U.S.C § 1030(g).

285.    As a direct and proximate result of Defendants' unauthorized access to Plaintiffs' protected computers, Plaintiffs have suffered damages in excess of $5,000.00, including but not limited to costs associated with investigation of the nature and extent of Defendants' unlawful actions, including employee time spent uncovering and investigating Defendants' unauthorized access; the loss, dilution, and unlawful use of Plaintiffs' confidential, proprietary, and trade secret information on the computers in competition to ML Fashion; the anticipated forensic damage assessment of the computers, hiring consultants, and/or employee time spent investigating Defendants' unauthorized access; lost revenues and/or other consequential damages resulting from Defendants' interruption of service; and/or anticipated remediation of Defendants' unlawful actions, including restoring the data, systems, and information prior to the offense and/or implementing security enhancements and remedial measures to Plaintiffs' computer systems.

286.    As a direct and proximate result of Defendants' unauthorized access to Plaintiffs' protected computers, Defendants have further been unjustly enriched.

287.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have also suffered and will continue to suffer incalculable financial losses, imminent and permanent irreparable harm, loss of the confidentiality of their trade secrets, and other continuing harm.  The losses and harm to Plaintiffs are ongoing and cannot be remedied by damages alone.

## TENTH CAUSE OF ACTION
### (Defend Trade Secrets Act 18 U.S.C. §§ 1832, 1836, *et seq.*—Misappropriation of Trade Secrets Against All Defendants)

288.    Plaintiffs hereby repeat and reallege each and every allegation contained in paragraphs 1 through 287 of this Complaint as if fully set forth herein.

289.    As set forth more fully above, Plaintiffs possess confidential, proprietary, and trade secret information necessary for Plaintiffs' to conduct their business in a competitive market place.

290.    In particular, the information includes information regarding ML Fashion's profitability year-over-year; its bills and invoices, including for the products ML Fashion sells at retail; the rent and utility payments at each of ML Fashion's locations; ML Fashion's banking information, including communications between ML Fashion and Chase Bank; documents relating to ML Fashion's landlords for its other retail stores; inventory information; and product levels in each of ML Fashion's retail stores.

291.    The computers also provide users with the ability to access ML Fashion's customer information through its "point of sale" system if they have login credentials.

292.    Plaintiffs' trade secrets relate to products and services used in, or intended for use in, interstate commerce.

293.    Plaintiffs' trade secrets are of great value Plaintiffs, as set forth above.  They are also valuable to Defendants, who are competitors of Plaintiffs, as is clearly demonstrated by the extent to which Defendants engaged in the gathering, misappropriation, and transfer of such information to Defendants, including without limitation Defendants' refusal to return computers containing such confidential, proprietary, and trade secret information.

294. Plaintiffs' kept their trade secrets from disclosure through all reasonable, appropriate, and necessary means, consistent with industry practice, such that they were not generally known or available to individuals or entities outside of Plaintiffs.

295. Among other things, the trade secrets were protected through confidentiality agreements, passwords, and other security measures, all consistent with measures taken by similar businesses in the fashion industry.

296. Defendants circumvented these protections by accessing a locked office controlled by ML Fashion, apparently with the purpose of specifically targeting these computers because of their highly valuable information.

297. Plaintiffs' trade secrets revealed to Defendants are critical to the success of Plaintiffs' business and provide Plaintiffs with a distinct competitive advantage in the market place.

298. Defendants were aware that Plaintiffs' trade secrets were to be kept confidential and not to be disclosed to competitors, customers, and others.

299. Defendants knew that the confidential, proprietary, and trade secret information being obtained from Plaintiffs' computers and other sources was confidential and in the nature of trade secrets and, nevertheless, Defendants chose to gather, receive, and utilize it.

300. As further set forth above, Defendants misappropriated Plaintiffs' trade secrets by acquiring them through unlawful means, and with intent to convert them, and/or disclosing and using them on behalf of Plaintiffs' competitors and in derogation of Plaintiffs'' interest, and continuing to retain possession of them to this day, all in violation of the Defend Trade Secrets Act, 18 U.S.C §§ 1832, 1836, *et seq*.

301.   Plaintiffs' trade secrets have been transferred to and maintained on Defendants' computers and other electronic devices.

302.   Plaintiffs' trade secrets remain in the possession of Defendants.

303.   Defendants have not merely retained Plaintiffs' trade secrets, but have actively utilized this information to operate their competing Nobelle business.

304.   Defendants have refused to provide at least one computer known to be taken from Plaintiffs and utilized by Defendants and, therefore, Plaintiffs cannot uncover the full extent of Defendants' theft and misappropriation of Plaintiffs' trade secrets without a forensic examination of Defendants' computers and other electronic devices.

305.   Because Defendants continue to use Plaintiffs' confidential, proprietary, and trade secret information, along with electronic records and documents, Defendants' misappropriation of Plaintiffs' trade secrets is continuing and ongoing.

306.   As a direct and proximate cause of Defendants' wrongful conduct, Plaintiffs have suffered and will continue to suffer incalculable financial losses, imminent and permanent irreparable harm, loss of the confidentiality of their trade secrets, loss of goodwill, loss of business opportunities, and other continuing harm.

307.   The losses and harm to Plaintiffs are ongoing and cannot be remedied by damages alone.

308.   Plaintiffs have no adequate remedy at law for sufficient compensation for the wrongs committed by Defendants.

309.   Defendants have acted willfully, maliciously, and with reckless disregard to the rights of Plaintiffs.

## ELEVENTH CAUSE OF ACTION

### (Defend Trade Secrets Act 18 U.S.C. §§ 1832, 1836, *et seq.*—Threatened Misappropriation of Trade Secrets Against All Defendants)

310. Plaintiffs hereby repeat and reallege each and every allegation contained in paragraphs 1 through 309 of this Complaint as if fully set forth herein.

311. As set forth more fully above, Plaintiffs' possess confidential, proprietary, and trade secret information necessary for Plaintiffs' to conduct their business in a competitive market place.

312. In particular, the information includes information regarding ML Fashion's profitability year-over-year; its bills and invoices, including for the products ML Fashion sells at retail; the rent and utility payments at each of ML Fashion's locations; ML Fashion's banking information, including communications between ML Fashion and Chase Bank; documents relating to ML Fashion's landlords for its other retail stores; inventory information; and product levels in each of ML Fashion's retail stores.

313. The computers also provide users with the ability to access ML Fashion's customer information through its "point of sale" system if they have login credentials.

314. Plaintiffs' trade secrets relate to products and services used in, or intended for use in, interstate commerce.

315. Plaintiffs' trade secrets are of great value Plaintiffs, as set forth above. They are also valuable to Defendants, who are competitors of Plaintiffs, as is clearly demonstrated by the extent to which Defendants engaged in the gathering, misappropriation, and transfer of such information to Defendants, including without limitation Defendants' refusal to return computers containing such confidential, proprietary, and trade secret information.

316. Plaintiffs' kept their trade secrets from disclosure through all reasonable, appropriate, and necessary means, consistent with industry practice, such that they were not generally known or available to individuals or entities outside of Plaintiffs.

317. Among other things, the trade secrets were protected through confidentiality agreements, passwords, and other security measures, all consistent with measures taken by similar businesses in the fashion industry.

318. Defendants circumvented these protections by accessing a locked office controlled by ML Fashion, apparently with the purpose of specifically targeting these computers because of their highly valuable information.

319. Plaintiffs' trade secrets revealed to Defendants are critical to the success of Plaintiffs' business and provide Plaintiffs with a distinct competitive advantage in the market place.

320. Defendants were aware that Plaintiffs' trade secrets were to be kept confidential and not to be disclosed to competitors, customers, and others.

321. Defendants knew that the confidential, proprietary, and trade secret information being obtained from Plaintiffs' computers and other sources was confidential and in the nature of trade secrets and, nevertheless, Defendants chose to gather, receive, and utilize it.

322. As further set forth above, Defendants have threatened to misappropriate Plaintiffs' trade secrets through unlawful means, including but not limited to partnering and hiring former employees of Plaintiffs with knowledge of Plaintiffs' trade secrets and by refusal to return Plaintiffs computers containing Plaintiffs' confidential, proprietary, and trade secret information.

323. Upon information and belief, Defendants intend to further misappropriate and unlawfully use Plaintiffs' confidential trade secret information from Plaintiffs' former employees

and Plaintiffs' computers containing Plaintiffs' confidential, proprietary, and trade secret information.

324. There is an inevitability of trade secret disclosure by virtue of the fact that Defendants are directly competing with Plaintiffs, Menkin, Goureau, and Nagrani are filling roles similar to those that they held at ML Fashion, Plaintiffs have sought to protect their trade secret information, and Defendants intend further utilize and misappropriate the trade secrets.

325. As a direct and proximate cause of Defendants' wrongful conduct, Plaintiffs are threatened with incalculable financial losses, imminent and permanent irreparable harm, loss of the confidentiality of their trade secrets, loss of goodwill, loss of business opportunities, and other continuing harm.

326. The threatened losses and harm to Plaintiffs are ongoing and cannot be remedied by damages alone.

327. Plaintiffs have no adequate remedy at law for sufficient compensation for the wrongs committed by Defendants.

328. Defendants have acted willfully, maliciously, and with reckless disregard to the rights of Plaintiffs justifying an award of punitive or exemplary damages.

## INJUNCTIVE RELIEF
### (Temporary Restraining Order, Preliminary and Permanent Injunction by Plaintiffs Against All Defendants)

329. Plaintiffs hereby repeat and reallege each and every allegation contained in paragraphs 1 through 328 of this Complaint as if fully set forth herein.

330. As set forth above, Plaintiffs are likely to succeed, and will succeed, on the merits of their claims, because Defendants have blatantly seized Inventory and FFE to which ML Fashion holds sole title under the terms of the LLC Agreement; have seized the Greenwich Property, to which ML Fashion has the exclusive right of possession and for which ML Fashion continues to

be the lessee; have misappropriated ML Fashion's trade secrets on stolen computers; and are operating a competing business in violation of the LLC Agreement.

331.     Plaintiffs are being irreparably harmed by, *inter alia*, the loss of unique fashion inventory; their loss of use of a unique retail location, the Greenwich Property; the damage to ML Fashion's brands and businesses by Defendants' operation of a competing business; the harm to Plaintiffs' reputation and goodwill; the misappropriation of trade secrets which are now being used against ML Fashion in unlawful competition; and the prospect that ML Fashion will be unable to fully perform under the Credit and Security Agreement, jeopardizing the employment of ML Fashion's employees.

332.     Menkin and Goureau expressly conceded in Section 7.7(d) of the LLC Agreement that competition against ML Fashion would cause irreparable harm to ML Fashion, and that ML Fashion could accordingly seek injunctive relief to stop their competitive conduct.

333.     Plaintiffs have no adequate remedy at law because money damages are not sufficient to compensate Plaintiffs for the harms they are suffering and will continue to suffer absent injunctive relief.

334.     The balance of the equities weighs heavily in Plaintiffs' favor because Defendants are willfully breaching the LLC Agreement, willfully disregarding ML Fashion's rights to possession of the Greenwich Property, and willfully engaging in a business in direct competition with ML Fashion.

335.     By reason of the foregoing, Plaintiffs are entitled to an injunction immediately (through temporary restraining order), preliminarily and permanently enjoining Defendants, their officers, partners, members, employees, agents, servants, attorneys, representatives, and all others acting under it or on its behalf, or in concert with it, known or unknown, from: (a) utilizing, selling,

or otherwise disposing of any stolen computers (and any of the information contained on the stolen computers), inventory or FFE at the Greenwich Property; (b) retaining any computer belonging to Plaintiffs; (c) operating a retail business at the Greenwich Property; (d) occupying or possessing the Greenwich Property; (e) engaging in business activities in competition with ML Fashion's business activities, including by operating Nobelle; and (f) using ML Fashion's confidential proprietary, and trade secret information for any purpose.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter an Order:

(a)     On the First Cause of Action for Conversion, awarding injunctive relief and all general, specific, actual, economic, and non-economic damages to ML Fashion in an amount to be determined at trial and requiring Defendants to return computers, unsold Inventory and FFE to ML Fashion;

(b)     On the Second Cause of Action for Breach of Fiduciary Duty, awarding injunctive relief and all general, specific, actual, economic, and non-economic damages to ML Fashion in an amount to be determined at trial;

(c)     On the Third Cause of Action for Breach of Contract, awarding injunctive relief and all general, specific, actual, economic, and non-economic damages to ML Fashion and ML Retail in an amount to be determined at trial and requiring Menkin and Goureau to specifically perform their obligations under the LLC Agreement by ceasing the operation of Nobelle and any other business in competition with ML Fashion's businesses;

(d)       On the Fourth Cause of Action for Fraud, awarding all general, specific, actual, economic, and non-economic damages to ML Fashion and ML Retail in an amount to be determined at trial;

(e)       On the Fifth Cause of Action for Tortious Interference with Noncompetition Agreement, awarding all general, specific, actual, economic, and non-economic damages to ML Fashion and ML Retail in an amount to be determined at trial;

(f)       On the Sixth Cause of Action for Aiding and Abetting, awarding damages to ML Fashion and ML Retail in an amount to be determined at trial;

(g)       On the Seventh Cause of Action for False Advertising under the Lanham Act, awarding all general, specific, actual, economic, and non-economic damages to ML Fashion and ML Retail in an amount to be determined at trial and enjoining Defendants' conduct in violation of the Lanham Act;

(h)       On the Eighth Cause of Action for Unfair Competition under the Lanham Act, awarding all general, specific, actual, economic, and non-economic damages to ML Fashion and ML Retail in an amount to be determined at trial and enjoining Defendants' conduct in violation of the Lanham Act;

(i)       On the Ninth Cause of Action for Violation of the Computer Fraud and Abuse Act, awarding all general, specific, actual, economic, and non-economic damages to ML Fashion and ML Retail in an amount to be determined at trial and enjoining Defendants' conduct in violation of the Computer Fraud and Abuse Act;

(j)       On the Tenth Cause of Action for Misappropriation of Trade Secrets under the Defend Trade Secrets Act, awarding damages to ML Fashion and ML Retail (including, without limitation, damages for lost profits, the value of the trade

secrets, a reasonable royalty, head-start damages, and/or unjust enrichment) in an amount to be determined at trial and enjoining Defendants' conduct in violation of the Defend Trade Secrets Act;

(k)    On the Eleventh Cause of Action for Threatened Misappropriation of Trade Secrets under the Defend Trade Secrets Act, awarding all general, specific, actual, economic, and non-economic damages to ML Fashion and ML Retail in an amount to be determined at trial and enjoining Defendants' conduct in violation of the Defend Trade Secrets Act;

(l)    On the request for Injunctive Relief, enjoining Defendants, their officers, partners, members, employees, agents, servants, attorneys, representatives, and all others acting under it or on its behalf, or in concert with it, known or unknown, from: (a) utilizing, selling, or otherwise disposing of any computers, inventory, or FFE at the Greenwich Property and returning same to Plaintiffs; (b) retaining any computer belonging to Plaintiffs and returning same to Plaintiffs; (c) operating a retail business at the Greenwich Property; (d) occupying or possessing the Greenwich Property; (e) engaging in business activities in competition with ML Fashion's business activities, including by operating Nobelle; (f) destroying, erasing, disposing of, or otherwise making unavailable for further proceedings in this matter, any discoverable records, documents, or information (including data or information maintained in electronic format or on computer media) pending the outcome of this lawsuit; (g) using ML Fashion's confidential proprietary, and trade secret information for any purpose and returning same to Plaintiffs; (h) allowing expedited discovery, including but not limited to document production, forensic

review, and depositions of all persons and entities necessary to uncover the extent of each Defendants' unlawful conduct;

(m) Awarding judgment that Defendants are in violation and liable under each of the above Counts;

(n) Awarding compensatory damages in an amount to be proved after the discovery of all relevant evidence and trial;

(o) Award the disgorgement of all improperly gained monies by Defendants;

(p) Awarding exemplary, punitive and other monetary damages allowed by law and equity;

(q) Awarding all statutory double and treble damages permitted by law;

(r) Awarding Plaintiffs their reasonable attorneys' fees and costs incurred in connection with this action and the enforcement of their rights;

(s) Costs and expenses in this action; and

(t)     For such other and further relief as the Court deems just and proper.


Dated:  April 9, 2021                              SEYFARTH SHAW LLP

                                                   By: */s/ Karen Y. Bitar*
                                                        Karen Y. Bitar
                                                   620 Eighth Avenue
                                                   New York, New York 10018
                                                   Telephone: (212) 218-5500

                                                   Michael D. Wexler (*pro hac vice* to be filed)
                                                   Willis Tower
                                                   233 S. Wacker Drive, Suite 8000
                                                   Chicago, Illinois 60606-6448
                                                   Telephone:  (312) 460-5559

                                                   Jesse M. Coleman (*pro hac vice* to be filed)
                                                   700 Milam Street, Suite 1400
                                                   Houston, Texas  77002
                                                   (713) 238-1805


                                                   *Attorneys for Plaintiffs ML Fashion, LLC and*
                                                   *ML Retail, LLC*

# Exhibit 1

**LIMITED LIABILITY COMPANY AGREEMENT**

**OF**

**ML FASHION, LLC**

The interests evidenced by this Agreement have not been registered under the Securities Act of 1933, as amended, or applicable state securities laws. The interests are subject to restrictions on transferability and resale and may not be transferred or resold except as permitted under the Securities Act and applicable state securities laws and in accordance with the provisions of this Agreement.

# TABLE OF CONTENTS

**Page**

SECTION 1        DEFINITIONS ................................................................. 1
SECTION 2        THE COMPANY ............................................................. 7
2.1    Formation of the Company ................................................. 7
2.2    Name ................................................................................... 7
2.3    Purpose; Powers ................................................................. 7
2.4    Principal Place of Business ................................................ 7
2.5    Term .................................................................................... 7
2.6    Registered Agent and Registered Office ............................ 7
2.7    Title to Property ................................................................. 7
2.8    Payments of Individual Obligations ................................... 7
2.9    Independent Activities; Transactions with Affiliates .......... 8
2.10   Override of Certain Statutory Defaults ............................... 8
SECTION 3        INITIAL CAPITALIZATION AND CAPITAL CONTRIBUTIONS ........... 8
3.1    Capital Contributions ......................................................... 8
3.2    Additional Capital Contributions ....................................... 8
3.3    Additional Members .......................................................... 8
3.4    Limitation on Withdrawal of Capital ................................. 9
SECTION 4        CAPITAL ACCOUNTS; PROFITS AND LOSSES ....................... 9
4.1    Capital Accounts ................................................................. 9
4.2    Allocation of Profits and Losses ........................................ 9
SECTION 5        DISTRIBUTIONS ......................................................... 11
5.2    Amounts Withheld ............................................................ 12
5.3    Tax Distributions .............................................................. 12
5.4    Limitations on Distributions ............................................. 13
5.5    Certain Liquidity Events ................................................... 13
SECTION 6        MANAGEMENT ........................................................... 13
6.1    Manager ............................................................................ 13
6.2    Duties and Obligations of the Manager; Discretion .......... 14
6.3    Reimbursements ................................................................ 14
6.4    Indemnification of the Manager and Officers ................... 14

# TABLE OF CONTENTS
(continued)

<div align="right">Page</div>

| | | |
|---|---|---|
| SECTION 7 | ROLE OF MEMBERS | 15 |
| 7.1 | Rights or Powers | 15 |
| 7.2 | Voting Rights | 15 |
| 7.3 | Member Liability | 16 |
| 7.4 | Partition | 16 |
| 7.5 | Transactions Between a Member and the Company | 16 |
| 7.6 | Other Instruments | 16 |
| 7.7 | Non-Solicitation and Non-Competition | 16 |
| 7.8 | Investment Representations and Warranties | 17 |
| SECTION 8 | ACCOUNTING, BOOKS AND RECORDS | 18 |
| 8.1 | Bank Accounts; Accounting, Books and Records | 18 |
| 8.2 | Tax Matters | 19 |
| 8.3 | Certificates | 21 |
| SECTION 9 | AMENDMENTS | 21 |
| 9.1 | Amendments Generally | 21 |
| 9.2 | Amendments by the Manager | 21 |
| SECTION 10 | TRANSFERS; DRAG-ALONG RIGHTS | 21 |
| 10.1 | Restrictions on Transfers | 21 |
| 10.2 | Permitted Transfers | 21 |
| 10.3 | Conditions to Permitted Transfers | 22 |
| 10.4 | Prohibited Transfers | 22 |
| 10.5 | Rights of Unadmitted Assignees | 23 |
| 10.6 | Admission of Substituted Members | 23 |
| 10.7 | Distributions in Respect of Transferred Membership Interests | 23 |
| 10.8 | Sale of the Company; Drag-Along Rights | 24 |
| SECTION 11 | REDEMPTION | 24 |
| SECTION 12 | DISSOLUTION AND WINDING UP | 24 |
| 12.1 | Dissolution Events | 24 |
| 12.2 | Winding Up | 25 |
| 12.3 | Liquidating Trust; Reserves | 26 |

**TABLE OF CONTENTS**
(continued)

12.4 Rights of Members ....................................................................... 26

12.5 Notice of Dissolution/Termination ............................................. 26

12.6 Character of Liquidating Distributions ...................................... 26

12.7 The Liquidator ............................................................................ 27

12.8 Form of Liquidating Distributions ............................................ 27

SECTION 13  MISCELLANEOUS ............................................................ 27

13.1 Notices ......................................................................................... 27

13.2 Binding Effect ............................................................................. 27

13.3 Effect of Consent or Waiver ....................................................... 27

13.4 Construction ................................................................................ 28

13.5 Time ............................................................................................ 28

13.6 Headings and References ............................................................ 28

13.7 Severability ................................................................................. 28

13.8 Incorporation by Reference ........................................................ 28

13.9 Governing Law ........................................................................... 28

13.10 Waiver of Jury Trial .................................................................. 28

13.11 Specific Performance ................................................................ 28

13.12 Counterparts; Signatures .......................................................... 29

13.13 Trustee Exculpation .................................................................. 29

# LIMITED LIABILITY COMPANY AGREEMENT
## OF
## ML FASHION, LLC

**THIS LIMITED LIABILITY COMPANY AGREEMENT OF ML FASHION, LLC**, a Delaware limited liability company (the **"Company"**), is entered and effective as of March 29, 2016 (the **"Effective Date"**), and is entered into by and among the Persons identified as Members on Exhibit A hereto, and such additional Persons as are hereinafter admitted as Members. Capitalized terms and phrases not otherwise defined herein shall have the meanings ascribed to them in Section 1 hereof.

**WHEREAS**, the Company is organized as a limited liability company under and pursuant to the Limited Liability Company Act of the State of Delaware, as amended; and

**WHEREAS**, the Members desire to set forth the terms and conditions in which the Company shall be operated, all as more particularly set forth below.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements herein contained and other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged, the parties hereto do hereby agree as follows:

## SECTION 1

## DEFINITIONS

In addition to terms defined elsewhere in this Agreement, the following capitalized words and phrases used in this Agreement shall have the following meanings:

**"2015 Budget Act"** means the Bipartisan Budget Act of 2015 (Pub. L. 114-74).

**"2015 Budget Act Audit Rules"** means the provisions of Subchapter C of Chapter 63 of the Code, as revised by Section 1101 of the 2015 Budget Act, as such provisions may thereafter be amended and including Treasury regulations or other guidance issued thereunder.

**"Act"** means the Delaware Limited Liability Company Act, 6 Del. C. §18-101, *et seq.*, as amended from time to time (or any corresponding provisions of succeeding law).

**"Additional Member"** shall have the meaning set forth in Section 3.3 hereof.

**"Adjusted Capital Account Deficit"** means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the applicable fiscal year after (a) crediting thereto any amounts which such Member is, or is deemed to be, obligated to restore pursuant to Regulations Section 1.704-2(g)(1) and Section 1.704-2(i)(5) and (b) debiting such Capital Account by the amount of the items described in Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) and (6). The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

**"Affiliate"** means, with respect to any Person (i) any Person directly or indirectly controlling, controlled by or under common control with such Person, (ii) any officer, director, general partner, member or trustee of such Person or (iii) any Person who is an officer, director, general partner, member or trustee of any Person described in clauses (i) or (ii) of this sentence. For purposes of this definition, the terms "controlling," "controlled by" or "under common control with" shall mean the possession, direct or

1

indirect, of the power to direct or cause the direction of the management and policies of a Person or entity, whether through the ownership of voting securities, by contract or otherwise, or the power to elect at least 50% of the directors, managers, general partners, or persons exercising similar authority with respect to such Person or entities.

"**Agreement**" or "**Limited Liability Company Agreement**" means this Limited Liability Company Agreement of ML Fashion, LLC, including all Exhibits and Schedules attached hereto, as amended from time to time. Words such as "herein," "hereinafter," "hereof," "hereto" and "hereunder" refer to this Agreement as a whole, unless the context otherwise requires.

"**Approval of the Members**" means the written consent of Members holding, in the aggregate, more than fifty percent (50%) of the Percentage Interests.

"**Business**" shall have the meaning set forth in Section 2.3(a) hereof.

"**Business Day**" means a day of the year on which banks are not required or authorized to close in Chicago, Illinois.

"**Capital Account**" means, with respect to each Member, the Capital Account maintained for such Member in accordance with Section 4.

"**Capital Contributions**" means, with respect to any Member, the amount of money and the initial net fair market value of any Property (other than money) contributed to the Company with respect to the Membership Interests in the Company held or purchased by such Member.

"**Carrying Value**" means, with respect to any Company asset, the asset's adjusted basis for U.S. federal income tax purposes, except as otherwise provided in this definition. The Carrying Value of an asset contributed to the Company shall be equal to its Fair Market Value at the time of contribution. The Carrying Values of all Company assets shall be adjusted to equal their respective Fair Market Values in accordance with the rules set forth in Regulations Section 1.704-1(b)(2)(iv)(f), except as otherwise provided herein, in connection with (a) the acquisition of any additional interest in the Company by any new or existing Member in exchange for more than a de minimis Capital Contribution; (b) the distribution of more than a de minimis amount of Company Property to a Member as consideration for an interest in the Company; (c) the distribution of Company Property (other than money) to a Member; (d) the grant of any Membership Interest or other equity interest in the Company (other than a de minimis interest) as consideration for the provision of services to or for the benefit of the Company within the meaning of Regulations Section 1.704-1(b)(2)(iv)(f)(5)(iii); or (e) the issuance by the Company of a noncompensatory option (a "warrant") (other than a warrant for a de minimis Company interest); provided, that, in the case of an exercise of a warrant to acquire Membership Interests, the adjustment of Carrying Values shall also take account of Regulations Section 1.704-1(b)(2)(iv)(s); and, provided further that adjustments pursuant to clauses (a) and (b) above shall be made only if the Manager in good faith determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members. The Carrying Value of any Company asset other than cash denominated in Dollars distributed to any Member shall be adjusted immediately prior to such Distribution to equal its Fair Market Value. In the case of any asset that has a Carrying Value that differs from its adjusted tax basis, Carrying Value shall be adjusted by the amount of depreciation calculated for purposes of the definition of "Profits" and "Losses" rather than the amount of depreciation determined for U.S. federal income tax purposes.

"**Certificate of Cancellation**" means a certificate filed in accordance with 6 Del. C.§ 18-203.

2

"**Certificate of Formation**" means the certificate filed pursuant to 6 Del. C.§ 18-201 of the Act to form the Company.

"**Change in Control**" means the following and shall be deemed to occur if any of the following events occur:

(a)     Any Person becomes, after the date of this Agreement, the beneficial owner (within the meaning of Rule 13d-3 promulgated under the Exchange Act) of 50% or more of either the combined fair market value of the Company's then outstanding Membership Interests or the combined voting power of the Company's then outstanding securities entitled to vote generally in the election of managers, except that any change in the ownership of the Membership Interests of the Company as a result of a private financing of the Company that is approved by the Manager will not be considered a Change in Control unless the Manager specifically states that such change is a Change in Control for purposes of this Agreement;

(b)     Consummation by the Company of a Reorganization; or

(c)     Approval by the Manager and the Voting Members of the Company or any order by a court of competent jurisdiction of a plan of liquidation of the Company.

Notwithstanding the foregoing, unless determined otherwise by the Manager, a Change in Control shall not be deemed to occur solely on account of any of the following:

(i)     a Reorganization that would result in the voting securities of the Company outstanding immediately prior thereto (or, in the case of a Reorganization that is preceded or accomplished by an acquisition or series of related acquisitions by any Person, by tender or exchange offer or otherwise, of voting securities representing 5% or more of the combined voting power of all securities of the Company, immediately prior to such acquisition or the first acquisition in such series of acquisitions) continuing to represent, either by remaining outstanding or by being converted into voting securities of another entity, more than fifty percent (50%) of the combined voting power of the voting securities of the Company or such other entity outstanding immediately after such Reorganization (or series of related transactions involving such a Reorganization);

(ii)     a Reorganization effected to implement a recapitalization or reincorporation of the Company (or similar transaction) that does not result in a material change in beneficial ownership of the voting securities of the Company or its successor;

(iii)     any acquisition by a lender of the Company pursuant to a debt restructuring thereof; or

(iv)     any acquisition by, or consummation of a Reorganization with, an Affiliate of the Company.

(d)     A Change in Control of the type described in paragraph (a)(ii), (b) or (c) shall be deemed to be completed on the date it occurs, and a Change in Control of the type described in paragraph (a)(i) shall be deemed to be completed as of the date the entity or group attaining 50% or greater ownership has elected its representative(s) as the managers of the Company and/or caused its nominees to become Officers with the authority to terminate or alter the terms of employees' employment.

"**Code**" means the United States Internal Revenue Code of 1986, as amended from time to time.

"**Company Minimum Gain**" shall have the same meaning attributed to "partnership minimum gain" as set forth in Regulations Section 1.704-2(b)(2) and Section 1.704-2(d).

"**Dissolution Event**" shall have the meaning set forth in Section 12.1(a) hereof.

"**Distribution**" means any distributions by the Company to the Members with respect to their Membership Interests in accordance with this Agreement.

"**Drag-Along Members**" shall have the meaning set forth in Section 10.8(a) hereof.

"**Dragging Member**" shall have the meaning set forth in Section 10.8(a) hereof.

"**Drag Notice**" shall have the meaning set forth in Section 10.8(a) hereof.

"**Drag Transaction**" shall have the meaning set forth in Section 10.8(a) hereof.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended, or any successor statute or statutes thereto.

"**Fair Market Value**" means, with respect to any asset, the fair market value of such asset, as reasonably determined by the Manager, except as otherwise expressly provided herein.

"**GAAP**" means generally accepted accounting principles in effect in the United States of America from time to time.

"**Liquidator**" has the meaning set forth in Section 12.7(a) hereof.

"**Manager**" means, at any point in time, the Person then serving the Company as Manager pursuant to Section 6 hereof.

"**Member**" means any Person (i) who is referred to as such on Exhibit A to this Agreement, or who has become a Member pursuant to the terms of this Agreement and (ii) who has not ceased to be a Member pursuant to the terms of this Agreement. "**Members**" means all such Persons.

"**Member Nonrecourse Debt**" shall have the meaning attributed to "partner nonrecourse debt" as set forth in Regulations Section 1.704-2(b)(4).

"**Member Nonrecourse Debt Minimum Gain**" means an amount with respect to each Member Nonrecourse Debt equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a nonrecourse liability (as defined in Regulations Section 1.752-1(a)(2)) determined in accordance with Regulations Section 1.704-2(i)(3).

"**Member Nonrecourse Deductions**" shall have the meaning attributed to "partner nonrecourse deductions" as set forth in Regulation Section 1.704-2(i)(2).

"**Membership Interest**" means, with respect to any Member at any time, the entire interest of such Member in the Company at such time. Such interest includes, without limitation, the Percentage Interest of such Member, as well as any and all other rights of a Member to receive distributions of revenues, allocations of income and loss and distributions of liquidation proceeds arising under this Agreement, and management rights, voting rights or rights to consent by a Member arising hereunder.

"**Misconduct**" means fraud, breach of fiduciary duty, bad faith, a knowing violation of law or willful misconduct.

"**ML Retail**" means ML Retail LLC, a Delaware limited liability company, and its successors and assigns.

"**Net Cash Flow**" means the gross cash proceeds of the Company less the portion thereof used to pay or establish reserves for all Company expenses, debt payments (including debt payments to Members or their Affiliates), capital improvements, replacements, and contingencies, all as determined by the Manager. "**Net Cash Flow**" shall not be reduced by depreciation, amortization, cost recovery deductions, or similar allowances, but shall be increased by any reductions of reserves previously established pursuant to the first sentence of this definition.

"**Nonrecourse Deductions**" has the meaning set forth in Regulation Sections 1.704-2(b)(1).

"**Officers**" has the meaning set forth in <u>Section 6.1(c)</u> hereof.

"**Partnership Representative**" has the meaning set forth in <u>Section 8.3(d)(iii)</u> hereof.

"**Percentage Interest**" means, with respect to any Member as of any date, the percentage of Membership Interests held by such Member set forth on <u>Exhibit A</u> hereto, as such percentage may be adjusted from time to time pursuant to <u>Section 9.2</u>.

"**Permitted Transfer**" has the meaning set forth in <u>Section 10.2</u> hereof.

"**Person**" means any individual, limited liability company, corporation, general partnership, limited partnership, trust, estate, governmental agency, cooperative, association, nominee or other entity, and the heirs, executors, administrators, legal representatives, successors and assigns of such person, as the context may require.

"**Profits**" and "**Losses**" means, for each fiscal year of the Company or other period, the Company's taxable income or loss for such year or period, or particular items thereof, determined in accordance with the accounting method used by the Company for U.S. federal income tax purposes and in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(a)     Any income of the Company that is exempt from U.S. federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be added to such taxable income or loss;

(b)     Any expenditures of the Company described in Code Section 705(a)(2)(B), or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv)(i), which are not deductible in computing taxable income or loss, not properly capitalizable, and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be treated as deductible items and shall be subtracted from such taxable income or loss;

(c)     If the Carrying Value of any Company asset is adjusted pursuant to the definition of "Carrying Value" herein, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits or Losses;

(d)     Gain or loss resulting from any disposition of property with respect to which gain or loss is recognized for U.S. federal income tax purposes shall be computed by reference to the Carrying Value of the property disposed of notwithstanding that the adjusted tax basis of such property differs from its Carrying Value in accordance with Regulations Section 1.704-1(b)(2)(iv);

(e)     If the Carrying Value of any asset differs from its adjusted tax basis for U.S. federal income tax purposes, the amount of depreciation, amortization or cost recovery deductions with respect to such asset for purposes of determining Profits and Losses shall be an amount which bears the same ratio to such Carrying Value as the U.S. federal income tax depreciation, amortization or other cost recovery deductions bears to such adjusted tax basis (<u>provided</u>, that if the U.S. federal income tax depreciation, amortization or other cost recovery deduction is zero, the Manager may use any reasonable method for purposes of determining depreciation, amortization or other cost recovery deductions in calculating Profits and Losses); and

(f)     Notwithstanding anything to the contrary herein, items that are specially allocated pursuant to <u>Section 4.2(b)</u> shall not be taken into account in computing Profits and Losses.

"**Property**" means all real and personal property acquired by the Company, including cash, and any improvements thereto, and shall include both tangible and intangible property.

"**Reconstitution Period**" has the meaning set forth in <u>Section 12.1(b)</u> hereof.

"**Regulations**" means the Income Tax Regulations, including Temporary Regulations, promulgated under the Code, as such regulations are amended from time to time.

"**Reorganization**" means any merger, consolidation, sale or other disposition of all or substantially all of the assets of the Company or other reorganization.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Subsidiary**" means any Person of which a majority of the outstanding shares or other equity interests having the power to vote for directors, managers, general partners or persons exercising similar authority are owned, directly or indirectly, by the Company.

"**Tax Distributions**" has the meaning set forth in <u>Section 5.3(a)</u> hereof.

"**Tax Matters Member**" has the meaning set forth in <u>Section 8.3(d)(i)</u> hereof.

"**Third Party Purchaser**" means, with respect to a proposed sale of Membership Interests pursuant to <u>Section 10.8</u>, a Person, other than an Affiliate or Permitted Transferee of any Member, who offers to purchase outstanding Membership Interests pursuant to a bona fide written offer.

"**Transfer**" means, as a noun, any voluntary or involuntary transfer, sale, pledge or hypothecation or other disposition and, as a verb, voluntarily or involuntarily to transfer, sell, pledge or hypothecate or otherwise dispose of (including in each case, without limitation, by way of merger, consolidation, reorganization, forced sale or otherwise).

"**Unreturned Capital Contributions**" means, with respect to any Member, the difference between (a) the sum of (i) such Member's initial Capital Contribution plus (ii) any subsequent Capital Contribution(s) made by such Member, less (b) any distributions previously made to such Member pursuant to <u>Sections 5.1(b)(i)</u> and <u>12.2(c)</u>.

## SECTION 2

## THE COMPANY

**2.1** **Formation of the Company**. The Company shall operate as a Delaware limited liability company under and pursuant to the Act, and pursuant to the terms of this Agreement. A Certificate of Formation was filed on March 29, 2016, with the Office of the Delaware Secretary of State by the organizer of the Company acting as agent for the Company. The Members shall be the "members" of the Company within the meaning of the Act, and except as expressly provided herein to the contrary, the rights and obligations of the Members shall be as provided in the Act.

**2.2** **Name**. The name of the Company shall be "ML Fashion, LLC" and all business of the Company shall be conducted in such name. The Manager may change the name of the Company at any time.

**2.3** **Purpose; Powers**.

(a) The purpose of the Company is to, directly or indirectly through one or more partnerships, limited liability companies or other entities, acquire, hold, maintain, manage, improve, finance, sell, dispose of or otherwise invest in businesses focused on the distribution and sale of apparel, footwear and accessories, via owned and leased retail stores and online (the "**Business**").

(b) The Company has the power to do any and all acts necessary, appropriate, proper, advisable, incidental or convenient to or in furtherance of the purposes of the Company set forth in Section 2.3(a) hereof.

**2.4** **Principal Place of Business**. The principal place of business of the Company shall be located at such place as the Manager may determine from time to time. The initial principal place of business of the Company shall be at 38 E. 29th Street, New York, New York 10016.

**2.5** **Term**. The term of the Company commenced on the date the Certificate of Formation was filed in the office of the Secretary of State of the State of Delaware in accordance with the Act and shall continue until the winding up and liquidation of the Company and its business is completed following a Dissolution Event, as provided in Section 12 hereof.

**2.6** **Registered Agent and Registered Office**. The registered agent and registered office of the Company in the State of Delaware shall be The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware, 19801, or any successor as appointed by the Manager.

**2.7** **Title to Property**. All Property owned by the Company shall be owned by the Company as an entity and no Member shall have any ownership interest in such Property in his or its individual name, and each Member's interest in the Company shall be personal property for all purposes. At all times, the Company shall hold title to all of its Property in the name of the Company and not in the name of any Member.

**2.8** **Payments of Individual Obligations**. The Company's credit and assets shall be used solely for the benefit of the Company, and no asset of the Company shall be Transferred or encumbered for, or in payment of, any individual obligation of any Member.

**2.9    Independent Activities; Transactions with Affiliates**.

(a)    The Manager shall be required to devote only such time to the affairs of the Company as may be necessary to manage and operate the Company, and shall be free to serve any other Person or enterprise in any capacity that such Manager may deem appropriate in his, her or its discretion.

(b)    Except as otherwise set forth in <u>Section 7.7</u> and insofar as permitted by applicable law, neither this Agreement nor any activity undertaken pursuant hereto shall prevent any Member or the Manager or their Affiliates from engaging in whatever activities they choose, whether the same are competitive with the Company or otherwise, and any such activities may be undertaken without having or incurring any obligation to offer any interest in such activities to the Company or any Member, or require any Member or the Manager to permit the Company or any other Member or the Manager or its Affiliates to participate in any such activities.

(c)    To the extent permitted by applicable law and subject to the provisions of this Agreement, the Manager is hereby authorized to cause the Company to purchase Property from, sell Property to or otherwise deal with any Member, acting on its own behalf, or any Affiliate of any Member on terms that are arms' length market terms or are more favorable to the Company than arms' length market terms.

**2.10    Override of Certain Statutory Defaults**.  To the extent permitted by law, the provisions of this Agreement shall govern over all provisions of the Act which would apply but for (and that are inconsistent with) this Agreement.  For each issue (a) with respect to which the Act provides a rule (a **"default rule"**) but permits a limited liability company's operating agreement to provide a different rule and (b) which is addressed by this Agreement, the default rule shall not apply to the Company.  Without limiting the generality of the foregoing, except as expressly provided in this Agreement, the following provisions of the Act shall not apply to the Company: Section 18-604 (Distribution upon Resignation), Section 18-801 (Dissolution) and Section 18-804 (Distribution of Assets).

# SECTION 3

# INITIAL CAPITALIZATION AND CAPITAL CONTRIBUTIONS

**3.1    Capital Contributions**.  Each Member has made such Capital Contributions as are set forth in the books and records of the Company.

**3.2    Additional Capital Contributions**.   No Member shall be required to make any additional Capital Contribution.

**3.3    Additional Members**.  By approval of the Manager and the Approval of the Members, the Company is authorized to admit any Person as an additional member of the Company (each, an **"Additional Member"**).  In connection with the admission of an Additional Member, the Manager shall agree with the Person to be admitted as an Additional Member as to what Capital Contribution, if any, such Additional Member shall make to the Company.  The Percentage Interest to be issued to any Additional Member shall represent the value of the Capital Contribution made by such Additional Member relative to the value of the Company at the time of such Capital Contribution and shall dilute all existing Members' Percentage Interests proportionately unless otherwise agreed by the Members.  Each Person admitted as an Additional Member will be deemed admitted at the time such Person (a) executes this Agreement or a counterpart of this Agreement and such other documents as are requested by the Manager and (b) is named as a Member on <u>Exhibit A</u> hereto.  In the event any Additional Members are admitted to the Company, the Manager shall cause <u>Exhibit A</u> to be updated to accurately reflect the

Additional Member and the related changes in the Members' Percentage Interests. The legal fees and expenses associated with such admission shall be borne by the Company.

**3.4** **Limitation on Withdrawal of Capital**. Except as expressly provided in this Agreement, no Member (a) shall have the right to withdraw or receive any return on such Member's Capital Contributions (including any part of its Capital Account) or a claim to any Company capital prior to termination of the Company pursuant to Section 12 hereof, (b) shall have any right to demand and receive property other than cash in return for such Member's contributions to the capital of the Company, or (c) shall be liable to any other Member for the return of such other Member's contributions to the capital of the Company, or any portion thereof (except as otherwise expressly required under the Act), it being expressly understood that such return shall be made solely from Company assets.

## SECTION 4

## CAPITAL ACCOUNTS; PROFITS AND LOSSES

**4.1** **Capital Accounts**. The Company shall establish and maintain a separate Capital Account for each Member in accordance with Regulations Section 1.704-1(b).

**4.2** **Allocation of Profits and Losses**.

(a) Profits and Losses. After giving effect to the special allocations in Section 4.2(b) and after adjusting for all Capital Contributions and Distributions made during such taxable year, Profits and Losses (and, if necessary, individual items of gross income or loss) shall be allocated annually (and at such other times in which it is necessary to allocate Profits or Losses) in a manner such that, after such allocations have been made, the balance of each Member's Capital Account shall, to the extent possible, be equal to (i) an amount that would be distributed to such Member if (A) the Company were to sell its assets for their Carrying Values, (B) all Company liabilities were satisfied (limited with respect to each nonrecourse liability to the Carrying Values of the assets securing such liability), (C) the Company were to distribute the proceeds of sale pursuant to Section 12.2 and (D) the Company were to dissolve pursuant to Section 12, minus (ii) the sum of (1) such Member's share of Company Minimum Gain or Member Nonrecourse Debt Minimum Gain, and (2) the amount, if any, that such Member is obligated (or deemed obligated) to contribute, in its capacity as a Member, to the Company, computed immediately prior to the hypothetical sale of assets.

(b) Special Allocations.

(i) Nonrecourse Deductions. Notwithstanding the general rule on allocation of Losses stated in Section 4.2(a), Nonrecourse Deductions will be allocated to and among the Members in accordance with their respective Percentage Interests, and Member Nonrecourse Deductions will be allocated to and among those Members bearing the economic risk of loss for such debt in accordance with each Member's share of such risk. The allocation of liabilities to a property, the determination of Nonrecourse Deductions and Member Nonrecourse Deductions, the effect of property revaluations and all other issues affecting the allocation of such items will be determined in accordance with the Regulations under Code Section 704(b).

(ii) Minimum Gain Chargeback. Notwithstanding the general rule on allocation of Profits stated in Section 4.2(a), if there is a net decrease in Company Minimum Gain for any fiscal year, each Member will be allocated items of Company income or gain for such year equal to such Member's share of the net decrease in Company Minimum Gain. If there is a net decrease in Member Nonrecourse Debt Minimum Gain for any fiscal year, each Member

having a share of such Member Nonrecourse Debt Minimum Gain will be allocated items of Company income or gain equal to such Member's share of such net decrease in Member Nonrecourse Debt Minimum Gain. The determination of net decreases in Company Minimum Gain and Member Nonrecourse Debt Minimum Gain, allocations of such net decreases, exceptions to minimum gain chargebacks and all other issues affecting the minimum gain chargeback requirements will be determined in accordance with the Regulations under Code Section 704(b).

(iii)   <u>Qualified Income Offset</u>.   If a Member unexpectedly receives an adjustment, allocation or distribution described in Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6) that causes or increases an Adjusted Capital Account Deficit with respect to such Member, items of Company gross income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate such Adjusted Capital Account Deficit as quickly as possible.

(iv)   <u>Section 754 Adjustments</u>.   To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Section 734(b) or 743(b) of the Code is required to be taken into account in determining Capital Accounts in accordance with Regulations Section 1.704-1(b)(2)(iv)(m), the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such Section of the Regulations.

(v)   <u>Loss Limitation</u>.   Losses allocated pursuant to <u>Section 4.2(a)</u> hereof shall not exceed the maximum amount of Losses that can be allocated without causing any Member to have or increase an Adjusted Capital Account Deficit at the end of any fiscal year of the Company or other allocation period in which any other Member does not have an Adjusted Capital Account Deficit. In the event some but not all of the Members would have an Adjusted Capital Account Deficit as a consequence of an allocation of Losses pursuant to <u>Section 4.2(a)</u>, the limitation set forth in this <u>Section 4.2(b)(v)</u> shall be applied on a Member by Member basis and Losses not allocable to a Member as a result of such limitation shall be allocated proportionately to the other Members without an Adjusted Capital Account Deficit so as to allocate the maximum permissible Losses to each Member under Regulations Section 1.704-1(b)(2)(ii)(d).

(vi)   <u>Interpretation</u>.   The foregoing provisions of this <u>Section 4.2(b)</u> (**"Regulatory Allocations"**) are intended to comply with Regulations Sections 1.704-1(b) and 1.704-2 and shall be interpreted consistently with this intention. Any terms used in such provisions that are not specifically defined in this Agreement shall have the meaning, if any, given such terms in such Regulations. The amounts of the items of Company income, gain, loss, or deduction available to be specially allocated pursuant to this <u>Section 4.2(b)</u> shall be determined by applying rules analogous to those set forth in <u>subparagraphs (a)</u> through <u>(e)</u> of the definition of "Profits" and "Losses" in <u>Section 1.1</u>.

(vii)   <u>Curative Allocations</u>.   If any allocation of gain, income, loss, expense or any other item is made pursuant to the Regulatory Allocations with respect to one or more Members, then the balance of such items for the current and all subsequent fiscal years shall be allocated among the Members so that, to the extent possible and without requiring further Regulatory Allocations, the Members receive aggregate net allocations under <u>Section 4.2</u> equal to the net allocations that would have been made to the Members if the Regulatory Allocations had

not occurred. This Section 4.2(b)(vii) is intended to minimize to the extent possible and to the extent necessary any economic distortions which may result from application of Regulations Section 1.704-1(b) and shall be interpreted in a manner consistent therewith.

**4.3** **Tax Allocations.** For income tax purposes only, each item of income, gain, loss and deduction of the Company shall be allocated among the Members in the same manner as the corresponding items of Profits and Losses and specially allocated items are allocated for Capital Account purposes; provided, that in the case of any Company asset the Carrying Value of which differs from its adjusted tax basis for U.S. federal income tax purposes, income, gain, loss and deduction with respect to such asset shall be allocated solely for income tax purposes in accordance with the principles of Sections 704(b) and (c) of the Code (in any reasonable manner determined by the Manager) so as to take account of the difference between the Carrying Value and adjusted basis of such asset.

**4.4** **Other Allocation Provisions.** The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations Section 1.704-1(b) and shall be interpreted and applied in a manner consistent with such Regulations. Sections 4.1 to and including Section 4.4 hereof may be amended at any time by the Manager if, in the opinion of tax counsel to the Company, it is necessary to comply with Regulations Section 1.704-1(b), so long as any such amendment does not change the relative economic interests of the Members.

**4.5** **Authority to Withhold; Treatment of Withheld Tax.** Notwithstanding any other provision of this Agreement, each Member hereby authorizes the Company to withhold and to pay over, or otherwise pay, any withholding or other Taxes payable by the Company with respect to such Member or as a result of such Member's participation in the Company. If and to the extent that the Company shall be required to withhold or pay any such withholding or other taxes with respect to a Member, such Member shall be deemed for all purposes of this Agreement to have received a Distribution from the Company as of the time such withholding or other tax is required to be paid. In the event that the Company receives a payment in respect of which Tax has been withheld, the Company shall be deemed to have received cash in an amount equal to the amount of such withheld Tax, and each Member shall be deemed to have received as a Distribution the portion of such amount that is attributable to such Member's interest as equitably determined by the Manager. Any Distribution deemed made to a Member pursuant to this Section 4.5 shall reduce the amounts the Member would otherwise be entitled to receive pursuant to Section 5.1(a).

## SECTION 5

## DISTRIBUTIONS

**5.1** **Distributions of Net Cash Flow.**

(a) Conditions to Cash Distributions to Members. No Distributions may be made to the Members unless (i) the Company is current on all payments of interest due and payable by the Company to any Member that has made a loan to the Company (each, a **"Member Loan"**), and (ii) the Company has no trade accounts payable in excess of sixty (60) days past due. Further, at any time any amount is due and owing under any Member Loan, no Distributions may be made to the Members unless an amount equal to the Distribution is used to pay down the principal balance and any related accrued and unpaid interest of such loan, pro rata to and among the Members holding Member Loans in accordance with the relative remaining balances of their respective Member Loans.

(b)    Cash Distributions to Members.  Subject to the requirements and limitations of this Section 5.1(a) and 5.4, the timing and amount of Distributions shall be determined by the Manager in his reasonable business judgment.  Except as set forth in Section 5.3 and Section 12.2 and subject to the requirements and limitations of this Section 5.1(a) and 5.4, the Manager, in his discretion, may distribute Net Cash Flow to and among the Members, provided that any such Distribution shall be made as follows:

(i)    first, 100% to and among the Members in proportion to and to the extent of their respective Unreturned Capital Contributions; and

(ii)    second, pro rata among the Members, provided that any such distribution shall be made pro rata to and among the Members in accordance with their respective Percentage Interests at such time.

5.2    **Amounts Withheld**.  All amounts withheld pursuant to the Code or any provision of any state, local or foreign tax law with respect to any payment, distribution or allocation to the Company or the Members shall be treated as amounts paid or distributed, as the case may be, to the Members with respect to which such amount was withheld pursuant to this Section 5.2 for all purposes under this Agreement but only to the extent such amounts are paid by the Company to such taxing authority.  The Company is authorized to withhold from payments and distributions, or with respect to allocations to the Members, and to pay over to any federal, state and local government or any foreign government, any amounts required to be so withheld pursuant to the Code or any provisions of any other federal, state or local law or any foreign law, and shall allocate any such amounts to the Members with respect to which such amount was withheld and paid to the taxing authority.

5.3    **Tax Distributions**.

(a)    If the distributions to the Members pursuant to Section 5.1 above (exclusive of Tax Distributions) for a taxable year are not expected to cover each Member's federal and state taxes on its distributive share of the Company's taxable income for such taxable year, then the Company shall be required to make additional distributions pursuant to this Section (**"Tax Distributions"**) to the Members in accordance with their Percentage Interests in such amount as determined pursuant to Section 5.3(b) below, to the extent the Company has sufficient Net Cash Flow.  If the distributions to the Members during the taxable year pursuant to Section 5.1 above (exclusive of Tax Distributions) are expected to cover each Member's federal and state taxes on its distributive share of the Company's taxable income, then no distributions shall be made pursuant to this Section 5.3.   Any distribution deemed made to a Member pursuant to this Section 5.3 shall reduce the amounts the Member would otherwise be entitled to receive pursuant to Section 5.1(b)(i) or 5.1(b)(ii).

(b)    The aggregate amount of the Tax Distributions shall be determined by the Manager and shall equal the amount of cash the Manager deems necessary to enable each Member to pay its federal and state taxes on its distributive share of the Company's taxable income for the taxable year, taking into account the distributions expected to be received from the Company (exclusive of Tax Distributions) during the taxable year.  To the extent the Company has sufficient Net Cash Flow, the Manager shall attempt to make the Tax Distributions on a quarterly basis to enable the Members to make their quarterly state and federal estimated tax payments.  In any event the Manager shall, to the extent the Company has sufficient Net Cash Flow, cause the Company to make the Tax Distribution no later than the April 10 following the taxable year to which the Tax Distribution relates.  The Manager shall be entitled to make reasonable assumptions concerning Member's tax rates and, when making quarterly Tax Distributions, the Company's ultimate taxable income for the entire taxable year.

**5.4    Limitations on Distributions**.

(a)    The Company shall make no Distributions to the Members except (i) as provided in this <u>Section 5</u> and in <u>Section 12</u> hereof, or (ii) as determined by the Manager.

(b)    The Company shall not make, and a Member may not receive, a Distribution from the Company to the extent that, after giving effect to the Distribution, all liabilities of the Company, other than liability to Members on account of their Capital Contributions and liabilities for which the recourse of creditors is limited to specific property of the Company, would exceed the fair value of the Company's assets.

**5.5    Certain Liquidity Events.**   Notwithstanding any other provision of this Agreement to the contrary, if a Change in Control occurs in which the Members dispose of all Membership Interests in the Company (whether in a merger or sale of all of the equity of the Company), the Members agree and acknowledge that the consideration paid to each Member for their Membership Interests shall be redistributed among them to equal that which each Member would have received if the Company had sold all of its assets for an amount equal to the aggregate consideration payable under such transaction plus all Company liabilities (including transaction expenses, brokers' commissions, attorney's and accountants' fees, debt repayment and other similar charges), and the sales proceeds (net of such liabilities) were distributed in accordance with <u>Section 12.2</u>.  Notwithstanding any other provision of this Agreement to the contrary, if a Change in Control occurs in which the Company disposes of assets, with proceeds from such transaction received by the Company, then the Distribution of any such proceeds to the Members shall be made in accordance with <u>Section 12.2</u>.


## SECTION 6

## MANAGEMENT

**6.1    Manager**.

(a)    The management of the Company shall be vested entirely and exclusively in the Manager.  Except as expressly provided for in this Agreement or prohibited by the Act, the Manager shall have the full, exclusive and unilateral power and authority to make all decisions affecting the business and affairs of the Company.  No Member acting as such shall have any voting, approval, or management rights whatsoever or any authority to bind the Company, except as expressly provided for in this Agreement or the Act.

(b)    The Manager need not be a Member of the Company.  The initial Manager of the Company as of the Effective Date shall be Marcus Lemonis.  The Manager shall serve as the Manager until his or its death, dissolution, voluntary resignation, or appointment of a successor Manager.  ML Retail shall have the sole power to remove a Manager and to appoint any successor Manager.

(c)    The Company may, but shall not be required to, have officers (the **"Officers"**), who shall be appointed by the Manager and may include a President, a Vice President, a Secretary and a Treasurer or Chief Financial Officer.  The Manager may also appoint a Chairman, more than one Vice President, and one or more Assistant Secretaries and Assistant Treasurers.  The Manager may appoint such other Officers and agents as he shall deem necessary, who shall hold their offices for such terms and shall exercise such powers and perform such duties as shall be determined from time to time by the Manager. Any number of offices may be held by the same Person.  The Manager may, in his own

discretion, fix the salaries of all Officers and agents of the Company, in their capacity as such. Each of the Officers of the Company shall hold office until such Officer's successor is appointed or until such Officer's earlier death, resignation or removal. Any Officer may be removed at any time by the Manager. Any vacancy occurring in any office of the Company may be filled by the Manager. The initial officers of the Company shall be the persons identified as such on the attached <u>Schedule A</u>.

(d)     The Manager may engage on behalf of, and at the expense of, the Company, such Persons as the Manager in his judgment shall deem advisable for the conduct and operation of the business of the Company.

(e)     The Manager shall not be liable under a judgment, decree or order of court, or in any other manner, for a debt, obligation or liability of the Company.

(f)     Instruments and documents of the Company shall be valid and binding upon the Company if executed by the Manager or a duly designated officer by the Manager, and Persons dealing with the Company shall be entitled to rely conclusively on such power and authority of the Manager and such officers.

(g)     The Manager is hereby authorized to enter into any contract or execute and deliver any instrument in the name of and on behalf of the Company. The Manager may authorize any Officer or agent of the Company to enter into any contract or execute and deliver any instrument in the name of and on behalf of the Company, and such authority may be general or confined to specific instances.

**6.2     Duties and Obligations of the Manager; Discretion**.

(a)     In lieu of any duty (including fiduciary duties) imposed on the Manager or any Members in acting as a Manager by the Act or otherwise at law or equity, the sole duty of the Manager or any such Member shall be to comply with the terms of this Agreement, and the Manager (including any Former Manager) or any such Member shall not have or incur any liability to the Company or to any Member relating thereto, except where the claim at issue is based on the Misconduct of such Person.

(b)     Subject to the foregoing but notwithstanding any other provision of this Agreement to the contrary or other applicable provision of law or equity, whenever in this Agreement a Manager or an Officer is permitted or required to make a decision or take an action (i) in his "sole discretion" or "discretion" or under a similar grant of authority or latitude, in making such decisions or taking such actions, he shall be entitled to take into account his own interests as well as the interests of the Members as a whole or (ii) in "good faith" or under another expressed standard, he shall act under such express standard and shall not be subject to any other or different standard.

**6.3     Reimbursements**. The Company may reimburse the Manager for all expenses incurred and paid in the conduct of the Company's business, including, but not limited to, expenses of maintaining an office, telephones, travel, office equipment and secretarial and other personnel as may reasonably be attributable to the Company. Such reimbursement shall be treated as expenses of the Company and shall not be deemed to constitute distributions to any Member of profit, loss or capital of the Company.

**6.4     Indemnification of the Manager and Officers**.

(a)     Unless otherwise provided in <u>Section 6.4(c)</u> hereof, the Company, its receiver, or its trustee (in the case of its receiver or trustee, to the extent of the Property) shall indemnify, save harmless, and pay all judgments and claims against the Manager, any former Manager, Officer, former

Officer or any agent of the Company (each such Person, a **"Covered Person"**) relating to any liability or damage incurred by reason of any act performed or omitted by the Covered Person in connection with the Company, including reasonable attorneys' fees and expenses incurred by the Covered Person in connection with the defense of any action based on any such act or omission, which attorneys' fees and expenses may be paid as incurred.

(b) Unless otherwise provided in <u>Section 6.4(c)</u> hereof, in the event of any action by a Member against the Covered Person including a Company derivative suit, the Company shall indemnify, save harmless, and pay all expenses of the Covered Person, including reasonable attorneys' fees and expenses incurred in the defense of such action.

(c) Notwithstanding the provisions of <u>Sections 6.4(a)</u> and <u>6.4(b)</u> above, such Sections shall be enforced only to the maximum extent permitted by law and the Covered Person shall only be indemnified (i) if such Person acted in good faith and without Misconduct and in a manner that he or it reasonably believed to be in or not opposed to the best interests of the Company, and (ii) with respect to any criminal action or proceeding, if such Person had no reasonable cause to believe his or its conduct was unlawful, unless the conduct in question involved actual (rather than simply alleged) criminal conduct, fraud, willful and wanton misconduct or gross negligence.

(d) The obligations of the Company set forth in this <u>Section 6</u> are expressly intended to create third party beneficiary rights of the Covered Person and any Manager, any Member, or any Officer is authorized, on behalf of the Company, to give written confirmation to the Covered Persons of the existence and extent of the Company's obligations to the Covered Persons hereunder.

(e) The provisions of this <u>Section 6.4</u> shall survive the dissolution, liquidation, winding up and termination of the Company.

## SECTION 7

## ROLE OF MEMBERS

**7.1** **Rights or Powers**.  The Members shall not have any right or power to take part in the management or control of the Company or its business and affairs or to act for or bind the Company in any way.  Notwithstanding the foregoing, the Members have all the rights and powers specifically set forth in this Agreement and, to the extent not inconsistent with this Agreement, in the Act.

**7.2** **Voting Rights**.  No Member has any voting rights except as otherwise provided in this Agreement and with respect to the following, which shall require the Approval of the Members:

(a) any conversion of the Company to any other entity; or

(b) any merger of the Company with or into any other entity that is not subject to a Drag Transaction; and

in each case, such Approval of the Members shall only be required in the event such conversion or merger would divest or diminish the rights of, or otherwise disproportionately disadvantage or unfairly discriminate against, any Member, with respect to that Member's Membership Interests in relation to other Membership Interests having similar rights, or increase the liabilities or obligations of any Member.

**7.3    Member Liability**.  No Member shall be liable under a judgment, decree or order of a court, or in any other manner for the debts or any other obligations or liabilities of the Company.  A Member shall be liable only to make its Capital Contributions and shall not be required to restore a deficit balance in its Capital Account or to lend any funds to the Company or, after its Capital Contributions have been made, to make any additional contributions, assessments or payments to the Company, *provided* that a Member may be required to repay distributions made to it as provided in 6 Del. C.§ 18-607 of the Act. No Manager shall have any personal liability for the repayment of any Capital Contributions of any Member.

**7.4    Partition**.  While the Company remains in existence, each Member agrees and waives its rights to have any Property partitioned, or to file a complaint or to institute any suit, action or proceeding at law or in equity to have any Property partitioned, and each Member, on behalf of itself, its successors and its assigns hereby waives any such right.

**7.5    Transactions Between a Member and the Company**.  Except as otherwise provided by applicable law, any Member may, but shall not be obligated to, lend money to the Company, act as surety for the Company and transact other business with the Company and has the same rights and obligations when transacting business with the Company as a Person who is not a Member. A Member, any Affiliate thereof or an employee, stockholder, member, manager, agent, director or officer of a Member or any Affiliate thereof, may also be an employee or be retained as an agent of the Company.  The existence of these relationships and acting in such capacities will not result in the Member being deemed to be participating in the control of the business of the Company or otherwise affect the limited liability of the Member.

**7.6    Other Instruments**.  Each Member shall execute and deliver to the Company within five (5) days after receipt of a written request therefor, such other and further documents and instruments, statements of interest and holdings, designations, powers of attorney and other instruments and to take such other action as the Manager deems necessary, useful or appropriate to comply with any laws, rules or regulations as may be necessary to enable the Company to fulfill its responsibilities under this Agreement, so long as any such documents do not materially or substantially change the rights of a Member under this Agreement.

**7.7    Non-Solicitation and Non-Competition**.

(a)    While a Member or Manager, and during the twelve (12) months immediately following the date on which such Member no longer owns any Membership Interests, directly or indirectly, or such Manager ceases to be a manager of the Company, each Member and Manager shall not (and shall cause his or its Affiliates not to), directly or indirectly (including, without limitation, through any of his, her or its Affiliates or immediate family members, i.e., spouse and unemancipated children), in any capacity: (i) employ any employee of the Company or a Subsidiary; or (ii) solicit or induce any employee of the Company or a Subsidiary to cease employment with the Company or any Subsidiary.

(b)    While a Member or Manager, and during the twelve (12) months immediately following the date on which such Member no longer owns any Membership Interests, directly or indirectly, or such Manager ceases to be a manager of the Company, each Member and Manager shall not (and shall cause his or its Affiliates not to) directly or indirectly (including, without limitation, through any of his or its Affiliates or immediate family members, i.e., spouse and unemancipated children), anywhere in the United States, alone or as a partner, member, manager, owner, joint venturer, officer, director, employee, consultant, agent, independent contractor, stockholder or in any other capacity of any company or entity, engage in any business, have any financial interest in any company or entity that engages in any business or make any loans to any company or entity that engages in any business that

16

engages in or competes, directly or indirectly, with the Business; provided, however, that the ownership by any Person of not more than five percent (5%) of the outstanding shares of stock of any corporation having a class of securities actively traded on a national securities exchange or on the NASDAQ Stock Market shall not be deemed, in and of itself, to violate the provisions of this Section 7.7(b).

(c)     If a Member or Manager breaches any obligation under Section 7.7(a) or 7.7(b), such breach will suspend and toll the running of the restrictive period for such obligation for such Member or Manager from the date of breach until such time as such violation ceases.

(d)     Each Member and the Manager agrees that any violations of Section 7.7(a) or 7.7(b) would be highly injurious and cause irreparable harm to the Company and its Members. Therefore, each Member and the Manager consents and agrees that if the terms of Section 7.7(a) and/or 7.7(b) are violated, the Company shall be entitled, in addition to any other rights and remedies that it may have (including monetary damages), to apply to any court of competent jurisdiction for specific performance and/or injunctive or other relief in order to enforce, or prevent any continuing or threatened violation of, the provisions of Section 7.7(a) and/or 7.7(b) by such Member, Manager, or any of their respective Affiliates. If the Company shall institute any action or proceeding to enforce the provisions of Section 7.7(a) and/or 7.7(b), each Member and the Manager hereby irrevocably waives any claim or defense that such Member or Manager may have that an adequate remedy at law is available, and each Member and each Manager hereby agrees not to interpose in any such action or proceeding any claim or defense that a remedy exists at law. Notwithstanding the foregoing provisions, the Manager in his sole discretion may waive or otherwise modify the restrictions set forth in Section 7.7(a) and/or 7.7(b) pursuant to a written agreement with any Member (or their Affiliate), as applicable. Further, if any Member (or their Affiliate) or Manager is subject to a separate written agreement with the Company containing similar restrictive covenants, then the terms of such other agreement shall govern and these restrictive covenants shall not apply to such Person.

(e)     It is the Members' and the Manager's intent that each of the restrictive covenants contained in Section 7.7(a) and/or 7.7(b) be read and interpreted with every reasonable inference given to its enforceability. However, it is also the Members' and the Manager's intent that if any term, provision or condition of such restrictive covenants is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions thereof shall remain in full force and effect and shall in no way be affected, impaired or invalidated. Further, it is also the Members' and the Manager's intent that if a court should determine any of such restrictive covenants are unenforceable because of over-breadth, then the court shall modify said covenant to the minimum extent possible so as to make it enforceable under the circumstances.

(f)     Notwithstanding the foregoing subsections (a) through (e) of this Section 7.7, neither Marcus Lemonis nor ML Retail or any other entity controlled by Marcus Lemonis is subject to the restrictions set forth in this Section 7.7.

**7.8     Investment Representations and Warranties**. Each Member executing this Agreement hereby represents and warrants to the Company and each other Member that: (a) if such Member is not a natural person, that it is organized, validly existing, and in good standing under the laws of its state of organization and that it has full organizational power to execute and agree to this Agreement and to perform its obligations hereunder; (b) such Member is acquiring his, her or its Membership Interests in the Company for such Member's own account as an investment and without an intent to distribute the Membership Interests; (c) such Member acknowledges that the Membership Interests have not been registered under federal securities laws, or any state securities laws, and may not be resold or transferred by such Member without appropriate registration or the availability of an exemption from such requirements; (d) such Member has such knowledge and experience in financial and business matters so

that such Member is capable of evaluating the merits and risks of an investment in the Company; and (e) such Member has been given the opportunity to ask questions of and receive information from the Company.

## SECTION 8

## ACCOUNTING, BOOKS AND RECORDS

**8.1     Bank Accounts; Accounting, Books and Records.**

(a)     All funds of the Company shall be deposited in its name in accounts designated by the Manager.  The Manager, the Chief Financial Officer of the Company, if any, and such person or persons as the Manager may designate shall have the right to draw checks thereon and make, deliver, accept and endorse negotiable instruments in connection with the Company business.

(b)     The Company shall keep on site at its principal place of business each of the following:

(i)     Separate books of account for the Company which shall show a true and accurate record of all costs and expenses incurred, all charges made, and all income derived in connection with the conduct of the Company in accordance with this Agreement;

(ii)     A current list of the full name and last known business, residence, or mailing address of each Member and Manager;

(iii)     A copy of the Certificate of Formation and all amendments thereto, together with executed copies of any powers of attorney pursuant to which any amendment has been executed;

(iv)     Copies of the Company's federal, state, and local income tax returns and reports, if any, for the three most recent years;

(v)     Copies of this Agreement;

(vi)     Copies of any writings permitted or required under Section 18-502 of the Act regarding the obligation of a Member to perform any enforceable promise to contribute cash or property or to perform services as consideration for such Member's Capital Contribution;

(vii)     Unless contained in this Agreement, a statement prepared and certified as accurate by the Manager of the Company which describes:

(A)     The amount of cash and a description and statement of the agreed value of the other property or services contributed by each Member and which each Member has agreed to contribute in the future;

(B)     The times at which or events on the happening of which any additional Capital Contributions agreed to be made by each Member are to be made;

(C)     If agreed upon, the time at which or the events on the happening of which a Member may terminate its Membership Interests in the Company and

18

the amount of, or the method of determining, the distribution to which he may be entitled respecting its Membership Interests and the terms and conditions of the termination and distribution;

(D)     Any right of a Member to receive distributions, which include a return of all or any part of a Member's contribution; and

(viii)     Any written consents obtained from Members pursuant to 6 Del. C.§ 18-302 of the Act regarding action taken by Members without a meeting.

(c)     Any Member or its designated representative has the right to have reasonable access to and inspect the books and records of the Company to the extent required by law.  The rights granted to a Member pursuant to this <u>Section 8.1</u> are expressly subject to compliance by such Member with the safety, security and confidentiality procedures and guidelines of the Company, as such procedures and guidelines may be established from time to time.

**8.2     Tax Matters**.

(a)     **Tax Elections**.  ML Retail shall, without any further consent of the Members being required (except as specifically required herein), make any and all elections for federal, state, local, and foreign tax purposes including, without limitation, any election, if permitted by applicable law:  (i) to adjust the basis of Property pursuant to Code Sections 754, 734(b) and 743(b), or comparable provisions of state, local or foreign law, in connection with Transfers of Membership Interests and Company distributions;  (ii) with the consent of all of the Members, to extend the statute of limitations for assessment of tax deficiencies against the Members with respect to adjustments to the Company's federal, state, local or foreign tax returns; and (iii) to the extent provided in Code Sections 6221 through 6231 and similar provisions of federal, state, local, or foreign law, to represent the Company and the Members before taxing authorities or courts of competent jurisdiction in tax matters affecting the Company or the Members in their capacities as Members, and to file any tax returns and execute any agreements or other documents relating to or affecting such tax matters, including agreements or other documents that bind the Members with respect to such tax matters or otherwise affect the rights of the Company and the Members.

(b)     **Tax Information**.  Necessary tax information shall be delivered to each Member as soon as practicable after the end of each taxable year of the Company but not later than five (5) months after the end of each taxable year.

(c)     **Tax Classification**.

(i)     The Manager shall take such action as may be required under the Code and the Regulations to cause the Company to be taxable as a partnership for Federal income tax purposes.

(ii)     To the extent <u>Section 8.2(c)(i)</u> does not govern the state and local tax classification of the Company, the Manager shall take such action as may be required under any state and/or local law applicable to the Company to cause the Company to be taxable as, and in a manner consistent with, a partnership (or the functional equivalent thereof under applicable law) for state and/or local income tax purposes.

(d)    **Tax Matters Member and 2015 Budget Act Audit Rules**.

(i)    *Tax Matters Member*.  ML Retail shall be the "tax matters partner" of the Company within the meaning of Code § 6231(a)(7) as in effect immediately prior to the effective date of its amendment by the 2015 Budget Act (the **"Tax Matters Member"**) for any period during which the Company is permitted or required to have such a tax matters partner, and shall serve as such until its successor is duly designated by the Manager.  The Tax Matters Member shall have authority to take any action that may be taken by a "tax matters partner" under Code §§ 6221 through 6234.  The Company shall indemnify and hold harmless the Tax Matters Member for any liabilities and all reasonable and documented costs and expenses incurred by the Tax Matters Member in its capacity as such.  Notwithstanding any other provision of this Agreement, the Tax Matters Member, in its capacity as Tax Matters Member, shall have no authority with respect to matters subject to the 2015 Budget Act Audit Rules.

(ii)    *No Early Election into the 2015 Budget Act Audit Rules*.  The Company shall not elect, under Section 1101(g)(4) of the 2015 Budget Act or otherwise, for any portion of the 2015 Budget Act Audit Rules to apply to the Company for any taxable years beginning before January 1, 2018.

(iii)    *Partnership Representative*.  ML Retail shall be the "partnership representative" of the Company within the meaning of Code § 6223 (as amended by the 2015 Budget Act) (the **"Partnership Representative"**) for any period during which the Company is permitted or required to have a Partnership Representative and shall serve as such until its successor is duly designated by the Manager.  The Partnership Representative shall have authority to take any action that may be taken by a "partnership representative" under the 2015 Budget Act Audit Rules.  The Company shall indemnify and hold harmless the Partnership Representative for any liabilities, costs and expenses reasonably incurred by the Partnership Representative in its capacity as such.

(iv)    *Notification of Members*.  The Partnership Representative shall, on a timely basis, provide the Company with copies of all notices received by the Partnership Representative in connection with any proceeding or potential adjustment relating to the Company that is subject to the 2015 Budget Act Audit Rules.  With respect to any proceeding or potential adjustment subject to the 2015 Budget Act Audit Rules, the Company shall, on a timely basis, provide each Member with copies of all notices received by the Company or the Partnership Representative from the Internal Revenue Service.

(v)    *Election Out of Imputed Underpayment*.  To the maximum extent permitted under the 2015 Budget Act Audit Rules, the Company shall elect, and each Member shall cooperate in electing, under Code § 6226(a) (as amended by the 2015 Budget Act) or otherwise, for Code § 6225 (as amended by the 2015 Budget Act) not to apply, and for each Member to take any adjustment into account as provided in Code § 6226(a) (as amended by the 2015 Budget Act).

(vi)    *Survival*.  The provisions of this Section 8.2 shall survive the termination of the Company or the termination of any Membership Interests and shall remain binding on the Members for as long a period of time as is necessary to resolve with the Internal Revenue Service any and all matters regarding the federal income taxation of the Company or the Members (relating to the operations of the Company).

**8.3     Certificates**.  No certificates or other evidence of ownership shall be issued in respect of the Membership Interests in the Company except this Agreement.

## SECTION 9

## AMENDMENTS

**9.1     Amendments Generally**.     Except as otherwise provided in <u>Section 9.2</u>, and notwithstanding any contrary provision of the Act, any amendments to this Agreement may be adopted with the Approval of the Members; <u>provided</u>, <u>however</u>, that no part of <u>Section 6</u> may be amended without the approval of the Manager.

**9.2     Amendments by the Manager**.  Without limiting the power to amend this Agreement granted by <u>Section 9.1</u> hereof, this Agreement may be amended by the Manager (a) to effect changes of a ministerial nature that do not materially and adversely affect the rights, duties or obligations of the Members; (b) to amend <u>Exhibit A</u> to add, remove or change any Member and/or Percentage Interests held by a Member, in accordance with the terms hereof; (c) to conform the terms of this Agreement with any Regulations, *provided* that, in the opinion of counsel to the Company, such amendment does not adversely affect the rights or interests of any of the Members; (d) with respect to the Company's status as a partnership (and not as an association taxable as a corporation) for federal tax purposes, (i) to comply with the requirements of the Regulations, or (ii) to ensure the continuation of partnership status; <u>provided</u>, <u>however</u>, that, in the opinion of counsel of the Company, such amendment does not adversely affect the rights or interests of any of the Members; and (e) to change the name of the Company.

## SECTION 10

## TRANSFERS; DRAG-ALONG RIGHTS

**10.1     Restrictions on Transfers**.  Except as otherwise permitted by this Agreement, including <u>Section 10.8</u>, no Member shall Transfer all or any portion of its Membership Interests without the approval of the Manager. In the event that any Member pledges or otherwise encumbers all or any part of its Membership Interests as security for the payment of a debt, any such pledge or hypothecation shall be made pursuant to a pledge or hypothecation agreement that requires the pledgee or secured party to be bound by all of the terms and conditions of this <u>Section 10</u>.  Each Member hereby acknowledges the reasonableness of the restrictions on the Transfer of Membership Interests imposed by this Agreement in view of the Company's purposes and the relationship of the Members.  Accordingly, the restrictions on Transfer contained herein shall be specifically enforceable.

**10.2     Permitted Transfers**.  Subject to the conditions and restrictions set forth in <u>Section 10.3</u> hereof, (a) a Member may at any time Transfer all or any portion of its Membership Interests to the Company pursuant to <u>Section 11</u>; and (b) with respect to ML Retail, ML Retail may Transfer all or any part of its Membership Interests to Affiliates of ML Retail (any such Transfer described in (a) or (b) being referred to in this Agreement as a **"Permitted Transfer"**).  **"Permitted Transfer"** shall also include, any Transfer by a Member to a Person that is (i) a trust, estate, guardianship or custodianship, including those established under any of the Uniform Gifts to Minors Act of any state, established for such Member or one or more of such Member's spouse and/or natural or adoptive lineal ancestors or descendants, (ii) an entity in which all of the equity interests are beneficially owned by such Member and/or its Permitted Transferees, and (iii) if such Member is an entity, the holders of its equity securities in a liquidating distribution of such entity's assets in proportion to their ownership thereof.  The subsequent Transfer of any Membership Interests by a Permitted Transferee shall be subject to the same restrictions of this <u>Section 10</u> in the same manner as if the Membership Interests to be Transferred were still owned by the

Member from whom such Permitted Transferee acquired such Membership Interests; and for this purpose, references herein to a Transfer by a Member shall include any Transfer by the Permitted Transferee(s) that acquired such Member's Membership Interests, and references to a Member in the context of Transfer restrictions and related provisions shall include its Transferees. If at any time a Member is required to Transfer its Membership Interests pursuant to this Agreement, such Transfer shall include or be applicable to all Membership Interests owned by such Member's Permitted Transferees and other Transferees.

**10.3    Conditions to Permitted Transfers**. Except for a Transfer to the Company, a Transfer shall not be treated as a Permitted Transfer under Section 10.2 hereof unless and until the following conditions are satisfied:

(a)    Except in the case of a Transfer involuntarily by operation of law, the transferor and transferee shall execute and deliver to the Company such documents and instruments of conveyance as may be necessary or appropriate in the opinion of counsel to the Company to effect such Transfer. In the case of a Transfer of Membership Interests involuntarily by operation of law, the Transfer shall be confirmed by presentation to the Company of legal evidence of such Transfer, in form and substance satisfactory to counsel to the Company. In all cases, the Company shall be reimbursed by the transferor and/or transferee for all costs and expenses that it reasonably incurs in connection with such Transfer.

(b)    The transferor and transferee shall furnish the Company with the transferee's taxpayer identification number, sufficient information to determine the transferee's initial tax basis in the Membership Interests transferred, and any other information reasonably necessary to permit the Company to file all required federal and state tax returns and other legally required information statements or returns. Without limiting the generality of the foregoing, the Company shall not be required to make any distribution otherwise provided for in this Agreement with respect to any transferred Membership Interests until it has received such information.

(c)    In addition to the foregoing, each Transfer of Membership Interests shall satisfy the following conditions: (i) the Transfer will not require registration of Membership Interests under the Securities Act or any state securities laws and (ii) if requested by the Manager, the transferor delivers to the Company an opinion of counsel, which opinion and counsel shall be reasonably satisfactory to the Manager, to the effect that such Transfer is exempt from all applicable registration requirements and that such Transfer will not violate any applicable laws regulating the Transfer of securities.

**10.4    Prohibited Transfers**. Any purported Transfer of Membership Interests that is not a Permitted Transfer shall be null and void and of no force or effect whatever; *provided* that, if the Company is required to recognize a Transfer that is not a Permitted Transfer (or if the Manager approves a Transfer that is not a Permitted Transfer pursuant to Section 10.1 hereof), the Membership Interests Transferred shall be strictly limited to the transferor's rights to allocations and distributions as provided by this Agreement with respect to the transferred Membership Interests, which allocations and distributions may be applied (without limiting any other legal or equitable rights of the Company) to satisfy any debts, obligations, or liabilities for damages that the transferor or transferee of such Membership Interests may have to the Company.

In the case of a Transfer or attempted Transfer of Membership Interests that is not a Permitted Transfer, the parties engaging or attempting to engage in such Transfer shall be liable to indemnify and hold harmless the Company and the other Members from all cost, liability, and damage that any of such indemnified Members may incur (including, without limitation, incremental tax liabilities, lawyers' fees and expenses) as a result of such Transfer or attempted Transfer and efforts to enforce the indemnity granted hereby.

**10.5     Rights of Unadmitted Assignees**.  A Person who acquires Membership Interests but who is not admitted as a substituted Member pursuant to Section 10.6 hereof shall be entitled only to allocations and distributions with respect to such Membership Interests in accordance with this Agreement, and shall have no right to any information or accounting of the affairs of the Company, shall not be entitled to inspect the books or records of the Company, and shall not have any of the rights of a Member under the Act or this Agreement.

**10.6     Admission of Substituted Members**.  Subject to the other provisions of this Section 10, a transferee of Membership Interests may be admitted to the Company as a substituted Member only upon satisfaction of the conditions set forth in this Section 10.6:

(a)     The Membership Interests with respect to which the transferee is being admitted were acquired by means of a Permitted Transfer or a Transfer otherwise approved by the Manager;

(b)     The transferee of Membership Interests (other than, with respect to clause (i) below, a transferee that was a Member prior to the Transfer) shall, by written instrument in form and substance reasonably satisfactory to the Manager (and, in the case of clause (ii) below, the transferor Member), (i) accept and adopt the terms and provisions of this Agreement, including this Section 10 and (ii) assume the obligations of the transferor Member under this Agreement with respect to the transferred Membership Interests.  The transferor Member shall be released from all such assumed obligations except (x) those obligations or liabilities of the transferor Member arising out of a breach of this Agreement, (y) in the case of a Transfer to any Person other than a Member or any of its Affiliates, those obligations or liabilities of the transferor Member based on events occurring, arising or maturing prior to the date of Transfer, and (z) in the case of a Transfer to any of its Affiliates, any Capital Contribution or other financing obligation of the transferor Member under this Agreement;

(c)     The transferee pays or reimburses the Company for all reasonable legal, filing, and publication costs that the Company incurs in connection with the admission of the transferee as a Member with respect to the Transferred Membership Interests; and

(d)     Except in the case of a Transfer involuntarily by operation of law, if required by the Manager, the transferee (other than a transferee that was a Member prior to the Transfer) shall deliver to the Company evidence of the authority of such Person to become a Member and to be bound by all of the terms and conditions of this Agreement, and the transferee and transferor shall each execute and deliver such other instruments as the Manager reasonably deems necessary or appropriate to effect, and as a condition to, such Transfer.

**10.7     Distributions in Respect of Transferred Membership Interests**.  If any Membership Interests are Transferred during any taxable year in compliance with the provisions of this Section 10, all distributions on or before the date of such Transfer shall be made to the transferor, and all distributions thereafter shall be made to the transferee.  Solely for purposes of making such distributions, the Company shall recognize such Transfer not later than the end of the calendar month during which it is given notice of such Transfer, *provided* that, if the Company is given notice of a Transfer at least five (5) Business Days prior to the Transfer, the Company shall recognize such Transfer as of the date of such Transfer.  If the Company has not received notice of a Transfer prior to a distribution date, all distributions shall be made to the Person who, according to the books and records of the Company, was the owner of the Membership Interests on the record date of such distribution.  Neither the Company nor any Member shall incur any liability for making distributions in accordance with the provisions of this Section 10.7, whether or not any Manager or the Company has knowledge of any Transfer of ownership of any Membership Interests.

**10.8    Sale of the Company; Drag-Along Rights**.

(a)    Notwithstanding any Transfer restrictions contained in this <u>Section 10</u>, in the event that ML Retail (the **"Dragging Member"**) proposes to sell all of its Membership Interests to a Third Party Purchaser, whether by merger or otherwise (the **"Drag Transaction"**), the Dragging Member may elect to require all other holders of Membership Interests, including unadmitted assignees (the **"Drag-Along Members"**), to sell to the Third Party Purchaser their Membership Interests on the same terms and conditions (including, without limitation, making customary representations, warranties and indemnification covenants applicable to the ownership of the Membership Interests of such Drag-Along Members) upon which the Dragging Member sells, transfers or assigns its Membership Interests. The Dragging Member shall cause the Drag Transaction to be reduced to writing and shall provide a written notice (the **"Drag Notice"**) of the Drag Transaction to the Drag-Along Member at least thirty (30) days prior to the anticipated closing of the Drag Transaction. The Drag Notice shall contain written notice of the exercise of rights pursuant to this <u>Section 10.8</u> and shall set forth the consideration to be paid by the Third Party Purchaser and the other material terms and conditions of the Drag Transaction. If, prior to the closing of the Drag Transaction, the terms of the Drag Transaction change from those set forth in the original Drag Notice, the Dragging Member shall issue a revised Drag Notice stating such revised terms.

(b)    Each holder of Membership Interests agrees to (i) use commercially reasonable efforts, in good faith and in a commercially prompt manner, to take, or cause to be taken, all action and to do, or cause to be done, all things necessary, proper or advisable, under applicable laws and regulations (including, without limitation, to ensure that all appropriate legal and other requirements are met and all consents of third persons are obtained), to consummate the Drag Transaction, (ii) vote all of its Membership Interests in favor of the Drag Transaction (if necessary, depending on the form of the transaction and the voting rights of such Membership Interests) and (iii) raise no objection to, bring no claim against and not contest such Drag Transaction. Execution of this Agreement or a joinder hereto constitutes each holder of Membership Interests' (and its Transferees') binding agreement to sell all his, her or its Membership Interests on the same terms and conditions set forth in the Drag Notice, as adjusted in accordance with this <u>Section 10.8</u>. Upon the closing of a Drag Transaction, such Third Party Purchaser shall pay to each holder of Membership Interests his, her or its share of the proceeds thereof.

<div align="center">

**SECTION 11**

**REDEMPTION**

</div>

The Company shall redeem, and any Member shall sell to the Company, any of the Member's Membership Interests pursuant to the terms and provisions of any agreement binding upon the Company and such Member.

<div align="center">

**SECTION 12**

**DISSOLUTION AND WINDING UP**

</div>

**12.1    Dissolution Events**.

(a)    **Dissolution**. The Company shall dissolve and shall commence winding up and liquidating upon the first to occur of any of the following (each a **"Dissolution Event"**):

(i)    The written consent of the Manager and the Approval of the Members to dissolve, wind up, and liquidate the Company; or

<div align="center">24</div>

        (ii)     The entry of a decree of judicial dissolution under Section 18-802 of the Act.

The Members hereby agree that, notwithstanding any provision of the Act, the Company shall not dissolve prior to the occurrence of a Dissolution Event.

        (b)    **Reconstitution**. If it is determined, by a court of competent jurisdiction, that the Company has dissolved prior to the occurrence of a Dissolution Event, then within an additional ninety (90) days after such determination (the **"Reconstitution Period"**), the Manager and the Members holding at least fifty percent (50%) of the Percentage Interests may elect to reconstitute the Company and continue its business on the same terms and conditions set forth in this Agreement by forming a new limited liability company on terms identical to those set forth in this Agreement. Unless such an election is made within the Reconstitution Period, the Company shall liquidate and wind up its affairs in accordance with Section 12.2 hereof. If such an election is made within the Reconstitution Period, then:

        (i)     The reconstituted limited liability company shall continue until the occurrence of a Dissolution Event as provided in Section 12.1(a);

        (ii)    Unless otherwise agreed to by the Manager and the Members holding at least fifty percent (50%) of the Percentage Interests, the Certificate of Formation and this Agreement shall automatically constitute the Certificate of Formation and Agreement of such new Company. All of the assets and liabilities of the dissolved Company shall be deemed to have been automatically assigned, assumed, conveyed and transferred to the new Company. No bond, collateral, assumption or release of any Member's or the Company's liabilities shall be required; provided, that the right of the Members to select a successor manager and to reconstitute and continue the Company's business shall not exist and may not be exercised unless the Company has received an opinion of counsel that the exercise of the right would not result in the loss of limited liability of any Member and neither the Company nor the reconstituted limited liability company would cease to be treated as a partnership for federal income tax purposes upon the exercise of such right to continue.

    **12.2**    **Winding Up**. Upon the occurrence of (i) a Dissolution Event or (ii) the determination by a court of competent jurisdiction that the Company has dissolved prior to the occurrence of a Dissolution Event (unless the Company is reconstituted pursuant to Section 12.1(b) hereof), the Company shall continue solely for the purposes of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors and Members, and no Member shall take any action that is inconsistent with, or not necessary to or appropriate for, the winding up of the Company's business and affairs, provided, that all covenants contained in this Agreement and obligations provided for in this Agreement shall continue to be fully binding upon the Members until such time as the Property has been distributed pursuant to this Section 12.2 and the Certificate of Formation has been canceled pursuant to the Act. The Liquidator shall be responsible for overseeing the winding up and dissolution of the Company, which winding up and dissolution shall be completed within ninety (90) days of the occurrence of the Dissolution Event and within ninety (90) days after the last day on which the Company may be reconstituted pursuant to Section 12.1(b) hereof. The Liquidator shall take full account of the Company's liabilities and Property and shall cause the Property or the proceeds from the sale thereof (as determined pursuant to Section 12.7 hereof), to the extent sufficient therefor, to be applied and distributed, to the maximum extent permitted by law, in the following order:

        (a)    First, to the payment of the debts and liabilities of the Company (including any loans or advances made by any of the Members to the Company or any of its Subsidiaries), and the expenses of liquidation;

(b)     Second, to the creation of any reserves which the Manager deems reasonably necessary for the payment of any contingent, unliquidated or unforeseen liabilities or obligations of the Company or any of its Subsidiaries or the Members (to the extent the Company is liable therefor) arising out of or in connection with the business and operations of the Company and its Subsidiaries;

(c)     Third, 100% to and among the Members in proportion to and to the extent of their respective Unreturned Capital Contributions; and

(d)     Finally, the balance, if any, to the Members, pro rata to and among the Members in accordance with their respective Percentage Interests at such time.

No Member or Manager shall receive additional compensation for any services performed pursuant to this Section 12.2.

**12.3     Liquidating Trust; Reserves**.  In the discretion of the Liquidator, a pro rata portion of the distributions that would otherwise be made to the Members pursuant to this Section 12 may be:

(a)     Distributed to a trust established for the benefit of the Members for the purposes of liquidating Company assets, collecting amounts owed to the Company, and paying any contingent or unforeseen liabilities or obligations of the Company.  The assets of any such trust shall be distributed to the Members from time to time, in the reasonable discretion of the Liquidator, in the same proportions as the amount distributed to such trust by the Company would otherwise have been distributed to the Members pursuant to Section 12.2 hereof; or

(b)     Withheld to provide a reasonable reserve for Company liabilities (contingent or otherwise) and to reflect the unrealized portion of any installment obligations owed to the Company, *provided* that such withheld amounts shall be distributed to the Members as soon as practicable.

**12.4     Rights of Members**.  Except as otherwise provided in this Agreement, each Member shall look solely to the Property of the Company for the return of its Capital Contribution and has no right or power to demand or receive Property other than cash from the Company.  If the assets of the Company remaining after payment or discharge of the debts or liabilities of the Company are insufficient to return such Capital Contribution, the Members shall have no recourse against the Company or any other Member or Manager.

**12.5     Notice of Dissolution/Termination**.

(a)     In the event a Dissolution Event occurs, the Manager shall, within thirty (30) days thereafter, provide written notice thereof to each of the Members and to all other parties with whom the Company regularly conducts business (as determined in the discretion of the Manager).

(b)     Upon completion of the distribution of the Company's Property as provided in this Section 12, the Company shall be terminated, and the Liquidator shall cause the filing of the Certificate of Cancellation pursuant to Section 18-203 of the Act and shall take all such other actions as may be necessary to terminate the Company.

**12.6     Character of Liquidating Distributions**.  All payments made in liquidation of the interest of a Member in the Company shall be made in exchange for the interest of such Member in Property pursuant to Section 736(b)(1) of the Code, including the interest of such Member in Company goodwill.

**12.7    The Liquidator**.

(a)    **Definition**.  The **"Liquidator"** shall mean the Manager or a Person appointed by the Manager to oversee the liquidation of the Company.

(b)    **Fees**.  The Company is authorized to pay a reasonable fee to the Liquidator for its services performed pursuant to this <u>Section 12</u> and to reimburse the Liquidator for its reasonable costs and expenses incurred in performing those services.

(c)    **Indemnification**.  The Company shall indemnify, save harmless, and pay all judgments and claims against such Liquidator or any officers, directors, agents or employees of the Liquidator relating to any liability or damage incurred by reason of any act performed or omitted to be performed by the Liquidator, or any officers, directors, agents or employees of the Liquidator in connection with the liquidation of the Company, including reasonable attorneys' fees incurred by the Liquidator, officer, director, agent or employee in connection with the defense of any action based on any such act or omission, which attorneys' fees may be paid as incurred, except to the extent such liability or damage is caused by the fraud, intentional misconduct of, or a knowing violation of the laws by the Liquidator which was material to the cause of action.

**12.8    Form of Liquidating Distributions**.  For purposes of making distributions required by <u>Section 12.2</u> hereof, the Liquidator may determine whether to distribute all or any portion of the Property in-kind or to sell all or any portion of the Property and distribute the proceeds therefrom.

## SECTION 13

## MISCELLANEOUS

**13.1    Notices**.  Any notice, payment, demand, or communication required or permitted to be given by any provision of this Agreement shall be in writing and shall be deemed to have been delivered, given, and received for all purposes (i) if delivered personally to the Person or to an officer of the Person to whom the same is directed, (ii) on the date sent by e-mail of a PDF document if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient, or (iii) when the same is actually received, if sent either by registered or certified mail, postage and charges prepaid, addressed as follows, or to such other address as such Person may from time to time specify by notice to the Members and the Manager:

(a)    If to the Company, to the address determined pursuant to <u>Section 2.4</u> hereof;

(b)    If to the Manager, at the same address of the Company;

(c)    If to a Member, to the address of such Member according to the Company's books and records;

or at such other address of a Person as such Person may furnish to the Company from time to time.

**13.2    Binding Effect**.  Except as otherwise provided in this Agreement, every covenant, term, and provision of this Agreement shall be binding upon and inure to the benefit of the Members and their respective heirs, executors, legal representatives, administrators, successors, transferees, and assigns.

**13.3    Effect of Consent or Waiver**.  No consent or waiver, express or implied, by any Member to or of any breach or default by any other Member (or Transferee) in the performance by such other

Member (or Transferee) of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any breach or default by such other Person in the performance by such other Person of the same or any other obligations of such Person hereunder. Failure on the part of any Member to object to or complain of any act or failure to act of any of the other Members (or Transferees) or to declare any of the other Members (or Transferees) in default, regardless of how long such failure continues, shall not constitute a waiver by any such Member of its rights hereunder.

13.4 **Construction**. Every covenant, term, and provision of this Agreement shall be construed simply according to its fair meaning and not strictly for or against any Member.

13.5 **Time**. In computing any period of time pursuant to this Agreement, the day of the act, event or default from which the designated period of time begins to run shall not be included, but the time shall begin to run on the next succeeding day. The last day of the period so computed shall be included, unless it is a Saturday, Sunday or legal holiday, in which event the period shall run until the end of the next day which is not a Saturday, Sunday or legal holiday.

13.6 **Headings and References**. Section and other headings contained in this Agreement are for reference purposes only and are not intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement or any provision hereof. References herein to the singular shall include the plural and to the plural shall include the singular, and references to one gender shall include the other, except where inappropriate.

13.7 **Severability**. Except as otherwise provided in the succeeding sentence, every provision of this Agreement is intended to be severable, and, if any term or provision of this Agreement is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity or legality of the remainder of this Agreement. The preceding sentence of this Section 13.7 shall be of no force or effect if the consequence of enforcing the remainder of this Agreement without such illegal or invalid term or provision would be to cause any Member to lose the material benefit of its economic bargain.

13.8 **Incorporation by Reference**. Every exhibit, schedule, and other appendix attached to this Agreement and referred to herein is incorporated in this Agreement by reference unless this Agreement expressly otherwise provides.

13.9 **Governing Law**. The laws of the State of Delaware shall govern the validity of this Agreement, the construction of its terms, and the interpretation of the rights and duties arising hereunder. To the extent this Agreement is inconsistent with the Act, this Agreement shall govern (to the maximum extent permitted by the Act).

13.10 **Waiver of Jury Trial**. Each of the Members irrevocably waives to the extent permitted by law, all rights to trial by jury and all rights to immunity by sovereignty or otherwise in any action, proceeding or counterclaim arising out of or relating to this Agreement.

13.11 **Specific Performance**. Because Members would be irreparably damaged if any of the provisions of this Agreement are not performed in accordance with their specific terms and that monetary damages would not provide an adequate remedy in such event, in addition to any other remedy to which the nonbreaching Members may be entitled, at law or in equity, the nonbreaching Members shall be entitled to injunctive relief to prevent breaches of the provisions of this Agreement and specifically to enforce the terms and provisions hereof in any action instituted in any court of the United States or any state thereof having subject matter jurisdiction thereof.

**13.12  Counterparts; Signatures**.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together constitute one and the same document.  This Agreement may be executed and delivered by electronic mail in portable document format (.pdf) and, if executed and delivered in such manner, shall be binding as though an executed original shall have been delivered by hand.

**13.13  Trustee Exculpation**.  When and if this Agreement is executed by the trustee of any trust, such execution is by the trustee, not individually but solely as trustee in the exercise of and under the power and authority conferred upon and invested in such trustee, and it is expressly understood and agreed that nothing herein contained shall be construed as creating any liability on any such trustee personally to pay any amounts required to be paid hereunder, or to perform any covenant, either express or implied, contained herein, all such liability, if any, being expressly waived by the parties hereto by their execution hereof.  Any liability of any party which is a trust to the Company or another party shall be only that of such trust to the full extent of its trust estate and shall not be a personal liability of any trustee, grantor or beneficiary thereof.

{Remainder of page intentionally left blank.}

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be duly executed as of the date first above written.

MEMBERS:

ML RETAIL LLC

By: _____
         Marcus Lemonis, Authorized Person

_____
Nicolas Goureau

_____
Stephanie Menkin

THE COMPANY:

ML FASHION, LLC

By: _____
         Marcus Lemonis, Manager

**EXHIBIT A**

**MEMBERS**

| Members | Percentage Interest |
|---|---|
| ML Retail LLC | 33.34% |
| Nicolas Goureau | 33.33% |
| Stephanie Menkin | 33.33% |
| **Total** | 100.0% |

## SCHEDULE A
### Officers

Chairman/CEO:                                   Marcus Lemonis

President:                                         Stephanie Menkin

Chief Financial Officer:               Manish Karna

24649273.3

# Exhibit 2



Gerard Fox Law

Gerard P. Fox, Esq.
gfox@gerardfoxlaw.com

September 1, 2020

***VIA OVERNIGHT DELIVERY AND E-MAIL***

Jesse M. Coleman
SEYFARTH SHAW LLP
700 Milam Street
Suite 1400
Houston, Texas 77002-2812
jmcoleman@seyfarth.com


Re:     **Nobelle – Response To Demand Letter**

Mr. Coleman,

As you know, our firm represents Stephanie Menkin and Nicolas Goureau in connection with the pending dispute regarding ML Fashion.  This letter is in response to your demand letter and the unfounded allegations of stolen computers, fixtures, furniture, and equipment and inventory therein.  As shown herein, your allegations against our clients have no merit.

Ms. Menkin and Ms. Nagrani—without any involvement of Mr. Goureau—have started a new and separate business, Nobelle.  The vast majority of the inventory, furniture, fixtures, and equipment being used by Nobelle were purchased by Ms. Menkin and/or Ms. Nagrani with their own money.  The ***only*** overlap of inventory consists solely of inventory that Marcus Lemonis expressly permitted Menkin to take to open her own independent store.  (*See* Attachment 1 hereto.)  Nevertheless, this inventory only accounts for roughly 5% of Nobelle's total inventory.  While Nobelle may carry some of the same brands MARCUS carries, apart from the ML Fashion inventory discussed above, Nobelle independently purchased that inventory.

With respect to your allegations that Ms. Menkin and Ms. Nagrani have taken computers with "confidential information," it is not accurate.  Ms. Menkin used one computer that ML Fashion abandoned and did not contain any confidential information regarding ML Fashion.  Nevertheless, our clients have agreed to return the computer to ML Fashion.

Further, your allegations that our clients took furniture, fixtures, and equipment from ML Fashion is also misplaced.  On or around May 12, 2020, ML Fashion vacated the store location and informed the landlord that it was giving back the space.  ML Fashion left certain FFE on the premises when it abandoned the space including: (1) shelving and racking attached to the walls,

1



Gerard Fox Law

(2) light fixtures consisting of chandeliers and track lights, and (3) stock racking in the basement of the store.

In or around June 19, 2020, ML Fashion returned the key to the premises to the landlord and confirmed with the landlord that it was abandoning the location, that the lease was terminated, and that any items left behind were abandoned. Separate and apart from the FFE that ML Fashion abandoned in the space, our clients spent their own money buying FFE for the store.

Finally, Mr. Menkin is completely within her rights to start Nobelle. In December 2019, Ms. Menkin and Mr. Lemonis agreed that Ms. Menkin would be able to open her own retail location. Then, Mr. Lemonis iced her out of ML Fashion cutting off her sole source of income. Ms. Menkin is entitled to make a living and is simply opening a retail shop which Mr. Lemonis already consented to.

Your claims that our clients stole from ML Fashion have no basis. As such, we insist that you drop the matter. However, should you feel the need to discuss this topic further, please feel free to reach out to me.

Best regards,

Gerard P. Fox
GERARD FOX LAW P.C.

Enclosures

2

Attachment 1



**From:** **Stephanie Menkin** stephanie.menkin@marcuslemonis.com ■
**Subject:** Re: Warehouse Inventory Moves
**Date:** January 24, 2020 at 2:01 PM
**To:** Marcus Lemons marcus@marcuslemonis.com

thank you

**Stephanie Menkin**
President
ML Fashion Group
500 7th Avenue, 8th Floor
New York, NY 10014


people. process. product.

On Jan 24, 2020, at 1:56 PM, Marcus Lemons <marcus@marcuslemonis.com> wrote:

Absolutely

Marcus A. Lemonis

The Profit on CNBC

Marcus Lemonis, LLC
ML Acquisition Company www.marcuslemonis.com

On Jan 24, 2020, at 1:25 PM, Stephanie Menkin <stephanie.menkin@marcuslemonis.com> wrote:

can I request some items ship out from the warehouse? Maybe the Line Tee's and broken old colors of travelers? Some sunglasses?

**Stephanie Menkin**
President
ML Fashion Group
500 7th Avenue, 8th Floor
New York, NY 10014

<5ADF5ECF-89EE-4E46-B2FB-535BF7D60B12[30].png>

Begin forwarded message:

**From:** Stephanie Menkin <stephanie.menkin@marcuslemonis.com>
**Subject: Warehouse inventory Moves**

**Date:** December 19, 2019 at 10:28:19 AM EST
**To:** Marcus Lemon s <marcus@marcus emon s.com>
**Cc:** Stephan e Menk n <stephan e.menk n@marcus emon s.com>

Attached  s what I wou d happ y take from the warehouse  f you th nk  t's ok.  Of course, I am torn because I know that Deerfie d can se  Amuse and Opaque for another month unt  Spr ng:

Amuse- $52,597
Autumn Cashmere (1 sty e, 15 un ts)- $2,001
Brod e- $2,552
Broken Heart Totes - $13,548
Ank e Trave ers (ma n y co ors not go forward) - $6,723.70
E  son - I wou d take some out of the 814 pa rs - @ 200 pa rs - $9,450
Opaque - $28,684
The L ne (Sweet Romeo Tees) - $19,167.05

TOTAL from WAREHOUSE - **$134,722.75**

Whatever  s  eft - Sk n, Core Ank e Trave er, E  son, the L ne and a.M Sweaters can a  be moved to H nsda e. Anderson bros needs to get g ven away.
The supp es  n the warehouse (g ft boxes, shopp ng bags, t ssue etc) can go to stores and anyth ng  eft can go to Bent eys warehouse

Th s w  get us out of Vermont.


**Stephanie Menkin**
President
ML Fashion Group
500 7th Avenue, 8th Floor
New York, NY 10014


<5ADF5ECF-89EE-4E46-B2FB-535BF7D60B12[30].png>

<Inventory to Stephan e.x s>
<5ADF5ECF-89EE-4E46-B2FB-535BF7D60B12[30].png><5ADF5ECF-89EE-4E46-B2FB-535BF7D60B12[30].png>

Attachment 2

8:05 ✈



marcus >

Sun, Jan 19, 2:08 PM

Besides front door what else have you shipped to your new location. Want to keep air tight records

Nothing else yet

I wouldn't do it without your approval

I'll be at Deerfield today to see what's there

Ok. Thank you

We have to make sure you have something to sell

What about warehouse ?

Attachment 3

7:59 ✈   



**marcus** >

They don't discount. Their stores look good. Their teams are happy and they rarely complain or ask for more money etc.

You know I will always do what you think is right. So if I'm seeing the same as you....

It's a longer discussion

Ok.

And if you want them you can have them

Really??

You really don't want them huh?

Dallas and Greenwich ?

# Exhibit 3

Free Shipping on orders over $250. Book a Private Styling Session Now!



*Nobelle*

SHOP
NEW ARRIVALS

WELCOME

NEW OUTLOOK
NEEDS A NEW OUTFIT

## Featured Products







**MR. BRIGHTSIDE CANDLE**

$52.00





### ESCAPADE REED DIFFUSER

$64.00



### SILVER LOVE TWO-PACK

$72.00



**ZIP AWAY TOTE**

$86.00





**DOUBLE LINE SET OF 3**

$78.00





**MEDIUM PACK**

$38.00





**SHIMMER SET**

$72.00







10MM SOLITAIRE STUD, GOLD

$78.00



OVAL RAINBOW CHANNEL RING

$118.00





**AMELIA HAT**

$150.00



Case: 1:20-cv-25124-00499-JCH #: 74-1 Filed: 10/19/21 Page 119 of 266 Page ID #:1896



**NATURAL PYTHON CARD HOLDER**

$119.00





**AMELIA HAT**

$150.00

View All Products >

*Keep In Touch*

Email Address

**GET STARTED**

*Photo Gallery*





# *FOLLOW US*

 



Copyright © 2020ShopNobelle - All Rights Reserved.

PRIVACY POLICY

TERMS AND CONDITIONS




Free Shipping on orders over $250. Book a Private Styling Session Now!

☰

🛒

*Nobelle*



## *About Us*

### STEPHANIE & SARA

We are a Pair with Flair and love for Ready-to Wear!  We have been in this business, dressing our adored customers for over 20 years and handpicking every item so you don't have to.  We chose the name Nobelle as a nod to our teacher and inspiration, the "Belle Noemi," who taught us everything we know.

### INNOVATIVE DESIGNS

Our goal is to put the "fun" in functional fashion. We know that looking stylish can make your whole day better; that's why we're committed to being your source for the newest trends. We design clothing you love so you can focus on looking great!






Copyright © 2020ShopNobelle - All Rights Reserved.

PRIVACY POLICY

TERMS AND CONDITIONS

---



Free Shipping on orders over $250. Book a Private Styling Session Now!

☰                                                                    🛒

*Nobelle*

# *Contact Us*

| Name |
| --- |

| Email* |
| --- |

| Looking for something special? Let us know! |
| --- |

**SEND**

This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

## WE LOVE TO HEAR FROM OUR CUSTOMERS!

Do you have a question or concern? Are you looking for something in our shop? Drop us a line and let us know. We will get back to you as soon as possible with an answer.

### NOBELLE

85 Greenwich Avenue, Greenwich, Connecticut 06830, United States





GET DIRECTIONS

© Mapbox © OpenStreetMap



Copyright © 2020ShopNobelle - All Rights Reserved.

PRIVACY POLICY
TERMS AND CONDITIONS

# Exhibit 4

Case: 1:20-cv-05121-AMD-JO Document #: 74-1 Filed: 04/12/21 Page 1 of 266 PageID #:1905






# Instagram

Search



## shopnobelle

**Follow**   • • •

**78** posts     **234** followers     **70** following

**NOBELLE**
Shopping & Retail
Sara & Stephanie come together with their 25+ yrs of Styling and Retail to bring you a new realm of customer experience & fashion 👯
**www.shopnobelle.com**



   

⊞ **POSTS**     ☒ **TAGGED**





*Instagram*









I ONLY DRINK CHAMPAGNE
ON TWO OCCASIONS. WHEN I
AM IN LOVE AND WHEN I'M
NOT



I BELIEVE IN PINK. I BELIEVE
THAT HAPPY GIRLS ARE THE
PRETTIEST GIRLS.




I LIKE MY MONEY RIGHT
WHERE I CAN SEE IT:
HANGING IN MY CLOSET.



"I AM A WOMAN /





# Exhibit 5

Email or Phone    Password

Log In

Forgot account?

### Nobelle

Home
Posts
Reviews
Photos
About
Community

**Create a Page**

👍 Like    ➤ Share    ✏ Suggest Edits    ···

💬 Send Message

**Posts**

**Nobelle**
October 31, 2020 · 🌐

TODAY!! Sip, Shop, & Save!

*Sip,*
*Shop,*
*& Save*

Up to 60% Off

**THIS WEEKEND ONLY**
**OCT 31-NOV 1ST**

Come choose from our Fall/Winter
Collection for a limited time
only.

**Nobelle**
Women's Clothing Store

**Community**                    See All

👍 2 people like this

🔗 2 people follow this

**About**                         See All

📨 Contact Nobelle on Messenger

🏬 Women's Clothing Store

ⓕ **Page Transparency**          See More

Facebook is showing information to help you better
understand the purpose of a Page. See actions taken by
the people who manage and post content.

🏷 Page created - July 19, 2020

**People**                              ❯

**2** likes

**Related Pages**

**Summertime**
Movie

**RDX-Arms Training**
Product/Service

A WALK WITH SHUN

Petticoat Lane Boutiques & Petti...

**See more of Nobelle on Facebook**

**Log In**    or    **Create New Account**





**Nobelle** updated their cover photo.
July 19, 2020

1

Like Comment Share

See All

**Photos**

See All

**Posts**

**Nobelle** updated their profile picture.
July 19, 2020

**SuiteSnob**
Women's Clothing Store

See More

**Pages** ▸ **Businesses** ▸ **Shopping & Retail** ▸ **Apparel & Clothing** ▸ **Clothing Store** ▸ **Women's Clothing Store** ▸ Nobelle

English (US) · Español · Português (Brasil) · Français (France) · Deutsch

Privacy · Terms · Advertising · Ad Choices · Cookies · More
Facebook © 2021

**See more of Nobelle on Facebook**

Log In or Create New Account

See more of Nobelle on Facebook

Log In    or    Create New Account

# Exhibit 6



Free Shipping on orders over $250. Book a Private Styling Session Now!

*Nobelle*

# *All Products*

## Categories

Sort by  Most popular  ⌄





**SILVER LOVE TWO-PACK**

$72.00





**JILLY NECKLACE**

$120.00

More options



**10MM SOLITAIRE STUD, GOLD**

$78.00



Free Shipping on orders over $250. Book a Private Styling Session Now!



*Nobelle*

Continue shopping

*Cart*

**SILVER LOVE TWO-PACK**

WHITE:  O/S

$72.00                          1

Update cart

Coupon code?

SUBTOTAL    **$72.00**

**CHECKOUT**

Copyright © 2020ShopNobelle - All Rights Reserved.

PRIVACY POLICY

TERMS AND CONDITIONS



Coupon code?                                    🛒 Total  **$72.00**  ⌄

Already have an account? Sign in

PayPal Check out

—— OR ——

## CUSTOMER INFORMATION

Email Address

Phone (Optional)

## SHIPPING/PICKUP

○ 🏪 Free Curbside & In-Store Pick-up

◉ 🚚 Shipping Address

First Name

Last Name

United States ⌄

Street Address

Apt, Unit, Suite, etc (Optional)

Postal / Zip

City

Alabama

**CONTINUE**   RETURN TO STORE

Copyright © 2021 Nobelle - Powered by GoDaddy Online Store

# Exhibit 7



Gerard Fox Law

Gerard P. Fox, Esq.
gfox@gerardfoxlaw.com

October 2, 2020

***VIA E-MAIL ONLY***

Jesse M. Coleman
SEYFARTH SHAW LLP
700 Milam Street
Suite 1400
Houston, Texas 77002-2812
jmcoleman@seyfarth.com

**Re:    Nobelle – Response To Demand Letter**

Mr. Coleman,

I write in response to your September 30, 2020 letter regarding the computer mentioned in my September 1, 2020 letter. When we prepared that letter we were unaware of the full scope of your client's lawsuit against our clients. Indeed, Ms. Menkin agreed to provide the computer—despite having no obligation to as it was abandoned by ML Fashion—in hopes of reaching an amicable solution that involved your clients dropping the suit as there is no merit to its claims.

However, the fact that you filed a motion for a temporary restraining order and preliminary injunction and a motion for expedited discovery, all within hours of sending the initial demand letter, shows that your client is not interested in a simple, amicable resolution of these issues.

Given your client's litigation practices, we must insist that documents and information be exchanged through the normal discovery procedures so that they can be properly authenticated as the case moves forward. Of course, delivering the computer can be part of any amicable resolution of this lawsuit if your client is so interested. Feel free to reach out if you have any questions or want to talk about the matter further. We reserve all rights and waive none.

Best regards,

*Gerard P. Fox*

Gerard P. Fox
GERARD FOX LAW P.C.

1

# Exhibit 8

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

---------------------------------------------------------------x

|  |  |  |
|---|---|---|
| ML FASHION, LLC and ML RETAIL, LLC, | : | Case No. 1:20-cv-05124 |
|  | : |  |
| Plaintiffs, | : |  |
|  | : | Hon. Steven C. Seeger |
|  | : |  |
| v. | : |  |
|  | : |  |
| NOBELLE GW LLC, STEPHANIE MENKIN, | : |  |
| SARIT MAMAN NAGRANI, and NICOLAS | : |  |
| GOUREAU, | : |  |
|  | : |  |
| Defendants. | : |  |

---------------------------------------------------------------x

## <u>DECLARATION OF MARCUS LEMONIS</u>

I, Marcus Lemonis, hereby declare, under penalty of perjury pursuant to 28 U.S.C. § 1746, as follows:

1.      I am the Manager, Chairman, and CEO for Plaintiffs ML Fashion, LLC ("ML Fashion") and ML Retail, LLC ("ML Retail") (collectively, "Plaintiffs"). I make this Declaration: (1) in opposition to the motion of Defendants Nobelle GW LLC ("Nobelle"), Stephanie Menkin ("Menkin"), Sarit Maman Nagrani ("Nagrani"), and Nicolas Goureau ("Goureau") (collectively, "Defendants") to dismiss the amended verified complaint in this action ("Verified Complaint" or "Verified Compl."); and (2) in support of Plaintiffs' responses to the Court's inquiries of January 19, 2021 (Dkt. No. 55).

2.      I have worked as Manager of ML Fashion since being appointed upon its inception on or about March 29, 2016. Based on the positions I hold and have held, I am familiar with the general activities and day-to-day operations at ML Fashion. I am also familiar with the fashion-related retail industry based upon my role with ML Fashion and experience in that industry.

3.      I previously verified the allegations of the Verified Complaint under penalty of perjury, and I reaffirm here, under penalty of perjury, that the allegations of the Verified Complaint are true and accurate, to the best of my knowledge.

**ML Fashion's Connection to Illinois**

4.      As the Manager of ML Fashion, I have the full, exclusive and unilateral power and authority to make all decisions affecting the business and affairs of ML Fashion under Section 6.1(a) of the Company Agreement.

5.      I manage ML Fashion in Illinois, primarily from an office in Long Grove, Illinois in Lake County, which I understand is located in this judicial district.

6.      Although ML Fashion originally maintained its principal place of business in New York City, that location was selected to be a "headquarters" in name only based on Menkin's and Goureau's residence at the time the parties entered into the LLC agreement for ML Fashion (the "LLC Agreement").  In reality, however, management decisions for ML Fashion have always been made by me in Illinois and I negotiated the terms of the LLC Agreement in Illinois on behalf of ML Fashion's third member, ML Retail.

7.      Moreover, now that Menkin and Goureau are, effectively, no longer working for, and are actively competing with, ML Fashion, ML Fashion has actually closed its primary New York office.  Accordingly, ML Fashion's office in Long Grove, Illinois is now ML Fashion's primary office.

8.      To the best of my knowledge, Menkin, Goureau, and Nagrani were aware at all relevant times, and continue to be aware, of the fact that I manage ML Fashion and ML Retail in Illinois.  In fact, Menkin and Goureau knew that I would be managing ML Fashion in Illinois when

we agreed in the LLC Agreement that I would serve as ML Fashion's manager.  They also knew that the principal place of business of ML Fashion's other member, ML Retail, is in Illinois.

9.      Menkin and Goureau further understood that setting up retail stores in Illinois would be a primary focus of ML Fashion from the outset of its existence.  ML Fashion's first retail store was opened in Lake County, and it has more stores in Illinois than in any other single state.  This focus on operating retail stores in Illinois was by design.  The plan, of which Menkin and Goureau were aware, was to establish retail arms in the Chicago suburbs in order to eventually set up a retail store in Chicago itself, with the suburban stores ultimately serving as the "spokes" from the "hub" in Chicago.

10.     As President of ML Fashion, Menkin was responsible for all of ML Fashion's retail stores in Illinois and regularly travelled to Illinois to manage their operation.  Menkin further took a specific interest in ML Fashion's downtown Chicago location and worked to open that location.

11.     As part of his employment with ML Fashion, Goureau physically moved to Chicago, Illinois to handle the initial buildout and installation of fixtures at the Lake Forest location.  While living in Illinois, Goureau oversaw the buildout of additional ML Fashion retail stores across Illinois, including in Hinsdale, Halsted, and Winnetka.

12.     Ultimately, Goureau and Menkin's activities in Illinois led to the systematic expansion of at least ten ML Fashion retail outlets in Illinois.

13.     In Illinois, ML Fashion owns and operates retail stores at the following locations:

- Arlington Heights ("ARL Store") at 12 South Dunton Ave., Arlington Heights, Illinois 60005;

- Glencoe ("GCO Store") at 339 Park Avenue, Glencoe, Illinois 60022;

- Delaware Place ("GLD Store") at 110 E. Delaware Place, Suite 101, Chicago, Illinois 60611;

- Halsted ("HAL Store") at 2030 North Halsted, Chicago, Illinois 60614;

3

- Hinsdale ("HIN Store") at 101 S. Washington Street, Hinsdale, Illinois 60521;

- Highland Park ("HP Store") at 1883 2nd Street, Highland Park, Illinois 60035;

- Lake Forest ("LF Store") at 267 East Westminster Avenue, Lake Forest, Illinois 60045;

- Deerfield ("MSS Store") at 720 Waukegan Rd., Suite F, Deerfield, Illinois 60015;

- Michigan Avenue ("NBR Store") at 520 North Michigan Ave., Chicago, Illinois 60611;

- Naperville ("NPV Store") at 26 W. Jefferson, Naperville, Illinois 60540; and

- Winnetka ("WKA Store") at 559 Chestnut St., Winnetka, Illinois 60093.

14.     With ten stores in Illinois, ML Fashion is predominantly situated and conducting business in Illinois as the state with the most retail locations over the rest of the country.

15.     ML Fashion's retail stores in Illinois have generated significant revenue for ML Fashion and, by extension, for Menkin and Goureau, as members of ML Fashion who have misappropriated ML Fashion's funds for their own personal purposes for years.

**Menkin's and Goureau's Roles in ML Fashion**

16.     Although I have ultimate management authority over ML Fashion, Menkin and Goureau both had active roles in the management and operations of ML Fashion.  Menkin was for years ML Fashion's president.  In that capacity, she oversaw and managed ML Fashion's retail operations and other endeavors.  Goureau too worked for ML Fashion, moving to Illinois to help oversee the build-out of ML Fashion stores there at one point, and worked for other affiliated entities that assisted ML Fashion's operations.

4

17. In other words, Menkin and Goureau were never passive members of ML Fashion who just sat back and collected distribution checks; they were involved in managing and operating ML Fashion's business under my direction and subject to my ultimate managerial authority.

18. Menkin, Goureau, and Nagrani have also traveled to Illinois in the past in connection with ML Fashion-related business. While traveling to Illinois for ML Fashion-related business, Menkin and Goureau frequently made unauthorized personal purchases in Illinois using an ML Fashion American Express credit card, thereby misappropriating ML Fashion funds for Menkin's and Goureau's personal uses in Illinois.

19. As described more fully in the Verified Complaint, from 2016 through 2020, Menkin, Goureau, and Nagrani made numerous misrepresentations to ML Fashion and ML Retail, through me, while I was in Illinois as part of Menkin's and Goureau's long-running scheme to improperly use ML Fashion funds for Menkin's and Goureau's personal purposes. I believe that they knew I was in Illinois when they made these statements to me, typically via email, text message, or telephone. For example, as shown in Exhibit 8 to the Verified Complaint, Menkin texted me on January 19, 2020 to say that "I wouldn't do it [*i.e.*, take inventory] without [my] approval." (Verified Compl. Ex. 8 pg. 8 of 10). That was a false statement, however, as Menkin ultimately did take inventory without my approval.

**Defendants Operation of the Competing Nobelle Store**

20. In late August 2020, I became aware that Menkin and Nagrani started a new fashion store called Nobelle, located at 85 Greenwich Avenue, Greenwich, Connecticut (the "Greenwich Property"). Nobelle opened for business on or about August 23, 2020, based on the date of the store's first social media post on Instagram.

5

21.     Nobelle's retail location at the Greenwich Property is a former ML Fashion storefront that Menkin and Goureau are using without permission from ML Fashion.

22.     ML Fashion operated a retail store at the Greenwich Property pursuant to a lease previously held by Gooberry Corp. ("Gooberry"), an entity formed by Nicolas Goureau for which Plaintiff ML Retail is now the controlling shareholder.  Pursuant to a Purchase Agreement, dated January 1, 2018, a copy of which is annexed hereto as **Exhibit A**, Gooberry sold all of its assets, including all contracts to which it was a party, all FFE it owned, and all real property it leased, including its lease for, and FFE at, the Greenwich Property to an entity called MLG Retail, LLC ("MLG Retail").  (Ex. A at § 1.1 and Ex. A(e), (h), and (i)).  Plaintiff ML Fashion is MLG Retail's sole member.  Accordingly, ML Fashion effectively became the lessee of the Greenwich Property pursuant to the Purchase Agreement.

23.     The Greenwich Property is also approximately 35 miles from 402 W. 13th Street in Manhattan, New York, where ML Fashion operated a retail store until approximately December 2020 and at which ML Fashion is still the tenant.  Based on my experience in the retail industry, New York and Greenwich are in the same retail market, both because of their physical proximity, but also because many people who live in Greenwich work in, or frequently travel to, New York City.  Greenwich is, effectively, a suburb of New York City.  My experience has been that many Greenwich residents do their fashion-related shopping in both Greenwich and New York City.

24.     Based on my past conversations with Menkin, Goureau, and Nagrani, I understand that they too viewed New York City and Greenwich as being in the same retail market.  Menkin's and Goureau's prior business enterprise, "Courage.B," maintained stores in both Greenwich and New York City for that very reason.

25.    As set forth in the Griep Declaration, on at least four occasions in January and February 2020, Menkin secretly had ML Fashion product, including products from ML Fashion's exclusive, private-label brands, re-routed to a store on the Upper East Side of Manhattan that had been controlled exclusively by Menkin's mother since October 2019 (the "Noemi Store").  Since the Noemi Store had not been controlled or used by ML Fashion for months at the time Menkin shipped goods there, Menkin was not authorized by ML Fashion to ship goods to that location, and there was no possible reason for Menkin to ship goods there except to misappropriate them for her own personal use.  Unsurprisingly, much of that same product has now appeared in the Nobelle store, as outlined in more detail in the Griep Declaration.

26.    ML Fashion, ML Retail, and I did not authorize Defendants to take or sell the ML Fashion inventory or FFE for use at Nobelle, or authorize Defendants to use ML Fashion photographs to promote the sale of those goods for Defendants' benefit.  Although Defendants claim that I authorized Menkin to take the inventory, and Menkin has submitted cherry-picked, incomplete email and text message chains to the Court to "support" that contention, it is false.  My discussions with Menkin were in the context of reaching a deal for her to separate from ML Fashion.  Those talks fell through, and we never reached such an agreement.  Menkin took the inventory while our discussions were still ongoing, without my approval or authorization.

27.    I believe that Nagrani, as Menkin's business partner and a former ML Fashion employee, assisted Menkin in getting the unauthorized product from the Noemi Store to Nobelle during the time when Nagrani was serving as ML Fashion's manager for its New York City and Greenwich retail stores.  Among other things, by virtue of her employment with ML Fashion, Nagrani was aware that many of the products Menkin had shipped to the Noemi were exclusive, private-label brands sold only by ML Fashion.

28.     In addition to being the property of ML Fashion, the inventory and fixtures that Menkin and Nagrani, on behalf of Nobelle, have misappropriated are collateral for the loans made to ML Fashion by ML Retail.  Menkin and Nagrani have taken this collateral without authority of ML Fashion and in violation of the credit and security agreements between ML Fashion and ML Retail, both of which have mandatory choice-of-law, jurisdiction, and venue provisions in Chicago, Illinois.  It will be impossible for ML Fashion to perform under those agreements without the inventory and the FFE Defendants have stolen, including because ML Fashion will not be able to generate revenue through the sale of the stolen inventory.

**Defendants' Theft of Trade Secrets and Computers**

29.     Defendants have attempted to make their competing enterprise more successful by stealing data and information from two ML Fashion-owned computers and seizing, and refusing to return, the computers.

30.     As set forth in greater detail in the Verified Complaint and in the Griep and Senafe Declarations, these computers were previously used by ML Fashion's former controller and bookeeper, and therefore contain confidential and sensitive trade secret information of ML Fashion.  ML Fashion has taken necessary and appropriate measures to protect this information. Until Defendants breached ML Fashion's office and targeted these computers, in violation of their contractual and fiduciary obligations, ML Fashion's security measures had been successful in keeping ML Fashion's trade secrets out of the hands of ML Fashion's competitors and the general public.

31.     As described in the Verified Complaint (Verified Compl. ¶ 102), ML Fashion's security measures included use of confidentiality agreements, passwords, and other, similar

security measures. Based on my experience, these measures are consistent with trade secret protections undertaken by other, similar businesses operating in the fashion-related retail industry.

32. The trade secrets were well-protected; Defendants simply abused their connection to ML Fashion to steal these trade secrets in order to boost their competitive enterprise, Nobelle.

33. As of the date of this declaration, Plaintiffs still do not have in their possession, and are still unable to access, the computers.

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed this 2 day of February, 2021.

_____
Marcus Lemonis

Exhibit A

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is made and entered into as of January 1, 2018 (the "Effective Date"), by and between Gooberry Corp., a New York corporation ("Seller"), and MLG Retail, LLC, a Delaware limited liability company ("Purchaser"). Purchaser and Seller are sometimes referred to individually as a "Party" and collectively as "Parties."

## RECITALS

WHEREAS, Seller, directly or indirectly through its wholly-owned subsidiary, Runway Boutique LLC, a Delaware limited liability company ("Runway"), is engaged in the business of owning and operating (i) the women's fashion brand "COURAGE b", which designs and retails clothing and accessories under the "COURAGE b" brand and operates the retail store chain "COURAGE b," and (ii) the men's and women's retail store chain "Denim and Soul" (collectively, the "Business");

WHEREAS, Seller owns 100% of the membership interests in Runway (the "Runway Membership Interests"); and

WHEREAS, Seller wishes to sell and assign to Purchaser, and Purchaser wishes to purchase and assume from Seller, substantially all of Seller's assets, including, without limitation, the Runway Membership Interests, and the liabilities of Seller arising from Seller's ownership and operation of the Business, subject to the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## PURCHASE AND SALE

1.1 **Agreement to Purchase and Sell**. At Closing (as defined hereinafter), and subject to the terms and conditions of this Agreement, Seller hereby agrees to sell, transfer, assign, convey and deliver to Purchaser, and Purchaser agrees to purchase and accept from Seller, free and clear of any Encumbrances (as defined hereinafter), all of Seller's right, title and interest in and to Seller's assets set forth in Exhibit A, including, without limitation, the Runway Membership Interests (such purchased assets collectively, the "Purchased Assets").

1.2 **Excluded Assets**. Notwithstanding the foregoing, the Purchased Assets shall not include the assets, properties and rights specifically set forth in Exhibit B (collectively, the "Excluded Assets").

1.3 **Assumption of Liabilities**. Subject to the terms and conditions set forth herein, Purchaser shall assume and agree to pay, perform and discharge the liabilities of Seller arising from Seller's ownership and operation of the Business, including, without limitation, those specifically set forth in Exhibit C, but excluding the Excluded Liabilities (as hereinafter defined) (collectively, the "Assumed Liabilities"), and no other liabilities, obligations or commitments of

26302497.3

Scanned by CamScanner

any nature whatsoever, asserted or unasserted, known or unknown, absolute or contingent, accrued or unaccrued, matured or unmatured or otherwise ("Liabilities").

    1.4    **Excluded Liabilities**. Purchaser shall not assume and shall not be responsible to pay, perform or discharge those Liabilities of Seller or any of its Affiliates (as defined hereinafter) set forth on Exhibit D (the "Excluded Liabilities"). Seller shall, and shall cause each of its Affiliates to, pay and satisfy in due course all Excluded Liabilities which they are obligated to pay and satisfy. As used in this Agreement, an "Affiliate" of any individual, corporation, partnership, limited liability company or other entity (a "Person") shall mean a Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

    1.5    **Treatment of Runway**. The Parties agree that the assets, properties, rights and liabilities held by Runway are not being separately conveyed to Purchaser hereunder but rather will continue to be held by Runway following the Closing.

    1.6    **Consideration**. The aggregate consideration for the Purchased Assets shall be Purchaser's assumption of the Assumed Liabilities.

    1.7    **Closing**. The closing of the transactions contemplated hereby (the "Closing") will take place as soon as practicable following the execution of this Agreement as of 12:01 A.M. on the Effective Date (the "Closing Date").

## ARTICLE II
## REPRESENTATIONS AND WARRANTIES

    2.1    **Seller's Representations and Warranties**. As an inducement to Purchaser to enter into and perform this Agreement, Seller hereby represents and warrants to Purchaser that the following are true and correct as of the date hereof, except as set forth in the disclosure schedules dated and delivered as of the date hereof to the Purchaser:

    (a)    Organization and Power; Authority. Seller is a corporation duly organized and validly existing under the laws of the State of New York. Runway is a limited liability company duly organized and validly existing under the laws of the State of Delaware. Seller has full company power and authority to enter into this Agreement and perform its obligations hereunder. The execution, delivery and performance by Seller of this Agreement and the other agreements contemplated hereby and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by all requisite action, and no other proceedings on the part of Seller are necessary to authorize the execution, delivery or performance of this Agreement or the other agreements contemplated hereby. This Agreement, and any other documents to be delivered in connection with the transactions contemplated by the Agreement, when executed and delivered by Seller shall be a valid and binding obligation of Seller enforceable against Seller in accordance with the terms hereof and thereof.

26302497 3

Scanned by CamScanner

(b)    <u>Title</u>.  Seller has good and marketable title to the Purchased Assets, including, without limitation, the Runway Membership Interests, free and clear of any charge, claim, pledge, condition, equitable interest, lien (statutory or other), option, security interest, or restriction of any kind, except any arising under applicable securities laws or transfer restrictions imposed by Runway's limited liability company agreement (each, an "<u>Encumbrance</u>").  Runway has good and marketable title to its assets free and clear of any Encumbrances.

(c)    <u>Capitalization</u>. Seller is the owner of 100% of the membership interests in Runway. All of Runway's membership interests have been duly authorized and issued, and are fully paid and non-assessable and were issued in compliance with applicable federal and state securities laws.  There are no options, warrants or rights of conversion or other rights or contracts obligating Runway to issue or sell any of its membership interests or any securities convertible into or exchangeable for its membership interests.  Runway has not granted any preemptive rights, rights of first refusal, co-sale or other similar rights with respect to the membership interests to any person, by contract or otherwise, that are still in effect.  Runway has no obligation (contingent or otherwise) to purchase, redeem, or otherwise acquire any membership interests or make any other distribution in respect thereof.

(d)    <u>Inventory</u>. All inventory held for use in the Business consists of a quality and quantity usable and salable in the ordinary course of business consistent with past practice. All such inventory is owned by Seller or Runway free and clear of all Encumbrances, and no inventory is held on a consignment basis.  The quantities of each item of inventory (whether raw materials, work-in-process or finished goods) are not excessive, but are reasonable in the present circumstances of Seller and Runway.

(e)    <u>No Conflicts; Consents</u>.  The execution, delivery and performance of this Agreement, and any other documents to be delivered in connection with the transactions contemplated by the Agreement, by Seller do not require the approval or consent of any governmental authority or any other party, and do not and will not conflict with or result in a default under any provision of law.  The execution, delivery, and performance of this Agreement by Seller will not result in a breach of any of the terms or provisions of, or constitute a default under (i) the governing documents, including the articles of organization or any operating agreement, of Seller or Runway; (ii) any agreement to which Seller or Runway is a party or by which Seller or Runway is bound; or (iii) any applicable judgment, decree or order of any court or governmental body, or any applicable law, rule or regulation.

(f)    <u>Compliance With Laws; Permits</u>.  Seller and Runway have each complied, and are now complying, with all laws, statutes, regulations, ordinances, codes and other requirements or rules of law of any governmental entity ("<u>Laws</u>") applicable to the conduct of the Business as currently conducted or the ownership and use of the Purchased Assets or the assets held by Runway.  Neither Seller nor Runway has received written notice of any violations of any Laws applicable to Seller, Runway, the Business, the Purchased Assets, the assets held by Runway or the Runway Membership Interests.  All permits, licenses, approvals, registrations, and similar rights required for Seller and Runway to conduct the Business as currently conducted or for the ownership and use of the Purchased Assets or the assets held by Runway have been obtained by Seller or Runway, as applicable, and are valid and in full force and effect.

Scanned by CamScanner

(g)    <u>Brokers</u>.  No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement (or in any agreement, certificate or instrument delivered by or on behalf of Seller pursuant to this Agreement) based upon arrangements made by or on behalf of Seller or Runway.

(h)    <u>Full Disclosure</u>.  No representation or warranty by Seller in this Agreement or any certificate or other document furnished to or to be furnished to Purchaser pursuant to this Agreement contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading.

2.2    <u>Purchaser's Representations and Warranties</u>.  As an inducement to Seller to enter into and perform this Agreement, Purchaser hereby represents and warrants to Seller that the following are true and correct as of the date hereof:

(a)    <u>Organization and Power; Authority</u>.  Purchaser is a limited liability company duly organized and validly existing under the laws of the State of Delaware. Purchaser has full company power and authority to enter into this Agreement and perform its obligations hereunder. The execution, delivery and performance by Purchaser of this Agreement and the other agreements contemplated hereby and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by all requisite action, and no other proceedings on the part of Purchaser are necessary to authorize the execution, delivery or performance of this Agreement or the other agreements contemplated hereby.

(b)    <u>No Conflict</u>.  The execution, delivery and performance of this Agreement, and any other documents to be delivered in connection with the transactions contemplated by the Agreement, by Purchaser do not require the approval or consent of any governmental authority or any other party, and do not and will not conflict with or result in a default under any provision of law.

(c)    <u>Enforceability</u>.  This Agreement, and any other documents to be delivered in connection with the transactions contemplated by the Agreement, when executed and delivered by Purchaser shall be a valid and binding obligation of Purchaser enforceable against Purchaser in accordance with the terms hereof and thereof. The execution, delivery, and performance of this Agreement by Purchaser will not result in a breach of any of the terms or provisions of, or constitute a default under (i) the governing documents, including the certificate of formation or any operating agreement, of Purchaser; (ii) any agreement to which Purchaser is a party or by which Purchaser is bound; or (iii) any applicable judgment, decree or order of any court or governmental body, or any applicable law, rule or regulation.

<div align="center">

**ARTICLE III**
**CLOSING DELIVERIES**

</div>

3.1    <u>Closing Deliveries of Seller</u>.  At the Closing, Seller will deliver to Purchaser (a) a bill of sale, assignment and assumption agreement in form and substance satisfactory to Purchaser (the "<u>Bill of Sale, Assignment and Assumption Agreement</u>") and duly executed by

Scanned by CamScanner

Seller, effecting the assignment to and assumption by Purchaser of the Purchased Assets and the Assumed Liabilities; (b) an intellectual property assignment for recording with governmental authorities in form and substance satisfactory to Purchaser (the "Intellectual Property Assignment") and duly executed by Seller; (c) an assignment of membership interests in form and substance satisfactory to Purchaser (the "Assignment of Runway Membership Interest"), effecting the assignment to Purchaser of the Runway Membership Interests and duly executed by Seller; and (d) such other customary instruments of transfer, assumption, filings or documents, in form and substance reasonably satisfactory to Purchaser, as may be required to give effect to this Agreement.

3.2 **Closing Deliveries of Purchaser.** At the Closing, Purchaser shall deliver to Seller: (a) the Bill of Sale, Assignment and Assumption Agreement and (b) the Assignment of Runway Membership Interest, in each case duly executed by Purchaser.

## ARTICLE IV
## COVENANTS

4.1 **Employees and Employee Benefits**. Commencing on the Closing Date, Seller shall terminate all employees of the Business, who are actively at work on the Closing Date, and, at Purchaser's sole discretion, Purchaser may offer employment, on an "at will" basis, to any or all of such employees. Seller will not take any action that would impede, hinder, interfere or otherwise compete with Purchaser's effort to hire any employees. Purchaser shall not assume any responsibility for any employee until such employee commences employment with Purchaser. Seller shall remain solely responsible for the satisfaction of all claims for medical, dental, life insurance, health accident or disability benefits, and worker's compensation claims brought by or in respect of current or former employees, officers, directors, independent contractors or consultants of the Business or the spouses, dependents or beneficiaries thereof, which claims relate to events occurring on or prior to the Closing Date. Seller shall pay, or cause to be paid, all such amounts to the appropriate persons as and when due. Seller shall bear any and all obligations and liability under the WARN Act resulting from employment losses pursuant to this Section 4.1.

## ARTICLE V
## INDEMNIFICATION

5.1 **Survival**. Subject to the limitations and other provisions of this Agreement, the representations and warranties contained herein shall survive the Closing. All covenants and agreements of the parties contained herein shall survive the Closing indefinitely or for the period explicitly specified therein.

5.2 **Indemnification By Seller**. Subject to the other terms and conditions of this Article 5, Seller shall indemnify, defend and hold harmless Purchaser and its Affiliates and their respective representatives (the "Purchaser Indemnitees") against any and all damages, losses, liabilities, penalties, interest, judgments, deficiencies, assessments, costs and expenses, including reasonable attorneys' fees and disbursements, incurred by the Purchaser Indemnitees based upon, arising out of, with respect to or by reason of: (a) any inaccuracy in or breach of or non-fulfillment of any of the representations, warranties, covenants, agreements or obligations of

Scanned by CamScanner

Seller contained in this Agreement or in any agreement, certificate or instrument delivered by or on behalf of Seller pursuant to this Agreement; (b) any third party claim based upon, resulting from or arising out of the Business, operations, properties, assets or obligations of Seller or any of its Affiliates (other than the Purchased Assets or Assumed Liabilities) conducted, existing or arising on or prior to the Closing Date; or (c) any Actions, demands or assessments incidental to any of the matters set forth in clauses (a) and (b) above.

5.3     **Indemnification By Purchaser**.  Subject to the other terms and conditions of this Article 5, Purchaser shall indemnify and defend Seller and its Affiliates and their respective representatives (the "Seller Indemnitees") against any and all damages, losses, liabilities, penalties, interest, judgments, deficiencies, assessments, costs and expenses, including reasonable attorneys' fees and disbursements, incurred by the Seller Indemnitees based upon, arising out of, with respect to or by reason of: (a) any inaccuracy in or breach of any of the representations or warranties of Purchaser contained in this Agreement or in any certificate or instrument delivered by or on behalf of Purchaser pursuant to this Agreement; (b) any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Purchaser pursuant to this Agreement; or (c) any Assumed Liability.

## ARTICLE VI
## MISCELLANEOUS

6.1     **Notices**.  All notices, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid.  Such communications must be sent to the respective parties at the addresses set forth on Exhibit E (or at such other address for a party as shall be specified in a notice given in accordance with this Section 6.1).

6.2     **Further Assurances**.  From time to time after execution of this Agreement the Parties will, without additional consideration, execute and deliver such further instruments and take such other action as may be reasonably requested by the other Party in order to carry out the purposes of this Agreement.

6.3     **Amendment**.  This Agreement may be amended, and any provision of this Agreement may be waived; provided that any such amendment or waiver shall be binding on the Party against whom the amendment is being asserted only if such amendment or waiver is set forth in a writing executed by such Party against whom the amendment is being asserted.

6.4     **Expenses**.  Each Party shall bear its own expenses with respect to the transaction contemplated by this Agreement.

6.5     **Binding Effect**.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors, assigns and legal representatives.

Scanned by CamScanner

6.6    **Entire Agreement**.  This Agreement contains the entire understanding among the Parties related to its subject matter and shall not be modified except in writing by the Parties. Furthermore, this Agreement supersedes any prior understandings and/or written or oral agreements between them respecting the subject matter of this Agreement.

6.7    **Counterparts**.  This Agreement may be executed in one or more counterparts, all of which together shall constitute one and the same instrument. This Agreement may be executed and delivered by email (via .pdf file), which shall be deemed the same as originals.

6.8    **Governing Law; Submission to Jurisdiction**.   This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois without reference to the choice of law principles thereof. All Actions arising out of or based upon this Agreement, any agreement, certificate or instrument delivered to this Agreement, or the transactions contemplated hereby or thereby may be instituted in the courts located in the City of Chicago and County of Cook.  Each Party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding.

6.9    **Survival of Warranties and Covenants**.   All representations, warranties and agreements of the Parties set forth in this Agreement or in any instrument delivered pursuant to this Agreement shall survive the Closing and (except to the extent that survival is necessary to effectuate the intent of such provisions) shall terminate at the end of the applicable statute of limitations periods.   The covenants and agreements contained herein to be performed or complied with after the Closing shall survive the Closing.

*[Signature Page Follows]*

Scanned by CamScanner

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

SELLER:

**GOOBERRY CORP.**

By: _____
Stephanie Menkin, President


PURCHASER:

**MLG RETAIL, LLC**

By: _____
Marcus Lemonis, CEO

-8-

26302497.3

Scanned by CamScanner

# EXHIBIT A
## PURCHASED ASSETS

All of the assets, properties and rights of every kind and nature of Seller, whether real, personal or mixed, tangible or intangible (including goodwill), wherever located and whether now existing or hereafter acquired (other than the Excluded Assets), which relate to, or are used or held for use in connection with, the Business, including, without limitation, the following:

(a)    the Runway Membership Interests;

(b)    all cash and cash equivalents;

(c)    all accounts or notes receivable held by Seller, and any security, claim, remedy or other right related to any of the foregoing;

(d)    all inventory, finished goods, raw materials, work in progress, packaging, supplies, parts and other inventories;

(e)    all verbal and written contracts and agreements of all kinds to which Seller is a party, by which Seller is bound or affected in connection with the Business, or by which any of the Purchased Assets is bound or affected, or pursuant to which Seller is an obligor or a beneficiary in connection with the Business, or which is used in the Business, excluding such contracts or agreements rejected by Purchaser by written notice to Seller before or after the Closing Date (collectively, "Purchased Contracts");

(f)    all intellectual property and industrial property rights and assets, and all rights, interests and protections that are associated with, similar to, or required for the exercise of, any of the foregoing, however arising, pursuant to any applicable laws of any jurisdiction throughout the world, whether registered or unregistered, including any and all: (i) trademarks, service marks, trade names, brand names, logos, trade dress, design rights and other similar designations of source, sponsorship, association or origin, together with the goodwill connected with the use of and symbolized by, and all registrations, applications and renewals for, any of the foregoing; (ii) internet domain names, whether or not trademarks, registered in any top-level domain by any authorized private registrar or governmental authority (as defined below), web addresses, web pages, websites and related content, accounts with Twitter, Facebook and other social media companies and the content found thereon and related thereto, and URLs (collectively, "Domain Names"); (iii) works of authorship, expressions, designs and design registrations, whether or not copyrightable, including copyrights, author, performer, moral and neighboring rights, and all registrations, applications for registration and renewals of such copyrights; (iv) inventions, discoveries, trade secrets, business and technical information and know-how, databases, data collections and other confidential and proprietary information and all rights therein; (v) patents (including all reissues, divisionals, provisionals, continuations and continuations-in-part, re-examinations, renewals, substitutions and extensions

26304451.1

Scanned by CamScanner

thereof), patent applications, and other patent rights and any other governmental authority-issued indicia of invention ownership (including inventor's certificates, petty patents and patent utility models); (vi) software and firmware, including data files, source code, object code, application programming interfaces, architecture, files, records, schematics, computerized databases and other related specifications and documentation; (vii) royalties, fees, income, payments and other proceeds now or hereafter due or payable with respect to any and all of the foregoing; and (viii) all rights to any proceedings of any nature available to or being pursued by Seller to the extent related to the foregoing, whether accruing before, on or after the date hereof, including all rights to and claims for damages, restitution and injunctive relief for infringement, dilution, misappropriation, violation, misuse, breach or default, with the right but no obligation to sue for such legal and equitable relief, and to collect, or otherwise recover, any such damages (all of the foregoing, collectively "Intellectual Property");

(g)     all Intellectual Property owned or used by Seller that are subject to any issuance, registration, application or other filing by, to or with any governmental authority or authorized private registrar in any jurisdiction, including registered trademarks, domain names and copyrights, issued and reissued patents and pending applications for any of the foregoing (all of the foregoing, collectively "Intellectual Property Registrations");

(h)     all furniture, fixtures, signage, equipment, machinery, tools, vehicles, office equipment, supplies, computers, telephones, telephone numbers and other tangible personal property, and, to the fullest extent transferable or assignable to Purchaser, the full benefit of all express or implied warranties by the manufacturers or Seller or lessors of any item or component part thereof;

(i)     all leased real property;

(j)     all permits, licenses, approvals, registrations, and similar rights required for Seller to conduct the Business as currently conducted or for the ownership and use of the Purchased Assets;

(k)     all rights to any claims and actions of any nature available to or being pursued by Seller to the extent related to the Business, the Purchased Assets or the Assumed Liabilities, whether arising by way of counterclaim or otherwise;

(l)     all prepaid expenses, credits, advance payments, claims, security, refunds, rights of recovery, rights of set-off, rights of recoupment, deposits, charges, sums and fees (including any such item relating to the payment of taxes, charges, fees, levies, or other like governmental assessments);

(m)     all of the rights of the Seller under warranties, indemnities and all similar rights against third parties to the extent related to any Purchased Assets;

(n)     all insurance benefits, including rights and proceeds, arising from or relating to the Business, the Purchased Assets or the Assumed Liabilities;

26304451.1

Scanned by CamScanner

(o)     originals, or where not available, copies, of all books, records and files relating to the Business;

(p)     any applicable employee benefit plans of Seller   (collectively, "Assumed Benefit Plans"); and

(q)     all goodwill and the going concern value of the Business.

26304451.1

Scanned by CamScanner

## EXHIBIT B

### EXCLUDED ASSETS

The Purchased Assets shall not include the following assets:

(a)  corporate seals, organizational documents, minute books, stock books, tax returns, books of account or other records relating to the corporate organization of Seller; and

(b)  any and all rights which accrue or will accrue to Seller under the Agreement and any other agreements or documents to be delivered in connection with the transactions contemplated by the Agreement.

26304451.1

Scanned by CamScanner

# EXHIBIT C

## ASSUMED LIABILITIES

The Company shall assume and agree to pay, perform and discharge the following Liabilities of Seller:

(a)     all debt and obligations of Seller other than Excluded Liabilities; and

(b)     all Liabilities in respect of any Purchased Contracts not rejected by Seller and any Assumed Benefit Plans.

26304451.1

Scanned by CamScanner

## EXHIBIT D

## EXCLUDED LIABILITIES

The Company shall not assume and shall not be responsible for any Liabilities of Seller other than the Assumed Liabilities, including, but not be limited to, the following:

(a)     all liability for all taxes of Seller (or any Affiliate of Seller) of any kind or description;

(b)     all Liabilities relating to or arising out of the Excluded Assets;

(c)     all Liabilities related to, associated with or arising out of any action, claim, suit or proceeding with respect to the operation of the Business prior to the Closing, to the extent brought prior to the Closing;

(d)     all environmental claims or actions; and

(e)     all Liabilities to indemnify, reimburse or advance amounts to any present or former officer, member, manager, director, employee or agent of Seller (including with respect to any breach of fiduciary obligations by same), except for indemnification of Seller Indemnitees pursuant to the terms of the Agreement.

26304451.1

Scanned by CamScanner

# EXHIBIT E

## NOTICES

Notices and communications pursuant to the Agreement must be sent to the respective parties at the following addresses:

| | | |
|---|---|---|
| If to Seller: | Address: | 38 East 29th Street<br>6th Floor<br>New York, NY 10016 |
| | Attention: | Stephanie Menkin, President |
| | Email: | stephanie.menkin@marcuslemonis.com |
| with copies<br>(which shall not<br>constitute notice) to: | Address: | Robert G. Gerber<br>Neal Gerber & Eisenberg, LLP<br>2 N. LaSalle Street, Suite 1700<br>Chicago, IL 60602 |
| | E-mail: | rgerber@ngelaw.com |
| If to Purchaser: | Address: | 38 East 29th Street<br>6th Floor<br>New York, NY 10016 |
| | Attention: | Marcus Lemonis, CEO |
| | Email: | marcus@marcuslemonis.com |
| with copies<br>(which shall not<br>constitute notice) to: | Address: | Robert G. Gerber<br>Neal Gerber & Eisenberg, LLP<br>2 N. LaSalle Street, Suite 1700<br>Chicago, IL 60602 |
| | E-mail: | rgerber@ngelaw.com |

26304451.1

Scanned by CamScanner

# Exhibit 9

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

-------------------------------------------------------------x

|  |  |  |
|---|---|---|
| ML FASHION, LLC and ML RETAIL, LLC, | : | Case No. 1:20-cv-05124 |
|  | : |  |
| Plaintiffs, | : | Hon. Steven C. Seeger |
|  | : |  |
| v. | : |  |
|  | : |  |
| NOBELLE GW LLC, STEPHANIE MENKIN, SARIT MAMAN NAGRANI, and NICOLAS GOUREAU, | : |  |
|  | : |  |
| Defendants. | : |  |

-------------------------------------------------------------x

## DECLARATION OF JOHNNA GRIEP

I, Johnna Griep, hereby declare, under penalty of perjury pursuant to 28 U.S.C. § 1746, as follows:

1.      I am the Merchandise Planning Manager for Plaintiffs ML Fashion, LLC ("ML Fashion") and ML Retail, LLC ("ML Retail") (collectively, "Plaintiffs"). I make this Declaration: (1) in opposition to the motion of Defendants Nobelle GW LLC ("Nobelle"), Stephanie Menkin ("Menkin"), Sarit Maman Nagrani ("Nagrani"), and Nicolas Goureau ("Goureau") (collectively, "Defendants") to dismiss the amended complaint in this action ("Complaint" or "Compl."); and (2) in support of Plaintiffs' responses to the Court's inquiries of January 19, 2021 (Dkt. No. 55).

2.      I have worked as Merchandise Planning Manager for Plaintiffs since approximately April 2017. As a result of my position, I am familiar with the general activities and day-to-day operations at ML Fashion.

3.      The below facts are based upon my personal knowledge, my investigations on behalf of ML Fashion to date, and my review of Plaintiffs' book and records. I want to stress at the outset, however, that, as set forth further below, Defendants have taken steps to hide their misconduct. Menkin, as president of ML Fashion, had the ability to delete or change company

records to hide the full extent of what she was able to take from ML Fashion, with respect to inventory and fixtures, furniture, and equipment ("FFE"). Accordingly, even now, Plaintiffs' investigation remains ongoing and we are discovering additional instances of theft by Defendants, including new instances we discovered as recently as January 27, 2021. We almost certainly do not know the full extent of Defendants' misconduct. I note that point at the outset to underscore the need for discovery in this action.

**Defendants' Theft of ML Fashion Merchandise**

4. I have uncovered four instances where Menkin redirected ML Fashion product for her own personal purposes.

5. On January 13, 2020, Lemonis, Menkin (who at that time was still president of ML Fashion), and I were contacted by Front Door Fashion ("FDF"). A copy of the email correspondence is annexed hereto as **Exhibit A**. FDF is a company that works with ML Fashion to sell merchandise online on ML Fashion's behalf.

6. FDF contacted us because it wished to return to ML Fashion 1,296 items, including pants, blouses, shirts, skirts, and coats. The products included items bearing private-label, exclusive brand names owned by ML Fashion, such as a.M, Brkn Heart, and The Line:



7. The products also included third-party brand names sold by ML Fashion, such as Ankle Traveler, Autumn Cashmere, and Brochu Walker.

8. A copy of a spreadsheet listing the 1,296 items is annexed hereto as **Exhibit B**.

2

9.      Menkin responded to tell FDF that she would provide them with a shipping address. She then apparently emailed FDF separately, without copying Lemonis or myself, to tell FDF to ship the 1,296 items of clothing to a location on the Upper East Side of Manhattan, New York, 1035 Third Avenue (the "Noemi Store").  As set forth in the accompanying Lemonis Declaration, since October 2019, the Noemi Store had been controlled exclusively by Menkin's mother, Noemi Goureau ("Noemi").  Accordingly, at the time Menkin directed FDF to ship ML Fashion's product to the Noemi Store, the store was not an ML Fashion location or otherwise controlled by ML Fashion.

10.      It is telling that Menkin did not copy Lemonis or me when she gave the shipping address to FDF.  I only learned that FDF had shipped the goods at all because FDF subsequently sent the Federal Express tracking numbers for the shipments, totaling 46 boxes, to Menkin, Lemonis, and me.[1]

11.      Based upon my knowledge of FDF's business, and the locations where it stores and sells merchandise, the 1,296 items shipped to Menkin included goods that originated from Illinois, such as at locations in Chicago and Deerfield.  I personally had directed that many of these 1,296 items be shipped to FDF in the first place, and at the time I directed them to be shipped to FDF, many were physically located in Illinois.

12.      If Menkin had not re-directed these items to New York, ML Fashion would have had FDF ship the goods to Illinois, either to ML Fashion's Deerfield location or to other areas in Illinois, like Chicago, so that ML Fashion could sell them to consumers as part of summer sidewalk sales.

---

[1] FedEx Tracking Numbers 779663974880, 779664710077, and 779665961437.

13. Notably, Menkin attempted to have FDF ship additional product to her on May 7, 2020. At that time, FDF advised Menkin that it would not ship additional product to her without direct authorization from Lemonis or myself. A copy of an excerpt from a text message chain between Menkin and an FDF representative is annexed hereto as **Exhibit C**.

14. The second incident of which we are aware occurred on January 24, 2020, when Menkin directed 2,769 products to be shipped from an ML Fashion warehouse to the Noemi Store. Menkin took this action without notifying me. I discovered the shipment later when I reviewed ML Fashion's inventory records and its Federal Express charges because Meknin used ML Fashion's Federal Express charge account to ship the goods for her personal purposes.

15. The 2,769 items included clothing items such as shirts, hooded sweatshirts, pants, and sunglasses. The products included products from third-party brands sold by ML Fashion, such as Ankle Traveler, and sunglasses from a company part-owned by Marcus Lemonis, Ellison Eyewear.

16. A copy of the transfer list for these 2,769 products is annexed hereto as **Exhibit D**.

17. Based on my review of ML Fashion's Federal Express invoices, the shipments were delivered to the Noemi Store on January 28, 2020, in a total of 25 boxes, by Federal Express.[2]

18. A copy of the FedEx shipping information for these 2,769 products is annexed hereto as **Exhibit E**.

19. On February 3, 2020, Menkin shipped an additional 335 items from ML Fashion's warehouse to the Noemi Store. These items included shirts, sweaters, pants, tote bags, and

---

[2] FedEx Tracking Numbers 779902747497, 779902758314, 779902735975, 779902745369, 779902734795, 779902743377, 779902752809, 779902744101, 779902742072, 779902757400, 779902736798, 779902741444, 779902739499, 779902739238, 779902754444, 779902750975, 779902759387, 779902749033, 779902737990, 779902746148, 779902755337, 779902751504, 779902761034, 779902756447, 779902749489.

sunglasses. The products included third-party brands sold by ML Fashion, such as Ankle Traveler, as well as sunglasses from the Lemonis-affiliated Ellison Eyewear.

20.     A copy of the transfer list for these 335 items is annexed hereto as **Exhibit F**.

21.     On February 6, 2020, Menkin shipped 40 more items from ML Fashion's warehouse to the Noemi Store. These items included shirts, hooded sweatshirts, and sunglasses, including from Ellison Eyewear.

22.     A copy of the transfer list for these 40 items is annexed hereto as **Exhibit G**.

23.     Based upon my review of ML Fashion's records, the wholesale cost of the 3,922 items Menkin had shipped on January 13, January 24, February 3, and February 6, 2020 totaled $109,443.93, and the items had a retail value of at least $207,473.90. Screenshots from ML Fashion's inventory system showing the whole sale cost of the goods from the January 24, February 3, and February 6, 2020 transfers is annexed hereto as **Exhibit H**.

**ML Fashion's Operations In or Near Greenwich, Connecticut**

24.     Until on or about May 8, 2020, ML Fashion operated a retail store at 85 Greenwich Avenue, Greenwich, Connecticut (the "Greenwich Property").

25.     Until recently, ML Fashion operated a retail store approximately 35 miles from the Greenwich Property at 402 W 13th Street in New York City. When ML Fashion closed its store at the Greenwich Property, it transferred the inventory at that store to its New York City store.

26.     Due to the impact of the COVID-19 pandemic on the brick-and-mortar retail market in New York City, ML Fashion closed its New York City store on or about December 22, 2020. ML Fashion has not relinquished that space to its landlord, however.

### Nobelle is Selling the Stolen Items and Other Goods Sold by ML Fashion

27.     Defendants are selling at their Nobelle store at the Greenwich Property, and to customers nationwide online, at least some of the products identified above, as well products from the same third-party brands and, in some cases, the exact same products as those sold by ML Fashion.

28.     For example, Exhibit 5 to the Complaint shows that Nobelle is selling sweaters from the brands Brochu Walker and Autumn Cashmere.  (*See* Compl. Ex.5 pg. 3 of 21).  For the Court's reference, I have included the relevant images from Exhibit 5 below; the Brochu Walker sweater is on the left, and the Autumn Cashmere sweater is on the right:



29.     ML Fashion sells the same or similar sweaters from these same brands, as shown in screenshots taken from the website for ML Fashion's "MARCUS" stores, which show just a few examples of the sweaters ML Fashion sells from these brands:



6

30.     Exhibit 5 also shows white-and-black patterned pants and khaki pants from Ankle Traveler, which I believe were part of Menkin's January 13, January 24, and/or February 3 2020 shipments.  (*See* Compl. Ex.5 pg. 17 of 21).  For the Court's reference, I have included the relevant image from Exhibit 5 below, with the Ankle Traveler pants circled:



31.     ML Fashion sells those same Ankle Traveler pants on its website as well:



32.     Exhibit 5 to the Complaint shows that Nobelle was displaying at least one shirt from ML Fashion's exclusive "The Line" brand, which I believe was part of either the January 13,

2020 or January 24, 2020 shipments. The tag showing "The Line" brand name on a hanging shirt is circled in red below:



33.    Another image of Nobelle's store shows dozens of colored shirts and sweaters that I believe came from ML Fashion's exclusive "The Line" brand, and which were part of either the January 13 or January 24, 2020 shipments:



34.    In addition to selling ML Fashion's exclusive, private-label brands like "The Line" and the ML Fashion merchandise stolen on January 13, January 24, February 3, and February 6 2020, Nobelle is selling items that are identical to the products sold by ML Fashion and are obtained from the same vendors used by ML Fashion.  The Nobelle website postings for these items are identical to those on ML Fashion's website, down to the prices and the photographs and text descriptions of the products on the website.

35.    Take, for example, this silver Sei ring shown in a screenshot taken from the Nobelle website (https://shopnobelle.com/shop/ols/products/sei-ring-silver):



36.    Compare that to the same exact product shown in this screenshot from the MARCUS website (https://shopmarcus.com/collections/everyday-jewelry/products/sei-ring-silver):



37.    Nobelle is selling the exact same product at the exact same price using the same photograph and text description to promote the product.

38.    Another example is the gold rainbow edge bangle, shown in this screenshot from the Nobelle website (https://shopnobelle.com/shop/ols/products/rainbow-edge-bangle-gold):



39. And here is the same product on ML Fashion's website (https://shopmarcus.com/collections/everyday-jewelry/products/rainbow-edge-bangle-gold):



40. Again, same product, same price, same photograph, and same text description of the product.

41. The foregoing are just a few examples of Nobelle's competition, rather than an exhaustive list. A comparison of the two websites reveals many more identical or strikingly similar products, ranging from clothing to handbags and clutch purses to other pieces of jewelry.

42. As of the date of this declaration, Nobelle's website for online ordering (https://shopnobelle.com/shop) is active and appears to be accessible to consumers nationwide. I have personally visited the website and browsed products for sale on the site.

43.     Nobelle's social media accounts contain at least one picture that I know to have been taken by ML Fashion employees in connection with ML Fashion's intention to sell those goods.  For example, page 3 of Exhibit 4 to the Complaint includes a picture of a stack of jeans that I know to have been taken by an ML Fashion employee.  (Compl. Ex. 4 pg. 3 of 5).  For the Court's convenience, below is an excerpt from Exhibit 4 to the Complaint, with a black circle around the photograph in question:



44.     In short, the Nobelle store is like a mirror image of an ML Fashion store. Defendants stole, are selling, and are using promotional photographs of more than $100,000 worth of goods taken without authorization from ML Fashion, including ML Fashion's exclusive, private label products such as "The Line" brand, to operate their competing business, Nobelle, while also selling other goods identical to those sold by ML Fashion.

**Defendants are Using ML Fashion's FFE**

45.     I am personally familiar with the fixtures, furniture, and equipment ("FFE") that belong to ML Fashion.  Based on the pictures in Nobelle's social media postings and elsewhere, much of the FFE that Nobelle is using in ML Fashion's retail space to sell products belongs to ML Fashion.

12

46.     As an initial matter, Nobelle appears to be utilizing FFE that was left by ML Fashion at the Greenwich Property, including shelving, permanent brackets (large metal bars coming down from the ceiling into which other fixtures can be fit), and wooden hangers.  Some of this FFE can be seen in Exhibit 5 to the Complaint.  (Compl. Ex. 5 at pg. 17 of 21).  For the Court's convenience, I have included the relevant image here, with the FFE circled:



47.     I was personally involved in the closure of ML Fashion's retail store at the Greenwich Property.  As far as I am aware, although ML Fashion provided its landlord with a key to the property because ML Fashion had changed the locks during its tenancy, it never turned its copy of its key over to the landlord.

48.     It is my belief also that ML Fashion intended to remove all of the FFE from the Greenwich Property, rather than leave it there.  An ML Fashion employee working at my direction did remove some of the FFE.  That employee had intended to go back to remove the remainder of the FFE, but in the interim she received a series of threatening phone calls from Goureau.  As a

result of Goureau's conduct, she felt uncomfortable about returning to the Greenwich Property and was unable to complete the removal of the remaining FFE.

49.     In addition to the FFE that remained at the Greenwich Property, based upon my review of Nobelle's social media postings and other pictures of the interior of the Nobelle store, I believe that Nobelle is utilizing other FFE owned by ML Fashion.  In particular, as shown in Exhibit 5 to the Complaint, Nobelle appears to be using nesting tables owned by ML Fashion. (Compl. Ex. 5 at pg. 15 of 21).  For the Court's convenience, I have reproduced the relevant image from Exhibit 5 here:



50.     In addition, there is a metal, t-shaped stand shown under a chandelier, circled in red in the following picture of the interior of the Nobelle store, which I also believe is part of ML Fashion's FFE:



51.     I believe that Menkin may have taken this FFE from ML Fashion stores that were closed in 2018 and 2019.  In particular, I was involved with store closures of ML Fashion stores in Greenville, South Carolina and San Francisco, California, and am aware of a store closure in Syosset, New York that Menkin handled herself, in 2018 and 2019.  During the store closing process, Menkin advised that she would take care of the FFE, but never advised what became of it.  Menkin was in a position to control that FFE in her role as president of ML Fashion, and I believe she used her position to re-route the FFE for Nobelle's use at the Greenwich Property.

**Defendants' Theft of Trade Secrets and Computers**

52.     Defendants have also taken two computers that were located in a locked office in an ML Fashion-rented building in New York.  That office was not open to the general public, and could only be accessed by individuals with the proper authorization and with a key to get into the room.

53.     The computers previously belonged to ML Fashion's former controller and former bookkeeper.  Since the computers were utilized by the individuals overseeing, and compiling

information regarding, among other things, ML Fashion's finances and performance, as well as the company's books and records, the computers have significant confidential information on them.

54.     Among other things, the computers have information regarding ML Fashion's profitability year-over-year; its bills and invoices, including for the products ML Fashion sells at retail; the rent and utility payments at each of ML Fashion's locations; ML Fashion's banking information, including communications between ML Fashion and Chase Bank; documents relating to ML Fashion's landlords for its other retail stores; inventory information; and product levels in each of ML Fashion's retail stores.

55.     The computers also have software on them that allows users to remotely log into ML Fashion's point-of-sale or "POS" system and obtain ML Fashion's customer information if the computer user has active login credentials.  We will not be able to determine whether they did so until the computers are returned.

56.     I personally conducted an investigation regarding these computers, until my ability to remotely access the computers was severed by Defendants.  Based upon that investigation, I believe that there is no doubt that Defendants improperly accessed the highly confidential information on these computers.

57.     On August 4, 2020, user "Nicolas" (which I believe to have been Goureau) logged into the computer used by ML Fashion's former bookkeeper:



58.     On August 6, 2020, this same "Nicolas" user logged into the computer again, and attempted to install the Nobelle Realtime POS program on that computer:





59.     At that point, Goureau severed my ability to access the computers remotely, impairing my ability to access data on the computers and also preventing me from seeing what Defendants were doing with the computers.

60.     The second computer, which belonged to ML Fashion's former controller, Manish Karna, was similarly taken by Defendants and used for Nobelle business:





61.    Based upon my investigation, someone from Nobelle (from what I have learned so far, likely Menkin, Goureau or Nagrani) accessed this computer for Nobelle business, as depicted in the screenshots above, on or about August 31, 2020.

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed this __2__ day of February, 2021.

_____
Johnna Griep

19

# Exhibit A

Case 1:18-cv-05680 Document 766-1 Filed 06/26/20 Page 123 of 266 Page ID #:13922

**From:** Stephanie Menkin <stephanie.menkin@marcuslemonis.com>
**Sent:** Tuesday, January 14, 2020 4:54 PM
**To:** Halle Teiber <halle.teiber@frontdoorfashion.com>
**Cc:** Veronica Davis <veronica.davis@frontdoorfashion.com>; Courtney Denby <courtney.denby@frontdoorfashion.com>; Nina Lowe <nina.lowe@frontdoorfashion.com>; Front Door Fashion Buyer <buyer@frontdoorfashion.com>; Marcus Lemonis <marcus@marcuslemonis.com>; Johnna Griep <johnna.griep@marcuslemonis.com>
**Subject:** Re: Front Door Fashion Return & Inventory Call Outs

Thanks for the info

Stephanie Menkin
President
ML Fashion Group
500 7th Avenue, 8th Floor
New York, NY 10018



> On Jan 14, 2020, at 4:28 PM, Halle Teiber <halle.teiber@frontdoorfashion.com> wrote:
>
> Hi Stephanie,
>
> Please see FedEx tracking below for the 46 boxes returned to Sample Sale in New York.
>
> 779663974880 [fedex.com] - 15 boxes
> 779664710077 [fedex.com] - 15 boxes
> 779665961437 [fedex.com] - 16 boxes
>
> Thank you!
> Halle
>
> On Mon, Jan 13, 2020 at 1:55 PM Stephanie Menkin <stephanie.menkin@marcuslemonis.com> wrote:
>> Veronica,
>>
>> Thank you so much, this is all very helpful.  I should be able to give you ship address for the return product by tomorrow am.
>>
>> In the meantime, I will also review the info you sent.
>>
>> Thanks again,
>> **Stephanie Menkin**
>> President
>> ML Fashion Group
>> 500 7th Avenue, 8th Floor
>> New York, NY 10014
>>
>>
>> <5ADF5ECF-89EE-4E46-B2FB-535BF7D60B12[30].png>
>>
>>> On Jan 13, 2020, at 2:49 PM, Veronica Davis <veronica.davis@frontdoorfashion.com> wrote:
>>>
>>> <FDF MLFG RETURN 1.13.20.xls>

--

**Halle Teiber**

*Assistant Buyer*

**Front Door Fashion**
p:  469.351.7144
a:  2119 Farrington Street, Dallas, TX 75207 [maps.google.com]
w:  frontdoorfashion.com [frontdoorfashion.com]   e:  halle.teiber@frontdoorfashion.com

[facebook.com]     [instagram.com]

# Exhibit B

| Color | Designer | Description | Cost | Retail | QTY | Extended Cost |
|-------|----------|-------------|------|--------|-----|---------------|
| BLACK | 360 SWEATER | LES TANK SWEATER | $65.00 | $143.00 | 1 | $65.00 |
| HEATHER GREY BLACK | 360 SWEATER | BETSY TANK | $100.00 | $230.00 | 1 | $100.00 |
| NAVY | 525 AMERICA | SPACE DYE V TIE SIDE TOP | $12.50 | $75.00 | 1 | $12.50 |
| NAVY | 525 AMERICA | SPACE DYE V TIE SIDE TOP | $12.50 | $75.00 | 1 | $12.50 |
| BLACK WHITE | 525 AMERICA | SPACE DYE TUNIC | $22.50 | $67.50 | 2 | $45.00 |
| BLACK/WHITE | 525 AMERICA | SPACE DYE LACE UP SWEATSHIRT | $21.12 | $72.50 | 1 | $21.12 |
| WHITE BUTTERFLY | a.M | BADI BLOUSE | $50.49 | $178.00 | 1 | $50.49 |
| WHITE BUTTERFLY | a.M | BIBI BLOUSE | $42.22 | $164.00 | 1 | $42.22 |
| NAVY | ADD | DOWN JACKET | $155.00 | $372.00 | 1 | $155.00 |
| MMH | AG | RIBFALLON SWEATER TEE | $126.56 | $160.00 | 1 | $126.56 |
| SUNBURST | AGOLDE | CROPPED MUSCLE TEE | $40.00 | $88.00 | 1 | $40.00 |
| SUNBURST | AGOLDE | CROPPED MUSCLE TEE | $40.00 | $88.00 | 1 | $40.00 |
| SUNBURST | AGOLDE | CROPPED MUSCLE TEE | $40.00 | $88.00 | 2 | $80.00 |
| Temple | AGOLDE | SOPHIE HIGH RISE SKINNY CROP | | $158.00 | 1 | $0.00 |
| SABOTAGE | AGOLDE | SOPHIE HIGH RISE SKINNY CROP | $72.00 | $158.00 | 2 | $144.00 |
| DOVE | ALO YOGA | ABYSS TOP | $29.00 | $35.00 | 1 | $29.00 |
| BRULEE | AMANDA UPRICHARD | EILEEN TOP | $67.32 | $150.00 | 1 | $67.32 |
| IVORY | AMANDA UPRICHARD | ABBIE TOP | $61.20 | $150.00 | 1 | $61.20 |
| CHROME | AMANDA UPRICHARD | DENISE TOP | $64.80 | $170.00 | 1 | $64.80 |
| CHROME | AMANDA UPRICHARD | DENISE TOP | $64.80 | $170.00 | 1 | $64.80 |
| WHITE | AMINA RUBINACCI | WINOOW BLOUSE | $119.88 | $260.00 | 1 | $119.88 |
| WHITE | AMINA RUBINACCI | WINOOW BLOUSE | $119.88 | $260.00 | 1 | $119.88 |
| LIGHT PINK GREY | AMUSE | STARS JUMPER | $106.52 | $285.00 | 1 | $106.52 |
| LAVENDULA WHITE | AMUSE | KATIE SKULL SWEATER | $96.13 | $290.00 | 1 | $96.13 |
| LAVENDULA WHITE | AMUSE | KATIE SKULL SWEATER | $96.13 | $290.00 | 1 | $96.13 |
| CHERRY BLOSSOM | AMUSE | KATE SKULL SWEATER | $96.13 | $290.00 | 2 | $192.26 |
| CHERRY BLOSSOM | AMUSE | KATE SKULL SWEATER | $96.13 | $290.00 | 7 | $672.91 |
| CHERRY BLOSSOM | AMUSE | KATIE SKULL SWEATER | $96.13 | $290.00 | 2 | $192.26 |
| CHERRY BLOSSOM | AMUSE | KATIE SKULL SWEATER | $96.13 | $290.00 | 1 | $96.13 |
| ASH SNOW LUREX | AMUSE | ROLO ROUND SWEATER | $96.13 | $290.00 | 1 | $96.13 |
| ASH SNOW LUREX | AMUSE | ROLO ROUND SWEATER | $96.13 | $290.00 | 5 | $480.65 |
| LAVENDULA WHITE | AMUSE | KATIE SKULL SWEATER | $96.13 | $290.00 | 2 | $192.26 |
| LAVENDULA WHITE | AMUSE | KATIE SKULL SWEATER | $96.13 | $290.00 | 5 | $480.65 |
| ARMY GREEN WHITE | AMUSE | KATIE SKULL SWEATER | $94.28 | $290.00 | 3 | $282.84 |
| ARMY GREEN WHITE | AMUSE | KATIE SKULL SWEATER | $94.28 | $290.00 | 3 | $282.84 |
| ARMY GREEN WHITE | AMUSE | KATIE SKULL SWEATER | $94.28 | $290.00 | 3 | $282.84 |
| GLACIER | AMUSE | KATIE SKULL SWEATER | $94.28 | $290.00 | 3 | $282.84 |
| GLACIER | AMUSE | KATIE SKULL SWEATER | $94.28 | $290.00 | 3 | $282.84 |
| GLACIER | AMUSE | KATIE SKULL SWEATER | $94.28 | $290.00 | 3 | $282.84 |
| GLACIER | AMUSE | KATIE SKULL SWEATER | $94.28 | $290.00 | 3 | $282.84 |
| ANTIQUE WHITE | AMUSE | KATIE SKULL TOP | $89.47 | $290.00 | 3 | $268.41 |
| ANTIQUE WHITE | AMUSE | KATIE SKULL TOP | $89.47 | $290.00 | 3 | $268.41 |
| ANTIQUE WHITE | AMUSE | KATIE SKULL TOP | $89.47 | $290.00 | 3 | $268.41 |
| ANTIQUE WHITE | AMUSE | KATIE SKULL TOP | $89.47 | $290.00 | 2 | $178.94 |
| BLACK WHITE | AMUSE | KATIE SKULL SWEATER | $96.20 | $290.00 | 3 | $288.60 |
| BLACK WHITE | AMUSE | KATIE SKULL SWEATER | $96.20 | $290.00 | 3 | $288.60 |
| BLACK WHITE | AMUSE | KATIE SKULL SWEATER | $96.20 | $290.00 | 2 | $192.40 |
| BLACK WHITE | AMUSE | KATIE SKULL SWEATER | $96.20 | $290.00 | 2 | $192.40 |
| BLACK WHITE | AMUSE | BRODIE SKULL SWEATER | $94.28 | $290.00 | 3 | $282.84 |
| BLACK WHITE | AMUSE | BRODIE SKULL SWEATER | $94.28 | $290.00 | 3 | $282.84 |
| BLACK WHITE | AMUSE | BRODIE SKULL SWEATER | $94.28 | $290.00 | 3 | $282.84 |
| BLACK WHITE | AMUSE | BRODIE SKULL SWEATER | $94.28 | $290.00 | 3 | $282.84 |
| RED WHITE | AMUSE | BRODIE SKULL SWEATER | $89.47 | $290.00 | 3 | $268.41 |
| RED WHITE | AMUSE | BRODIE SKULL SWEATER | $89.47 | $290.00 | 1 | $89.47 |
| RED WHITE | AMUSE | BRODIE SKULL SWEATER | $89.47 | $290.00 | 3 | $268.41 |
| NAVY ORGANIC WHITE | AMUSE | KATIE SKULL SWEATER | $94.28 | $290.00 | 3 | $282.84 |
| NAVY ORGANIC WHITE | AMUSE | KATIE SKULL SWEATER | $94.28 | $290.00 | 3 | $282.84 |

| | | | | | | |
|---|---|---|---|---|---|---|
| NAVY ORGANIC WHITE | AMUSE | KATIE SKULL SWEATER | $94.28 | $290.00 | 2 | $188.56 |
| LIGHT PINK GRET | AMUSE | PEACE AND LOVE SWEATER | $96.13 | $295.00 | 1 | $96.13 |
| LIGHT PINK GRET | AMUSE | PEACE AND LOVE SWEATER | $96.13 | $295.00 | 1 | $96.13 |
| N/A | AMUSE | N/A | | $290.00 | 1 | $0.00 |
| N/A | AMUSE | N/A | | $290.00 | 1 | $0.00 |
| WHITE BLACK | ARCOBALENO | CAMILA CARDIGAN | $96.60 | $235.00 | 1 | $96.60 |
| WHITE BLACK | ARCOBALENO | CAMILA CARDIGAN | $82.80 | $235.00 | 1 | $82.80 |
| TAN/BROWN | AS BY DF | INDIE LEATHER TOP | $179.19 | $398.00 | 1 | $179.19 |
| OFF WHITE | AS BY DF | LEIA SUEDE TEE | $108.90 | $242.00 | 1 | $108.90 |
| OFF WHITE | AS BY DF | LEIA SUEDE TEE | $108.90 | $242.00 | 1 | $108.90 |
| OFF WHITE | AS BY DF | LEIA SUEDE TEE | $99.00 | $242.00 | 1 | $99.00 |
| OFF WHITE | AS BY DF | LEIA SUEDE TEE | $99.00 | $242.00 | 1 | $99.00 |
| BLACK | AS BY DF | LEIA SUEDE TEE | $108.90 | $242.00 | 1 | $108.90 |
| BLACK | ATM | SLUB SHORT SLEEVE PIPING TEE | $54.65 | $125.00 | 1 | $54.65 |
| BLACK | ATM | SLUB SHORT SLEEVE PIPING TEE | $54.65 | $125.00 | 1 | $54.65 |
| IVORY | ATM | COTTON BLEND CABLE SWEATER | $117.76 | $147.50 | 1 | $117.76 |
| IVORY | ATM | COTTON BLEND CABLE SWEATER | $117.76 | $147.50 | 1 | $117.76 |
| BLACK | ATM | L/S BOY TEE | | $98.00 | 1 | $0.00 |
| BLACK | ATM | L/S BOY TEE | | $98.00 | 1 | $0.00 |
| DEW | AUTUMN CASHMERE | COLORBLOCK DRAWSTRING CREW | $124.20 | $310.00 | 1 | $124.20 |
| ALUMINUM | AUTUMN CASHMERE | TIED SHOULDER TEE | $109.91 | $265.00 | 1 | $109.91 |
| BLACK | AUTUMN CASHMERE | SHADOW STRIPE V TOP | $69.00 | $175.00 | 1 | $69.00 |
| NAVY | AUTUMN CASHMERE | POINTELLE OPEN BACK TANK | $75.90 | $175.00 | 1 | $75.90 |
| MIST | AUTUMN CASHMERE | BOXY CROP CABLE SWEATER | $128.80 | $154.00 | 2 | $257.60 |
| MULCH/MIST | AUTUMN CASHMERE | DISTRESSED RUGBY SWEATER | $128.80 | $154.00 | 1 | $128.80 |
| PASTEL COMBO | AUTUMN CASHMERE | MULTI STRIPE TEXTURED CREW | $80.96 | $185.00 | 4 | $323.84 |
| WHITE | AUTUMN CASHMERE | LEOPARD TANK | $67.13 | $165.00 | 11 | $738.43 |
| WHITE | AUTUMN CASHMERE | LEOPARD TANK | $67.13 | $165.00 | 9 | $604.17 |
| WHITE | AUTUMN CASHMERE | LEOPARD TANK | $67.13 | $165.00 | 5 | $335.65 |
| WHITE | AUTUMN CASHMERE | LEOPARD TANK | $67.13 | $165.00 | 5 | $335.65 |
| CHERRY BLOSSOM | AUTUMN CASHMERE | SCALLOP SHAKER TANK | $60.72 | $140.00 | 1 | $60.72 |
| HYACINTH | AUTUMN CASHMERE | SCALLOP SHAKER TANK | $60.72 | $140.00 | 1 | $60.72 |
| ALUMINUM | AUTUMN CASHMERE | TIED SHOULDER TEE | $110.59 | $265.00 | 7 | $774.13 |
| BLACK | AUTUMN CASHMERE | SHADOW STRIPE V TOP | $75.90 | $175.00 | 1 | $75.90 |
| WHITE MARIGOLD | AUTUMN CASHMERE | TWO TONE GRID STITCH RAGLAN TOP | $78.20 | $195.00 | 3 | $234.60 |
| BLACK | AUTUMN CASHMERE | SHADOW STRIPE V TOP | $75.90 | $175.00 | 5 | $379.50 |
| NAVY | AUTUMN CASHMERE | SHAKER KEYHOLE BK V TOP | $87.96 | $210.00 | 2 | $175.92 |
| NAVY | AUTUMN CASHMERE | POINTELLE OPEN BACK TANK | $75.90 | $175.00 | 1 | $75.90 |
| PEPPER/BLACK ROSE | AUTUMN CASHMERE | CINCHED CUFF SWEATER | $115.00 | $150.00 | 1 | $115.00 |
| STARRY NIGHT PEWTER | AUTUMN CASHMERE | LEOPARD BOXY CREW SWEATER | $172.04 | $340.00 | 1 | $172.04 |
| BLACK WHITE MARIGOLD | AUTUMN CASHMERE | ATHLETIC SHAKER HALTER TOP | $64.40 | $165.00 | 1 | $64.40 |
| WHITE | AUTUMN CASHMERE | SHADOW STRIPE SWEATER | $75.90 | $175.00 | 1 | $75.90 |
| BLACK | AVENUE MONTAIGNE | PULL-ON PANT | $80.00 | $195.00 | 1 | $80.00 |
| BLACK | AVENUE MONTAIGNE | PULL-ON PANT | $80.00 | $195.00 | 1 | $80.00 |
| BLACK | AVENUE MONTAIGNE | PULLON PANT | $90.40 | $195.00 | 1 | $90.40 |
| BLACK | BAILEY 44 | PATISSAIRE LACE UP JERSEY TOP | $67.80 | $148.00 | 1 | $67.80 |
| CHALK MLT | BAILEY 44 | CUSTARD TART PUCKER STRIPE TANK | $58.70 | $128.00 | 2 | $117.40 |
| CHALK MLT | BAILEY 44 | CUSTARD TART PUCKER STRIPE TANK | $58.70 | $128.00 | 3 | $176.10 |
| PALM | BAILEY 44 | BONOBO SHEER TOP | $61.64 | $148.00 | 2 | $123.28 |
| PALM | BAILEY 44 | BONOBO SHEER TOP | $64.72 | $148.00 | 1 | $64.72 |
| PALM | BAILEY 44 | BONOBO SHEER TOP | $61.64 | $148.00 | 4 | $246.56 |
| WHITE | BAILEY 44 | SANCTUARY TOP | $61.64 | $148.00 | 1 | $61.64 |
| WHITE | BAILEY 44 | ADONIS CROSS FRONT TOP | $66.24 | $158.00 | 2 | $132.48 |
| WHITE | BAILEY 44 | ADONIS CROSS FRONT TOP | $66.24 | $158.00 | 2 | $132.48 |
| WHITE | BAILEY 44 | ADONIS CROSS FRONT TOP | $66.24 | $158.00 | 3 | $198.72 |
| PALM | BAILEY 44 | PASEO DEL PRADO PANT | $85.00 | $188.00 | 1 | $85.00 |
| STONE | BAREFOOT DREAMS | TRAVEL SHAWL | $50.00 | $110.00 | 1 | $50.00 |
| CHARCOAL | BELLA LUX | SUE RIB CAP SLEEVE | | $78.00 | 1 | $0.00 |

| | | | | | | |
|---|---|---|---|---|---|---|
| BLACK | BLANK NYC | RAVEN FEATHER VELVET PANT | $40.79 | $88.00 | 1 | $40.79 |
| HUNTER | BLUE BLUSH | TWISTED BACK TIE CROP TOP | $15.00 | $42.00 | 1 | $15.00 |
| ASTER | BROCHU WALKER | JOHAN CREW SWEATER | $192.06 | $428.00 | 2 | $384.12 |
| ASTER | BROCHU WALKER | JOHAN CREW SWEATER | $192.06 | $428.00 | 3 | $576.18 |
| ASTER | BROCHU WALKER | JOHAN CREW SWEATER | $192.06 | $428.00 | 5 | $960.30 |
| RAINBOW | BROCHU WALKER | MAYA SWEATSHIRT | $179.10 | $438.00 | 2 | $358.20 |
| JUTE | BROCHU WALKER | TARA PANT | $122.40 | $298.00 | 1 | $122.40 |
| JUTE | BROCHU WALKER | TARA PANT | $122.40 | $298.00 | 1 | $122.40 |
| JUTE | BROCHU WALKER | LAILA CAMI | $109.80 | $268.00 | 5 | $549.00 |
| JUTE | BROCHU WALKER | LAILA CAMI | $109.80 | $268.00 | 5 | $549.00 |
| BERGEN BLUE | BROCHU WALKER | TESSA WRAP PO | $178.54 | $175.00 | 1 | $178.54 |
| NIGHTSTONE NAVY | BROCHU WALKER | NILE LAYERED | $155.66 | $159.00 | 1 | $155.66 |
| SALT PEPPER COMBO | BROCHU WALKER | FELIA POPOVER | $121.31 | $125.00 | 2 | $242.62 |
| SALT PEPPER COMBO | BROCHU WALKER | FELIA POPOVER | $121.31 | $125.00 | 1 | $121.31 |
| SALT PEPPER COMBO | BROCHU WALKER | FELIA POPOVER | $121.31 | $125.00 | 1 | $121.31 |
| BLACK ONYX | BROCHU WALKER | ALDA PANT | $174.02 | $175.00 | 2 | $348.04 |
| COVERT GREY | BROCHU WALKER | ALBO SWEATSHIRT | $158.00 | $175.00 | 1 | $158.00 |
| COVERT GREY | BROCHU WALKER | ALBO SWEATSHIRT | $158.00 | $175.00 | 1 | $158.00 |
| MOONSTONE MELANGE | BROCHU WALKER | CLOE CREW SWEATER | $138.60 | $169.00 | 1 | $138.60 |
| INDIGO NAVY | BROCHU WALKER | FLORES OFF THE SHOULDER SWEATER | $150.30 | $184.00 | 1 | $150.30 |
| DOVER WHITE | BROCHU WALKER | LUKAS TANK | $104.00 | $230.00 | 1 | $104.00 |
| PALOMA | BROCHU WALKER | SHORB TEE | $61.93 | $148.00 | 1 | $61.93 |
| PALOMA | BROCHU WALKER | MILAM TEE | $70.25 | $168.00 | 2 | $140.50 |
| OLYMPUS WHITE | BROCHU WALKER | ELLA TANK | $61.93 | $148.00 | 1 | $61.93 |
| OLYMPUS WHITE | BROCHU WALKER | ELLA TANK | $61.93 | $148.00 | 3 | $185.79 |
| NUBIA COMBO | BROCHU WALKER | ALEKS V-NECK TANK | $126.00 | $139.00 | 1 | $126.00 |
| LILAC ASH | BROCHU WALKER | FRANS TANK | $129.20 | $149.50 | 2 | $258.40 |
| LILAC ASH | BROCHU WALKER | FRANS TANK | $129.20 | $149.50 | 1 | $129.20 |
| LILAC ASH | BROCHU WALKER | FRANS TANK | $129.20 | $149.50 | 1 | $129.20 |
| REVERIE MELANGE | BROCHU WALKER | ADRIA TANK | $119.70 | $280.00 | 1 | $119.70 |
| PUMICE | BROCHU WALKER | MABEL LAYERED PULLOVER | $136.80 | $320.00 | 1 | $136.80 |
| PUMICE | BROCHU WALKER | MABEL LAYERED PULLOVER | $136.80 | $320.00 | 1 | $136.80 |
| OLYMPUS WHITE STRIPE | BROCHU WALKER | HARLAND TEE | $108.15 | $258.00 | 1 | $108.15 |
| OTTER | BROCHU WALKER | LEVI TANK | $143.55 | $318.00 | 2 | $287.10 |
| PARCHMENT WHITE | BROCHU WALKER | MYA TIE TOP | $154.00 | $170.00 | 1 | $154.00 |
| SALT WHITE | BROCHU WALKER | FINN BLOUSE | $134.10 | $328.00 | 1 | $134.10 |
| SALT WHITE | BROCHU WALKER | FINN BLOUSE | $134.10 | $328.00 | 1 | $134.10 |
| WHITE POPLIN | BROCHU WALKER | ADELE POPOVER | $163.90 | $165.00 | 1 | $163.90 |
| BONE | BROCHU WALKER | HARLEY TANK | $156.73 | $318.00 | 1 | $156.73 |
| BLACK ONYX | BROCHU WALKER | ASHBY SWEATER | $154.00 | $170.00 | 1 | $154.00 |
| ANTIQUE WHITE BLACK | BRODIE | HORSE SHOE WRIST WARMER | $22.54 | $60.00 | 2 | $45.08 |
| ARMY GREEN | BRODIE | ORION STAR WRIST WARMER | $22.52 | $60.00 | 1 | $22.52 |
| WHITE/EMERALD | BRODIE | FLASH JUMPER | $106.25 | $135.00 | 3 | $318.75 |
| WHITE/EMERALD | BRODIE | FLASH JUMPER | $106.25 | $135.00 | 2 | $212.50 |
| WHITE/EMERALD | BRODIE | FLASH JUMPER | $106.25 | $135.00 | 4 | $425.00 |
| WHITE/EMERALD | BRODIE | FLASH JUMPER | $106.25 | $135.00 | 6 | $637.50 |
| MID GREY | BRODIE | LOVE BUG JUMPER | $114.75 | $150.00 | 2 | $229.50 |
| MID GREY | BRODIE | LOVE BUG JUMPER | $114.75 | $150.00 | 1 | $114.75 |
| MID GREY | BRODIE | LOVE BUG JUMPER | $114.75 | $150.00 | 2 | $229.50 |
| BLACK/GOLD | BRODIE | KISS JUMPER | $127.16 | $165.00 | 2 | $254.32 |
| OFF WHITE/GREY | BRODIE | FLOWER PRINTED JUMPER | $117.80 | $285.00 | 1 | $117.80 |
| WHITE GREY | BRODIE | FLOWER PRINTED JUMPER | $117.80 | $285.00 | 2 | $235.60 |
| OFF WHITE/GREY | BRODIE | FLOWER PRINTED JUMPER | $117.80 | $285.00 | 1 | $117.80 |
| WHITE GREY | BRODIE | FLOWER PRINTED JUMPER | $117.80 | $285.00 | 3 | $353.40 |
| LT PINK | BRODIE | MINI HOOD PONCHO 7GG LOOSE | $69.42 | $235.00 | 1 | $69.42 |
| MORNING DEW | BRODIE | MINI PONCHO | $53.82 | $180.00 | 2 | $107.64 |
| OLTBRWN/OWHTL | BRODIE | STAR BOYFRIEND CARDIGAN 12GG | $139.62 | $470.00 | 1 | $139.62 |
| NAVY | BRODIE | HANNAH CARDIGAN 12GG | $61.62 | $210.00 | 1 | $61.62 |

| BADGER | BRODIE | MISS DAISY TOP | $85.08 | $310.00 | 1 | $85.08 |
|---|---|---|---|---|---|---|
| CORAL | BRODIE | HANNAH CARDIGAN | $71.89 | $210.00 | 1 | $71.89 |
| BLACK/SILVER | BROKEN HEART | HEART PATCH HOODIE | $37.40 | $98.00 | 1 | $37.40 |
| BLACK/SILVER | BROKEN HEART | HEART PATCH HOODIE | $37.40 | $98.00 | 1 | $37.40 |
| BLACK/SILVER | BROKEN HEART | HEART PATCH HOODIE | $37.40 | $98.00 | 3 | $112.20 |
| BLACK/RED | BROKEN HEART | SWEATSHIRT HOODIE W HEART PATC | $37.40 | $98.00 | 1 | $37.40 |
| BLACK/RED | BROKEN HEART | SWEATSHIRT HOODIE W HEART PATC | $37.40 | $98.00 | 1 | $37.40 |
| BLACK/WHITE | BROKEN HEART | HEART PATCH HOODIE | $37.40 | $98.00 | 3 | $112.20 |
| BLACK/WHITE | BROKEN HEART | HEART PATCH HOODIE | $37.40 | $98.00 | 1 | $37.40 |
| BLACK/WHITE | BROKEN HEART | HEART PATCH HOODIE | $37.40 | $98.00 | 2 | $74.80 |
| WHS | CALVIN RUCKER | CR THERE YOU GO SKIRT | $50.85 | $325.00 | 1 | $50.85 |
| BLK | CALVIN RUCKER | WALKIN ON THE SUN CHINO | $23.17 | $115.00 | 1 | $23.17 |
| BLK | CALVIN RUCKER | CR TRU LOVE | $50.85 | $325.00 | 1 | $50.85 |
| BLK | CALVIN RUCKER | CR TRU LOVE | $50.85 | $325.00 | 1 | $50.85 |
| BLK | CALVIN RUCKER | CR TRU LOVE | $50.85 | $325.00 | 1 | $50.85 |
| BLK | CALVIN RUCKER | CR ADDICTED TO LOVE RIDING JOD | $50.85 | $127.50 | 2 | $101.70 |
| BLACK | CALVIN RUCKER | LETS GET IT ON PANT | $25.63 | $240.00 | 1 | $25.63 |
| OFF WHITE | CALVIN RUCKER | NOTHING COMPARES TO YOU BLOUSE | $56.25 | $142.50 | 1 | $56.25 |
| SALT | CHASER | DEJA VU TEE | $32.40 | $79.00 | 1 | $32.40 |
| WHITE | CHASER | JERSEY FOOTBALL TEE | $24.30 | $60.00 | 1 | $24.30 |
| IVORY | CHELSEA AND WALKER | RYAN SILK PULLOVER | $105.30 | $258.00 | 1 | $105.30 |
| WHITE | CHRISTINE ALCALAY | CHARMEUSE SILK BLOUSE | $169.00 | $350.00 | 1 | $169.00 |
| WHITE | CHRISTINE ALCALAY | CHARMEUSE SILK BLOUSE | $185.90 | $375.00 | 1 | $185.90 |
| PLAID | CHRISTINE ALCALAY | DANNY BLOUSE | $159.00 | $175.00 | 1 | $159.00 |
| OP WHT | CITIZENS OF HUMANITY | CITIZENS HI LO TEE | $63.00 | $138.00 | 1 | $63.00 |
| SADDLE | CLARIDGE + KING | SUEDE IVY TOP | $61.20 | $150.00 | 1 | $61.20 |
| SADDLE | CLARIDGE + KING | SUEDE IVY TOP | $61.20 | $150.00 | 1 | $61.20 |
| BLACK POPLIN | CLARIDGE + KING | MICHAELA TUNIC | $61.20 | $150.00 | 6 | $367.20 |
| BLACK POPLIN | CLARIDGE + KING | MICHAELA TUNIC | $61.20 | $150.00 | 6 | $367.20 |
| BLACK POPLIN | CLARIDGE + KING | MICHAELA TUNIC | $61.20 | $150.00 | 6 | $367.20 |
| ORANGE | COOPER & ELLA | OLIVIA CAMI | $34.85 | $98.00 | 1 | $34.85 |
| ABSTRACT POLKA | COOPER & ELLA | LUNA TANK | $45.90 | $128.00 | 1 | $45.90 |
| NAVY | COURAGE B | COURAGE PANT | n/a | $148.00 | 1 | |
| ENVY | CURRENT/ELLIOTT | N/A | | $248.00 | 1 | $0.00 |
| BLACK | DAVID LERNER NEW YORK | ELLIOT HIGH-WAISTED LEGGING | $58.50 | $71.50 | 1 | $58.50 |
| WHITE | DAVID LERNER NEW YORK | NECK TIE BLOUSE | $81.00 | $198.00 | 1 | $81.00 |
| WHITE | DAVID LERNER NEW YORK | DROP SHLDR RUFFLE SLV TEE | $30.60 | $75.00 | 1 | $30.60 |
| WHITE STRIPE | DAVID LERNER NEW YORK | BUTTON UP TOP | $82.50 | $165.00 | 1 | $82.50 |
| WHITE STRIPE | DAVID LERNER NEW YORK | BUTTON UP TOP | $82.50 | $165.00 | 1 | $82.50 |
| BLACK | DAVID LERNER NEW YORK | GEMMA LEGGING | $64.80 | $158.00 | 2 | $129.60 |
| BLACK | DAVID LERNER NEW YORK | GEMMA LEGGING | $64.80 | $158.00 | 2 | $129.60 |
| BLACK | DAVID LERNER NEW YORK | CORSET LEGGING | $63.00 | $154.00 | 4 | $252.00 |
| BLACK | DAVID LERNER NEW YORK | CORSET LEGGING | $63.00 | $154.00 | 1 | $63.00 |
| BLACK | DAVID LERNER NEW YORK | CORSET LEGGING | $63.00 | $154.00 | 1 | $63.00 |
| BLACK | DAVID LERNER NEW YORK | WIDE CORSET BACK CROP PANT | $56.70 | $168.00 | 1 | $56.70 |
| BLACK | DAVID LERNER NEW YORK | WIDE CORSET BACK CROP PANT | $56.70 | $168.00 | 1 | $56.70 |
| BLACK | DAVID LERNER NEW YORK | GEMMA LEGGING | $73.22 | $158.00 | 1 | $73.22 |
| BLACK | DAVID LERNER NEW YORK | VEGAN COMBO | $99.00 | $230.00 | 1 | $99.00 |
| BLACK | DAVID LERNER NEW YORK | UP FRONT LEGGING | $79.20 | $185.00 | 1 | $79.20 |
| BLACK | DAVID LERNER NEW YORK | ELLIOT HIGH-WAISTED LEGGING | $58.50 | $71.50 | 1 | $58.50 |
| CLASSIC BLACK | DAVID LERNER NEW YORK | THE CLASSIC - 8" RISE | $40.00 | $90.00 | 7 | $280.00 |
| CLASSIC BLACK | DAVID LERNER NEW YORK | THE CLASSIC - 8" RISE | $40.00 | $90.00 | 2 | $80.00 |
| BLACK | DAVID LERNER NEW YORK | THE HIGH RISE LEGGING | $36.00 | $90.00 | 1 | $36.00 |
| GREEN | DAYDREAMER | LOST ANGEL SWEATSHIRT | $46.53 | $115.00 | 1 | $46.53 |
| GREEN | DAYDREAMER | LOST ANGEL SWEATSHIRT | $46.53 | $115.00 | 2 | $93.06 |
| MULTI | DELFI | MARIA TOP | $98.00 | $235.00 | 1 | $98.00 |
| MULTI | DELFI | MARIA TOP | $98.00 | $235.00 | 1 | $98.00 |
| BLACK | DIMONI DESIGNS | 3 ARM CASHMERE PONCHO | $256.41 | $595.00 | 1 | $256.41 |

| | | | | | | |
|---|---|---|---|---|---|---|
| GREY | DIMONI DESIGNS | 3 ARM CASHMERE PONCHO | $256.41 | $595.00 | 2 | $512.82 |
| DAVIDSON | DL1961 | LARA CROPPED FL | | $198.00 | 1 | $0.00 |
| DAVIDSON | DL1961 | LARA CROPPED FL | | $198.00 | 1 | $0.00 |
| BELGROVE | DL1961 | MARGAUX ANKLE SKINNY | | $178.00 | 1 | $0.00 |
| HEATHER | DL1961 | EMMA JEAN | | $185.00 | 1 | $0.00 |
| WHITE PIQUE | EAST2WEST | PULL ON STRETCH PANT | $41.80 | $119.00 | 1 | $41.80 |
| WHITE VELVET DOT | EAST2WEST | ANKLE TRAVELER | $45.00 | $145.00 | 1 | $45.00 |
| WHITE VELVET DOT | EAST2WEST | ANKLE TRAVELER | $45.00 | $145.00 | 1 | $45.00 |
| SPLATTER | EAST2WEST | ANKLE TRAVELER | $38.00 | $145.00 | 1 | $38.00 |
| SPLATTER | EAST2WEST | ANKLE TRAVELER | $38.00 | $145.00 | 1 | $38.00 |
| GREY | EAST2WEST | ANKLE TRAVELER | $40.00 | $72.50 | 1 | $40.00 |
| WHITE STICKS | EAST2WEST | ANKLE TRAVELER | $49.40 | $145.00 | 1 | $49.40 |
| BLACK VELVET | EAST2WEST | ANKLE TRAVELER PANT | $55.31 | $145.00 | 1 | $55.31 |
| BLACK VELVET DOTS | EAST2WEST | ANKLE TRAVELER PANT | $55.31 | $145.00 | 3 | $165.93 |
| BLACK VELVET DOTS | EAST2WEST | ANKLE TRAVELER PANT | $55.31 | $145.00 | 3 | $165.93 |
| BLACK VELVET DOTS | EAST2WEST | ANKLE TRAVELER PANT | $55.31 | $145.00 | 3 | $165.93 |
| BLACK VELVET DOTS | EAST2WEST | ANKLE TRAVELER PANT | $55.31 | $145.00 | 4 | $221.24 |
| BLACK VELVET DOTS | EAST2WEST | ANKLE TRAVELER PANT | $55.31 | $145.00 | 1 | $55.31 |
| BLACK VELVET DOTS | EAST2WEST | ANKLE TRAVELER PANT | $55.31 | $145.00 | 4 | $221.24 |
| BLACK VELVET DOTS | EAST2WEST | ANKLE TRAVELER PANT | $55.31 | $145.00 | 2 | $110.62 |
| RED | EAST2WEST | ANKLE TRAVELER PANT | $53.20 | $145.00 | 1 | $53.20 |
| RED | EAST2WEST | ANKLE TRAVELER PANT | $53.20 | $145.00 | 1 | $53.20 |
| RED | EAST2WEST | ANKLE TRAVELER PANT | $53.20 | $145.00 | 1 | $53.20 |
| WB SPLATTER | EAST2WEST | ANKLE TRAVELER | $38.00 | $145.00 | 2 | $76.00 |
| SPLATTER | EAST2WEST | ANKLE TRAVELER | $38.00 | $145.00 | 1 | $38.00 |
| SPLATTER | EAST2WEST | ANKLE TRAVELER | $38.00 | $145.00 | 1 | $38.00 |
| WB SPLATTER | EAST2WEST | ANKLE TRAVELER | $38.00 | $145.00 | 1 | $38.00 |
| BLACK | EAST2WEST | ANKLE TRAVELER | $51.30 | $72.50 | 1 | $51.30 |
| BLACK | EAST2WEST | ANKLE TRAVELER | $51.30 | $72.50 | 1 | $51.30 |
| BLACK | EAST2WEST | ANKLE TRAVELER | $40.00 | $145.00 | 2 | $80.00 |
| BLACK | EAST2WEST | VELVET ANKLE TRAVELER | $40.00 | $145.00 | 1 | $40.00 |
| | 9 ELEVENTY | EMMARIE FULL ZIP HOODIE | $174.38 | $1,395.00 | 1 | $174.38 |
| GREEN | ELEVENTY | ENID NEW YORK PANTS | $47.50 | $237.50 | 1 | $47.50 |
| GREEN | ELEVENTY | ENID NEW YORK PANTS | $47.50 | $237.50 | 1 | $47.50 |
| STONE | ELEVENTY | ERYNN NO POCKET PANTS | $37.50 | $375.00 | 1 | $37.50 |
| BLACK | ELIZABETH & JAMES | EDDINE TWILL PANT | $147.00 | $162.50 | 1 | $147.00 |
| BLACK | ENRICA | CAREY TOP | $138.60 | $315.00 | 1 | $138.60 |
| BLU/WHT | ENZA COSTA | ITALIAN EASY S/S STRP V | $56.00 | $123.20 | 1 | $56.00 |
| BLU/WHT | ENZA COSTA | ITALIAN EASY S/S STRP V | $56.00 | $123.20 | 2 | $112.00 |
| BLU/WHT | ENZA COSTA | ITALIAN EASY S/S STRP V | $56.00 | $123.20 | 1 | $56.00 |
| BLK/WHT | ENZA COSTA | ITALIAN EASY S/S STRP V | $56.00 | $123.20 | 1 | $56.00 |
| PEBBLE | ENZA COSTA | CASH THERMAL BASEBALL TANK | $75.00 | $175.00 | 1 | $75.00 |
| PEBBLE | ENZA COSTA | CASH THERMAL BASEBALL TANK | $75.00 | $175.00 | 2 | $150.00 |
| PEBBLE | ENZA COSTA | CASH THERMAL BASEBALL TANK | $75.00 | $175.00 | 2 | $150.00 |
| BLK/WHT | ENZA COSTA | ITALIAN STRP SCOOP TANK | $50.00 | $110.00 | 6 | $300.00 |
| BLK/WHT | ENZA COSTA | ITALIAN STRP SCOOP TANK | $50.00 | $110.00 | 4 | $200.00 |
| RD/WHT | ENZA COSTA | ITALIAN STRP SCOOP TANK | $50.00 | $110.00 | 1 | $50.00 |
| RD/WHT | ENZA COSTA | ITALIAN STRP SCOOP TANK | $50.00 | $110.00 | 3 | $150.00 |
| RD/WHT | ENZA COSTA | ITALIAN STRP SCOOP TANK | $50.00 | $110.00 | 1 | $50.00 |
| BLACK | ENZA COSTA | JERSEY SEAMED MINI DRESS | $102.00 | $224.40 | 2 | $204.00 |
| BLACK | ENZA COSTA | JERSEY SEAMED MINI DRESS | $102.00 | $224.40 | 2 | $204.00 |
| SMOKE/WHITE | ENZA COSTA | CASH STRIPE EASY SWEATSHIRT | $120.00 | $280.00 | 1 | $120.00 |
| SMOKE/WHITE | ENZA COSTA | CASH STRIPE EASY SWEATSHIRT | $120.00 | $280.00 | 1 | $120.00 |
| SMOKE/WHITE | ENZA COSTA | CASH STRIPE EASY SWEATSHIRT | $120.00 | $280.00 | 2 | $240.00 |
| BALTIC/WHT | ENZA COSTA | BRACLET SLV BSBLL CREW | $90.00 | $198.00 | 8 | $720.00 |
| BALTIC/WHT | ENZA COSTA | BRACLET SLV BSBLL CREW | $90.00 | $198.00 | 2 | $180.00 |
| BALTIC/WHT | ENZA COSTA | BRACLET SLV BSBLL CREW | $90.00 | $198.00 | 4 | $360.00 |
| BALTIC/WHT | ENZA COSTA | BRACLET SLV BSBLL CREW | $90.00 | $198.00 | 4 | $360.00 |

| | | | | | | |
|---|---|---|---|---|---|---|
| SANGRIA BLACK | ENZA COSTA | 3/4 SLEEVE RUCHED BACK TOP | $57.00 | $135.00 | 1 | $57.00 |
| BLACK | ENZA COSTA | CROPPED WIDE SLEEVE HOODIE | $80.00 | $185.00 | 1 | $80.00 |
| WHITE | ENZA COSTA | CASHMERE CUFFED TOP | $74.00 | $170.00 | 1 | $74.00 |
| WHITE | ENZA COSTA | CASHMERE CUFFED TOP | $74.00 | $170.00 | 1 | $74.00 |
| PEBBLE | ENZA COSTA | CASHMERE CUFFED TOP | $74.00 | $170.00 | 1 | $74.00 |
| PEBBLE | ENZA COSTA | CASHMERE CUFFED TOP | $74.00 | $170.00 | 1 | $74.00 |
| VIPER RINSE | FIDELITY | LILY JEAN | $76.80 | $174.00 | 1 | $76.80 |
| HIGHGATE | FRAME | LE SKINNY DE JEAN | $118.65 | $240.00 | 1 | $118.65 |
| BLANC | FRAME | LE CUT OFF SHORT | $93.60 | $179.00 | 1 | $93.60 |
| BLANC MULTI | FRAME | RACER TANK | $42.00 | $95.00 | 1 | $42.00 |
| BLANC MULTI | FRAME | OPEN NECK | $55.00 | $125.00 | 1 | $55.00 |
| BLANC MULTI | FRAME DENIM | RACER TANK | $42.00 | $95.00 | 1 | $42.00 |
| BLANC | FRAME DENIM | TIE POPLIN TOP | $103.00 | $235.00 | 1 | $103.00 |
| OFF WHITE | FRAME DENIM | HIGH LOW CREW | $145.77 | $147.50 | 1 | $145.77 |
| BLANC MULTI | FRAME DENIM | LINEN RINGER TEE | $46.00 | $105.00 | 3 | $138.00 |
| GOLDEN HAZE | FRAME DENIM | ONE SIDE STRIPE TOP | $105.00 | $240.00 | 1 | $105.00 |
| NAVY | FRAME DENIM | SCALLOPED BELL SLEEVE | $64.00 | $145.00 | 1 | $64.00 |
| NAVY MULTI | FRAME DENIM | CALI TOP | $142.00 | $325.00 | 1 | $142.00 |
| OFF WHITE MULTI | FRAME DENIM | CLEAN COLLAR TOP | $114.00 | $260.00 | 1 | $114.00 |
| OFF WHITE MULTI | FRAME DENIM | CLEAN COLLAR TOP | $114.00 | $260.00 | 1 | $114.00 |
| BLANC MULTI | FRAME DENIM | CLEAN COLLARED SHIRT | $117.00 | $269.00 | 1 | $117.00 |
| BLANC MULTI | FRAME DENIM | CLEAN COLLARED SHIRT | $117.00 | $269.00 | 1 | $117.00 |
| BLANC MULTI | FRAME DENIM | CLEAN COLLARED SHIRT | $117.00 | $269.00 | 1 | $117.00 |
| BLANC MULTI | FRAME DENIM | BUTTON UP GAUZE TOP | $114.00 | $260.00 | 1 | $114.00 |
| OFF WHITE | FRAME DENIM | BOW SWEATSHIRT | $92.00 | $215.00 | 1 | $92.00 |
| OLIVE | G1 | VACATION PANT | $79.00 | $185.00 | 1 | $79.00 |
| MULTI | GALADRIEL MATTEI | RELAXED FIT CREW NECK TOP | $171.00 | $440.00 | 1 | $171.00 |
| PINE | GINIA | EVA V-NECK CAMI | $48.59 | $47.50 | 1 | $48.59 |
| SMALL TALK | GRLFRND | RHODA SKIRT | $85.00 | $188.00 | 2 | $170.00 |
| BLOWN | GRLFRND | MILLA SKIRT | $136.00 | $298.00 | 1 | $136.00 |
| CHALK | HALSTON | LONG SLEEVE V-NECK PLEATED TOP | $112.50 | $275.00 | 1 | $112.50 |
| CHALK | HALSTON | LONG SLEEVE EMBROIDERED TOP | $153.00 | $187.50 | 1 | $153.00 |
| CHALK | HALSTON | LONG SLEEVE EMBROIDERED TOP | $153.00 | $187.50 | 1 | $153.00 |
| HEATHER GREY | HALSTON | COLD SHOULDER SWEATER | $133.65 | $142.50 | 2 | $267.30 |
| CHALK/BLACK STRIPE | HALSTON | OVERSIZED STRIPE TOP | $121.50 | $147.50 | 1 | $121.50 |
| HEATHER CHAMBRAY | HALSTON | OVERSIZED CHAMBRAY TOP | $121.50 | $295.00 | 1 | $121.50 |
| CHALK | HALSTON | CRINKLE CREPE WIDE LEG PANT | $135.00 | $325.00 | 1 | $135.00 |
| DENIM TEXT | HALSTON | CAP SLEEVE RUCHED SCOOP NECK TOP | $112.50 | $275.00 | 1 | $112.50 |
| DENIM TEXT | HALSTON | CAP SLEEVE RUCHED SCOOP NECK TOP | $112.50 | $275.00 | 2 | $225.00 |
| DENIM PRINT | HALSTON | V-NECK PRINTED SWEATER | $121.50 | $147.50 | 1 | $121.50 |
| STONE | HALSTON | LONG SLEEVE STRIPED SHIRT | $121.50 | $147.50 | 1 | $121.50 |
| STONE | HALSTON | LONG SLEEVE STRIPED SHIRT | $121.50 | $147.50 | 1 | $121.50 |
| FUCHSIA/TULIP | HALSTON | N/A | | $275.00 | 1 | $0.00 |
| GREY | HANNES ROETHER | RIBBED SWEATER | $110.00 | $155.00 | 2 | $220.00 |
| PINK | HAPPY SHEEP | STRIPED CREW SWEATER | $153.60 | $197.50 | 3 | $460.80 |
| PINK | HAPPY SHEEP | STRIPED CREW SWEATER | $153.60 | $197.50 | 5 | $768.00 |
| BLS | HAPPY SHEEP | PEACE CREW NECK | $143.75 | $187.50 | 1 | $143.75 |
| BLS | HAPPY SHEEP | PEACE CREW NECK | $143.75 | $187.50 | 2 | $287.50 |
| BLS | HAPPY SHEEP | PEACE CREW NECK | $143.75 | $187.50 | 3 | $431.25 |
| MULTI | HAPPY SHEEP | BUGS SWEATER | $166.00 | $207.50 | 1 | $166.00 |
| BLACK | HAUTE HIPPIE | T-SHIRT WITH GUNMETAL BEADING | $165.60 | $395.00 | 1 | $165.60 |
| PALE PINK | HAUTE HIPPIE | VIDA COLD SHOULDER TOP | $134.00 | $295.00 | 1 | $134.00 |
| SWAN | HAUTE HIPPIE | REFLECTED LIGHT TIE BLOUSE | $120.60 | $147.50 | 1 | $120.60 |
| BLACK | HIPCHIK | FOREVER GRATEFUL BLAZER | $150.00 | $330.00 | 2 | $300.00 |
| BLACK | HIPCHIK | MINI BUTTERFLY BLAZER | $150.00 | $330.00 | 1 | $150.00 |
| BLACK | HIPCHIK | LARGE BUTTERFLY BLAZER | $150.00 | $330.00 | 1 | $150.00 |
| GINGHAM | HIPCHIK | SMILEY BLAZER | $150.00 | $330.00 | 1 | $150.00 |
| WHITE | HUBERT GASSER | LUREX SWEATER | $98.10 | $250.00 | 1 | $98.10 |

| | | | | | | |
|---|---|---|---|---|---|---|
| SILVER | HUBERT GASSER | LUREX SINGLE BUTTON BLAZER | $192.06 | $460.00 | 1 | $192.06 |
| SILVER | HUBERT GASSER | LUREX SINGLE BUTTON BLAZER | $192.06 | $460.00 | 3 | $576.18 |
| SILVER | HUBERT GASSER | LUREX SINGLE BUTTON BLAZER | $192.06 | $460.00 | 1 | $192.06 |
| BEECH | INHABIT | SIDE KNOT V-NECK TOP | $30.00 | $77.50 | 1 | $30.00 |
| WILLOW | INHABIT | LONG SLEEVE LINEN CREW TOP | $118.80 | $280.00 | 1 | $118.80 |
| WILLOW | INHABIT | LONG SLEEVE LINEN CREW TOP | $118.80 | $280.00 | 1 | $118.80 |
| BLACK | INHABIT | CAMRI TEE | $42.19 | $200.00 | 1 | $42.19 |
| LAVENDER | INHABIT | CARALEA TANK | $24.38 | $145.00 | 1 | $24.38 |
| LAVENDER | INHABIT | CARALEA TANK | $24.38 | $145.00 | 1 | $24.38 |
| GREY | INHABIT | CARALEA TANK | $21.45 | $145.00 | 1 | $21.45 |
| WHITE | INHABIT | CARALEA TANK | $58.00 | $145.00 | 1 | $58.00 |
| WHITE | INHABIT | CARALEA TANK | $58.00 | $145.00 | 1 | $58.00 |
| WILLOW | INHABIT | BUTTON STRETCH CASHMERE SWEATER | $168.30 | $395.00 | 7 | $1,178.10 |
| WILLOW | INHABIT | BUTTON STRETCH CASHMERE SWEATER | $168.30 | $395.00 | 3 | $504.90 |
| WILLOW | INHABIT | BUTTON STRETCH CASHMERE SWEATER | $168.30 | $395.00 | 4 | $673.20 |
| WILLOW | INHABIT | POINTELLE CREW CASHMERE SWEATER | $143.55 | $335.00 | 6 | $861.30 |
| LOTUS | INHABIT | WAFFLE STRIPE CASHMERE SWEATER | $168.30 | $395.00 | 3 | $504.90 |
| LOTUS | INHABIT | WAFFLE STRIPE CASHMERE SWEATER | $168.30 | $395.00 | 4 | $673.20 |
| LOTUS | INHABIT | CUFFED CREW LONG SLEEVE TEE | $123.75 | $290.00 | 1 | $123.75 |
| FLAGSTONE | INHABIT | POINTELLE LINEN CREW TOP | $143.55 | $335.00 | 2 | $287.10 |
| FUSE | INHABIT | CASH LINEN CARDIGAN | $50.00 | $285.00 | 1 | $50.00 |
| BLACK | INHABIT | TISSUE CREW SWEATER | $130.50 | $320.00 | 1 | $130.50 |
| BLACK | INHABIT | MIDNIGHT DUSTER | $190.58 | $390.00 | 2 | $381.16 |
| BLACK | INTROPIA | KNIT SKIRT | $77.90 | $205.00 | 1 | $77.90 |
| BLACK | INTROPIA | KNIT SKIRT | $77.90 | $205.00 | 1 | $77.90 |
| BLACK | IRO | DIABY LEATHER BUTTON FRONT SKIRT | $231.84 | $580.00 | 1 | $231.84 |
| BLACK | IRO | DIABY LEATHER BUTTON FRONT SKIRT | $231.84 | $580.00 | 2 | $463.68 |
| BLACK | IRO | DIABY LEATHER BUTTON FRONT SKIRT | $231.84 | $580.00 | 1 | $231.84 |
| BLACK | IRO | ASYMMETRICAL GATHERED LEATHER SKIRT | $344.08 | $825.00 | 1 | $344.08 |
| BLACK | IRO | ASYMMETRICAL GATHERED LEATHER SKIRT | $344.08 | $825.00 | 2 | $688.16 |
| DARK BEIGE | IRO | HAN SHEARLING JACKET | $506.00 | $1,265.00 | 1 | $506.00 |
| DARK BEIGE | IRO | HAN SHEARLING JACKET | $506.00 | $1,265.00 | 1 | $506.00 |
| BLACK | IRO | AWA TIE BELT BLAZER | $346.84 | $870.00 | 1 | $346.84 |
| BLACK | IRO | AWA TIE BELT BLAZER | $346.84 | $870.00 | 1 | $346.84 |
| BLACK WHITE | IRO | BERA ZEBRA PRINT COAT | $231.84 | $580.00 | 1 | $231.84 |
| CHALK | IRO | MARSHALL DEEP V SWEATER | $185.84 | $465.00 | 1 | $185.84 |
| BLACK WHITE | IRO | CLEON DISTRESSED STRIPE SWEATER | $116.84 | $295.00 | 1 | $116.84 |
| CHALK | IRO | MARSHALL DEEP V SWEATER | $185.84 | $465.00 | 1 | $185.84 |
| ECRU/BLACK | IRO | NINE STRIPE JACKET | $262.20 | $660.00 | 2 | $524.40 |
| BLACK | IRO | FELICIA LASER CUT BLOUSE | $159.90 | $365.00 | 3 | $479.70 |
| GREY | IRO | GABOTA PRINT TOP | $174.06 | $400.00 | 2 | $348.12 |
| ECRU | IRO | WITTY LONG SLEEVE V-NECK TOP | $129.54 | $295.00 | 1 | $129.54 |
| ECRU | IRO | MINDFUL TOP | $201.39 | $460.00 | 1 | $201.39 |
| RED | IRO | BLAZE PRINTED SHIRT | $158.24 | $400.00 | 1 | $158.24 |
| GREY | IRO | GABOTA PRINT TOP | $158.24 | $400.00 | 1 | $158.24 |
| ECRU | IRO | PARADON TOP | $167.99 | $385.00 | 3 | $503.97 |
| ECRU | IRO | PARADON TOP | $167.99 | $385.00 | 1 | $167.99 |
| ECRU | IRO | EAGER BLOUSE | $144.72 | $330.00 | 1 | $144.72 |
| NAVY | IRO | REASON BLOUSE | $162.51 | $187.50 | 2 | $325.02 |
| NAVY | IRO | REASON BLOUSE | $162.51 | $187.50 | 1 | $162.51 |
| NAVY | IRO | REASON BLOUSE | $162.51 | $187.50 | 2 | $325.02 |
| CHALK/GREY | IRO | PARADA SWEATER | $128.00 | $257.00 | 1 | $128.00 |
| NAVY | IRO | REASON BLOUSE | $147.78 | $187.50 | 1 | $147.78 |
| PURPLE | IRO | RENEY BLOUSE | $232.86 | $292.50 | 1 | $232.86 |
| PURPLE | IRO | RENEY BLOUSE | $232.86 | $292.50 | 1 | $232.86 |
| CHALK/GREY | IRO | PARADA SWEATER | $116.50 | $257.00 | 1 | $116.50 |
| CHALK/GREY | IRO | PARADA SWEATER | $116.50 | $257.00 | 1 | $116.50 |
| GREY | IRO | HEATHEN SWEATER | $96.60 | $245.00 | 1 | $96.60 |

| PEARL GREY | IRO | OPERA SWEATER | $118.68 | $150.00 | 1 | $118.68 |
|---|---|---|---|---|---|---|
| ECRU GREY | IRO | BALL SWEATER | $174.80 | $220.00 | 1 | $174.80 |
| ECRU GREY | IRO | BALL SWEATER | $174.80 | $220.00 | 1 | $174.80 |
| CLOUDY WHITE | IRO | WEBRO SWEATER | $135.24 | $170.00 | 1 | $135.24 |
| LGHT NUDE | IRO | SPACIOUS BLOUSE | $111.32 | $280.00 | 1 | $111.32 |
| ECRU/BLACK | IRO | CONAH TOP | $72.68 | $185.00 | 1 | $72.68 |
| BLACK | IRO | FLOREN TOP | $158.24 | $400.00 | 1 | $158.24 |
| ECRU | IRO | MINDFUL TOP | $201.39 | $460.00 | 1 | $201.39 |
| GREY | IRO | GABOTA PRINT TOP | $174.06 | $400.00 | 1 | $174.06 |
| GREY | IRO | GABOTA PRINT TOP | $174.06 | $400.00 | 1 | $174.06 |
| GREY | IRO | GABOTA PRINT TOP | $174.06 | $400.00 | 1 | $174.06 |
| GREY | IRO | GABOTA PRINT TOP | $174.06 | $400.00 | 1 | $174.06 |
| ECRU | IRO | MINDFUL TOP | $201.39 | $460.00 | 1 | $201.39 |
| YELLOW | IRO | DEBBY CROSS BACK TOP | $200.38 | $460.00 | 1 | $200.38 |
| PINK | IRO | SKIFUL TOP | $139.84 | $340.00 | 1 | $139.84 |
| PINK | IRO | SKIFUL TOP | $139.84 | $340.00 | 1 | $139.84 |
| YELLOW | IRO | DEBBY CROSS BACK TOP | $182.16 | $460.00 | 1 | $182.16 |
| BLACK SILVER | IRO | BAYING SKIRT | $245.89 | $620.00 | 1 | $245.89 |
| WHITE BLACK | IRO | TOUR SHIRT | $145.36 | $365.00 | 2 | $290.72 |
| WHITE BLACK | IRO | TOUR SHIRT | $145.36 | $365.00 | 1 | $145.36 |
| ECRU | IRO | WITTY LONG SLEEVE V-NECK TOP | $129.54 | $295.00 | 1 | $129.54 |
| PINK | IRO | SKIFUL TOP | $153.82 | $340.00 | 2 | $307.64 |
| PINK | IRO | SKIFUL TOP | $153.82 | $340.00 | 1 | $153.82 |
| OFF WHITE | IRO | BOLD TOP | $151.80 | $380.00 | 1 | $151.80 |
| BLACK WHITE | IRO | CLEON STRIPE SWEATER | $116.84 | $295.00 | 1 | $116.84 |
| CHALK | IRO | MARSHALL DEEP V SWEATER | $185.84 | $465.00 | 1 | $185.84 |
| STARGAZER BLACK | J BRAND | HARLOW JACKET | $149.00 | $328.00 | 2 | $298.00 |
| STARGAZER BLACK | J BRAND | HARLOW JACKET | $149.00 | $328.00 | 1 | $149.00 |
| SATIN STRIPE | J BRAND | PEYTON UTILITY SHIRT | $126.00 | $278.00 | 1 | $126.00 |
| MOONBEAM | J BRAND | LULA SHIRT | $104.00 | $228.00 | 1 | $104.00 |
| MOONBEAM | J BRAND | LULA SHIRT | $104.00 | $228.00 | 1 | $104.00 |
| MOONBEAM | J BRAND | LULA SHIRT | $104.00 | $228.00 | 1 | $104.00 |
| FADED GIBSON DES | J BRAND | 835 MID RISE CAPR | | $228.00 | 1 | $0.00 |
| MOONBEAM LACE | J BRAND | CAROLINA TEE | $54.00 | $118.00 | 1 | $54.00 |
| WHITE | JUDITH AND CHARLES | AMALFI BLOUSE | $143.42 | $162.50 | 1 | $143.42 |
| WHITE | JUDITH AND CHARLES | AMALFI BLOUSE | $143.42 | $162.50 | 2 | $286.84 |
| WHITE | JUDITH AND CHARLES | AMALFI BLOUSE | $143.42 | $162.50 | 1 | $143.42 |
| MID GREY | JUMPER 1234 | STRIPE CREW SWEATER | $89.30 | $112.50 | 1 | $89.30 |
| DARK GREY | JUMPER 1234 | FLASH STAR CREW SWEATER | $102.60 | $130.00 | 1 | $102.60 |
| BUFF | JUMPER 1234 | FUN SWEATER | $113.05 | $142.50 | 1 | $113.05 |
| BUFF | JUMPER 1234 | FUN SWEATER | $113.05 | $142.50 | 2 | $226.10 |
| DARK GREY | JUMPER 1234 | FLASH STAR CREW SWEATER | $102.60 | $130.00 | 1 | $102.60 |
| STRIPES | JUMPER 1234 | RAINBOW BALLOON SLEEVE SWEATER | $119.70 | $151.00 | 1 | $119.70 |
| WHITE | JUNE 7.2 | LOGON SWEATPANT | $86.74 | $198.00 | 1 | $86.74 |
| WHITE | JUNE 7.2 | KYLO SHORT | $66.12 | $148.00 | 1 | $66.12 |
| WHITE | JUNE 7.3 | KYLO SHORT | $66.12 | $148.00 | 2 | $132.24 |
| WHITE | JUNE 7.4 | KYLO SHORT | $66.12 | $148.00 | 2 | $132.24 |
| BONE | KINLY | DROP SHOULDER TEE | $50.00 | $115.00 | 1 | $50.00 |
| MARITIME BLUE | KOPAL | SOLITUDE GRAVITY TOP | $75.00 | $82.50 | 1 | $75.00 |
| CLOUD | KORAL | BRISTOL PULLOVER | $65.54 | $128.00 | 1 | $65.54 |
| CLOUD | KORAL | BRISTOL PULLOVER | $65.54 | $128.00 | 1 | $65.54 |
| ASHEN | KORAL | BOOST MESH PANEL LEGGING | $66.00 | $145.00 | 1 | $66.00 |
| BKSR | KORAL | KNIGHT LEGGINGS | $55.00 | $120.00 | 1 | $55.00 |
| BKSR | KORAL | KNIGHT LEGGINGS | $55.00 | $120.00 | 1 | $55.00 |
| ARMY | LA DOVITCH | VELVET TOP | $143.00 | $178.75 | 1 | $143.00 |
| CHARCOAL | LABEL + THREAD | LUXE SPIRAL CREW TOP | $117.00 | $150.00 | 1 | $117.00 |
| CHARCOAL | LABEL + THREAD | LUXE SPIRAL CREW TOP | $117.00 | $150.00 | 1 | $117.00 |
| LIGHT HEATHER GREY | LADAIRE | NORA SWEATER | $71.25 | $89.00 | 3 | $213.75 |

| | | | | | | |
|---|---|---|---|---|---|---|
| LIGHT HEATHER GREY | LADAIRE | NORA SWEATER | $71.25 | $89.00 | 2 | $142.50 |
| LIGHT HEATHER GREY | LADAIRE | NORA SWEATER | $71.25 | $89.00 | 2 | $142.50 |
| LIGHT HEATHER GREY | LADAIRE | ALYSSA PANTS | $75.05 | $188.00 | 5 | $375.25 |
| LIGHT HEATHER GREY | LADAIRE | ALYSSA PANTS | $75.05 | $188.00 | 5 | $375.25 |
| MILK/BLACK | LAUREN MOSHI | MAGLAN TOP | $54.00 | $150.00 | 2 | $108.00 |
| MILK/BLACK | LAUREN MOSHI | MAGLAN TOP | $54.00 | $150.00 | 1 | $54.00 |
| CREAM | LAUREN MOSHI | RAINBOW CASHMERE SWEATER | $151.20 | $192.50 | 1 | $151.20 |
| DARK TEAL | LEO & SAGE | LONG SLEEVE DROPPED NEEDLE TOP | $51.05 | $149.00 | 1 | $51.05 |
| OFF WHITE | LEO & SAGE | LS INLAY JACKET | $43.62 | $398.00 | 1 | $43.62 |
| OFF WHITE | LEO & SAGE | LS INLAY JACKET | $43.62 | $398.00 | 1 | $43.62 |
| BLACK JACQUARD | LEO & SAGE | LS DOLMAN PULLOVER | $43.62 | $142.50 | 1 | $43.62 |
| GRAPHITE JACQUAR | LEO & SAGE | LS TIED JACQUARD WRAP | $43.62 | $174.00 | 1 | $43.62 |
| BLK | LEO & SAGE | V NECK MIDI DRESS | $43.62 | $295.00 | 1 | $43.62 |
| BLACK JACQUARD | LEO & SAGE | LS PENCIL SKIRT | $43.62 | $120.00 | 1 | $43.62 |
| BLACK JACQUARD | LEO & SAGE | LS DOLMAN PULLOVER | $43.62 | $285.00 | 1 | $43.62 |
| CHARCOAL/BLUSH | LEO & SAGE | LS STRIPED PENCIL SKIRT | $43.62 | $162.50 | 1 | $43.62 |
| CHARCOAL | LEO & SAGE | LS CHINO PANT TOO | $43.62 | $295.00 | 1 | $43.62 |
| IVORY | LEO & SAGE | LS POINTELLE RIB CREWNECK | $43.62 | $198.00 | 1 | $43.62 |
| IVORY | LEO & SAGE | POINTELLE RIB CREWNECK TOP | $38.60 | $298.00 | 1 | $38.60 |
| IVORY | LEO & SAGE | POINTELLE RIB CREWNECK TOP | $38.60 | $298.00 | 1 | $38.60 |
| SNOW | LEO & SAGE | SNAP FRONT CASHMERE CARDIGAN | $159.84 | $348.00 | 2 | $319.68 |
| BRONZE | LEO & SAGE | OPEN STITCH VEST | $114.00 | $278.00 | 1 | $114.00 |
| BRONZE | LEO & SAGE | OPEN STITCH VEST | $114.00 | $278.00 | 1 | $114.00 |
| OYSTER | LEO & SAGE | SILK BUTTON UP | $115.20 | $298.00 | 1 | $115.20 |
| OYSTER | LEO & SAGE | SILK BUTTON UP | $115.20 | $298.00 | 3 | $345.60 |
| OYSTER | LEO & SAGE | SILK BUTTON UP | $115.20 | $298.00 | 2 | $230.40 |
| BLACK | LEO & SAGE | SLEEVELESS TOP | $38.60 | $188.00 | 1 | $38.60 |
| BLACK | LEO & SAGE | SLEEVELESS TOP | $38.60 | $188.00 | 9 | $347.40 |
| BLK | LEO & SAGE | LS SLEEVELESS TOP | $43.62 | $188.00 | 1 | $43.62 |
| LGHT H. GREY | LEO & SAGE | LS CHINO PANT TOO | $43.62 | $147.50 | 2 | $87.24 |
| THYME | LEO & SAGE | LONG SLEEVE RUFFLE BLOUSE | $38.60 | $298.00 | 1 | $38.60 |
| OAT | LEO & SAGE | WOVEN FLANNEL PULL ON PANT | $48.25 | $275.00 | 3 | $144.75 |
| FLINT | LEO & SAGE | WOVEN FLANNEL PULL ON PANT | $50.95 | $275.00 | 1 | $50.95 |
| BLACK RIB | LEO & SAGE | LS RIBBED PENCIL SKIRT | $43.62 | $240.00 | 3 | $130.86 |
| BLACK | LEO & SAGE | RIBBED PENCIL SKIRT | $51.05 | $240.00 | 1 | $51.05 |
| BLACK RIB | LEO & SAGE | LS RIBBED PENCIL SKIRT | $43.62 | $240.00 | 1 | $43.62 |
| GREY | LILLA P | GATHERED SLEEVE SCOOP NECK TOP | $37.80 | $98.00 | 1 | $37.80 |
| CREAM | LILLA P | BRIDE SLEEVELESS SHELL | $52.70 | $148.00 | 1 | $52.70 |
| RED STRIPE | LNA | MILLIE STRIPE TEE | $44.00 | $97.00 | 1 | $44.00 |
| YELLOW/BLUE | LNA | HONEY STRIPE LONG SLEEVE TEE | $41.80 | $96.00 | 1 | $41.80 |
| YELLOW/BLUE | LNA | HONEY STRIPE LONG SLEEVE TEE | $41.80 | $96.00 | 1 | $41.80 |
| YELLOW/BLUE | LNA | HONEY STRIPE LONG SLEEVE TEE | $41.80 | $96.00 | 3 | $125.40 |
| WHITE | LOVE SAM | D'ORSAY EMBROIDERED HALTER TOP | $143.26 | $325.00 | 1 | $143.26 |
| TANGERINE STRIPE | LOVE SAM | BOISONNA CROP JACKET | $121.00 | $275.00 | 2 | $242.00 |
| TANGERINE STRIPE | LOVE SAM | BOISONNA CROP JACKET | $121.00 | $275.00 | 1 | $121.00 |
| TANGERINE STRIPE | LOVE SAM | BOISONNA CROP JACKET | $121.00 | $275.00 | 1 | $121.00 |
| HEATHER OATMEAL | LOVE SAM | PAPILLION SWEATPANT | $45.00 | $295.00 | 2 | $90.00 |
| LOTUS | LOVE SHACK FANCY | LINETTE TOP | $100.98 | $225.00 | 2 | $201.96 |
| LOTUS | LOVE SHACK FANCY | LINETTE TOP | $100.98 | $225.00 | 2 | $201.96 |
| LOTUS | LOVE SHACK FANCY | LINETTE TOP | $100.98 | $225.00 | 1 | $100.98 |
| GARDEN FLORAL | LOVERS & FRIENDS | NORTHWEST TOP | $58.00 | $135.00 | 2 | $116.00 |
| GARDEN FLORAL | LOVERS & FRIENDS | NORTHWEST TOP | $58.00 | $135.00 | 2 | $116.00 |
| NATURAL/BLUE | LOVESTITCH | RUGBY STRIPE SWEATER | $16.00 | $46.00 | 3 | $48.00 |
| BLUE HAZE | MADEWORN | BEACH BOYS TOUR CROP TOP | $70.00 | $160.00 | 1 | $70.00 |
| BLUE HAZE | MADEWORN | BEACH BOYS TOUR CROP TOP | $70.00 | $160.00 | 1 | $70.00 |
| DARK HTR GREY | MAISON LABICHE | HOODIE CROP BLONDIE | $54.00 | $135.00 | 4 | $216.00 |
| DARK HTR GREY | MAISON LABICHE | HOODIE CROP BLONDIE | $54.00 | $135.00 | 5 | $270.00 |
| DARK HTR GREY | MAISON LABICHE | HOODIE CROP BLONDIE | $54.00 | $135.00 | 6 | $324.00 |

| ARMY | MAJESTIC FILATURES | LACE UP SCOOP TANK | $34.54 | $193.00 | 1 | $34.54 |
|---|---|---|---|---|---|---|
| NOIR | MAJESTIC FILATURES | LEATHER RACER TANK | $117.00 | $655.00 | 1 | $117.00 |
| FIGUE | MAJESTIC FILATURES | TIE-DYE CREW TOP | $28.44 | $160.00 | 1 | $28.44 |
| AUBERGINE/NACRE | MAJESTIC FILATURES | DOUBLE LAYER TUNIC | $35.96 | $140.00 | 1 | $35.96 |
| MARINE NACRE CHI | MAJESTIC FILATURES | DOUBLE LAYER TUNIC | $41.35 | $140.00 | 2 | $82.70 |
| BLANC | MAJESTIC FILATURES | LIN DRAWSTRING PANT | $44.29 | $248.00 | 1 | $44.29 |
| DAME DE COER | MCGUIRE | SAN PIETRO SKINNY | $123.46 | $270.00 | 1 | $123.46 |
| BOLIVAR | MCGUIRE | CARTAGENA SKIRT | $101.20 | $245.00 | 4 | $404.80 |
| BOLIVAR | MCGUIRE | CARTAGENA SKIRT | $101.20 | $245.00 | 2 | $202.40 |
| BOLIVAR | MCGUIRE | CARTAGENA SKIRT | $101.20 | $245.00 | 2 | $202.40 |
| BOLIVAR | MCGUIRE | CARTAGENA SKIRT | $101.20 | $245.00 | 4 | $404.80 |
| BOLIVAR | MCGUIRE | CARTAGENA SKIRT | $101.20 | $245.00 | 3 | $303.60 |
| CRIMSON STRIPE | MCGUIRE | BEZOS TIE BACK SWEATER | $137.10 | $164.00 | 1 | $137.10 |
| WHITE | MCGUIRE | LONG SLEEVE SUNSET TEE | $46.00 | $110.00 | 1 | $46.00 |
| SEA BREEZE | MICHAEL STARS | PLAYA RUFFLE TOP | $46.40 | $128.00 | 3 | $139.20 |
| SEA BREEZE | MICHAEL STARS | PLAYA RUFFLE TOP | $46.40 | $128.00 | 4 | $185.60 |
| BOURBON | MICHAEL STARS | MADISON KNIT SWEATER | $45.10 | $118.00 | 1 | $45.10 |
| RUBY | MICHAEL STARS | JASPER CREW TEE | $27.06 | $68.00 | 1 | $27.06 |
| POPPY | MICHAEL STARS | SHEER STRIPE PULLOVER | $50.40 | $138.00 | 1 | $50.40 |
| ROSETTE | MICHAEL STARS | HARLOW SIDE SPLIT TOP | $32.00 | $88.00 | 6 | $192.00 |
| ROSETTE | MICHAEL STARS | HARLOW SCOOP TOP | $32.00 | $88.00 | 3 | $96.00 |
| HEATHER | MICHAEL STARS | MADISON STITCH HOODIE | $50.20 | $138.00 | 1 | $50.20 |
| CHALK/PINK | MICHAEL STARS | MADISON NEON STITCH HOODIE | $50.20 | $138.00 | 1 | $50.20 |
| BLACK | MICHAEL STARS | LOVE TANK | $24.60 | $34.00 | 1 | $24.60 |
| ROSETTE | MICHAEL STARS | LEOPARD LACE UP TOP | $35.20 | $88.00 | 1 | $35.20 |
| WHITE | MICHAEL STARS | HARLOW SIDE SPLIT TOP | $35.20 | $88.00 | 1 | $35.20 |
| BLACK | MICHAEL STARS | LEATHER ZIP SKIRT | $72.00 | $198.00 | 1 | $72.00 |
| CAMO | MICHAEL STARS COLLECTION | PULLOVER ATHLETIC STRIPE SWEATER | $39.16 | $98.00 | 1 | $39.16 |
| IVORY | MICHELLE MASON | RUFFLE SLEEVE TOP | $161.50 | $395.00 | 1 | $161.50 |
| IVORY | MICHELLE MASON | CROP SPLIT BACK TEE | $123.50 | $300.00 | 1 | $123.50 |
| IVORY | MICHELLE MASON | CROP SPLIT BACK TEE | $123.50 | $300.00 | 1 | $123.50 |
| ASH | MICHELLE MASON | MINI SKIRT | $255.00 | $325.00 | 1 | $255.00 |
| ASH | MICHELLE MASON | MINI SKIRT | $255.00 | $325.00 | 2 | $510.00 |
| IVORY | MICHELLE MASON | CROP SPLIT BACK TEE | $135.85 | $300.00 | 1 | $135.85 |
| IVORY | MICHELLE MASON | CROP SPLIT BACK TEE | $135.85 | $300.00 | 2 | $271.70 |
| BLACK CURRANT | MICHELLE MASON | TWIST SWEATER | $135.85 | $300.00 | 1 | $135.85 |
| BLACK CURRANT | MICHELLE MASON | TWIST SWEATER | $135.85 | $300.00 | 1 | $135.85 |
| ASH | MICHELLE MASON | MINI SKIRT | $255.00 | $325.00 | 3 | $765.00 |
| ASH | MICHELLE MASON | MINI SKIRT | $255.00 | $325.00 | 2 | $510.00 |
| BLACK CURRANT | MICHELLE MASON | TWIST SWEATER | $123.50 | $300.00 | 2 | $247.00 |
| IVORY | MICHELLE MASON | TWIST SWEATER | $123.50 | $300.00 | 2 | $247.00 |
| BLACK | MICHELLE MASON | PAPERBAG PANT | $215.00 | $247.50 | 2 | $430.00 |
| BLACK | MICHELLE MASON | PAPERBAG PANT | $215.00 | $247.50 | 1 | $215.00 |
| CARGO/PLATINUM | MINNIE ROSE | GIRAFFE JACQUARD PULLOVER | $20.00 | $155.00 | 1 | $20.00 |
| WHITE | MINNIE ROSE | COTTON FRINGE BLANKIE WRAP | $15.89 | $130.00 | 4 | $63.56 |
| LT. HR GREY | MINNIE ROSE | MR COTTON FRINGE BLANKIE WRAP | $22.60 | $65.00 | 2 | $45.20 |
| VIOLET | MINNIE ROSE | MR FRAYED FRINGE SCARF | $22.60 | $107.50 | 1 | $22.60 |
| BURANO BLUE | MINNIE ROSE | MR BASKET STITCH RUANA | $14.36 | $130.00 | 3 | $43.08 |
| BOUGAINVI | MINNIE ROSE | DOUBLE LAYER RUFFLE SKIRT | $15.89 | $105.00 | 2 | $31.78 |
| AMARELO | MINNIE ROSE | DOUBLE LAYER RUFFLE SKIRT | $15.89 | $105.00 | 1 | $15.89 |
| AZUL | MINNIE ROSE | DOUBLE LAYER RUFFLE SKIRT | $15.89 | $105.00 | 1 | $15.89 |
| LIGHT HEATHER GREY | MINNIE ROSE | PLEATED SKIRT | $15.89 | $110.00 | 2 | $31.78 |
| BLACK | MINNIE ROSE | TENNIS SKIRT | $15.89 | $205.00 | 1 | $15.89 |
| DOESKIN | MINNIE ROSE | MESH FRINGE BANDANA | $15.89 | $115.00 | 1 | $15.89 |
| LIGHT HEATHER GREY | MINNIE ROSE | MESH FRINGE BANDANA | $15.89 | $115.00 | 1 | $15.89 |
| BLACK | MINNIE ROSE | STRAPPY V-NECK BLOUSE | $25.00 | $120.00 | 1 | $25.00 |
| BLACK | MINNIE ROSE | DYED FOX FUR RUANA | $30.00 | $470.00 | 1 | $30.00 |
| BLACK SILVER | MINNIE ROSE | STUDDED ONE STRAP TANK | $85.54 | $210.00 | 1 | $85.54 |

| Color | Brand | Description | | | | |
|---|---|---|---|---|---|---|
| WHITE SILVER | MINNIE ROSE | STUDDED ONE STRAP TANK | $85.54 | $210.00 | 1 | $85.54 |
| BLACK | MINNIE ROSE | OPEN BACK TOP | $16.52 | $210.00 | 1 | $16.52 |
| CHAMBRAY BLUE | MINNIE ROSE | RACER BACK TANK | $12.71 | $110.00 | 1 | $12.71 |
| NATURAL | MONROW | VINTAGE STRIPE TEE | $48.00 | $108.00 | 1 | $48.00 |
| NATURAL | MONROW | VINTAGE STRIPE TEE | $48.00 | $108.00 | 1 | $48.00 |
| BLACK | MONROW | RAISED CREW NECK RIB TEE | $50.16 | $108.00 | 1 | $50.16 |
| BLACK | MONROW | RAISED CREW NECK RIB TEE | $45.60 | $108.00 | 1 | $45.60 |
| WHITE | MONROW | SIDE KNOT V-NECK TOP | $50.00 | $112.00 | 1 | $50.00 |
| DARK HEATHER | MONROW | LOOSE TANK WITH ZIGZAG TRIM | $38.00 | $90.00 | 1 | $38.00 |
| BONE | MONROW | VINTAGE RAGLAN W/STUDS | $83.60 | $198.00 | 2 | $167.20 |
| WHITE | MONROW | STUD MOTIF CREW TOP | $55.86 | $126.00 | 1 | $55.86 |
| WHITE | MONROW | VINTAGE STUD CREW | $63.84 | $144.00 | 1 | $63.84 |
| WHITE | MONROW | VINTAGE STUD CREW | $63.84 | $144.00 | 1 | $63.84 |
| BLACK | MONROW | RAW HEM SWEATSHIRT | $55.00 | $112.00 | 2 | $110.00 |
| NAVY | MY TRIBE | CATIE STRIPE TOP | $12.50 | $125.00 | 1 | $12.50 |
| YELLOW | MY TRIBE | CASIE TOP | $12.50 | $130.00 | 2 | $25.00 |
| HEATHER GREY | N: PHILANTHROPY | GAYLA SWEATSHIRT | $63.00 | $138.00 | 1 | $63.00 |
| BLACK | N: PHILANTHROPY | KNOX SWEATSHIRT | $76.50 | $188.00 | 1 | $76.50 |
| BLACK CAT | N: PHILANTHROPY | HENDRIX ZIP UP SWEATSHIRT | $75.94 | $154.00 | 1 | $75.94 |
| BLACK | N: PHILANTHROPY | KNOX SWEATSHIRT | $76.50 | $188.00 | 1 | $76.50 |
| DARK OLIVE | N/A | CROP TRICOT CREPE | | $375.00 | 1 | $0.00 |
| WHITE | NAADAM | OFF SHOULDER BLOUSON SWEATER | $145.80 | $310.00 | 1 | $145.80 |
| WHITE | NAADAM | OFF SHOULDER BLOUSON SWEATER | $133.65 | $310.00 | 1 | $133.65 |
| DIRTY WHITE | NATION | CHERI ROLLED SCOOP NECK TEE | $71.28 | $165.60 | 1 | $71.28 |
| NATURAL | NATION | MADELINE BOXY CARDI | $89.10 | $207.00 | 3 | $267.30 |
| LAVENDER | NATION | GIA SWEETHEART HENLEY TOP | $45.00 | $115.00 | 1 | $45.00 |
| LAVENDER | NATION | GIA SWEETHEART HENLEY TOP | $45.00 | $115.00 | 1 | $45.00 |
| LAVENDER | NATION | GIA SWEETHEART HENLEY TOP | $49.50 | $115.00 | 1 | $49.50 |
| WHITE | NATION | WILLA BISHOP SLEEVE TOP | $48.60 | $125.00 | 1 | $48.60 |
| RUST | NATION | BRIDGETTE VERTICAL STRIPE CREW | $79.20 | $194.00 | 1 | $79.20 |
| OFF WHITE | NATION | TRIBECA DROP SHLDR RUFFLE L/S | $47.46 | $100.00 | 1 | $47.46 |
| BLUE STRIPE | NICHOLAS | TUCK SLEEVE SHIRT | $118.00 | $147.50 | 1 | $118.00 |
| BLUE STRIPE | NICHOLAS | TUCK SLEEVE SHIRT | $118.00 | $147.50 | 1 | $118.00 |
| IVORY | NICOLE MILLER | HONEYCOMB STITCH TOP | | $200.00 | 1 | $0.00 |
| BLACK | NIGHTCAP | LACE MINIDRESS | $155.00 | $345.00 | 1 | $155.00 |
| BLANC | NOT SHY | VANIA LONG SLEEVE CREW TEE | $55.00 | $130.00 | 1 | $55.00 |
| BLANC | NOT SHY | SIBEL LONG SLEEVE V NECK TEE | $50.00 | $115.00 | 2 | $100.00 |
| BLANC | NOT SHY | SIBEL LONG SLEEVE V NECK TEE | $50.00 | $115.00 | 2 | $100.00 |
| PACIFIC | NSF | N/A | | $322.00 | 1 | $0.00 |
| SLATE | ONE GREY DAY | VISBY BACK DETAIL PULLOVER | $78.40 | $218.00 | 2 | $156.80 |
| GREY | ONE GREY DAY | CAMERON BACK DETAIL PULLOVER | $81.60 | $228.00 | 3 | $244.80 |
| ASH | OPAQUE | DAKOTA SWEATER | $87.91 | $290.00 | 3 | $263.73 |
| MELLOW YELLOW | OPAQUE | DAKOTA SWEATER | $96.60 | $290.00 | 2 | $193.20 |
| SNOW | OPAQUE | DAKOTA SWEATER | $96.60 | $290.00 | 9 | $869.40 |
| MELLOW YELLOW | OPAQUE | DAKOTA SWEATER | $82.80 | $290.00 | 2 | $165.60 |
| BLACK | PEACE OF CLOTH | HARLEY JEAN | $84.15 | $205.00 | 7 | $589.05 |
| BLACK | PEACE OF CLOTH | HARLEY JEAN | $84.15 | $205.00 | 4 | $336.60 |
| BLACK | PEACE OF CLOTH | JADE JEGGINGS | $75.60 | $205.00 | 2 | $151.20 |
| BLACK | PEACE OF CLOTH | JADE JEGGINGS | $75.60 | $205.00 | 2 | $151.20 |
| BLACK | PEACE OF CLOTH | JADE JEGGINGS | $75.60 | $205.00 | 2 | $151.20 |
| BLACK | PEACE OF CLOTH | JADE JEGGINGS | $75.60 | $205.00 | 2 | $151.20 |
| SKY | PHARAOH | TWIST FRONT ELBOW SLEEVE TEE | $57.00 | $130.00 | 1 | $57.00 |
| WHITE | PHARAOH | FLY AWAY BACK SHIRT | $107.00 | $122.50 | 1 | $107.00 |
| H GREY | PHARAOH | TWIST FRONT ELBOW SLEEVE | $83.60 | $175.00 | 2 | $167.20 |
| H GREY | PHARAOH | TWIST FRONT ELBOW SLEEVE | $76.00 | $175.00 | 2 | $152.00 |
| H GREY | PHARAOH | TWIST FRONT ELBOW SLEEVE | $76.00 | $175.00 | 2 | $152.00 |
| MILITARY | PHARAOH | XANDER DOUBLE LAYER CAMI | $85.00 | $195.00 | 1 | $85.00 |
| PINK | POLES | PIANO DEEP V CARDIGAN | $107.10 | $305.00 | 1 | $107.10 |

| | | | | | | |
|---|---|---|---|---|---|---|
| INDIGO | PRPS | CONTRAST PANEL DENIM JACKET | $169.40 | $338.00 | 1 | $169.40 |
| INDIGO | PRPS | CONTRAST PANEL DENIM JACKET | $169.40 | $338.00 | 1 | $169.40 |
| MULTI | PSOPHIA | OPEN TIE WAIST JACKET | $426.36 | $1,000.00 | 1 | $426.36 |
| MULTI | PSOPHIA | OPEN TIE WAIST JACKET | $426.36 | $1,000.00 | 1 | $426.36 |
| ECRU | RACHEL ZOE | SILK ROUCHED WOVEN TOP | $31.20 | $245.00 | 1 | $31.20 |
| ECRU | RACHEL ZOE | SILK ROUCHED WOVEN TOP | $31.20 | $245.00 | 1 | $31.20 |
| ECRU | RACHEL ZOE | SILK ROUCHED WOVEN TOP | $28.80 | $245.00 | 1 | $28.80 |
| ECRU | RACHEL ZOE | SILK ROUCHED WOVEN TOP | $28.80 | $245.00 | 1 | $28.80 |
| ECRU | RACHEL ZOE | SMOCKED RUFFLE TOP | $30.00 | $295.00 | 1 | $30.00 |
| ECRU | RACHEL ZOE | SMOCKED RUFFLE TOP | $30.00 | $295.00 | 1 | $30.00 |
| ECRU | RACHEL ZOE | WOVEN FLOUNCE ZIP BACK TOP | $30.00 | $325.00 | 1 | $30.00 |
| HANOVER | RAG & BONE | N/A | | $225.00 | 1 | $0.00 |
| CORSA | RAG & BONE | N/A | | $225.00 | 1 | $0.00 |
| SNOW | REBECCA TAYLOR | LACE JERSEY BLOUSE | $98.10 | $175.00 | 1 | $98.10 |
| SNOW | REBECCA TAYLOR | LACE JERSEY TOP | $98.10 | $250.00 | 1 | $98.10 |
| CREAM GOLD LUREX | REPEAT | SHORT SLEEVE SCOOP TEE | $49.50 | $115.00 | 1 | $49.50 |
| KHAKI/GOLD LUREX | REPEAT | DOLMAN CREW SHIRT | $55.00 | $135.00 | 3 | $165.00 |
| PLUM | REPEAT | CHOOSE LOVE SWEATER | $163.90 | $389.00 | 1 | $163.90 |
| GREY PINK | REPEAT | RAGLAN STAR CREW TOP | $129.00 | $162.50 | 2 | $258.00 |
| BLACK | REPEAT | LE TETE DAYS SHAWL | $97.14 | $245.00 | 3 | $291.42 |
| NAVY GOLD | REPLICA | LUREX MOONBEAM SWEATER | $130.00 | $145.00 | 1 | $130.00 |
| GREY | SADIE & SAGE | SOLID STRETCH VELOUR TOP | $9.00 | $58.00 | 1 | $9.00 |
| BLACK | SAINT DENIM | AILE DROP BACK SWEATSHIRT | $23.10 | $90.00 | 1 | $23.10 |
| LAVENDER | SANTORELLI | CREW TIE WAIST TOP | $150.30 | $368.00 | 1 | $150.30 |
| BLACK | SANTORELLI | LEATHER ZIP KNEE LENGTH SKIRT | $313.83 | $698.00 | 5 | $1,569.15 |
| BLACK | SANTORELLI | LEATHER ZIP KNEE LENGTH SKIRT | $313.83 | $698.00 | 4 | $1,255.32 |
| BLACK | SANTORELLI | LEATHER ZIP KNEE LENGTH SKIRT | $313.83 | $698.00 | 4 | $1,255.32 |
| BLACK | SANTORELLI | SWISS DOT CHIFFON BLOUSE | $172.80 | $368.00 | 1 | $172.80 |
| WHITE | SANTORELLI | ASYMMETRICAL HEM TIE DRESS | $224.10 | $548.00 | 1 | $224.10 |
| WHITE/GREY 002 | SEVENTY | WOOL PONCHO | $216.00 | $260.00 | 2 | $432.00 |
| BROWN | SEVENTY | GEOMETRIC PRINT BLOUSE | $126.00 | $305.00 | 1 | $126.00 |
| CREAM | SEVENTY | BOW NECK SWEATER | $117.00 | $196.00 | 2 | $234.00 |
| CREAM | SEVENTY | BOW NECK SWEATER | $117.00 | $196.00 | 2 | $234.00 |
| SOFT BLUSH | SEVENTY | V-NECK MAXI DRESS | $152.10 | $335.00 | 1 | $152.10 |
| BLUE/GREY | SHE & SKY | BUBBLE SLEEVE BLOCK SWEATER | $18.88 | $54.00 | 1 | $18.88 |
| BLACK | SILOETT | COHEN CROCHET PONCHO | $31.32 | $115.00 | 2 | $62.64 |
| OATMEAL | SKIN | MALIKA HOODIE | $108.00 | $185.50 | 1 | $108.00 |
| HEATHER GREY | SKIN | VERONICA PULLOVER | $57.60 | $160.00 | 1 | $57.60 |
| HEATHER GREY | SKIN | MALIKA HOODIE | $108.00 | $265.00 | 1 | $108.00 |
| HEATHER GREY | SKIN | N/A | | N/A | 2 | $0.00 |
| HEATHER GREY | SKIN | N/A | | N/A | 2 | $0.00 |
| NAVY | SOSKEN | GABY BASKET JACQUARD COAT | $214.00 | $267.50 | 1 | $214.00 |
| DAFFODIL | SOSKEN | HARLEY CROPPED MOTO JACKET | $117.14 | $385.00 | 1 | $117.14 |
| LAVENDER | SOSKEN | BEV SHORT PUFFER JACKET | $157.43 | $385.00 | 2 | $314.86 |
| LAVENDER | SOSKEN | BEV SHORT PUFFER JACKET | $157.43 | $385.00 | 1 | $157.43 |
| AS SHOWN | SOSKEN | SOSKEN SHRUG | $27.50 | $365.00 | 11 | $302.50 |
| HEATHER GREY | SPIRITUAL GANGSTER | DRAPEY DAZED HOODIE | $53.00 | $59.00 | 1 | $53.00 |
| FADED BLUE | SPIRITUAL GANGSTER | BREATHE SWEATSHIRT | $40.00 | $88.00 | 9 | $360.00 |
| ROSE QUARTZ | SPIRITUAL GANGSTER | LOVED IN CREW TOP | $57.00 | $118.00 | 8 | $456.00 |
| ROSE QUARTZ | SPIRITUAL GANGSTER | LOVED IN CREW TOP | $57.00 | $118.00 | 4 | $228.00 |
| ROSE QUARTZ | SPIRITUAL GANGSTER | LOVED IN CREW TOP | $57.00 | $118.00 | 3 | $171.00 |
| WHITE | SPIRITUAL GANGSTER | NAMASTE SPIRIT TEE | $35.00 | $78.00 | 1 | $35.00 |
| WHITE | SPIRITUAL GANGSTER | NAMASTE SPIRIT TEE | $35.00 | $78.00 | 1 | $35.00 |
| STONE | SPIRITUAL GANGSTER | LOVE RAW EDGE HOODIE | $59.85 | $138.00 | 1 | $59.85 |
| MULTI PLAID | STATESIDE | OXFORD SHIRT | $68.04 | $148.00 | 1 | $68.04 |
| BLACK | STRENESSE | 3/4 SLEEVE SHEER KNIT TOP | $133.02 | $320.00 | 1 | $133.02 |
| WHITE | STRENESSE | LINEN COLLAR SHIRT | $90.48 | $240.00 | 1 | $90.48 |
| WHITE | STRENESSE | LINEN COLLAR SHIRT | $90.48 | $240.00 | 2 | $180.96 |

| WHITE | STRENESSE | LINEN COLLAR SHIRT | $90.48 | $240.00 | 1 | $90.48 |
|---|---|---|---|---|---|---|
| COCONUT MILK | SUNDAYS | HAMEL TOP | $55.44 | $130.00 | 1 | $55.44 |
| COCONUT MILK | SUNDAYS | HAMEL TOP | $55.44 | $130.00 | 3 | $166.32 |
| HEATHER BLUE | SUNDAYS | SHERBOURNE LOVERS TOP | $53.46 | $125.00 | 1 | $53.46 |
| METAL GREY | SUNDAYS | BELLA SWEATSHIRT | $44.40 | $55.00 | 2 | $88.80 |
| METAL GREY | SUNDAYS | BELLA SWEATSHIRT | $44.40 | $55.00 | 1 | $44.40 |
| STRIPES | SUNDRY | LOVER CROPPED HOODIE | $65.96 | $150.00 | 1 | $65.96 |
| GREY | SUNDRY | PRINT ROUND TANK | $33.95 | $78.00 | 1 | $33.95 |
| SEA LOVE & SUN | SUNDRY | SEA LOVE & SUN CROPPED TEE | $41.65 | $85.00 | 1 | $41.65 |
| BLACK | SUSANA MONACO | BOOT CUT PANT | $54.23 | $128.00 | 1 | $54.23 |
| GREY NAVY | TEREZ | LIGHTNING BOLT CREW PULLOVER | $33.66 | $100.00 | 1 | $33.66 |
| GREY NAVY | TEREZ | LIGHTNING BOLT CREW PULLOVER | $33.66 | $100.00 | 1 | $33.66 |
| GREY NAVY | TEREZ | LIGHTNING BOLT CREW PULLOVER | $33.66 | $100.00 | 1 | $33.66 |
| GREY | THE KOOPLES | PYRAMID STUD FLEECE SWEATSHIRT | $102.28 | $250.00 | 1 | $102.28 |
| WHITE | THE KOOPLES | CASHMERE PULLOVER | $130.09 | $318.00 | 1 | $130.09 |
| BLACK | THE KOOPLES | JEWEL NECK SWEATER | $129.54 | $142.50 | 1 | $129.54 |
| GREY | THE KOOPLES | PYRAMID STUD FLEECE SWEATSHIRT | $102.28 | $250.00 | 1 | $102.28 |
| GREY | THE KOOPLES | PYRAMID STUD FLEECE SWEATSHIRT | $102.28 | $250.00 | 1 | $102.28 |
| STONE GROUND | THE LINE | BALBINA CREW NECK SWEATER | $29.00 | $98.00 | 2 | $58.00 |
| SEA BLUE | THE LINE | BREGAN JERSEY TANK | $6.75 | $32.00 | 1 | $6.75 |
| SPARK | THE LINE | BALDASSARE V NECK SWEATER | $29.00 | $98.00 | 2 | $58.00 |
| SPARK | THE LINE | BALDASSARE V NECK SWEATER | $29.00 | $98.00 | 1 | $29.00 |
| SPARK | THE LINE | BALDASSARE V NECK SWEATER | $29.00 | $98.00 | 3 | $87.00 |
| SPARK | THE LINE | BALBINA CREW NECK SWEATER | $29.00 | $98.00 | 1 | $29.00 |
| SPARK | THE LINE | BALBINA CREW NECK SWEATER | $29.00 | $98.00 | 1 | $29.00 |
| SPARK | THE LINE | BALDASSARE V NECK SWEATER | $29.00 | $98.00 | 2 | $58.00 |
| BROWN | THE PANT COMPANY | ANKLE TRAVELER PANT | $46.18 | $145.00 | 3 | $138.54 |
| BROWN | THE PANT COMPANY | ANKLE TRAVELER PANT | $50.00 | $145.00 | 1 | $50.00 |
| BROWN | THE PANT COMPANY | ANKLE TRAVELER PANT | $50.00 | $145.00 | 1 | $50.00 |
| BROWN | THE PANT COMPANY | ANKLE TRAVELER PANT | $50.00 | $145.00 | 1 | $50.00 |
| BROWN/NAVY SMOKE | THE PANT COMPANY | ANKLE TRAVELER TPC | $48.00 | $145.00 | 4 | $192.00 |
| BROWN/NAVY SMOKE | THE PANT COMPANY | ANKLE TRAVELER TPC | $48.00 | $145.00 | 2 | $96.00 |
| BLACK GEO | THE PANT COMPANY | ANKLE TRAVELER PANT | $45.03 | $145.00 | 1 | $45.03 |
| BLACK GEO | THE PANT COMPANY | ANKLE TRAVELER PANT | $45.03 | $145.00 | 1 | $45.03 |
| BLACK GEO | THE PANT COMPANY | ANKLE TRAVELER PANT | $45.03 | $145.00 | 2 | $90.06 |
| WHITE GEO | THE PANT COMPANY | ANKLE TRAVELER PANT | $43.70 | $145.00 | 3 | $131.10 |
| WHITE GEO | THE PANT COMPANY | ANKLE TRAVELER PANT | $43.70 | $145.00 | 3 | $131.10 |
| WHITE GEO | THE PANT COMPANY | ANKLE TRAVELER PANT | $43.70 | $145.00 | 2 | $87.40 |
| WHITE GEO | THE PANT COMPANY | ANKLE TRAVELER PANT | $42.00 | $145.00 | 2 | $84.00 |
| WHITE GEO | THE PANT COMPANY | ANKLE TRAVELER PANT | $42.00 | $145.00 | 1 | $42.00 |
| WHITE GEO | THE PANT COMPANY | ANKLE TRAVELER PANT | $43.70 | $145.00 | 3 | $131.10 |
| WHITE GEO | THE PANT COMPANY | ANKLE TRAVELER PANT | $43.70 | $145.00 | 1 | $43.70 |
| BLACK | THEORY | BERNETTA B BLOUSE | $150.00 | $315.00 | 1 | $150.00 |
| IVORY | THEORY | ZABETHA TANK | $120.00 | $255.00 | 1 | $120.00 |
| WHITE | THEORY | ESSENTIAL BUTTON DOWN | $155.00 | $325.00 | 1 | $155.00 |
| WHITE | THEORY | ESSENTIAL BUTTON DOWN | $155.00 | $325.00 | 2 | $310.00 |
| WHITE | TONET | PYRAMID STUD FRONT BLOUSE | $173.70 | $395.00 | 1 | $173.70 |
| WHITE | TONET | PYRAMID STUD FRONT BLOUSE | $173.70 | $395.00 | 2 | $347.40 |
| WHITE | TRICOT CHIC | V-NECK KNIT TANK | $66.60 | $165.00 | 1 | $66.60 |
| WHITE | TRICOT CHIC | V-NECK KNIT TANK | $66.60 | $165.00 | 1 | $66.60 |
| CLOUD | TRYB | THOMPSON BLOUSE | $74.70 | $192.00 | 1 | $74.70 |
| OFF WHITE | TWENTY TEES | WALLACE CLAWED L/S SHIRT | $47.80 | $135.00 | 1 | $47.80 |
| BLACK | VEDA | RECORD SKIRT | $299.45 | $298.00 | 1 | $299.45 |
| BLACK | VEDA | RECORD SKIRT | $299.45 | $298.00 | 1 | $299.45 |
| BLACK | WALTER BAKER | AZALEE TOP | $72.36 | $148.00 | 1 | $72.36 |
| NOIR | ZADIG & VOLTAIRE | REGLIS STRPE CP PULLOVER | $174.42 | $398.00 | 1 | $174.42 |
| BLANC | ZADIG & VOLTAIRE | TUNISIEN ML LOVE L/S TEE | $51.30 | $118.00 | 1 | $51.30 |
| GRIS CHINE | ZADIG & VOLTAIRE | PORTLAND CHINE TEE | $51.30 | $118.00 | 1 | $51.30 |

| | | | | | | |
|---|---|---|---|---|---|---|
| GRIS CHINE | ZADIG & VOLTAIRE | PORTLAND CHINE TEE | $51.30 | $118.00 | 1 | $51.30 |
| GRIS CHINE | ZADIG & VOLTAIRE | PORTLAND CHINE TEE | $51.30 | $118.00 | 1 | $51.30 |
| NOIR | ZADIG & VOLTAIRE | REGLIS STRPE CP PULLOVER | $174.42 | $398.00 | 1 | $174.42 |
| NOIR | ZADIG & VOLTAIRE | REGLIS STRPE CP PULLOVER | $174.42 | $398.00 | 1 | $174.42 |
| NOIR | ZADIG & VOLTAIRE | REGLIS STRPE CP PULLOVER | $174.42 | $398.00 | 1 | $174.42 |
| NOIR | ZADIG & VOLTAIRE | REGLIS STRPE CP PULLOVER | $159.88 | $398.00 | 1 | $159.88 |
| NOIR | ZADIG & VOLTAIRE | REGLIS STRPE CP PULLOVER | $159.88 | $398.00 | 1 | $159.88 |
| NOIR | ZADIG & VOLTAIRE | REGLIS STRPE CP PULLOVER | $159.88 | $398.00 | 1 | $159.88 |
| NOIR | ZADIG & VOLTAIRE | KANSAS PULLOVER | $120.18 | $298.00 | 2 | $240.36 |
| NOIR | ZADIG & VOLTAIRE | KANSAS PULLOVER | $120.18 | $298.00 | 1 | $120.18 |
| NOIR | ZADIG & VOLTAIRE | KANSAS PULLOVER | $120.18 | $298.00 | 1 | $120.18 |
| TUTU | ZADIG & VOLTAIRE | PORTLAND AMOUR TEE | $51.30 | $158.00 | 1 | $51.30 |
| ARGIE | ZADIG & VOLTAIRE | KANSAS ARMOUR PULLOVER | $108.90 | $258.00 | 1 | $108.90 |
| ARGILE | ZADIG & VOLTAIRE | KANSAS STAR PULLOVER | $115.00 | $149.00 | 1 | $115.00 |
| ARGILE | ZADIG & VOLTAIRE | KANSAS STAR PULLOVER | $115.00 | $149.00 | 1 | $115.00 |
| NACRE | ZADIG & VOLTAIRE | MISS BIS EMBELLISHED SWEATER | $145.35 | $199.00 | 1 | $145.35 |
| GRIS CHINE | ZADIG & VOLTAIRE | READY SWEATER | $115.00 | $149.00 | 1 | $115.00 |
| MULTI | ZADIG & VOLTAIRE | DELVY CO SPLASH BLOUSE | $120.18 | $298.00 | 2 | $240.36 |
| MULTI | ZADIG & VOLTAIRE | DELVY CO SPLASH BLOUSE | $120.18 | $298.00 | 1 | $120.18 |
| NOIR | ZADIG & VOLTAIRE | TAMARA STRASS SHIRT | $131.67 | $328.00 | 1 | $131.67 |
| NOIR | ZADIG & VOLTAIRE | UPPER PRINT SWEATSHIRT | $57.60 | $158.00 | 4 | $230.40 |
| NOIR | ZADIG & VOLTAIRE | UPPER PRINT SWEATSHIRT | $57.60 | $158.00 | 5 | $288.00 |
| NOIR | ZADIG & VOLTAIRE | UPPER PRINT SWEATSHIRT | $57.60 | $158.00 | 3 | $172.80 |
| NOIR | ZADIG & VOLTAIRE | UPPER PRINT SWEATSHIRT | $57.60 | $158.00 | 3 | $172.80 |
| SALUTE | ZOE KARSSEN | VELOUR LOOSE FIT SWEATER | $55.77 | $158.00 | 1 | $55.77 |
| | | | | TOTAL | 1296 | $119,266.78 |

Case 1:23-cv-11195-SHS-OTW   Document 176-1   Filed 08/12/24   Page 212 of 266

# Exhibit C

Case 1:24-cv-00488... Document #... Filed 04/... Page 213 of 266 ... Page ID #:4990



Stephanie ›

Thank you so much

Np

Thu, May 7, 1:01 PM

Hi Nina,
Hope all is well. Just checking to
see which day I can get in to grab
the inventory next week. Thank you

We were told to have you speak to
Gio about the inventory. We were
told not to transfer any inventory
without instructions from Marcus or
Johnna.

Ok. I'll reach out to them to give you
confirmation to you

When was this please?

We spoke with Marcus yesterday
and Gio this morning.

Oh. Ok gotcha

  iMessage 

      

# Exhibit D

# Transfer Order

MLG Retail LLC
1/24/2020 2:09:34 PM

Transfer Number: NYHQ-HO4 1107

| Source Store: | AGH Warehouse | Dest Store: | NYHQ | | | | | | PLEASE SHIP TO: |
|---|---|---|---|---|---|---|---|---|---|
| | 6 ETHAN ALLEN DR | | 38 E 29TH ST. 6TH FL | | | | | | SAMPLE SALE |
| | SUITE #4 | | | | | | | | 1035 THIRD AVE |
| | SOUTH BURLINGTON VT 05403 | | NEW YORK NY 10016 | | | | | | NEW YORK, NY 10065 |
| | | | | | | | | | Time: 1/24/2020 3:50:22 PM |
| | | | | | | | | | Time: 1/24/2020 3:59:13 PM |
| | | | | | | | | | Time: 1/24/2020 4:03:50 PM |
| User: | STEPHANIE | | | | | | | | Time: 1/27/2020 9:53:00 AM |

| ItemNum | Description | Description 2 | Season | Size | Color | Comments | AGE GROUP | Qty | Retail Price |
|---|---|---|---|---|---|---|---|---|---|
| 76382 | BAYLIN RIB L/S TEE | | A | XS | BLACK | | | 1 | 44.00 |
| 76383 | BAYLIN RIB L/S TEE | | A | S | BLACK | | | 19 | 44.00 |
| 76384 | BAYLIN RIB L/S TEE | | A | M | BLACK | | | 19 | 44.00 |
| 76385 | BAYLIN RIB L/S TEE | | A | L | BLACK | | | 4 | 44.00 |
| 76387 | BAYLIN RIB L/S TEE | | A | S | OPTIC WHITE | | | 5 | 44.00 |
| 76390 | BAYLIN RIB L/S TEE | | A | XS | H GREY | | | 23 | 44.00 |
| 76391 | BAYLIN RIB L/S TEE | | A | S | H GREY | | | 36 | 44.00 |
| 76392 | BAYLIN RIB L/S TEE | | A | M | H GREY | | | 36 | 44.00 |
| 76393 | BAYLIN RIB L/S TEE | | A | L | H GREY | | | 23 | 44.00 |
| 76394 | BAYLIN RIB L/S TEE | | A | XS | CHARCOAL | | | 23 | 44.00 |
| 76395 | BAYLIN RIB L/S TEE | | A | S | CHARCOAL | | | 38 | 44.00 |
| 76396 | BAYLIN RIB L/S TEE | | A | M | CHARCOAL | | | 39 | 44.00 |
| 76397 | BAYLIN RIB L/S TEE | | A | L | CHARCOAL | | | 20 | 44.00 |
| 76398 | BAYLIN RIB L/S TEE | | A | XS | DEEP RED | | | 7 | 44.00 |
| 76399 | BAYLIN RIB L/S TEE | | A | S | DEEP RED | | | 17 | 44.00 |
| 76400 | BAYLIN RIB L/S TEE | | A | M | DEEP RED | | | 14 | 44.00 |
| 76401 | BAYLIN RIB L/S TEE | | A | L | DEEP RED | | | 7 | 44.00 |
| 76415 | BAYLIN RIB L/S TEE | | A | S | LAVENDER | | | 1 | 40.00 |
| 76416 | BAYLIN RIB L/S TEE | | A | M | LAVENDER | | | 1 | 40.00 |
| 76418 | BAYLIN RIB L/S TEE | | A | XS | SEA BLUE | | | 7 | 44.00 |
| 76419 | BAYLIN RIB L/S TEE | | A | S | SEA BLUE | | | 9 | 44.00 |
| 76420 | BAYLIN RIB L/S TEE | | A | M | SEA BLUE | | | 15 | 44.00 |
| 76421 | BAYLIN RIB L/S TEE | | A | L | SEA BLUE | | | 7 | 44.00 |

# Transfer Order

**MLG Retail LLC**
1/24/2020 2:09:34 PM

Transfer Number: NYHQ-HO4 1107

| Source Store: | AGH Warehouse | Dest Store: | NYHQ | | Comments | | PLEASE SHIP TO: |
|---|---|---|---|---|---|---|---|
| | 6 ETHAN ALLEN DR | | 38 E 29TH ST. 6TH FL | | | | SAMPLE SALE |
| | SUITE #4 | | | | | | 1035 THIRD AVE |
| | SOUTH VT 05403 | | NEW YORK NY 10016 | | | | NEW YORK, NY 10065 |
| | BURLINGTON | | | | | | Time: 1/24/2020 3:50:22 PM |
| | | | | | | | Time: 1/24/2020 3:59:13 PM |
| User: | STEPHANIE | | | | | | Time: 1/24/2020 4:03:50 PM |
| | | | | | | | Time: 1/27/2020 9:53:00 AM |

| ItemNum | Description | Description 2 | Season | Size | Color | AGE GROUP | Qty | Retail Price |
|---|---|---|---|---|---|---|---|---|
| 76426 | BAYLIN RIB L/S TEE | | A | XS | BLUSH PINK | | 2 | 44.00 |
| 76427 | BAYLIN RIB L/S TEE | | A | S | BLUSH PINK | | 5 | 44.00 |
| 76428 | BAYLIN RIB L/S TEE | | A | M | BLUSH PINK | | 8 | 44.00 |
| 76431 | BAYLIN RIB L/S TEE | | A | S | FOREST | | 2 | 44.00 |
| 76432 | BAYLIN RIB L/S TEE | | A | M | FOREST | | 1 | 44.00 |
| 76434 | BAYLIN RIB L/S TEE | | A | XS | TANGERINE | | 7 | 44.00 |
| 76435 | BAYLIN RIB L/S TEE | | A | S | TANGERINE | | 15 | 44.00 |
| 76436 | BAYLIN RIB L/S TEE | | A | M | TANGERINE | | 16 | 44.00 |
| 76437 | BAYLIN RIB L/S TEE | | A | L | TANGERINE | | 7 | 44.00 |
| 76438 | BAYLIN RIB L/S TEE | | A | XS | EGGPLANT | | 4 | 44.00 |
| 76439 | BAYLIN RIB L/S TEE | | A | S | EGGPLANT | | 11 | 44.00 |
| 76440 | BAYLIN RIB L/S TEE | | A | M | EGGPLANT | | 10 | 44.00 |
| 76441 | BAYLIN RIB L/S TEE | | A | L | EGGPLANT | | 2 | 44.00 |
| 76442 | BAYLIN RIB L/S TEE | | A | XS | DENIM | | 2 | 44.00 |
| 76443 | BAYLIN RIB L/S TEE | | A | S | DENIM | | 8 | 44.00 |
| 76444 | BAYLIN RIB L/S TEE | | A | M | DENIM | | 10 | 44.00 |
| 76445 | BAYLIN RIB L/S TEE | | A | L | DENIM | | 2 | 44.00 |
| 76455 | BATTY RIB CAP SLV TEE | | A | S | BLACK | | 8 | 38.00 |
| 76456 | BATTY RIB CAP SLV TEE | | A | M | BLACK | | 7 | 38.00 |
| 76460 | BATTY RIB CAP SLV TEE | | A | M | OPTIC WHITE | | 5 | 38.00 |
| 76462 | BATTY RIB CAP SLV TEE | | A | XS | H GREY | | 9 | 38.00 |
| 76463 | BATTY RIB CAP SLV TEE | | A | S | H GREY | | 27 | 38.00 |

# Transfer Order

MLG Retail LLC
1/24/2020 2:09:34 PM

Transfer Number: NYHQ-HO4 1107

| Source Store: | AGH Warehouse | Dest Store: | NYHQ | | | | Comments | | PLEASE SHIP TO: |
|---|---|---|---|---|---|---|---|---|---|
| | 6 ETHAN ALLEN DR | | 38 E 29TH ST. 6TH FL | | | | | | SAMPLE SALE |
| | SUITE #4 | | | | | | | | 1035 THIRD AVE |
| | SOUTH          VT          05403 | | NEW YORK          NY          10016 | | | | | | NEW YORK, NY 10065 |
| | BURLINGTON | | | | | | | | Time: 1/24/2020 3:50:22 PM |
| User: | STEPHANIE | | | | | | | | Time: 1/24/2020 3:59:13 PM |
| | | | | | | | | | Time: 1/24/2020 4:03:50 PM |
| | | | | | | | | | Time: 1/27/2020 9:53:00 AM |

| ItemNum | Description | Description 2 | Season | Size | Color | AGE GROUP | Qty | Retail Price |
|---|---|---|---|---|---|---|---|---|
| 76464 | BATTY RIB CAP SLV TEE | | A | M | H GREY | | 31 | 38.00 |
| 76465 | BATTY RIB CAP SLV TEE | | A | L | H GREY | | 6 | 38.00 |
| 76467 | BELIA RIB ML FIT TEE | | A | S | BLACK | | 11 | 42.00 |
| 76468 | BELIA RIB ML FIT TEE | | A | M | BLACK | | 10 | 42.00 |
| 76475 | BELIA RIB ML FIT TEE | | A | S | H GREY | | 10 | 42.00 |
| 76476 | BELIA RIB ML FIT TEE | | A | M | H GREY | | 13 | 42.00 |
| 76479 | BELIA RIB ML FIT TEE | | A | S | CHARCOAL | | 8 | 42.00 |
| 76480 | BELIA RIB ML FIT TEE | | A | M | CHARCOAL | | 4 | 42.00 |
| 76482 | BELIA RIB ML FIT TEE | | A | XS | DEEP RED | | 5 | 42.00 |
| 76483 | BELIA RIB ML FIT TEE | | A | S | DEEP RED | | 14 | 42.00 |
| 76484 | BELIA RIB ML FIT TEE | | A | M | DEEP RED | | 13 | 42.00 |
| 76485 | BELIA RIB ML FIT TEE | | A | L | DEEP RED | | 2 | 42.00 |
| 76487 | BELIA RIB ML FIT TEE | | A | S | MINK | | 1 | 42.00 |
| 76503 | BELIA RIB ML FIT TEE | | A | S | SEA BLUE | | 17 | 42.00 |
| 76504 | BELIA RIB ML FIT TEE | | A | M | SEA BLUE | | 14 | 42.00 |
| 76505 | BELIA RIB ML FIT TEE | | A | L | SEA BLUE | | 7 | 42.00 |
| 76515 | BELIA RIB ML FIT TEE | | A | S | FOREST | | 3 | 42.00 |
| 76516 | BELIA RIB ML FIT TEE | | A | M | FOREST | | 2 | 42.00 |
| 76518 | BELIA RIB ML FIT TEE | | A | XS | TANGERINE | | 11 | 42.00 |
| 76519 | BELIA RIB ML FIT TEE | | A | S | TANGERINE | | 15 | 42.00 |
| 76520 | BELIA RIB ML FIT TEE | | A | M | TANGERINE | | 19 | 42.00 |
| 76521 | BELIA RIB ML FIT TEE | | A | L | TANGERINE | | 7 | 42.00 |
| 76522 | BELIA RIB ML FIT TEE | | A | XS | EGGPLANT | | 11 | 42.00 |

# Transfer Order

MLG Retail LLC
1/24/2020 2:09:34 PM

Transfer Number: NYHQ-HO4 1107

| Source Store: | AGH Warehouse | Dest Store: | NYHQ | | | PLEASE SHIP TO: |
|---|---|---|---|---|---|---|
| | 6 ETHAN ALLEN DR | | 38 E 29TH ST. 6TH FL | | | SAMPLE SALE |
| | SUITE #4 | | | | | 1035 THIRD AVE |
| | SOUTH        VT    05403 | | NEW YORK    NY    10016 | | | NEW YORK, NY 10065 |
| | BURLINGTON | | | | | Time: 1/24/2020 3:50:22 PM |
| User: | STEPHANIE | | | | | Time: 1/24/2020 3:59:13 PM |
| | | | | | | Time: 1/24/2020 4:03:50 PM |
| | | | | | | Time: 1/27/2020 9:53:00 AM |

| ItemNum | Description | Description 2 | Season | Size | Color | Comments | AGE GROUP | Qty | Retail Price |
|---|---|---|---|---|---|---|---|---|---|
| 76523 | BELIA RIB ML FIT TEE | | A | S | EGGPLANT | | | 17 | 42.00 |
| 76524 | BELIA RIB ML FIT TEE | | A | M | EGGPLANT | | | 12 | 42.00 |
| 76525 | BELIA RIB ML FIT TEE | | A | L | EGGPLANT | | | 3 | 42.00 |
| 76610 | BEKA JERSEY L/S TEE | | A | XS | BLACK | | | 2 | 38.00 |
| 76611 | BEKA JERSEY L/S TEE | | A | S | BLACK | | | 14 | 38.00 |
| 76612 | BEKA JERSEY L/S TEE | | A | M | BLACK | | | 16 | 38.00 |
| 76613 | BEKA JERSEY L/S TEE | | A | L | BLACK | | | 4 | 38.00 |
| 76618 | BEKA JERSEY L/S TEE | | A | XS | H GREY | | | 23 | 38.00 |
| 76619 | BEKA JERSEY L/S TEE | | A | S | H GREY | | | 35 | 38.00 |
| 76620 | BEKA JERSEY L/S TEE | | A | M | H GREY | | | 38 | 38.00 |
| 76621 | BEKA JERSEY L/S TEE | | A | L | H GREY | | | 16 | 38.00 |
| 76622 | BEKA JERSEY L/S TEE | | A | XS | CHARCOAL | | | 23 | 38.00 |
| 76623 | BEKA JERSEY L/S TEE | | A | S | CHARCOAL | | | 40 | 38.00 |
| 76624 | BEKA JERSEY L/S TEE | | A | M | CHARCOAL | | | 42 | 38.00 |
| 76625 | BEKA JERSEY L/S TEE | | A | L | CHARCOAL | | | 23 | 38.00 |
| 76626 | BEKA JERSEY L/S TEE | | A | XS | DEEP RED | | | 12 | 38.00 |
| 76627 | BEKA JERSEY L/S TEE | | A | S | DEEP RED | | | 20 | 38.00 |
| 76628 | BEKA JERSEY L/S TEE | | A | M | DEEP RED | | | 20 | 38.00 |
| 76629 | BEKA JERSEY L/S TEE | | A | L | DEEP RED | | | 11 | 38.00 |
| 76646 | BEKA JERSEY L/S TEE | | A | XS | SEA BLUE | | | 8 | 38.00 |
| 76647 | BEKA JERSEY L/S TEE | | A | S | SEA BLUE | | | 15 | 38.00 |
| 76648 | BEKA JERSEY L/S TEE | | A | M | SEA BLUE | | | 13 | 38.00 |
| 76649 | BEKA JERSEY L/S TEE | | A | L | SEA BLUE | | | 7 | 38.00 |

# Transfer Order

MLG Retail LLC
1/24/2020 2:09:34 PM

Transfer Number: NYHQ-HO4 1107

| Source Store: | AGH Warehouse | Dest Store: | NYHQ | | | | Comments | | PLEASE SHIP TO: |
|---|---|---|---|---|---|---|---|---|---|
| | 6 ETHAN ALLEN DR | | 38 E 29TH ST. 6TH FL | | | | | | SAMPLE SALE |
| | SUITE #4 | | | | | | | | 1035 THIRD AVE |
| | SOUTH BURLINGTON VT 05403 | | NEW YORK NY 10016 | | | | | | NEW YORK, NY 10065 |
| | | | | | | | | | Time: 1/24/2020 3:50:22 PM |
| | | | | | | | | | Time: 1/24/2020 3:59:13 PM |
| User: | STEPHANIE | | | | | | | | Time: 1/24/2020 4:03:50 PM |
| | | | | | | | | | Time: 1/27/2020 9:53:00 AM |

| ItemNum | Description | Description 2 | Season | Size | Color | AGE GROUP | Qty | Retail Price |
|---|---|---|---|---|---|---|---|---|
| 76654 | BEKA JERSEY L/S TEE | | A | XS | BLUSH PINK | | 3 | 38.00 |
| 76655 | BEKA JERSEY L/S TEE | | A | S | BLUSH PINK | | 4 | 38.00 |
| 76656 | BEKA JERSEY L/S TEE | | A | M | BLUSH PINK | | 8 | 38.00 |
| 76657 | BEKA JERSEY L/S TEE | | A | L | BLUSH PINK | | 6 | 38.00 |
| 76658 | BEKA JERSEY L/S TEE | | A | XS | FOREST | | 19 | 38.00 |
| 76659 | BEKA JERSEY L/S TEE | | A | S | FOREST | | 8 | 38.00 |
| 76660 | BEKA JERSEY L/S TEE | | A | M | FOREST | | 18 | 38.00 |
| 76661 | BEKA JERSEY L/S TEE | | A | L | FOREST | | 10 | 38.00 |
| 76662 | BEKA JERSEY L/S TEE | | A | XS | TANGERINE | | 10 | 38.00 |
| 76663 | BEKA JERSEY L/S TEE | | A | S | TANGERINE | | 15 | 38.00 |
| 76664 | BEKA JERSEY L/S TEE | | A | M | TANGERINE | | 19 | 38.00 |
| 76665 | BEKA JERSEY L/S TEE | | A | L | TANGERINE | | 9 | 38.00 |
| 76666 | BEKA JERSEY L/S TEE | | A | XS | EGGPLANT | | 8 | 38.00 |
| 76667 | BEKA JERSEY L/S TEE | | A | S | EGGPLANT | | 14 | 38.00 |
| 76668 | BEKA JERSEY L/S TEE | | A | M | EGGPLANT | | 18 | 38.00 |
| 76669 | BEKA JERSEY L/S TEE | | A | L | EGGPLANT | | 10 | 38.00 |
| 76671 | BEKA JERSEY L/S TEE | | A | S | DENIM | | 3 | 38.00 |
| 76672 | BEKA JERSEY L/S TEE | | A | M | DENIM | | 8 | 38.00 |
| 76673 | BEKA JERSEY L/S TEE | | A | L | DENIM | | 1 | 38.00 |
| 76678 | BEKA JERSEY L/S TEE | | A | XS | NAVY | | 5 | 38.00 |
| 76679 | BEKA JERSEY L/S TEE | | A | S | NAVY | | 8 | 38.00 |
| 76680 | BEKA JERSEY L/S TEE | | A | M | NAVY | | 9 | 38.00 |

# Transfer Order

MLG Retail LLC
1/24/2020 2:09:34 PM

Transfer Number: NYHQ-HO4 1107

| Source Store: | AGH Warehouse | Dest Store: | NYHQ | | | | Comments | | PLEASE SHIP TO: |
|---|---|---|---|---|---|---|---|---|---|
| | 6 ETHAN ALLEN DR | | 38 E 29TH ST. 6TH FL | | | | | | SAMPLE SALE |
| | SUITE #4 | | | | | | | | 1035 THIRD AVE |
| | SOUTH      VT    05403 | | NEW YORK      NY      10016 | | | | | | NEW YORK, NY 10065 |
| | BURLINGTON | | | | | | | | Time: 1/24/2020 3:50:22 PM |
| User: | STEPHANIE | | | | | | | | Time: 1/24/2020 3:59:13 PM |
| | | | | | | | | | Time: 1/24/2020 4:03:50 PM |
| | | | | | | | | | Time: 1/27/2020 9:53:00 AM |

| ItemNum | Description | Description 2 | Season | Size | Color | AGE GROUP | Qty | Retail Price |
|---|---|---|---|---|---|---|---|---|
| 76682 | BASHIA JERSERY CAP SLV TEE | | A | XS | BLACK | | 23 | 42.00 |
| 76683 | BASHIA JERSERY CAP SLV TEE | | A | S | BLACK | | 35 | 42.00 |
| 76684 | BASHIA JERSERY CAP SLV TEE | | A | M | BLACK | | 40 | 42.00 |
| 76685 | BASHIA JERSERY CAP SLV TEE | | A | L | BLACK | | 23 | 42.00 |
| 76687 | BASHIA JERSERY CAP SLV TEE | | A | S | OPTIC WHITE | | 4 | 42.00 |
| 76688 | BASHIA JERSERY CAP SLV TEE | | A | M | OPTIC WHITE | | 7 | 42.00 |
| 76690 | BASHIA JERSERY CAP SLV TEE | | A | XS | H GREY | | 14 | 42.00 |
| 76691 | BASHIA JERSERY CAP SLV TEE | | A | S | H GREY | | 27 | 42.00 |
| 76692 | BASHIA JERSERY CAP SLV TEE | | A | M | H GREY | | 23 | 42.00 |
| 76693 | BASHIA JERSERY CAP SLV TEE | | A | L | H GREY | | 11 | 42.00 |
| 76695 | BIRGIT JERSEY ML FIT TEE | | A | S | BLACK | | 9 | 38.00 |
| 76696 | BIRGIT JERSEY ML FIT TEE | | A | M | BLACK | | 15 | 38.00 |
| 76700 | BIRGIT JERSEY ML FIT TEE | | A | M | OPTIC WHITE | | 1 | 38.00 |
| 76702 | BIRGIT JERSEY ML FIT TEE | | A | XS | H GREY | | 12 | 38.00 |
| 76703 | BIRGIT JERSEY ML FIT TEE | | A | S | H GREY | | 20 | 38.00 |
| 76704 | BIRGIT JERSEY ML FIT TEE | | A | M | H GREY | | 25 | 38.00 |
| 76705 | BIRGIT JERSEY ML FIT TEE | | A | L | H GREY | | 4 | 38.00 |
| 76706 | BIRGIT JERSEY ML FIT TEE | | A | XS | CHARCOAL | | 7 | 38.00 |
| 76707 | BIRGIT JERSEY ML FIT TEE | | A | S | CHARCOAL | | 12 | 38.00 |
| 76708 | BIRGIT JERSEY ML FIT TEE | | A | M | CHARCOAL | | 10 | 38.00 |
| 76709 | BIRGIT JERSEY ML FIT TEE | | A | L | CHARCOAL | | 2 | 38.00 |
| 76710 | BIRGIT JERSEY ML FIT TEE | | A | XS | DEEP RED | | 10 | 38.00 |
| 76711 | BIRGIT JERSEY ML FIT TEE | | A | S | DEEP RED | | 10 | 38.00 |

# Transfer Order

**MLG Retail LLC**
1/24/2020 2:09:34 PM

Transfer Number: NYHQ-HO4 1107

| Source Store: | AGH Warehouse | Dest Store: | NYHQ | | | PLEASE SHIP TO: |
|---|---|---|---|---|---|---|
| | 6 ETHAN ALLEN DR | | 38 E 29TH ST. 6TH FL | | | SAMPLE SALE |
| | SUITE #4 | | | | | 1035 THIRD AVE |
| | SOUTH          VT     05403 | | NEW YORK        NY      10016 | | | NEW YORK, NY 10065 |
| | BURLINGTON | | | | | Time: 1/24/2020 3:50:22 PM |
| | | | | | | Time: 1/24/2020 3:59:13 PM |
| User: | STEPHANIE | | | | | Time: 1/24/2020 4:03:50 PM |
| | | | | | | Time: 1/27/2020 9:53:00 AM |

| ItemNum | Description | Description 2 | Season | Size | Color | Comments | AGE GROUP | Qty | Retail Price |
|---|---|---|---|---|---|---|---|---|---|
| 76712 | BIRGIT JERSEY ML FIT TEE | | A | M | DEEP RED | | | 10 | 38.00 |
| 76713 | BIRGIT JERSEY ML FIT TEE | | A | L | DEEP RED | | | 3 | 38.00 |
| 76714 | BIRGIT JERSEY ML FIT TEE | | A | XS | MINK | | | 4 | 38.00 |
| 76715 | BIRGIT JERSEY ML FIT TEE | | A | S | MINK | | | 13 | 38.00 |
| 76716 | BIRGIT JERSEY ML FIT TEE | | A | M | MINK | | | 12 | 38.00 |
| 76717 | BIRGIT JERSEY ML FIT TEE | | A | L | MINK | | | 4 | 38.00 |
| 76730 | BIRGIT JERSEY ML FIT TEE | | A | XS | SEA BLUE | | | 5 | 38.00 |
| 76731 | BIRGIT JERSEY ML FIT TEE | | A | S | SEA BLUE | | | 12 | 38.00 |
| 76732 | BIRGIT JERSEY ML FIT TEE | | A | M | SEA BLUE | | | 16 | 38.00 |
| 76733 | BIRGIT JERSEY ML FIT TEE | | A | L | SEA BLUE | | | 4 | 38.00 |
| 76746 | BIRGIT JERSEY ML FIT TEE | | A | XS | TANGERINE | | | 12 | 38.00 |
| 76747 | BIRGIT JERSEY ML FIT TEE | | A | S | TANGERINE | | | 17 | 38.00 |
| 76748 | BIRGIT JERSEY ML FIT TEE | | A | M | TANGERINE | | | 15 | 38.00 |
| 76749 | BIRGIT JERSEY ML FIT TEE | | A | L | TANGERINE | | | 6 | 38.00 |
| 76750 | BIRGIT JERSEY ML FIT TEE | | A | XS | EGGPLANT | | | 4 | 38.00 |
| 76751 | BIRGIT JERSEY ML FIT TEE | | A | S | EGGPLANT | | | 15 | 38.00 |
| 76752 | BIRGIT JERSEY ML FIT TEE | | A | M | EGGPLANT | | | 15 | 38.00 |
| 76753 | BIRGIT JERSEY ML FIT TEE | | A | L | EGGPLANT | | | 3 | 38.00 |
| 76762 | BIRGIT JERSEY ML FIT TEE | | A | XS | NAVY | | | 3 | 38.00 |
| 76763 | BIRGIT JERSEY ML FIT TEE | | A | S | NAVY | | | 7 | 38.00 |
| 76764 | BIRGIT JERSEY ML FIT TEE | | A | M | NAVY | | | 10 | 38.00 |
| 76767 | BREGAN JERSEY TANK | | A | S | BLACK | | | 2 | 31.00 |
| 76768 | BREGAN JERSEY TANK | | A | M | BLACK | | | 8 | 31.00 |

# Transfer Order

**MLG Retail LLC**
1/24/2020 2:09:34 PM

Transfer Number:  NYHQ-HO4 1107

| Source Store: | AGH Warehouse | Dest Store: | NYHQ | | | | Comments | | PLEASE SHIP TO: |
|---|---|---|---|---|---|---|---|---|---|
| | 6 ETHAN ALLEN DR | | 38 E 29TH ST. 6TH FL | | | | | | SAMPLE SALE |
| | SUITE #4 | | | | | | | | 1035 THIRD AVE |
| | SOUTH        VT    05403 | | NEW YORK        NY    10016 | | | | | | NEW YORK, NY 10065 |
| | BURLINGTON | | | | | | | | Time: 1/24/2020 3:50:22 PM |
| User: | STEPHANIE | | | | | | | | Time: 1/24/2020 3:59:13 PM |
| | | | | | | | | | Time: 1/24/2020 4:03:50 PM |
| | | | | | | | | | Time: 1/27/2020 9:53:00 AM |

| ItemNum | Description | Description 2 | Season | Size | Color | AGE GROUP | Qty | Retail Price |
|---|---|---|---|---|---|---|---|---|
| 76772 | BREGAN JERSEY TANK | | A | M | OPTIC WHITE | | 11 | 31.00 |
| 76774 | BREGAN JERSEY TANK | | A | XS | H GREY | | 9 | 31.00 |
| 76775 | BREGAN JERSEY TANK | | A | S | H GREY | | 23 | 31.00 |
| 76776 | BREGAN JERSEY TANK | | A | M | H GREY | | 26 | 31.00 |
| 76778 | BREGAN JERSEY TANK | | A | XS | CHARCOAL | | 31 | 31.00 |
| 76779 | BREGAN JERSEY TANK | | A | S | CHARCOAL | | 42 | 31.00 |
| 76780 | BREGAN JERSEY TANK | | A | M | CHARCOAL | | 43 | 31.00 |
| 76781 | BREGAN JERSEY TANK | | A | L | CHARCOAL | | 19 | 31.00 |
| 76782 | BREGAN JERSEY TANK | | A | XS | DEEP RED | | 9 | 31.00 |
| 76783 | BREGAN JERSEY TANK | | A | S | DEEP RED | | 17 | 31.00 |
| 76784 | BREGAN JERSEY TANK | | A | M | DEEP RED | | 18 | 31.00 |
| 76785 | BREGAN JERSEY TANK | | A | L | DEEP RED | | 8 | 31.00 |
| 76802 | BREGAN JERSEY TANK | | A | XS | SEA BLUE | | 9 | 32.00 |
| 76803 | BREGAN JERSEY TANK | | A | S | SEA BLUE | | 12 | 32.00 |
| 76804 | BREGAN JERSEY TANK | | A | M | SEA BLUE | | 17 | 32.00 |
| 76805 | BREGAN JERSEY TANK | | A | L | SEA BLUE | | 3 | 32.00 |
| 76815 | BREGAN JERSEY TANK | | A | S | FOREST | | 3 | 32.00 |
| 76816 | BREGAN JERSEY TANK | | A | M | FOREST | | 2 | 32.00 |
| 76818 | BREGAN JERSEY TANK | | A | XS | TANGERINE | | 4 | 32.00 |
| 76819 | BREGAN JERSEY TANK | | A | S | TANGERINE | | 3 | 32.00 |
| 76820 | BREGAN JERSEY TANK | | A | M | TANGERINE | | 6 | 31.00 |
| 76821 | BREGAN JERSEY TANK | | A | L | TANGERINE | | 1 | 31.00 |

# Transfer Order

**MLG Retail LLC**
1/24/2020 2:09:34 PM

Transfer Number: NYHQ-HO4 1107

| Source Store: | AGH Warehouse | Dest Store: | NYHQ |
|---|---|---|---|
| | 6 ETHAN ALLEN DR | | 38 E 29TH ST. 6TH FL |
| | SUITE #4 | | |
| | SOUTH    VT    05403 | | NEW YORK    NY    10016 |
| | BURLINGTON | | |

User: STEPHANIE

PLEASE SHIP TO:

SAMPLE SALE
1035 THIRD AVE
NEW YORK, NY 10065
Time: 1/24/2020 3:50:22 PM
Time: 1/24/2020 3:59:13 PM
Time: 1/24/2020 4:03:50 PM
Time: 1/27/2020 9:53:00 AM

| ItemNum | Description | Description 2 | Season | Size | Color | Comments | AGE GROUP | Qty | Retail Price |
|---|---|---|---|---|---|---|---|---|---|
| 76822 | BREGAN JERSEY TANK | | A | XS | EGGPLANT | | | 1 | 31.00 |
| 76823 | BREGAN JERSEY TANK | | A | S | EGGPLANT | | | 10 | 31.00 |
| 76824 | BREGAN JERSEY TANK | | A | M | EGGPLANT | | | 5 | 31.00 |
| 76838 | BRELAN THERMAL HOODIE WO PKT | | A | XS | BLACK | | | 10 | 54.00 |
| 76839 | BRELAN THERMAL HOODIE WO PKT | | A | S | BLACK | | | 25 | 54.00 |
| 76840 | BRELAN THERMAL HOODIE WO PKT | | A | M | BLACK | | | 28 | 54.00 |
| 76841 | BRELAN THERMAL HOODIE WO PKT | | A | L | BLACK | | | 9 | 54.00 |
| 76842 | BRELAN THERMAL HOODIE WO PKT | | A | XS | OPTIC WHITE | | | 5 | 54.00 |
| 76843 | BRELAN THERMAL HOODIE WO PKT | | A | S | OPTIC WHITE | | | 19 | 54.00 |
| 76844 | BRELAN THERMAL HOODIE WO PKT | | A | M | OPTIC WHITE | | | 26 | 54.00 |
| 76845 | BRELAN THERMAL HOODIE WO PKT | | A | L | OPTIC WHITE | | | 10 | 54.00 |
| 76850 | BRELAN THERMAL HOODIE WO PKT | | A | XS | DENIM | | | 3 | 54.00 |
| 76851 | BRELAN THERMAL HOODIE WO PKT | | A | S | DENIM | | | 8 | 54.00 |
| 76852 | BRELAN THERMAL HOODIE WO PKT | | A | M | DENIM | | | 10 | 54.00 |

# Transfer Order

MLG Retail LLC
1/24/2020 2:09:34 PM

Transfer Number: NYHQ-HO4 1107

| Source Store: | AGH Warehouse | Dest Store: | NYHQ | | Comments | | PLEASE SHIP TO: |
|---|---|---|---|---|---|---|---|

6 ETHAN ALLEN DR
SUITE #4
SOUTH BURLINGTON VT 05403

38 E 29TH ST. 6TH FL
NEW YORK NY 10016

SAMPLE SALE
1035 THIRD AVE
NEW YORK, NY 10065
Time: 1/24/2020 3:50:22 PM
Time: 1/24/2020 3:59:13 PM
Time: 1/24/2020 4:03:50 PM
Time: 1/27/2020 9:53:00 AM

User: STEPHANIE

| ItemNum | Description | Description 2 | Season | Size | Color | AGE GROUP | Qty | Retail Price |
|---|---|---|---|---|---|---|---|---|
| 76853 | BRELAN THERMAL HOODIE W/O PKT | | A | L | DENIM | | 6 | 54.00 |
| 76854 | BRELAN THERMAL HOODIE W PKT | | A | XS | BLACK | | 12 | 58.00 |
| 76855 | BRELAN THERMAL HOODIE W PKT | | A | S | BLACK | | 13 | 58.00 |
| 76856 | BRELAN THERMAL HOODIE W PKT | | A | M | BLACK | | 12 | 58.00 |
| 76858 | BRELAN THERMAL HOODIE W PKT | | A | XS | OPTIC WHITE | | 12 | 58.00 |
| 76859 | BRELAN THERMAL HOODIE W PKT | | A | S | OPTIC WHITE | | 9 | 58.00 |
| 76860 | BRELAN THERMAL HOODIE W PKT | | A | M | OPTIC WHITE | | 12 | 58.00 |
| 76862 | BRELAN THERMAL HOODIE W PKT | | A | XS | H GREY | | 19 | 58.00 |
| 76863 | BRELAN THERMAL HOODIE W PKT | | A | S | H GREY | | 23 | 58.00 |
| 76864 | BRELAN THERMAL HOODIE W PKT | | A | M | H GREY | | 27 | 58.00 |
| 76865 | BRELAN THERMAL HOODIE W PKT | | A | L | H GREY | | 13 | 58.00 |
| 22207 | ANKLE TRAVELER TPC | | A | 4 | BLACK | | 2 | 145.00 |
| 22208 | ANKLE TRAVELER TPC | | A | 6 | BLACK | | 6 | 145.00 |
| 22209 | ANKLE TRAVELER TPC | | A | 8 | BLACK | | 3 | 145.00 |

# Transfer Order

**MLG Retail LLC**
1/24/2020 2:09:34 PM

Transfer Number: NYHQ-HO4 1107

| Source Store: | AGH Warehouse | Dest Store: | NYHQ | | Comments | | PLEASE SHIP TO: |
|---|---|---|---|---|---|---|---|
| | 6 ETHAN ALLEN DR | | 38 E 29TH ST. 6TH FL | | | | SAMPLE SALE |
| | SUITE #4 | | | | | | 1035 THIRD AVE |
| | SOUTH       VT    05403 | | NEW YORK       NY    10016 | | | | NEW YORK, NY 10065 |
| | BURLINGTON | | | | | | Time: 1/24/2020 3:50:22 PM |
| | | | | | | | Time: 1/24/2020 3:59:13 PM |
| | | | | | | | Time: 1/24/2020 4:03:50 PM |
| | | | | | | | Time: 1/27/2020 9:53:00 AM |

User:    STEPHANIE

| ItemNum | Description | Description 2 | Season | Size | Color | AGE GROUP | Qty | Retail Price |
|---|---|---|---|---|---|---|---|---|
| 22210 | ANKLE TRAVELER TPC | | A | 10 | BLACK | | 2 | 145.00 |
| 22256 | ANKLE TRAVELER TPC | | A | 10 | MILITARY | | 2 | 145.00 |
| 22274 | ANKLE TRAVELER TPC | | A | 2 | BROWN | | 3 | 145.00 |
| 22275 | ANKLE TRAVELER TPC | | A | 4 | BROWN | | 4 | 145.00 |
| 22276 | ANKLE TRAVELER TPC | | A | 6 | BROWN | | 1 | 145.00 |
| 22291 | ANKLE TRAVELER TPC | | A | 14 | STONE | | 1 | 145.00 |
| 22518 | ANKLE TRAVELER TPC | | A | 6 | BLACK GEO | | 1 | 145.00 |
| 22519 | ANKLE TRAVELER TPC | | A | 10 | BLACK GEO | | 17 | 145.00 |
| 22520 | ANKLE TRAVELER TPC | | A | 12 | BLACK GEO | | 8 | 145.00 |
| 22523 | ANKLE TRAVELER TPC | | A | 8 | BLACK GEO | | 2 | 145.00 |
| 61778 | ANKLE TRAVELER TPC | | A | 0 | WHITE GEO | | 5 | 145.00 |
| 61779 | ANKLE TRAVELER TPC | | A | 2 | WHITE GEO | | 3 | 145.00 |
| 61780 | ANKLE TRAVELER TPC | | A | 4 | WHITE GEO | | 3 | 145.00 |
| 61781 | ANKLE TRAVELER TPC | | A | 6 | WHITE GEO | | 1 | 145.00 |
| 61782 | ANKLE TRAVELER TPC | | A | 8 | WHITE GEO | | 7 | 145.00 |
| 61783 | ANKLE TRAVELER TPC | | A | 10 | WHITE GEO | | 7 | 145.00 |
| 61784 | ANKLE TRAVELER TPC | | A | 12 | WHITE GEO | | 6 | 145.00 |
| 22247 | ANKLE TRAVELER TPC | | A | 14 | WHITE | | 1 | 145.00 |
| 22306 | ANKLE TRAVELER TPC | | A | 0 | SMOKE | | 1 | 145.00 |
| 28468 | ANKLE TRAVELER TPC | | A | 0 | PINK | | 1 | 145.00 |
| 28474 | ANKLE TRAVELER TPC | | A | 8 | PINK | | 1 | 145.00 |
| 28481 | ANKLE TRAVELER TPC | | A | 10 | BERRY | | 1 | 145.00 |
| 28482 | ANKLE TRAVELER TPC | | A | 8 | BERRY | | 1 | 145.00 |

# Transfer Order

**MLG Retail LLC**
1/24/2020 2:09:34 PM

Transfer Number: NYHQ-HO4 1107

| Source Store: | AGH Warehouse | Dest Store: | NYHQ | | | Comments | | PLEASE SHIP TO: |
|---|---|---|---|---|---|---|---|---|
| | 6 ETHAN ALLEN DR | | 38 E 29TH ST. 6TH FL | | | | | SAMPLE SALE |
| | SUITE #4 | | | | | | | 1035 THIRD AVE |
| | SOUTH VT 05403 | | NEW YORK NY 10016 | | | | | NEW YORK, NY 10065 |
| | BURLINGTON | | | | | | | |

User: STEPHANIE

| ItemNum | Description | Description 2 | Season | Size | Color | AGE GROUP | Qty | Retail Price |
|---|---|---|---|---|---|---|---|---|
| 39998 | ANKLE TRAVELER TPC | | A | 4 | BLUE | | 1 | 145.00 |
| 40002 | ANKLE TRAVELER TPC | | A | 12 | BLUE | | 1 | 145.00 |
| 42488 | COURAGE PANT TPC | | A | 0 | HUNTER GREEN | | 1 | 145.00 |
| 42489 | COURAGE PANT TPC | | A | 2 | HUNTER GREEN | | 1 | 145.00 |
| 58745 | ANKLE TRAVELER TPC | | A | 0 | AQUA | | 1 | 145.00 |
| 58747 | ANKLE TRAVELER TPC | | A | 4 | AQUA | | 1 | 145.00 |
| 58750 | ANKLE TRAVELER TPC | | A | 8 | AQUA | | 1 | 145.00 |
| 22273 | ANKLE TRAVELER TPC | | A | 0 | BROWN | | 2 | 145.00 |
| 22541 | ANKLE TRAVELER TPC | | A | 10 | RED | | 2 | 145.00 |
| 28473 | ANKLE TRAVELER TPC | | A | 6 | PINK | | 2 | 145.00 |
| 28477 | ANKLE TRAVELER TPC | | A | 14 | PINK | | 3 | 145.00 |
| 135213 | HYPERION | | A | OS | C7 | | 0 | 105.00 |
| 135224 | OWEN | | A | OS | C4 | | 0 | 105.00 |
| 135194 | CHARLES | | A | OS | C5 | | 1 | 95.00 |
| 142698 | LARISA | | A | OS | C1 | | 1 | 105.00 |
| 142699 | LARISA | | A | OS | C3 | | 1 | 105.00 |
| 142701 | LARISA | | A | OS | C7 | | 1 | 105.00 |
| 135192 | CHARLES | | A | OS | C3 | | 1 | 95.00 |
| 142700 | LARISA | | A | OS | C5 | | 1 | 105.00 |
| 79341 | CARTA | | A | NA | C3 | | 1 | 120.00 |
| 142692 | BETTIE | | A | OS | C4 | | 1 | 105.00 |

Time: 1/24/2020 3:50:22 PM
Time: 1/24/2020 3:59:13 PM
Time: 1/24/2020 4:03:50 PM
Time: 1/27/2020 9:53:00 AM

# Transfer Order

MLG Retail LLC
1/24/2020 2:09:34 PM

Transfer Number: NYHQ-HO4 1107

| Source Store: | AGH Warehouse | Dest Store: | NYHQ | Comments | | PLEASE SHIP TO: |
|---|---|---|---|---|---|---|
| | 6 ETHAN ALLEN DR | | 38 E 29TH ST. 6TH FL | | | SAMPLE SALE |
| | SUITE #4 | | | | | 1035 THIRD AVE |
| | SOUTH       VT    05403 | | NEW YORK       NY    10016 | | | NEW YORK, NY 10065 |
| | BURLINGTON | | | | | Time: 1/24/2020 3:50:22 PM |
| User: | STEPHANIE | | | | | Time: 1/24/2020 3:59:13 PM |
| | | | | | | Time: 1/24/2020 4:03:50 PM |
| | | | | | | Time: 1/27/2020 9:53:00 AM |

| ItemNum | Description | Description 2 | Season | Size | Color | AGE GROUP | Qty | Retail Price |
|---|---|---|---|---|---|---|---|---|
| 102735 | HOWARD | | SU | NA | C2 | | 1 | 105.00 |
| 135183 | ARIADNE | | A | OS | C4 | | 1 | 105.00 |
| 142691 | BETTIE | | A | OS | C3 | | 1 | 105.00 |
| 135205 | FRANKLIN | | A | OS | C3 | | 1 | 95.00 |
| 136717 | CARTA | | A | OS | C4 | | 1 | 120.00 |
| 135203 | FRANKLIN | | A | OS | C1 | | 1 | 95.00 |
| 142689 | BETTIE | | A | OS | C1 | | 1 | 105.00 |
| 142693 | JANELLE | | A | OS | C1 | | 1 | 105.00 |
| 142695 | JANELLE | | A | OS | C3 | | 1 | 105.00 |
| 79339 | CARTA | | A | NA | C1 | | 1 | 120.00 |
| 102738 | HOWARD | | SU | NA | C3 | | 1 | 105.00 |
| 135204 | FRANKLIN | | A | OS | C2 | | 1 | 95.00 |
| 135218 | LAURENCE | | A | OS | C3 | | 1 | 95.00 |
| 142690 | BETTIE | | A | OS | C2 | | 1 | 105.00 |
| 142694 | JANELLE | | A | OS | C2 | | 1 | 105.00 |
| 142696 | JANELLE | | A | OS | C4 | | 1 | 105.00 |
| 142697 | JANELLE | | A | OS | C5 | | 1 | 105.00 |
| 79340 | CARTA | | A | NA | C2 | | 1 | 120.00 |
| 135180 | ARIADNE | | A | OS | C1 | | 1 | 105.00 |
| 135181 | ARIADNE | | A | OS | C2 | | 1 | 105.00 |
| 135182 | ARIADNE | | A | OS | C3 | | 1 | 105.00 |
| 135221 | MELINA | | A | OS | C3 | | 1 | 115.00 |
| 135191 | CHARLES | | A | OS | C2 | | 1 | 95.00 |

# Transfer Order

**MLG Retail LLC**
1/24/2020 2:09:34 PM

Transfer Number: NYHQ-HO4 1107

| Source Store: | AGH Warehouse | Dest Store: | NYHQ | | Comments | | PLEASE SHIP TO: |
|---|---|---|---|---|---|---|---|
| | 6 ETHAN ALLEN DR | | 38 E 29TH ST. 6TH FL | | | | SAMPLE SALE |
| | SUITE #4 | | | | | | 1035 THIRD AVE |
| | SOUTH    VT    05403 | | NEW YORK    NY    10016 | | | | NEW YORK, NY 10065 |
| | BURLINGTON | | | | | | Time: 1/24/2020 3:50:22 PM |
| User: | STEPHANIE | | | | | | Time: 1/24/2020 3:59:13 PM |
| | | | | | | | Time: 1/24/2020 4:03:50 PM |
| | | | | | | | Time: 1/27/2020 9:53:00 AM |

| ItemNum | Description | Description 2 | Season | Size | Color | AGE GROUP | Qty | Retail Price |
|---|---|---|---|---|---|---|---|---|
| 135249 | RHODES | | A | OS | C3 | | 1 | 110.00 |
| 135250 | RHODES | | A | OS | C7 | | 1 | 110.00 |
| 135208 | HELLEN | | A | OS | C3 | | 1 | 110.00 |
| 135225 | RHODES | | A | OS | C5 | | 1 | 110.00 |
| 135220 | HELLEN | | A | OS | C4 | | 1 | 110.00 |
| 135240 | MELINA | | A | OS | C1 | | 1 | 115.00 |
| 135248 | RHODES | | A | OS | C1 | | 1 | 110.00 |
| 142686 | ANNETTE | | A | OS | C3 | | 1 | 105.00 |
| 135206 | HELLEN | | A | OS | C1 | | 1 | 110.00 |
| 142687 | ANNETTE | | A | OS | C4 | | 1 | 105.00 |
| 135207 | HELLEN | | A | OS | C2 | | 1 | 110.00 |
| 135222 | MELINA | | A | OS | C4 | | 1 | 115.00 |
| 135193 | CHARLES | | A | OS | C4 | | 1 | 95.00 |
| 142685 | ANNETTE | | A | OS | C2 | | 1 | 105.00 |
| 142684 | ANNETTE | | A | OS | C1 | | 1 | 105.00 |
| 142688 | ANNETTE | | A | OS | C5 | | 1 | 105.00 |
| 135241 | MELINA | | A | OS | C2 | | 1 | 115.00 |
| 135195 | CONSTANTINE | | A | OS | C1 | | 1 | 115.00 |
| 135197 | CONSTANTINE | | A | OS | C3 | | 1 | 115.00 |
| 135198 | CONSTANTINE | | A | OS | C4 | | 1 | 115.00 |
| 135196 | CONSTANTINE | | A | OS | C2 | | 1 | 115.00 |
| 135245 | THEO | | A | OS | C4 | | 1 | 120.00 |
| 135244 | THEO | | A | OS | C3 | | 1 | 120.00 |

# Transfer Order

MLG Retail LLC

1/24/2020 2:09:34 PM

Transfer Number: NYHQ-HO4 1107

| Source Store: | AGH Warehouse | Dest Store: | NYHQ | | | | Comments | | PLEASE SHIP TO: |
|---|---|---|---|---|---|---|---|---|---|
| | 6 ETHAN ALLEN DR | | 38 E 29TH ST. 6TH FL | | | | | | SAMPLE SALE |
| | SUITE #4 | | | | | | | | 1035 THIRD AVE |
| | SOUTH          VT    05403 | | NEW YORK      NY    10016 | | | | | | NEW YORK, NY 10065 |
| | BURLINGTON | | | | | | | | Time: 1/24/2020 3:50:22 PM |
| User: | STEPHANIE | | | | | | | | Time: 1/24/2020 3:59:13 PM |
| | | | | | | | | | Time: 1/24/2020 4:03:50 PM |
| | | | | | | | | | Time: 1/27/2020 9:53:00 AM |

| ItemNum | Description | Description 2 | Season | Size | Color | Comments | AGE GROUP | Qty | Retail Price |
|---|---|---|---|---|---|---|---|---|---|
| 135242 | THEO | | A | OS | C1 | | | 1 | 120.00 |
| 135243 | THEO | | A | OS | C2 | | | 1 | 120.00 |
| 76404 | BAYLIN RIB L/S TEE | | A | M | MINK | | | 2 | 40.00 |
| 76466 | BELIA RIB ML FIT TEE | | A | XS | BLACK | | | 1 | 42.00 |
| 76488 | BELIA RIB ML FIT TEE | | A | M | MINK | | | 3 | 42.00 |
| 76489 | BELIA RIB ML FIT TEE | | A | L | MINK | | | 1 | 42.00 |
| 76528 | BELIA RIB ML FIT TEE | | A | M | DENIM | | | 1 | 42.00 |
| 76686 | BASHIA JERSERY CAP SLV TEE | | A | XS | OPTIC WHITE | | | 1 | 42.00 |
| 76694 | BIRGIT JERSEY ML FIT TEE | | A | XS | BLACK | | | 1 | 38.00 |
| 76701 | BIRGIT JERSEY ML FIT TEE | | A | L | OPTIC WHITE | | | 1 | 38.00 |
| 76765 | BIRGIT JERSEY ML FIT TEE | | A | L | NAVY | | | 1 | 38.00 |
| 76777 | BREGAN JERSEY TANK | | A | L | H GREY | | | 4 | 31.00 |
| 76788 | BREGAN JERSEY TANK | | A | M | MINK | | | 1 | 31.00 |
| 76847 | BRELAN THERMAL HOODIE WO PKT | | A | S | NAVY | | | 1 | 54.00 |
| 76848 | BRELAN THERMAL HOODIE WO PKT | | A | M | NAVY | | | 2 | 54.00 |

Total Qty: 2769

Case 1:23-cv-02524-JGLC Document #: 1 66-5 Filed: 09/29/21 Page 230 of 266 PageID #:1407

# Exhibit E



| Invoice Number | Invoice Date | Account Number |
|---|---|---|
| 6-922-38725 | Feb 10, 2020 | 6563-5539-5 |

**FedEx Ground Miscellaneous Charges**

| | Date | Quantity | Consolidated Account | Zip Code | Other Handling Charges | Ret Chg/Tax Credits/Other | Discounts | Total Charges |
|---|---|---|---|---|---|---|---|---|
| Weekly Service Chg | 01/27 | 1 | 6563-5539-5 | | 15.50 | | | 15.50 |
| **Total** | | **1** | | | **$15.50** | | | **$15.50** |

| | Shipments | Rated Weight lbs | Transportation Charges | Other Handling Charges | Ret Chg/Tax Credits/Other | Discounts | Total Charges |
|---|---|---|---|---|---|---|---|
| **Total FedEx Ground** | **68** | **1,536** | **$1,225.12** | **$173.50** | | **-$738.19** | **$660.43** |

<div align="center">

### TOTAL THIS INVOICE      USD      $660.43

</div>

### FedEx Ground Prepaid Detail (Original)

**Ship Date:** Jan 23, 2020    **Cust. Ref.:** 100020      **P.O.#:**
**Payor:** Shipper    **Dept.#:**

The Earned Discount for this ship date has been calculated based on a revenue threshold of USD 46,836,536.77
Net charge represents minimum package charge for this parcel.
We calculated your charges based on a dimensional weight of 3.0 lbs, 14 in x 10 in x 4 in, using a dimensional factor of 275.

| Tracking ID | 779836713174 | Sender | | Recipient | | Transportation Charge | | 11.16 |
|---|---|---|---|---|---|---|---|---|
| Service Type | Ppd, Domestic | ML Fashion Group | | ZOES CHOCOLATE CO | | Earned Discount | | -1.67 |
| Zone | 04 | c/o AGH Fulfillment | | ZOES CHOCOLATE CO | | Performance Pricing | | -3.67 |
| Packages | 1 | 6 Ethan Allen Dr | | 34 E MAIN ST | | Fuel Surcharge | | 0.37 |
| Actual Weight | 1.9 lbs | South Burlington VT 05403 | | WAYNESBORO PA 17268-163434 | | **Total Charge** | **USD** | **$6.19** |
| Rated Weight | 3 lbs | | | | | | | |
| Delivered | Jan 27, 2020 | | | | | | | |

**Ship Date:** Jan 23, 2020    **Cust. Ref.:** NO REFERENCE INFORMATION      **P.O.#:**
**Payor:** Shipper    **Dept.#:**

The Earned Discount for this ship date has been calculated based on a revenue threshold of USD 46,836,536.77
Net charge represents minimum package charge for this parcel.
We calculated your charges based on a dimensional weight of 6.0 lbs, 14 in x 11 in x 10 in, using a dimensional factor of 275.

| Tracking ID | 777087918259 | Sender | | Recipient | | Transportation Charge | | 10.19 |
|---|---|---|---|---|---|---|---|---|
| Service Type | Ppd, Domestic | donna JOHNSON | | ADDRESS UNAVAILABLE | | Earned Discount | | -1.02 |
| Zone | 02 | donna JOHNSON | | 10018 | | Performance Pricing | | -3.35 |
| Packages | 1 | 38 EAST 29TH STREET | | | | Fuel Surcharge | | 0.37 |
| Actual Weight | 5.6 lbs | NEW YORK NY 10016 | | | | **Total Charge** | **USD** | **$6.19** |
| Rated Weight | 6 lbs | | | | | | | |
| Delivered | Jan 27, 2020 | | | | | | | |

**Ship Date:** Jan 27, 2020    **Cust. Ref.:** NYHQ-HO4-1107      **P.O.#:**
**Payor:** Shipper    **Dept.#:**

The Earned Discount for this ship date has been calculated based on a revenue threshold of USD 46,653,900.32

| Tracking ID | 779902747497 | Sender | | Recipient | | Transportation Charge | | 26.45 |
|---|---|---|---|---|---|---|---|---|
| Service Type | Ppd, Domestic | ML Fashion Group | | SAMPLE SALE | | Earned Discount | | -6.88 |
| Zone | 03 | c/o AGH Fulfillment | | SAMPLE SALE | | Performance Pricing | | -10.80 |
| Packages | 1 | 6 Ethan Allen Dr | | 1035 3RD AVE | | Fuel Surcharge | | 0.93 |
| Actual Weight | 56.6 lbs | South Burlington VT 05403 | | NEW YORK NY 10065-811035 | | AHS - Weight | | 6.00 |
| Rated Weight | 57 lbs | | | | | **Total Charge** | **USD** | **$15.70** |
| Delivered | Jan 28, 2020 | | | | | | | |

**Ship Date:** Jan 27, 2020    **Cust. Ref.:** NYHQ-HO4-1107      **P.O.#:**
**Payor:** Shipper    **Dept.#:**

The Earned Discount for this ship date has been calculated based on a revenue threshold of USD 46,653,900.32

| Tracking ID | 779902758314 | Sender | | Recipient | | Transportation Charge | | 23.31 |
|---|---|---|---|---|---|---|---|---|
| Service Type | Ppd, Domestic | ML Fashion Group | | SAMPLE SALE | | Earned Discount | | -6.06 |
| Zone | 03 | c/o AGH Fulfillment | | SAMPLE SALE | | Performance Pricing | | -9.06 |
| Packages | 1 | 6 Ethan Allen Dr | | 1035 3RD AVE | | Fuel Surcharge | | 0.52 |
| Actual Weight | 39.7 lbs | South Burlington VT 05403 | | NEW YORK NY 10065-811035 | | **Total Charge** | **USD** | **$8.71** |
| Rated Weight | 40 lbs | | | | | | | |
| Delivered | Jan 28, 2020 | | | | | | | |



®

| Invoice Number | Invoice Date | Account Number | Page |
|---|---|---|---|
| 6-922-38725 | Feb 10, 2020 | 6563-5539-5 | 4 of 16 |

**Ship Date:** Jan 27, 2020 **Cust. Ref.:** NYHQ-HO4-1107 **P.O.#:**
**Payor:** Shipper **Dept.#:**
The Earned Discount for this ship date has been calculated based on a revenue threshold of USD 46,653,900.32

| | | | | |
|---|---|---|---|---|
| Tracking ID | 779902735975 | **Sender** | **Recipient** | Transportation Charge | 25.23 |
| Service Type | Ppd, Domestic | ML Fashion Group | SAMPLE SALE | Earned Discount | -6.56 |
| Zone | 03 | c/o AGH Fulfillment | SAMPLE SALE | Performance Pricing | -9.80 |
| Packages | 1 | 6 Ethan Allen Dr | 1035 3RD AVE | Fuel Surcharge | 0.56 |
| Actual Weight | 43.8 lbs | South Burlington VT 05403 | NEW YORK NY 10065-811035 | **Total Charge USD** | **$9.43** |
| Rated Weight | 44 lbs | | | |
| Delivered | Jan 28, 2020 | | | |

**Ship Date:** Jan 27, 2020 **Cust. Ref.:** NYHQ-HO4-1107 **P.O.#:**
**Payor:** Shipper **Dept.#:**
The Earned Discount for this ship date has been calculated based on a revenue threshold of USD 46,653,900.32

| | | | | |
|---|---|---|---|---|
| Tracking ID | 779902745369 | **Sender** | **Recipient** | Transportation Charge | 26.04 |
| Service Type | Ppd, Domestic | ML Fashion Group | SAMPLE SALE | Earned Discount | -6.77 |
| Zone | 03 | c/o AGH Fulfillment | SAMPLE SALE | Performance Pricing | -10.64 |
| Packages | 1 | 6 Ethan Allen Dr | 1035 3RD AVE | Fuel Surcharge | 0.92 |
| Actual Weight | 52.9 lbs | South Burlington VT 05403 | NEW YORK NY 10065-811035 | AHS - Weight | 6.00 |
| Rated Weight | 53 lbs | | | **Total Charge USD** | **$15.55** |
| Delivered | Jan 28, 2020 | | | |

**Ship Date:** Jan 27, 2020 **Cust. Ref.:** NYHQ-HO4-1107 **P.O.#:**
**Payor:** Shipper **Dept.#:**
The Earned Discount for this ship date has been calculated based on a revenue threshold of USD 46,653,900.32

| | | | | |
|---|---|---|---|---|
| Tracking ID | 779902734795 | **Sender** | **Recipient** | Transportation Charge | 25.39 |
| Service Type | Ppd, Domestic | ML Fashion Group | SAMPLE SALE | Earned Discount | -6.60 |
| Zone | 03 | c/o AGH Fulfillment | SAMPLE SALE | Performance Pricing | -9.87 |
| Packages | 1 | 6 Ethan Allen Dr | 1035 3RD AVE | Fuel Surcharge | 0.56 |
| Actual Weight | 45.6 lbs | South Burlington VT 05403 | NEW YORK NY 10065-811035 | **Total Charge USD** | **$9.48** |
| Rated Weight | 46 lbs | | | |
| Delivered | Jan 28, 2020 | | | |

**Ship Date:** Jan 27, 2020 **Cust. Ref.:** NYHQ-HO4-1107 **P.O.#:**
**Payor:** Shipper **Dept.#:**
The Earned Discount for this ship date has been calculated based on a revenue threshold of USD 46,653,900.32

| | | | | |
|---|---|---|---|---|
| Tracking ID | 779902743377 | **Sender** | **Recipient** | Transportation Charge | 26.02 |
| Service Type | Ppd, Domestic | ML Fashion Group | SAMPLE SALE | Earned Discount | -6.77 |
| Zone | 03 | c/o AGH Fulfillment | SAMPLE SALE | Performance Pricing | -10.62 |
| Packages | 1 | 6 Ethan Allen Dr | 1035 3RD AVE | Fuel Surcharge | 0.92 |
| Actual Weight | 50.6 lbs | South Burlington VT 05403 | NEW YORK NY 10065-811035 | AHS - Weight | 6.00 |
| Rated Weight | 51 lbs | | | **Total Charge USD** | **$15.55** |
| Delivered | Jan 28, 2020 | | | |

**Ship Date:** Jan 27, 2020 **Cust. Ref.:** NYHQ-HO4-1107 **P.O.#:**
**Payor:** Shipper **Dept.#:**
The Earned Discount for this ship date has been calculated based on a revenue threshold of USD 46,653,900.32

| | | | | |
|---|---|---|---|---|
| Tracking ID | 779902752809 | **Sender** | **Recipient** | Transportation Charge | 26.08 |
| Service Type | Ppd, Domestic | ML Fashion Group | SAMPLE SALE | Earned Discount | -6.78 |
| Zone | 03 | c/o AGH Fulfillment | SAMPLE SALE | Performance Pricing | -10.65 |
| Packages | 1 | 6 Ethan Allen Dr | 1035 3RD AVE | Fuel Surcharge | 0.92 |
| Actual Weight | 55.3 lbs | South Burlington VT 05403 | NEW YORK NY 10065-811035 | AHS - Weight | 6.00 |
| Rated Weight | 56 lbs | | | **Total Charge USD** | **$15.57** |
| Delivered | Jan 28, 2020 | | | |

**Ship Date:** Jan 27, 2020 **Cust. Ref.:** NYHQ-HO4-1107 **P.O.#:**
**Payor:** Shipper **Dept.#:**
The Earned Discount for this ship date has been calculated based on a revenue threshold of USD 46,653,900.32

| | | | | |
|---|---|---|---|---|
| Tracking ID | 779902744101 | **Sender** | **Recipient** | Transportation Charge | 26.04 |
| Service Type | Ppd, Domestic | ML Fashion Group | SAMPLE SALE | Earned Discount | -6.77 |
| Zone | 03 | c/o AGH Fulfillment | SAMPLE SALE | Performance Pricing | -10.64 |
| Packages | 1 | 6 Ethan Allen Dr | 1035 3RD AVE | Fuel Surcharge | 0.92 |
| Actual Weight | 52.3 lbs | South Burlington VT 05403 | NEW YORK NY 10065-811035 | AHS - Weight | 6.00 |
| Rated Weight | 53 lbs | | | **Total Charge USD** | **$15.55** |
| Delivered | Jan 28, 2020 | | | |



| | Invoice Number | Invoice Date | Account Number | Page |
|---|---|---|---|---|
| | **6-922-38725** | **Feb 10, 2020** | **6563-5539-5** | 5 of 16 |

**Ship Date:** Jan 27, 2020    **Cust. Ref.:** NYHQ-HO4-1107    **P.O.#:**
**Payor:** Shipper    **Dept.#:**
The Earned Discount for this ship date has been calculated based on a revenue threshold of USD 46,653,900.32

| Tracking ID | 779902742072 | **Sender** | **Recipient** | Transportation Charge | 26.08 |
|---|---|---|---|---|---|
| Service Type | Ppd, Domestic | ML Fashion Group | SAMPLE SALE | Earned Discount | -6.78 |
| Zone | 03 | c/o AGH Fulfillment | SAMPLE SALE | Performance Pricing | -10.65 |
| Packages | 1 | 6 Ethan Allen Dr | 1035 3RD AVE | Fuel Surcharge | 0.92 |
| Actual Weight | 55.9 lbs | South Burlington VT 05403 | NEW YORK NY 10065-811035 | AHS - Weight | 6.00 |
| Rated Weight | 56 lbs | | | **Total Charge**    **USD** | **$15.57** |
| Delivered | Jan 28, 2020 | | | | |

**Ship Date:** Jan 27, 2020    **Cust. Ref.:** NYHQ-HO4-1107    **P.O.#:**
**Payor:** Shipper    **Dept.#:**
The Earned Discount for this ship date has been calculated based on a revenue threshold of USD 46,653,900.32

| Tracking ID | 779902757400 | **Sender** | **Recipient** | Transportation Charge | 20.82 |
|---|---|---|---|---|---|
| Service Type | Ppd, Domestic | ML Fashion Group | SAMPLE SALE | Earned Discount | -5.41 |
| Zone | 03 | c/o AGH Fulfillment | SAMPLE SALE | Performance Pricing | -8.09 |
| Packages | 1 | 6 Ethan Allen Dr | 1035 3RD AVE | Fuel Surcharge | 0.46 |
| Actual Weight | 33.9 lbs | South Burlington VT 05403 | NEW YORK NY 10065-811035 | **Total Charge**    **USD** | **$7.78** |
| Rated Weight | 34 lbs | | | | |
| Delivered | Jan 28, 2020 | | | | |

**Ship Date:** Jan 27, 2020    **Cust. Ref.:** NYHQ-HO4-1107    **P.O.#:**
**Payor:** Shipper    **Dept.#:**
The Earned Discount for this ship date has been calculated based on a revenue threshold of USD 46,653,900.32

| Tracking ID | 779902736798 | **Sender** | **Recipient** | Transportation Charge | 26.08 |
|---|---|---|---|---|---|
| Service Type | Ppd, Domestic | ML Fashion Group | SAMPLE SALE | Earned Discount | -6.78 |
| Zone | 03 | c/o AGH Fulfillment | SAMPLE SALE | Performance Pricing | -10.65 |
| Packages | 1 | 6 Ethan Allen Dr | 1035 3RD AVE | Fuel Surcharge | 0.92 |
| Actual Weight | 55.5 lbs | South Burlington VT 05403 | NEW YORK NY 10065-811035 | AHS - Weight | 6.00 |
| Rated Weight | 56 lbs | | | **Total Charge**    **USD** | **$15.57** |
| Delivered | Jan 29, 2020 | | | | |

**Ship Date:** Jan 27, 2020    **Cust. Ref.:** NYHQ-HO4-1107    **P.O.#:**
**Payor:** Shipper    **Dept.#:**
The Earned Discount for this ship date has been calculated based on a revenue threshold of USD 46,653,900.32

| Tracking ID | 779902741444 | **Sender** | **Recipient** | Transportation Charge | 25.96 |
|---|---|---|---|---|---|
| Service Type | Ppd, Domestic | ML Fashion Group | SAMPLE SALE | Earned Discount | -6.75 |
| Zone | 03 | c/o AGH Fulfillment | SAMPLE SALE | Performance Pricing | -10.09 |
| Packages | 1 | 6 Ethan Allen Dr | 1035 3RD AVE | Fuel Surcharge | 0.76 |
| Rated Weight | 48 lbs | South Burlington VT 05403 | NEW YORK NY 10065-811035 | NDOC P/U - Auto Comm | 3.00 |
| Delivered | Jan 28, 2020 | | | **Total Charge**    **USD** | **$12.88** |

**Ship Date:** Jan 27, 2020    **Cust. Ref.:** NYHQ-HO4-1107    **P.O.#:**
**Payor:** Shipper    **Dept.#:**
The Earned Discount for this ship date has been calculated based on a revenue threshold of USD 46,653,900.32

| Tracking ID | 779902739499 | **Sender** | **Recipient** | Transportation Charge | 25.38 |
|---|---|---|---|---|---|
| Service Type | Ppd, Domestic | ML Fashion Group | SAMPLE SALE | Earned Discount | -6.60 |
| Zone | 03 | c/o AGH Fulfillment | SAMPLE SALE | Performance Pricing | -9.86 |
| Packages | 1 | 6 Ethan Allen Dr | 1035 3RD AVE | Fuel Surcharge | 0.56 |
| Actual Weight | 44.9 lbs | South Burlington VT 05403 | NEW YORK NY 10065-811035 | **Total Charge**    **USD** | **$9.48** |
| Rated Weight | 45 lbs | | | | |
| Delivered | Jan 28, 2020 | | | | |

**Ship Date:** Jan 27, 2020    **Cust. Ref.:** NYHQ-HO4-1107    **P.O.#:**
**Payor:** Shipper    **Dept.#:**
The Earned Discount for this ship date has been calculated based on a revenue threshold of USD 46,653,900.32

| Tracking ID | 779902739238 | **Sender** | **Recipient** | Transportation Charge | 26.06 |
|---|---|---|---|---|---|
| Service Type | Ppd, Domestic | ML Fashion Group | SAMPLE SALE | Earned Discount | -6.78 |
| Zone | 03 | c/o AGH Fulfillment | SAMPLE SALE | Performance Pricing | -10.64 |
| Packages | 1 | 6 Ethan Allen Dr | 1035 3RD AVE | Fuel Surcharge | 0.92 |
| Actual Weight | 53.3 lbs | South Burlington VT 05403 | NEW YORK NY 10065-811035 | AHS - Weight | 6.00 |
| Rated Weight | 54 lbs | | | **Total Charge**    **USD** | **$15.56** |
| Delivered | Jan 28, 2020 | | | | |



| Invoice Number | Invoice Date | Account Number | Page |
|---|---|---|---|
| 6-922-38725 | Feb 10, 2020 | 6563-5539-5 | 6 of 16 |

**Ship Date:** Jan 27, 2020    **Cust. Ref.:** NYHQ-HO4-1107    **P.O.#:**
**Payor:** Shipper    **Dept.#:**
The Earned Discount for this ship date has been calculated based on a revenue threshold of USD 46,653,900.32

| | | | | |
|---|---|---|---|---|
| Tracking ID | 779902754444 | **Sender** | **Recipient** | Transportation Charge | 26.03 |
| Service Type | Ppd, Domestic | ML Fashion Group | SAMPLE SALE | Earned Discount | -6.77 |
| Zone | 03 | c/o AGH Fulfillment | SAMPLE SALE | Performance Pricing | -10.63 |
| Packages | 1 | 6 Ethan Allen Dr | 1035 3RD AVE | Fuel Surcharge | 0.92 |
| Actual Weight | 51.6 lbs | South Burlington VT 05403 | NEW YORK NY 10065-811035 | AHS - Weight | 6.00 |
| Rated Weight | 52 lbs | | | **Total Charge**   **USD** | **$15.55** |
| Delivered | Jan 28, 2020 | | | | |

**Ship Date:** Jan 27, 2020    **Cust. Ref.:** NYHQ-HO4-1107    **P.O.#:**
**Payor:** Shipper    **Dept.#:**
The Earned Discount for this ship date has been calculated based on a revenue threshold of USD 46,653,900.32

| | | | | |
|---|---|---|---|---|
| Tracking ID | 779902750975 | **Sender** | **Recipient** | Transportation Charge | 26.03 |
| Service Type | Ppd, Domestic | ML Fashion Group | SAMPLE SALE | Earned Discount | -6.77 |
| Zone | 03 | c/o AGH Fulfillment | SAMPLE SALE | Performance Pricing | -10.63 |
| Packages | 1 | 6 Ethan Allen Dr | 1035 3RD AVE | Fuel Surcharge | 0.92 |
| Actual Weight | 51.6 lbs | South Burlington VT 05403 | NEW YORK NY 10065-811035 | AHS - Weight | 6.00 |
| Rated Weight | 52 lbs | | | **Total Charge**   **USD** | **$15.55** |
| Delivered | Jan 28, 2020 | | | | |

**Ship Date:** Jan 27, 2020    **Cust. Ref.:** NYHQ-HO4-1107    **P.O.#:**
**Payor:** Shipper    **Dept.#:**
The Earned Discount for this ship date has been calculated based on a revenue threshold of USD 46,653,900.32

| | | | | |
|---|---|---|---|---|
| Tracking ID | 779902759387 | **Sender** | **Recipient** | Transportation Charge | 24.40 |
| Service Type | Ppd, Domestic | ML Fashion Group | SAMPLE SALE | Earned Discount | -6.34 |
| Zone | 03 | c/o AGH Fulfillment | SAMPLE SALE | Performance Pricing | -9.48 |
| Packages | 1 | 6 Ethan Allen Dr | 1035 3RD AVE | Fuel Surcharge | 0.54 |
| Actual Weight | 41.6 lbs | South Burlington VT 05403 | NEW YORK NY 10065-811035 | **Total Charge**   **USD** | **$9.12** |
| Rated Weight | 42 lbs | | | | |
| Delivered | Jan 28, 2020 | | | | |

**Ship Date:** Jan 27, 2020    **Cust. Ref.:** NYHQ-HO4-1107    **P.O.#:**
**Payor:** Shipper    **Dept.#:**
The Earned Discount for this ship date has been calculated based on a revenue threshold of USD 46,653,900.32

| | | | | |
|---|---|---|---|---|
| Tracking ID | 779902749033 | **Sender** | **Recipient** | Transportation Charge | 26.06 |
| Service Type | Ppd, Domestic | ML Fashion Group | SAMPLE SALE | Earned Discount | -6.78 |
| Zone | 03 | c/o AGH Fulfillment | SAMPLE SALE | Performance Pricing | -10.64 |
| Packages | 1 | 6 Ethan Allen Dr | 1035 3RD AVE | Fuel Surcharge | 0.92 |
| Actual Weight | 53.8 lbs | South Burlington VT 05403 | NEW YORK NY 10065-811035 | AHS - Weight | 6.00 |
| Rated Weight | 54 lbs | | | **Total Charge**   **USD** | **$15.56** |
| Delivered | Jan 28, 2020 | | | | |

**Ship Date:** Jan 27, 2020    **Cust. Ref.:** NYHQ-HO4-1107    **P.O.#:**
**Payor:** Shipper    **Dept.#:**
The Earned Discount for this ship date has been calculated based on a revenue threshold of USD 46,653,900.32

| | | | | |
|---|---|---|---|---|
| Tracking ID | 779902737990 | **Sender** | **Recipient** | Transportation Charge | 25.39 |
| Service Type | Ppd, Domestic | ML Fashion Group | SAMPLE SALE | Earned Discount | -6.60 |
| Zone | 03 | c/o AGH Fulfillment | SAMPLE SALE | Performance Pricing | -9.87 |
| Packages | 1 | 6 Ethan Allen Dr | 1035 3RD AVE | Fuel Surcharge | 0.56 |
| Actual Weight | 45.1 lbs | South Burlington VT 05403 | NEW YORK NY 10065-811035 | **Total Charge**   **USD** | **$9.48** |
| Rated Weight | 46 lbs | | | | |
| Delivered | Jan 28, 2020 | | | | |

**Ship Date:** Jan 27, 2020    **Cust. Ref.:** NYHQ-HO4-1107    **P.O.#:**
**Payor:** Shipper    **Dept.#:**
The Earned Discount for this ship date has been calculated based on a revenue threshold of USD 46,653,900.32

| | | | | |
|---|---|---|---|---|
| Tracking ID | 779902746148 | **Sender** | **Recipient** | Transportation Charge | 26.46 |
| Service Type | Ppd, Domestic | ML Fashion Group | SAMPLE SALE | Earned Discount | -6.88 |
| Zone | 03 | c/o AGH Fulfillment | SAMPLE SALE | Performance Pricing | -10.81 |
| Packages | 1 | 6 Ethan Allen Dr | 1035 3RD AVE | Fuel Surcharge | 0.93 |
| Actual Weight | 57.2 lbs | South Burlington VT 05403 | NEW YORK NY 10065-811035 | AHS - Weight | 6.00 |
| Rated Weight | 58 lbs | | | **Total Charge**   **USD** | **$15.70** |
| Delivered | Jan 28, 2020 | | | | |

# FedEx®

| Invoice Number | Invoice Date | Account Number | Page |
|---|---|---|---|
| 6-922-38725 | Feb 10, 2020 | 6563-5539-5 | 7 of 16 |

**Ship Date:** Jan 27, 2020     **Cust. Ref.:** NYHQ-HO4-1107     **P.O.#:**
**Payor:** Shipper     **Dept.#:**
The Earned Discount for this ship date has been calculated based on a revenue threshold of USD 46,653,900.32

| | | | | |
|---|---|---|---|---|
| Tracking ID | 779902755337 | **Sender** | **Recipient** | Transportation Charge | 23.31 |
| Service Type | Ppd, Domestic | ML Fashion Group | SAMPLE SALE | Earned Discount | -6.06 |
| Zone | 03 | c/o AGH Fulfillment | SAMPLE SALE | Performance Pricing | -9.06 |
| Packages | 1 | 6 Ethan Allen Dr | 1035 3RD AVE | Fuel Surcharge | 0.52 |
| Actual Weight | 39.1 lbs | South Burlington VT 05403 | NEW YORK NY 10065-811035 | **Total Charge**   **USD** | **$8.71** |
| Rated Weight | 40 lbs | | | | |
| Delivered | Jan 28, 2020 | | | | |

**Ship Date:** Jan 27, 2020     **Cust. Ref.:** NYHQ-HO4-1107     **P.O.#:**
**Payor:** Shipper     **Dept.#:**
The Earned Discount for this ship date has been calculated based on a revenue threshold of USD 46,653,900.32

| | | | | |
|---|---|---|---|---|
| Tracking ID | 779902751504 | **Sender** | **Recipient** | Transportation Charge | 26.07 |
| Service Type | Ppd, Domestic | ML Fashion Group | SAMPLE SALE | Earned Discount | -6.78 |
| Zone | 03 | c/o AGH Fulfillment | SAMPLE SALE | Performance Pricing | -10.65 |
| Packages | 1 | 6 Ethan Allen Dr | 1035 3RD AVE | Fuel Surcharge | 0.92 |
| Actual Weight | 54.8 lbs | South Burlington VT 05403 | NEW YORK NY 10065-811035 | AHS - Weight | 6.00 |
| Rated Weight | 55 lbs | | | **Total Charge**   **USD** | **$15.56** |
| Delivered | Jan 28, 2020 | | | | |

**Ship Date:** Jan 27, 2020     **Cust. Ref.:** NYHQ-HO4-1107     **P.O.#:**
**Payor:** Shipper     **Dept.#:**
The Earned Discount for this ship date has been calculated based on a revenue threshold of USD 46,653,900.32

| | | | | |
|---|---|---|---|---|
| Tracking ID | 779902761034 | **Sender** | **Recipient** | Transportation Charge | 17.93 |
| Service Type | Ppd, Domestic | ML Fashion Group | SAMPLE SALE | Earned Discount | -4.66 |
| Zone | 03 | c/o AGH Fulfillment | SAMPLE SALE | Performance Pricing | -6.61 |
| Packages | 1 | 6 Ethan Allen Dr | 1035 3RD AVE | Fuel Surcharge | 0.42 |
| Actual Weight | 25.1 lbs | South Burlington VT 05403 | NEW YORK NY 10065-811035 | **Total Charge**   **USD** | **$7.08** |
| Rated Weight | 26 lbs | | | | |
| Delivered | Jan 29, 2020 | | | | |

**Ship Date:** Jan 27, 2020     **Cust. Ref.:** NYHQ-HO4-1107     **P.O.#:**
**Payor:** Shipper     **Dept.#:**
The Earned Discount for this ship date has been calculated based on a revenue threshold of USD 46,653,900.32

| | | | | |
|---|---|---|---|---|
| Tracking ID | 779902756447 | **Sender** | **Recipient** | Transportation Charge | 22.56 |
| Service Type | Ppd, Domestic | ML Fashion Group | SAMPLE SALE | Earned Discount | -5.87 |
| Zone | 03 | c/o AGH Fulfillment | SAMPLE SALE | Performance Pricing | -8.76 |
| Packages | 1 | 6 Ethan Allen Dr | 1035 3RD AVE | Fuel Surcharge | 0.50 |
| Actual Weight | 37.1 lbs | South Burlington VT 05403 | NEW YORK NY 10065-811035 | **Total Charge**   **USD** | **$8.43** |
| Rated Weight | 38 lbs | | | | |
| Delivered | Jan 28, 2020 | | | | |

**Ship Date:** Jan 27, 2020     **Cust. Ref.:** NYHQ-HO4-1107     **P.O.#:**
**Payor:** Shipper     **Dept.#:**
The Earned Discount for this ship date has been calculated based on a revenue threshold of USD 46,653,900.32

| | | | | |
|---|---|---|---|---|
| Tracking ID | 779902749489 | **Sender** | **Recipient** | Transportation Charge | 26.03 |
| Service Type | Ppd, Domestic | ML Fashion Group | SAMPLE SALE | Earned Discount | -6.77 |
| Zone | 03 | c/o AGH Fulfillment | SAMPLE SALE | Performance Pricing | -10.63 |
| Packages | 1 | 6 Ethan Allen Dr | 1035 3RD AVE | Fuel Surcharge | 0.92 |
| Actual Weight | 51.4 lbs | South Burlington VT 05403 | NEW YORK NY 10065-811035 | AHS - Weight | 6.00 |
| Rated Weight | 52 lbs | | | **Total Charge**   **USD** | **$15.55** |
| Delivered | Jan 29, 2020 | | | | |

**Prepaid Subtotal**     **USD**     **$331.05**

# Exhibit F

# Transfer Order

MLG Retail LLC
2/3/2020 3:09:17 PM

Transfer Number: NYHQ-HO4 1108

| Source Store: | AGH Warehouse | Dest Store: | NYHQ | | | Comments | | SHIP TO: |
|---|---|---|---|---|---|---|---|---|
| | 6 ETHAN ALLEN DR | | 38 E 29TH ST. 6TH FL | | | | | SAMPLE SALE |
| | SUITE #4 | | | | | | | 1035 THIRD AVE |
| | SOUTH      VT      05403 | | NEW YORK      NY      10016 | | | | | NEW YORK, NY 10065 |
| | BURLINGTON | | | | | | | Time: 2/4/2020 9:57:26 AM |
| User: | STEPHANIE | | | | | | | Time: 2/4/2020 10:01:47 AM |

| ItemNum | Description | Description 2 | Season | Size | Color | AGE GROUP | Qty | Retail Price |
|---|---|---|---|---|---|---|---|---|
| 135784 | MISS KATIE W/SKULL V2 | | SC | S | GLACIER/WHT/ FGREY | | 3 | 290.00 |
| 122855 | INKED LIGHTNING BOLTS TOP | | S | L | BLACK COMBO | | 3 | 350.00 |
| 122854 | INKED LIGHTNING BOLTS TOP | | S | M | BLACK COMBO | | 2 | 350.00 |
| 122853 | INKED LIGHTNING BOLTS TOP | | S | S | BLACK COMBO | | 6 | 350.00 |
| 122852 | INKED LIGHTNING BOLTS TOP | | S | XS | BLACK COMBO | | 4 | 350.00 |
| 119578 | CLAUDIA JUMPER CRW SWTR | | S | L | BLACK | | 4 | 240.00 |
| 119577 | CLAUDIA JUMPER CRW SWTR | | S | M | BLACK | | 2 | 240.00 |
| 119575 | CLAUDIA JUMPER CRW SWTR | | S | XS | BLACK | | 2 | 240.00 |
| 119602 | STRIPE MINI CREW SWEAT | | S | L | BLK/OWHT | | 5 | 265.00 |
| 119601 | STRIPE MINI CREW SWEAT | | S | M | BLK/OWHT | | 5 | 265.00 |
| 119600 | STRIPE MINI CREW SWEAT | | S | S | BLK/OWHT | | 5 | 265.00 |
| 119599 | STRIPE MINI CREW SWEAT | | S | XS | BLK/OWHT | | 7 | 265.00 |
| 146066 | LUX MARCHE TOTE | | SUC | L | PETRA/ROSE GOLD | | 10 | 80.00 |
| 146067 | LUX PETITE MARCHE TOTE | | SUC | L | CASCO/ROSE GOLD | | 10 | 80.00 |
| 146068 | LUX PETITE MARCHE TOTE | | SUC | L | HAVANA/ GOL | | 10 | 80.00 |
| 146072 | PETITE MARCHE TOTE | | SUC | S | CABO/BURLAP | | 10 | 68.00 |
| 146073 | PETITE MARCHE TOTE | | SUC | S | CORSICA/BUR LAP | | 10 | 68.00 |
| 146074 | PETITE MARCHE TOTE | | SUC | S | HAVANA/BURL AP | | 10 | 68.00 |
| 146069 | PETITE RACING STRIPE TOTE | | SUC | S | FLAX/ GOLD | | 10 | 68.00 |

# Transfer Order

MLG Retail LLC
2/3/2020 3:09:17 PM

Transfer Number: NYHQ-HO4 1108

| Source Store: | AGH Warehouse | Dest Store: | NYHQ | | Comments | | SHIP TO: |
|---|---|---|---|---|---|---|---|
| | 6 ETHAN ALLEN DR | | 38 E 29TH ST. 6TH FL | | | | SAMPLE SALE |
| | SUITE #4 | | | | | | 1035 THIRD AVE |
| | SOUTH        VT    05403 | | NEW YORK        NY      10016 | | | | NEW YORK, NY 10065 |
| | BURLINGTON | | | | | | Time: 2/4/2020 9:57:26 AM |
| | | | | | | | Time: 2/4/2020 10:01:47 AM |

User:      STEPHANIE

| ItemNum | Description | Description 2 | Season | Size | Color | AGE GROUP | Qty | Retail Price |
|---|---|---|---|---|---|---|---|---|
| 146071 | PETITE RACING STRIPE TOTE | | SUC | S | FLAX/ROSE GOLD | | 10 | 68.00 |
| 146070 | PETITE RACING STRIPE TOTE | | SUC | S | FLAX/SILVER | | 10 | 68.00 |
| 89939 | ANKLE TRAVELER | | SU | 8 | WHITE VELVET DOT | | 5 | 145.00 |
| 89937 | ANKLE TRAVELER | | SU | 10 | WHITE VELVET DOT | | 4 | 145.00 |
| 135127 | ANKLE TRAVELER PANT | | FWH | 10 | CEMENT | | 2 | 145.00 |
| 89990 | ANKLE TRAVELER TPC | | SU | 0 | WATERMELON | | 2 | 145.00 |
| 89991 | ANKLE TRAVELER TPC | | SU | 2 | WATERMELON | | 3 | 145.00 |
| 89994 | ANKLE TRAVELER TPC | | SU | 6 | WATERMELON | | 3 | 145.00 |
| 89996 | ANKLE TRAVELER TPC | | SU | 8 | WATERMELON | | 10 | 145.00 |
| 89993 | ANKLE TRAVELER TPC | | SU | 10 | WATERMELON | | 2 | 145.00 |
| 89995 | ANKLE TRAVELER TPC | | SU | 12 | WATERMELON | | 4 | 145.00 |
| 89946 | ANKLE TRAVELER TPC | | SU | 8 | WB SPLATTER | | 3 | 145.00 |
| 89952 | ANKLE TRAVELER TPC | | SU | 10 | WB SPLATTER | | 3 | 145.00 |
| 89964 | ANKLE TRAVELER TPC | | SU | 6 | WHITE STICKS | | 2 | 145.00 |
| 142684 | ANNETTE | | A | OS | C1 | | 1 | 105.00 |
| 142685 | ANNETTE | | A | OS | C2 | | 1 | 105.00 |
| 142686 | ANNETTE | | A | OS | C3 | | 1 | 105.00 |
| 142687 | ANNETTE | | A | OS | C4 | | 1 | 105.00 |
| 142688 | ANNETTE | | A | OS | C5 | | 1 | 105.00 |
| 135180 | ARIADNE | | A | OS | C1 | | 1 | 105.00 |

# Transfer Order

**MLG Retail LLC**
2/3/2020 3:09:17 PM

Transfer Number:   NYHQ-HO4 1108

| Source Store: | AGH Warehouse | Dest Store: | NYHQ | Comments | SHIP TO: |
|---|---|---|---|---|---|
| | 6 ETHAN ALLEN DR | | 38 E 29TH ST. 6TH FL | | SAMPLE SALE |
| | SUITE #4 | | | | 1035 THIRD AVE |
| | SOUTH    VT    05403 | | NEW YORK    NY    10016 | | NEW YORK, NY 10065 |
| | BURLINGTON | | | | Time: 2/4/2020 9:57:26 AM |
| | | | | | Time: 2/4/2020 10:01:47 AM |

User:    STEPHANIE

| ItemNum | Description | Description 2 | Season | Size | Color | AGE GROUP | Qty | Retail Price |
|---|---|---|---|---|---|---|---|---|
| 135181 | ARIADNE | | A | OS | C2 | | 1 | 105.00 |
| 135182 | ARIADNE | | A | OS | C3 | | 1 | 105.00 |
| 135183 | ARIADNE | | A | OS | C4 | | 1 | 105.00 |
| 142689 | BETTIE | | A | OS | C1 | | 1 | 105.00 |
| 142690 | BETTIE | | A | OS | C2 | | 1 | 105.00 |
| 142691 | BETTIE | | A | OS | C3 | | 1 | 105.00 |
| 142692 | BETTIE | | A | OS | C4 | | 1 | 105.00 |
| 79339 | CARTA | | A | NA | C1 | | 1 | 120.00 |
| 79340 | CARTA | | A | NA | C2 | | 1 | 120.00 |
| 79341 | CARTA | | A | NA | C3 | | 1 | 120.00 |
| 136717 | CARTA | | A | OS | C4 | | 1 | 120.00 |
| 135195 | CONSTANTINE | | A | OS | C1 | | 1 | 115.00 |
| 135196 | CONSTANTINE | | A | OS | C2 | | 1 | 115.00 |
| 135197 | CONSTANTINE | | A | OS | C3 | | 1 | 115.00 |
| 135198 | CONSTANTINE | | A | OS | C4 | | 1 | 115.00 |
| 135206 | HELLEN | | A | OS | C1 | | 1 | 110.00 |
| 135207 | HELLEN | | A | OS | C2 | | 1 | 110.00 |
| 135208 | HELLEN | | A | OS | C3 | | 1 | 110.00 |
| 135220 | HELLEN | | A | OS | C4 | | 1 | 110.00 |
| 102735 | HOWARD | | SU | NA | C2 | | 1 | 105.00 |
| 102738 | HOWARD | | SU | NA | C3 | | 1 | 105.00 |
| 142693 | JANELLE | | A | OS | C1 | | 1 | 105.00 |
| 142694 | JANELLE | | A | OS | C2 | | 1 | 105.00 |

# Transfer Order

MLG Retail LLC
2/3/2020 3:09:17 PM

Transfer Number:  NYHQ-HO4 1108

| Source Store: | AGH Warehouse | Dest Store: | NYHQ | | Comments | | SHIP TO: |
|---|---|---|---|---|---|---|---|
| | 6 ETHAN ALLEN DR SUITE #4 SOUTH BURLINGTON  VT  05403 | | 38 E 29TH ST. 6TH FL NEW YORK  NY  10016 | | | | SAMPLE SALE 1035 THIRD AVE NEW YORK, NY 10065 |

User:  STEPHANIE

Time: 2/4/2020 9:57:26 AM
Time: 2/4/2020 10:01:47 AM

| ItemNum | Description | Description 2 | Season | Size | Color | AGE GROUP | Qty | Retail Price |
|---|---|---|---|---|---|---|---|---|
| 142695 | JANELLE | | A | OS | C3 | | 1 | 105.00 |
| 142696 | JANELLE | | A | OS | C4 | | 1 | 105.00 |
| 142697 | JANELLE | | A | OS | C5 | | 1 | 105.00 |
| 142698 | LARISA | | A | OS | C1 | | 1 | 105.00 |
| 142699 | LARISA | | A | OS | C3 | | 1 | 105.00 |
| 142700 | LARISA | | A | OS | C5 | | 2 | 105.00 |
| 142701 | LARISA | | A | OS | C7 | | 2 | 105.00 |
| 135218 | LAURENCE | | A | OS | C3 | | 1 | 95.00 |
| 135240 | MELINA | | A | OS | C1 | | 1 | 115.00 |
| 135241 | MELINA | | A | OS | C2 | | 1 | 115.00 |
| 135221 | MELINA | | A | OS | C3 | | 1 | 115.00 |
| 135222 | MELINA | | A | OS | C4 | | 1 | 115.00 |
| 135248 | RHODES | | A | OS | C1 | | 1 | 110.00 |
| 135249 | RHODES | | A | OS | C3 | | 1 | 110.00 |
| 135225 | RHODES | | A | OS | C5 | | 1 | 110.00 |
| 135250 | RHODES | | A | OS | C7 | | 1 | 110.00 |
| 135242 | THEO | | A | OS | C1 | | 1 | 120.00 |
| 135243 | THEO | | A | OS | C2 | | 1 | 120.00 |
| 135244 | THEO | | A | OS | C3 | | 1 | 120.00 |
| 135245 | THEO | | A | OS | C4 | | 1 | 120.00 |
| 123658 | LE HIGH STRT FRNT TRNGLE GUSSET | | SU | 25 | BOMBAY | | 0 | 245.00 |
| 136767 | KAYLEE SPORTY VEE | | SC | M | BLACK | | 2 | 195.00 |

# Transfer Order

MLG Retail LLC
2/3/2020 3:09:17 PM

Transfer Number: NYHQ-HO4 1108

| | | |
|---|---|---|
| Source Store: | AGH Warehouse | Dest Store: NYHQ |
| | 6 ETHAN ALLEN DR | 38 E 29TH ST. 6TH FL |
| | SUITE #4 | |
| | SOUTH        VT    05403 | NEW YORK        NY        10016 |
| | BURLINGTON | |

User: STEPHANIE

SHIP TO:
SAMPLE SALE
1035 THIRD AVE
NEW YORK, NY 10065
Time: 2/4/2020 9:57:26 AM
Time: 2/4/2020 10:01:47 AM

| ItemNum | Description | Description 2 | Season | Size | Color | Comments | AGE GROUP | Qty | Retail Price |
|---|---|---|---|---|---|---|---|---|---|
| 136766 | KAYLEE SPORTY VEE | | SC | S | BLACK | | | 2 | 195.00 |
| 136765 | KAYLEE SPORTY VEE | | SC | XS | BLACK | | | 2 | 195.00 |
| 125607 | KAYLEE SPORTY VEE | | SC | M | MOSS | | | 2 | 195.00 |
| 125606 | KAYLEE SPORTY VEE | | SC | S | MOSS | | | 2 | 195.00 |
| 125605 | KAYLEE SPORTY VEE | | SC | XS | MOSS | | | 2 | 195.00 |
| 124400 | OLIVE SHORT | | FWH | 0 | WHITE | | | 1 | 65.00 |
| 124422 | PIMA MODAL RIB NADIRA TANK | | FWH | 2 | BLACK | | | 8 | 58.00 |
| 124423 | PIMA MODAL RIB NADIRA TANK | | FWH | 3 | BLACK | | | 1 | 58.00 |
| 124382 | SEXY CAMI | | FWH | 2 | BLACK | | | 12 | 55.00 |
| 124386 | SEXY CAMI | | FWH | 2 | WHITE | | | 5 | 55.00 |
| 98614 | SKINNY JOGGER PANT | | SU | 0 | BLACK | | | 2 | 95.00 |
| 68404 | TANK | | S | 2 | HEATHER GREY | | | 4 | 68.00 |
| 98590 | V-NECK EASY TEE | | SU | 0 | BLACK | | | 2 | 65.00 |
| 120767 | BALBINA CREW NECK SWEATE | | A | XL | BAY LILY | | | 1 | 98.00 |
| 145009 | BALBINA CREW NECK SWEATE | | A | SM | BLACK BRAMBLE | | | 2 | 98.00 |
| 145008 | BALBINA CREW NECK SWEATE | | A | XS | BLACK BRAMBLE | | | 4 | 98.00 |
| 120791 | BALBINA CREW NECK SWEATE | | A | L | CASCADE | | | 2 | 98.00 |
| 145014 | BALBINA CREW NECK SWEATE | | A | M | COCHINEAL | | | 1 | 98.00 |
| 145013 | BALBINA CREW NECK SWEATE | | A | SM | COCHINEAL | | | 1 | 98.00 |
| 145012 | BALBINA CREW NECK SWEATE | | A | XS | COCHINEAL | | | 4 | 98.00 |

# Transfer Order

**MLG Retail LLC**
2/3/2020 3:09:17 PM

Transfer Number:  NYHQ-HO4 1108

| Source Store: | AGH Warehouse | Dest Store: | NYHQ | | | | | SHIP TO: |
|---|---|---|---|---|---|---|---|---|
| | 6 ETHAN ALLEN DR SUITE #4 SOUTH BURLINGTON  VT  05403 | | 38 E 29TH ST. 6TH FL NEW YORK  NY  10016 | | | | | SAMPLE SALE 1035 THIRD AVE NEW YORK, NY 10065 Time: 2/4/2020 9:57:26 AM Time: 2/4/2020 10:01:47 AM |

User:  STEPHANIE

| ItemNum | Description | Description 2 | Season | Size | Color | Comments | AGE GROUP | Qty | Retail Price |
|---|---|---|---|---|---|---|---|---|---|
| 120772 | BALBINA CREW NECK SWEATE | | A | XL | COSMOS | | | 3 | 98.00 |
| 145005 | BALBINA CREW NECK SWEATE | | A | SM | HOT CHESTNUT | | | 2 | 98.00 |
| 145004 | BALBINA CREW NECK SWEATE | | A | XS | HOT CHESTNUT | | | 6 | 98.00 |
| 120796 | BALBINA CREW NECK SWEATE | | A | L | LEMON SORBET | | | 4 | 98.00 |
| 71517 | BALBINA CREW NECK SWEATE | | A | XS | MIXED HERBS | | | 1 | 98.00 |
| 122602 | BALBINA CREW NECK SWEATE | | A | L | SILVER LINING | | | 3 | 98.00 |
| 120781 | BALBINA CREW NECK SWEATE | | A | L | SUNKISSED PINK | | | 2 | 98.00 |
| 120716 | BALDASSARE V NECK SWEATER | | A | L | BAY LILY | | | 2 | 98.00 |
| 120715 | BALDASSARE V NECK SWEATER | | A | M | BAY LILY | | | 6 | 98.00 |
| 71385 | BALDASSARE V NECK SWEATER | | A | L | CHROMIUM | | | 2 | 98.00 |
| 144980 | BALDASSARE V NECK SWEATER | | A | XS | COCHINEAL | | | 4 | 98.00 |
| 71377 | BALDASSARE V NECK SWEATER | | A | XS | STONE GROUND | | | 5 | 98.00 |

Total Qty: 335

# Exhibit G

# Transfer Order

**MLG Retail LLC**
2/6/2020 6:04:56 PM

Transfer Number: NYHQ-HO4 1109

| Source Store: | AGH Warehouse | Dest Store: | NYHQ | Comments | Sub Transfer created: NYHQ-HO4 1109 |
|---|---|---|---|---|---|

6 ETHAN ALLEN DR
SUITE #4
SOUTH BURLINGTON VT 05403

38 E 29TH ST. 6TH FL

NEW YORK NY 10016

PLEASE SHIP TO:

SAMPLE SALE
1035 THIRD AVE
NEW YORK, NY 10065
Time: 1/24/2020 3:50:22 PM
Time: 1/24/2020 3:59:13 PM
Time: 1/24/2020 4:03:50 PM
Time: 1/2

User: STEPHANIE

| ItemNum | Description | Description 2 | Season | Size | Color | AGE GROUP | Qty | Retail Price |
|---|---|---|---|---|---|---|---|---|
| 76434 | BAYLIN RIB L/S TEE | | A | XS | TANGERINE | | 1 | 44.00 |
| 76610 | BEKA JERSEY L/S TEE | | A | XS | BLACK | | 1 | 38.00 |
| 76612 | BEKA JERSEY L/S TEE | | A | M | BLACK | | 1 | 38.00 |
| 76620 | BEKA JERSEY L/S TEE | | A | M | H GREY | | 1 | 38.00 |
| 76659 | BEKA JERSEY L/S TEE | | A | S | FOREST | | 8 | 38.00 |
| 76663 | BEKA JERSEY L/S TEE | | A | S | TANGERINE | | 4 | 38.00 |
| 76695 | BIRGIT JERSEY ML FIT TEE | | A | S | BLACK | | 1 | 38.00 |
| 76750 | BIRGIT JERSEY ML FIT TEE | | A | XS | EGGPLANT | | 12 | 38.00 |
| 76852 | BRELAN THERMAL HOODIE WO PKT | | A | M | DENIM | | 1 | 54.00 |
| 76856 | BRELAN THERMAL HOODIE W PKT | | A | M | BLACK | | 1 | 58.00 |
| 76859 | BRELAN THERMAL HOODIE W PKT | | A | S | OPTIC WHITE | | 1 | 58.00 |
| 76863 | BRELAN THERMAL HOODIE W PKT | | A | S | H GREY | | 6 | 58.00 |
| 135213 | HYPERION | | A | OS | C7 | | 1 | 105.00 |
| 135224 | OWEN | | A | OS | C4 | | 1 | 105.00 |

Total Qty: 40

# Exhibit H





| Sku | Description | Description2 | Size | Attribute | Cost | Quantity | Ext Cost |
|---|---|---|---|---|---|---|---|
| 76382 | BAYLIN RIB L/S TEE | | XS | BLACK | 8.00 | 1 | 8.00 |
| 76383 | BAYLIN RIB L/S TEE | | S | BLACK | 8.00 | 19 | 152.00 |
| 76384 | BAYLIN RIB L/S TEE | | M | BLACK | 8.00 | 19 | 152.00 |
| 76385 | BAYLIN RIB L/S TEE | | L | BLACK | 8.00 | 4 | 32.00 |
| 76387 | BAYLIN RIB L/S TEE | | S | OPTIC WHITE | 8.00 | 5 | 40.00 |
| 76390 | BAYLIN RIB L/S TEE | | XS | H GREY | 8.00 | 23 | 184.00 |
| 76391 | BAYLIN RIB L/S TEE | | S | H GREY | 8.00 | 36 | 288.00 |
| 76392 | BAYLIN RIB L/S TEE | | M | H GREY | 8.00 | 36 | 288.00 |
| 76393 | BAYLIN RIB L/S TEE | | L | H GREY | 8.00 | 23 | 184.00 |
| 76394 | BAYLIN RIB L/S TEE | | XS | CHARCOAL | 8.00 | 23 | 184.00 |
| 76395 | BAYLIN RIB L/S TEE | | S | CHARCOAL | 8.00 | 38 | 304.00 |
| 76396 | BAYLIN RIB L/S TEE | | M | CHARCOAL | 8.00 | 39 | 312.00 |





# Exhibit 10

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

-------------------------------------------------------------x

ML FASHION, LLC and ML RETAIL, LLC,

              Plaintiffs,

       v.

NOBELLE GW LLC, STEPHANIE MENKIN, SARIT MAMAN NAGRANI, and NICOLAS GOUREAU,

              Defendants.

-------------------------------------------------------------x

:   Case No. 1:20-cv-05124

:   Hon. Steven C. Seeger

### DECLARATION OF GIOVANNI SENAFE

I, Giovanni Senafe, hereby declare, under penalty of perjury pursuant to 28 U.S.C. § 1746, as follows:

1.     I am the Vice President of Business Development and Real Estate for Plaintiffs ML Fashion, LLC ("ML Fashion") and ML Retail, LLC ("ML Retail") (collectively, "Plaintiffs"). I make this Declaration: (1) in opposition to the motion of Defendants Nobelle GW LLC ("Nobelle"), Stephanie Menkin ("Menkin"), Sarit Maman Nagrani ("Nagrani"), and Nicolas Goureau ("Goureau") (collectively, "Defendants") to dismiss the amended complaint in this action ("Complaint" or "Compl."); and (2) in support of Plaintiffs' responses to the Court's inquiries of January 19, 2021 (Dkt. No. 55).

2.     I have worked with Plaintiffs since in or about March 2017. Based on the positions I hold, I am familiar with the general activities and day-to-day operations of Plaintiffs.

**<u>Defendants' Operation of the Competing Nobelle Store</u>**

3.      In late August 2020, I became aware that Menkin and Nagrani started a new fashion store called Nobelle, located at 85 Greenwich Avenue, Greenwich, Connecticut (the "Greenwich Property").

4.      Nobelle's retail location at the Greenwich Property is a former ML Fashion storefront, which ML Fashion operated as a retail store until approximately May 8, 2020.  The Greenwich Property is also approximately 35 miles from ML Fashion's retail store located at 402 W. 13th Street in Manhattan, New York, which ML Fashion closed recently.

5.      A copy of the lease for ML Fashion's retail store at the Greenwich Property is annexed hereto as **Exhibit A**.

6.      ML Fashion's lease for the Greenwich Property never ended or terminated.  ML Fashion never received a notice of default or notice of lease termination from its landlord at the Greenwich Property, or any other communication from the landlord suggesting that its lease is no longer in effect.

7.      ML Fashion also never told the landlord or Defendants that ML Fashion would approve a new tenant using the property.

8.      As far as I am aware, no ML Fashion employee discussed the fixtures, furniture, or equipment ("FFE") in the Greenwich Property with landlord at all, and certainly never told the landlord that ML Fashion was abandoning the FFE.

9.      Although ML Fashion's landlord is not currently demanding rent from ML Fashion, ML Fashion has no way of knowing whether the landlord is continuing to accrue rent under ML Fashion's name even while Nobelle is operating at the property.

**Defendants' Competing Business is Causing Confusion**

10.    I believe that Nobelle is sowing confusion in the marketplace, causing consumers and others in the industry to believe that Nobelle is a subsidiary of, other otherwise affiliated with, ML Fashion or with Lemonis personally.

11.    Nobelle's web address (shopnobelle.com) is quite similar to the website ML Fashion uses to sell goods to consumers nationwide under the MARCUS brand (shopmarcus.com) in that both websites append "shop" in front of the store name (Nobelle and MARCUS, respectively).  Under the circumstances here, where Nobelle is selling the same and similar products, the fact that they also chose to mirror ML Fashion's website address is telling.  I believe those factors, without more, would cause consumers to believe that Nobelle is authorized by, or affiliated with, ML Fashion when, in fact, it is not.

12.    There is more, however.  Menkin is expressly leveraging her association with ML Fashion to promote Nobelle.  As shown in the following screenshot, Menkin's Instagram page refers to her as the "Founder [of] ML Fashion," followed immediately by "also JUST LAUNCHED @shopnobelle":



13.    Menkin is deliberately using her association with ML Fashion to confuse consumers about whether Nobelle is affiliated with ML Fashion.

14.    And it has worked.  Since in or about late 2020, ML Fashion has been receiving calls from vendors about unpaid bills or about where to ship certain goods that have turned out to be for Nobelle.  Based upon these discussions, I believe that vendors are extending credit to Nobelle for trade goods based upon the vendors' mistaken assumption that Nobelle's debts are being backed by me or by Plaintiffs.

15.    If sophisticated vendors active in the fashion industry are confused about whether Nobelle's operations have been authorized by Plaintiffs, then it is very likely that average consumers will be equally or even more confused by Defendants' conduct.

### **Defendants' Theft of Trade Secrets and Computers**

16.    Defendants have attempted to make their competing enterprise more successful by stealing data and information from certain ML Fashion-owned computers and seizing, and refusing to return, the computers.  These computers were located in a locked office in an ML Fashion-rented building New York, which ML Fashion was in the process of closing in order to move to a shared workspace operated by WeWork.  The office was not open to the general public, and could only be accessed by individuals with the proper authorization and with a key to get into the room.

17.    I had a conversation with Menkin in which I advised her that ML Fashion was closing the office.  Apparently, upon learning that ML Fashion was closing the office, she took the opportunity to go into the office herself, or have an accomplice do so, in order to take the computers for herself, rather than transfer the computers to another ML Fashion location.

18.    Plaintiffs' Complaint almost certainly understates the amount of information, inventory, and other ML Fashion property taken by Defendants.  Because of their access to ML Fashion's systems and records during the period in which they were taking inventory from ML

Fashion, Menkin and Nagrani had the ability to cover their tracks by, among other things, altering or deleting ML Fashion's records.

Pursuant to 28 U.S.C. § 1746, I state under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed this ___3rd___ day of February, 2021.

_____
Giovanni Senafe

# Exhibit A

**THIS LEASE,** dated the 8 day of ~~February,~~ *MARCH* 2016

*Parties:* Between **Sutton Land, LLC** , a Florida Limited Liability Company having offices at 87 Greenwich Ave., Greenwich, CT 06830, hereinafter referred to as the **Landlord**, and **Gooberry Corporation dba Denim & Soul**, a New York corporation **having offices at 38 East 29th Street , 6th Floor, New York, New York 10006 , hereinafter** referred to as the **Tenant**. *Premises:* WITNESSETH: That the Landlord hereby demises and leases unto the Tenant, and the Tenant hereby hires and takes from the Landlord for the term and upon the rentals hereinafter specified, the premises described as follows: the retail **store comprising approximately 1075 square feet of space at 85 Greenwich Avenue**, situated in the Town of **Greenwich**, County of **Fairfield**, State of **Connecticut** .

*Term:* The term of this demise shall be for **Five years** beginning **May 1, 2016 and expiring April 30, 2021.**

*Rent:* The base annual rent is to be paid monthly, in advance, on the first day of each calendar month, except as set forth below:

**Year One: Commencing on May 1, 20016 through April 30, 2017, Tenant shall pay base annual rent equal to Nine Thousand Five Hundred Forty Eight Dollars ($9,548.00) per month ( $114,576.00 annually) .**

**Year Two, Commencing May 1, 2017: Nine Thousand Eight Hundred Thirty Five Dollars ($9,835.00.) Dollars ($118,020.00 annually)**

**Year Three, Commencing May 1, 2018: Ten Thousand One Hundred Thirty ($10,130.00) Dollars ($121,560.00 annually)**

**Year Four, Commencing May 1, 2019: Ten Thousand Four Hundred Thirty Three ($10,433.00) Dollars ($125,196.00 annually)**

**Year Five, Commencing May 1, 2020: Eleven Thousand Two Hundred Fifty Five ($10, 746.00) Dollars ($128,952.00 annually)**

Said rent shall be paid at the office of **Sutton Land, LLC, 87 Greenwich Ave., Greenwich, CT 06830,** or as may be otherwise directed by the Landlord in writing.

## THE ABOVE LETTING IS UPON THE FOLLOWING CONDITIONS:

First: *Peaceful Possession:* The Landlord covenants that the Tenant, on paying the said rental and performing the covenants and conditions in this Lease contained, shall and may peaceably and quietly have, hold and enjoy the demised premises for the term aforesaid.

**Second:** *Purpose:* The Tenant covenants and agrees to use the demised premises as a store selling men's and women's clothing and accessories.

**Third:** *Default in Payment of Rent, Abandonment of Premises, Re-entry and Reletting by landlord, Tenant Liable for Deficiency, Lien of Landlord to Secure, Performance Attorney's Fees*:

The Tenant shall, without any previous demand therefore, pay to the Landlord, or its agent, the said rent at the times and in the manner above provided. In the event of the non-payment of said rent, or any installment thereof, at the times and in the manner above provided, Landlord shall have all available remedies permitted by law. I If the leased premises shall be deserted or vacated, the Landlord or its agents shall have the right to and may enter the said premises either by force or otherwise, without being liable for any prosecution or damages therefor, and may re-let the premises, and receive the rent therefor, upon such terms as shall be satisfactory to the Landlord, and all rights of the Tenant to repossess the premises under this lease shall be forfeited. Such re-entry by the Landlord shall not operate to release the Tenant from any rent to be paid or covenants to be performed hereunder during the full term of this lease. For the purpose of re-letting, the landlord shall be authorized to make such repairs or alterations in or to the leased premises as may be necessary to place the same in good order and condition. The Tenant shall be liable to the Landlord for the cost of such repairs or alterations, and all expenses of such re-letting. The Tenant shall not be entitled to any surplus accruing as the result of the re-letting. The landlord shall have the right to take possession of any furniture, fixtures or other personal property of the Tenant found in or about the premises, and sell the same at public or private sale and to apply the proceeds thereof to the payment of any monies becoming due under this lease, the Tenant hereby waiving the benefit of all laws exempting property from execution, levy and sale on distress or judgment. The Tenant agrees to pay, as additional rent, all reasonable attorneys' fees and other expenses incurred by the Landlord in enforcing in litigation any of the obligations under this lease.

**Fourth:** *Sub-letting and Assignment:* The Tenant shall not sub-let the demised premises nor any portion thereof, nor shall this lease be assigned by the Tenant without the prior written consent of the Landlord endorsed hereon. Said consent shall not be unreasonably withheld.

**Fifth:** *Condition of Premises, Repairs, alterations and Improvements, Sanitation, Inflammable Materials, Sidewalks:* The Tenant has examined the demised premises, and accepts them in their present condition (except as otherwise expressly provided in the Rider to Lease ) and without any representations on the part of the Landlord or its agents as to the present or future condition of the said premises. The Tenant shall keep the demised premises in good condition. The Tenant shall quit and surrender the premises at the end of the demised term in as good condition as the reasonable use thereof will permit. The Tenant shall not make any alterations, additions, or improvements to said premises without the prior written consent of the Landlord, which

consent shall not be unreasonably withheld. All erections, alterations, additions and improvements, whether temporary or permanent in character, which may be made upon the premises either by the Landlord or the Tenant, except furniture, office equipment or movable trade fixtures installed at the expense of the Tenant, shall be the property of the Landlord and shall remain upon and be surrendered with the premises as a part thereof at the termination of this Lease, without compensation to the Tenant. The Tenant further agrees to keep said premises and all parts thereof in a clean and sanitary condition and free from trash, inflammable material and other objectionable matter. Landlord agrees to keep the building in which the demised premises are located in good condition and repair during the term.

Sixth: *Mechanics' Liens:* In the event that any mechanics' lien is filed against the premises as a result of alterations, additions or improvements made by the Tenant or for any other reason, the Landlord, at its option, after thirty days' notice to the Tenant, may terminate this lease and may pay the said lien, with-out inquiring into the validity thereof, unless the tenant posts bond or other appropriate security with a court so that it may contest such lien, and the Tenant shall forthwith reimburse the Landlord for the total expense incurred by the Landlord as to said lien, as additional rent hereunder.

Seventh: *Glass:* The Tenant agrees to replace at the Tenant's expense any and all glass which may become broken as a result of the Tenant's negligence in and on the demised premises.

Eighth: *Liability of Landlord*: The Landlord shall not be responsible for the loss of or damage to property, or injury to persons, occurring in or about the demised premises, by reason of the acts, omissions or negligence of the tenant or other persons or tenants in and about the said premises. The Tenant agrees to indemnify and save the Landlord harmless from all claims and liability for losses of or damage to property, or injuries to persons occurring in or about the demised premises except arising from or relating to acts , omissions or negligence of the Landlord.
Tenant shall provide Landlord with proof of adequate Tenant insurance.

Ninth: *Services and Utilities:* Utilities and services furnished to the demised premises for the benefit of the Tenant shall be provided and paid for as follows: Water per separate meter by the Landlord; gas per separate meter by the Tenant; electricity per separate meter by the Tenant; heat per separate meter by the Tenant;; hot water per separate meter by the Tenant; cleaning by the Tenant; refuse collection by the Tenant. . The Landlord shall not be liable for any interruption or delay in any of the above services for any reason outside of his control.

Tenth: *Right to Inspect and Exhibit:* The Landlord, or its agents, shall have the right to enter the demised premises, upon reasonable notice to Tenant, at reasonable hours in the day or night to examine the same, or to run telephone or other wires, or to make such repairs, additions or alternations as it shall deem necessary for the safety, preservation or restoration of the improvements, or for the safety or convenience of the occupants or users thereof (there being no obligation, however, on the part of the

Case 2:20-cv-05212-DRH-ARL Document #: 7-21 Filed: 02/07/20 Page 259 of 266 PageID #: 2086

Landlord to make any such repairs, additions or alterations) or to exhibit the same to prospective purchasers and put upon the premises a suitable "For Sale" sign, provided that the Landlord gives reasonable advance notice to the Tenant in each instance and does not interfere with the normal operations of the tenant's business, except that no notice shall be required for an entry necessary to prevent imminent harm to persons or property. For three months prior to the expiration of the demised term and upon reasonable notice to Tenant, the Landlord, or its agents, may similarly exhibit the premises to prospective tenants, and may place the usual "To Let" signs thereon.

Eleventh: *Damage by Fire, Explosion, The Elements or Otherwise:* In the event of the destruction of the demised premises or the building containing the said premises by fire, explosion, the elements or otherwise during the term hereby created, or previous thereto, or such partial destruction thereof as to render the premises wholly un-tenantable or unfit for occupancy, or should the demised premises be so badly injured that the same cannot be repaired within ninety days from the happening of such injury, then and in such case the term thereby created shall, at the option of the Landlord, cease and become null and void from the date of such damage or destruction, and the Tenant shall immediately surrender said premises and all the Tenant's interest therein to the Landlord, and shall pay rent only to the time of such surrender. In which event the Landlord may re-enter and re-possess the premises thus discharged from this lease and may remove all parties therefrom. Should the demised premises be rendered un-tenantable and unfit for occupancy, but yet repairable within ninety days from the happening of said injury, the Landlord may enter and repair the same with diligent and reasonable speed, and the rent shall not accrue after said injury or while repairs are being made, but shall recommence immediately after said repairs shall be completed and after Tenant re-occupies the premises and is able to conduct business in a commercially reasonable manner. But if the premises shall be so slightly injured as not to be rendered un-tenantable and unfit for occupancy, then the Landlord agrees to diligently repair the same with reasonable promptness and in that case the rent accrued and accruing shall not cease or determine. The Tenant shall immediately notify the Landlord in case of fire or other damage to the premises.

Twelfth: *Observation of Laws, Ordinances, Rules and Regulations*: The Tenant agrees to observe and comply with all laws, ordinances, rules and regulations of the Federal, State, County and Municipal authorities applicable to the business to be conducted by the Tenant in the demised premises. The Tenant agrees not to do or permit anything to be done in said premises, or keep anything therein, which will increase the rate of fire insurance premiums on the improvements or any part thereof, or on property kept therein, or which will obstruct or interfere with the rights of other tenants, or conflict with the regulations of the Fire Department or with any insurance policy upon said improvements or any part thereof. In the event of any increase in insurance premiums resulting from the Tenant's occupancy of the premises, or from any act or omission on the part of the Tenant, the Tenant agrees to pay said increase in insurance premiums on the improvements or contents thereof as additional rent.

Thirteenth: *Signs:* No sign, advertisement or notice shall be affixed to or place upon any part of the demised premises by the Tenant, except in such manner, and of such size, design and color as shall be approved in advance in writing by the Landlord, such approval shall not be unreasonably withheld. Notwithstanding the foregoing, Landlord hereby agrees to allow Tenant to install a new awning on the premises with Tenant's name and logo upon it. Further, Landlord hereby agrees to allow Tenant to shorten the length of the awning, but its starting point, so that Tenant can increase the visibility of the top of its window display and so that greater sunlight may enter the premises. Any and all changes to said awning are subject to the written approval of the Town of Greenwich.

Fourteenth: *Subordination to Mortgages and Deeds of Trust:* This lease is subject and is hereby subordinated to all present and future mortgages, deeds of trust and other encumbrances affecting the demised premises or the property of which said premises are a part. The Tenant agrees to execute, at the Landlord's expense, any instrument which may be deemed necessary or desirable by the Landlord to further effect the subordination of this lease to any such mortgage, deed of trust or encumbrance

Fifteenth: *Rules and Regulations of Landlord:*     Subject to the provisions of Article Twelve above, the reasonable rules and regulations which shall be made by the Landlord and provided in writing to the Tenant, shall be observed by the Tenant and by the Tenant's employees, agents and customers. The Landlord reserves the right to make such other and further reasonable rules and regulations as, in its judgment, may from time to time be desirable for the safety, care and cleanliness of the premises, and for the preservation of good order therein, which rules, when so made and notice thereof given to the Tenant, shall have the same force and effect as if originally made a part the original terms and conditions of this lease. Such other and further rules shall not, however, be inconsistent with the proper and rightful enjoyment by the Tenant of the demised premises.

Sixteenth:    *Violation of Covenants, Forfeiture of Lease, Re-entry by Landlord, Non-waiver of Breach::* In case of violations by the Tenant of any of the covenants, agreements and conditions of this lease, or of the rules and regulations now or hereafter to be reasonably established by the Landlord, Tenant shall commence rectification of the violation or default within Ten (10) days after written notice thereof is given to Tenant by Landlord. Tenant shall cure said violation within Twenty (20) days of said notice from Landlord. In the event Tenant has not cured said violation or default within Twenty (20) days from notice by Landlord through no fault of its own then this lease shall thenceforth, at the option of the Landlord, become null and void, and the Landlord may re-enter without further notice or demand. The rent in such case shall become due, be apportioned and paid on and up to the day of such re-entry, and the Tenant shall be liable for all loss or damage resulting from such violation as aforesaid. No waiver by the Landlord of any violation or breach of condition by the Tenant shall constitute or be construed as a waiver of any other violation or breach of condition, nor shall lapse of time after breach of condition by the Tenant before the Landlord shall exercise its option under this paragraph operate to defeat the right of the Landlord to declare this lease null

and void and to re-enter upon the demised premises after the said breach or violation and appropriate notice.

Seventeenth: *Notices:* All notices services and demands, legal or otherwise, provide for under or incidental to this lease, or the occupation of the demised premises, shall be in writing. If the Landlord or its agent desires to give or serve upon the Tenant any notice or demand, it shall be sufficient to send a copy thereof by registered or certified mail, addressed to the Tenant at the demised premises. Notices from the Tenant to the Landlord shall be sent by registered of certified mail or delivered to the Landlord at the place hereinbefore designated for the payment of rent, or to such party or place as the Landlord may from time to time designate in writing.

Eighteenth: *Bankruptcy, Insolvency, Assignment for Benefit of Creditors*: It is further agreed that if at any time during the term of this lease the Tenant shall make any assignment for the benefit of creditors, or be decreed insolvent or bankrupt according to law, or if a receiver shall be appointed for the Tenant, then the Landlord may, at its option, terminate this lease, exercise of such option to be evidenced by notice to that effect served upon the assignee, receiver, trustee or other person in charge of the liquidation of the property of the Tenant or the Tenant's estate, but such termination shall not release or discharge any payment of rent payable hereunder and then accrued, or any liability then accrued by reason of any agreement or covenant herein contained on the part of the Tenant, or the Tenant's legal representative.

Nineteenth: *Holding Over by Tenant:* In the event that the Tenant shall remain in the demised premises after the expiration of the term of this lease without having executed a new written lease with the Landlord, such holding over shall not constitute a renewal or extension of this lease. The Landlord, may at its option, elect to treat the Tenant as one who has not removed at the end of his term, and thereupon be entitled to all the remedies against the Tenant provided by law in that situation, or the Landlord may elect, at its option, to construe such holding over as a tenancy from month to month, subject to all the terms and conditions of this lease, except as to duration thereof, and in that event the Tenant shall pay monthly rent in advance at the rate provided herein as effective during the last month of the demised term.

Twentieth: *Eminent Domain, Condemnation:* If the property or any part thereof wherein the demised premises are located shall be taken by public or quasi-public authority under any power of eminent domain or condemnation, this lease, at the option of the Landlord, shall forthwith terminate and the Tenant shall have no claim or interest in or to any award of damages for such taking.

Twenty-first: *Security:* The Tenant shall deposit with the Landlord prior to taking occupancy the sum of **$18,000.00** as security for the full and faithful performance by the Tenant of all the terms, covenants and conditions of this lease upon the Tenant's part to be performed, which said sum shall be returned to the Tenant after the time fixed as the expiration of the term herein, provided the Tenant has fully and faithfully carried out all of the said terms, covenants and conditions on Tenant's part to be performed. In

the event of a bona fide sale, subject to this lease, the Landlord shall have the right to transfer the security to the vendee for the benefit of the Tenant and the Landlord shall be considered released by the Tenant from all liability for the return of such security; and the Tenant agrees to look to the new Landlord solely for the return of the said security, and it is agreed that this shall apply to every transfer or assignment made of the security to a new Landlord, provided that for each bona fide sale, Landlord shall have secured from each vendee a letter acknowledging receipt and transfer of Tenant's security to be held by said vendee for the benefit of Tenant.. The security deposited under this lease shall not be mortgaged, assigned or encumbered by the Tenant without the written consent of the Landlord.

Twenty-second: DELETED

Twenty-third: *Delivery of Lease:* No rights are to be conferred upon the Tenant until this lease has been signed by the Landlord, and an executed copy of the lease has been delivered to the Tenant.

Twenty-fourth: *Lease Provisions Not Exclusive:* The foregoing rights and remedies are not in-tended to be exclusive but as additional to all rights and remedies the Landlord would otherwise have by law..

Twenty-fifth: *Lease Binding on Heirs, Successors, Etc.* All of the terms, covenants and conditions of this lease shall inure to the benefit of and be binding upon the respective heirs, executors, administrators, successors and assigns of the parties hereto. However, in the event of the death of the Tenant, if an individual, the Landlord may, at its option, terminate this lease by notifying the executor or administrator of the Tenant at the demised premises.

Twenty-sixth: This lease and the obligation of Tenant to pay rent hereunder and perform all of the other covenants and agreements hereunder on part of Tenant to be performed shall in nowise be affected impaired or excused because Landlord is unable to supply or is delayed in supplying any service expressly or impliedly to be supplied or is unable to make, or is delayed in making any repairs, additions, alternations or decorations or is unable to supply or is delayed in supplying any equipment or fixtures if Landlord is prevented or delayed from so doing by reason of governmental preemption in connection with the National Emergency declared by the President of the United States or in connection with any rule, order or regulation of any department or subdivision thereof of any governmental agency or by reason of the conditions of supply and demand which have been or are affected by the war or other civil disturbance.

Twenty-seventh: *Changes:* This instrument may not be changed except through an additional written instrument signed by the duly authorized representatives of both parties.

Twenty- Eighth: Prior to lease signing the Tenant will provide Landlord with the name of a properly authorized agent for service of process in the State of Connecticut and a

certificate showing that the Tenant is registered to do business in the State of Connecticut.

**SEE RIDER FOR LEASE**
**IN WITNESS WHEREOF,** the said Parties have hereunto set their hands and seals the day and year first above written:

Witness:                                          Sutton Land, LLC

                                                  By _Stanford Guy Sutton_
                                                  Stanford Guy Sutton, Managing Member

                                                  Gooberry Corporation

                                                  By _____



## RIDER FOR LEASE FROM SUTTON LAND LLC TO GOOBERRY CORPORATION

**Twenty-Ninth** – Tenant shall be given a credit against the rent ($9,548.00) plus additional rent for real estate taxes ( $1,051.54) due for May 2016 in the amount of $10,599.54.

**Thirtieth**- Tenant agrees and covenants that Landlord shall not be responsible for any damage done to any property of Tenant or anyone else in, or under the aforesaid premises regardless whether said damage is caused by water or otherwise; it being fully understood by the Tenant and Tenant agrees to assume the risk of any such damage, irrespective of the cause.

**Thirty-first**: Landlord shall at Landlord's own cost and expense, make all necessary structural repairs to the building upon the premises and also all necessary repairs to the roof and to the exterior of said premises so as to maintain the same at all times in good order and condition. Tenant shall make any and all necessary repairs, at his own cost and expense, to the interior of said demised premises so as to maintain the same at all times in good order and condition .Interior shall include plumbing, electrical, wiring, air conditioning, heating, flooring and the rear and front entrance doors.

**Thirty-second**: The Tenant agrees that it shall pay as additional rent, sixteen (16 %) percent of the real property taxes on the entire premises of which the demised premises are part during the lease term in monthly installments. The real property and sewer taxes for the tax year ending 6/30/14 are $78,865.72 .The monthly share is currently $1051.54.

JS 44 (Rev. 10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

ML FASHION, LLC and ML RETAIL, LLC

**DEFENDANTS**

NOBELLE GW, LLC, STEPHANIE MENKIN, SARIT MAMAN NAGRANI, and NICOLAS GOUREAU

**(b)** County of Residence of First Listed Plaintiff    Lake County, Illinois
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Greenwich, Connecticut
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Seyfarth Shaw LLP, 620 Eighth Avenue, New York, New York 10018 (212) 218-5500

Attorneys *(If Known)*

Gerard Fox Law P.C., 1880 Century Park East, Suite 1410, Los Angeles, California 90067, (310) 441-0500

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | |
|---|---|---|
| ☐ 1 U.S. Government Plaintiff | ☒ 3 Federal Question *(U.S. Government Not a Party)* | |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)* | |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | 625 Drug Related Seizure of Property 21 USC 881 | 422 Appeal 28 USC 158 | 375 False Claims Act |
| 120 Marine | 310 Airplane | 365 Personal Injury - | 690 Other | 423 Withdrawal 28 USC 157 | 376 Qui Tam (31 USC 3729(a)) |
| 130 Miller Act | 315 Airplane Product Liability | Product Liability | | | 400 State Reapportionment |
| 140 Negotiable Instrument | 320 Assault, Libel & | 367 Health Care/ Pharmaceutical | | **PROPERTY RIGHTS** | 410 Antitrust |
| 150 Recovery of Overpayment & Enforcement of Judgment | Slander | Personal Injury | | 820 Copyrights | 430 Banks and Banking |
| 151 Medicare Act | 330 Federal Employers' Liability | Product Liability | | 830 Patent | 450 Commerce |
| 152 Recovery of Defaulted Student Loans (Excludes Veterans) | 340 Marine | 368 Asbestos Personal Injury Product Liability | | 835 Patent - Abbreviated New Drug Application | 460 Deportation |
| | 345 Marine Product Liability | **PERSONAL PROPERTY** | | 840 Trademark | 470 Racketeer Influenced and Corrupt Organizations |
| 153 Recovery of Overpayment of Veteran's Benefits | 350 Motor Vehicle | 370 Other Fraud | **LABOR** | ☒ 880 Defend Trade Secrets Act of 2016 | 480 Consumer Credit (15 USC 1681 or 1692) |
| 160 Stockholders' Suits | 355 Motor Vehicle Product Liability | 371 Truth in Lending | 710 Fair Labor Standards Act | | 485 Telephone Consumer Protection Act |
| 190 Other Contract | 360 Other Personal Injury | 380 Other Personal Property Damage | 720 Labor/Management Relations | **SOCIAL SECURITY** | 490 Cable/Sat TV |
| 195 Contract Product Liability | 362 Personal Injury - Medical Malpractice | 385 Property Damage Product Liability | 740 Railway Labor Act | 861 HIA (1395ff) | 850 Securities/Commodities/ Exchange |
| 196 Franchise | | | 751 Family and Medical Leave Act | 862 Black Lung (923) 863 DIWC/DIWW (405(g)) | 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | 790 Other Labor Litigation | 864 SSID Title XVI | 891 Agricultural Acts |
| 210 Land Condemnation | 440 Other Civil Rights | **Habeas Corpus:** | 791 Employee Retirement Income Security Act | 865 RSI (405(g)) | 893 Environmental Matters |
| 220 Foreclosure | 441 Voting | 463 Alien Detainee | | | 895 Freedom of Information Act |
| 230 Rent Lease & Ejectment | 442 Employment | 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | 896 Arbitration |
| 240 Torts to Land | 443 Housing/ Accommodations | 530 General | | 870 Taxes (U.S. Plaintiff or Defendant) | 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| 245 Tort Product Liability | 445 Amer. w/Disabilities - Employment | 535 Death Penalty | **IMMIGRATION** | 871 IRS—Third Party 26 USC 7609 | 950 Constitutionality of State Statutes |
| 290 All Other Real Property | 446 Amer. w/Disabilities - Other | **Other:** | 462 Naturalization Application | | |
| | 448 Education | 540 Mandamus & Other 550 Civil Rights 555 Prison Condition 560 Civil Detainee - Conditions of Confinement | 465 Other Immigration Actions | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | | |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity):*
15 U.S.C. § 1125, 18 U.S.C. §§ 1034, et seq., 18 U.S.C. §§ 1832, 1836, et seq., 28 U.S.C. § 1367

Brief description of cause:
False advertising, unfair competition, misappropriation of trade secrets, computer fraud, and state-law claims.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:

JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE    Judge Mary Kay Vyskocil
Judge Michael F. Otto

DOCKET NUMBER    1:20-cv-4691 (S.D.N.Y.)
2020-L-012546 (Cook Cty. Cir. Ct.)

DATE    04/09/2021

SIGNATURE OF ATTORNEY OF RECORD    */s/ Karen Y. Bitar*

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)**   **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

  **(b)**   **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

  **(c)**   **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**   **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.)**

**III.**   **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**   **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.**   **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.**   **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.**   **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**   **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.